**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, et al., | No. CV-21-01444-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Pending before the Court are four motions to dismiss filed by Defendants Aurora Behavioral Healthcare Tempe LLC ("Aurora") (Doc. 22), Krzysztof Mlak ("Mlak") (Doc. 42), Kattia Luevano ("Luevano") (Doc. 46), and Helen Nagle ("Nagle") (Doc. 47). All four motions are fully briefed, and the Court now issues its decision.[1]

## I.     Background[2]

As alleged in the First Amended Complaint ("FAC"), Plaintiff Christine Scianna ("Christine") is the mother of Plaintiff Brooke Scianna ("Brooke").  (Doc. 17 at ¶ 23). Brooke "is a non-verbal, severely autistic individual."  (*Id.* at ¶ 24).  Beginning in April 2018, several individuals contacted Defendant Arizona Department of Child Safety ("DCS") and reported, falsely, that Christine was not taking proper care of Brooke.  (*Id.* at

---

[1] Aurora requested oral argument on this matter.  (Doc. 22 at 1).  The Court finds that the issues have been fully briefed and oral argument will not aid the Court's decision. Therefore, the Court will deny the request for oral argument.  *See* Fed. R. Civ. P. 78(b) (court may decide motions without oral hearings); LRCiv 7.2(f) (same).

[2] The Court bases this background on the FAC's allegations, which it must take as true at the motion to dismiss phase. *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001).

¶¶ 43, 84).   The first report took place in April 2018, when a program that assists the mentally ill contacted DCS under the mistaken assumption that Christine had refused to let Brooke go to the hospital after an incident at Brooke's school.   (*Id.* at ¶ 43).   A DCS investigator then went to Christine's home and questioned her about this incident.   (*Id.* at ¶ 56).   In June 2018, an anonymous caller contacted DCS and falsely reported that Christine was "leaving Brooke wandering in the streets" and that a friend of Christine's was choking Brooke, when in reality he was just placing Brooke in "an appropriate safety restraining hold that he had been taught by qualified personnel."   (*Id.* at ¶¶ 74, 84).

On June 13, 2018, Christine met with a DCS investigator who told Christine "it was her intention to place Brooke in a group home and that if Christine did not consent to that plan, then she would just take action to remove Christine's parental rights."   (*Id.* at ¶ 94).   Christine refused, and the DCS investigator "seized Brooke" and placed her in a group home.   (*Id.* at ¶¶ 107, 117, 125).   DCS then filed a dependency petition, and on July 2, 2018, an Arizona juvenile court ordered that Brooke continue as a "temporary ward of the Court, committed to the care, custody and control" of DCS.   (*Id.* at ¶¶ 135, 140).   While at the group home, Plaintiffs allege that Brooke was taken to a hospital where she was neglected or even abused.   (*See id.* at ¶¶ 204–07).

In August 2018, Brooke was transferred to Aurora's facility.   (*Id.* at ¶ 212).   Around that time, Defendant Nagle, an Aurora employee, informed Christine that Brooke would be tested for tuberculosis.   (*Id.* at ¶ 387).   In September 2018, a DCS employee authorized "Defendant Mlak, Brooke's treating physician, to administer Haldol to Brooke as part of her mental health treatment."   (*Id.* at ¶ 221).   Christine alleges she did not consent to the tuberculosis test nor to the administration of Haldol.   (*Id.* at ¶¶ 221, 387).

In November 2018, the Arizona juvenile court granted Christine's request that Brooke be discharged from Aurora and placed with Christine.   (*Id.* at ¶ 227).   And in February 2019, DCS filed a motion to dismiss the dependency proceedings after observing that Brooke had been doing well with Christine.   (*Id.* at ¶¶ 229–30).   The court granted the motion and dismissed all proceedings.   (*Id.* at ¶ 234).

Plaintiffs originally filed this action in Maricopa County Superior Court in July 2021. (Doc. 1-4). Defendants removed to this Court on the basis of federal question jurisdiction. (Doc. 1). Plaintiffs then filed their FAC against many different Defendants alleged to be involved in Brooke's removal and treatment. The original Complaint and the FAC bring federal claims, such as violations of 42 U.S.C. § 1983, thus providing this Court with original jurisdiction. *See* 28 U.S.C. § 1331. Several Defendants have moved to dismiss parts of the FAC under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim.

