Vincent J. Montell (Bar No. 014236)
Dustin A. Christner (Bar No. 019707)
QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
8800 E. Raintree Dr., Suite 100
Scottsdale, Arizona 85260
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
vmontell@qpwblaw.com
dustin.christner@qpwblaw.com

*Attorneys for Defendant Krzystztof Mlak, MD*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Tina Canale, individually and as an employee with the State of Arizona Department of Child Safety; Melissa Courtright, individually and as an employee with the State of Arizona Department of Child Safety, and Barry Courtright, her spouse; Nicholas Long, individually and as an employee with the State of Arizona Department of Child Safety; Gregory McKay, as former Director, Arizona Department of Child Safety; Michael Faust, as Director, Arizona Department of Child Safety; Aurora Behavioral Healthcare-Tempe, LLC, an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Krzystztof Mlak, individually and as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and Jane Doe Mlak, his spouse; Kattia Luevano, individually as an employee with | **CASE NO. 2:21-cv-01444-DJH**<br><br><br>**DEFENDANT KRZYSTZTOF MLAK, MD'S MOTION FOR SUMMARY JUDGMENT**<br><br><br>**The Hon. Judge Diane J. Humetewa**<br><br><br>**ORAL ARGUMENT REQUESTED** |

Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Luevano, her spouse; Helen Nagle, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Nagle, her spouse; Care and Dignity Services, LLC, an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; John and Jane Does 2-6; and Black Entities 1-5.

Defendants.

Defendant Krzysztof Mlak, M.D. ("Dr. Mlak"), by and through undersigned counsel, pursuant to Fed. R. Civ. P. 56(a), moves for Summary Judgment on claims Fifteen, Twenty, Twenty-One, and Twenty-Three of Plaintiff's First Amended Complaint as asserted against him. This Motion is supported by the following Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     FACTUAL BACKGROUND

Plaintiff Christine Scianna ("Christine") is the biological mother of Plaintiff Brooke Scianna ("Brooke"). **Ex. 1**, ¶ 23. Brooke, born July 14, 2021, is a non-verbal, severely autistic individual. **Ex. 1**, ¶ 24. On June 22, 2018, Brooke was removed from her home and taken into temporary physical custody of Arizona Department of Child Safety ("DCS"). **Ex. 2**, p. 3. DCS filed an Out-of-Home Dependency Petition ("Dependency Petition") on June 27, 2018, **Ex. 2**, along with a DCS Court Report, **Ex. 3**. The same day, the Juvenile Court ordered that Brooke "is made a temporary ward of the Court, committed to the legal care, custody and control of [DCS] and placed in the physical custody of Care and Dignity," and that "in furtherance of A.R.S. § 8–512 and DCS's obligation, if any, to provide medical behavioral health or other services to child in the DCS's legal custody, the DCS is authorized to consent to evaluation and treatment for medical . . . care upon recommendation of a health care provider . . . ." **Ex. 4**, pp. 2, 5.

On July 2, 2018, the Juvenile Court found it had "exclusive jurisdiction over the subject matter pursuant to A.R.S. § 8–802" and that "continued temporary custody is clearly

necessary to prevent abuse or neglect pursuant to A.R.S. § 8–825," **Ex. 5**, pp. 3, 6, and ordered "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS]," **Ex. 6**, p. 4. On August 16, 2018, the Juvenile Court ordered "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS]." **Ex. 7**, p. 3. On August 21, 2018, the Juvenile Court ordered, among other things: (a) "that temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition;" (b) "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS];" (c) "affirming all contrary to welfare findings;" (d) "that there is a comprehensive medical team evaluating the child's needs;" (e) "directing [DCS] to make arrangements to facilitate a comprehensive medical evaluation for the child with Dr. Richard Frye at Phoenix Children's Hospital and to include mother's input;" and (f) "[DCS] will amend the dependency petition to include an allegation of neglect and based on the child's behaviors as to mother." **Ex. 8**, pp. 3–4.

On August 22, 2018, police and paramedics were called to Care and Dignity when Brooke began "displaying uncontrollable behaviors within the group home. **Ex. 9, 10, 11**; **Ex. 12**, pp. 3, 10. Upon arrival, Brooke "was combative with the officers and EMTs and sustained facial abrasions while being restrained." **Ex. 9**. Brooke was transported to the emergency department at Abrazo Arrowhead Campus ("Abrazo") where she was administered 5mg Haldol. **Ex. 13**, p. 91. Brooke remained at Abrazo until August 25, 2018, and was administered Haldol each day. **Ex. 14**, pp. 97–98; **Ex. 15**. During her admission Brooke "continued to have uncontrollable behaviors as she was hitting, biting, and pulling the hair of the staff members" and was "throwing and eating feces," and referral was submitted for her to be placed at Aurora Behavioral Healthcare ("Aurora") because "her needs are too great for the group home and hospital staff to meet." **Ex. 9**; **Ex. 16**, pp. 1, 6.

Brooke was transported to Aurora on August 25, 2018, **Ex. 17**. Her admission, care, and adolescent medication were authorized by DCS case manager Katy B. **Ex. 18**; **Ex. 19**. On August 26, 2018, Dr. Mlak performed a psychiatric evaluation of Brooke and

documented: (a) "attempts to contact her mother, Ms. Christine Scianna, and left messages;" (b) "she received multiple medications for agitation including Haldol and Ativan throughout her stay in the ER;" and (c) "[s]he is currently a temporary ward in a foster care system and her DCS worker is Ms. Melissa Courtright." **Ex. 20**, pp. 1–3. Dr. Mlak's recommended treatment plan included pharmacological approach to target "mood instability and explosive aggressive behavior" and "[p]sychiatric rounds to manage medication and coordination with DCS regarding placement." **Ex. 20**, p. 4. On August 27, 2018, Dr. Mlak documented Brooke's aggressive behavior, regression, and danger to self and others, and further noted he had "left two messages for mother to obtain collateral information." **Ex. 21**.

On August 30, 2018, DCS filed an emergency motion for approval of seventy-two-hour admission for inpatient assessment pursuant to A.R.S. § 8–272(A), **Ex. 22**, and a motion for approval of inpatient psychiatric acute care services pursuant to A.R.S. § 8–272(F), **Ex. 23**, attaching Dr. Mlak's psychiatric evaluation report and recommendation and a written statement of Aurora's medical director that Aurora's services are appropriate to meet Brooke's mental health needs, **Ex. 20, 24**. On August 31, the Juvenile Court granted DCS's emergency motion and set a hearing for approval of inpatient psychiatric acute care services. **Ex. 25, 26**. The Juvenile Court held the hearing on September 4, 2018, and after holding discussion and reviewing supporting evidence, approved Brooke's admission for inpatient psychiatric acute care services. **Ex. 27**. The Juvenile Court found, "based upon clear and convincing evidence, that Brooke . . . is suffering from a mental disorder or is a danger to self or others, and requires inpatient psychiatric acute care services; and [a]vailable alternatives to inpatient psychiatric acute care services were considered, but inpatient psychiatric acute care services are the least restrictive available alternative." **Ex. 27**.

