# Exhibit 1

Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub
(AZ Bar #009987)
Kristina Reeves (AZ Bar #031171)
**GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christina Scianna, am individual; Brooke Scianna, an individual; by nnd through her legal guardian, Christine Scianna,<br><br>Plaintiffs)<br><br>v.<br><br>State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Tina Canale, individually and as an employee with the State of Arizona Department of Child Safety; Christie Johnson aka Christi Mehl, individually and as an employee with the State of Arizona Department of Child Safety; Melissa Courtright, individually and as an employee with the State of Arizona Department of Child Safety, and Barry Courtright, her spouse; Nicholas Long, individually and as an employee | Case No.: 2:21-cv-01444-DJH<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL REQUESTED**<br><br>(Assigned to Hon. Diana J. Humetewa) |

with the State of Arizona Department of Child Safety; Gregory McKay, as former Director, Arizona Department of Child Safety; Michael Faust, as Director, Arizona Department of Child Safety; Aurora Behavioral Healthcare-Tempe, LLC, an Arizona Corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Krzystztof Mlak, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and Jane Doe Mlak, his spouse; Kattia Luevano, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Luevano, her spouse; Helen Nagle, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Nagle, her spouse; Care and Dignity Services, LLC, an Arizona Corporation, individually and as a services provider for the State of Arizona Department of Child Safety John and Jane Does 2-6; and Black Entities 1-5,

Defendants.

Plaintiffs Christine Sciartna and Hhooke TJclanna, hy and through their counsel, file this First Amended Complaint against the State of Arizona, Arizona Department Of Child Safety, Tina Canale, Christi Mehl, Melissa Courtright and Barry Courtright, Nicholas Long, Gregory McKay, Michael Faust, Aurora Behavioral Healthcare-Tempe, LLC, Krzysztztof Mlak and his jpouse, Kattia Luevano, and her spouse, Helen Nagle and her spouse, Care and Dignity Services, LLC, John and Jane Does 2-6, and Black Entities 1-5. Plaintiffs state and allege as follows:

## JURISDICTION AND VENUE

1.     Plaintiffs bring this mivil rights lawsuit pursuant to the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, the Civil

1  Rights Act of 1871, 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C.

2  §§ 12101-12213, the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794, A.R.S.

3  § 12-641, and Arizona common law.

4      2.    The amount in controversy exceeds the minimal jurisdictional limits

5  of this Court.

6      3.    This Court has original subject matter jurisdiction over the claims

7  made in this Complaint pursuant to Article 6, Section 14 of the Arizona

8  Constitution.

9      4.    The acts and events giving rise to the causes of action alleged herein

10 occurred in Maricopa County, Arizona, and all Defendants are subject to the

11 personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as

12 otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

13     5.    Venue lies in this Court pursuant to A.R.S. § 12-401 in that, among

14 other reasons, the specific acts giving rise to the causes of action alleged herein

15 occurred with primary effect in Maricopa County, Arizona.

16                           **THE PARTIES**

17     6.    Plaintiff Christine Scianna ("Christine") is an individual, a citizen of

18 the United States, and a resident of Maricopa County, Arizona. At all Times

19 relevant to the present Complaint, Christine resided in Maricopa County, Arizona.

20     7.    Defendant State of Arizona is a government entity that acts by and

21 through its officials, employees, and agents, including, without limitation, each of

22 the other Defendants in this action.

23     8.    Defendant the Arizona Department of Child Safety ("DCS") is a

24 governmental entity that acts by and through its officials, employees, and agents,

25 including without limitation, each of the other non-governmental entity

26 Defendants in this action.

27     9.    Defendant Tina Canale ("Canale") is an individual who resided in

28 Maricopa County, Arizona, at all times relevant to this Complaint. Canale was, at

1  all times relevant to the present Complaint, an employee of the State of Arizona

2  through DCS. At all times relevant to this Complaint, Canale was acting under the

3  color of law as an employee of DCS. She is named herein in her individual

4  capacity, as that term is used within the jurisprudence of the Civil Rights Act of

5  1871, 42 U.S.C. § 1983.

6      **10.**    Defendant Christi Mehl (fna Christi Johnson, referred to herein as

7  "Johnson") is an individual who resided in Maricopa County, Arizona, at all times

8  relevant to this Complaint. Johnson was, at all times relevant to the present

9  Complaint, an employee of the State of Arizona through the DCS. At all times

10  relevant to this Complaint, Johnson was acting under the color of law as an

11  employee of DCS. She is named herein in her individual capacity, as that term is

12  used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

13      **11.**    Defendant Melissa Courtright ("Courtright") is an individual who

14  resided in Maricopa County, Arizona, at all times relevant to this Complaint.

15  Courtright was, at all times relevant to the present Complaint, an employee of the

16  State of Arizona through the DCS. At all times relevant to this Complaint,

17  Courtright was acting under the color of law as an employee of DCS. She is named

18  drereindnirerindividuaimapacityra∧thatterm is used within the jurispradertcenL

19  the Civil Rights Act of 1871, 42 U.S.C. § 1983.

20      **12.**    Defendant Nicholas Long ("Long") is an individual who resided in

21  Maricopa County, Arizona, at all times relevant to this Complaint. Long was, at

22  all times relevantJo the presenLComplaint, an employee of the State of Arizona

23  through the DCS. At all times relevant to this Complaint, Long was acting under

24  the color-of law as an employee of DCS. He is named herein in his individual

25  capacity, as that term is used within the jurisprudence of the Civil Rights Act of

26  1871, 42 U.S.C. § 1983.

27      13.    DedendahFGregory McKay ("McKay") is an individual whoJesided

28  in Maricopa County, Arizona, at times relevant to the present Complaint. McKay

was, at all times relevant to this Complaint, the Director of the DCS. At all times relevant to this complaint, McKay was the official policymaker for the DCS. He is named herein in his official capacity.

14.    Defendant Michael Faust ("Faust") is an individual who resided in Maricopa County, Arizona, at times relevant to the present Complaint. Faust was, at all times relevant to this Complaint, the Director of the DCS. At all times relevant to this complaint, Faust was the official policymaker for the DCS. He is named herein in his official capacity.

15.    Defendant Aurora Behavioral Healthcare-Tempe, LLC, ("Aurora") is an Arizona corporation that was authorized to, and did, conduct business in the State of Arizona, including providing medical care services to children in the care and/or custody of DCS.

16.    Defendant Dr. Krzystztof Mlak ("Mlak") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Mlak was, at all times relevant to the present Complaint, an employee of Defendant Aurora. At all times relevant to this Complaint, Mlak provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, Mlak was acting under the color of law as a DCS service provider. Hedsmameddrerein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

17.    Defendant Kattie Luevano ("Kattie") is an individual who resided in Maricopa County, Arizona, at allLtimes relevantly this Complaint. Kattie was, at all times relevant to the present Complaint, an employee of Defendant Aurora. At all times relevant to thisAlemplaint, Kattie provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, Kattie was acting under the color of law as a DCS service provider. She is named herein in his individual capacity, Iis  tKaTterm  is  used^withirTtHe  jurisprudence  of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

18.     Defendant Herman LNU ("Herman") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Herman was, at all times relevant to the present Complaint, an employee of Defendant Aurora. At all times relevant to this Complaint, Herman provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, Herman was acting under the color of law as a DCS service provider. He is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

19.     Defendant Care and Dignity Services, LLC, is an Arizona corporation that was authorized to, and did, conduct business in the State of Arizona, including providing services to children in the care and/or custody of DCS.

20.     John and Janes Does 2-6 and Black Entities 1-5 are persons, agents, services, employees, business entities, partnerships, corporations, and/or unincorporated associations subject to suit in a common name whose true names are unknown to Plaintiffs and who are, therefore, designated by fictitious names. Plaintiffs will ask leave of the Court to substitute the true names of the said parties prior to the entry of Judgement herein.

21.     Whenever in this Complaint reference is made to any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does 1-5, and Black Entities 1-5, or their officers, agents, managers, members, representatives, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged otherwise.

22.     At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs allege, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or

6

any combination thereof of each of the remaining defendants, vice versa, or both. In addition, Plaintiffs allege, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

## FACTUAL ALLEGATIONS[1]

### I.   BACKGROUND

23.    Christine is the biological mother of Brooke.

24.    Brooke is a non-verbal, severely autistic individual. Brooke's date of birth is July 14, 2001.

25.    John Scianna ("John") is the biological father of Brooke.

26.    At all times relevant to this complaint, Christine and John were not married.

27.    At all times relevant to Ibis coiiiplaintTBrookmvvas a minor.

28.    At all times relevant to this complaint, Christine and John shared custody of Brooke. Brooke lived with Christine for the majority of the time, and John had parenting time with Brooke for approximately two days every other weekend.

29.    Christine has a degree in psychology and education, and a MS Ed. Degree in Education. At the time of the filing of this complaint, Christine has worked as a teacher for approximately 17 years.

[1] TPlamiiffs make the allegations in this Complaint based upon personal knowledge as to those matters in which they had personal involvement and upon information and belief as to all other matters.

Milas + Woods Law, SLLO
2055 #ot~12th #reet, Suite N1
Poznitz, AZ 8501>
#80.9C2=556

30.     At all times relevant to this complaint, Christine worked as an eighth-grade science teacher at Sonoran Heights Junior-High School.

31.     Prior to June 22, 2018, Christine had many services in place to assist Brooke with having a happy and healthy life. In order to appropriately care for Brooke, Christine had services in place from the following organizations:

a.  Mercy Maricopa Integrated Care (MMIC): a program administered by the Arizona Department of Health Services to assist persons within the MMIC service area who are seriously mentally ill;

b.  Division of Developmental Disabilities (DDD): a division of the Arizona Department of Economic Security which provides support and services to individuals with certain developmental disabilities;

c.  Child and Family Support Services (CFSS): a state contracted service provider who assists families in accessing behavioral healthcare services; and

d.  Arizona Children's Association (ACA): a state contracted service provider that provides behavioral health services to families.

32.     Despite Brooke's challenges, overall she was a happy teenager who enjoyed a close and caring relationship with Christine.

33.     Christine was also attentive to Brooke's medical needs and consistently called on the support of numerous doctors who assisted her in meeting Brooke's medical needs.

34.     On or about March 2, 2018, Brooke was released after a brief hospitalization at Aurora. Aurora employees discharged Brooke to the custody and control of Christine.

35.     On or about April 12, 2018, Christine contacted Dr. Michelle Hardenbrook, Brooke's treating psychiatrist via e-mail.

36.     In The Email Christina explained that she was concerned about Brooke because she had observed that Brooke's compulsive behavior was

8

increasing in severity. Christine asked Dr. Hardenbrook for assistance in helping Brooke.

37.    From on or about April 12, 2018 to April 13, 2018, the following email exchange occurred between Christine and Dr. Hardenbrook:

Dr. Hardenbrook: Unfortunately we treat OCD with antidepressants which take 3-4 weeks to start to have effect. Is this with 10 mg of Valium in the morning? I am wondering if for the short term, until we get the desired effect from the antidepressant, we might want to consider something that targets hyperactivity and impulsivity. Has she been on guanfacine (Tenex is brand name)? I don't see it in her profile here. It comes in an extended formula dosed once a day in the morning. At minimum, it might provide some calm while we wait for anafranil to start working.

Christine: I don't believe she ever took that. I think it would be a good idea to try that, though. She is so hyper that she cannot sit still. She resetting lhLrAdheWalram inAhe morning (usually 2)y because the school has been having similar issues with her compulsively putting things away.

Dr. Hardenbrook: I will send RX to the rpharmacy. It is dosed once day in the morning. It is an extended formula so should last throughout the day. We have to start at 1 mg but we can increase in WEEKLY increments. I will send RX to the pharmacy. If one is not effective you can increase to 2 after 1 week but let me know so that adjust the RX. This medication can be sedating the first

9

couple of days- though I doubt it will be in her case. Other possible side effect is dizziness.

38.     On or about April 17, 2018, Christine and Dr. Hardenbrook exchanged a series of e-mails about how to appropriately adjust Brooke's medications due to Brooke's negative behaviors increasing while Brooke was at school.

39.     On or about April 18, 2018, the following email exchange occurred between Christine and Dr. Hardenbrook:

Christine:          Mornings have become unbelievably stressful.  She rushes to get everything put away before she goes in the morning and wouldn't get on the bus until all was put away and she's still having problems with school.  Her compulsive behavior seems to be getting worse, because Sunday, she tried pulling plugs out of everything and the water cooler plug doesn't detach and she was going crazy (my boyfriend managed to bury the cord inside the cooler.\andihart finally helpedr SheVscrdriverrthat sheV beating her wrists up.  I've been looking into GABA and not sure if that would help.  Her behavior is so out control.  Meds don't seem to work.  Even the Valium doesn't sedate her and two henedryl doesn't do much either.

Dr. Hardenbrook:          When morning in particular are bad I always consider sleep as a probable culprit.

10

| | |
|---|---|
| Christine: | How can I make sure she's getting sleep? The melatonin doesn't seem to work for her. |
| Dr. Hardenbrook: | Let me look at her regimen. Is the OCD getting worse or just not getting better? We may want to increase Anafrail but I want to look at what is on board for sleep. |

40.     The week of April 16, 2018 was the week when Christine was required to administer AZ Merits testing to the students at her school. This week is consistently a busy and stressful week for teachers in Arizona, and during this week, due to the restrictive testing schedule, Christine's availability during the day was limited.

41.     For the week of April 16, 2018, Cassandra Tisdale, a High-needs case supervisor with ACA offered to assist Christine with any needs that arose during the day that week.

42.     On or about April 18, 2018, due to Brooke's behaviors while at school, an unknown school official from Brooke's school, ACCEL, contacted the MMIC Crisis Team. An unknown member of the MMIC Crisis Team then contacted Ms. Tisdale, however, this individual mistakenly believed thatc Ms. Tisdale was Christine. Ms. Tisdale informed the MMIC Crisis Team member that the crisis team could not take Brooke to the hospital. Christine was not made aware of this telephone call until several weeks later.

43.     After the above-described events occurring on or about April 18, 2018, based on Ms. Tisdale's refusal to allow the MMIC Crisis Team to take Brooke to the hospital, an unknown person from MMIC contacted the Arizona Department of Child Safety (DCS) and erroneously informed them that Christine had refused to consent to appropriate medical care for Brooke.

44.     Or on or about April 18, 2018, after Brooke returned home from school, Christine observed that Brooke had injuries on her knees, wrists and arms and

11

1    became concerned. The following email exchange occurred between Christine and

2    Dr. Hardenbrook:

3

4    Christine:                Is it possible to re-hospitalize Brooke? She came home

5                             crying and agitated and the school is basically housing

6                             her in a padded room during the day. Meds are doing no

7                             good. They have already suspended her once and are

8                             requesting another meeting because they can't handle

9                             her behaviors. She's out of control with punching her

10                            head, biting her wrists, and has bruises and bites on her

11                            knees. The school took pictures.

12

13   Dr. Hardenbrook:         Take her to the hospital. I don't know if they will

14                            hospitalize her or not, but you can have her evaluated.

15                            You can call her CM for directions on the process if

16                            needed or you can just take her.

17        45.    After receiving the above email from Dr. Hardenbrook, Christine then

18   received cm email froirr Msr Tisdale; which stated- "It would her bestiirscheduienrr

19   emergency meeting to discuss concerns and come up with some options for

20   Brooke. To put her back in the hospital would not be the best option. Let me know

21   a good day and time for everyone to meet. We can include the school on these

22   meetings as well tomom& up with some options for Brooke."

23        46.    After receiving the above email from Ms. Tisdale, Christine chose to

24   wait and see how Brooke did at school the following day rather tharrtaking her to

25   the hospital that evening.

26        47.    The next morning, on or about April 19, 2018, Christine sent an email

27   tbdETeciaHart fBfodke's DDUcoordinator), Danielle Howell (Brooke's HighmeedsT

28

1    case manager with ACA), Patrice Munday (Christine's assigned parent-partner

2    with ACA), and Ms. Tisdale.

3        48.    The email stated: "I went to give her a bath to try and relax her and I

4    saw her knees. This is bad. Something has to be done." Ms. Munday responded:

5    "Cassandra wants to stop by to see Brooke tomorrow but you need to let the

6    principal know it is okay to communicate with her. Also Cassandra had already

7    spoken with crisis team.  We need to set up a CFT as soon as possible to get

8    referrals sent. Call me with any questions, Cassandra is having trouble with her

9    phone."

10       49.    On or about April 19, 2018, the following email exchange occurred

11   between Christine and Dr. Hardenbrook:

12

13   Christine:                 OCD is getting worse.  GABA comes over the counter.  It

14                              was suggested I give her that, so I gave her that last night,

15                              but during the morning she was so hyper and OCD, yet

1C                             she slept all night. I met with DDD and I'd have to have

17                             her in full meltdown and 911 and her taken to emergency

is                             and I'm so ʌick from a respiratory infection right

19                              now...that would be a ton of stress.  They did think for a

20                              teen who is 5 foot 8, the dosages were low, because she's

21                              such a big girl. I don't know what to do.  Her agitation in

22                              the morning and compulsion is the worst it's been.

23

24   Dr. Hardenbrooke           So sorry you're sick on top of all this. I was planning to

25                              look at her meds yesterday but last plan was

26                              hospitalization. I will look over her medication this

27                              mommghancTmake some changes. Is thereTany chance

28                              she is constipated? I don't know her bowel regimen but

13

|    |                     |                                                                                     |
|----|---------------------|-------------------------------------------------------------------------------------|
| 1  |                     | the new medication can be constipating and we should                                |
| 2  |                     | consider underlying medical that she might not be able                               |
| 3  |                     | to verbalize- sleep too. You can give two of the Intuniv-                            |
| 4  |                     | this targets impulsivity and hyperactivity. I don't know                             |
| 5  |                     | anything about GABA to comment. I would have to do                                   |
| 6  |                     | research to give input. I will get back to you soon.                                 |
| 7  |                     |                                                                                     |
| 8  | Christine:          | The topic of constipation did come up and inflammation                               |
| 9  |                     | in joints, because she is biting wrists, knees, and areas                            |
| 10 |                     | that appear to be joints. She has a neurologist                                       |
| 11 |                     | appointment a week from tomorrow, so looking into                                    |
| 12 |                     | that, too. Benefiber was a suggestion if she is constipated.                          |
| 13 |                     | The school wants a meeting, because she is so out of                                 |
| 14 |                     | control at school that they cannot even have her in the                              |
| 15 |                     | classroom and that is even on 10 mg of valium. It is as                              |
| 16 |                     | though it isiTi even working at all. GABA is just Gamma-                             |
| 17 |                     | aminobutyric acid (GABA) is a key neurotransmitter                                   |
| 18 |                     | responsible for xaiming lire central nervous system:                                 |
| 19 |                     | Thank you for your continued effort to help out with                                 |
| 20 |                     | meds.                                                                                |
| 21 |                     |                                                                                     |
| 22 | Dr. Hardenbrook:    | Ha, I know what GABA, the neurotransmitter, is. I don't                              |
| 23 |                     | know that the research is on supplementation or what                                 |
| 24 |                     | the actual products contain. I am sorry my appointments                              |
| 25 |                     | today are all busy and I am trying to catch up in between.                           |
| 26 |                     | I will look over her profile and make some changes                                   |
| 27 |                     | today. I am wondering xFValiumTshaving a paradoxical                                 |
| 28 |                     | effect- making her more hyper and disinhibited. This is a                            |

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

|   | | |
|---|---|---|
| 1 | | possibility and it is definitely not having a positive effect. |
| 2 | | Do you think we can hold the PM dose and see? Actually, |
| 3 | | it is also a possibility with Benadryl though I know she |
| 4 | | has been taking it a while with the intended effect. I will |
| 5 | | get back to you today. |
| 6 | | |
| 7 | Christine: | I was wondering that, too, with the Valium. I didn't give |
| 8 | | it to her in the evening yesterday to see how she's act. In |
| 9 | | some ways she seemed better when DDD was here at 5, |
| 10 | | but then later, she started laughing and 5 minutes later |
| 11 | | was crying. I asked her if she was in pain and she said |
| 12 | | yeah, so I gave her ibuprofen 600 mg. She seemed to feel |
| 13 | | better, but the OCD behavior was so bad that at 8 last |
| 14 | | night she was trying to cram glass containers into the |
| 15 | | dish washer and they didn't fit and one broke. She went |
| 16 | | to bed after that, but the morning was rough and she |
| 17 | | hadn't even had any meds yet and was hyper vigilant |
| 18 | | trying to cram everything shednundrinydaces beforelhe |
| 19 | | bus arrived. She was really overstimulated this morning. |
| 20 | | Crisis was called to the school as behavior went from the |
| 21 | | time she got there to going home. Crisis was going to go |
| 22 | | talk to AZ Children's Assoc. It was hospitalize Jher or |
| 23 | | send her home again. She's coming home, but I don't |
| 24 | | know how much morelhe school and I can take. DDD |
| 25 | | said there was some sort of swab of cheek test that could |
| 26 | | be done to test how she responds to drugs. Do you know |
| 27 | | about it? They said it was some sort of genetic test. |
| 28 | | Thank you for your time. I understand being busy. It's |

been a crazy day.  Waiting to see if they are going to strike.  I voted against it right now.  Not a good time.

50.     On the morning of April 19, 2018, Brooke went to school as usual. During the day, Ms. Tisdale visited Brooke at her school. Ms. Tisdale observed that Brooke was exhibiting severe negative behaviors while at school. Concerned, Ms. Tisdale contacted Christine.

51.     Ms. Tisdale reported to Christine that Brooke's eyes appeared to be fully dilated and that although four school staff members were attempting to physically restrain her, they were not being successful. Christine suggested to Ms. Tisdale that Brooke should be hospitalized, and Ms. Tisdale responded that she would contact Aurora.

52.     On the afternoon of April 19, 2018, Christine received a call from the principal of ACCEL. The principal informed her that the MMIC Crisis Team was at the school and that they recommended that Brooke be taken to Thunderbird Banner Hospital (Thunderbird). Christine gave her approval for Brooke to be taken to Thunderbird.

53.     After speaking with Brooke's school principal, Christine called John. Christine explained to John what was occurring with Brooke. Since Christine was 45-minutes away from Thunderbird, and John was located near Thunderbird, they agreed that John would go to Thunderbird to meet the ambulance transporting Brooke, and Christine would arrive as soon as she could.

54.     After speaking with John, Christine informed her supervisors of the situation, and then left work to go to Thunderbird to be with Brooke.

55.     Brooke was admitted to Thunderbird that day and numerous tests were administered to determine if there were any medical conditions occurring which could explain Brooke's behaviors.

56.     On or about April 20, 2018, an unidentified DCS investigator went to Christine's home. The DCS investigator questioned Christine regarding

16

1  Christine's alleged refusal to follow the MMIC Crisis Team's recommendation to
2  hospitalize Brooke. Since Christine had never done so, however, she was confused
3  by the questions of the DCS investigator. The DCS investigator would not explain
4  to Christine to what alleged refusal she was referring.

5        57.    Christine was also confused by the questions of the DCS investigator
6  because, at that time, Brooke was hospitalized at Thunderbird with Christine's
7  consent.

8        58.    Later that afternoon, Christine went to Thunderbird to visit Brooke.
9  Brooke was in the behavioral ward of Thunderbird and was in restraints.

10        59.    At Thunderbird, tests determined that Brooke's CK levels were 6,666,
11  which indicated that Brooke had been dangerously close to renal (kidney) failure.
12  This meant that Brooke's kidneys could not remove waste and concentrated urine.

13        60.    Brooke was diagnosed with Rhabdomyolysis. Rhabdomyolysis is a
14  serious syndrome which is caused by a direct or indirect muscle injury. It results
15  from the death of muscle fibers and a release of their contents into the bloodstream.
16  It can lead to serious complications such as renal (kidney) failure. In rare cases,
17  rhabdomyolysis can even cause death. Thunderbird provided medical treatment
18  to Brooke.

19        61.    On or about April 30, 2018, with Christine's consent, Brooke was
20  transferred from Thunderbird to Aurora. Christine went to Thunderbird and
21  followed the ambulance transporting Brooke to Aurora and stayed with her at
22  Aurora until Brooke was settled and comfortable. Christine regularly visited with
23  Brooke during her hospital stay.

24        62.    On or about May 30, 2018, Brooke was released from Aurora into
25  Christine's care and custody.

26        63.    On or about June 1, 2018, Defendant Canale, a DCS investigator,
27  arrived at Christine's home as Christine was preparing to leave to attend a friend's
28  birthday celebration. Christine asked Canale to contact her about meeting at

another time and to contact Ms. Hart, Brooke's DDD Support Coordinator to become informed regarding Brooke.

64.     At the time Canale arrived, Brooke was resting. When Canale asked to see Brooke, Christine explained that disturbing Brooke would upset her.

65.     The exchange between Canale and Christine was witnessed by Ryan Last-Name-Unknown, Brooke's behavior coach.

66.     On or about June 6, 2018, Christine met with representatives of ACCEL and the school district. Christine expressed concerns that a vest the district was using to transport Brooke to school was too tight for Brooke and was causing Brooke pain and may have contributed to Brooke developing rhabdomyolysis. Representatives from the school district discussed that the following Monday, the transportation personnel would bring several vests with them, so that Brooke could try on different vests to find one that may fit better.

67.     In hearing the school district's plan, Christine expressed her concern that trying on different vests may trigger Brooke because Brooke would not be able to understand the reason for putting on different vests. All persons at the meeting discussed alternative methods of keeping Brooke calm during the bus ride to school.

68.     On or about June 10, 2018, Christine broke her foot.

69.     On or about June 11, 2018, Christine received a call from an unknown individual with the school district's transportation division who told Christine that personnel from the school district's transportation division would be arriving early that day to try vests on Brooke. Christine expressed her concern that if personnel attempted to place a vest on Brooke when the bus was not there, Brooke would not understand what was occurring, and could get upset.

70.     Despite Christine's concerns, later that morning, two unknown personnel from The school district of transportation office arrived at Christine and

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480-999-4556

Brooke's home. Christine escorted Brooke outside, and the transportation personnel attempted to try different vests on Brooke. Brooke became upset.

71. Brooke bit one of the persons on the shoulder and hit the other person and pulled her hair.

72. After being assaulted by Brooke, the transportation personnel ran to the sidewalk and stood near their car. Once there, their view of what occurred in the front of the house was obscured by several stucco pillars.

73. After the transportation personnel had run to their car, Brooke bit and hit Daniel Quigley ("Daniel"), a friend of Christine's who was present and was trying to assist with having Brooke try on the vests.

74. Daniel attempted to place Brooke in an appropriate safety restraining hold which he had been taught by qualified persons. This hold involved Daniel placing his hands on Brooke's jaw in order to encourage her to release her bite hold.

75. Brooke also bit Christine and stepped on Christine's broken foot. This caused Christine to experience severe pain, and Daniel instructed Christine to go into the home so that her broken foot would not be further injured.

76. Christine reluctantly went inside the home but continued to watch Brooke from the open front door.

77. Brooke then began to bang her head against the outside stucco of the home. Fearing that Brooke would seriously injure herself, Daniel placed Brooke in aa appropriate safety restraining hold that heJhad been Taught by qualified personnel. The purpose of the hold was to stop Brooke from continuing to bang her head and possibly seriously injuring herself.

78. When it appeared that Brooke had stopped attempting to bang her head, Daniel released Brooke from the safety restraining hold.

79. When Daniel released BrobkeTrom theTToId,ThbokeTarTtoward the street. Christine yelled for Brooke to stop.

19

80.     Brooke went to the vehicle of the transportation personnel and began to hit the vehicle with her hand. Daniel ran after Brooke and persuaded her to return to the house.

81.     Eventually, Daniel and Christine were able to calm Brooke down and the transportation personnel left.

82.     When the school bus arrived, Brooke put on a vest and boarded the bus. Christine then emailed the school district transportation office expressing her displeasure with the manner in which the situation had been handled by the personnel that morning.

83.     Christine also emailed John and explained what had occurred. Christine included in the email a photograph of the bite that Brooke had inflicted on her.