## II.    Legal Standard

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of a claim. *Cook v. Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011). Complaints must make a short and plain statement showing that the pleader is entitled to relief for its claims. Fed. R. Civ. P. 8(a)(2). This standard does not require "'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not generally require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555. A complaint must "state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Dismissal of a complaint for failure to state a claim can be based on either the "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). In reviewing a motion to dismiss, "all factual allegations set forth in the complaint 'are taken as true and construed in the light most favorable to the plaintiffs.'" *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001) (quoting *Epstein v. Wash. Energy Co.*, 83 F.3d 1136, 1140

1  (9th Cir. 1996)).  But courts are not required "to accept as true a legal conclusion couched
2  as a factual allegation."  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S.
3  265, 286 (1986)).

4  **III.   Analysis**

5      **a.   DCS' Authority to Consent to Treatment**

6      The first issue the Court will address is raised in all of the motions: whether DCS
7  had the authority to consent to the administration of the antipsychotic drug Haldol and a
8  tuberculosis test on Brooke's behalf.  (Docs. 22 at 4; 43 at 4; 46 at 6; 47 at 5).  Defendants
9  argue that DCS, as Brooke's custodian, had the legal authority to consent to these
10  treatments and that any claim based on a lack of consent must be dismissed.

11      The parties do not dispute that DCS was appointed Brooke's custodian by the
12  Arizona juvenile court.  (Doc. 17 at ¶ 140).  By statute, a custodian is a court-appointed
13  entity tasked with the "responsibility to provide adequate" medical care to the child
14  "provided that" this responsibility is "exercised subject to the powers, rights, duties and
15  responsibilities of the guardian of the person and subject to the residual parental rights and
16  responsibilities if they have not been terminated by judicial decree."  A.R.S. §§  8-531(4),
17  (5).[3]  Of note, a guardian, which the parties agree DCS is not, has the statutory authority to
18  consent to "major" medical and psychiatric treatment on a minor's behalf.  A.R.S. § 8-
19  531(8)(a).

20      With these definitions in mind, Plaintiffs assume that DCS is precluded from
21  consenting to "major" medical and psychiatric treatments.  They argue the treatments DCS
22  authorized went beyond the scope of its duty to provide "adequate" treatment and were so
23  "major" that only a guardian could consent to their administration.  For example, Plaintiffs
24  argue Haldol is a major treatment because it "is a prescription-only anti-psychotic

---

[3] Plaintiffs argued in a responsive briefing that Defendant Aurora Behavioral healthcare-Tempe, LLC's Motion to Dismiss misrepresents this section of Arizona law and warrants sanctions under Federal Rule of Civil Procedure 11.  (Doc. 26 at 7–9).  The Court finds no such misrepresentation.  The Court warns Plaintiffs that a motion for sanctions under Rule 11 must, among other requirements, "be made separately from any other motion . . . ."  Fed. R. Civ. P. 11(c).  Plaintiffs would do well to abide by Rule 11 when accusing others of violating it.

- 4 -

medication with a potential for severe and permanent side-effects . . . ."  (Doc. 26 at 6–7).

Plaintiffs also maintain that the tuberculosis test is a major treatment, despite conceding that "for an otherwise healthy minor child" such a test is not a major medical treatment. (Doc. 66 at 6).  Nevertheless, they assert that because Brooke "has suffered from severe autism for her entire life" a tuberculosis test is, for her, a major medical treatment.  (*Id.*) Defendants argue that the administration of Haldol and the tuberculosis test are treatments that fall within DCS' duty to provide adequate care.

In considering where to draw the limits of DCS' authority, the Court starts by examining the lower boundary.  There, the Court makes the unremarkable finding that adequate care includes, at the very least, enough care to keep a child alive.  But adequate care must also include something more than naked survival.  Afterall, the statute charges DCS with providing "adequate" food, clothing, shelter, and education.  *See* A.R.S. § 8-531(5)(c).  The question, then, is at what point does care for a child go beyond what is adequate, if such a point even exists.