Brooke remained an inpatient at Aurora until November 21, 2018. **Ex. 28**, p. 1. Each day Dr. Mlak assessed Brooke and prepared daily progress notes. On September 6, 2018, Dr. Mlak documented that "mother has not responded to author attempts to establish contact." **Ex. 29**, p. 2. On September 7, 2018, Dr. Mlak again documented that "mother has not

responded to author attempts to establish contact." **Ex. 30**, p. 2. The same day he recommended Haldol for mood instability after Brooke had not responded to first- and second-line treatment, **Ex. 30**, p. 2, and obtained consent to administer Haldol from DCS, **Ex. 31**. On September 10, 2018, Dr. Mlak again documented that "mother has not responded to author attempts to establish contact." **Ex. 32**, p. 2. The same day Dr. Mlak increased Brooke's Haldol dose. **Ex. 32**, p. 2. On each of these days Dr. Mlak noted Brooke's continued agitation, aggression, striking of staff, injurious behavior, and danger to self. **Ex. 29**, **30**, **32**.

On September 11, 2018, Dr. Mlak documented medication side effects of "[t]remor/muscle rigidity" and recommended Cogentin for extrapyramidal symptoms ("EPS"). **Ex. 33**, pp. 1–2. On September 12, 2018, Dr. Mlak noted the medication side effects were resolving. **Ex. 34**, p. 1. The same day he spoke with Christine for the first time, addressed her questions and concerns about Haldol, and discussed Brooke's treatment plan that included continuing Haldol. **Ex. 34**, p. 2. On September 13, 2018, Dr. Mlak decreased Brooke's Haldol for mood instability. **Ex. 35**, On September 14, 2018, Dr. Mlak documented Brooke's medication side effects were resolving and he "attempted to contact mother and left message to report resolution of side effect and improving sleep." **Ex. 36**, p. 2.

On September 21, 2018, Dr. Mlak documented Brooke's continued emotional dysregulation, aggression, striking of staff, injurious behavior, and danger to self. **Ex. 37**, p. 1. The same day he spoke with Christine and documented he "attempted to discuss medication plan but mother insisted that patient is having side effect of Haldol and demands for the medication to be discontinued;" "attempt[ed] to address her concern about 'muscle breakdown' as patient experienced rhabdomyolysis in 4/2018, and to discuss that patient has no signs of this condition in current time frame;" and that "mother indicated she will file a complaint and hung up the phone." **Ex. 37**, p. 2. On September 28, 2018, Dr. Mlak again spoke with Christine to discuss Brooke's treatment recommendation and plan and documented Brooke was not experiencing current side effects of Haldol with Cogentin as claimed by Christine. **Ex. 38**, p. 2. Dr. Mlak further documented he would decrease Haldol

"due to suboptimal response and parental objection." **Ex. 38**, p. 2.

On October 3, 2018, Dr. Mlak documented Brooke "had another period of agitation occurring during visit by mother" and "engaged in head banging but was de-escalated after mother had left." **Ex. 39**, p. 1. Dr. Mlak further documented that Christine "continues to request that CPK level be drawn despite no clinical indication." **Ex. 39**, p. 2. Dr. Mlak documented that Brooke had another period of agitation when Christine visited on October 5, 2018, and October 8, 2018. **Ex. 40**, p. 1; **Ex. 41**, p. 1.

Christine filed a request for emergency hearing with the Juvenile Court on October 17, 2018. **Ex. 42**. Among other things, Christine sought relief in the form of a court order for DCS "to immediately give written instructions to all of Brooke's providers that they are to communicate with Mother and consider her input." **Ex. 42**, p. 5. The Juvenile Court addressed the motion the same day and ordered that DCS "shall promptly give the Child's treatment providers the instruction that they shall make reasonable efforts to obtain information from Mother concerning the Child's medical history, and to consult with Mother concerning the Child's ongoing medical care." **Ex. 43**, p. 2. Importantly, the order stated: "Mother's input should be considered, but shall not be considered determinative of the appropriate course of treatment." **Ex. 43**, p. 2.

Brooke was discharged from Aurora on November 21, 2018. **Ex. 28**, p. 1. On February 11, 2019, DCS moved to dismiss the Dependency Petition, **Ex. 44**, which the Juvenile Court granted on February 19, 2019, **Ex. 45**. Plaintiffs filed their original complaint in Arizona state court on July 14, 2021, and the complaint was removed to this Court on August 20, 2021. Plaintiffs filed their First Amended Complaint on September 22, 2021.

As against Dr. Mlak, Plaintiffs allege he was an employee Aurora who provided contract services for the State of Arizona through DCS. **Ex. 1**, ¶ 16. Plaintiffs allege at all relevant times, he "was acting under the color of law as a DCS service provider." **Ex. 1**, ¶ 16. In claim fifteen, Plaintiffs allege Dr. Mlak, Ms. Courtright, Nicholas Long, Kattie Luevano, and Helen Nagle are liable under 42 U.S.C. § 1983 for "conspiring to violate

Christine's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to make medical decisions for Brooke and Brooke's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to have medical decisions for her made by Christine." **Ex. 1**, p. 68. In claim twenty, Plaintiffs allege Dr. Mlak "is liable for failing to provide the minimum accepted standard of care in his care of Brooke." **Ex. 1**, p. 79. In claim twenty-one, Plaintiffs allege Aurora and Dr. Mlak "are liable to Brooke for the assault and battery committed upon her person." **Ex. 1**, p. 80. In claim twenty-three, Plaintiffs allege Aurora and Dr. Mlak are liable to Brooke for negligently carrying out their duty to provide appropriate medical and/or mental health services to Brooke. **Ex. 1**, p. 82.

## II.   LEGAL ARGUMENT

### A. <u>Summary Judgment Standard</u>

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The movant can also discharge its initial burden by pointing out the absence of evidence to support the non-moving party's case. *Id.* at 325.

If the movant meets this burden, the opposing party must offer evidence of specific facts sufficient to raise a genuine issue for trial. *Matushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986). The non-moving party must go beyond the pleadings and by his own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id*. at 249–50.