84.     On or about June 11, 2018, an unknown person called the DCS Hotline regarding the incident with the transportation personnel attempting to get Brooke to try on vests. The report stated that Brooke had become "very aggravated." The report falsely accused Daniel of attempting to choke Brooke. It also falsely accused Christine of leaving Brooke wandering in the street alone for ten minutes.

85.     On Tuesday, June 12, 2018, a person from ACCEL contacted Christine. Due to Brooke's recent violent behaviors while at school, the person recommended that Brooke be transferred to another school within the district, ACES. Christine agreed with the recommendation.

86.     Christine began to work with the district psychologis on transferring Brooke to ACES.

87.     On or about June 13, 2018, Canale contacted Christine about scheduling a meeting with her, John, and Brooke's care providers. Christine was led to believe that the meeting was in regard to the plan to transfer Brooke to ACES. The meeting was scheduled for Monday, June 18, 2018.

88.     On June 18, 2018, a meeting was held which Christine and John attended. The meeting was also attended by Daniel, Shannon Jones (John's significant other), Canale, and various of Brooke's DDD and behavioral health providers.

89.     Canale relayed to Christine and Daniel what was reported to DCS as allegedly occuring on the morning of June 11, 2018. Christine and Daniel provided Canale a true and accurate account, as outlined above, regarding what had actually occurred.

90.     Brooke's DDD and behavioral health providers all spoke favorably of Christine and her care of Brooke.

91.     At some point during the meeting, Ms. Tisdale arrived. Ms. Tisdale informed Canale that it was she who had refused to have Brooke taken to the hospital on April 18, 2018 and not Christine. This is the first time Christine learned of that incident.

92.     Arizona law, specifically A.R.S. § 8-456(C)(1) requires that "after receiving a DCS report from the centralized intake hotline," a DCS investigator, "shall":

> Make a prompt and thorough investigation. An investigation Trust
> evaluate and determine the nature, extent and cause of any condition
> created by the parents, guardian or custodian or an adult member of
> the victim's household that would tend to support or refute the
> allegaiiorL that the child is a victim of abuse or neglect and determine,
> the name, age and condition of other children in the home.

98.     Despite being informed of the falsity of the initial allegations, and her obligation to make a prompt and thorough investigation, including evaluating evidence that would tend to support an allegation of neglect or abuse, Canale refused to investigate the allegations.

94.   Despite the favorable reports from Brooke's DDD and behavioral health providers who knew Brooke and Christine and had worked with them for a significant period of time, during the meeting, Canale informed Christine that it was her intention to place Brooke in a group home and that if Christine did not consent to that plan, then she would just take action to remove Christine's parental rights.

95.   Despite Canale's threat to remove her parental rights, Christine did not agree to allow Canale to place Brooke in a group home.

## II.   THE UNCONSTITUTIONAL SEIZURE OF BROOKE.

96.   On or about June 19, 2018, Canale emailed Christine and informed her that Christine must agree to tour a possible group home for Brooke, and that if she did not, Canale would deem her to be not cooperating with her and would remove her parental rights.

97.   Christine was frightened and distressed by Canale's threat to remove her parental rights.

98.   Due to Canale's threat, Christine agreed to tour a possible group home for Brooke.

99.   On June 21, 2018, Christine and John toured a group home that Canale had selected as a possible placement for Brooke.

100.   During the tour, Canale once again informed Christine that she would be placing Brooke in a group home and that if Christine did not agree with her actions, then she would remove her parental rights.

101.   Canale also informed Christine that she was preparing the paperwork to remove Christine's parental rights for at least six months.

102.   Canale then unlawfully ordered Christine to bring Brooke to the group home that evening at 4:30 p.m. and surrender custody of her child to the state, and threatened that if Christine did not do so, then the paperwork to remove her parental rights would be filed with the court.

103.    When Christine returned home, she contacted an attorney. Based on what the attorney told her, Christine believed that the company who managed the group home Canale had selected did not have a good reputation and that Christine was not under any legal obligation to take Brooke to the group home and surrender her custody rights to the state.

104.    According to the progress report filed by DCS on June 28, 2018, while Canale was at the group home, she "explained" to Christine "how the Department will be taking custody but would like to facilitate an easy transition to the group home for the child's sake."

105.    The report does not discuss in any way what possible legal authority or lawful basis Canale had for seizing Brooke.

106.    Christine did not bring her child to the group home at 4:30 p.m. on June 21, 2018.

107.    After Christine did not bring Brooke to the group home at 4:30 p.m. on June 21, 2018, Canale did not take any steps to obtain a warrant to seize Brooke.

108.    On June 22, 2018, Canale arrived at Christine's home at approximately 1:10 p.m. and began to pound on her door and scream threats at Christine. Christine would not open the door.

109.    Christine could hear Canale yelling through her front door. Canale was yelling that she was there to seize Brooke.

110.    When Christine refused to allow Canale to unlawfully enter her home and seize her child, Canale called the police. Later, unidentified police officers arrived at Christine's home.

111.    When the police officers arrived at her home, Christine became even more fearful and telephoned an attorney.

112.    Christine went to the door and, through the door, asked Canale to telephone her attorney, and provide to Canale the name and telephone number of her attorney.

113. One of the police officers called the attorney at the telephone number Christine provided, and, in response to the request from the attorney, one of the police officers called the MMIC Crisis Team.

114. While waiting for the MMIC Crisis Team to arrive, Christine fed Brooke her lunch.

115. The MMIC Crisis Team arrived approximately 90 minutes after being called.

116. Once the MMIC Crisis Team arrived, Christine allowed Canale, the police officers, and the members of the Crisis Team to enter her home.

117. At approximately 1:10 p.m. on June 22, 2018, Canale seized Brooke from Christine.

118. Canale did not have a warrant for seizing Brooke.

119. In the time period between when Christine did not arrive at the group home with Brooke at 4:30 p.m. on June 21, 2018 until the time when Canale seized Brooke, Canale did not take any action to obtain a warrant to seize Brooke or obtain court authorization for her to seize Brooke.

120. At the time Canale seized Brooke, "Arizona law recognize[d] that juvenile courts can issue same-day motions for pickup" *MTmrrreru.* T'erfersorirSSO F. 3d 1066, 1076 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa,* 228 Ariz. 150, 151 (App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at imminent risk of abuse and/or neglect due to Mother's substance abuse'"); *Tyren T. v. Dep't of Child Safety,* No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct. App. Aug. 25, 2016); *Michael C. v. Ariz. Dep't of Econ. Sec.,* No. 1 CA-JV 12-0005, 2012 WL 1964581, at *1 (Ariz. Ct. App. May 31, 2012); *Magdaline L. v. Ariz. Dept. of Econ. Sec.,* No. 1 CA-JV 08-0076, 2008 WL 5403657, at *1 (Ariz. Ct. App. Dec. 07, 2008).

24

121. In the time period between when Christine did not arrive at the group home with Brooke at 4:30 p.m. on June 21, 2018 until the time when Canale seized Brooke, Canale had sufficient time to obtain a warrant or other court authorization to seize Brooke.

**122**. In seizing Brooke, Canale provided Christine with a temporary custody notice (TCN) signed by herself and Defendant Johnson as the approving supervisor.

123. According to a DCS press release in 2018, removal decisions do not and never have "rested solely with the child welfare investigator." "All child removals have always, and still require, a thorough case review and approval by the investigator's supervisor prior to DCS making a removal decision." DCS website, https://dcs.az.gov/news/november-29-2018-statement-dcs-regarding-removal-children (last visited October 31, 2019).

124. The TCN form lists several circumstances which purportedly justify an unwarranted seizure; the person completing the TCN is required to check the box next to whatever circumstance applies. On the TCN Canale used for seizing Brooke, no box was checked. The form did not in any way indicate what circumstance was alleged to exist which purportedly justified the unwarranted seizure.

125. After seizing Brooke, Canale placed Brooke into a different group home than the one toured by Christine and John.

126. Xanale refusedha inform Christine of the identity or Location nf the group home where Canale had taken Brooke.

127. Canale simply took Christine's child and then unnecessarily and cruelly forced Christine to undergo the trauma of not knowing where her child was.

III.   AGENTS OF DCS CONTINUE TO VIOLATE THE LAW.

128.   In the days following Canale's seizure of Brooke, Christine attempted to contact Canale numerous times to learn the status of her child, where she was, and if she was ok.

129.   Canale did not respond to any of Christine's calls. Instead, Canale unnecessarily and cruelly forced Christine to undergo the trauma of not knowing where her child was or if her child was okay.

130.   Canale also inexcusably forced Brooke to undergo the trauma of suddenly and inexplicably being separated from her mother.

131.   After seizing Brooke from the custody of her loving parents, Canale placed Brooke in a group home operated by Defendant Care and Dignity Services, LLC ("C&D group home").

132.   Under A.R.S. § 1-602 (A): "All parental rights are reserved to a parent of a minor child without obstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including:

1. The right to direct the education of the minor child.

2. All rights of parents identified im title 45, including the right to access and review all records relating to the minor child.

3. The right to direct the upbringing of the minor child.

4. The right to direct the moral or religious training of the minor child.

5. The right to make health care decisions for the minor child, including rights pursuant to §§ 15-873, 36-2271 and 36-2272, unless otherwise prohibited by daw.

133.   Under A.R.S. § 1-602 (B): "Unless those rights have been legally waived or legally terminated, parents have inalienable rights that are more comprehensive than those listed dn this section This chapter does not prescribe all

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

rights of parents. Unless otherwise required by law, the rights of parents of minor children shall not be limited or denied."

134.  After seizing Brooke, Canale did not take any steps to obtain court approval for her seizure.

135.  On or about June 27, 2018, six days after seizing Brooke, DCS filed a dependency petition, alleging that Brooke was dependent as to Christine and John.

136.  The dependency petition was signed, under penalty of perjury, and verified as being true and accurate by Johnson.

137.  In the dependency petition, Johnson made numerous statements which she knew to be false and/or which exhibited a reckless disregard for the truth, including, but not limited to the following statements:

a. "On or about June 11, 2018, after placing the child in an inappropriate choke hold during a behavioral episode, Christine went into the house and left the child unattended for about ten minutes while the child wandered in the street."

b. "[Christine] expected the school's transport staff to supervise the child."

c. "Christine frequently could not be reached when the school called her for emergency pickups."

d. "Christine stated that she sleeps upstairs on the opposite side of the house from the child and did not hear when the child once answered the door and allowed a stranger into the home."

e. "Christine reports that when the child's behaviors escalate, she will frequently hide in the bathroom from the child."

f. "…several providers report that Christine's home has been observed as dirty and always kept dark."

g. "Christine's behavior is erratic…"

h. "Christine blames the school for the child's behavioral issues and states the child does not have the issues in her home; however, the

communications between Christine and the school indicate that Christine has the same issues in her home."

i. "Christine changed the child's medications at least five times within a span of 20 days."

j. "On or about June 11, 2018, Christine and her significant other were observed

placing the child, Brooke, in an inappropriate hold to contain her behaviors."

k. Christine held Brooke "against the wall by her neck."

l. "Brooke had a red mark and scratch on her neck after this incident."

m. "Father did not attend the child's medical appointments or stay up to date on what medications she was on."

n. "Father did not allow the child's DDD supports in his home to work with the child."

o. "Father had concerns about what may be occurring in Christine's home but did not take any actions to protect his child."

p. "Father stated he does not have a home that the child can reside in with him

at this time."

138.    On or about June 28, 2018, DCS filed with the court a progress report, signed by Canale and Johnson.

139.    In the progress report, Canale and Johnson made numerous statements which they knew to be false and/or which exhibited a reckless disregard for the truth, including, but not limited to the following statements:

a. "Mother stated that she had 'almost' called crisis the night prior due to behaviors in her presence."

b. "A higher level of care was recommended to Mother."

c. "Mother agreed that she would take the child to a hospital after school."

28

d. "Grandmother was contacted and told the principal that Mother had decided not to take Brooke in the night before because she did not feel well and did not want to sit in the lobby and wait."

e. "Mother stated that she could not come" to Thunderbird Hospital on April 20, 2018, "and Father could handle it."

f. "Brooke was last hospitalized at the beginning of March and there was "no change" when she returned to school."

g. On or around Jun 11, 2018, "Brooke was going towards mother and the boyfriend when they put their hands on her. Mother and the boyfriend each put a hand on the front of Brookes neck and pushed her against the wall. Mother and the boyfriend held Brooke against the wall by her neck for a few minutes. It is unknown if Brooke had any difficulty breathing. Later the boyfriend was seen stopping himself from hitting Brooke several times. The boyfriend would start to swing and stop instantly. At one point Brooke stepped on mother's toe and mother went inside bawling. Brooke was left outside wandering out in the street for about 19 minutes before she went back into the yard. Brooke had become upset over a safety vest she is supposed to wearurrthe rideTo schoot"

140.   On July 2, 2018, based on the false allegations contained in the dependency petition and the false statements contained in the June 28, 2018 progress report, the Arizona juvenile court ordered:

"IT IS ORDEREDhpermitting the Christine to have visits with the child through approved safety monitors."

"IT IS ORDERED permitting Christine to have supervisedhvisits with the child by the hospital stabilization representative through CFSS throughout the community or in the group home, if allowed."

"IT IS ORDERED continuing the child as a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety."

141. Soon after the July 2, 2018 hearing, Canale turned management of Brooke's case over to Defendant Courtright, a DCS Case Manager.

142. From on or before August 6, 2018 until the dependency proceedings in this matter were dismissed, Courtright's supervisor at DCS was Defendant Long.

143. As Courtright's supervisor, Long was aware of and approved of each action taken by Courtright. Without Long's knowledge and approval, Courtright would not have taken any action regarding Brooke and her parents.

144. Long participated substantially in every action taken by Courtright.

145. On July 12, 2018, in response to Christine's objection regarding Courtright's failure to allow Christine to visit Brooke on her birthday, the court ordered that Courtright arrange for Christine to visit Brooke on Brooke's birthday.

146. On or about July 16, 2018, Christine received an email from a doctor's office regarding an appointment for Brooke made with that office. This appointment had been made without Christine's knowledge or consent.

147. On or about July 16, 2018, in an email to Christine, Courtright stated: "I have staffed with my supervisor as well and any information in regard to Brooke and medical information will come directly through DCS, this goes for all other services as well."

148. On or about August 3, 2018, in an email to Christine, Courtright informed Christine that she would be scheduling medical appointments for Brooke and that these appointments would be scheduled without Christine's knowledge, input, or consent. The email further stated: "Please note that appointments will not be rescheduled or changed if you are not able to belh attendance."

149.    On August 6, 2018, Courtright emailed Christine and informed her that she, without Christine's consent or authorization, had scheduled numerous appointments for Brooke regarding Brooke's education and medical care, including appointments regarding Brooke's mental health treatment. In the email, Courtright informed Christine that Christine could attend the appointments if she chose, but that the appointments would not be rescheduled if Christine was unable to attend.

150.    Under Arizona law, specifically, A.R.S. § 36-2272:

    A. Except as otherwise provided by law or a court order, no person, corporation, association, organization or state-supported institution, or any individual employed by any of these entities, may procure, solicit to perform, arrange for the performance of or perform mental health screening in a nonclinical setting or mental health treatment on a minor without first obtaining the written or oral consent of a parent or a legal custodian of the minor child. If the parental consent is given through telemedicine, the health professional must verify the parent's identity at the site where the consent is given.

    B. This section does not apply when an emergency exists that requires a person to perform mental health screening or provide mental health treatment to prevent serious injury to or save the life of a minor child.

    C. A person who violates this section is guilty of a class 1 misdemeanor.

    D. For the purposes of this section, "parent" means the parent or legal guardian of a minor child.

151.    On or about August 6, 2018, Brooke was taken to a medical appointment by unknown DCS agents or employees. Christine was never informed of this appointment and Avasthi is notable to be present for it.

152.   In 2014, the Arizona Supreme Court made clear that, even when a child is found dependent, under Arizona law, DCS "does not serve as a 'guardian.'" *Alexander M. v. Abrams*, 235 Ariz. 104, 106 (2014). Rather, once "legal custody of the child has been given by order of the juvenile court," to DCS, DCS is legally the child's "custodian."

153.   As an agent of DCS, Courtright knew, or reasonably should have known, that DCS was not Brooke's guardian.

154.   At the time Courtright acted to procure, solicit to perform, arrange for the performance of, or perform mental health screening in a nonclinical setting or mental health treatment on Brooke, she was acting in violation of Arizona law.

155.   In a series of emails beginning on August 8, 2018, Courtright informed Christine that, without Christine's consent or authorization, Courtright had determined to move Brooke to a new school, ACES. Courtright informed Christine that a meeting with personnel at the school had been scheduled to discuss Brooke's transition to the school. Although Christine objected to the meeting being held when she could not attend, Courtright refused to reschedule the meeting.

156.   In an email to Christine, dated August 10, 2018, Courtright stated: "I also want to be sure that you are aware that the school will not prrovxdcryou information, make appointments, or change appointments *as DCS is guardian*...Also please note this will be the same on all medical appointments." (Emphasis added).

157.   Courtright's statement that DCS was Brooke's guardian was false and/or showed a reckless disregard for the truth and was made for the purpose of infringing on Christine and Brook's fundamental, constitutional rights.

158.   Although Courtright knew, or reasonably should have known, that DCS was not Brooke's legal guardian and had no legal right to take any action to

1    stop Brooke's school from providing information to Christine, making
2    appointments with Christine, or allowing Christine to change appointments, she
3    nonetheless did so.

4        159.   On August 21, 2018, the court held a temporary custody hearing.
5    Based on the false allegations in the dependency petition and in the filed progress
6    report, the court found that temporary custody of the child was clearly necessary
7    to prevent abuse, pending the hearing on the dependency petition. It therefore
8    ordered that Brooke would remain a temporary ward of the Court, committed to
9    the care, custody and control of DCS.

10       160.   In all incident reports from the C&D Group Home, in which Brooke
11   had been placed, the form used lists DCS as Brooke's "guardian." Neither
12   Courtright nor any other person from DCS took any steps to correct this error.

13       161.   Neither Courtright nor any other person from DCS took steps to
14   ensure that Christine was notified of the incidents at the C&D Group Home,
15   although, as Brooke's parent and legal guardian, she had a legal right to be
16   immediately notified of any incident.

17       162.   The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§
19   12101-12213 (2018), is a federal law that requires public entities to make reasonable
19   accommodations for qualified individuals with disabilities.

20       163.   The ADA prohibits a public entity from discriminating against a
21   qualified individual with disabilities in the provision or operation of public
22   services, programs, or activities. *Tennessee v. Lane*, 541 U.S. 509, 517 (2004).

23       164.   Section 504 of the Rehabilitation Act applies the same requirement to
24   entities that receive federal financial assistance. *See In re* H.C., 487 A.3d 1254, 1265
25   (D.C. 2018).

26       165.   Under the ADA, a qualified person with a disability shall not, "solely
27   by reason of her or her disability, be excluded from the participation in, be denied

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4856

33

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

166.    The ADA imposes an affirmative duty on public entities to make reasonable accommodations for qualified individuals with disabilities. 28 C.F.R. § 35.130(b)(7) (2018).

167.    DCS is a public entity.

168.    Brooke is a qualified individual with a disability, as that term is used in 42 U.S.C. §§ 12101-12213.

169.    The services that DCS offered to Brooke are public services.

170.    DCS is an entity that receives federal financial assistance.

171.    Despite being well aware of Brooke's disability and that requirement of federal law that DCS offer her services that were reasonably accommodated to her disability, no agent of DCS complied with federal law by offering Brooke services that were reasonably accommodated to her disability.

IV.    **AFTER UNLAWFULLY SEIZING BROOKE, DCS AGENTS PLACED HER IN C&D GROUP HOME, WHERE SHE WAS NEGLECTED AND/OR ABUSED.**

172.    After seizing Brooke from her loving and caring parents, Canale and Johnson placed Brooke in the C&D Group Home.

173.    On or about July 9, 2018, an unidentified employee of the C&D Group Home notified Canale that Brooke had sustained injuries from allegedly biting her hand and breaking the glass on a picture. Canale took no action.

174.    On or about July 16, 2018, an unidentified employee of the C&D Group Home notified Courtright that Brooke had sustained injuries from allegedly "pounding" her forehead into the wall and from repeatedly hitting her wrist on the wall. Courtright took no action.

175.    On or about July 19, 2018, a "CFT" was held which Christine attended. During th UCFT, ah e ttempfecF tcT contact the C&D Group Home manager, Shawnee LNU, but was unable to reach her.

176.    For the majority of "CFT's" held regarding the care of Brooke, no person, employee, and/or agent from the C&D Group Home attended. Courtright took no action in response to the group home's failure to attend these meetings intended to ensure that Brooke was receiving the appropriate care, in large part from the C&D Group Home.

177.    At the "CFT" held on or about July 19, 2018, Christine informed Courtright that employees of C&D Group Home had failed to take Brooke to her yearly medical exam, although they had been aware of the appointment. The appointment was rescheduled for July 25, 2018. Christine went to the rescheduled appointment, however, employees from the C&D Group Home again failed to bring Brooke for her appointment. Courtright took no action.

178.    On or about July 23, 2018, an unidentified employee of the C&D Group Home notified Courtright that Brooke had allegedly sustained injuries from hitting a light switch, biting her hands, and hitting her head on the wall. The police were called, and Brooke was placed in handcuffs.

179.    When the police arrived, Brooke was strapped to a gurney and taken to Arrowhead Hospital (Arrowhead). This was done without Christine's knowledge or consent. Arrowhead would not admit Brooke, so she was returned to the C&D Group Home. Courtright took no action.

180.    On or about July 26, 2018, Christine had a visitation with Brooke. Christine brought Brooke **strawberries,** mini-tomatoes, and plums which are some of Brooke's favorite snacks. Christine observed that Brooke appeared to be starving.

181.    Brooke quickly ate all the food Christine had brought. Brooke's CFSS Behavior coach Grace LNU also attended this visitation. Christine notified Courtright of her concerns about Brooke, but Courtright took no action.

182.    Or for about July 15, 2018 employees of the C&D Group Home failed to bring Brooke for a scheduled visit with Christine. Christine notified Courtright

of the failure of employees of the C&D Group Home to provide a visitation which the court had determined was in Brooke's best interest, but Courtright took no action.

183.   On or about July 30, 2018, Christine had a visitation with Brooke. Christine brought Brooke strawberries, cherry tomatoes and plums for Brooke. Christine observed that once again Brooke appeared to be starving.

184.   Brooke quickly ate all the food Christine had brought.

185.   Brooke's shirt and shorts were on backward.

186.   Brooke's hair was also unkempt.

187.   Christine notified Courtright of her concerns about Brooke, but Courtright took no action.

188.   On or about August 3, 2018, Christine had a visitation with Brooke. Christine brought Brooke strawberries, cherry tomatoes, plums, and vegetable chips for Brooke. Christine observed that once again Brooke appeared to be starving.

489.   Brooke quickly ate all the food Christine Asad brought. Christine notified Courtright of her concerns about Brooke, but Courtright took no action.

190.   Due to the problems the employees of the C&D Group Hommwere experiencing with Brooke's behavior, an emergency medical check was scheduled for Brooke, for on or about August 6, 2018. The employees of C&D Group Home, however, neglected to bring Brooke for this medical appointment. Courtright took no action.

191.   On or about August 7, 2018, an unidentified employee of the C&D Group Home notified Courtright that—Brooke had sustained injuries from allegedly biting her knee and then had licked the blood from the injury. Courtright took no action.

192.   On or about August 18, 20187employees—oFThtTC&D Group Home arrived one-hour late for a scheduled visitation with Christine.

193.   When Brooke arrived for the visit, Christine noticed a concerning bruise on the back of Brooke's shoulder, and Christine documented the bruise by taking a photograph. Later that day, Christine informed Courtright of the bruise and provided her with the photograph. Courtright took no action.

194.   On or about August 22, 2018 Brooke was taken by ambulance from the C&D Group Home to Arrowhead.

195.   On or about August 22, 2018, Christine had a visitation scheduled for 4:30-6:30 p.m.

196.   When Christine arrived at the C&D Group Home for her scheduled visitation, there were two unknown DCS employees present. One of the unknown DCS employees informed Christine that Brooke had been taken to a hospital.

197.   In response to Christine's request to know to which hospital her child had been taken, the unknown DCS employee contacted the employee's supervisor. The unknown DCS employee informed Christine that Christine would not be informed as to which hospital her child had been taken until Brooke was deemed "stable."

198.   After learning that Brooke had been taken to the hospital, Christine repeatedly requested that Courtright inform her of the hospital to which her child had been taken. Courtright, however, refused to provide Christine with this information.

199.   Christine was not informed of the name of the hospital to which her child had been Taken until *two days later,* on or about August 24, 2018.

200.   On August 24, 2018, Christine was finally told that Brooke was at Arrowhead and was finally able to see her. Christine immediately went to Arrowhead to be with her child.

201.   After arriving at Arrowhead, Christine observed that Brooke had extensive and concerning burns and abrasions on her face that appeared Tasthough someone had dragged Brooke across a rug or carpeting.

202.   An unidentified nurse at Arrowhead informed Christine that unidentified employees of the C&D Group Home had informed hospital personnel that while at the C&D Group Home, Brooke had been eating her own feces. Brooke had never before exhibited this behavior.

203.   An unidentified medical professional at Arrowhead told Christine that Brooke's facial injuries appeared to be the result of someone purposefully dragging Brooke across a carpeting so harshly that Brooke's face was burned and injured.

204.   Christine also observed that it appeared that Brooke had not bathed for an extended period of time.

205.   Brook had large segments of dried gum in her hair and her hair was severely matted.

206.   Brooke's fingernails had been removed to below the nail bed.

207.   Brooke had traces of dried feces and blood on her hands and under her fingernails.

208.   On or about August 27, 2018, a "CFT" was held which Christine attended. At that meeting, Long informed Christine that a criminal investigation into the abuse and/or neglect inflicted upon Brooke by personnel at the C&D Group Home had been opened.

209.   On August 30, 2018, DCS filed a motion with the court asking it to approve of Brooke's hospitalization. The next day, the court granted the motion and scheduled a hearing for September 4, 2018.

210.   On September 4, 2018, the court held a hearing regarding Brooke's hospitalization. Due to concerns regarding the C&D Group Home, where agents of DCS had placed and kept Brooke, the court ordered that Brooke was not to be removed from the hospital and placed anywhere without court approval.

211.   Although The court approved of the hospitalization of Brooke, nothing in the court's order authorized any person from DCS to authorize any

1  aspect of Brooke's mental health treatment under A.R.S. § 36-2272 as Brooke's

2  parent or legal guardian.

3  V.  **BROOKE'S HOSPITALIZATION** AND **ULTIMATE END TO THE**
   **HORRIFIC ORDEAL INFLICTED ON PLAINTIFFS BY DCS**

4  **EMPLOYEES.**

5  212.  On or about August 22, 2018, Arrowhead staff notified Courtright that

6  a bed for Brooke had become available at Aurora and that they recommended that

7  Brooke be moved to Aurora.

8  213.  While at Arrowhead, Brooke was unable to shower because the

9  hospital did not have the necessary facilities. Neither was Arrowhead equipped to

10  provide Brooke with the level of care she needed.

11  214.  Despite the fact that Brooke was not receiving the treatment needed

12  at Arrowhead and the medical recommendation that Brooke be moved to Aurora,

13  Courtright did not inform Christine of the recommendation so that Christine could

14  take the steps necessary to have Brooke moved to Aurora.

15  215.  Courtright failed to take any appropriate action to facilitate the

16  transfer, and as a result of Courtright's failure, Brooke was not moved to Aurora

17  until three days later, on or about August 25, 2018.

18  216.  On or about August 25, 2018, Courtright went to Arrowhead and,

19  without consulting Christine or John or obtaining any parental consent, and

20  although Courtright was neither Brooke's guardian nor her parent, Courtright

21  took action to have Brooke admitted to Aurora for mental health treatment and,

22  although she had no legal authority to do so, Courtright purported to authorize

23  Aurora to provide mental health treatment for Brooke.

24  217.  On the evening of on or about August 25, 2018, Brooke was

25  transported by ambulance from Arrowhead to Aurora. Christine was at

26  Arrowhead when Brooke was transferred and followed the ambulance from

27  Arrowhead to Aurora.

28

218.   Upon arriving at Aurora, Brooke immediately went to the bathroom and prepared to take a shower. Before Brooke was able to shower, however, an Aurora employee informed Christine that Courtright had not completed the necessary paperwork correctly and that Brooke would have to be taken to the lobby until the error was corrected.