So far, the Court finds the parties' briefing fails to offer a satisfactory answer. Specifically, the Court doubts the assumption that DCS is precluded from consenting to "major" treatments.  To some extent, the assumption makes sense because only guardians have the explicit statutory authority to consent to "major" treatment.  A.R.S. § 8-531(8)(a). But this assumption may rely on a false dichotomy.  As Plaintiffs agree, there are no Arizona cases evaluating "*adequate* versus *major medical* care by DCS."  (Doc. 59 at 7) (citing Doc. 43 at 6).[4]  Such an absence may be because medical and psychiatric treatment can be both major and adequate, such as life-saving surgery after a car accident, just as treatment may be both minor and beyond adequate, such as the removal of a wart for cosmetic purposes.  It seems that the provision of adequate care may necessarily entail major treatment.  Viewed in this light, the parties have not presented the Court with any support for the proposition that DCS may not consent to major medical and psychiatric care.

---

[4] The Court as well, conducting its own research, cannot find any caselaw on this point.

Perhaps the difficulty lies in what "major" means. Plaintiffs try to craft their own definition of "major," but they fail to cite cases that address what the *Arizona legislature* meant when it gave DCS authority to provide adequate treatment in A.R.S. § 8-531(5). (*See* Doc. 26 at 6) (citing *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (holding, in a case that originated in California, that "the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations"); *Diana H. v. Rubin*, 171 P.3d 200 (Ariz. Ct. App. 2007) (holding that in general, "when the state exercises authority to direct compliance with a medical procedure to promote the health and welfare of a dependent child, it asserts a compelling interest in the child's well-being sufficient to override the parent's right to direct the religious upbringing of his or her child")).[5] Without relevant authority, the Court is not persuaded by Plaintiffs' definition of "major."

Even though the Court has its doubts about Plaintiffs' statutory interpretation, Defendants do not convince the Court that it must dismiss all claims based upon DCS' authorization of medical treatments. Defendants helpfully cite caselaw showing that courts have previously found adequate care includes "feeding therapies, speech therapies, significant dental care including root canals, development pediatric specialist visits, and care and treatment of vaginal infection." (Doc. 43 at 6) (*citing Kesha B. v. Dep't of Child Safety*, 2016 WL 3033902, at *1 (Ariz. Ct. App. May 27, 2016); *Caitlin F. v. Dep't of Child Safety*, 2020 WL 5200969, at *2 (Ariz. Ct. App. Sept. 1, 2020), *review denied* (Dec. 21, 2020); *Blondella W. v. Dep't of Child Safety*, 2020 WL 950296, at *3 (Ariz. Ct. App. Feb. 27, 2020); *Satava O. v. Dep't of Child Safety*, 2020 WL 2535092, at *1 (Ariz. Ct. App. May 19, 2020), *review denied* (Nov. 20, 2020). However, if anything, these cases show

---

[5] Here, the Court has quoted a portion from the majority opinion in *Diana H*. The Court notes that Plaintiffs' briefing misquotes *Diana H.* by framing a fragment of the dissent as if it were the majority opinion. (Doc. 26 at 6). The quote, as represented by Plaintiffs, implies that Arizona does not have a compelling interest in overriding a parent's religious objection to immunizing their children. In reality the quote states the dissenting position that the majority "necessarily" determined that "Arizona has no compelling state interest in immunizing dependent children that would override a parent's religious objection." *Diana H.*, 171 P.3d at 213 (Espinosa, J., dissenting)). Though most likely a mistake, such mistakes corrode the writer's credibility.

that whether the administration of Haldol or a tuberculosis exam constitute "adequate" treatment is a fact-intensive, medical question.  At the motion to dismiss phase, the Court must take Plaintiffs' allegations as true and construe them in their favor.  *Lee*, 250 F.3d at 679.  Because of its fact-intensive nature, and the lingering legal questions, this issue is better suited for a motion for summary judgment.[6]  For now, the Court will accept Plaintiffs' allegations that the treatment Brooke received was beyond adequate and, therefore, without consent.

### b.  Claims against Defendant Krzysztof Mlak

Next, the Court takes up Mlak's Motion to Dismiss, which argues the FAC's allegations of negligence and assault and battery must be dismissed.