**B.  Plaintiffs' § 1983 Conspiracy Claim Fails as a Matter of Law**

**1.  *Christine's § 1983 Claim is Barred by the Statute of Limitations***

The statute of limitations for federal civil rights claims brought under section 1983 is "governed by the forum state's statute of limitations for personal injury actions." *Bird v. State*, 935 F.3d 738, 743 (9th Cir. 2019). In Arizona, the limitations period for personal injury claims is two years. A.R.S. § 12–542. Although Arizona law determines the length of the limitations period, federal law determines when a civil rights claim accrues. *Morales v. City of Los Angeles*, 214 F.3d 1151, 1153–54 (9th Cir. 2000). Under federal law, a civil rights claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.* (quoting *TwoRivers v. Lewis*, 174 F.3d 987, 991 (9th Cir. 1999).

Specific to section 1983 conspiracy claims, the accrual for limitations purposes is determined "in accordance with the last overt act doctrine," under which "injury and damage in a civil conspiracy action flow from the overt acts, not from the mere continuance of a conspiracy." *Gibson v. U.S.*, 781 F.2d 1334, 1340 (9th Cir. 1986).

Here, the evidence shows that Dr. Mlak cared for and treated Brooke between August and November 2018, during which time he recommended and administered Brooke the medication Haldol. **Ex. 30–41.** Christine alleges that during this time, Dr. Mlak conspired with Ms. Courtright and/or Mr. Long "to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when [Dr.] Mlak provided medical treatment to Brooke from August 2018 to November 2018 without Christine's knowledge and/or consent . . . ." **Ex. 1, ¶ 384.** Thus, the alleged "overt acts" occurred between August and November 2018, meaning Christine's claim accrued no later than November 2018. Under Arizona law, Christine had until November 2020 to file her complaint before the statute of limitations ran. Christine filed her original complaint in Arizona state court on July 14, 2021, before it was removed to the District Court of Arizona on August 20, 2021. Christine's claim is therefore time-barred and must be dismissed.

### 2. *Plaintiffs' § 1983 Claim Fails Because Dr. Mlak Was Not a State Actor and there is No Evidence that He Conspired with State Actors*

To bring a valid claim under section 1983, a plaintiff must demonstrate that the defendants acted under color of state law and deprived her of rights secured by the Constitution or federal statutes. 42 U.S.C. § 1983. Section 1983 claims may not be brought against private actors who were not acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). It is presumed that conduct by private actors is not state action, and the plaintiff bears the burden of establishing that a defendant was a state actor. *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011). The Ninth Circuit utilizes four tests to determine whether a private actor's conduct amounts to state action: (1) the public function test; (2) the joint action test; (3) the state compulsion test; and (4) the governmental nexus test. *Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002). Here, Plaintiffs only allege that Dr. Mlak was a state actor via joint action. **Ex. 1, ¶¶ 381–83.**

To be engaged in joint action, the private actor must be a "willful participant" with the state in an activity that deprives the plaintiff of her constitutional rights. *Dennis v. Sparks*, 449 U.S. 24, 27 (1980). Such activity must be "inextricably intertwined" with those of the state, *Brunette v. Humane Society of Ventura County*, 294 F.3d 1205, 1211 (9th Cir. 2002), and "substantial cooperation" between the private actor and the state must be shown, *Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Joint action or substantial cooperation may be shown through evidence of a conspiracy between the private actor and the state. *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1546–47 (9th Cir. 1989). To prove conspiracy, the plaintiff must show there was an agreement or meeting of the minds to violate the plaintiff's constitutional rights, and each co-conspirator must share the common objective of the conspiracy. *Id*. at 1540–41.

Conspiracy is not itself a stand-alone constitutional tort. *Lacey v. Maricopa County*, 693 F.3d 896, 935 (9th Cir. 2012). Nor is conspiracy a vital element of a section 1983 claim. *Mizell v. N. Broward Hosp. Dist.*, 427 F.2d 468, 472–73 (5th Cir. 1970). Rather, "a conspiracy may be used as the legal mechanism through which to impose liability on each

and all the defendants without regard to the person doing the particular act." *Id.*

Considering the above, section 1983 conspiracy claims serve two purposes. First, conspiracy claims may be used to "enlarge the pool of responsible defendants by demonstrating their causal connections" to the underlying violation of constitutional rights. *Lacey*, 693 F.3d at 935. Under this theory, if several individual state actors conspire to deprive an individual of her constitutional rights, but not all those co-conspirators effectuate the deprivation, each co-conspirator who participated in some way in furtherance of the conspiracy can be held liable. *See Hostrop v. Board of Jr. College Dist. No 515*, 523 F.2d 569, 576–77 (7th Cir. 1975). Second, conspiracy claims may be used as a vehicle for a plaintiff "to draw in private parties who would otherwise not be susceptible to a § 1983 action because of the state action doctrine." *Lacey*, 693 F.3d at 935. However, it is presumed at the outset that private action is not state action. *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011).

Here, only the second theory is applicable, because Dr. Mlak is not a state actor. Therefore, the only mechanism to bring Dr. Mlak within the realm of section 1983 liability is to show that he, as a *private actor*, conspired with *state actors*. To do so, Plaintiffs must prove with factual evidence that Dr. Mlak and DCS agreed to violate Plaintiffs' constitutional rights and shared in the common objective to do so. *See United Steelworkers*, 865 F.2d at 1540–41. Plaintiffs have no facts to present to a jury that such a conspiracy existed.

Plaintiffs only allege Dr. Mlak conspired with Ms. Courtright and/or Mr. Long, and do not allege he conspired with Ms. Luevano and/or Ms. Nagle. **Ex. 1, ¶¶ 384–88.**[1] Still, Plaintiffs have failed to produce any facts demonstrating a conspiracy between Dr. Mlak, Ms. Courtright, and Mr. Long. Regarding Mr. Long, Plaintiffs did not take his deposition, and no other facts in the record demonstrate that he engaged in conspiratorial conduct with

---

[1] The Court already dismissed both Ms. Luevano and Ms. Nagle. In its dismissal order, the Court stated that in exercising its "judicial experience and common sense," it could not discern a plausible connection between their allegedly illegal conduct and an agreement with DCS to infringe on Plaintiffs' constitutional rights. [Doc. 74, at 10:1-6]. Since the Court found it implausible that they conspired with DCS, it is equally implausible that Dr. Mlak could have engaged in some wider conspiracy with each of them and DCS.