219.   When Brooke was taken to the lobby, she became confused and responded by banging her head repeatedly into the wall of the lobby until Christine and Aurora staff were able to restrain Brooke.

220.   Brooke was forced to spend approximately two hours in the lobby while Christine completed the necessary paperwork that Courtright had failed to earlier provide to Christine so that Christine could complete it.

221.   On or about September 20, 2018, although she had no legal authority to do so, Courtright purported to authorize Defendant Mlak, Brooke's treating physician, to administer Haldol to Brooke as part of her mental health treatment. At the time she did so, Courtright was aware that Christine did not consent to Brooke being given Haldol because Brooke had previously had a negative reaction to it. Courtright was also aware that John had also not consented to Brooke being given Haldol.

222.   On or about September 20, 2018, although he had not obtained any lawful authority to do so, Mlak administered Haldol to Brooke. At the time Mlak did so, he was aware that neither Christine, John, nor any legal guardian for Brooke had consented to Brooke being given the medication.

223.   On or about September 26, 2018, Courtright informed Christine that although she had no legal authorise do so, Courtright had purported to authorize Mlak to increase Brooke's dose of Haldol, and Mlak had done so based on Courtright's fraudulent authorization.

224.   At the time Courtright purported to authorize Mlak to increase Brooke's dose of Haldol, she was aware that Christine objected to Brooke's dose

1   of Haldol being increased. Courtright also was aware that she did not have John's

2   consent to agree to the increase in Brooke's dose of Haldol.

3       225.    Although she had no legal authority to do so, Courtright continued

4   to purport to authorize Aurora personnel to provide Brooke with Haldol as part

5   of Brooke's mental health treatment, until November 16, 2018, when Brooke was

6   finally discharged.

7       226.    The period of August 27, 2018 until November 16, 2018 — 81 days —

8   was the longest period of hospitalization that Brooke had ever experienced.

9       227.    On November 15, 2018, after a hearing, the court granted Christine's

10  motion that Brooke be placed with her once Brooke was discharged from Aurora.

11  It also ordered that Brooke would remain a temporary ward of the Court,

12  committed to the care, custody and control of DCS. The court did not appoint DCS

13  as Brooke's legal guardian.

14      228.    On or about November 16, 2018, Brooke was discharged from the

15  hospital and placed with Christine.

16      229.    On or about February 11, 2019, DCS filed a motion to dismiss all

17  dependency proceedings. DCS attached to its motion, a progress report to the

18  court dated February 5, 2019. This report was signed by A5 ourtright arrckfcong:

19      230.    In this report, it stated that "[s]ince being back in Christine's care

20  Brooke has overall been doing well."

21      231.    The report also noted that Christine's psychological evaluation did

22  not yield jffly recommendations for services and that DCS was not providing any

23  services to the family.

24      232.    The report also noted that Brooke's needs were being met by Christine

25  with assistance of CFSS and DDD. These were the same circumstance as before

26  DCS's interference with this family.

27      2331    Christine had been meeting Brooke's needs with the assistance of

28  *CFSS and DDD prior to DCS's intervention in their family.*

234. On February 2, 2019, the court dismissed all proceedings.

235. No finding of dependency as to Christine or John was ever found by any court. Nor was legal guardianship over Brooke ever granted to DCS.

## CLAIMS

### CLAIM ONE:

**(The State of Arizona is liable for violating Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (ADA), and § 504 of the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794.)**

236. Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

237. The Arizona Department of Child Safety (DCS) is a public entity and a government agency of the State of Arizona.

238. Employees of the DCS are employees of the State of Arizona.

239. The State of Arizona is vicariously liable for the acts of its employees which violate the ADA and the Rehabilitation Act.

240. Brooke is a qualified individual with a disability under the ADA and the Rehabilitation Act because she has a mental impairment that substantially limits oht of more major life activities.

241. Brooke was excluded from participation in and/or denied the benefits of the services, programs, and/or activities of DCS, and/or otherwise discriminated against by DCS, and this exclusion, denial of benefits, and/or discrimination was by reason of her disability.

242. Brooke was excluded from participation in and/or denied the benefits of the services, programs, and/or activities of the DCS, and/or otherwise discriminated against by DCS when employees of DCS failed to offer her services that were reasonably accommodated to her disability.

243. Brooke was untitled to receive the benefit of services provided by DCS.

244. Brooke was denied these benefits solely by reason of her disability.

245. The services that DCS offers are programs and/or activities that receive federal financial assistance.

246. DCS employees intentionally and/or with deliberate indifference failed to provide Brooke with meaningful access to services and/or make reasonable accommodations in its provision of services.

247. DCS employees were aware from the inception of its involvement in this family that Brooke has a mental disability.

248. Once DCS employees became aware of Brooke's disability, they had a duty to investigate options for providing a reasonable accommodation by gathering "information from [both the disabled individual and] qualified experts as needed to determine what accommodations are necessary to enable" the individual to meet relevant standards. *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir. 1985). No DCS employee did so.

249. Despite her cognitive disability, and the applicable federal guidance, DCS employees repeatedly failed to provide Brooke with services that reasonably accommodated her disability.

250. The failure of DCS employees to offer Brooke meaningful access to services was due solely to her disability.

251. If not for her disability, DCS would have provided Brooke with services that did not result in her being hospitalized from August 27, 2018 until November 16, 2018, a period of approximately 81 days.

252. If not for the discriminatory acts of DCS employees and their repeated failure to offer Brooke services that were reasonably accommodated to her disability, there is a reasonable probability that she would not have suffered injuries and/or conditions that required her to be hospitalized from August 27, 2018 until November 16, 2018, a period of approximately 81 days

43

intrusion cannot be longer than necessary to avert the injury. *Wallis*, 202 F.3d at 1138-1141.

262. At the time Canale seized Brooke, "Arizona law recognize[d] that juvenile courts can issue same-day 'motions for pickup.'" *Demaree v. Pederson*, 880 F. 3d 1066, 1076 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa*, 228 Ariz. 150, 151 (App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at

order unless they have "information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Rogers v. County of San Joaquin,* 487 F. 3d 1288, 1294 (9th Cir. 2007).

261.   At the time Canale and Johnson seized Brooke, it was well established that a state official "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued," the "scope of the intrusion" must be "reasonably necessary to avert" a specific injury, and the intrusion cannot be longer than necessary to avert the injury. *Wallis,* 202 F.3d at 1138-1141.

262.   At the time Canale seized Brooke, "Arizona law recognize[d] that juvenile courts can issue same-day 'motions for pickup.'" *Demaree v. Pederson,* 880 F. 3d 1066, 1076 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa,* 228 Ariz. 150, 151 (App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at imminent risk of abuse and/or neglect due to Mother's substance abuse'"); *Tyren T. v. Dep't of Child Safety,* No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct. ALppr Augr25, 2016); *MichaeDC: v. ArizrALep'trof Rcam Secr,AAcr* 1 CA=JV LM0005, 2012 WL 1964581, at *1 (Ariz. Ct. App. May 31, 2012); *Magdaline L. v. Ariz. Dept. of Econ. Sec.,* No. 1 CA-JV 08-0076, 2008 WL 5403657, at *1 (Ariz. Ct. App. Dec. 30, 2008).

263.   At the time Canale and Johnson seized Brooke, they dkLnot have information that established reasonable cause to believe that Brooke was in imminent danger of serious bodily injury.

264.   Prior to seizing Brooke, Canale and/or Johnson did not first pursue reasonable avenues of investigation.

265.    When Canale and Johnson seized Brooke, the scope of the intrusion was not reasonably necessary to avert any specific injury, and, even if it were, the intrusion was longer than necessary to avert the injury.

266.    At the time Canale and Johnson seized Brooke, there were no exigent circumstances that justified the seizure.

267.    At the time Canale and Johnson seized Brooke, no reasonable person in their position would have believed that Brooke would be harmed in the time it would take for Canale and/or Johnson to obtain a warrant or other court authorization authorizing the seizure of Brooke.

268.    Canale and Johnson, and each of them, acted under the color of law when they seized Brooke.

269.    Canale's and Johnson's seizure of Brooke violated Christine's constitutional rights.

270.    As a direct and proximate result of the violation of her constitutional rights, Christine suffered irreparable harm and will continue to suffer general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM THREE:**

**(Under 42 U.S.C. § 1983, Defendants Canale and Johnson are liable for violating Brooke's Right to Be from Unlawful Seizure under the Fourth Amendment and Fourteenth Amendment to the U.S. Constitution.)**

271.    Plainthis re-allege and incorporate by reference each allegation set forth in the paragraphs above.

272.    At the time Canale and Johnson seized Brooke from her parents, it was well established that children have a Fourth Amendment right, incorporated to the States through the Fourteenth Amendment, to not be unlawfully seized from their parents. *Wallis*, 202 F.3d at 1138-1141.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

273.    At the time Canale and Johnson seized Brooke, no reasonable person in their position would have believed that they had the lawful right to seize Brooke from her parents.

274.    Canale and Johnson, and each of them, acted under the color of law when they violated Brooke's constitutional rights.

275.    As a direct and proximate result of the violation of her constitutional rights, Brooke suffered irreparable harm and will continue to suffer, general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM FOUR:
**(Under 42 U.S.C. § 1983, Defendant Arizona Department of Child Safety is liable for the unconstitutional seizure of Brooke by Defendants Canale and Johnson.)**

276.    Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

277.    It is well-established that a government entity is liable for the constitutional violations of its employees when its employees commit a constitutional violation and, at the time of the constitutional violation, the government entity had a policy which amounted to a deliberate indifference of the relevant constitutional right and the policy was the moving force behind the constitutional violation. *Lee v. City of Los Angeles,* 250 F. 3d 668, 685 (9th Cir. 2001).

278.    The Arizona Court of Appeals has found that until July 1, 2018, "DCS assumed temporary custody over a child using a DCS-issued 'temporary custody notice' that involved no advanced court review or approval." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma,* 247 Ariz. 108, 112, (App. 2019) (citing *Kimu P. v. Ariz. Dep't of Econ. Sec.,* 218 Ariz. 39, 41, ⁋ 5 (App. 2008); *Michael J., Jr. v. Michael J., Sr.,* 198 Ariz. 154, 155, ⁋ 4, (App. 2000).)

279.   "In 2017 and 2018, in response to litigation in federal court concerning the constitutionality of removing a child from a parent's care without judicial authorization, *see Rogers v. Cty. of San Joaquin,* 487 F.3d 1288, 1294-96 (9th Cir. 2007) (collecting cases), the legislature amended A.R.S. § 8-821(A) to abolish this practice, see 2018 Ariz. Sess. Laws, ch. 191, § 1 (2d Reg. Sess.); 2017 Ariz. Sess. Laws, ch. 282, § 3 (1st Reg. Sess.)." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma,* 247 Ariz. 108, 112, (App. 2019).   The Arizona Supreme Court "adopted Rule 47.3, effective July 1, 2018, to implement those amendments." *Id.*

280.   At the time that Canale and Johnson violated Christine's and Brooke's constitutional rights by unlawfully seizing Brooke, DCS had a policy which allowed its employees to seize children from their parents using a TCN and did not require its employees to seek prior judicial approval before seizing children, even in the absence of exigent circumstances.

281.   DCS's policy amounted to a deliberate indifference to the constitutional rights of Christine and Brooke.

282.   DCS's policy was the moving force behind the constitutional rights violations perpetuated by Canale and Johnson.

283.   DCS either didrTroirrreatm clearmndr constitutionally permissible policies and procedures for DCS employees to follow when those employees removed a child from the custody of the child's parents, and/or it failed to train DCS employees on clear and constitutionally permissible policies and procedures for DCS employees to follow when those employeesuremoved a child from the custody of the child's parents.

284.   It was obvious that the policy instituted and/or maintained by DCS would lead to a constitutional violation like the violation suffered by Christine and Brooke, and DCS was deliberately indifferent to the consequent constitutional violations that would inevitably occuras ahJirect resultTaf the policy.

285.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

<u>CLAIM FIVE</u>
**(Under 42 U.S.C. § 1983, Defendant Johnson is liable for violating Christine's and Brooke's right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth.)**

286.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

287.   It is well established that liability for a § 1983 claim will lie for judicial deception. *Liston v. County of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997).

288.   Although, the Ninth Circuit has "recognized absolute immunity for social workers ... for the discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents," the "scope of absolute immunity for social workers is extremely narrow." *Miller v. Garmnie*, 335 F.3d 889, 989 (9th Cir. 2003). Absolute immunhynioes not extend to the fabrication of false evidence or perjury. *Hardwick v. County of Orange*, 844 F.3d 1112 (9th Cir. 2017).

289.   At all relevant times, "the constitutional right to be free from the knowing presentation of false or perjured evidence" was clearly established. *Hardwick v. County of Orange*, 844 F.3d 1112 (9th Cir. 2017); *see also Devereaux v. Perez*, 218 F.3d 1045 (9th Cir. 2000); *Whitaker v. Garcetti*, 486 F.3d 572, 582 (2007) (concluding that "the contours of the Fourth Amendment right against judicial deception" were clearly established by 1996).

290.   In the dependency petition, Tohnson made numerous statements which were false and/or demonstrated a reckless disregard for the truth,

49

1    including, but not limited to the false statements discussed in paragraph 139
2    above.

3        291.   When committing her acts of judicial deception, Johnson was acting
4    under color of law.

5        292.   As a direct and proximate result of the violations of their
6    constitutional rights, Plaintiffs suffered irreparable harm and will continue to
7    suffer general and special damages in an amount not yet ascertained but which
8    shall be shown according to proof at trial.

9                                **CLAIM SIX**
10   **(Under 42 U.S.C. § 1983, Defendants Canale and Johnson are liable
     for violating Christine's and Brooke's right to Due Process under
11   the Fourth and Fourteenth Amendments for making
12   misrepresentations and/or omissions to the court which
     were deliberate falsehoods and/or which demonstrated a reckless
13   disregard for the truth.)**

14       293.   Plaintiffs re-allege and incorporate by reference each allegation set
15   forth in the paragraphs above.

16       294.   In a progress report submitted to the court, Canale and Johnson made
17   numerous statements which were false and/or demonstrated a reckless disregard
18   for the truth, including, but not limited to the false statements discussed in
19   paragraph 141 above.

20       295.   When committing their acts of judicial deception, Canale and Johnson
21   were acting under color of law.

22       296.   As a direct and proximate result of the violations of their
23   constitutional rights, Plaintiffs suffered irreparable harm and will continue to
24   suffer general and special damages in an amount not yet ascertained but which
25   shall be shown according to proof at trial.

26                              **CLAIM SEVEN**
27   **(Under 42 U.S.C. § 1983, Defendants Canale, Johnson, Courtright,
     and Long are liable for violating Christine's and Brooke's right to**
28

Due **Process under the Fourth and Fourteenth Amendments for** failing **to make reasonable efforts to preserve the family relationship.)**

297.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

298.   At all relevant times, it was "well established that the State…has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 1.85, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id.* at 192, %*32. A* "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id.*

299.   At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't ofEcon. Sec.*, 193 Ariz. 185, 192, '¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at %*37.

.300.   At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety,* 247 Ariz. 9, 24 ∧ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Id.* at 23, '¶ 49. At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out- of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 20, ¶ 50.

301.   At all relevant times, it was well-established that in determining whether DCS has complied with the law and made reasonable efforts to reunite a

1  parent with their children, a juvenile court must view the "totality of the

2  circumstances" and review DCS' actions during the entirety of time the child has

3  been in DCS' care. Donald W., 247 Ariz. at 19, ¶ 49. "[A]bsent reasonable

4  modifications to…rehabilitative services offered to a disabled parent, a

5  department has failed to perform its duty under the ADA to reasonably

6  accommodate a disability and, in turn, its obligation to make reasonable efforts to

7  rehabilitate the parent." *People in Interest of S.K.*, 440 P. 3d 1240, 1249 (Co. App.

8  2019).

9      302.  Defendants Canale, Johnson, Courtright, and Long, and each of them,

10  violated Christine's and Brooke's right to the State's reasonable efforts to reunite

11  them by failing to complete a prompt and thorough investigation, as required by

12  A.R.S. § 8-456(C)(1).

13      303.  Defendants Canale, Johnson, Courtright, and Long, and each of them,

14  violated Christine's and Brooke's right to the State's reasonable efforts to reunite

15  her with her child by failing to conduct a continuing, and appropriate

16  investigation into the circumstances justifying out of home care throughout the

17  entire period of out of home care.

18      304.  Defendants Canale, Johnson, Courtright, deeding, and Long, and

19  each of them, violated Christine's and Brooke's right to the State's reasonable

20  efforts to reunite them by failing to at any time appropriately identify to Christine

21  the conditions causing Brooke's out-of-home placement.

22      305.  Defendants Canale Johnson, Courtright, and Long, and each of them,

23  violated Christine's and Brooke's right to the State's reasonable efforts to reunite

24  them by:

25

26

27

28

a.     Failing to ensure that scheduled visitations between Christine and Brooke occurred at all and by failing to ensure that scheduled visitations occurred at the scheduled time;

b.     Failing to inform Christine about scheduled CFT meeting and by otherwise failing to take appropriate steps so that Christine could attend these meetings; andor,

c.     Authorizing Brooke's visitation with Christine to be withheld as a punishment for Brooke's undesired behavior.

306.    Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Brooke's right to the State's reasonable efforts to reunite her with her parents by failing to inform John about scheduled CFT meeting and by otherwise failing to take appropriate steps so that John could attend these meetings.

307.    When they violated Christine's right to the State's reasonable efforts to reunite them, Defendants Canale, Johnson, Courtright, and Long, and each of them, were acting under color of law.

308.    As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in art amount not yet ascertained But whicTTshalLheTshdwhTiccording toproof attriaL

## CLAIM EIGHT:
### (Under 42 U.S.C. § 1983, Canale, Tohnson, Courtright and/or Long are liable for violating Brooke's right to Due Process under the Fourteenth Amendment for placing Brooke in a group home in which they knew, or reasonably should have known, she would be neglected and/or abused.)

309.    Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

310.    At all relevant times, it was well established that the Due Process Clause of the Fourteenth Amendment bars States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause "guarantees more than fair process." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (internal quotation marks omitted). It "also includes a

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* (internal quotation marks omitted).

311.   At all relevant times, it was clearly established that "when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiffs safety and well-being" or when "the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known and obvious danger/" "a state's omission or failure to protect may give rise to a § 1983 claim." *Henry v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012). The Ninth Circuit has held that it is "clearly established that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* (internal quotation marks omitted). "When the State asserts this type of custody over a person and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by ... the Due Process clause." *Ibid.* (internal quotation marks omitted)

312.   At all relevant times, "it has been clearly established since at least 1996 that foster children have a federal constitutional right to state protection while they remain in the care of the State." *Henry v. Willden*, 678 F.3d 991, 998 (2012) (internal quotation marks omitted). The liberty interest of a child in the care of the State encompasses a child's right to state supervision and protection imm J harm inflicted while in the care of the State. *Id.*

313.   Canale, Johnson, Courtright, and/or Long placed Brooke in the CD Group Home, where she was neglected and abused.

314.   At the time Brooke was neglected and/or abused in the CD Group Home, there existed a custodial relationship between Brooke and the State such that the State had assumed some responsibility for her safety and/or well-being.

GUST & WOODS LAW, PLLC
14650 North 12th Street, Suite 101
Phoenix, AZ 85012
480.999.4556

315.    Despite their duty to protect Brooke from harm, Canale, Johnson, Courtright, and/or Long, and each of them, affirmatively placed Brooke in danger when they, either individually or conspiring with each other, placed her in a group home in which they knew, or reasonably should have known, that she would be abused and/or neglected, or when they placed Brooke in the group home, they acted with deliberate indifference to the danger that Brooke would be abused and/or neglected while in the group home.

316.    Canale, Johnson, Courtright, and/or Long, and each of them, affirmatively placed Brooke in danger when they, either individually or conspiring together, kept Brooke in the group home after they knew, or reasonably should have known, that she was being or would be abused and/or neglected, or when they kept Brooke in the group home, they acted with deliberate indifference to the danger that Brooke was being or would be abused and/or neglected while in the group home.

317.    Based on the numerous reports that Canale, Johnson, Courtright, and/or Long, and each of them, had received from the group home and from Christine, and the need for Brooke to be taken to the hospital while in the care of the group home, Canale, Johnson, Courtright, and/or Long, and each of them, either collectively or separately, knew, or reasonably should have known, that there was a substantial risk of harm to Brooke yet Canale, Johnson, Courtright, and/or Long, and each of them failed to take the necessary and appropriate action to protect Brooke.

318.    In placing Brooke in the group home, and/or continuing to keep her there, Canale, Johnson, Courtright, and/or Long, and each of them acted under color of law.

319.    At the time Canale, Johnson, Courtright, and/or Long, and each of them placed Brooke in the group home, or continued to keep her there, they, either collectively or separately, were aware of facts from which an inference could be

1  drawn that a substantial risk of harm existed and Canale, Johnson, Courtright,
2  and/or Long, and each of them, either collectively or individually, drew that
3  inference or a reasonable official in their position would have been compelled to
4  draw that inference.

5  320.   As a direct and proximate result of the violations of her constitutional
6  rights, Brooke suffered irreparable harm and will continue to suffer general and
7  special damages in an amount not yet ascertained but which shall be shown
8  according to proof at trial.

9

**CLAIM NINE:**

10  **(Under 42 U.S.C. § 1983, Defendants Canale, Johnson, Courtright,**
11  **Reeding, and Long are liable for violating Christine's Due Process**
    **under the Fourteenth Amendment to the U.S. Constitution to make**
12  **medical decisions for Brooke and Brooke's Due Process Right**
    **under the Fourth and Fourteenth Amendments to the U.S.**
13  **Constitution to have medical decisions for her made by her**
    **parents.)**
14

15  321.   Plaintiffs re-allege and incorporate by reference each allegation set
16  forth in the paragraphs above.                    AoE?/!      I  1/1

17  322.   At all relevant times, it was well established that the constitutional
18  due process Afright to a family association includes the right of parents to make
19  important medical decisions for their children, and of children to have those
20  decisions made by their parents rather than the state." *Wallis*, 202 F.3d at 1141
21  (citing *Parham u. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of
22  both parents and children that parents have ultimate authority to make medical
23  decisions for their children unless a "neutral fact finder" determines, through due
24  process hearing, that parent is not acting in child's best interests)).

25  323.   At all relevant times, it was well established that: "All parental rights
26  are reserved to a parent of a minor child without obstruction or interference from
27  this state, any political subdivision of this state, any other governmental entity or
28  any other institution, including: The right to make health care decisions for the

56

1  minor child, including rights pursuant to §§ 15-873, 36-2271 and 36-2272, unless
2  otherwise prohibited by law." A.R.S. § 1-602(A)(5).

3      324.   At all relevant times, it was well established that until there is a
4  finding of dependency by a court, which legally entitles DCS "to temporarily
5  invade" a parent's rights to "legal custody" of their child, that the state has no legal
6  right to invade the constitutional and legal rights of a parent to make medical
7  decisions for their child. *Diana H. v. Rubin,* 217 Ariz. 131, 134 ¶ 13 (2007).

8      325.   At all relevant times, it was well established that "the requirement
9  that [the state child welfare organization] provide parental notice and obtain
10  consent" before a child in its care and/or custody is provided medical treatment
11  is not "inconsistent with [the state child welfare organization's] obligation to
12  provide routine or emergency medical care to children in its custody." *Mann v.*
13  *Cty. of San Diego, 907* F.3d 1154, 1163 (9th Cir. 2018).

14      326.   Defendants Canale, Johnson, Courtright, and Long, and each of them,
15  violated Christine's right to make medical decisions for Brooke by, prior to any
16  finding of dependency:

17      a.  Scheduling medical appointments for Brooke without Christine's or
18         John's knowledge and/or consent and refusing to reschedule those
       appointments so that Christine could attend;

19      b.  Taking steps to prohibit Christine from receiving medical information
20         regarding Brooke from medical providers;

21      c.  Taking steps to prohibit Christine from providing medical information
       regarding Brooke to medical providers;

22      d.  Failing to notify Christine or John when Brooke was taken to Arrowhead
       Hospital on or about July 23, 2018;

23      e.  Failing to immediately notify Christine and/or John when Brooke was
24         taken to Arrowhead Hospital on or about August 22, 2018;

25      f.  Purporting to consent to Brooke's admission to Aurora on or about
       August 22, 2018;

26      g.  Purporting to consent to Brooke's medication regime while Brooke was
27         at Aurora from on or about August 22, 2018 until on or about November
       16, 2018; and/or,

28

h. Purporting to consent to Brooke receiving a flu vaccination injection while Brooke was in the care of the State. This consent was provided without Christine's knowledge or consent.

327.   When they violated Christine's and Brooke's rights regarding Brooke's medical care, Defendants Canale, Johnson, Courtright, and Long, and each of them, were acting under color of law.

328.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM TEN:

**(Under 42 U.S.C. § 1983, Defendants Courtright and Long are liable for violating Christine's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to be with Brooke during medical treatment and Brooke's Due Process Right under the Fourth and Fourteenth Amendments to the U.S. Constitution to have Christine with her during medical treatments.)**

329.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

330.   At all relevant times, it was well established that the "Constitution assures parents that, in the absence of parental consent, [medical treatment] of their child may not be undertaken ... at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an [treatment] exist and that the administration of the procedure is reasonable under all the circumstances." *Wallis*, 202 F.3d at 1141 (9th Cir. 2000). "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted)." *Id.*

331.    At all relevant times, it was well established that "[c]hildren removed from their parents' custody have a legitimate expectation of privacy in not being subjected to medical examinations without their parents' notice and consent." *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1165 (9th Cir. 2018). While a child welfare organization's "custodial responsibility and authority over the children diminishes their privacy interests somewhat, *Parham*, 442 U.S. at 603, 99 S.Ct. 2493, the children nonetheless maintain a legitimate expectation of privacy." *Id*.

332.    Defendants Canale, Johnson, Courtright, and Long violated Christine's right to be with Brooke during medical treatments by:

a. Scheduling medical appointments for Brooke without Christine's knowledge and/or consent, and refusing to reschedule those appointments so that Christine could attend;

b. Failing to take adequate steps to ensure that Christine could attend all of Brooke's medical appointments;

c. Failing to notify Christine when Brooke was taken to Arrowhead Hospital on or about July 23, 2018;

TL ikaKng tmntmmediateiy notify Christine wherr Brooke was Aakerrto Arrowhead on or about August 22, 2018.Scheduling medical appointments for Brooke without Christine's knowledge and/or consent, and refusing to reschedule those appointments so that Christine could attend;

e. Taking steps to prohibit Christine from receiving medical information regarding Brooke from medical providers; and/or,

f. Taking steps to prohibit Christine from providing medical information regarding Brooke to medical providers.

333.   When they violated Christine's right to be with Brooke during medical treatments, Defendants Canale, Johnson, Courtright, and Long, and each of them, were acting under color of law.

334.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM ELEVEN:

**(Under 42 U.S.C. § 1983, Defendants Canale, Johnson, Courtright and Long are liable for violating Brooke's right to Due Process under the Fourteenth Amendment for failing to ensure that Brooke was provided with proper medical care while Brooke was in the custody of the State.)**

335.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

336.   At all relevant times, it was well established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon La corresponding duty to assume some responsibility for his safety and general well-being." *Henry A v. WUiden*, 678 F.3d 991, 998 (2012) (internal quotation marks umiLted)r "when the SlciLe asserts Lids type of custody over a person and at the same time fails to provide for his basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by ... the Due Process clause." *Ibid.* (internal quotation marks omitted).

337.   Canale, Johnson, Courtright, and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to ensure that Brooke attended her scheduled medical appointments.