He starts by arguing that Counts Twenty and Twenty-Three are too vague.  Count Twenty alleges that Mlak failed to meet his duty to provide the minimum standard of care for Brooke and that she suffered an injury as a result.  (Doc. 17 at ¶¶ 432–35).  Count Twenty-Three similarly alleges that Mlak had a duty to retrieve Brooke's medical history and parental consent before administering Haldol and, because he did not, "Mlak's negligence" resulted in harm to Brooke.  (*Id.* at ¶¶ 451–54).  Both Counts are pled under "established Arizona law" and do not invoke a specific cause of action.  (Doc. 17 at 79, 82).

The FAC is messy and could have been crafted more clearly and efficiently.  However, the Court finds that both Counts Twenty and Twenty-three plead sufficient factual matter to place Mlak on notice of, as Plaintiffs say, this "medical malpractice action."  (Doc. 59 at 11).  Therefore, the Court finds that Counts Twenty and Twenty-three are medical malpractice claims under Arizona's Medical Malpractice Act.[7]

With these Counts falling under the same cause of action, Mlak argues some should

---

[6] The Court recognizes this issue involves careful study of the statutory language and its underlying policy considerations, which the Court hopes the parties will spend a greater time discussing should the issue be briefed in the future.

[7] A medical malpractice claim is any action "for injury . . . against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions . . . in the rendering of health care . . . or health-related services, without express or implied consent . . . ."  A.R.S. § 12-561(2).

be dismissed under the Court's "broad discretion to dismiss duplicative claims."  (Doc. 68 at 8).  Mlak cites *Adams v. California Department of Health Services*, in support of his assertion, but that case deals with the dismissal of duplicative actions, not the dismissal of duplicative pleadings in a complaint.  487 F.3d 684, 688–89 (9th Cir. 2007).  Instead, the Court looks to Rule 8, which states that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones."  Fed. R. Civ. P. 8(d)(2).  Plaintiffs, if they wish, may set out two or more statements of their medical malpractice claims.

Mlak finally argues that if Count Twenty is based on a theory that he lacked consent to treat Brooke, Plaintiffs cannot also plead assault and battery in Count Twenty-one because it is also predicated on the same lack of consent theory.  (Doc. 43 at 7).  A lack of consent claim clearly falls under the definition of medical malpractice claim.  *See* A.R.S. § 12-561(2) (stating that such claim include injury that resulted from lack of "express or implied consent").  And yet, Plaintiffs may also bring a "lack of consent" claim in battery. *Duncan v. Scottsdale Med. Imaging, Ltd.*, 70 P.3d 435, 439 (Ariz. 2003) (holding A.R.S. §12-562(B), which sought to abrogate the right to bring battery actions for medical malpractice, unconstitutional).  Under Rule 8, as said before, these alternative claims are permissible.  So, the Court cannot dismiss Count Twenty-one.

Before considering Defendants Luevano and Nagle's motions to dismiss, the Court emphasizes that the FAC is adequate, but just barely.  Everyone would benefit from an amended complaint that states its claims with greater clarity and less redundancy. Therefore, the Court will require that the parties meet and confer no later than April 7, 2023, before the dispositive motion deadline, to determine how the FAC may be amended so to simplify its existing claims, resolve any ambiguities identified in this Order, and clarify the issues to be tried.  If the parties agree, Plaintiffs may file a second amended complaint.  *See* Fed. R. Civ. P. 15(a)(2).  To be clear, the Court's intention is to provide an opportunity to distill Plaintiffs' existing claims and excise unnecessary or redundant claims.  The purpose of the meet and confer is not to introduce new claims or further

1    complicate the pleadings.

2        **c.  Claims Against Defendant Kattia Luevano & Helen Nagle**

3        Finally, the Court addresses Defendants Luevano and Nagle's argument that the

4    FAC fail to allege facts against them that raise a plausible claim.  Both Defendants are only

5    named in Count Fifteen, which alleges they conspired to violate Plaintiffs' constitutional

6    rights as a parent.  (Doc. 17 at 68).  As to Luevano, only two of the FAC's five hundred

7    and fifty-four paragraphs actually allege what she did.  (Doc. 17 at ¶¶ 385–86).  And as

8    alleged, Luevano was an a DCS contractor who "refused to provide information regarding

9    Brooke's medical treatments" to Brooke's parents even though she provided it to DCS

10   employees.  (*Id.*)  As to Nagle, who similarly receives two paragraphs of factual treatment,

11   she is alleged to have told Plaintiffs in August 2018 that Brooke would receive a

12   tuberculosis test, despite the Plaintiffs' objection.  (*Id.* at ¶¶ 387–88).  Based on these

13   allegations, the FAC claims both Luevano and Nagle conspired with DCS employees to

14   deprive Plaintiffs of their constitutional rights to "make medical decisions for Brooke . .