Dr. Mlak. **Ex. 46**, 250:19–24. For his part, Dr. Mlak confirmed at his deposition that he "personally had no meetings, conversations, understanding, or agreements with Mr. Long from DCS regarding Christine's ability to make medical decisions for Brooke Scianna." **Ex. 46**, 250:19–24. Regarding Ms. Courtright, Plaintiffs did not elicit any testimony demonstrating that she engaged in conspiratorial conduct with Dr. Mlak. **Ex. 46**, 250:12–17. And again, for his part, Dr. Mlak confirmed at his deposition that he "personally had no meetings, conversation, understanding, or agreements with Melissa Courtright from DCS regarding Christine's ability to make medical decisions for Brooke." **Ex. 46**, 250:12–17.

Dr. Mlak further testified he: understood that DCS "had the authority to provide consent for treatment, hospitalization, and inherently any medication and services as part of [Brooke's] hospitalization; was never aware that while Brooke was an inpatient at Aurora, there was any dispute regarding who could legally consent to her care and treatment; made all care and treatment decisions for Brooke in her best interest; never personally had any meetings, conversations, understandings, or agreements with anyone from DCS regarding Christine's ability to make medical decisions for Brooke; and disagrees with any assertion that he conspired with Ms. Courtright or Mr. Long to violate Christine's right to make medical decisions for Brooke. **Ex. 46**, 106:18–107:6, 250:8–11, 251:2–22. Plaintiffs have not produced any testimonial or documentary evidence to rebut Dr. Mlak's testimony. Accordingly, there is no genuine dispute of any material fact, and Dr. Mlak is entitled to summary judgment as a matter of law regarding Plaintiffs' § 1983 claim.

### 3. *Plaintiffs' § 1983 Claim Fails Because there was no Constitutional Deprivation*

While it is true that "[t]he right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state," *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000), this right is not absolute, *Mueller v. Auker*, 700 F.3d 1180, 1186–87 (9th Cir. 2012). "The state has an interest in the welfare and health of children," and "[i]f the interest of the state is great enough—that is, if the welfare of the child is seriously jeopardized—the state

may act and invade the rights of the parent and the family." *In re Appeal in Cochise County Juvenile Action No. 5666-J*, 133 Ariz. 157, 161 (1982). In dependency proceedings, the state's interest is "protecting children from abuse and neglect," and the parent's interest "is to preserve the family and maintain custody and control of their minor children." *In re Appeal in Maricopa County Juvenile Action etc.*, 131 Ariz. 25, 28 (1981). When the state seeks to change the parent's interest, it may only do so with "due process of law and strict compliance with the statutes involved." *Id*. That is exactly what occurred in this case.

The Juvenile Court has jurisdiction over all proceedings brought under Title 8. A.R.S. § 8–202. When a dependency petition is filed, the Juvenile Court has authority to issue an order authorizing DCS "to take temporary custody of a child on finding that probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect and it is contrary to the child's welfare to remain in the home." § 8–821(B). If the Juvenile Court authorizes DCS to take temporary custody, it must hold a hearing to decide "whether there is probable cause to believe that continued temporary custody is clearly necessary to prevent abuse or neglect pending the hearing on the dependency petition." § 8–824(F). If the Juvenile Court makes this finding, it "may declare the child a temporary ward of the court pending the dependency hearing." § 8–825(C)(2).

Brooke was removed from her home on June 22, 2018, and DCS filed its Dependency Petition on June 27, 2018. **Ex. 2–3**. The same day the Dependency Petition was filed, and based upon the verified allegations therein, the Juvenile Court found that "continuation of the child in the home would be contrary to the welfare of the child" and ordered that Brooke be "made a temporary ward of the Court, committed to the legal care, custody and control of [DCS]." **Ex. 4**, pp. 2, 5. The Juvenile Court further ordered that pursuant to section 512, DCS "provide medical, behavioral health or other services to the child in the DCS's legal custody" and authorized DCS "to consent to evaluation and treatment for medical and dental care upon recommendation of a health care provider." **Ex. 4**, p. 5. On July 2, 2018, and August 16, 2018, the Juvenile Court held hearings and ordered that Brooke be continued "as a temporary

ward of the Court, committed to the care, custody and control of [DCS]." **Ex. 6**, p. 4; **Ex. 7**, p. 3. On August 21, 2018, pursuant to sections 824(F) and 825(C)(2), the Juvenile Court found "that temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition," and ordered that Brooke be continued "as a temporary ward of the Court, committed to the care, custody and control of [DCS]." **Ex. 8**, pp. 3–4. This all occurred before Dr. Mlak's involvement in Brooke's care.

Under Title 8, "[i]f a child exhibits behavior that indicates the child may suffer from a mental disorder or is a danger to self or others, an entity my request that the child receive an . . . inpatient assessment." § 8–272(A). Relevant here, "child" means "a person who is under eighteen years of age" and who is, among other qualifying bases, "temporarily subject to court jurisdiction pending an adjudication of a dependency petition" or "[i]n the temporary custody of the department pursuant to section 8–821." § 8–272(S)(1). "Entity" is defined to include DCS. § 8–271(2). "Inpatient assessment" can include "[t]he administration of psychotropic medication and medication monitoring, if necessary to complete the assessment or to prevent the child from being a danger to self or others." § 8–271(3).

The psychiatrist who conducts the inpatient assessment must provide the assessment to the entity and make a recommendation, which may include "admi[ssion] to a psychiatric acute care facility for inpatient psychiatric acute care services." § 8–272(C). "Psychiatric acute care services" is defined as any of the following:

(a) Emergency or crisis behavioral health services.

(b) Psychiatric and psychological assessments and short-term intensive behavioral health counseling and treatment for acute episodes or mental disorders.

(c) Medication stabilization and twenty-four hour a day nursing care for a child who suffers from acute psychiatric or mental disorders or who needs to have a chronic mental illness stabilized.

§ 8–271(8).

The entity must bring a motion for approval of inpatient psychiatric acute care

services before it may be provided. § 8–272(F). The Juvenile Court must then hold a hearing and may only approve such services if it finds "by clear and convincing evidence" that both: (1) "[t]he child is suffering from a mental disorder or is a danger to self or others and requires inpatient psychiatric acute care services;" and (2) "[a]vailable alternatives to inpatient psychiatric acute care services were considered, but that inpatient psychiatric acute care services are the least restrictive available alternative." § 8–272(H), (J).