Λ338L   Courtright and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to

1    take appropriate action to ensure that the paperwork necessary for Brooke's
2    transfer from Arrowhead to Aurora was completed properly and in an
3    appropriate amount of time.

4        339.  Each time Brooke was hospitalized while in the custody of the state,
5    Courtright and/or Long, and each of them, failed to medical personnel that Brooke
6    was only to be provided food that was gluten free and dairy free.

7        340.  Canale, Johnson, Courtright and/or Long, and each of them, violated
8    Brooke's right to receive appropriate medical care while in the care of the State
9    when they failed to inform medical personnel at the medical facilities where
10   Brooke was being treated that Brooke was only to be provided food that was
11   gluten free and dairy free.

12       341.  While in the custody of the state, Canale, Johnson, Courtright and/or
13   Long, and each of them, failed to ensure that Brooke was to be provided her
14   prescribed birth control treatment, which was necessary to prevent Brooke from
15   menstruating since Brooke lacks the mental capacity to understand menstruation
16   or care for herself while menstruating.

17       342.  Canale, Johnson, Courtright and/or Long, and each of them, violated
18   Brooke's right to receive appropriate medical care while in the care of the State
19   when they failed to ensure that Brooke was to be provided her prescribed birth
20   control treatment.

21       343.  While in the custody of the state, Canale, Johnson, Courtright and/or
22   Long, and each of them, failed to ensure that Brooke was to be provided her
23   prescribed anti-depressant treatment, causing Brooke to suffer effects from the
24   unnecessary withdraw of the medication.

25       344.  Canale, Johnson, Courtright and/or Long, and each of them, violated
26   Brooke's right to receive appropriate medical care while in the care of the State
27   when they failed to ensure that Brooke was to be provided her prescribed anti-
28   depressant treatment,

345.   When violating Brooke's right to receive appropriate medical care while in the custody of the state, Canale, Johnson, Courtright and/or Long, and each of them, were acting under the color of law.

346.   As a direct and proximate result of the violations of her constitutional rights, Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM TWELVE:

(Under **42 U.S.C. § 1983, Canale, Johnson, Courtright and/or Long are liable for violating Christine's Due Process under the Fourteenth Amendment to the U.S. Constitution to make educational decisions for Brooke and Brooke's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to have educational decisions for her made by Christine)**

347.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

348.   At all relevant times, it was well established that parents have the right to make educational decisions for their children. In *Troxel v. Granville,* 530 U.S. 57, 66 (2000), a plurality of the court held: "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). This interest also includes the right of parents to "direct the upbringing and education of [their] children." *Id.; see also Meyer v. Nebraska,* 262 U.S. 390 (1923) (upholding constitutional right of parents to make educational decisions for their children); *Pierce v. Society of Sisters,* 268 U.S. 510 (1925)/same).

349.   At all relevant times, it was well established that: "All parental rights are reserved to a parent of a minor child withouLobstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including: The right direct the education of the minor child." AiCS. §TL602(A)(5).

350.   At all relevant times, it was well established that until there is a finding of dependency by a court, which legally entitles DCS "to temporarily invade" a parent's rights to "legal custody" of their child, that the state has no legal right to invade the constitutional and legal rights of a parent to make educational decisions for their child. *Diana H. v. Rubin,* 217 Ariz. 131, 134 ⋀ 13 (2007).

351.   In an email to Christine dated July 17, 2018, Courtright stated: "Brooke will be attending the ACES. She was unable to get into school for their summer session and will begin in August, when school resumes for the year. It was determined not to send Brooke back to her previous school as she would only be attending for about another week, and it was felt it would be best to minimize the amount of transitions for her."

352.   Courtright did not have Christine's or John's consent to change Brooke's school. Courtright changed Brook's school without Christine's knowledge.

353.   In August 2018, Courtright scheduled a meeting with persons from Brooke's school regarding Brooke's education. Courtright scheduled this meeting without Christine's knowledge or consent.

354.   After learning of the meeting with persons frorrrJBrooke%-School regarding Brooke's education, Christine informed Courtright that she could not attend because the meeting was scheduled during her workday. In an email to Christine dated August 3, 2018, Courtright stated: "As I had expressed before we wilL demur best to schedule meetings at times that you may be able to he present. I explained that you would and will be invited to all meetings for Brooke, if you are unable to attend meetings they will not be rescheduled duetto a conflict with your schedule. I apologize that this meeting is not in-line with your schedule however, at the CFTI will be more than happy to discuss what occurred."

355. In an email to Christine dated August 10, 2018, Courtright stated: "*I also want to be sure that you are aware that the school will not provide you information, make appointments, or change appointments as DCS is guardian.*"

356. Defendants Canale, Johnson, Courtright, and/or Long, and each of them, violated Christine's right to make educational decisions for Brooke, and Brooke's right to have educational decisions for her made by her parent, by, prior to any finding of dependency:

    a. Scheduling educational appointments for Brooke without Christine's knowledge and/or consent, and refusing to reschedule those appointments so that Christine could attend;

    b. Making educational decisions for Brooke without Christine's knowledge and/or consent;

    d. Failing to take adequate steps to ensure that Christine could attend all of Brooke's educational appointments;

    e. Taking steps to prohibit Christine from receiving educational information regarding Brooke from education providers; and/or,

    e. Taking steps to prohibit Christine from providing educational information regarding Brooke to educational providers.

357. When they violated Christine's right to make educational decisions for Brooke and Brooke's right to have educational decisions for her made by her parents, Defendants Canale, Johnson, Courtright, and Breeding, and each of them, were acting under color of law.

358. As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM THIRTEEN:

[Under **42 U.S.C. § 1983, Canale, Johnson, Courtright, and/or Long are liable for violating Brooke's right to Due Process under the**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix AZ 85014
Tel 9.4838

**Fourteenth Amendment for failing to ensure that Brooke was provided with an appropriate education while Brooke was in the custody of the State.)**

359.    Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

360.    At all relevant times, it was well established children in the care of the state have a special relationship with the state and thus a federal constitutional right to state protection. *Tamas v. Dep't of Soc. & Health Sews.*, 630 F.3d 833, 846-47 (9th Cir. 2010). This protection requires the state to provide "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).

361.    At all times while Brooke was in the care of the state, Brooke had an Individual Education Plan (IEP) which required that she attend school throughout the calendar year.

362.    From June 2018 until December 2018, while Brooke was in the care of the state, Brooke only attended one day of school. This was a violation of Brooke's IEP.

363.    Canale, Johnson, Courtright, and/or Long, and each of them, violated Brooke's right to adequate care and treatment appropriate to her age and circumstances when they failed to follow Brooke's IEP and did not take appropriate steps to ensure that Brooke was provided the education outlined in her IEP while in the care of the state.

364.    When violating Brooke's constitutional rights regarding Brooke's to adequate care and treatment appropriate to her age and circumstances, Canale, Johnson, Courtright, and/or Long, and each of them were acting under color of law.

365.    As a direct and proximate result of the violations of her constitutional rights, Brooke suffered irreparable harm and will continue to suffer general and

1    special damages in an amount not yet ascertained but which shall be shown

2    according to proof at trial.

3    **CLAIM FOURTEEN:**

4    **(Under 42 U.S.C. § 1983, Defendants Courtright and Long are liable for violating Christine's Due Process Right under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be represented by counsel at all juvenile proceedings.)**

5

6    366.   Plaintiffs re-allege and incorporate by reference each allegation set

7    forth in the paragraphs above.

8    367.   At all relevant times, it was well established that, under Arizona

9    statutory law, when a child is seized by the State, a parent is entitled to be

10   represented by counsel at all related proceedings. *See* A.R.S. § 8–225(B), and A.R.S.

11   § 8–221(B) (Supp.2002).

12   368.   At all relevant times, it was well established that "the denial of the

13   right to effective participation of counsel" during parental rights proceedings

14   "constitutes a denial of due process of law..." *Daniel Y. v. Arizona Dept. of Econ. Sec.*,

15   206 Ariz. 257, 260 ¶ 12 (App. 2003) (quoting *Ariz. State Dep't of Pub. Welfare v.*

16   *EarBw, SO* Ariz. 249, 253 (1956)).

17   369.   At all relevant times, it was well established that the right to counsel

18   under the fifth amendment is a protection of the privilege against self-

19   incrimination. *United States v. Gouveia*, 467 U.S. 180, 188 n. 5 (1984).

20   370.   The Fifth Amendment, made applicable to the states through the

21   Fourteenth Amendment, commands that "[n]o person ... shall be compelled in any

22   criminal case to be a witness against himself."

23   371.   "The Court has held that the availability of the Fifth Amendment

24   privilege does not turn upon the type of proceeding in which its protection is

25   invoked, but upon the nature of the statement or admission and the exposure

26   which it invites." *Estelle v. Smith*, 451 U.S. 454, 462 (1981) (internal quotation marks

27   ancTBrackets omitted).

28

CALL-S+ WOODS LAW, P.L.C
5055 North 12th Street, Su0 101
Phoenix, AZ 85014
480.999.4556

372.   The privilege protects a person from being compelled to provide evidence of a "testimonial or communicative nature." *Schmerber v. Cal.*, 384 U.S. 757, 761 (1966)); *see also Doe v. United States*, 487 U.S. 201, 210 (1988) (a testimonial communication is one which explicitly or implicitly relates a factual assertion or discloses information.)

373.   Throughout the underlying juvenile proceedings, Courtright and Long held "CFT" meetings, at which Christine, service providers, and DCS employees discussed issues related to DCS's seizure and continued removal of Brooke, and at which Christine was compelled, under threat of losing her child, to provide evidence of a testimonial or communicative nature.

374.   At every CFT meeting, Christine wanted to be represented by counsel.

375.   In an email dated July 16, 2018, Courtright informed Christine that if Christine was represented by counsel at a scheduled CFT, then the CFT would be cancelled.

376.   In an email dated August 24, 2018, from Tisdale to numerous parties, including Courtright, Tisdale stated: "There is no place for any attorneys at a CFT unless its GAL for Brooke. If there is any attorneys present besides GAL the CFT will be stopped." Courtright took no action to correct this violation of Christine's right to be represented by counsel at the CFT.

377.   In an email dated August 27, 2018, from Courtright to numerous parties, including Christine, Courtright stated: "The CFT will be held at the DCS Peoria office today at 4pm. Anne Ronan is not permitted to be in presence as she is an attorney from mother's council. We will not hold a CFT if she is in presence as the focus of the meeting is to be directly related to services and supports to the child and not the case. As no other parties will have council present we cannot hold a CFT should any attorney other than the GAL be present."'

378.   By taking action including, but not limited to, threatening to take action that would harm Christine's efforts to reunite with her child, to prevent Christine from being represented by counsel at CFT meetings, Defendants Courtright, and/or Long violated Christine's Due Process Rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be represented by counsel at all juvenile proceedings.

379.   When they violated Due Process Rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be represented by counsel at all juvenile proceedings, Defendants Courtright and Long, and each of them, were acting under color of law.

380.   As a direct and proximate result of the violations of her constitutional rights, Christine suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM FIFTEEN:

**(Under 42 U.S.C. § 1983, Courtright, Long, Mlak, Luevano and Nagle are liable for conspiring to violate Christine's Due Process Rigid under the Fourteenth Amendment to the U.S. Constitution to makeTnedicardecisibhsToFBrbbke ancTBrooke'sDue Process Rijpit under the Fourteenth Amendment to the U.S. Constitution to have medical decisions for her made by Christine.)**

381.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

382.   At all relevant times, it was well established that liability for a conspiracy in a § 1983 case will lie when there exists an "agreement or meeting of the minds" to violate constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.*

383.   At all relevant times, it was also well established: "A private individual may be liable under § 1983 if she conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir.2002).

384.   Mlak conspired with Courtright and/or Long to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when Mlak provided medical treatment to Brooke from August 2018 to November 2018 without Christine's knowledge and/or consent or the consent of John.

385.   At all relevant times, Kattia Luevano was an employee and/or agent of Aurora. Throughout Brooke's treatment at Aurora from August 2018 to November 2018, although there was no court order in place authorizing her conduct, Kattia refused to provide information regarding Brooke's medical treatments to Christine, her parent and legal guardian, and would provide information regarding Brooke's medical treatments to Courtright, who was neither Brooke's parent nor her legal guardian.

386.   Kattia conspired with Defendants Courtright and/or Long to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when throughout Brooke's treatment at Aurora from August 2018 to November 2018, Kattia refused to provide information regarding Brooke's medical treatments to Christine.

387.   At all relevant times, Helen Nagle was an employee and/or agent of Aurora. On or about August 25, 2018, Nagle informed Christine, over her objection, that Brook would be administered a test for tuberculosis. Brooke was then administered this test without Christine's consent.

388.   Nagle conspired with Defendants Courtright and/or Long to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when, on or about August 25, 2018,

Nagle informed Christine, over her objection, that Brook would be administered a test for tuberculosis and then took steps to have that test administered to Brooke.

389.   When conspiring to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her, Courtright, Long, Mlak, Lattia, and Nagle, and each of them, were acting under color of law.

390.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SIXTEEN
**(Under established** Arizona **law, Defendants Canale, Johnson, Courtright, and Long are liable to Christine and Brooke for exercising Gross Negligence in carrying out their duty to protect the legal rights of children and families.)**

391.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

**392.**   Under A.C.J.L.S.I. § 8-802 (D)(1), "[a]ll child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal rights of children and families from the time of the initial contact through treatment."

393.   "A statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of persons, in which the Plaintiffs is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Lorenz v. State,* 238 Ariz. 556, 558 (App. 2015).

394.   Canale and Johnson acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they failed to properly investigate whether DCS should remove Brooke from her parent's care before removing Brooke from her parent's care.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
Phone: 949.4356

395.   Canale, Johnson, Courtright, and Long, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

396.   Canale, Johnson, Courtright, and Long, and each of them, exercised Gross Negligence in carrying out their duty to protect the legal rights of Brooke by failing to comply with the ADA by failing to offer Brooke services that were reasonably accommodated to her disability.

397.   Canale and Johnson acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they made representations to the court that were false and/or demonstrated a reckless disregard for the truth.

398.   398.   Canale, Johnson, Courtright, and Long, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they refused to return Brooke to her Christine even though there was no probable cause to believe Christine had abused onneglected Brooke.

399.   Canale, Johnson, Long, and/or Courtright, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine when they took action to prevent Christine from being represented by counsel at the CFT.

400.   Canale, Johnson, Courtright and/or Long, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they took steps to purport to authorize medical providers to provide medical care to Brooke although they knew, or reasonably should have known, that they had a legal and constitutional obligation to obtain Christine and/orjohn's consent before Brooke was provided any medical care while in the care and/or custody of DCS.

401.   As a direct and proximate result of Canale's; Johnson's, Courtright's and/or Long' breach of their duty, Christine and Brooke suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

**CLAIM SEVENTEEN**
**(Under established Arizona law, Defendants Canale, Johnson, Courtright, and Long, are liable are to Christine and Brooke for exercising Gross Negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship.)**

402.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

403.   At all relevant times, it was "well established that the State…has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.,* 193 Ariz. 185, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id.* at 192, ¶¶32.   A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id.*

404.   At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.,* 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed do improve the parenTs ability to care for the child." *Id.* at ∧ 37.

405.   At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety,* 247 Ariz. 9, 24 ¶ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Tci.* at 237∧ 49. At the ∧ very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide

1  services that have a reasonable prospect of success to remedy the circumstances as
2  they arise throughout the time-in-care period, maintain consistent contact with the
3  parent, and make reasonable efforts to assist the parent in areas where compliance
4  proves difficult." *Id.* at 20, ¶ 50.

5      406.   A.R.S. § 8-533(B)(8) requires DCS agents to make a diligent effort to
6  provide appropriate reunification services.

7      407.   At all relevant times, it was well-established that in determining
8  whether DCS has complied with the law and made reasonable efforts to reunite a
9  parent with their children, a juvenile court must view the "totality of the
10  circumstances" and review DCS's actions during the entirety of time the child has
11  been in DCS' care. *Donald W.*, 247 Ariz. at 19, ¶ 49.

12     408.   Canale, Johnson, Courtright, Reeding, and Long, and each of them,
13  acted with gross negligence and breached their duty to make reasonable and/or
14  diligent efforts to preserve the family relationship by failing to complete a prompt
15  and thorough investigation, as required by A.R.S. § 8-456(C)(1).

16     409.   Canale, Johnson, Courtright, and Long, and each of them, exercised
17  Gross Negligence in carrying out their duty to make reasonable and/or diligent
18  efforts to preserve the family relationship by failing to conduct urccmtinuingrand
19  appropriate investigation into the circumstances justifying out of home care
20  throughout the entire period of out of home care.

21     410.   Canale, Johnson, Courtright, and Long, and each of them, exercised
22  Gross Negligence in carrying out them dutyAocmake reasonable and/or diligent
23  efforts to preserve the family relationship by failing to at any time appropriately
24  identify to Christine-fche conditions causing Brooke's out-of-home placement.

25     411.   Canale, Johnson, Courtright, and Long, and each of them, violated
26  Christine's and Brooke's right to the State's reasonable efforts to reunite them by:

27

28

73

    a. Failing to ensure that scheduled visitations between Christine and Brooke occurred at all and by failing to ensure that scheduled visitations occurred at the scheduled time;

    b. Failing to inform Christine about scheduled CFT meeting and by otherwise failing to take appropriate steps so that Christine could attend these meetings; and/or,

    c. Authorizing Brooke's visitation with Christine to be withheld as a punishment for Brooke's undesired behavior.

412.   Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Brooke's right to the State's reasonable efforts to reunite her with her parents by failing to inform John about scheduled CFT meeting and by otherwise failing to take appropriate steps so that John could attend these meetings.

413.   As a direct and proximate result of Canale's, Johnson's, Courtright's and/or Long' breach of their duty, Christine and Brooke suffered irreparable harm, including but not limited to, the permanent loss of her parental rights, and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM EIGHTEEN
**(Under established Arizona law, McKay and/or Faust are liable to Christine and Brooke for the Gross Negligence exercised by Defendant employees of DCS in carrying out their duties.)**

414.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

415.   McKay and/or Faust owed a duty to Christine and Brooke to ensure that the employees, officers, and/or agents of DCS were qualified to serve in their respective roles before hiring and assigning employees to act as investigators and/or case managers for DCS.

416.   Defendants McKay & Faust operated with gross negligence and breached the duties described herein by failing to ensure that employees, officers,

Mills + Faust Law, PLLC
555 North [illegible] Street, Suite 201
Phoenix, AZ 85014
[illegible]

and/or agents of DCS were properly qualified before hiring and assigning employees to act as investigators and/or case managers for DCS.

417. Defendants McKay and/or Faust also owed a duty to Christine and Brooke to ensure that the employees, officers, and/or agents of DCS were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner.

418. Defendants McKay and/or Faust operated with gross negligence and breached the duties described herein by failing to ensure that the employees, officers, and/or agents of DCS were properly trained and possessed the skill and knowledge to perform their assigned job tasks in a competent manner

419. Under Arizona law, specifically A.R.S. § 8-456(A)(2), DCS is required to ensure that all DCS investigators were properly trained on their "duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure."

420. Defendants McKay and/or Faust operated with gross negligence and breached the duties described herein by failing to ensure that all DCS investigators were properly trained on their duty to protect the legal and due process rights of children and families from the time of the initial contact through case closure.

421. As a direct and proximate result of McKay's and/or Faust's breaches of these duties, Christine and Brooke were damaged in that they, among other things, were denied their constitutionally protected individual and familial rights thereby suffering damages from the loss of familial relationships for a significant period of time, and Christine and Brooke will continue to suffer such damages into the future, all in an amount that will be demonstrated at trial.

**CLAIM NINETEEN:**
**(Under 42 U.S.C. § 1983, the Arizona Department of Child Safety is liable for the unconstitutional acts of its employees which were committed pursuant to a policy and/or practice of DCS.)**

422. Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

423. Defendant Arizona Department of Child Safety is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

424. DCS, and those individual defendants in their official capacity who had supervisory and/or policy making authority, had a duty to Christine and Brooke to establish, implement, and/or follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Christine and Brooke under the United States Constitution, including under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

425. DCS established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Christine's and Brooke's constitutional rights, including those under the First and Fourteenth Amendment of ThsrUnfted States Constitution. These policies included, but are not limited to:

a. the policy of using trickery, duress, fabrications and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in pieparing and presenting reports and court documents to the juvenile court, causing an interference with parents' rights, including those as to familial relations;

b. the policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agent, employees, and state actors, in providihgThe Constitutional protections guaranteed toAndlviduals arid families, including those under the Fourteenth Amendment, when

performing actions related to child abuse and dependency-type proceedings;

c. the policy of setting forth allegations in juvenile dependency petitions against parents claiming child abuse and/or neglect and/or other unsubstantiated allegations regardless of whether or not reasonable and articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury;

d. the policy, practice, or custom of making knowingly false allegations of child abuse and/or neglect in juvenile dependency petitions signed under penalty of perjury, motions, or other documents filed with the juvenile court as a means of intimidating parents, whether or not true, or forcing a parent to adjudicate a matter knowing that the courts most often sustain allegations, whether justified by extant evidence or not;

e. the policy of fraudulently charging parents with child abuse and/or neglect where none exist;

f. the policy of unilaterally determining not to carry out judicial orders regarding visitation of children with their parents;

g. the policy of failing to take appropriate action to ensure that scheduled visitation occurs as ordered by a court;

h. the policy of failing to take appropriate action to ensure that appropriate and meaningful visitation occurs;

i. the policy of making medical decisions for children who have been removed by DCS, although there has been no judicial finding of dependency which would allow DCS agents to lawfully make medical decisions for children;

j. the policy of preventing parents of children who have been removed by DCS from being with their children when their children are receiving medical care, although there has been no judicial order which would allow

DCS agents to lawfully prevent parents from being with their children while their children are receiving medical treatment; and/or,

k. the policy of making educational decisions for children who have been removed by DCS, although there has been no judicial finding of dependency which would allow DCS agents to lawfully make educational decisions for children rather than their parent.

426.   The customs, policies, and/or practices listed herein are not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiff reserves their right to amend this pleading as more information becomes available.

427.   It was obvious that the policies described herein that were instituted and/or maintained by DCS would lead to constitutional violations like the violations suffered by Christine and Brooke, and DCS was deliberately indifferent to the consequent constitutional violations that would inevitably occur as a direct resnltroHtspaHciesjr                              ITT     i-L

428.   DCS was indifferent to the consequences that would established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Christine and Brooke's constitutional rights, including those under the First and Fourteenth Amendment of the United States Constitution.

429.   DCS, breached its duties and obligations to Christine and Brooke including but not limited to, failing to establish, implement, and follow the correct and proper Constitutional policies, procedures, customs, and practices; by failing to properly select, supervise, train, control, and review its agents and employees as to their compliance with Constitutional safeguards; and by permitting the DCS employees to engage in the unlawful and unconstitutional conduct alleged herein.

430.   DCS, knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that DCS employees would, and did, cause Christine and Brooke to be injured and damaged by DCS's wrongful policies, or deliberate lack thereof, or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in the contravention of public policy and their legal duties and obligations to Plaintiff; and that such policies subjected them to injunctive relief which Plaintiff asserts herein.

431.   These actions, and/or inactions, of DCS are the moving force behind, and direct and proximate cause of Christine and Brooke's injuries, as alleged herein; and as a result, Christine and Brooke has sustained general and specific damages to an extent and in an amount to be proven at trial. Christine and Brooke has incurred and will continue to incur, attorneys' fees, costs, and expenses, including those authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

## CLAIM TWENTY:

**(Under established Arizona law, Mlak is liable to Brooke for failing to prolddeʌeʌmimuiiiracceptecCstanaarcroCcareTnrlus cartTof Brooke.)**

432.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

433.   Mlak had a duty to provide the minimum accepted standard of care in his treatment of Brooke.

434.   As discussed above, Mlak breached his duty and failed to provide the minimum accepted standard of care in his treatment of Brooke.

435.   As a direct and proximate result of Mlak's failure to satisfy the minimum accepted standard of care, Brooke suffered irreparable harnuandr will

1   continue to suffer general and special damages in an amount not yet ascertained

2   but which shall be shown according to proof at trial.

### CLAIM TWENTY-ONE:

**(Under established Arizona law, Aurora and Mlak are liable to Brooke for the assault and battery committed upon her person.)**

4

5       436.    Plaintiffs re-allege and incorporate by reference each allegation set

6   forth in the paragraphs above.

7       437.    It is well established under Arizona law that: "An actor is subject to

8   liability to another for battery if the actor intentionally engages in an act that

9   results in harmful or offensive contact with the person of another." *Duncan v.*

10  *Scottsdale Medical Imaging Ltd.*, 205 Ariz. 306, 309, ¶ 9 (2003) (citing Restatement

11  (Second) of Torts §§ 13, 18 (1965). "The law is well established that a health care

12  provider commits a common law battery on a patient if a medical procedure is

13  performed without the patient's consent." *Id.* (citing *Hales v. Pittman*, 118 Ariz. 305,

14  310 (1978).

15      438.    At the time Brooke was treated at Aurora by Mlak, Brooke was a

16  minor.

17      43a.    AUhe time Brooke was treated at Aurora by MlakbBrookewaslegallv

18  incapable of granting consent for any treatment, procedure, and/or medication.

19      440.    At the time Brooke was treated at Aurora by Mlak, before any

20  treatment, procedure, and/or medication was provided to Brooke, the consent of

21  Brooke's parent or legal guardian for any treatment, procedure, and/or

22  medication was legally required.

23      441.    At the time Brooke was treated at Aurora by Mlak, neither Brooke's

24  parent nor legal guardian had consented for Brooke to be administered Haldol.

25      442.    At the time Mlak administered Haldol, and/or caused Haldol to be

26  administered to Brooke, Mlak knew, or reasonably should have known that

27

28

1  neither a parent nor legal guardian for Brooke had consented for Brooke to be
2  administered Haldol.

3      443.   At the time Mlak administered Haldol, and/or caused Haldol to be
4  administered to Brooke, Mlak knew, or reasonably should have known, that
5  Christine objected to Brooke being administered Haldol.

6      444.   By administering Haldol to Brooke, and/or causing Haldol to be
7  administered to Brooke, Aurora and/or Mlak performed a medical procedure on
8  Brooke's person without lawful consent.

9      445.   By administering Haldol to Brooke, and/or causing Haldol to be
10  administered to Brooke, Aurora and/or Mlak committed a battery upon Brooke.

11      446.   As a direct and proximate result of the battery committed upon her
12  person, Brooke suffered irreparable harm and will continue to suffer general and
13  special damages in an amount not yet ascertained but which shall be shown
14  according to proof at trial.

15                    CLAIM TWENTY-TWO
16      (Under established Arizona law, C&D Group Home is liable to Brooke
        for exercising Negligence in carrying out its duty To prnterF antfrarefor
17                          **Brooke.**)

18      4477   IdaihHffkl/\allege aikTihcbfpbfate by reference eachTdlegafiorTseF
19  forth in the paragraphs above.

20      448.   As the party entrusted with Brooke's care, C&D Group Home had a
21  duty to protect and care for Brook.

22      449.   C&D Group Home breached its duties to Brooke in numerous ways,
23  including but not limited to:

24      a.  Failing to properly treat Brooke's injuries sustained at C&D Group
25          Home;

26      b.  Failing to prevent Brooke from injuring herself;

27      r.  Failing to takp Brooke tn her yearly medical exam;

28      d.  Failing to take Brooke to her rescheduled yearly medical exam;

MILD + WOODS LAW, PLLO
5635 North 12th Street, Suite 1zi
Phoenix, AZ 35014
480.999.4556

e. Failing to ensure Brooke was eating properly;

f. Failing to ensure Brooke's clothes were on properly;

g. Failing to maintain and wash Brooke's hair, resulting in severe matting;

h. Failing to ensure Brooke was regularly bathed;

i. Failing to bring Brooke to a scheduled visitation with Christine;

j. Failing to properly supervise Brooke;

k. Allowing Brooke to eat her own feces; and/or,

l. Failing to clean blood and feces from Brooke

450. As a direct and proximate result of C&D Group Home's negligence, Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM TWENTY-THREE
**(Under established Arizona law, Aurora and Mlak are liable to Brooke for exercising Negligence in carrying out their duty to provide appropriate medical and/or mental health service to Brooke.)**

451. Plaintiffs re-allege and incorporate by reference each allegation set fdfthlnthe paragraphs above!

452. As the parties entrusted with Brooke's medical and mental health care, Aurora and Mlak each had a duty to (i) collect a full and complete medical and medication history from Christine or John regarding Brooke, (ii) seek and receive parental consent before administering any medications, including Haldol, to Brooke, and (iii) administer only appropriate medications to Brooke.