15   . ." (*Id.* at ¶¶ 386, 388).

16       Plaintiffs argue these allegations are sufficient.  They argue Luevano prevented

17   Plaintiffs from accessing records to which they had a legal right, demonstrating that

18   Luevano "was in agreement with DCS to violate Plaintiffs' constitutional rights regarding

19   access to the records" because she "would not have provided the records only to DCS had

20   she not agreed with that course of action."  (Doc. 65 at 11–12).  Plaintiffs also argue Nagle

21   "would not have administered the tuberculosis test" against their objections "unless she

22   agreed" with DCS' unconstitutional goals.  (Doc. 66 at 8).

23       The Court finds these allegations do not demonstrate a right to relief beyond a

24   speculative level.  *See Twombly*, 550 U.S. at 555.  "Determining whether a complaint states

25   a plausible claim for relief" is "a context-specific task," and the FAC fails to provide

26   enough context to support a plausible claim against Luevano or Nagle.  *Iqbal*, 556 U.S. at

27   679.[8]  Their roles in this action appears to be limited to that of recordkeeper and messenger.

28   ───────────────
     [8] Plaintiffs cite a case from the Seventh Circuit Court of Appeals, *Kunik v. Racine County*,
     946 F.2d 1574 (7th Cir. 1991), in support of their position that the FAC's allegations with

1  The assumption that either had a larger part or medical authority in the events underlying

2  this case is too speculative.  Therefore, the Court, exercising its "judicial experience and

3  common sense," cannot discern a plausible connection between Luevano's allegedly illegal

4  refusal to release documents, Nagle's message to Plaintiffs, and an agreement with DCS to

5  infringe on Plaintiffs' constitutional rights.  Therefore, the Court will dismiss both Luevano

6  and Nagle from this action.

7  **IV.    Conclusion**

8          Having exhausted the Defendants' arguments within the motions to dismiss, the

9  Court only finds cause to dismiss Luevano and Nagle from this action.

10          Accordingly,

11          **IT IS HEREBY ORDERED** that Defendant Aurora Behavioral Health Care

12  Tempe, LLC's Motion to Dismiss (Doc. 22) is **denied**.

13          **IT IS FURTHER ORDERED** that Defendant Krzysztof Mlak's Motion to

14  Dismiss (Doc. 43) is **denied**.

15          **IT IS FURTHER ORDERED** that Defendant Kattia Luevano's Motion to Dismiss

16  (Doc. 46) is **granted**.  The Court will dismiss Defendant Kattia Luevano from this action.

17          **IT IS FURTHER ORDERED** that Defendant Helen Nagle's Motion to Dismiss

18  (Doc. 47) is **granted**.  The Court will dismiss Defendant Helen Nagle from this action.

19  …

20  …

21  …

22  …

23  …

24  …

25  …

26  respect to Luevano suffice.  (Doc. 65 at 10).  The Court notes that not only is *Kunik* not

27  binding on this Court, but also it was also decided well before the Supreme Court's
landmark decision in *Iqbal*.  Even so, the *Kunik* court held that a complaint's factual
allegations must be "sufficiently specific."  946 F.2d at 1581.  And there, the challenged

28  complaint was "reasonably specific as to time, location and even scope" of the conspiracy
claims.  *Id.*  The same is not true here with respect to the Luevano and Nagle's allegations.

**IT IS FINALLY ORDERED** that the parties shall meet and confer no later than April 7, 2023, to determine how the First Amended Complaint may be amended.  If the parties reach an agreement, Plaintiffs may file a second amended complaint.  *See* Fed. R. Civ. P. 15(a)(2).  After the parties meet and confer, they shall jointly file a notice indicating the results of the meeting.

Dated this 20th day of May, 2022.

_____
Honorable Diane J. Humetewa
United States District Judge