On August 22, 2018, police and paramedics were called to arrive at Care and Dignity because Brooke was engaging in uncontrollable and combative behaviors. **Ex. 9–12**. Brooke was transferred to Arrowhead where her behaviors continued. **Ex. 9**, **13–15**. On August 25, 2018, Brooke was transferred to Aurora where her admission, care, and medication administration was authorized by DCS. **Ex. 17–19**. On August 26, 2018, Dr. Mlak performed an inpatient psychiatric evaluation of Brooke, and provided the assessment to DCS with recommendations that she be admitted for inpatient psychiatric acute care services as coordinated through DCS. **Ex. 20**. Dr. Mlak's recommended initial treatment plan included "pharmacological approach," "a trial of Thorazine . . . targeting mood instability and explosive aggressive behavior," and "[p]syciatric rounds to manage medication and coordination with DCS regarding placement." **Ex. 20**, p. 4. On August 30, 2018, DCS filed a motion for approval of inpatient psychiatric acute care services as recommended by Dr. Mlak. **Ex. 23**. The Juvenile Court held a hearing on the motion on September 4, 2018. **Ex. 27**. After holding a discussion and reviewing Dr. Mlak's assessment, recommendation for inpatient psychiatric acute care services, and recommended initial treatment plan, the Juvenile Court made the necessary findings under section 272(J) by "clear and convincing evidence." **Ex. 27**.

Here, Plaintiffs do not challenge the jurisdiction of the Juvenile Court or the constitutionality of the Arizona statutes under which the Juvenile Court made various findings and issued various orders. As detailed above, the Juvenile Court operated within the bounds of these statutes and lawfully ordered Brooke be placed in DCS's temporary legal

care, custody, and control; granted DCS the authority to provide and consent for Brooke's medical care; and approved Brooke's admission for inpatient psychiatric acute care services. Because the Juvenile Court lawfully intruded upon Plaintiffs' rights regarding Brooke's medical decisions by temporarily vesting this right in DCS and by approving Brooke's inpatient psychiatric acute care services as recommended by Dr. Mlak, at no time during Dr. Mlak's involvement did Plaintiffs' have any rights regarding Brooke's medical decisions.

Although Plaintiffs challenge the actions of DCS and the information DCS presented to the Juvenile Court, Plaintiffs have not produced any evidence showing that Dr. Mlak conspired with DCS to allegedly deceive the Juvenile Court to make the findings and issue the orders it did. All Plaintiffs have is allegations, not evidence, that Dr. Mlak conspired to deprive them of their rights involving Brooke's medical decisions. But these rights were lawfully intruded upon by orders of the Juvenile Court issued long before Dr. Mlak's involvement and long before Dr. Mlak administered Haldol to Brooke with DCS consent. Plaintiffs' allegations are implausible, factually baseless, and legally unsound, and their section 1983 claim against Dr. Mlak must be dismissed.

### 4.  *A.R.S. § 8–531 Does Not Apply to the Facts of this Case*

Notwithstanding the above, much litigation and discovery in this case has focused on the meaning of wholly inapplicable statutory definitions. In the Court's order dated May 20, 2022, it tasked the Parties with "careful study of the statutory language and its underlying policy considerations" regarding the meaning of "adequate" and "major" medical treatment as those terms are used in section 8–531. [Doc. 74, pp. 4–7]. After careful study, Dr. Mlak asserts section 531 applies only to proceedings to terminate the parent-child relationship, which were never initiated in this case. As argued below, these definitions are irreconcilable with the applicable statutes governing pre-adjudication dependency proceedings.

Relevant here, a permanency hearing "to determine the future permanent legal status of the child" must be held: (1) within thirty days after a disposition hearing if the Juvenile Court does not order reunification services; or, (2) within twelve months after the child is

removed from the child's home. § 8–862(A). At the permanency hearing, the Juvenile Court must determine "[w]hether termination of parental rights, adoption, permanent guardianship pursuant to section 8–872 or some other permanent legal status is the most appropriate plan for the child." § 8–862(B). If the Juvenile Court determines that termination of parental rights is clearly in the best interests of the child, it shall order DCS to file a motion pursuant to section 8–533, and if it determines that permanent guardianship is clearly in the best interest of the child, it shall order DCS to file a motion pursuant to section 8–871. § 8–862(D), (F).

Adoption proceedings are governed by Title 8, Chapter 1, Article 1. As applied to article 1, "custody" means "a status embodying all of the following rights and responsibilities:"

(a) The right to have the physical possession of the child.

(b) The right and the duty to protect, train and discipline the child.

(c) The responsibility to provide the child with food, shelter, education and health care, and the authority to consent to surgery or other extraordinary medical care in an emergency.

§ 8–101(5). "Permanent guardian" means "a legal guardian appointed by the court pursuant to section 8–871. § 8–101(9). Upon entry of an adoption decree, "the relationship of parent and child and all the legal rights, privileges, duties, obligations and other legal consequences of the natural relationship of the child and parent thereafter exist between the adopted child and the adoptive parent as though the child were born to the adoptive parent in lawful wedlock;" and "the relationship of parent and child between the adopted child and the persons who were the child's parents before entry of the decree of adoption is completely severed and all the legal rights, privileges, duties, obligations and other legal consequences of the relationship cease to exist, including the right of inheritance." § 8–117(A), (B).

Permanent guardianship proceedings are governed by Title 8, Chapter 4, Article 12. If the Juvenile Court vests permanent guardianship with an individual, it "divests the birth or adoptive parent of legal custody of or guardianship for the child but does not terminate

the parent's rights." § 8–872(I). A "permanent guardian is vested with all of the rights and responsibilities set forth in section 14–5209 relating to the powers and duties of a guardian of a minor, other than those rights and responsibilities of the birth or adoptive parent, if any, that are set forth in the decree of permanent guardianship." § 8–871(E).

Parent-child termination proceedings are governed by Title 8, Chapter 4, Article 5. Sections 531 to 544 were enacted by the Arizona Legislature in 1970. Act of May 18, 1970, ch. 153, Ariz. Laws 1970 (relating to children; prescribing procedures for termination of parent-child relationship, and amending Title 8, Chapter 5, Arizona revised statutes, by adding Article 2).[2] The purpose of the act was described as to:

> [P]rovide for voluntary and involuntary severance of the parent-child relationship and for substitution of parental care and supervision by judicial process which will safeguard the rights and interests of all parties concerned and promote their welfare and that of the state. Implicit in this act is the philosophy that, wherever possible, family life should be strengthened and preserved and that the issue of severing the parent-child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual arrangements, express or implied, for the surrender or relinquishment of children. This judicial action is intended primarily for those situations where other judicial remedies appear inappropriate.

*Id*. § 1.

Section 8–531 provides that "[i]n this article, unless the context otherwise requires:"

5. 'Custody' or 'legal custody' means a status embodying all of the following rights and responsibilities:

   (a) The right to have physical possession of the child.

   (b) The right and the duty to protect, train and discipline the child.

   (c) The responsibility to provide the child with adequate food, clothing, shelter, education and medical care, provided that such rights and responsibilities shall be exercised subject to the powers, rights, duties and responsibilities of the guardian of the person and subject to the residual parental rights and responsibilities if they have not been terminated by judicial decree.