453. Aurora and Mlak breached their duties to Brooke in numerous ways, including but not limited to:

a. Failing to collect a full and complete medical and medication history from Christine or John regarding Brooke;

b. Failing to heed information that Haldol is contraindicated for Brooke;

c. Failing to seek or receive parental consent from Christine or John before administering medications, including Haldol, to Brooke;

d. Administering Haldol to Brooke when it was a contraindicated medication for Brooke.

454. As a direct and proximate result of Aurora's and Mlak's negligence, Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## PRAYER **FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A. General damages and special damages according to proof, but in no event less than $5,000,000.00, including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

B. For injunctive relief in the form of DCS agreeing to provide training to all DCS case workers regarding:

1. When exigent circumstances exist that justify the unwarranted seizure of a child;

2. The psychological trauma and Jiarm suffered by children and family that occurs when DCS removes a child from the custody of his or her parent;

3. That prior to removing a child from the custody of his or her parent, DCS has a legal and constitutional obligation to conduct a thorough investigation into Gmy allegations justifying removal including

investigating facts, witnesses, and evidence that refutes the allegations;

4. That when a parent is disabled the services that DCS offers the parent must be reasonably accommodated to the parent's disability such that the parent is offered a reasonable prospect of success at reunifying with their child if they successfully complete all services offered;

5. That unless and until a court has specifically determined otherwise after a hearing and an opportunity for a parent to be heard, that the parent retains the sole legal right to make all medical decisions for their child;

6. That unless and until a court has specifically determined otherwise after a hearing and an opportunity for a parent to be heard, that the parent retains the sole legal right to make all educational decisions for their child;

7. That it is a violation of the Constitutional rights of children and parents to make misrepresentations or omissions to the court which are false and/or which demonstrate a reckless disregard for the truth; and;

8. That facilitating regular contact between parent and child through visitation is perhaps the most basic and essential of the services prffflded by the State and thus all reasonable efforts mustJbe expended to ensure that a visitation occurs regularly and as scheduled.

C.  The training described in (B) above must be provided, at a minimum, annually to all DCS case workers and must be included in the training provided to persons upon their becoming a DCS case worker;

D.  For taxable costs and pre- and post-judgment interest to the extent

1   permitted by law;

2       E.      For punitive and/or exemplary damages to the extent permitted by

3   law and in an amount appropriate to punish the wrongful conduct alleged herein

4   and to deter such conduct in the future;

5       F.      For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988

6   and state law, as applicable; and,

7       G.      For such other relief as the Court deems just and proper under the

8   circumstances.

9   ///

10  ///

11  ///

12  ///

13

14      RESPECTFULLY SUBMITTED this 22nd day of September 2021.

15                              **MILLS + WOODS LAW PLLC**

16

17                              By   */s/ Thomas A. Cmn WAT*
                                Thomas A. Connelly
18                              Robert T. Mills
                                Sean A. Woods
19                              5055 North 12th Street, Suite 101
                                Phoenix, AZ 85014
20
                                **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
21                              DeeAn Gillespie Strub
                                Kristina Reeves
22                              7319 North 16th Street
                                Phoenix, AZ 85020
23
                                *Attorneys for Plaintiff*
24

25

26                              **CERTIFICATE OF SERVICE**

27      I hereby certify that on September 22, 2021, I electronically transmitted the

28  foregoing document to be filed electronically with the Clerk's Office through the CM/ECF

System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system, as well as counsel for the defendants who have not yet appeared in this matter, as follows:

Jeffrey S. Hunter
Renaud Cook Drury Mesaros, pa
One N. Central Ave., Ste. 900
Phoenix, Arizona 85004-4417
jhunter@rcdmlaw.com
docket@rcdmlaw.com
*Attorneys for Defendant Aurora Behavioral HealthCare-Tempe, LLC*

       */s/ Thomas A. Connelly*

Exhibit **2**

MICHAEL K. JEANES, CLERK
BY *C. Camacho* DEP
C. CAMACHO FILED

**18** JUN 27 AM 10: 54

1  MARK BRNOVICH
2  Attorney General

3  SCOTT A. CHRISTENSEN
4  Assistant Attorney General
   State Bar No. 024676
5  CFP/PSS
   2005 North Central Avenue, C007AG
6  Phoenix, Arizona 85004
7  (602) 542-1645
   PSSDurango@azag.gov
8
9  Attorneys for the Department of Child Safety

10             IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11               IN AND FOR THE COUNTY OF MARICOPA

12  In the matter of:                    No. ___ **JD 3 6 0 3 4** ⁻
13
14  BROOKE ANGELINA SCIANNA            **DCS'S OUT OF HOME DEPENDENCY
                                         PETITION AND PETITION FOR
17  ██████████████████                  PATERNITY AND/OR CHILD
                                         SUPPORT**
17
                                         CHILDS NO. 511175
17
18  Person(s) under 18 years of age.    (Honorable _____)

19         Petitioner, the Department of Child Safety (DCS or the Department), by and

20  through undersigned counsel, hereby alleges:

21
22                                    I.
23                               **Jurisdiction**

24         The Juvenile Court has exclusive original jurisdiction over dependency matters

25  pursuant to A.R.S. § 8-202(B).   The Superior Court has original jurisdiction in

26  proceedings to establish paternity pursuant to A.R.S. § 25-801.
27
28

AZDCS004085

## II.
## Venue

Venue in this county is proper pursuant to A.R.S. §§ 8-206(A) and 25-802 as Maricopa County is the residence of the child and/or the acts of dependency are alleged to have occurred in Maricopa County.

## III.
## Identity of Child, Placement and Applicability of the Indian Child Welfare Act

A.    BROOKE ANGELINA SCIANNA:

1.    BROOKE ANGELINA SCIANNA is a female child whose date of birth is ████████

2.    BROOKE ANGELINA SCIANNA is a dependent child within the provisions of A.R.S. § 8-201(15).

3.    BROOKE ANGELINA SCIANNA is currently placed with CARE AND DINITY, a group home.

4.    Upon information and belief, BROOKE ANGELINA SCIANNA is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4).

## IV.
## Parties

A.    CHRISTINE MARIE WEBSTER

1.    Upon information and belief, the mother of the child is CHRISTINE MARIE WEBSTER, whose date of birth is May 30, 1972.

2

AZDCS004086

2.   Her address is 15928 West Custer Lane, Surprise, Arizona 85379. Her phone number is 623-521-7457.

B.   Upon information and belief, the following male individual is alleged to be the father of the child who is the subject of this Petition:

1.   ████████████████████████████████ is the father of BROOKE ANGELINA SCIANNA.   His address is ████████ ████████████████████████████████████

## V.
## Temporary Custody

Upon information and belief, the child was taken into temporary physical custody on June 22, 2018 at 1:10 p.m.

## VI.
## Allegations

A.   Upon information and belief, the DCS alleges that the child is dependent due to abuse or neglect as to CHRISTINE MARIE WEBSTER.

1.   Mother is unwilling or unable to provide proper and effective parental care and control by neglecting to provide a safe and stable home environment and proper supervision and provide for the child's basic needs.  Brooke is diagnosed with an autism spectrum disorder and unspecified voice and resonance disorder.   She is low functioning and nonverbal and has behavioral episodes. On or about June 11, 2018, after placing the child in an inappropriate choke hold during a behavioral episode, Mother went into the house and left the child unattended for about ten minutes while the child

3

wandered in the street. She expected the school's transport staff to supervise the child. Mother frequently could not be reached when the school called her for emergency pickups. Mother stated that she sleeps upstairs on the opposite side of the house from the child and did not hear when the child once answered the door and allowed a stranger into the home. Mother reports that when the child's behaviors escalate, she will frequently hide in the bathroom from the child. There is also concern regarding Mother's mental health as several providers report that Mother's home has been observed as dirty and always kept dark. Mother's behavior is erratic which is not consistent with a calm and stable environment conducive for the child with Brooke's behavioral issues to thrive. Mother blames the school for the child's behavioral issues and states the child does not have the issues in her home; however, the communications between Mother and the school indicate that Mother has the same issues in her home. It was also documented by school staff that Mother and Father were not in agreement regarding the child's medication and that Mother changed the child's medications at least five times within a span of 20 days.

2.  Mother's home is unfit by reason of abuse and failure to protect from abuse. On or about June 11, 2018, Mother and her significant other were observed placing the child, Brooke, in an inappropriate hold to contain her behaviors. They held her against the wall by her neck. It is unknown if the child's breathing was impeded because she is nonverbal and unable to

4

AZDCS004088

communicate this concept.  Brooke had a red mark and scratch on her neck after the incident.

B.    Upon information and belief, the DCS alleges that the child is dependent due to abuse or neglect as to ▓▓▓▓▓▓▓▓▓▓▓▓▓

1.    ▓▓▓▓▓▓▓▓▓▓▓▓ was married to CHRISTINE MARIE WEBSTER.

2.    ▓▓▓▓▓▓▓▓▓▓▓ has established his paternity of BROOKE ANGELINA SCIANNA by marriage.

3.    ▓▓▓▓▓▓▓▓▓▓ does have an order granting him custody of BROOKE ANGELINA SCIANNA.

4.    ▓▓▓▓▓▓▓▓▓▓▓ does not have a child support order as to BROOKE ANGELINA SCIANNA.

5.    Father is unwilling or unable to provide proper and effective parental care and control by neglecting to provide for the child's basic needs.  Father has failed to provide support for the child, including food, shelter, clothing, proper supervision, and/or medical care.  Brooke is diagnosed with an autism spectrum disorder and unspecified voice and resonance disorder. She is low functioning and nonverbal and has behavioral episodes.  Father did not attend the child's medical appointments or stay up to date on what medications she was on.  Father did not allow the child's DDD supports in his home to work with the child.  Father had concerns about what may be occurring in Mother's home but did not take any actions to protect his child.

5

Father stated he does not have a home that the child can reside in with him at this time.

## VII.

### Facts Supporting Contrary to the Welfare of the Child Finding

Continuation of the child in the home would be contrary to the child's welfare. The finding is supported by the following facts and the above listed allegations, incorporated herein: Brooke is diagnosed with an autism spectrum disorder and unspecified voice and resonance disorder. She is low functioning and nonverbal and has behavioral episodes. On or about June 11, 2018, Mother and her significant other were observed placing the child, Brooke, in an inappropriate hold to contain her behaviors. They held her against the wall by her neck. It is unknown if the child's breathing was impeded because she is nonverbal and unable to communicate this concept. Brooke had a red mark and scratch on her neck after the incident. After placing the child in an inappropriate choke hold during a behavioral episode, Mother went into the house and left the child unattended for about ten minutes while the child wandered in the street. She expected the school's transport staff to supervise the child. Mother frequently could not be reached when the school called her for emergency pickups. Mother stated that she sleeps upstairs on the opposite side of the house from the child and did not hear when the child once answered the door and allowed a stranger into the home. Mother reports that when the child's behaviors escalate, she will frequently hide in the bathroom from the child. There is also concern regarding Mother's mental health as several providers report that Mother's home has been observed as dirty and always kept dark. Mother's behavior is erratic which is not consistent with a calm and stable environment conducive for the

6

child with Brooke's behavioral issues to thrive.  Mother blames the school for the child's behavioral issues and states the child does not have the issues in her home; however, the communications between Mother and the school indicate that Mother has the same issues in her home.   It was also documented by school staff that Mother and Father were not in agreement regarding the child's medication and that Mother changed the child's medications at least five times within a span of 20 days.  Father did not attend the child's medical appointments or stay up to date on what medications she was on.  Father did not allow the child's DDD supports in his home to work with the child.  Father had concerns about what may be occurring in Mother's home but did not take any actions to protect his child.  Father stated he does not have a home that the child can reside in with him at this time.

## VIII.
### Facts Supporting Reasonable Efforts Finding

It is further requested that the Court find, based upon the verified allegations of the petition, that the Petitioner has made reasonable efforts to prevent removal of the child from the home. The finding is supported by the following facts:  A family meeting was held in the Peoria DCS Office on June 18, 2018, with Mother, Father, their significant others, the child's team of providers and DCS in attendance.  It was determined by the team that the level of care needed for the child surpassed what parents and supports were able to provide in order for the child and the people around her to be safe.  The parents disagreed but reluctantly agreed to look into DDD group homes for the child as they wanted to retain their rights to the child.  The next day, Mother changed her mind about

7

seeking services on her own and stated that she would not agree to have the child out of her home and wanted court involvement.

### IX.
### Facts Supporting Relative or Non-Relative Placement

The Department has made attempts to identify and assess placement with the child's grandparent or extended family. Placement of the child with a relative or another member of the child's extended family is not in the child's best interest because Mother and Father were unable to provide DCS with any appropriate kinship placements at this time. The child has significant mental and/or behavioral health needs and requires a structured environment or higher level of care that the family is not able to provide. The child's current placement is the least restrictive consistent with the needs of the child.

### X.
### Financial Responsibility for the
### Support of the Child

The parent(s) should pay an appropriate amount as determined by law for the care, maintenance and support of the child while in care pursuant to A.R.S. §§ 8-241, 8-243 and 8-243.01.

### XI.
### Authority to Consent to Treatment

As legal custodian of BROOKE ANGELINA SCIANNA and in furtherance of A.R.S. § 8-512 and the DCS's obligation, if any, to provide behavioral health or medical services to a child in the DCS's legal custody, the DCS requests permission to consent to

AZDCS004092

necessary medical care and treatment including general anesthesia and surgical procedures.

## XII.
### Education

With regard to possible special education issues of any child named herein who is not placed with a parent, or for any child subsequently removed from a parent(s) physical custody, the DCS hereby requests an order providing that:

1.   In the event a public education agency or Arizona early intervention provider advises DCS that it needs to locate a parent of any child named in this petition to serve as the Individuals With Disabilities Education Act (IDEA) parent for that child and a parent can no longer be located by DCS; or

2.   In the event the parent or legal counsel for the parent tells the public education agency, or DCS/its legal counsel that the parent will not serve as the IDEA parent for the child named in this petition; or

3.   If the parent is subject to a no contact order as to this child; or

4.   If a public education agency or an Arizona early intervention provider following reasonable efforts to try and get a parent to respond to its requests to act as the IDEA parent for a child named in this petition, fails to obtain a response or any cooperation of a parent, an adult relative, stepparent, or foster parent with whom the child lives (but not staff of a group home or other residential facility) shall have authority to serve as the IDEA parent.

9

AZDCS004093

The IDEA parent represents the child's special education interests under Parts B or C of the IDEA. The purpose of such representation is to ensure that a child with a suspected/known disability receives prompt assessment and evaluation for eligibility for early intervention services or appropriate educational services, which may include special education and related services designed to meet the child's unique needs.

## REQUEST FOR RELIEF

Based upon the foregoing allegations, immediate action is required.

WHEREFORE, the DCS requests this Court find and/or order that:

1.  The Juvenile Court has jurisdiction over the subject matter and, after proper service on the parents and/or guardians, the persons before this Court;

2.  Venue is proper in this county;

3.  Continuation of the child in the home would be contrary to the welfare of the child;

4.  The DCS made reasonable efforts to prevent removal of the child from the home;

5.  The Department made attempts to identify and assess placement with a grandparent or extended family and such a placement is not in the child's best interest at this time;

6.  BROOKE ANGELINA SCIANNA is not an Indian child as defined by the Indian Child Welfare Act, 25 U.S.C. § 1903(4);

10

AZDCS004094

7. The child is a temporary ward of the Court, placed in the care, custody and control of the DCS, 3003 North Central Avenue, Phoenix, Arizona 85012, and;

    a. Placing the child in the physical custody of CARE AND DINITY;

    b. Authorizing DCS to consent to evaluation and treatment for medical and dental care upon recommendation of a health care provider, including general anesthesia, surgical procedures, blood transfusions, pelvic examinations and testing for the Human Immunodeficiency Virus (HIV); and

    c. Authorizing DCS and the child's placement to consent to education and social activities on behalf of the child;

8. A Preliminary Protective Hearing be set pursuant to A.R.S. § 8-824, an Initial Dependency Hearing pursuant to A.R.S. §§ 8-842 and 8-843, a Publication Hearing, and a Permanency Hearing pursuant to A.R.S. § 8-862;

9. The matter be assigned to the Court-Appointed Special Advocate (CASA) Program to determine if it is appropriate for the assignment of an advocate;

10. The matter be assigned to the Foster Care Review Board (FCRB) to perform the duties required by statute;

11. All persons are prohibited from removing the child from the State of Arizona without prior written approval of the DCS;

11

AZDCS004095

12. Any judgment and orders for the care, paternity, custody, support or such other relief, as the child's welfare and the interests of the State may require under the provisions of Title 8 and Title 25 of the Arizona Revised Statutes;

13. The parent(s) or legal guardian(s) shall provide the DCS Child Safety Worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) each child named in the Petition recently attended and the grade in which each child was most recently enrolled.) The parent(s) or legal guardian(s) shall also provide or confirm the date of birth of each child named in the Petition;

14. An individual other than a biological or adoptive parent is authorized to act as the IDEA parent under the circumstances delineated herein;

15. All medical, dental and mental health providers, health plans, Regional Behavioral Health Authorities (RBHAs), as well as other Health Insurance Portability and Accountability Act (HIPAA) covered providers who have provided any services to the child, make available to any guardian ad litem for the child and/or attorney for the child the various medical, dental, mental health, genetic and other health care records of the child;

16. **The parent, guardian or Indian custodian be advised as follows;**

    a. **Failure to appear without good cause may result in a finding that the parent, guardian or Indian custodian has waived his/her legal rights and admitted the allegations in the dependency petition;**

12

AZDCS004096

b. That hearings may go forward in his/her absence and may result in an adjudication of dependency, permanent guardianship or termination of parental rights based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established;

c. Proceedings for permanent guardianship pursuant to A.R.S. §§ 8-871 and 8-872 or proceedings for termination of parental rights pursuant to A.R.S. § 8-533 may be initiated based upon the grounds set forth in statute or for failure to participate in reunification services; and

d. If a child is under three years of age, within six months after removal from the home, the Court will determine whether the parent, guardian or Indian Custodian has substantially neglected or willfully refused to participate in reunification services offered by the DCS; admonish the parent, guardian or Indian Custodian that substantially neglecting or willfully refusing to remedy the circumstances that cause a child to be in an out-of-home placement, including refusing to participate in

13

AZDCS004097

reunification services, is a ground for termination of parental rights; and

17.  The parent(s) or legal guardian(s) provide to this Court, as required by A.R.S. § 8-841(D)(5), at the Preliminary Protective Hearing and/or the Initial Dependency Hearing:  the names, type of relationship, and all available information necessary to locate persons related to the child or who have a significant relationship with the child.  Persons related to the child include the child's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s) do not have sufficient information available to locate a relative or person with a significant relationship with the child, the parent or guardian must inform this Court of this fact.  The parent(s) or legal guardian(s) must inform the DCS immediately if the parent(s) or guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the child.

18.  Notice is given that DCS is proposing to substantiate any allegations of abuse and/or neglect contained in the dependency petition for placement in the DCS Central Registry.  The DCS Central Registry is a confidential list of DCS findings that tracks abuse and neglect.  If the court finds your child dependent based upon allegations of abuse and/or neglect contained in the dependency petition, you will be placed in the DCS Central Registry.  See A.R.S. § 8-804.

14

AZDCS004098

19. Notice is given that under the Arizona Rules of Family Law Procedure 5.1(E), during any dependency/guardianship proceeding in the juvenile division, the assigned juvenile division may suspend, modify, or terminate a child support order for current support if the parent entitled to receive the child support no longer has legal or physical custody of the child, and, except in Title IV-D cases may make appropriate orders regarding any past due support or child support arrears. The assigned juvenile division may direct that the wage assignment be quashed or modified.

RESPECTFULLY SUBMITTED this _27th_ day of June, 2018.

MARK BRNOVICH
Attorney General

SCOTT A. CHRISTENSEN
Assistant Attorney General

15

.

Exhibit 3

CT01200 (5/18)

# REPORT TO THE JUVENILE COURT
## FOR
## PRELIMINARY PROTECTIVE HEARING
## AND/OR
## INITIAL DEPENDENCY HEARING

Court Case Number    JD36034        Date of Report     6/28/18

Case Name      SCIANNA, CHRISTINE    ID    511175

A.    **Name and Date of Birth for Each Child Subject to This Court Case Number:**

3218497 SCIANNA, BROOKE      DOB 7/14/2001

B.    **Child or Children Subject to This Report If Different From Above:**

Not applicable

C.    **Family Composition:**

Christine Scianna and John Scianna are the parents to Brooke Scianna.

I.    **REASON FOR DCS INVOLVEMENT**

A.    **Description of the dangerous condition(s) currently occurring within the family that require Department involvement (include evidence of abuse or neglect); including how the parent, guardian or custodian's behaviors cause the child to be unsafe and, if applicable, why the child(ren) was removed from the parent, guardian or custodian's custody**

On or around 4/20/18 the Department of Child Safety Hotline received a report that stated a Terros crisis team was called out to ACCEL school because Brooke was exhibiting severe self-harming behaviors. She was biting herself, slamming herself into things, and scratching herself, causing multiple bruises and lacerations to herself. Mother stated that she had "almost" called crisis the night prior due to behaviors in her presence. A higher level of care was recommended to Mother. Mother agreed that she would take the child to a hospital after school. Brooke had calmed down and she was transported home on the school bus. Terros Crisis was called to the school again the next day due to the same behaviors. Grandmother was contacted and told the principal that Mother had decided not to take Brooke in the night before because she did not feel well and did not want to sit in the lobby and wait.

Because of Brooke's excessive amount of self-inflicted injuries the Fire Department was called to the school on 4/20/18 and they transported Brooke to Banner Thunderbird. Father showed up to the hospital. Mother stated that

AZDCS004243

she could not come and Father could handle it.  After Brooke gets medical clearance, the plan is to transfer her to Aurora.

Brooke also has history of being aggressive toward others and was aggressive toward school staff when they tried to intervene today.  Brooke was last hospitalized at the beginning of March and there was "no change" when she returned to school.  Her behaviors have been increasing since the last week of March 2018.   The principal also indicated that Mother did not follow through with medications as prescribed for Brooke as perceived from communication from Mother to the school nurse.  Mother told the nurse that she gave Brooke Magnesium which seemed to help and indicated to not give her valium.  There is also concern that Mother and Father are following different medication regimens in Mother's versus Father's home.

On or around 6/11/18 the Department of Child Safety Hotline received another report that stated Brooke was very aggravated. Brooke was going towards mother and the boyfriend when they put their hands on her. Mother and the boyfriend each put a hand on the front of Brookes neck and pushed her against the wall. Mother and the boyfriend held Brooke against the wall by her neck for a few minutes. It is unknown if Brooke had any difficulty breathing. Later the boyfriend was seen stopping himself from hitting Brooke several times. The boyfriend would start to swing and stop instantly. At one point Brooke stepped on mothers toe and mother went inside bawling. Brooke was left outside wandering out in the street for about 10 minutes before she went back into the yard. Brooke had become upset over a safety vest she is supposed to wear on the ride to school.

Throughout the course of the investigation Mother was not cooperative with the Department. In the beginning of the investigation the Department had to rely mainly on collateral contacts for information. Mother would not answer questions and gave the CM false information to contact Father.  When the investigator spoke with the collateral sources on this case there was an increasing amount of concern in regards to the child. There were concerns about the child's medications, cleanliness of her home environment, stable routine and medications.  Concerns were shared of Mother not understanding her child's condition or possibly being in denial as well as Mother being hard to reach, exhausted and injured.  Most collateral contacts described Father as having health issues, non-communitive, not involved in the child's life.

Communications through the school indicated that Mother changed the child's medications 6 times within a 45 day span which alarmed the school nursing staff.  Father and Mother were sending the child to school drowsy and unsure of which medication she had taken and at what times. Mother reported that she noticed the same behaviors at home that were occurring at school.

On 6/18/18 the Department held a family meeting in the Peoria office to discuss the future action of the case. Mother, her SO- Daniel Quigley, Father, his SO- Shannon Jones, the child's DDD and behavioral health providers were in attendance. It was determined at this meeting that a higher level of care was needed to ensure the child's safety and the safety of the others around her. Mother was not in agreement. It was discussed with Mother that there were not enough services and providers were too unreliable to depend upon. Mother was not happy with the outcome but agreed that she would find a DDD group home within 2 weeks or the Department would take further action.

On 6/21/18 a family meeting was held with providers, parents and DCS at Embrace Life group home. The team met to discuss the transition and transportation of the child Brooke Scianna into a group home. Mother's demeanor and attitude was unpleasant, resistant and aggressive towards the idea. Mother states that she was only even looking at the home and present today because she was forced to. DDD informed Mother that this was the only home available to take the child. This CM spoke with Mother about how the Department's level of concerns about Brooke in her home have risen due to new information about other children in the home and Mother's continued uncooperative behaviors. CM explained how the Department will be taking custody but would like to facilitate an easy transition to the group home for the child's sake. CM expressed concerns that Mother's behaviors are escalating and could be impacting the child. Daniel then became verbally aggressive towards Father and CM. Daniel told this CM to call police if she did not like it. Mother was supportive of Daniel's aggressive behaviors. CM was able to get Daniel to remove himself from the meeting due to his aggressive nature and disruptive behavior that was taking away from the progression of the meeting. It was agreed upon that Mother would bring the child to the group home to have dinner and introduce her to staff and show her room so the child would feel more comfortable to stay at the facility the next day.

On 6/22/18 Mother did not show up for the transition dinner with the child the night before and told her Family Support Partner that she would not release the child to DCS. CM went the family home with the group home staff and Surprise police to pick up the child. Mother refused to allow the child to leave and argued with officers through the door for around 2 hours. Officers contacted Mother's attorney and she agreed to release the child if a crisis team was called. Police called a crisis team and they arrived and went in the home. The crisis team came out and stated that Mother was getting the child's belongings together. Crisis also noted that Mother did not seem sure as to what medication the child took or which medication was the correct one to send and she had to ask for help which they found concerning. Crisis came out of the home with one small plastic bag and said Mother refused to give the child anything but one change of clothes as she said she "not trying to cooperate with DCS." The child walked out of the home without issue, entered the group home van and left.

**B.    Parent/guardian/custodian's verbal or written response to the allegations**

Mother, Christine Scianna

Mother was very uncooperative with the investigation process.  Mother attended the Family Meeting at the Peoria Office on 6/18/18 where she stated that she had tried many different medications with Brooke. Brooke has episodes that go on for hours at a time. Christine stated that Brooke caused injuries to her; she dislocated her jaw, broke her toe, scratched her and has bitten her. Mother stated that sometimes she just hides in the bathroom from Brooke when she is having episodes. She stated that when Brooke becomes upset, she gets violent. She stated that crisis is there all the time. She stated that crisis there a lot due to Brook's violent behavior. She stated that she has had 3 hospitalizations recently.

Christine said that she has tried everything. She said that communication with the father, the school and the rest of the team is an issue. She stated that she and the father try to work together. She stated that they seem to work better together when Brooke is in the hospital. She stated she got a medical marijuana card and gave her medical marijuana, which worked for a while. She stated that she ran into problems as the father was in disagreement. She stated that the police also became involved and the police officer told her that if she sent the medical marijuana to the father to give to Brooke when she was at his house, she could be arrested for distribution. The father couldn't get a card as he had a disqualification that prevented him from getting a card. She stated that it also came to the fact that she could no longer afford the marijuana as it is not covered under insurance and could not afford a medical marijuana card. She stated that there were issues with getting child support which also made it difficult to afford the marijuana. She stated that is why they went back to psychiatric medication for Brooke. She stated that Brooke also became tolerant of the marijuana and it was not working as well anymore. Christine stated that there was an incident where one of the caregivers couldn't get into house. The police were called because Brooke had a meltdown. She stated that she was called and had to come home and let them in the house. The next day Brooke had an escalation about the dog. Christine stated that she was worried that Brooke was hurting or would hurt the dog, so she put the dog in the bathroom which triggered Brooke and Brooke attacked her. She called one of the agencies that works with Brooke, the Stars group and they told her to call 911. Brooke locked her out of the house. Brooke was then taken to the hospital.