---

[2] Now titled 8, chapter 4, article 5, as amended by 2014 Ariz. Sess. Laws 1.

. . .

8. 'Guardianship of the person' with respect to a minor means the duty and authority to make important decisions in matters affecting the minor including but not necessarily limited either in number or kind to:

   (a) The authority to consent to marriage, to enlistment in the armed forces of the United States and to major medical, psychiatric and surgical treatment, to represent the minor in legal actions and to make other decisions concerning the child of substantial legal significance.

   (b) The authority and duty of reasonable visitation, except to the extent that such right of visitation has been limited by court order.

   (c) The rights and responsibilities of legal custody, except where legal custody has been vested in another individual or in an authorized agency.

   (d) When the parent-child relationship has been terminated by judicial decree with respect to the parents, or only living parent, or when there is no living parent, the authority to consent to the adoption of the child and to make any other decision concerning the child that the child's parent could make.

§ 8–531(5), (8).

Importantly, these definitions apply only to article 5, "unless the context otherwise requires." Based on a fair reading of article 5, only section 538 uses these terms in a way where their defined meaning fits within the context and scope of the provision. Section 538 provides that if the Juvenile Court finds grounds to terminate the parent-child relationship, it shall terminate the relationship and *either*: (1) "[a]ppoint an individual as guardian of the child;" or (2) "[a]ppoint an individual as the child's guardian and vest legal custody in another individual or in an authorized agency." § 8–538(B). "Agency" means an agency licensed by DCS "to place children for adoption." § 8–531(2).

The duties and authorities of the "'guardianship of the person' with respect to a minor" *includes* "[t]he rights and responsibilities of legal custody, except where legal custody has been vested in another individual or in an authorized agency." § 8–531(8).

"Legal custody" is a "status" embodying the entirety of a finite list of "rights and responsibilities," which are subordinate to both "the powers, rights, duties and responsibilities of the *guardian of the person*" and "the residual *parental* rights and responsibilities." § 8–531(5).

Considering all the above: (1) a guardian of the person must be an individual; (2) legal custody may only be vested in an individual or an agency, and an agency is not DCS but rather an adoption agency licensed by DCS; (3) an individual must be appointed guardian of the person if legal custody is vested in a different individual or agency; and (4) the parent cannot be the individual appointed guardian of the person or the individual vested legal custody. This is consistent with, and unique to, the specific nature of parent-child termination proceedings. However, when these meanings are applied to pre-adjudication dependency proceedings, as attempted in this case, they are irreconcilable with the applicable statutes.

For example, section 512 requires DCS to provide "comprehensive medical and dental care" for a child "[i]n the custody of [DCS] in an out-of-home placement," and does not include any requirement that DCS obtain parental consent before doing so. § 8–512(A). Here, Brooke was in DCS's custody in an out-of-home placement and the Juvenile Court ordered DCS comply with section 512. But if the meanings of section 531 apply to section 512, then only a guardian of the person of Brooke had the authority to consent to any "comprehensive" medical care deemed "major." First, section 512 does not even contemplate where "comprehensive" medical care falls within, or outside, the hierarchy of "adequate" and "major" medical care under section 531. Second, no guardian of the person of Brooke was ever appointed under section 538. So, even if DCS were vested legal custody as that term is defined under section 531—and DCS could not have been vested legal custody because it is not an individual or agency—who is the guardian of the person of Brooke that DCS could have sought authority to consent to her "comprehensive" medical care deemed "major" medical treatment? And why would the definition of "legal custody" under section 531 have any more applicability than the definition of "custody" under section 8–101(5),

which provides similar, but key differences, in the rights and responsibilities regarding medical care? This scenario reflects that section 531 is wholly inapplicable to section 512.

Another example especially relevant to this case, section 272 allows for an "entity" to request that a "child" receive an inpatient assessment if the "child exhibits behavior that indicates the child may suffer from a mental disorder or is a danger to self or others." § 8–272(A). If a psychiatrist performs an inpatient assessment of the child and recommends inpatient psychiatric acute care services, the entity must file a motion with the Juvenile Court, a hearing must be held, and the services may be provided only if the Juvenile Court makes certain necessary findings of "clear and convincing evidence." § 8–272(F), (J). "Child" means a minor "in the temporary custody of [DCS] pursuant to section 8–821." § 8–272(S).

Section 272 evidences the legislature's intent that while a child is in the temporary custody of DCS, some medical services are sufficiently "major"—inpatient psychiatric acute care services—such that DCS must adhere to strict statutory procedures and obtain court approval before a child may receive such services. But if the meanings of section 531 apply to section 272, there is a conflict between the Juvenile Court's duty to make necessary findings before Brooke could receive inpatient psychiatric acute care services, and the authority of the guardian of the person of Brooke to consent to major psychiatric treatment. Further, if section 531 applied to section 272, then approval of the Juvenile Court would seem unnecessary. And neither section 531 nor section 272 gives a parent, like Christine, the duty to provide adequate medical care or authority to consent to major medical/psychiatric treatment. Section 531 has no application to section 272. Section 531 has no application outside of parent-child termination proceedings.

Additionally, it is clear the legislature enacted specific definitions that uniquely apply to the different proceedings and outcomes under articles 1, 5, and 12 affecting the "future permanent legal status of the child." § 8–862(A). Here, Brooke was neither adjudicated dependent nor had twelve months passed since she was removed from Christine's home, so the Juvenile Court was never required to order DCS to initiate adoption, permanent

guardianship, or parent-child termination proceedings. Further, these proceedings were not initiated by any other interested party as allowed under these articles. As shown above, until an adjudication of Brooke's dependency or the dismissal of DCS's dependency petition, Brooke was in the temporary legal care, custody, and control of DCS, and Title 8 prescribes the rights and duties of DCS regarding medical care and inpatient psychiatric acute care services for a child in its temporary custody, all of which were followed in this case.

Last, section 8–809.01, titled "Parent, guardian or custodian rights," was enacted in 2023. Act. of May 19, 2023, ch. 157, § 5, Ariz. Laws 2023 (amending Title 8, Chapter 4, Article 8, Arizona Revised Statutes, by adding section 8–809.01; relating to child welfare). Section 8–809.01 provides, in relevant part:

> C.  Unless parental rights have been terminated, exigent circumstances exist or as otherwise ordered by the court, a parent, guardian or custodian whose child is placed in the department's custody has the following rights:
>
> . . .
>
> 9.  To be consulted about the child's medical care, education and grooming.
>
> . . .
>
> F.  The rights provided in this section do not establish an independent cause of action.

§ 8–809.01(C), (F).