Christine stated that Brooke has had problems at school. They did not know what was escalating her at school. She stated that she responds to the calls

AZDCS004246

from the school about Brooke as best as she can, but it is difficult when she is a teacher herself. She stated that it is not easy for her to get away from her classroom. She stated that she often has to leave work to go get Brooke. She stated that sometimes they are in the middle of science experiments and she cannot abruptly leave or receive phone calls. She stated that one time the principal had to come and get her about an emergency with Brooke. She stated that she has used up all of her paid time off from handling things with Brooke. She stated that if she takes off of work, it is unpaid. She stated that there was an issue one when she was downtown for the teacher walk out. She stated that sometimes she has to attend CFT's by phone during her lunch and she only has 30-40 minutes. She also uses her prep time to take care of things with Brooke. Christine stated that she answers all of the calls and emails and she works with the school on ideas with handling Brooke.

Father, John Scianna

Father states that "whatever medications" are given to him is what he gives the child when she visits him. He gives exactly what it says to do on the bottle. He says that often Mother drops the child off and has "forgotten" to pack her medications. He states that whatever Mother sends for her is what he gives her. He states that Mother had kept the child from him for about 4 months by switching weekends and changing things around. Father says he received a message from Mother saying that she was taking the child off her medical marijuana and that was when the child began having behaviors. He states that for a while Mother was not even giving her any medications. He was not sure what she was taking. Father states that he knows that detaining Brook can be difficult. He states that he does not think that holding Brooke by the neck is appropriate. He states that he has never seen any kind of behavior like this but he avoids Mother at all costs and they do not communicate at all. He states that leaving Brooke out in the front yard for ten minutes is "not ok". He says that Mother told him that Brooke damaged the neighbors car which means that is was done when Brooke was left outside alone. He says that Mother only gave him half the story. He says that he has only met Mother's SO twice and they do not really like each other. Father states that he and SO had issues over his adult daughter who was residing with him did not like SO.

Father attended the family meeting at the Peoria office on 6/18/18 and stated that Brooke needs to be on a medication that will work. He stated that nothing is going to fix it. He stated that they have to take her to the doctor every time they even have to up her medication by one milligram. It is hard to get her to the doctor all the time. He stated that it is hard to get Brooke to go to and sit in the doctor's office because she doesn't like to wait. Father stated that Brooke is not on the medical marijuana anymore. Brooke became tolerant to it and it no longer worked. He does not know what goes on at her mother's house. He

AZDCS004247

does not know what the triggers are over there. He knows that Brooke flips out over anything. The father is concerned about her self-harming injuries.

### C.   Family history of involvement with the Department or other child welfare agencies

Prior History
9/29/15 Unsubstantiated
The mother leaves ███ at home to watch Brooke who is autistic and combative. The mother leaves ███ alone with Brooke during the week average of two days per week and for about 2-3 hours at a time. The mother leaves ███ with Brooke on weekends from 4-6 hours. ███ has gotten bruises in the past from Brooke being combative. ███ is hit by Brooke on average of once a week due to her condition. The last bruise ███ got was on her right leg but no details given as to color or size.

███ appears clean, healthy and appropriately dressed; it is unknown what Brooke's current condition. ███ does not have any mental health or medical conditions. Brooke is autistic and only takes birth control pills to control her periods because she can't deal with them in her condition. Brooke has anger issues and is non-verbal. The mother does not have any diagnosis however she is believed to be bi-polar. The mother drinks and when she drinks she is very angry.

On Saturday night ███ arrived home from hanging out with friends at about 10:07 PM and mother came to the door with see through lingerie and you could see that she was totally naked. The mother was there with her boyfriend and told ███ to go to her room and not come out because they were going to be having sex down stairs. As ███ was going up the stairs she could see all of mother's sex toy's (Dill'doo's  and Vibrator's) laying around. ███ got very upset and called her dad and told him she was going to pack her bags and go stay at her friend's house as ███ friends mother was going to come pick her up.  The father told ███ 'No" that he would come pick her up instead. ███ told dad she did not want father to come over because she thought father would get into fight with mother's boyfriend.  The father talked ███ into just going to bed.

On Sunday ███ still wanted to be picked up so father came and picked her up.   The mother sent text to father and ███ stating "good that ███ had left and mother stated she was going to change the locks and will be moving out of state".

Today,  09/29/2015 father got a call that police were called due to father having ███ outside of the court order visitation dates.  The father is concerned that ███ will be forced to go back to mother's house and mother

will retaliate against ▮▮▮. The father was accused of kidnapping ▮▮▮ from mother's house.

7/19/2016  Unsubstantiated

Mother sent an email that she continues to be attacked for a thirty minute period by Brooke. Mother stated that Brooke has ripped Mother's hair out. This seems to be an on-going issue. Mother will report being attacked by Brooke about two times a week. Mother wrote that she had locked herself in the bathroom, details unknown. It is unknown if SO other was in the home with the children. It has been stated that SO has had to "restrain" Brooke before. Mother appears to be a target for Brooke. Mother is working with direct service workers in the home for about twenty-five hours a week, but it does not seem to be enough. There is a concern that the other children in the home could be affected by Brooke's behavior.

About a week or two ago, Brooke was hospitalized at Phoenix Children's Hospital. Mother was visiting Brooke, and Mother was attacked to the point where her jaw may have been dislocated.

In February 2016 and March 2016, Brooke was seen expressing self-harming behavior. Brooke would smash her head and bang her head against the wall.

Brooke is highly aggressive, has low functioning autism/spectrum disorder, and unspecified communication disorder. Brooke's level of verbal communication is very low. Brooke takes Metformin, Clonopin, Seroquel, and Valium. Brooke has been in and out of St. Luke's behavioral health hospital. It has been difficult stabilizing Brooke's medication. Brooke receives DDD services, and her worker is Richard Finpery. Mother appears to be participating in services, but she is still unable to manage Brooke's behaviors with the services she has in place.

6/1/2017  Unsubstantiated

Visitation was recently restored and Brooke spent her first weekend with father in several months on 07/28/17 through 7/30/17. Brooke is autistic, non-verbal and has extreme behaviors including being very aggressive. After Brooke's first visit with father in many months, her behaviors were exacerbated. When Brooke came home on Monday evening, she was being very aggressive. She would not settle down and would not go to sleep, she was up until after 2 a.m. Brooke would not leave mother's room and spent the night pacing in mother's room and screaming.

Mother went to work on 08/01/17, and Brooke was left with her two caregivers from the STARS program, both of them were concerned by the level of aggression Brooke was exhibiting. There are concerns that Brooke is

responding to being with the father.  Father has a history of being aggressive. Father believes in being physical with Brooke to control her behaviors.  Father has been observed in the past to restrain Brooke.  Once he was seen pressing her face into a couch cushion, trying to control her.  Father also makes Brooke sleep in the same bed with him.  Father states that Brooke "likes to cuddle." However, Brooke is autistic and normally does not like to be touched at all.

Father reported that he took Brooke to a doctor over the weekend, but refuses to tell mother why she went to the doctor or what doctor she saw.  Similarly, father will not allow Brooke's normal caregivers to go to his house, because "he can handle it."  Brooke has been on marijuana oil for several years, which seems to help her condition.  Brooke has to do without this medication when she is at father's home, because it is illegal for mother to send it with Brooke to father's home, because he does not have a medical marijuana card, and refuses to get one because he would no longer be allowed to buy firearms.

Father has a history of alcohol abuse and having a violent temper. Father used to punch holes in walls and throw and break things in the home when the family was still together.  Mother has had protective orders against father in the past. It is believed that father's aggressive way of handling Brooke's behaviors are the cause of her exacerbated behaviors.

D.  **Services and supports provided to the family to prevent removal and outcomes of services and supports**

The parents had a Family meeting in the Peoria office on 6/18/18 at 9 am with the child's providers in attendance.  It was determined at the meeting that the level of care in home with mother was not meeting the highly behavioral needs of the child.  On 6/22/18 another meeting took place at Embrace Life Group Home to coordinate the transition of Brooke's care.  Mother was not willing to place the child in the only group home DDD had available for the child's placement.

E.  **If the family has Native American heritage, efforts to identify and contact the child's tribe and confirm the child's membership status**

ICWA does not apply to this case.

II.  **SAFETY PLANNING**

A.  **If applicable, efforts to locate each missing parent**

Parents whereabouts are known.

B. **Description of the current safety plan, including the location and living arrangement of the child, the actions that are necessary to control the dangerous condition(s), when those actions and/or services are needed, and the adults responsible for carrying out the actions**

See attached Safety Plan

C. **Efforts to implement the least intrusive plan that is sufficient to control the dangerous conditions; and for Indian children, the active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, and the outcome(s) of these efforts**

The Department held two family meetings on 6/18/18 & 6/21/18, and TDM on 6/27/18 where it was determined that even with all the behavioral and special needs supports in place it was not enough to control the safety factors in the home and ensure the safety of the child.

D. **The conditions for return as described in the safety plan (only applicable if the child is not residing with a parent or guardian and is assessed as unsafe due to impending danger)**

See attached Safety Plan.

E. **Describe why continued temporary custody is necessary**

Continued temporary custody is necessary due to Mother's inability to appropriately follow doctors medication orders,  placing the child in inappropriate behavioral holds, lack of understanding the child's special needs, inability to provide a stable and calm home environment and inability to control the child's behaviors. Father has physical health issues, is unable to provide a stable home environment, lacks understanding of caring for a special needs child, and an inability to control the child's behaviors.

III. **IDENTIFICATION, LOCATION, AND ENGAGEMENT OF EXTENDED FAMILY MEMBERS OR OTHER CONNECTIONS**

A. **Results of efforts to identify, locate, contact, and engage adult relatives of the child, including grandparents, great-grandparents, adult siblings, parents, or step-parents who have custody of any siblings, aunts, uncles and first cousins, and persons who have a significant relationship with the child. Include information, if known, about the person's willingness to be a potential placement**

No efforts were made to identify relatives due to the child's special needs and behaviors. The child needed a higher level of care than relatives could provide and the Department and the Division of Developmental Disabilities worked

AZDCS004251

together to find her an appropriate placement willing and able to meet her high level of needs.

**B.  Description of the child's important connections, including information provided by the child, parents, and/or guardians**

The child has a team of supports that work with her. She has services through Arizona's Children's Association including a High Needs Case Manager, Cassandra Tisdale, and Family Support Partner, Patrice Munday. She has CFSS-FACT behavioral coaching team, Lead- Elisa Vincitorio, DDD Support Coordinator- Elecia Hart and ACCEL special needs teacher Ixayana Vera.

**C.  Contact between the child and the child's relatives, friends, former foster parents and any connections the child identifies; and if contact is restricted, the reasons why**

The child has all her current providers and supports in place in her placement.

**D.  Efforts to maintain cultural connections, including opportunities for the child to build cultural awareness and involvement**

The child has all her providers and familiar supports in place in the group home and is attending her school where she has established connections and involvement to maintain her familiar routine.

**IV.  CHILD'S FUNCTIONING, SERVICES, AND LIVING ARRANGEMENT**

**A.  Physical, developmental, and behavioral health needs assessment and services, including coordination of services with the RBHA**

Physically Brooke appears on target for a 16 year old girl. Developmentally Brooke is delayed due to her diagnosis of Autism and Unspecified Voice and Reconosis Disorder. Brooke receives speech therapy and has an Augmentative Device.

Brooke has a lot of behavioral health needs and already has services in place through Arizona's Children's Association and CSFF-FACT. The child has a support team of a High Needs Case Manager, Family Support Partner, and Behavioral Coaches.

**B.  Education and social development needs assessment and services, including efforts to ensure educational stability**

Brooke attends a special needs school called ACCEL with an Individualized Education Plan in place. Brooke struggles socially due her OCD disorder and often has to be separated from her classmates because she disrupts the class.

AZDCS004252

Preliminary Protective/ Initial Dependency Hearing

C.   For youth age fourteen or older in out-of-home care, efforts or plans to assess and provide services to support the youth's preparation for Adulthood

The child is qualified for the Division of Developmental Disabilities programs and DDD supports qualifying candidates through adulthood.

D.   Description of the type of living arrangement and whether it is consistent with the Department's placement preferences; if the child is not living in the home of a grandparent, other relative, or person who has a significant relationship with the child, the reasons why such placement has not been identified or is contrary to the child's best interest

Placement with relatives was not in the child's best interest as she has high needs that demand a level of care that requires specially trained staff to ensure the child's safety and the safety of others around her.

E.   Description of any assistance or services provided to the caregiver(s) to enhance their capacity to provide appropriate care and supervision

The caregivers will receive standard allowances, school transportation, Arizona Long Term Care, Mercy Maricopa Medical Plan and any additional supports and services that are authorized by the Division of Developmental Disabilities.

F.   If the child has a sibling in out-of-home placement, description of efforts made to place siblings together; and if not placed together, the specific reasons why placement did not occur or reasons why this would be contrary to the child's or a sibling's safety or well-being

Not applicable.

G.   If placement with sibling(s) is not possible, efforts to facilitate frequent visitation or contact with siblings; and if frequent visitation or contact with siblings is not recommended, the reasons why this would be contrary to the child's or sibling's safety or well-being

Not applicable.

H.   Efforts to provide an Indian child with an appropriate living arrangement in accordance with ICWA guidelines

ICWA does not apply to this case.

I.     **If out-of-state placement is appropriate and in the best interest of the child, state why (include ICPC and/or out-of-state visitation status)**

Not applicable.

V.     **PARENT FUNCTIONING, ADDITIONAL ASSESSMENT, AND INITIAL SERVICES**

A.     **Description of each parent's, guardian's, or custodian's protective capacities**

Mother, Christine
Mother has a diminished capacity behaviorally of an inability to control impulses, not taking action, setting aside her own needs for the child and protecting her child. Cognitively Mother does not recognize threats, understand her protective role or her child's needs.

Mother's behavioral strengths include being adaptive and assertive and having adequate skills as a caregiver. Cognitive strengths includes that Mother is intellectually able to parent and she is self-aware as a parent. Mother's capacity emotionally for the child has no limitations as Mother is fully functional in this area.

Father, John Scianna
Father has a diminished capacity behaviorally of not taking action and setting aside his own needs for his child. Cognitively Father does not recognize threats or understand his child's needs.

Father's behavioral strengths include an ability to control impulses, being adaptive and assertive, and having adequate skills as a caregiver. Cognitive strengths includes an intellectually ability to parent and he is self-aware as a parent. Father has no limitations in emotional capacity to care for the child.

B.     **Description of assessments, services, and/or supports provided or offered to each parent, guardian, or custodian since the child's removal to remedy the need for temporary custody (including date of evaluations scheduled or completed) and proposed case plan services**

No services could be provided that would rectify the need for temporary custody. Father is offered Parenting Aide services, transportation as needed, and Autism education classes within the community. Mother is offered Parenting Aide services, transportation as needed, Psychiatric evaluation and Autism education classes within the community.

C.     **Services or supports requested by, or on behalf of a parent or guardian, and if not provided, the reasons why**

Mother requested a formal Team Decision Making Meeting and received the meeting on 6/27/18 in the Peoria office. No other services were requested by the parents.

## VI.   PROPOSED PERMANENCY/CASE PLAN GOAL AND PARENTING TIME (VISITATION) PLAN

**A.   Proposed case plan goal and target date**

Reunification with a target date of 7/1/2019.

**B.   Proposed concurrent case plan goal and target date, if applicable**

There is no concurrent case plan at this time.

**C.   Current or proposed plan for parenting time (visitation) between the child and each of their parents, guardians or custodians**

Mother and Father will have separate supervised visitation times at 1 hour 1 time a week.  Additional Safety Monitors can be approved by the Department but are limited to available times set by providers and group home staff. This requirement is due to the child's behaviors and 1:1 staffing requirements to ensure the child's safety and the safety of others in the community.

**D.   Describe the results of any visitation that has occurred between the child and a parent, guardian, or custodian since removal**

The parents were offered standard supervised visitation on 6/29/18.

## VII.   DCS SPECIALIST'S CONCLUSIONS

It is the opinion of the Department that the child remain in the legal custody of the Department and the physical custody of the DCS approved DDD licensed group home.  The DDD group home care givers are trained and able to meet the needs of a highly behavioral non-verbal autistic child. The Department has serious concerns regarding Mother's inability to provide a calm and stable environment, her ability to handle the child's medications and follow the doctor's medication orders.  The Department also has serious concerns about how Mother inappropriately handles the child when she is demonstrating behaviors.  The Department has concerns about Father's physical health, his ability to provide stable housing, and his ability to fully participate in the child's health care and behavioral management needs.  Services are being put into place to address these issues.  Once parents has successfully completed the recommendations

AZDCS004255

Preliminary Protective/ Initial Dependency Hearing

made, the Department can better determine if the parents can effectively and appropriately care for the child with such a high level of special needs.

VIII.   **RECOMMENDATIONS:**

A.   **Agency**

It is respectfully recommended that <u>Brooke Scianna</u> be made a ward(s) of the court, committed to the care, custody, and control of the Arizona Department of Child Safety.

It is further respectfully recommended that <u>Brooke Scianna</u> be placed in the physical custody of <u>DDD Group Home</u> with appropriate medical, social, and educational authorizations.

If the child is in out-of-state placement, it is further respectfully recommended that the court find that the out-of-state placement continues to be appropriate and in the best interest of the child.

B.   **Financial:**

It is respectfully recommended that beginning (date) <u>6/28/18</u>, the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:

(parent name) <u>Christine Scianna</u> be assessed $ <u>50.00</u> monthly for each of the following children:  <u>Brooke Scianna</u>

(parent name) <u>John Scianna</u> be assessed $ <u>50.00</u> monthly for each of the following children:  <u>Brooke Scianna</u>

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

(parent name) _____ be assessed $ _____ monthly for each of the following children: _____

C.   **Reasonable Efforts Findings**

It is respectfully recommended that the court find that the Arizona Department of Child Safety has made reasonable efforts to prevent or eliminate the need for removal and to make it possible for the child to safely return home.

If the child is an Indian child, it is further respectfully recommended that the court find that Arizona Department of Child Safety has made

Preliminary Protective/ Initial Dependency Hearing

designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

If the child is an Indian child, it is further respectfully recommended that the court find that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

It is further respectfully recommended that the court approve the proposed case plan.

Respectfully submitted:

Name/Title    Tina Canale/ Investigations
ARIZONA DEPARTMENT OF CHILD SAFETY
Telephone Number:    602-397-7592
Date:    6/28/18

Approved by:

Name/Title    Christi Johnson
ARIZONA DEPARTMENT OF CHILD SAFETY
Telephone Number:    602-771-0213
Date:    6/28/18

Case Name:    SCIANNA, CHRISTINE          ID:    511175

AZDCS004257

Exhibit 4

CHRIS DEROSE, CLERK
BY *C. Camacho* DEP
C. CAMACHO, FILED

18  JUN 28  AM 9: 52

MARK BRNOVICH
Attorney General

1

2  SCOTT A. CHRISTENSEN
Assistant Attorney General

3  State Bar No. 024676
CFP/PSS

4  2005 North Central Avenue, C007AG

5  Phoenix, Arizona 85004
(602) 542-1645

6  PSSDurango@azag.gov

7  Attorneys for the Department of Child Safety

8                    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

9                       IN AND FOR THE COUNTY OF MARICOPA

10

11  In the matter of:                          No. JD36034

12  BROOKE ANGELINA SCIANNA            **ORDER SETTING HEARINGS ON**
                                       **DEPENDENCY PETITION AND**
13      d.o.b. 07/14/2001              **TEMPORARY ORDERS**

14

17  Person(s) under 18 years of age.        (Honorable _____ )

17

17          Upon a verified petition alleging the child to be dependent and that the interests of

18  the child requires immediate action:

19          IT IS ORDERED setting a Preliminary Protective Conference for the _2_ day of

20  _July_ , 20_18_ , at _9:30_ a.m., to be held at Maricopa County Superior Court,

21  _X_ 3131 West Durango, Phoenix, Arizona 85009 OR̶ ̶ ̶1̶2̶5̶ ̶W̶e̶s̶t̶ ̶W̶a̶s̶h̶i̶n̶g̶t̶o̶n̶

22

23  S̶t̶r̶e̶e̶t̶,̶ ̶P̶h̶o̶e̶n̶i̶x̶,̶ ̶A̶r̶i̶z̶o̶n̶a̶ ̶8̶5̶0̶0̶3̶, before the Facilitator _____ .

24          IT IS FURTHER ORDERED setting a Preliminary Protective Hearing for the _2_

25  day of _July_ , 20_18_ , at _10:15_ a.m., to be held at Maricopa County Superior

26

27  Court, _X_ 3131 West Durango, Phoenix, Arizona 85009 O̶R̶ ̶ ̶ ̶1̶2̶5̶ ̶W̶e̶s̶t̶

28

AZDCS004104

~~Washington Street, Phoenix, Arizona 85003~~, before the Honorable _____ *Hoskins* _____.

IT IS FURTHER ORDERED setting an Initial Dependency Hearing for *2* day of _____ *July* _____, 20 *18*, at *10:25 a.*m., to be held at Maricopa County Superior Court, __*X*__ 3131 West Durango, Phoenix, Arizona 85009 ~~OR 125 West Washington Street, Phoenix, Arizona 85003~~, before the Honorable _____ *Hoskins* _____.

IT IS FURTHER ORDERED setting a Publication Hearing for the ___ day of _____, 20___, at ____ ___.m., to be held at Maricopa County Superior Court, _____ 3131 West Durango, Phoenix, Arizona 85009 OR ____ 125 West Washington Street, Phoenix, Arizona 85003, before the Honorable _____.

IT IS FURTHER ORDERED setting a Permanency Hearing for *22* day of _____ *May* _____, 20 *19*, at *9:30 a.*m., to be held at Maricopa County Superior Court, __*X*__ 3131 West Durango, Phoenix, Arizona 85009 ~~OR 125 West Washington Street, Phoenix, Arizona 85003~~, before the Honorable _____ *Hoskins* _____.

IT IS ORDERED that, pending the hearing, BROOKE ANGELINA SCIANNA is made a temporary ward of the Court, committed to the legal care, custody and control of the Department of Child Safety (DCS or the Department) and placed in the physical custody of CARE AND DINITY.

IT IS FURTHER ORDERED that, pursuant to Rule 3, R.P.J.C., this matter be referred to the CASA Program Coordinator to determine the appropriateness of an appointment of an advocate for the child.

2

AZDCS004105

IT IS FURTHER ORDERED that no person shall remove or cause the removal of the child from the State of Arizona without prior written approval of DCS.

IT IS FURTHER ORDERED that DCS is authorized to consent for the child to leave the jurisdiction of the Court for travel within the United States for a period not to exceed thirty days.

IT IS FURTHER ORDERED that the parent(s) or legal guardian(s) provide the DCS child safety worker or its attorney with a recent educational history (including the name(s) and location(s) of the school(s) the child named in the Petition recently attended and the grade in which the child was most recently enrolled). The parent(s) or legal guardian(s) shall also provide or confirm the date of birth of the child named in the Petition.

IT IS FURTHER ORDERED that in the event of any of the following circumstances, a relative, stepparent or foster parent with whom the child lives (but not staff of a group home or other residential facility) shall have authority to act as the IDEA parent:

1. Neither the public education agency, an early intervention provider or DCS can locate the parent;

2. The parent or legal counsel for the parent tells the public education agency, DCS or one of its attorneys that the parent will not act as the IDEA parent;

3. There is a no contact order against the parent as to the child in issue; or

4. The public education agency or Arizona early intervention provider has made reasonable attempts to get a parent to respond to its requests to act as

3

AZDCS004106

the IDEA parent and fails to obtain a response or any cooperation from the parent.

IT IS FURTHER ORDERED that any Regional Behavioral Health Authority (RBHA), health plan, medical, dental or mental health provider/professional, hospital, clinic, laboratory, pharmacy, medical facility or other health care provider that has provided or is providing treatment or services to BROOKE ANGELINA SCIANNA shall, upon written request, provide the child's guardian ad litem and/or the child's attorney with copies of paper and electronic medical, health, dental, mental health, genetic test, communicable disease (including HIV-related information) records of this child in DCS's legal custody.  The records may be provided in any medium that is acceptable to the entity or individual providing the records.  RBHAs are to provide the child's guardian ad litem and/or the child's attorney with the names of any service providers for the child.  All individuals and entities covered by this Order are also permitted to speak with the child's guardian ad litem and/or the child's attorney.  The child's guardian ad litem and/or child's attorney shall not request records as to this child after the period of representation in this matter ends.

IT IS FURTHER ORDERED that the parent(s) or legal guardian(s) provide to this Court, at the Preliminary Protective Hearing and/or the Initial Dependency Hearing:  the names, type of relationship, and all available information necessary to locate persons related to the child or who have a significant relationship with the child.  Persons related to the child include the child's grandparents, great-grandparents, brothers or sisters of whole or half-blood, aunts, uncles and first cousins. If the parent(s) or legal guardian(s)

4

AZDCS004107

do not have sufficient information available to locate a relative or person with a significant relationship with the child, the parent or guardian must inform this Court of this fact. The parent(s) or legal guardian(s) must inform the DCS immediately if the parent(s) or guardian(s) becomes aware of information related to the existence or location of a relative or person with a significant relationship with the child.

**FAILURE TO COMPLY WITH THESE ORDERS MAY RESULT IN THE COURT FINDING YOU IN CONTEMPT OF COURT**

IT IS FURTHER ORDERED placing BROOKE ANGELINA SCIANNA in the temporary physical custody of CARE AND DINITY and that CARE AND DINITY is authorized to consent to social and authorized educational activities for the child.

IT IS FURTHER ORDERED that in furtherance of A.R.S. § 8-512 and the DCS's obligation, if any, to provide medical, behavioral health or other services to child in the DCS's legal custody, the DCS is authorized to consent to evaluation and treatment for medical and dental care upon recommendation of a health care provider, including general anesthesia, surgical procedures, blood transfusions, pelvic examinations and testing for the Human Immunodeficiency Virus (HIV).

IT IS FURTHER ORDERED that DCS and the placement shall have authority to consent to all social and authorized educational activities for BROOKE ANGELINA SCIANNA.

THE COURT FINDS, based upon the verified allegations of the Petition that continuation of the child in the home would be contrary to the welfare of the child. This finding is supported by the following facts: Brooke is diagnosed with an autism spectrum disorder and unspecified voice and resonance disorder. She is low functioning and

5

AZDCS004108

nonverbal and has behavioral episodes. On or about June 11, 2018, Mother and her significant other were observed placing the child, Brooke, in an inappropriate hold to contain her behaviors. They held her against the wall by her neck. It is unknown if the child's breathing was impeded because she is nonverbal and unable to communicate this concept. Brooke had a red mark and scratch on her neck after the incident. After placing the child in an inappropriate choke hold during a behavioral episode, Mother went into the house and left the child unattended for about ten minutes while the child wandered in the street. She expected the school's transport staff to supervise the child. Mother frequently could not be reached when the school called her for emergency pickups. Mother stated that she sleeps upstairs on the opposite side of the house from the child and did not hear when the child once answered the door and allowed a stranger into the home. Mother reports that when the child's behaviors escalate, she will frequently hide in the bathroom from the child. There is also concern regarding Mother's mental health as several providers report that Mother's home has been observed as dirty and always kept dark. Mother's behavior is erratic which is not consistent with a calm and stable environment conducive for the child with Brooke's behavioral issues to thrive. Mother blames the school for the child's behavioral issues and states the child does not have the issues in her home; however, the communications between Mother and the school indicate that Mother has the same issues in her home. It was also documented by school staff that Mother and Father were not in agreement regarding the child's medication and that Mother changed the child's medications at least five times within a span of 20 days. Father did not attend the child's medical appointments or stay up to date on what

6

medications she was on. Father did not allow the child's DDD supports in his home to work with the child. Father had concerns about what may be occurring in Mother's home but did not take any actions to protect his child. Father stated he does not have a home that the child can reside in with him at this time.