Pursuant to section 8–809.01, parents like Christine now have the right to be "consulted" about their child's "medical care." Based on a reasonable interpretation of "consulted," a parent whose child is in DCS custody during dependency proceedings does not have the right to make decisions about their child's medical care. In this case, the events occurred in 2018, at a time when Arizona law did not even provide a parent like Christine the right to be "consulted" about Brooke's medical care, much less the right to override the Juvenile Court's authority to vest DCS with the duty to provide comprehensive medical care and petition the Juvenile Court to approve inpatient psychiatric acute care services. In this

case, the Juvenile Court even accommodated Christine's request to be "consulted" about Brooke's medical care when it had no legal obligation to do so. **Ex. 43**, p. 2.

Accordingly, sections 8–512, 271, and 272 govern the Juvenile Court's authority to place Brooke in the temporary legal care, custody, and control of DCS, grant DCS the authority to consent to Brooke's medical treatment, and to approve Brooke's inpatient psychiatric acute services performed by Dr. Mlak. Section 8–531 does not apply.

## C. Dr. Mlak is Entitled to Summary Judgment on Plaintiffs' Remaining Claims

Claim twenty alleges, without any facts, that Dr. Mlak failed to provide the minimum accepted standard of care in caring for Brooke. **Ex. 1**, pp. 79–80. Claim twenty-one alleges Dr. Mlak committed an assault and battery upon Brooke because Dr. Mlak failed to obtain consent to administer Haldol to Brooke. **Ex. 1**, pp. 80–81. Claim twenty-three alleges Dr. Mlak is negligent for failing to "collect a full and complete medical and medication history from Christine . . . regarding Brooke;" "seek and receive parental consent before administering any medication, including Haldol, to Brooke;" and "administer only appropriate medications to Brooke." **Ex. 1**, pp. 82–83.

First, to the extent any of these claims are based on "consent," each fails for the reasons explained in Part II.B.3-4, *supra*. Collectively, all that remains is a patch-work allegation of medical negligence. However, this claim fails because Plaintiffs have not produced any evidence showing that Dr. Mlak breached the standard of care by administering Haldol to Brooke, or that such breach caused Brooke any injury.

A claim for medical malpractice is defined as "an action for injury or death against a licensed health care provider based upon such provider's alleged negligence, misconduct, errors or omissions." A.R.S. § 12–561(2). As with all negligence claims, a medical malpractice action requires proof of the existence of a duty, a breach of that duty, causation, and damages. *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9 (2007) (citing *Ontiveros v. Borak*, 136 Ariz. 500, 504 (1983). *See also Seisinger v. Seigel*, 220 Ariz. 85, 94, ¶ 32 (2009). Arizona law requires a plaintiff asserting a medical malpractice claim to prove negligence with expert

opinion testimony that the provider fell below the standard of care and that such deviation proximately caused the plaintiff's injury. § 12–563; *Seisinger*, 220 Ariz. at 94, ¶ 32 (noting that the standard of care must be established by expert medical testimony); *Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 12 (Ct. App. 2004) (noting that a "causal connection between an act or omission and the ultimate injury" must be established by expert medical testimony).

### 1.  *Plaintiffs Have No Evidence Establishing Breach of the Standard of Care*

Dr. Clark is Plaintiffs' psychiatry standard of care expert against Dr. Mlak. **Ex. 47**, pp. 1, 13–15. In his expert report, Dr. Clark opines Dr. Mlak fell below the standard of care by failing to "obtain an adequate history around Brooke's prior psychiatric treatment prior to prescribing her Haldol" and "take account of [Christine's] experience or concerns in that regard." **Ex. 47**, p. 15. At his deposition, Dr. Clark repeatedly testified that he holds no opinions about whether the manner in which Dr. Mlak prescribed and administered Haldol to Brooke was outside the standard of care, and that his sole standard of care opinion is limited to Dr. Mlak "not having obtained a history from the mother in particular and not taking account of her ongoing assessments or observations of how Brooke was doing." **Ex. 48**, 107:22–108:13, 111:3–12. Yet, Dr. Clark acknowledged that Dr. Mlak made several efforts to speak with Christine and obtain Brooke's medical history before prescribing Haldol to Brooke, and that Dr. Mlak spoke with Christine several times about her own assessments and observations of Brooke after he prescribe Haldol to Brooke. **Ex. 48**, 45:24–46:7, 48:19–49:13, 53:19–54:21; **Ex. 34**, **37–38**. Ultimately, Dr. Clark admitted it was not below the standard of care for Dr. Mlak to administer Haldol to Brooke under the circumstances and information available to him. **Ex. 48**, 60:18–62:1, 116:5–117:7.

First, Dr. Clark acknowledged Dr. Mlak made several attempts to contact Christine to obtain collateral information about Brooke's medical history before first prescribing her Haldol on September 7, 2018. **Ex. 48**, 53:19–23; **Ex. 20–21**, **30**. Specifically, Dr. Mlak left messages for Christine on August 26, 2018, August 27, 2018, and September 6, 2018. **Ex. 20–21**, **30**. Dr. Clark does not dispute what is documented in these records or Dr. Mlak's

corroborating testimony. **Ex. 48**, 53:24–54:7.

Second, Dr. Clark acknowledged Dr. Mlak spoke with Christine several times after he first prescribed Haldol to Brooke on September 7, 2018. **Ex. 48**, 48:19–49:13, 54:8–21; **Ex. 34, 37–38**. Specifically, Dr. Mlak first spoke with Christine on September 12, 2018, and he discussed Brooke's treatment plan and obtained information about Brooke's medical history. **Ex. 34**. Dr. Mlak next spoke with Christine on September 21, 2018, and she expressed that Brooke was having side effects from Haldol and then hung up the phone. **Ex. 37**. Dr. Mlak spoke with Christine a third time on September 28, 2018, and they discussed his treatment recommendation and plan for Brooke. **Ex. 38**.

Nevertheless, Dr. Clark believes Dr. Mlak "did not give adequate weight" to Christine's concerns that she expressed to him, and believes Dr. Mlak's assessments "should have integrated the mother's understanding and impressions of how her child was doing." **Ex. 48**, 47:20–48:24, 52:13–21. However, Dr. Clark admitted that Christine was not always correct in her own assessments of Brooke, and further admitted he found no documentation by any medical provider in Brooke's medical records reflecting that prior administration of antipsychotic medications, including Haldol, was counterproductive, caused her side effects, increased her aggression, or was ineffective. **Ex. 48**, 55:6–57:11, 63:18–64:13, 86:14–91:17.