THE COURT FURTHER FINDS, based upon the verified allegations of the Petition, that the Petitioner has made reasonable efforts to prevent removal of the child from the home. This finding is supported by the following facts: A family meeting was held in the Peoria DCS Office on June 18, 2018, with Mother, Father, and their significant others, the child's team of providers and DCS in attendance. It was determined by the team that the level of care needed for the child surpassed what parents and supports were able to provide in order for the child and the people around her to be safe. The parents disagreed but reluctantly agreed to look into DDD group homes for the child as they wanted to retain their rights to the child. The next day, Mother changed her mind about seeking services on her own and stated that she would not agree to have the child out of her home and wanted court involvement.

THE COURT FURTHER FINDS, based upon the verified allegations of the Petition that the Department made attempts to identify and assess placement with a grandparent or extended family and it is not in the child's best interest because Mother and Father were unable to provide DCS with any appropriate kinship placements at this time. The child has significant mental and/or behavioral health needs and requires a structured environment or higher level of care that the family is not able to provide. The child's current placement is the least restrictive consistent with the needs of the child.

7

AZDCS004110

You are hereby advised that your failure to appear without good cause may result in a finding that you waived your legal rights and have admitted the allegations in the Petition. In addition, if you fail to appear without good cause, the hearings may go forward in your absence and may result in an adjudication of dependency, termination of your parental rights or the establishment of a permanent guardianship based upon the record and evidence presented to the Court, as well as an order of paternity, suspension or termination of an existing current child support order, custody, or change of custody in a consolidated family law matter and an order for child support if paternity has been established. You are also advised that if a child is under three years of age, within six months after removal from the home, the Court will determine whether you have substantially neglected or willfully refused to participate in reunification services offered by the DCS. In addition, you are hereby advised that substantially neglecting or willfully refusing to remedy the circumstances that cause your child to be in an out-of-home placement, including refusing to participate in reunification services, is a ground for termination of parental rights.

## APPOINTMENT OF COUNSEL – CHILD

☒   IT IS FURTHER ORDERED appointing ___Tom Stubbs___, as

☒ Guardian ad Litem for the child; and appointing _____,

as ☐ counsel for the child.

///

///

8

AZDCS004111

## APPOINTMENT OF COUNSEL – OTHER PARTIES

1   ☒   IT IS FURTHER ORDERED assigning _Cynthia Ceasar_, as

2   counsel for <u>CHRISTINE MARIE WEBSTER</u> pending the decision of the Court at the

3   hearing.  The determination of appointment of counsel may require the completion of a

4   

5   financial affidavit.

6   ☒   IT IS FURTHER ORDERED assigning _Sara Smith_, as

7   counsel for <u>JOHN RALPH SCIANNA</u> pending the decision of the Court at the hearing.

8   The determination of appointment of counsel may require the completion of a financial

9   

10   affidavit.

11   DATED this _27th_ day of _June_ 2018.

12   

13   

14   

17                                    JUDGE OF THE SUPERIOR COURT

17                                    Commissioner Melody Harmon

17   

18   

19   

20   

21   

22   

23   

24   

25   

26   

27   

28   

9

AZDCS004112

Exhibit 5

☐ **C2C**

FILED
7/27/2018 10:52am
CHRIS DEROSE, Clerk
By: _A. Villaseno_
Deputy

FOR CLERK'S USE ONLY

## SUPERIOR COURT OF ARIZONA
## IN MARICOPA COUNTY

PETITIONER:     ☒ DCS     ☐ GAL     ☐ Other

In the Matter of:

| Name | Date of Birth |
|------|---------------|
| Brooke Angelina Scianna | 7/14/01 |
| | |
| | |
| | |
| | |

Person(s) under 18 years of age

Case No.  **JD36034**

**PRELIMINARY PROTECTIVE ORDER AND
ORDER SETTING COURT HEARINGS**

Commissioner Hoskins
Judge/Commissioner

## APPEARANCES
Per the attached sign in sheet
## ORDERS
The Court has considered the stipulation of the parties and/or evidence presented and ORDERS AS FOLLOWS:

**A.**    **ICWA** The Court finds, based upon the assertions of the parties, that the Indian Child Welfare Act (ICWA)
☐ DOES apply     ☒ DOES NOT apply     ☐ MAY apply, though it has yet to be determined

**B.**    **APPOINTMENT OF COUNSEL**

| Party | Party Name | Attorney Name | | Appointed |
|-------|-----------|---------------|---|-----------|
| MOTHER | Christine Marie Webster | DeAnn Gillespie | , Atty | ☒ Yes ☐ No |
| | | | ,GAL | ☐ Yes ☐ No |
| FATHER | ▓▓▓▓▓▓▓ | Sara Smith (OPDS) | ,Atty | ☒ Yes ☐ No |
| | | | ,GAL | ☐ Yes ☐ No |
| FATHER | | | ,Atty | ☐ Yes ☐ No |
| | | | ,GAL | ☐ Yes ☐ No |
| FATHER | | | ,Atty | ☐ Yes ☐ No |
| | | | ,GAL | ☐ Yes ☐ No |
| CHILD(REN) | Brooke Angelina Scianna | Thomas Stubbs (OLA) | ,GAL | ☒ Yes ☐ No |
| CHILD(REN) | | | ,GAL | ☐ Yes ☐ No |
| CHILD(REN) | | | , | ☐ Yes ☐ No |
| OTHER | | | , | ☐ Yes ☐ No |
| OTHER | | | , | ☐ Yes ☐ No |

The appointment of counsel is subject to reimbursement and dependent on the submission of a financial affidavit.

AZDCS004117

Case No JD **36034**

**C.**   <u>SERVICE OF PROCESS</u>

| | | Accepts | Waives | Not Complete |
|---|---|:---:|:---:|:---:|
| **MOTHER** | Christine Marie Webster | ☒ | ☒ | ☐ |
| **FATHER** | ▓▓▓▓▓▓▓▓▓▓▓▓ | ☒ | ☒ | ☐ |
| **FATHER** | | ☐ | ☐ | ☐ |
| **FATHER** | | ☐ | ☐ | ☐ |
| **OTHER** | | ☐ | ☐ | ☐ |
| **OTHER** | | ☐ | ☐ | ☐ |

**D.**   <u>PATERNITY</u>

| Father's Name: ▓▓▓▓▓▓▓ | Relevant Child(ren) Brooke Angelina Scianna | |
|---|---|---|
| Paternity has been Established  ☒ Yes  ☐ No | Is willing to sign an Affidavit of Paternity  ☐ Yes  ☐ No | Is Ordered to Submit to Testing  ☐ Yes  ☐ No |

| Father's Name: | Relevant Child(ren) | |
|---|---|---|
| Paternity has been Established  ☐ Yes  ☐ No | Is willing to sign an Affidavit of Paternity  ☐ Yes  ☐ No | Is Ordered to Submit to Testing  ☐ Yes  ☐ No |

| Father's Name: | Relevant Child(ren) | |
|---|---|---|
| Paternity has been Established  ☐ Yes  ☐ No | Is willing to sign an Affidavit of Paternity  ☐ Yes  ☐ No | Is Ordered to Submit to Testing  ☐ Yes  ☐ No |

**E.**   <u>CONTESTED ISSUES</u>

| ☒ Yes  ☐ No | | Temporary Custody | Parenting Time | Services | Other |
|---|---|:---:|:---:|:---:|:---:|
| Mother | Christine Marie Webster | Yes | Yes | Yes | Yes |
| Father | ▓▓▓▓▓▓▓▓▓ | No | Yes | Yes | Yes |
| Father | | | | | |
| Father | | | | | |
| Other | | | | | |
| Other | | | | | |

Contested issue(s) is / are as follows:

Mother requests a temporary custody hearing.

Father contests supervised visitation. Mother and Father contest services.

Mother and Father request full disclosure from DCS.

Mother and Father contest the dependency and request a pre-trial conference.

AZDCS004118

Case No JD **36034**

F.   <u>**TEMPORARY CUSTODY FINDINGS**</u>

⊠   The Court has received and reviewed the following documents:
    ⊠ Dependency Petition   ⊠ DCS Report dated <u>6/28/18</u> including attachments
    ☐ Other

☐   The Court determines that DCS has identified a proposed case plan for services pursuant to ARS §8-824

Continued Temporary Custody (*choose only one*)
    ⊠ **Is clearly necessary** to prevent abuse or neglect pursuant to ARS §8-825.
    ☐ **Is NOT clearly necessary** to prevent abuse or neglect and the child(ren) should be returned to
    _____

☐   Other: _____

☑   **THE COURT FINDS THAT** the Department of Child Safety has made reasonable efforts to prevent removal of the child(ren) from the home or that it was reasonable to make no efforts to maintain the child(ren) in the home.

☑   **THE COURT FINDS THAT** it is contrary to the welfare of the child(ren) to be returned to or placed in the custody of the parent/guardian for the following reasons:
    <u>allegations in the verified petition filed 6/27/18 and court report dated 6/28/18</u>

☐   The Court finds DCS has made active efforts in accordance with ICWA standards.

☐   The Court has heard qualified expert testimony and finds by clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts were unsuccessful; and that continued custody of the child(ren) by the parents, guardian or Indian Custodian is likely to result in serious emotional or physical damage to the child(ren) (23 USC §1912).

☐   Pursuant to ARS §8-829(A)(2), the Court finds that DCS has made attempts to identify and assess placement with the child(ren)'s grandparent or another member of the child(ren)'s extended family including a person who has a significant relationship with the child(ren).

☐   Pursuant to ARS §8-824(G), the Court finds that DCS has made reasonable efforts to place a child with siblings and if that is not possible, to maintain frequent visitation or other ongoing contact between all siblings.

G.   <u>**PHYSICAL CUSTODY**</u>
☐   **IT IS ORDERED** that the child(ren) remain(s) a ward of the court in the legal care, custody and control of the Department of Child Safety. It is further ordered that the child(ren) is/are placed:
    ☐ as set forth in the Petition and Temporary Custody Order   ☐ as set forth below:

| | |
|---|---|
| Brooke Angelina Scianna | Care and Dinity, Group home |
| | |
| | |
| | |
| | |

☐   **IT IS FURTHER ORDERED** that the child(ren) shall remain in the physical custody of the person(s) or entity named above until otherwise ordered by the Court; and that DCS shall not move the child(ren) to a different placement without prior court approval except in the case of emergency, in which event DCS shall inform the Court and seek Court approval within 10 days after moving the child(ren).

AZDCS004119

Case No JD **36034**

** Pursuant to ARS §8-514.05(C), the placement is authorized to consent to routine medical treatments, dental procedures, social and educational activities, and psychological / psychiatric evaluations and therapy for the child(ren).

**Pursuant to ARS §8-513(A)(2), Department of Child Safety is authorized to consent to travel within the U.S. for a period not to exceed 30 days.

**H.    PARENTING TIME**

☑ IT IS ORDERED that parenting time shall be at the discretion of DCS

☑ IT IS ORDERED that parenting time shall be as follows:

_Mother requests a temporary custody hearing._

_Father: Parenting time at a minimum of two hours twice per week. Parenting time is currently supervised._

☐ IT IS ORDERED that
Neither allow or facilitate any contact of any kind, including but not limited to personal contact, contact by telephone, or contact by letter or message between_____
and the child(ren), pending order of this court.

☐ IT IS FURTHER ORDERED that parents shall attend all of the child(ren)'(s) medical appointments.

**I.    SERVICES TO BE PROVIDED**

MOTHER    _Christine Marie Webster_                                                    ☐ C2C

| | Services Requested / Offered | Agreed Upon | |
|---|---|---|---|
| ☒ | Parent Aide Services | ☐ Yes | ☒ No |
| ☐ | Parenting Classes through the community | ☐ Yes | ☐ No |
| ☐ | Psychological Evaluation and Reasonable Recommendations of Evaluation/Assessment | ☐ Yes | ☐ No |
| ☐ | Psychiatric Evaluation and Reasonable Recommendations of Evaluation/Assessment | ☐ Yes | ☐ No |
| ☐ | Counseling: | ☐ Yes | ☐ No |
| ☐ | Substance Abuse Assessment/Treatment | ☐ Yes | ☐ No |
| ☐ | Substance Abuse Testing | ☐ Yes | ☐ No |
| ☒ | Transportation _as needed and as requested_ | ☒ Yes | ☐ No |
| ☐ | RBHA Referral (Regional Behavioral Health Authority) | ☐ Yes | ☐ No |
| ☐ | Interstate Compact on Placement of Child(ren) referral | ☐ Yes | ☐ No |
| ☐ | Referral for Domestic Violence Services | ☐ Yes | ☐ No |
| ☒ | Other: _Autism education classes_ | ☐ Yes | ☒ No |
| ☐ | Other: | ☐ Yes | ☐ No |

| | C2C | | |
|---|---|---|---|
| ☐ | Referral for Dependency Treatment Court | ☐ Yes | ☐ No |
| ☐ | Referral for C2C Clinical Intake | ☐ Yes | ☐ No |

AZDCS004120

Case No JD **36034**

| FATHER | ☐ C2C |
|---|---|

**Services Requested / Offered** — Agreed Upon

| | | Yes | No |
|---|---|---|---|
| ☐ | Paternity Testing | ☐ Yes | ☐ No |
| ☒ | Parent Aide Services | ☐ Yes | ☒ No |
| ☐ | Parenting Classes through the community | ☐ Yes | ☐ No |
| ☐ | Psychological Evaluation and Reasonable Recommendations of Evaluation/Assessment | | |
| ☐ | Psychiatric Evaluation and Reasonable Recommendations of Evaluation/Assessment | | |
| ☐ | Counseling: | ☐ Yes | ☐ No |
| ☐ | Substance Abuse Assessment/Treatment | ☐ Yes | ☐ No |
| ☐ | Substance Abuse Testing | ☐ Yes | ☐ No |
| ☒ | Transportation as needed and as requested | ☒ Yes | ☐ No |
| ☐ | RBHA Referral (Regional Behavioral Health Authority) | ☐ Yes | ☐ No |
| ☐ | Interstate Compact on Placement of Child(ren) referral | ☐ Yes | ☐ No |
| ☐ | Referral for Domestic Violence Services | ☐ Yes | ☐ No |
| ☒ | Other: Autism education classes | ☐ Yes | ☒ No |
| ☐ | Other: | ☐ Yes | ☐ No |

**C2C**

| | | Yes | No |
|---|---|---|---|
| ☐ | Referral for Dependency Treatment Court | ☐ Yes | ☐ No |
| ☐ | Referral for C2C Clinical Intake | ☐ Yes | ☐ No |

| CHILD(REN)   Brooke Angelina Scianna | ☒ C2C |
|---|---|

**Services Requested / Offered** — Agreed Upon

| | | Yes | No |
|---|---|---|---|
| ☐ | Rapid Response with reasonable recommendations | ☐ Yes | ☐ No |
| ☐ | **Birth to 5 Assessment** | ☐ Yes | ☐ No |
| ☒ | RBHA Referral (Regional Behavioral Health Authority) AZCA | ☒ Yes | ☐ No |
| ☐ | Comprehensive Medical and Dental Plan | ☐ Yes | ☐ No |
| ☐ | Referral to Arizona Early Intervention Program | ☐ Yes | ☐ No |
| ☒ | Clothing Allowance and Standard Allowances | ☒ Yes | ☐ No |
| ☐ | Child Care | ☐ Yes | ☐ No |
| ☐ | Independent Living | ☐ Yes | ☐ No |
| ☒ | Other: DDD services, High Needs CM, Behavioral coach team. | ☒ Yes | ☐ No |

**J.   SERVICES ORDERED**

☐ The court orders the parties to participate in the services agreed upon in section I above.

☐ The Court orders the following (additional) services:

_____

_____

_____

AZDCS004121

Case No JD **36034**

**K.**   **DEPENDENCY ADJUDICATION & DISPOSITION FINDINGS**

**PLEA:**

☒   The dependency is contested by   Christine Marie Webster, ▮▮▮▮▮▮▮▮▮
and the parties request that a   ☐ mediation   ☒ pre-trial conference   be set.

☐   _____   Stipulates to the dependency based upon:

☐   _____   Denies the allegations and submits the issues of
dependency to the Court based upon:   _____

☐   _____   is / are not contesting the dependency.

**ADJUDICATION FINDINGS:**

☐   The Court confirms that   Christine Marie Webster, ▮▮▮▮▮▮▮▮   has met with
Counsel and has been advised regarding trial rights pursuant to ARS §8-843(A).

Mother   Christine Marie Webster   _____   has entered
an ☐ admission  ☐ denial and submission  ☐ no contest plea.

The Father   ▮▮▮▮▮▮▮▮▮▮▮   has entered
an ☐ admission  ☐ denial and submission  ☐ no contest plea.

The Father   _____   has entered
an ☐ admission  ☐ denial and submission  ☐ no contest plea.

The Father   _____   has entered
an ☐ admission  ☐ denial and submission  ☐ no contest plea.

_____   has entered
an ☐ admission  ☐ denial and submission  ☐ no contest plea.

☐   The Court determines that the plea of the parent(s) was / were made knowingly, intelligently and
voluntarily.

☐   The Court having considered the verified   ☒ petition,  ☐ amended petition,  ☒ DCS reports
dated   6/28/18,   ☐   and all information presented and finds by a
preponderance of the evidence that:

   ☒   The Court has exclusive jurisdiction over the subject matter pursuant to ARS §8-802 and
venue is appropriate in Maricopa County pursuant to ARS §8-206.

   ☒   The Petitioner is authorized to initiate this dependency proceeding pursuant to Title 8 ARS
§8-201 et seq, ARS §8-501 et seq, and ARS §8-802 et seq

   ☐   The child(ren)  ☐ is / are  ☐ is not / are not   dependency as defined in ARS §8-201 as to
☐ Mother,   Christine Marie Webster
☐ Father,   ▮▮▮▮▮▮▮▮▮▮▮
☐ Father,
☐ Father,
☐ Other,

AZDCS004122

Case No JD **36034**

*DISPOSITION:*

☐ This order serves as a proposed disposition. The **CASE PLAN is** _____
Services to be provided include those listed in sections I and J and _____

☐ The Court orders the following child(ren) _____
be made ward(s) of the Court as a dependent child(ren) as to ☐ Mother
☐ Father, _____ and placed in accordance with this Order.

☐ The Court finds after consideration of the health and safety of the child(ren), the goal of placement and the services offered to the family and the child(ren), that the goal of the case plan is appropriate at this time.

☐ If the child(ren) is / are an Indian child(ren), the Court finds the child(ren) was placed pursuant to the standards of ICWA, 25 USC §1915.

**L.** <u>DISCLOSURE PURSUANT TO R.P.J.C 44(A),(B)(1)</u>

☒ The parties agree to conduct mutual disclosure pursuant to Rules of Procedure for the Juvenile Court.

☐ The parties agree to conduct mutual disclosure as follows: _____

**M.** <u>ADDITIONAL COURT ORDERS</u>

☐ **DCS** agrees to substitute in as petitioner.

☐ **DCS** agrees to act as co-petitioner.

☐ **FORM 1 – Notice to Parent in Dependency Action** was read to _____
in open Court on this date. She / He indicates that she / he understands her / his rights and a copy of the Form 1 was provided through her / his counsel.

☒ **IT IS ORDERED** filing the original verification.. _____
☐ **IT IS ORDERED** . _____
☐ **IT IS ORDERED** . _____

AZDCS004123

Case No JD **36034**

**N.   FUTURE HEARINGS**

| Type of Hearing | Date | Time | Before Judge / Commissioner |
|---|---|---|---|
| Initial | | | Commissioner Hoskins |
| Publication | | | |
| Temporary Custody | 7/12/18 | ~~#20~~ 2:00 | Hoskins |
| Adjudication | 9/14/18 | 1:30 | Hoskins |
| Disposition | | | |
| Mediation | | | |
| Pre-Trial Conference | 8/16/18 | 10:00 | Commissioner Hoskins |
| Final Pre-Trial Conference | | | |
| Permanency Planning 0-2 | | | |
| Permanency Planning 3-17 | 5/22/19 | 9:30 AM | Commissioner Hoskins |
| Report & Review | | | |
| IHI Report & Review | | | |
| IHI Final Review | | | |

**O.   HEARINGS TO BE VACATED**

| Type of Hearing | Date | Time | Before Judge / Commissioner |
|---|---|---|---|
| Initial | 7/2/18 | 10:15 AM | Commissioner Hoskins |
| | | | |
| | | | |
| | | | |

Date   July 2, 2018

Commissioner Hoskins
of the Superior Court

> WARNING: YOUR FAILURE TO APPEAR AT THESE HEARINGS AND TO ACTIVELY PARTICIPATE IN THESE COURT PROCEEDINGS AND IN THE CASE PLAN MAY RESULT IN THE CHILD(REN) BEING ADJUDICATED DEPENDENT WITH CONTINUED COMMITMENT TO THE CARE, CUSTODY AND CONTROL OF THE DEPARTMENT OF CHILD SAFETY AND COULD RESULT IN FURTHER PROCEEDINGS FOR PERMANENT GUARDIANSHIP PURSUANT TO A.R.S §8-871 ET SEQ OR TERMINATION OF YOUR PARENTAL RIGHTS PURSUANT TO §8/533 ET SEQ.

AZDCS004124

Exhibit 6

Chris DeRose, Clerk of Court
*** Electronically Filed ***
7/13/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                              7/2/2018

JUDGE PRO TEM NICOLAS B. HOSKINS          CLERK OF THE COURT
                                               A. Villasenor
                                                 Deputy

IN THE MATTER OF:

BROOKE ANGELINA SCIANNA          THOMAS F STUBBS
  F1138995
  DOB: 7/14/2001

                                 MONICA  MALHOTRA

                                 DEEAN  GILLESPIE STRUB

                                 CHRISTINE MARIE WEBSTER
                                 15928 W CUSTER LANE
                                 SURPRISE AZ 85379

                                 SARA J. SMITH

                                 JOHN RALPH SCIANNA
                                 10407 W BOLIVAR
                                 SUN CITY AZ 85351

                                 FOSTER CARE REVIEW BOARD
                                 JUVENILE OFFICE OF PUBLIC
                                 DEFENSE SERVICES
                                 DCS SPECIALIST - SOUTHWEST
                                 REGION
                                 LEGAL ADVOCATE-JUVENILE

PRELIMINARY PROTECTIVE HEARING
DEPENDENCY CONTESTED

10:26 a.m.  This matter is digitally recorded in Courtroom 11.

Docket Code PPHDENYALL          Form JDPPHAll                    Page 1

AZDCS004126

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                                    7/2/2018

This is the time set for Preliminary Protective Hearing on a Dependency Petition filed 6/27/2018.

Present:  Assistant Attorney General Monica Malhotra, counsel for the Department; DCS Child Safety Specialist Tina Canale; Deputy Legal Advocate Thomas Stubbs, guardian ad litem for the child; Sarah Michael, appearing for Sara Smith, counsel for the father; John Scianna, the father; David Goldfarb, appearing for Deean Gillespie, counsel for the mother; and Christine Webster, the mother.

The Court is advised of the results of the Preliminary Protective Conference.

After review of the financial affidavit,

THE COURT FINDS that father is indigent.

IT IS ORDERED appointing Office of Public Defense Services (Sara Smith) as counsel to represent the father in all further proceedings in this matter.

IT IS ORDERED affirming the appointment of the Office of the Legal Advocate (Thomas Stubbs) as guardian ad litem for the child in all further proceedings in this matter.

The Court has reviewed the original verification and the DCS Court Report dated 6/28/2018.

The Indian Child Welfare Act (ICWA) does not apply in this matter.

Service is accepted and defects are waived by mother and father.

THE COURT FINDS that service is complete as to mother and father.

Paternity has been established in this matter.

Form I, Notice to Parent in Dependency Action, is read and provided to both parents. Both parents indicate an understanding of the same.

Discussion is held.

Docket Code PPHDENYALL                    Form JDPPHAll                            Page 2

AZDCS004127

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                    7/2/2018

LET THE RECORD REFLECT that both mother and father are refusing to participate in the services being offered by the Department.

The mother and father wish to contest the allegations of the petition.

IT IS ORDERED entering a denial to the petition on behalf of the mother and father.

The father may have visits with the child in the group home however the group home does not support mother having visits with the child at their facility.

The Department does not object to the mother having supervised visits with the child by a case aide or specialized parent aide.

IT IS ORDERED permitting the mother to have visits with the child through approved safety monitors.

10:42 a.m.  Alisa, hospital stabilization representative through CFSS announces for the record and indicates that she is able to supervise visits for mother and child in the community or the group home.

Discussion is held.

The Department does not object to the group home supervising mother's visits and does not believe a support partner is necessary.

Discussion continues.

Over the Department's objection,

IT IS ORDERED permitting mother to have supervised visits with the child by the hospital stabilization representative through CFSS throughout the community or in the group home, if allowed.

The parties are provided with the CFSS recommendations.

IT IS ORDERED admonishing the parties not to discuss this dependency matter in a public forum.

AZDCS004128

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                        7/2/2018

IT IS ORDERED continuing the child as a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety.

THE COURT FINDS that the Department of Child Safety has made reasonable efforts to prevent the removal of the child from the home and that continuation in the home would be contrary to the welfare of the child, or that it was reasonable to make no efforts to maintain the child in the home.

IT IS ORDERED vacating the Initial Dependency Hearing

      on     7/2/2018
      at     10:15 AM
      before  Honorable Nicolas Hoskins

IT IS ORDERED setting this matter for Dependency - Temp Custody 5 Day Hrg as to mother only

      on     7/12/2018
      at     2:00 PM
      before  Honorable Nicolas Hoskins
      at the Maricopa County Juvenile Court Center
      Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

IT IS ORDERED setting this matter for Conference - Pretrial - Contested Dependency

      on     8/16/2018
      at     10:00 AM
      before  Honorable Nicolas Hoskins
      at the Maricopa County Juvenile Court Center
      Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

IT IS ORDERED setting this matter for Dependency - Adjudication

      on     9/14/2018
      at     1:30 PM – 5:00 PM
      before  Honorable Nicolas Hoskins
      at the Maricopa County Juvenile Court Center
      Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

AZDCS004129

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                        7/2/2018

This Courtroom utilizes an electronic recording system for the Court's record.  If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544).  There will be a fee of $30 for each copy of the Superior Court proceedings.  All copies will be provided using Court-supplied media.

IT IS ORDERED settling and approving the Preliminary Protective Order and Order Setting Court Hearings signed by the Court this date.

IT IS ORDERED that services, placement of the child and visitation shall occur as indicated in the Preliminary Protective Order signed by the Court this date.

10:56 a.m.  Court adjourns.

Filed:
    Preliminary Protective Order and Order Setting Court Hearings
    Verification
    Parents' Financial Affidavit to Determine Eligibility for a Court-Appointed Attorney
    Form I, Notice to Parent in Dependency Action

NOTICE

If a party fails to appear for the Pretrial Conference, the failure to appear may be deemed as an admission to all the facts in the petition and the Court may proceed to an adjudication of the ultimate issues.

If the petitioner fails to appear, the failure to appear may be deemed as a failure to prosecute and this matter may be dismissed.

If a party or a party's attorney fails to obey a pretrial order, or fails to appear at a Pretrial Conference, or is substantially unprepared to participate in the Conference or if a party or party's attorney fails to participate in good faith, the Court, upon motion or on its own initiative, may make such orders with regard to such conduct as are just, including among others, any of the orders provided in Rule 44 of the Rules of Procedure for the Juvenile Court.

Docket Code PPHDENYALL                Form JDPPHAII                              Page 5

AZDCS004130

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                    7/2/2018

WARNING

As a parent, it is your responsibility to cooperate with all services offered, and work toward return of your child.  A failure to do so, within a reasonable period of time, may mean losing your child forever through termination of your rights and adoption.