Notably, Dr. Clark never testified that had Dr. Mlak "given adequate weight" or "integrated Christine's understanding and impressions," then Dr. Mlak's prescribing and administering Haldol to Brooke would have been outside the standard of care. Dr. Clark acknowledged that when Brooke was admitted to Aurora in August 2018, she was at risk of harming herself and others, and that Brooke's aggression increased in the days leading up to September 7, 2018. **Ex. 48**, 57:21–24, 59:3–60:11; **Ex. 29–30**. Dr. Clark agreed that "[a] doctor has a duty to protect a patient from harming themselves" and "from harming others." **Ex. 48**, 60:18–62:1, 116:5–117:7. Dr. Clark agreed "that a reasonable psychiatrist, if presented with a patient such as Brooke who is going through one of her aggressive outbursts, that the standard of care requires the doctor to take some action to reduce the aggressiveness

of Brooke." **Ex. 48**, 60:18–62:1, 116:5–117:7. Dr. Clark then admitted "it is not necessarily below the standard of care to prescribe Haldol to a patient like Brooke." **Ex. 48**, 60:18–62:1, 116:5–117:7. In fact, Dr. Clark was asked: "To a reasonable degree of medical certainty, did you develop a treatment plan for Brooke that you believe would have met the standard of care that did not include her being prescribed Haldol?" **Ex. 48**, 73:4–7. Dr. Clark decisively answered: "No." **Ex. 48**, 73:8. Dr. Clark made this admission after acknowledging that his opinions are based on "the big picture and with the benefit of 20/20 hindsight," which Dr. Mlak did not have, and which the standard of care is not measured against. **Ex. 48**, 55:6–18.

Aside from the above, whether the standard of care required Dr. Mlak to obtain and consider Christine's input is irrelevant in this case. Dr. Mlak's care and treatment of Brooke was provided with DCS's consent pursuant to lawful order by the Juvenile Court. **Ex. 27**. Christine's disagreement with Dr. Mlak's medical decision making does not override Brooke's best interests, which the Juvenile Court found to be inpatient psychiatric acute care services provided by Dr. Mlak with DCS's consent. **Ex. 27**. This is especially clear through the Juvenile Court's order of October 17, 2018, when it ordered that Christine's input "should be considered, but shall not be considered determinative of the appropriate course of treatment." **Ex. 43**. Brooke had no right of input before this order, and her right of input after this order never outweighed Dr. Mlak's medical judgment, which remained determinative.

Dr. Clark's testimony shows his standard of care opinions are baseless. He admits Dr. Mlak made efforts to speak with Christine before prescribing and administering Haldol to Brooke, and he admits Dr. Mlak spoke with Christine and considered her input after prescribing and administering Haldol to Brooke. **Ex. 48**, 48:19–49:13, 53:19–54:21. Whatever weight Dr. Clark believes Dr. Mlak should have given to Christine's input—which Dr. Mlak was not legally required to even consider—he admits Dr. Mlak's prescribing and administering Haldol to Brooke was <u>not</u> a deviation of the standard of care. **Ex. 48**, 60:18–62:1, 116:5–117:7. Plaintiffs have wholly failed to show through expert testimony that Dr. Mlak breached the standard of care.

**2. *Plaintiffs Have No Evidence Establishing Causation***

Even if the Court believes Plaintiffs have met their burden and established a deviation of the standard of care, Plaintiffs have failed to meet their burden to establish that such deviation caused any injury to Brooke. At deposition, Dr. Clark confirmed that his sole causation opinion is that "[a]s a result of Brooke's being unsuccessfully treated with Haldol over the course of approximately four weeks in September and October of 2018, she was unnecessarily exposed to a range of side effects and risks and her hospital course was unnecessarily prolonged for several weeks." **Ex. 47**, p. 15. This is unsubstantiated speculation.

First, Dr. Clark never explains how Dr. Mlak's alleged failure to obtain Brooke's medical history from Christine and alleged failure to consider Christine's input about Brooke caused Brooke's alleged injuries. Dr. Clark simply speculates that Brooke's alleged injuries were caused by Dr. Mlak's "unsuccessful" prescribing and administering Haldol to Brooke, despite admitting he has no standard of care opinions about Dr. Mlak's prescribing and administering Haldol to Brooke. **Ex. 48**, 107:22–108:13, 111:3–12.

Second, Dr. Clark admitted, and the medical records show, that Brooke did not suffer any side effects of Haldol. **Ex. 48**, 70:24–73:22. Dr. Clark admitted that to a reasonable degree of medical certainty, Brooke did not experience any permanent injuries or harm from the Haldol administered to her at Aurora. **Ex. 48**, 70:24–73:22. Dr. Clark testified that exposure to Haldol "somewhat" increased Brooke's risk "down the road" of developing tardive dyskinesia, but that as of 2024—six years since Brooke's admission to Aurora—she has not manifested any symptoms of tardive dyskinesia. **Ex. 48**, 70:24–73:22. Dr. Clark admitted that to a reasonable degree of medical certainty, based on the facts and circumstances presented to Dr. Mlak at the time, he had not developed a treatment plan for Brooke that he believes would have met the standard of care that did not include prescribing Haldol. **Ex. 48**, 73:4–8. Dr. Clark testified he cannot confirm to a reasonable degree of medical certainty that had Brooke been treated with a different medication than Haldol, her hospitalization at Aurora would have been shorter. **Ex. 48**, 70:24–73:22.

Based on this testimony, Plaintiffs have wholly failed to produce expert testimony that Dr. Mlak's alleged breach of the standard of care proximately caused Brooke's alleged injuries. Plaintiffs have not even produced any evidence that Brooke sustained any injury at all resulting from Dr. Mlak's care.

## III.    CONCLUSION

For the reasons asserted above, Dr. Mlak is entitled to summary judgment as a matter of law on claims fifteen, twenty, twenty-one, and twenty-three, and respectfully requests the Court dismiss these claims against him.

**RESPECTFULLY SUBMITTED** this 3rd day of July 2024.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: /s/  Vincent J. Montell
      Vincent J. Montell
      Dustin A. Christner
      *Attorneys for Defendant Krzystztof Mlak, MD*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of June, 2024, I electronically transmitted the foregoing with the Clerk of the Court using the CM/ECF system for filing, and copies were mailed to all counsel of record at the following addresses:

Thomas A. Connolly
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub
GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street
Phoenix, AZ 85020
*Attorneys for Plaintiffs*

Jeffrey S. Hunter
ERNAUD COOK DRURY MESAROS, PA
One N. Central, Suite 900
Phoenix, Arizona 85004
*Attorneys for Defendant Aurora*
*Behavioral Healthcare-Tempe, LLC*

By: ___/s/ Julie Irby_____