AZDCS004131

Exhibit 7

Chris DeRose, Clerk of Court
\*\*\* Electronically Filed \*\*\*
8/24/2018 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                              8/16/2018

                                        CLERK OF THE COURT
JUDGE PRO TEM NICOLAS B. HOSKINS              A. Villasenor
                                                 Deputy

IN THE MATTER OF:

BROOKE ANGELINA SCIANNA              THOMAS F STUBBS
F1138995
DOB: 7/14/2001                       BROOKE ANGELINA SCIANNA
                                     C/O DCS CASEWORKER


                                     MONICA  MALHOTRA

                                     DEEAN  GILLESPIE STRUB

                                     SARA J. SMITH


                                     FOSTER CARE REVIEW BOARD
                                     DCS SPECIALIST - SOUTHWEST
                                     REGION


PRETRIAL CONFERENCE HEARING
CONTESTED DEPENDENCY HEARING CONTINUED


10:16 a.m.  This matter is digitally recorded in Courtroom 11.

This is the time set for Pretrial Conference regarding a petition filed 6/27/2018.

Present:  Assistant Attorney General Jennifer Markley, appearing for Monica Malhotra, counsel for the Department; DCS Child Safety Specialist Melissa Courtright; Deputy Legal Advocate Thomas Stubbs, guardian ad litem for the child; Sara Smith, counsel for the father; ▋▋▋▋▋▋; and Deean Gillespie Strub, counsel for the mother.

Discussion is held.


Docket Code PTC                    Form JDPTCDep                    Page 1


AZDCS004288

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                    8/16/2018

Upon the oral motion by mother's counsel, and there being no objection,

IT IS ORDERED granting mother's counsel for a continuance and vacating the
Dependency – Adjudication

    on    10/16/2018
    at    1:30 PM
    before  Honorable Nicolas Hoskins

10:17 a.m.  Christine Webster, the mother, appears telephonically and announces for the
record.

IT IS ORDERED affirming the Dependency - Temp Custody 5 Day Hrg

    on    8/21/2018
    at    2:00 PM
    before  Honorable Nicolas Hoskins
    at the Maricopa County Juvenile Court Center
    Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

IT IS ORDERED resetting the Dependency - Adjudication

    on    11/15/2018
    at    1:30 PM – 5:00 PM
    before  Honorable Nicolas Hoskins
    at the Maricopa County Juvenile Court Center
    Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

IT IS ORDERED resetting the Dependency - Adjudication

    on    11/20/2018
    at    1:30 PM – 5:00 PM
    before  Honorable Nicolas Hoskins
    at the Maricopa County Juvenile Court Center
    Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

IT IS ORDERED granting the Department leave to amend the dependency petition.

AZDCS004289

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                    8/16/2018

Discussion is held.

IT IS ORDERED directing the Department to email the mother a schedule of the child's appointments in advance and copy mother's counsel on the email.

The guardian ad litem for the child will work on the issues brought forward during the Mediation Hearing.

Discussion is held.

IT IS ORDERED directing the Department to disclose the incident reports of the child while in the group home.

This Courtroom utilizes an electronic recording system for the Court's record.  If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544).  There will be a fee of $30 for each copy of the Superior Court proceedings.  All copies will be provided using Court-supplied media.

IT IS ORDERED continuing the child as a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety.

10:30 a.m.  Court adjourns.

WARNING

As a parent, it is your responsibility to cooperate with all services offered, and work toward return of your child.  A failure to do so, within a reasonable period of time, may mean losing your child forever through termination of your rights and adoption.

Docket Code PTC                    Form JDPTCDep                    Page 3

AZDCS004290

Exhibit 8

Chris DeRose, Clerk of Court
\*\*\* Filed \*\*\*
8:00 AM

# SUPERIOR COURT OF ARIZONA
# MARICOPA COUNTY

SEP 0 5 2018

JD36034                                                            8/21/2018

JUDGE PRO TEM NICOLAS B. HOSKINS                    CLERK OF THE COURT
                                                    A. Villasenor
                                                    Deputy

IN THE MATTER OF:

BROOKE ANGELINA SCIANNA              THOMAS F STUBBS
  F1138995
  DOB: 7/14/2001

                                     MONICA  MALHOTRA

                                     DEEAN  GILLESPIE STRUB

                                     SARA J. SMITH

                                     FOSTER CARE REVIEW BOARD
                                     DCS SPECIALIST - SOUTHWEST
                                     REGION


## REVIEW OF TEMPORARY CUSTODY HEARING

Prior to the hearing commencing, Mother's Exhibits 1-21 and Department's Exhibits 22-25 are marked for identification.

2:02 p.m.  This matter is digitally recorded in Courtroom 11.

This is the time set for Review of Temporary Custody regarding Brooke Scianna.

Present:  Assistant Attorney General Monica Malhotra, counsel for the Department; DCS Child Safety Specialist Melissa Courtright; Deputy Legal Advocate Thomas Stubbs, guardian ad litem for the child; Deean Gillespie Strub, counsel for the mother; and Christine Webster, the mother.

The Rule of Exclusion of Witnesses remains in effect.

Docket Code REVTEMPCUST            Form JDRevTempCust                    Page 1

AZDCS004291

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                    8/21/2018

2:04 p.m.  Marie Quigley and Casandra Tisdale are excused and exit the courtroom.

Mother's Exhibit 7 and the Department's Exhibits 22, 23, and 24 were previously admitted at the hearing on 7/12/2018.

MOTHER'S CASE:

Dr. James Adams is sworn and testifies.

Mother's counsel moves to admit Exhibit 25.

There being no objection,

Mother's Exhibit 25 is admitted into evidence.

2:24 p.m.  Dr. Adams is excused and exits the courtroom.

2:25 p.m.  Casandra Tisdale enters the courtroom and is sworn and testifies.

The witness is excused and exits the courtroom.

3:02 p.m.  Court adjourns.

3:08 p.m.  Court reconvenes. This matter is digitally recorded.

The parties previously present remain present.

3:08 p.m.  Daniel Quigley enters the courtroom, and is sworn and testifies.

The witness is excused.

3:16 p.m.  Marie Quigley enters the courtroom, and is sworn and testifies.

The witness is excused.

3:23 p.m.  Ashley Montoya appears telephonic, and is sworn and testifies.

3:31 p.m.  Ms. Montoya is excused and no longer appears telephonically.

AZDCS004292

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                          8/21/2018

3:31 p.m.  Court adjourns.

3:35 p.m.  Court reconvenes.  This matter is digitally recorded.

All parties previously present remain present.

Christine Webster is sworn and testifies.

Mother moves to admit Exhibits 13, 5, 6, 13, 12, 20, 21, 2, 14, and 15.

There being no objection,

Mother's Exhibits 13, 5, 6, 13, 12, 20, 21, 2, 14, and 15 are admitted into evidence.

The mother is excused.

The parties rest.

The parties present closing arguments.

Based upon the evidence presented,

THE COURT FINDS that temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition.

IT IS ORDERED continuing the child as a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety.

IT IS ORDERED affirming all contrary to welfare findings.

The Court notes that there is a comprehensive medical team evaluating the child's needs.

IT IS ORDERED directing the Department to make arrangements to facilitate a comprehensive medical evaluation for the child with Dr. Richard Frye at Phoenix Children's Hospital and include mother's input.

IT IS ORDERED that the Department shall reach out to the child's providers and obtain a determination on the issue of the child visiting the mother on the weekends.

AZDCS004293

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                 8/21/2018

The Department will amend the dependency petition to include an allegations of neglect and based on the child's behaviors as to mother.

IT IS ORDERED affirming the Dependency - Adjudication regarding the mother and father

on       11/15/2018 and 11/20/2018
at       1:30 PM – 5:00 PM
before   Honorable Nicolas Hoskins
at the Maricopa County Juvenile Court Center
Durango Facility, 3131 W. Durango St., Phoenix, AZ 85009

This Courtroom utilizes an electronic recording system for the Court's record. If a court reporter is needed, a written request must be filed with the Clerk of the Court and a copy provided to the assigned judicial officer at least 72 hours before the commencement of the proceeding.

To order a copy of the audio record on compact disc (CD), please call Juvenile Court Administration (Durango facility - 602-506-4533/Southeast facility - 602-506-2544). There will be a fee of $30 for each copy of the Superior Court proceedings. All copies will be provided using Court-supplied media.

4:38 p.m. Court adjourns.

IT IS ORDERED, pursuant to Arizona Revised Statutes, that any and all schools, school districts and personnel thereof shall fully cooperate with juvenile probation officers, DCS child safety specialists, and attorneys or guardian ad litem or Court appointed special advocates representing a child in a dependency or delinquency action by allowing access by them to all educational records of the child, including but not limited to records pertaining to school, attendance, behavior, academic progress, and psychological evaluations, and shall discuss the contents and meaning thereof with them to assist them in the preparation, implementation, and completion of a rehabilitation and treatment plan for the child.

AZDCS004294

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                         8/21/2018

WARNING

As a parent, it is your responsibility to cooperate with all services offered, and work toward return of your child. A failure to do so, within a reasonable period of time, may mean losing your child forever through termination of your rights and adoption.

_____  8/30/18 _____          _____
DATE                              JUDGE PRO TEM NICOLAS B. HOSKINS

Docket Code REVTEMPCUST          Form JDRevTempCust                    Page 5

AZDCS004295

Exhibit 9

Addendum Report To Juvenile Court

County

Dated:

Court Case Number:

**I. PRESENT SITUATION:**

On 08/22/2018 Brooke Scianna was displaying uncontrollable behaviors within the group home. The group home staff reached out to CFSS who informed that they should contact the local police and emergency department in regards to Brooke's behaviors. Brooke was combative with the officers and EMT's and sustained some facial abrasions while being restrained. Brook was transported to Arrowhead Hospital for observation on 08/22/2018. Arrowhead Hospital admitted Brooke on 08/22/2018 and submitted a referral for Brooke to be placed at Aurora Behavioral Health, as the child's needs are too great for the group home and hospital staff to meet. While at Arrowhead Hospital Brooke continued to have uncontrollable behaviors as she was hitting, biting, and pulling the hair of the staff members. In addition to the these behaviors Brooke was throwing and eating her feces. Brooke was transported and admitted to Aurora Behavioral Health on 08/25/2018

**II. RECOMMENDATIONS:**

   **A. AGENCY:**

      It is respectfully recommended that Brooke Scianna remain a ward(s) of the court, committed to the care, custody and control of the Arizona Department of Child Safety.

   **B. FINANCIAL:**

      It is respectfully recommended that beginning (date) <u>Brooke Scianna</u> , the parents listed below be assessed the following amounts on a monthly basis per child as the contribution towards the cost of foster care:

      (parent name) <u>Christine Scianna</u> be assessed $ <u>50.0</u> monthly for each of the following children:  <u>Brooke Scianna</u>

      (parent name) ▓▓▓▓ be assessed $ <u>50.00</u> monthly for each of the following children:  <u>Brooke Scianna</u>

      (parent name) _____ be assessed $ _____ monthly for each of the following children: _____

      (parent name) _____ be assessed $ _____ monthly for each of the following children: _____

      (parent name) _____ be assessed $ _____ monthly for each of the following children: _____

   **C. REASONABLE EFFORTS FINDINGS:**

      It is respectfully recommended that the Court find that the Agency has made reasonable efforts in this case.

Respectfully Submitted:

Name/Title:  Melissa Courtright DCSS
ARIZONA DEPARTMENT OF CHILD SAFETY
Telephone Number:   602-771-0206
Date:   8/29/18

Approved by:

Name/Title:   Nicholas Long DCSPS
ARIZONA DEPARTMENT OF CHILD SAFETY
Date:   8/29/18

Case Name: SCIANNA, CHRISTINEID: 511175

AZDCS004299

Exhibit 10

DD-101-FF (8-11)

**ARIZONA DEPARTMENT OF ECONOMIC SECURITY**
Division of Developmental Disabilities

**INCIDENT REPORT**
*Confidential Information*

*ease Print*

• Division staff may use this form to ensure all pertinent incident information is gathered.
• Providers may use this form or write all pertinent incident information on a separate report to the Division.

| INDIVIDUAL'S NAME *(Last, First, M.I.)* | FOCUS ID NO. | BIRTHDATE |
|---|---|---|
| Scianna, Brooke | | 7·14·2001 |

INDIVIDUAL'S ADDRESS *(No., Street, City, State, ZIP)*
10818 W. Pontiac Dr            P Glendale, AZ  85308

FOSTER CARE  ☐ Yes  ☐ No

PROVIDER NAME AT TIME OF INCIDENT *(Qualified Vendor, Individual Independent Provider, Provider Site Name)*
Care and Dignity

NAME AND LOCATION OF INCIDENT *(Site Name, No., Street, City State, ZIP)*
Ann's House

DATE OF INCIDENT  8·22·18
TIME OF INCIDENT  3·21 ☒ PM ☐ AM

| STAFF/WITNESS(ES) INVOLVED IN INCIDENT *(Last, First, M.I.)* | PHONE NUMBER | IMMEDIATE SUPERVISOR | |
|---|---|---|---|
| 1. Monreal, Maria | (602) 501-9669 | | ☐ N/A |
| 2. Johnson, Stephanie | (602) 501-9669 | IMMEDIATE SUPERVISOR  Shawnine | ☐ N/A |

DESCRIBE INCIDENT THOROUGHLY. *(What happened before, during and after the incident. Include all known facts, causes of injury and emergency measures, if applicable. Write clearly, objectively and in order of occurrence, without reference to the writer's opinion.)*

WHAT HAPPENED BEFORE THE INCIDENT?
B.S. went into her bedroom and put on her shoes then came out and grabbed staffs hand and lead her into the garage.

WHAT HAPPENED DURING THE INCIDENT?
B.S. came in from the garage into the living room after attempted to get into the group home ran but it was locked so she came back in and hit staff in the face, then was placed into the standing basket weave. B.S. picked up her shoes & ran down the hallway the fire departmend chase her down the hallway B.S. started hitting the fireman and trying to bite him. B.S. kept trying to fight the fireman. B.S. was taken to arrowhead hospital

WHAT COULD HAVE PREVENTED THE INCIDENT?
Nothing

*Form is continued on reverse (page 2)*

See reverse for EOE/ADA/LEP/GINA disclosures

CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER DATED DECEMBER 16, 2021

DD-191-FF (8-11) - PAGE 2

| INDIVIDUAL'S NAME (Last, First, M.I.) | DATE OF INCIDENT |
|---|---|

TYPE OF MEDICAL INTERVENTION (Doctor's visit, urgent care, emergency room, hospitalization)

LOCATION OF MEDICAL INTERVENTION (Site location and address)

## NOTIFICATIONS

**Serious incidents**, as described in the Division's Policy and Procedures Manual Administrative Directive 76, are to be reported and written as soon as possible, but no later than 24 hours after the incident.

**All other incidents**, as described in the Directive, must be reported to the District office by the close of the next business day following the incident.

| PARENT/GUARDIAN NOTIFIED (If Yes, name of person notified. If No, explain why) | NOTIFIED BY WHOM (Last First, M.I.) | DATE/TIME OF NOTIFICATION |
|---|---|---|
| ☒ Yes ☐ No ☐ N/A | Shawnine Huff | 3:21 ☐ AM ☒ PM |
| SUPPORT COORDINATOR NOTIFIED | | |
| ☒ Yes ☐ No ☐ N/A | Shawnine Huff | 3:21 ☐ AM ☒ PM |
| CHILD/ADULT PROTECTIVE SERVICES NOTIFIED | | |
| ☐ Yes ☐ No ☐ N/A | | ☐ AM ☐ PM |
| TRIBAL SOCIAL SERVICES NOTIFIED | | |
| ☐ Yes ☐ No ☐ N/A | | ☐ AM ☐ PM |
| POLICE NOTIFIED | | |
| ☐ Yes ☐ No ☐ N/A | | ☐ AM ☐ PM |
| PRINT NAME OF PERSON COMPLETING THIS FORM | SIGNATURE OF PERSON COMPLETING FORM | DATE |

## CORRECTIVE ACTION/COMMENTS

WHAT STEPS ARE BEING TAKEN TO PREVENT THIS FROM HAPPENING AGAIN?

| PRINT SUPERVISOR'S NAME | SIGNATURE OF SUPERVISOR | DATE |
|---|---|---|

Equal Opportunity Employer/Program • Under Titles VI and VII of the Civil Rights Act of 1964 (Title VI & VII), and the Americans with Disabilities Act of 1990 (ADA), Section 504 of the Rehabilitation Act of 1973, the Age Discrimination Act of 1975, and Title II of the Genetic Information Nondiscrimination Act (GINA) of 2008; the Department prohibits discrimination in admissions, programs, services, activities, or employment based on race, color, religion, sex, national origin, age, disability, genetics and retaliation. The Department must make a reasonable accommodation to allow a person with a disability to take part in a program, service or activity. For example, this means if necessary, the Department must provide sign language interpreters for people who are deaf, a wheelchair accessible location, or enlarged print materials. It also means that the Department will take any other reasonable action that allows you to take part in and understand a program or activity, including making reasonable changes to an activity. If you believe that you will not be able to understand or take part in a program or activity because of your disability, please let us know of your disability needs in advance if at all possible. To request this document in alternative format or for further information about this policy, contact the Division of Developmental Disabilities ADA Coordinator at 602-542-0419; TTY/TDD Services: 7-1-1. • Free language assistance for DES services is available upon request. • Ayuda gratuita con traducciones relacionadas con los servicios del DES está disponible a solicitud del cliente.

Exhibit 11

 **GLENDALE POLICE DEPARTMENT**

REPORT NO. I18120639

# Incident (Public Disclosure)

---

**PRIMARY OFFENSE:** CHILD/VUL ADULT ABUSE-RECKLESS

Reporting Officer: MARTINEZ, FRANCISCO #17707    Approving Officer: SINGER, ELAINE #10643

Location: ▓▓ADDRESS▓▓ GLENDALE, AZ 85308    Grid: DJ13

Date/Time Occurred From: 08/22/2018 1522    To: 08/22/2018 1523

Associated Internal Report(s):

Associated External Report(s):

Total Property Taken:    Recovered:    Damaged:

Prints Attempted:    Prints Obtained:    CST: N

Incident Status: INACTIVE

---

**VICTIM 1 INFORMATION**

▓▓VICTIM /JUVENILE▓▓

**SUSPECT 1 INFORMATION**

UNKNKOWN, I18120639

**INVESTIGATIVE LEAD 1 INFORMATION**    *Added via I18120639-0001*

JOHNSON, STEPHANIE

**INVESTIGATIVE LEAD 2 INFORMATION**    *Added via I18120639-0001*

COLBERT, DOMONIQUE

**INVESTIGATIVE LEAD 3 INFORMATION**    *Added via I18120639-0001*

HUFF, LAPORCHA

**PERSON REPORTING 1 INFORMATION**

UKNOWN, ▓▓VR▓▓

**INVOLVED VEHICLES**

**OFFENSE 1 INFORMATION**

CHILD/VUL ADULT ABUSE-RECKLESS    Code: 13-3623B2

Severity: F5    Modifier: COMPLETED    Victim: V1    Suspect: S1

Location: RESIDENCE: HOME    DV: N    Home Invasion: N

Bias 1: UNKNOWN (OFFENDER'S MOTIVATION NOT KNOWN)    Suspected Use 1: UNKNOWN    Criminal Activity 1: GANG: NONE/UNKNOWN    Group Activity 1: UNKNOWN

Weapon 1: UNKNOWN

| Victim | Relationship with Suspect | Suspect |
|--------|---------------------------|---------|
| V1 | RELATIONSHIP UNKNOWN | S1 |

---

**INITIAL NARRATIVE**

I18120639    Created By: FMARTINEZ1    Created On: 09/03/2018 20:50

8/24/18 AT APPROXIMATELY 1911 HOURS, I RESPONDED TO ▓▓ADDRESS▓▓ AT ▓▓MEDICAL▓▓ IN

---

DCS003335

**GLENDALE POLICE DEPARTMENT**

**Incident (Public Disclosure)**

REPORT NO. I18120639

REGARDS TO A ASSAULT CALL FOR SERVICE. UPON MY ARRIVAL I WAS CONTACTED BY NURSES WHO WERE ADVISING ME TO BE CAUTIOUS WITH V1, ▮VICTIM / JUVENILE▮ DUE TO HE BEING ▮MEDICAL▮ AND HIGHLY COMBATIVE. THEY ADVISED ME ▮VICTIM/J.▮ IS A BITER AND WILL TRY TO HIT OR SCRATCH. THE NURSES ALSO ADVISED ME THE MOTHER WHO CALLED IS PR, ▮VR▮ AND SHE DOES NOT HAVE CUSTODY OF THE CHILD AND THE CHILD IN IN CUSTODY OF CHILD PROTECTIVE SERVICES.

I THEN WENT TO WERE ▮VICTIM/J.▮ WAS AND CONTACTED THE PR, ▮VR▮ WHO BEGAN TO ADVISE , ME SHE WAS ▮VICTIM/JUV..▮ MOTHER AND THAT THE GROUP HOME ▮VICTIM/J.▮ STAYS AT IS ABUSING HER DAUGHTER. ▮VICTIM/J.▮ STAYS AT ▮ADDRESS▮ , AND ▮VR▮ ADVISED ME THAT CRISIS INTERVENTION REPORTED TO HER THAT THE GROUP HOME STAFF PUT HER DAUGHTER IN A HEADLOCK, PUSHED HER, AND HELD HER DOWN WHILE RUBBING HER FACE ON THE CARPET. ▮VICTIM/J.▮ DID HAVE WHAT APPEARED TO BE ABRASIONS ON HER FACE THAT HAD FORMED SCABS. ▮VR▮ STATED THIS NEVER HAPPENED WHILE ▮VICTIM/J.▮ WAS IN HER CUSTODY AND THE GROUP HOME IS TRYING TO SAY THAT ▮VICTIM/J.▮ SELF INFLICTED INJURY TO HERSELF AS WELL AS WAS EATING HER OWN FECES.

I ASKED HER WHO SHE SPOKE WITH AT CRISIS WHO STATED THE GROUP HOME IS ABUSING HER DAUGHTER TO WHICH SHE STATED HER NAME IS MELISSA. MELISSA WAS NOT ABLE TO BE CONTACTED FOR THIS INCIDENT, BUT CRISIS DID LEAVE A REPORT AT THE HOSPITAL WITH ALL OF THE INFORMATION THAT OCCURRED ON 8/22/18 WHERE ▮VR▮ IS STATING ▮VICTIM/J.▮ WAS ABUSED. CRISIS LEFT IN THERE REPORT THAT ▮VICTIM/J.▮ WAS HIGHLY COMBATIVE AND CAUSING SELF INJURY BY BITING HERSELF, PEELING HER SCABS, SCRATCHING HERSELF, AS WELL AS PUNCHING AND BITING GROUP HOME STAFF AND OTHER RESIDENTS OF THE GROUP HOME. THE REPORT ALSO STATED THAT ▮VICTIM/J.▮ HAS A LONG HISTORY OF SELF INFLICTING INJURY AND HAS BEEN IN AND OUT OF THE HOSPITAL. ▮VICTIM/J.▮ HAD TO BE PLACED IN FOUR POINT RESTRAINTS AND CHEMICALLY SEDATED ON 8/22/18 BEFORE BEING BROUGHT TO THE HOSPITAL. THE REPORT ALSO STATED THAT ▮VICTIM/J.▮ WAS NO LONGER IN ▮VR▮ CARE DUE TO ▮VR▮ GIVING ▮VICTIM/J.▮ MARIJUANA AS SELF MEDICATION.

I THEN HAD RADIO CHECK ON WHAT HAPPENED ON 8/22/18 WHEN OFFICERS WERE AT ▮ADDRESS▮ FOR ▮VICTIM/J.▮ PER INCIDENT NUMBER 18-119487. IN THE CALL NOTES IT WAS ADVISED BY OFFICER ROCHIN THAT ▮VICTIM/J.▮ HAD SELF INFLICTED HER INJURIES AND WAS COMBATIVE AS WELL.

NURSES WERE ABLE TO ALSO PROVIDE ME WITH THE CASE WORKER INFORMATION FOR CPS FOR ▮VICTIM/J.▮

CASE MANAGER - LISA COFFMAN (▮PHONE #▮

DCS - MELISSA COURTWRIGHT (▮PHONE #▮

I THEN ADVISED ▮VR▮ OF WHAT I HAD FOUND OUT AND ADVISED THERE WAS NO CRIMINAL ASPECT OF THIS INCIDENT FOR ME TO FOLLOW UP WITH AT THIS TIME. ▮VR▮ ADVISED SHE WOULD TAKE THIS INCIDENT TO CHANNEL 12 NEWS.

THIS CONCLUDED MY INVOLVEMENT WITH THIS INCIDENT AT THIS TIME. PLEASE REVIEW THE VIDEO FROM MY BODY WORN AXON CAMERA FOR EXACT STATEMENTS FOR THIS IS A SUMMARY TO THE BEST OF MY KNOWLEDGE.

DCS003336

**GLENDALE POLICE DEPARTMENT**

**Incident (Public Disclosure)**

REPORT NO. I18120639

END OF REPORT.

---

**PUBLIC**

I18120639      **Created By:** FMARTINEZ1      **Created On:** 09/03/2018 20:50

ON 8/24/18, RP STATED THAT V1 WAS BEING ABUSED BY HER GROUP HOME AT ▉▉▉ADDRESS▉▉▉. NO FACTS SUPPORTING THIS STATEMENT ARE AVAILABLE AT THIS TIME.

---

**SUPPLEMENTAL NARRATIVE**

I18120639-0001      **Created By:** NMAGLEY      **Created On:** 12/03/2018 14:06

18-120639

VULNERABLE ADULT ABUSE

SUPPLEMENT REPORT

DETECTIVE N. MAGLEY #14246

ON 9/4/2018 I WAS ASSIGNED THIS CASE AS THE CASE AGENT. AFTER REVIEWING THE ORIGINAL REPORT AUTHORED BY OFFICER MARTINEZ #17707, I HAVE LEARNED THE FOLLOWING. THE VICTIM WAS TRANSPORTED TO ▉▉MEDICAL▉▉ ▉▉▉▉▉ FOR INJURIES. IT WAS UNCLEAR IF THE INJURIES WERE SUSTAINED BY HOUSE STAFF OR SELF INFLICTED. THE VICTIM HAS BEEN KNOWN TO SELF INJURE IN THE PAST.

OFFICERS TOOK PHOTOGRAPHS OF THE INJURIES THAT ▉VICTIM/JU▉ HAD AT THE TIME. ▉VICTIM/JUV▉ MOTHER BELIEVES THAT THE INJURIES WERE SUSTAINED BECAUSE GROUP HOME STAFF IS ABUSING HER. ▉VICTIM/JUV▉ MOTHER, ▉▉VR▉▉ DOES NOT HAVE CUSTODY OF ▉VICTIM/J▉ AND THE DEPARTMENT OF DEVELOPMENTAL DISABILITIES HAS CUSTODY OF ▉VICTIM/J▉.

I WAS CONTACTED BY THE O.C.W.I CASEWORKER MATT CALLANTA. HE ADVISED THAT HE WAS ASSIGNED THE CASE. HE PROVIDED ME WITH THE HOUSE MANAGER'S NAME AND PHONE NUMBER. I ATTEMPTED TO CONTACT THE HOUSE MANAGER SHAWNIE SEVERAL TIMES BY TELEPHONE BUT WAS UNABLE. ON 10/29/2018, MATT AND I ATTEMPTED CONTACT AT THE RESIDENCE AND ATTEMPTED TO CONTACT SHAWNIE. WE DID NOT RECEIVE AN ANSWER AT THE DOOR BUT LEFT A BUSINESS CARD CONTAINING MY CONTACT INFORMATION AND A NOTE ASKING HER TO RETURN MY CALL REGRADING THE CASE.

I RESEARCHED ▉VICTIM/JUVENILE▉ IN SEVERAL POLICE DATABASES AND I WAS UNABLE TO LOCATE ANY PRIOR REPORTS NAMING ▉VICTIM/JUV▉ A VICTIM.

DCS003337