Exhibit 35

# Psychiatric Progress Note

**Date and Time:** 9/13/2018 @ 14:23

**Reason for Hospitalization:** Aggression , mood sx

**CC:** Follow up

**Interim History:**
Brooke was observed, with staff present, chart reviewed, staff provided input and case was discussed during treatment team meeting

Brooke continue to have poor sleep and appears tired and not engaging in activities. She remains dysregulated emotionally but (labile) and is engaging in compulsive/repetitive behavior which if interrupted often lead to aggression and mild self injury. She is attending fewer activities due to sleeping most of the morning. She required continuous supervision to maintain ADLs and support/assistance.

Any medication side effects: ☑ Yes   ☐ No   Comments: resolving tremor/muscle rigidity

Vital signs stable: ☑ Yes   ☐ No   Comments: T98.7 P118 R18 BP 109/56

| ADL's: | Sleep: | Appetite: |
|---|---|---|
| ☐ Good | ☐ Good | ☐ Good |
| ☐ Fair | ☐ Fair | ☑ Fair |
| ☑ Poor | ☑ Poor | ☐ Poor |

**LABS:**
-repeat labs 8/26 reveal AST 78 and Tchol 187 and recent h/o elevated AST 55

**Physical SXS/Pain:** ☐ Yes   ☑ No   Comments: none observed or reported

**Mental Status Exam:** (Check all that apply)

**Appearance:**
☐ clean/well groomed
☑ unkempt/disheveled
☐ fair grooming

**Behavior:**
☐ appropriate
☑ semi/uncooperative
☐ demanding/argumentative
☐ suspicious/bizarre

tremulous but less apparent

**Speech:**
☐ normal rate/tone/volume
☐ slow/soft
☐ loud/verbose
☐ rapid/pressured

non-verbal with author

**Orientation:**
☐ person/place/time
☐ disoriented/confusion
☐ impaired attention/concentration

alert but nonverbal towards author

**Mood:**
☐ euthymic
☐ depressed
☐ anxious
☐ elevated/euphoric
☑ dysphoric/irritable
☐ labile

**Affect:**
☐ appropriate
☐ inappropriate
☑ restricted/blunted
☐ flat
☐ labile
☐ anxious

**Thought Process:**
☐ linear/goal-directed
☐ tangential/circumstantial
☐ blocking
☐ concrete
☐ flight of ideas
☐ perseveration

n/a -does not talk with author

auditory hallucinations: ☐ Yes ☑ No
no signs observed

visual hallucinations: ☐ Yes ☑ No
no signs observed

delusions ☐ Yes ☑ No
no signs observed

☐ other
cogwheel rigidity

| **Gait/Station:** | ☑ Normal | ☐ Injured | ☐ Other |
|---|---|---|---|
| **Memory:** | ☑ Intact | ☐ Partial | ☐ Impaired |
| **Insight:** | ☐ Intact | ☐ Partial | ☑ Impaired |
| **Judgment:** | ☐ Intact | ☐ Partial | ☑ Impaired |
| **Suicidal Ideation:** | ☑ Denies | ☐ Passive | ☐ Active |
| **Homicidal Ideation:** | ☑ Denies | ☐ Passive | ☐ Active |

**How Tested:** grossly intact per staff report

**Impulse Control:** ☐ Intact ☐ Fair ☑ Poor
Comment: per her behavior

Comment: none evident in her behavior

Comment: exhibits unpredictable behavior

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000228

**Psychiatric Progress Note**

**Contact with collateral sources (doctor, family, case management, etc.):**

staff/treatment team - continue to note pt lack of sleep at night and sleeping in AM  and verbalize concern over worsened 'OCD' even compared to last admission, RN reports improving tremor and appetite

Misc:
-Court hearing will be held again on emergent basis prior to d/c to determine placement
-discontinued thorazine , benadryl and clomipramine due to unclear benefit

**Assessment:**

Brooke demonstrates poor progress toward her treatment goals due to mood lability, with prominent irritability and subsequent aggression and compulsive behavior. This represent  significant regression after her discharged 5/2018 and has subsequently been removed from mothers care. She remains and danger to self and others due to mood sx, and severity of aggression

**Diagnosis:**

| Psychiatric Diagnosis |
|---|
| DMDD,<br>ASD severe<br>h/o OCD<br>h/o PTSD |
| **Medical Diagnosis** |
| Repeat labs 8/26 reveal AST 78 and Tchol 187  and recent h/o elevated AST 55<br>none currently but h.o of rhabdomyolysis in 4/2018. |

| Psychosocial and Environmental Stressors | | | |
|---|---|---|---|
| ☐ Health Problems | ☐ Lack of Healthy Supports | ☐ Financial Problems | ☐ Housing Issues |
| ☑ Other   temporary ward of DCS | | | |

Estimated Length of Stay:  25-30 days

Circumstances that support continued inpatient hospitalization: (Check all that apply)

- ☐ Change in diagnosis/ Treatment Plan
- ☑ Medication adjustment in inpatient setting needed
- ☐ Continued use of "PRN" medications to regulate mood, thought or behavior
- ☑ No less restrictive setting appropriate and/or available at this time
- ☑ Condition can be more efficiently or more rapidly treated as an inpatient
- ☑ Significant regression anticipated without continuity of care
- ☑ Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care
- ☑ Continued disturbance in. mood, thought, behavior rendering patient incapable of self care self regulation
- ☑ Danger to Self/ other.
- ☑ Other   remains on 1:1 for sfaety

**Plan:**

1. Descrease haldol 2.5mg qAM and 5mg qHS for mood instability (monitor for resolving EPS
2. Increase cogentine 1mg BID for EPS prophylaxis
3. Start benadryl 25mg qHS for sleep
4. Continue clonidine 0.1m BID for hyperactivity but consider taper
5. Monitor other medication including leostrin, colace, omega 3FAs, vitamin D
6. maintain 1:1 observation for safety and  continue behavioral modification
7. coordinate care with DCS
8. consult Internal Medicine for increasing AST and elevated cholesterol
9. consider restartng TCA in 5-10 days once EPS resolves
10. Recommend secure RTC as primary consideration however DDD group have may be an option if consultation/ training occurs with group home staff

| Name/Signature: | Date: | Time: | Name: Brooke Scianna |
|---|---|---|---|
| Krzysztof Mlak, M.D. | 9/13/2018 | 13°5 | MR#: 119188<br>UNIT: coyote<br>Patient Label |

Page 2 of 2

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000229

Exhibit 36

## Psychiatric Progress Note

Date and Time: 9/14/2018 @ 13:13

Reason for Hospitalization: Aggression , mood sx

CC: Follow up

Interim History:

Brooke was observed, with staff present, chart reviewed, staff provided input and case was discussed during treatment team meeting

Brooke was reported to have fallen asleep without difficulty. She woke up ar 3am and ate cereal and fell asleep at 4am. He appears bright and upbeat this morning and is observed to be smiling. Staff descried fewer repetitive compulsive behavior so far this morning. She has not appears ans easilt frustrated and not exhibited aggressive behavior. She is not pacing the unit as often. She is attending fewer activities due to sleeping most of the morning. She requires continuous supervision to maintain ADLs and support/assistance.

Any medication side effects: ☑ Yes   ☐ No   Comments: resolved tremor/muscle rigidity

Vital signs stable:   ☑ Yes   ☐ No   Comments: BP140/84 P110 R16 T98.2

| ADL's: | Sleep: | Appetite: |
|---|---|---|
| ☐ Good | ☐ Good | ☐ Good |
| ☑ Fair | ☐ Fair | ☑ Fair |
| ☐ Poor | ☑ Poor | ☐ Poor |

LABS:
-repeat labs 8/26 reveal AST 78 and Tchol 187 and recent h/o elevated AST 55

Physical SXS/Pain:   ☐ Yes   ☑ No   Comments: none observed or reported

Mental Status Exam: (Check all that apply)

**Appearance:**
☐ clean/well groomed
☐ unkempt/disheveled
☑ fair grooming

follows directive well and readily provided her arm to allow tendon /arm rigidity checked

**Behavior:**
☐ appropriate
☑ semi/uncooperative
☐ demanding/argumentative
☐ suspicious/bizerre

**Speech:**
☐ normal rate/tone/volume
☐ slow/soft
☐ loud/verbose
☐ rapid/pressured

non-verbal with author

**Orientation:**
☐ person/place/time
☐ disoriented/confusion
☐ impaired attention/concentration

alert but nonverbal towards author

**Mood:**
☑ euthymic
☐ depressed
☐ anxious
☐ elevated/euphoric
☐ dysphoric/irritable
☐ labile

**Affect:**
☑ appropriate
☐ inappropriate
☐ restricted/blunted
☐ flat
☐ labile
☐ anxious

shallow depth

**Thought Process:**
☐ linear/goal-directed
☐ tangential/circumstantial
☐ blocking
☐ concrete
☐ flight of ideas
☐ perseveration

n/a -does not talk with author

auditory hallucinations ☐ Yes ☑ No
no signs observed

visual hallucinations: ☐ Yes ☑ No
no signs observed

delusions: ☐ Yes ☑ No
no signs observed

☑ other:
mild stiffness present in upper extermities

| | | | | |
|---|---|---|---|---|
| Gait/Station: | ☑ Normal | ☐ Injured | ☐ Partial | ☐ Other |
| Memory: | ☑ Intact | ☐ Partial | ☐ Impaired | |
| Insight: | ☐ Intact | ☐ Partial | ☑ Impaired | |
| Judgment: | ☐ Intact | ☐ Partial | ☑ Impaired | |
| Suicidal Ideation: | ☑ Denies | ☐ Passive | ☐ Active | |
| Homicidal Ideation: | ☑ Denies | ☐ Passive | ☐ Active | |

How Tested: grossly intact per staff report

Impulse Control:   ☐ Intact   ☐ Fair   ☑ Poor

Comment: per her behavior

Comment: none evident in her behavior

Comment: exhibits unpredictable behavior

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

Page 1 of 2

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000230

## Psychiatric Progress Note

**Contact with collateral sources** (doctor-to doctor, family, case management, etc.):
-attempted to contact mother and left message to report resolution of side effect and improving sleep.
-author did not receive call for peer review as scheduled for today
Misc:
-Court hearing will be held again on emergent basis prior to d/c to determine placement.
-discontinued thorozine , benadryl and clomipramine due to unclear benefit

**Assessment:**
Brooke demonstrates poor progress toward her treatment goals due to mood lability, with prominent irritability and subsequent aggression and compulsive behavior. This represent  significant regression after her discharged 5/2018 and has subsequently been removed from mothers care. She remains and danger to self and others due to mood sx, and severity of aggression

**Diagnosis:**

| Psychiatric Diagnosis |
|---|
| DMDD,<br>ASD severe<br>h/o OCD<br>h/o PTSD |

| Medical Diagnosis |
|---|
| Repeat labs 8/26 reveal AST 78 and Tchol 187  and recent h/o elevated AST 55 none currently but h.o of rhabdomyolysis in 4/2018. |

**Psychosocial and Environmental Stressors**

| ☐ Health Problems | ☐ Lack of Healthy Supports | ☐ Financial Problems | ☐ Housing Issues |
|---|---|---|---|
| ☑ Other:  temporary ward of DCS | | | |

**Estimated Length of Stay:** 25-30 days

**Circumstances that support continued inpatient hospitalization:** (Check all that apply)

☐ Change in diagnosis/ Treatment Plan: _____

☑ Medication adjustment in inpatient setting needed: _____

☐ Continued use of "PRN" medications to regulate mood, thought or behavior

☑ No less restrictive setting appropriate and/or available at this time

☑ Condition can be more efficiently or more rapidly treated as an inpatient

☑ Significant regression anticipated without continuity of care

☑ Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care

☑ Continued disturbance in: mood, thought, behavior rendering patient incapable of self care self regulation

☑ Danger to Self/ other.

☑ Other:  remains on 1:1 for sfaety _____

**Plan:**
1. Continue  haldol 2.5mg qAM and 5mg qHS for mood instability (monitor for resolving EPS
2. Continue  cogentin 1mg BID for EPS prophylaxis
3. continue benadryl 25mg qHS for sleep
4. Continue clonidine 0.1m BID for hyperactivity but consider taper
5. Monitor other medication including leostrin, colace, omega 3FAs, vitamin D
6. maintain 1:1 observation for safety and  continue behavioral modification
7. coordinate care with DCS
8. consult Internal Medicine for increasing AST and elevated cholesterol
9. consider restartng TCA in 5-10 days once EPS resolves
10. Recommend secure RTC as primary consideration however DDD group have may be an option if consultation/ training occurs with group home staff

**Name/Signature:** Krzysztof Mlak, M.D.     **Date:** 9/14/2018     **Time:** 1300

**Name:** Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000231

Exhibit 37

# Psychiatric Progress Note

Date and Time: 9/21/2018 @ 10:58

Reason for Hospitalization: Aggression , mood sx

CC: Follow up

**Interim History:**

Brooke was observed with staff present, chart reviewed, staff provided input and case was discussed during treatment team meeting

Brooke continued to display emotional dysregulation and become aggressive yesterday afternoon and required a PRN (zuprexa) after hitting her head repeatedly and hitting staff. Sleep maintenance was intact last night. She engages in self injury when her needs/demands are not quickly met. She continues engaging in repetitive/compulsive behaviors particularly pacing the unit. She requires continuous supervision to maintain ADLs and support/assistance.

Any medication side effects: ☐ Yes  ☑ No     Comments: none apparent but low appetite of constipation reported

Vital signs stable:  ☑ Yes  ☐ No     Comments: T97.3 P98 R16 BP 102/68

| ADL's: | Sleep: | Appetite: | LABS: |
|---|---|---|---|
| ☐ Good | ☐ Good | ☐ Good | -repeat labs 8/26 reveal AST 78 and Tchol 187 |
| ☑ Fair | ☑ Fair | ☑ Fair | and recent h/o elevated AST 55 |
| ☐ Poor | ☐ Poor | ☐ Poor | |

Physical SXS/Pain:  ☐ Yes  ☑ No     Comments: none observed or reported

**Mental Status Exam:** (Check all that apply)

**Appearance:**
☐ clean/well groomed
☐ unkempt/disheveled
☑ fair grooming

**Behavior:**
☐ appropriate
☑ semi/uncooperative
☐ demanding/argumentative
☐ suspicious/bizarre

ignores author

**Speech:**
☐ normal rate/tone/volume
☐ slow/soft
☐ loud/verbose
☐ rapid/pressured

non-verbal with author

**Orientation:**
☐ person/place/time
☐ disoriented/confusion
☐ impaired attention/concentration

alert but nonverbal towards author

**Mood:**
☐ euthymic
☐ depressed
☐ anxious
☑ elevated/euphoric
☑ dysphoric/irritable
☑ labile

**Affect:**
☐ appropriate
☐ inappropriate
☑ restricted/blunted
☐ flat
☑ labile
☐ anxious

shallow depth

**Thought Process:**
☐ linear/goal-directed
☐ tangential/circumstantial
☐ blocking
☐ concrete
☐ flight of ideas
☐ perseveration

n/a -does not talk with author

auditory hallucinations ☐ Yes ☑ No
no signs observed

visual hallucinations: ☐ Yes ☑ No
no signs observed

delusions: ☐ Yes ☑ No
no signs observed

☐ other:

| Gait/Station: | ☑ Normal | ☐ Injured | ☐ Other | How Tested grossly intact per staff report |
|---|---|---|---|---|
| Memory: | ☑ Intact | ☐ Partial | ☐ Impaired | |
| Insight: | ☐ Intact | ☐ Partial | ☑ Impaired | Impulse Control: ☐ Intact ☐ Fair ☑ Poor |
| Judgment: | ☐ Intact | ☐ Partial | ☑ Impaired | Comment per her behavior |
| Suicidal Ideation: | ☑ Denies | ☐ Passive | ☐ Active | Comment: exhibits unpredictable behavior |
| Homicidal Ideation: | ☑ Denies | ☐ Passive | ☐ Active | Comment exhibits unpredictable behavior |

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

Page 1 of 2

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000244

# Psychiatric Progress Note

**Contact with collateral sources (doctor-to doctor, family, case management, etc.):**

Mother: Spoke with mother today and attempted to discuss medication plan but mother insisted that pt is having side effect of haldol and demands for the medication to be discontinued. Attempts top address her concern about "muscle breakdown " as pt experienced rhabdomyolysis in 4/2018, and to discussed that pt has no sings of this condition in current time frame. mother indicated that she will file a complaint and hung up the phone. Reviewed records from past hospitalization from 2016-2018

**Assessment:**

Brooke demonstrates limited progress toward her treatment goals due to recurrent mood lability, with prominent irritability, aggression and compulsive behavior. She experienced EPS after starting haldol which resolved with cogentin and is sleeping better since taking benadryl. There is lack of clear benefit from current medication strategy. She remains and danger to self and others due to mood sx, and severity of aggression

**Diagnosis:**

| Psychiatric Diagnosis |
|---|
| DMDD,<br>ASD severe<br>h/o OCD<br>h/o PTSD |

| Medical Diagnosis |
|---|
| Repeat labs 8/26 reveal AST 78 and Tchol 187 and recent h/o elevated AST 55<br>none currently but h.o of rhabdomyolysis in 4/2018. |

**Psychosocial and Environmental Stressors**

- [ ] Health Problems
- [ ] Lack of Healthy Supports
- [ ] Financial Problems
- [ ] Housing Issues
- [x] Other: temporary ward of DCS

**Estimated Length of Stay:** 25-30 days

**Circumstances that support continued inpatient hospitalization: (Check all that apply)**

- [ ] Change in diagnosis/ Treatment Plan: ___
- [x] Medication adjustment in inpatient setting needed. ___
- [x] Continued use of "PRN" medications to regulate mood, thought or behavior
- [x] No less restrictive setting appropriate and/or available at this time
- [x] Condition can be more efficiently or more rapidly treated as an inpatient
- [x] Significant regression anticipated without continuity of care
- [x] Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care
- [x] Continued disturbance in mood, thought, behavior rendering patient incapable of self care self regulation
- [x] Danger to Self/ other.
- [x] Other remains on 1:1 for sfaety

**Plan:**

1. Continue haldol 2.5mg qAM and 5mg qHS to complete therapeutic trial for mood instability (monitoring for recurring EPS). Plan for-trial with zyprexa or seroquel
2. Continue cogentin 1mg BID for EPS prophylaxis
3. Continue benadryl 50mg qHS for sleep
4. Continue clonidine 0.0.05mg BID due to unclear benefit
5. Monitor other medication including leostrin, colace, omega 3FAs, vitamin D
6. Maintain 1:1 observation for safety (increase to around the clock) and continue behavioral modification
7. Consider restarting TCA once mood stabilization/irritability is achieved
8. Recommend secure RTC as primary consideration however DDD group have may be an option if consultation/ training occurs with group home staff

Name/Signature: _____ Date: 9/21/2018    Time: /3___

Krzysztof Mlak, M.D.

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

Page 2 of 2

Exhibit 38

# Psychiatric Progress Note

Date and Time: 9/28/2018 @ 10:37

Reason for Hospitalization: Aggression , mood sx

cc: Follow up

Interim History:

Brook was observed with staff present, chart reviewed, staff provided input  and case was discussed during treatment team meeting

Brooke is maintaining  variable improvement in mood lability and aggression today but has been having an (+) day today and most of yesterday. She engaged in functional communication with staff to make her needs known and exhibits  improving tolerance (delay in provided desired response) . Sleep maintenance was intact last night. There are ongoing repetitive/compulsive behaviors to higher degree during  lack of structured activity.  She requires continuous support/assistance to maintain ADLs.

Any medication side effects: ☐ Yes   ☑ No    Comments: none observed or reported

Vital signs stable:   ☑ Yes   ☐ No    Comments: WNL per RN

| ADL's: | Sleep: | Appetite: | LABS: |
|---|---|---|---|
| ☐ Good | ☐ Good | ☐ Good | -current AST/ALT normalized |
| ☑ Fair | ☑ Fair | ☑ Fair | |
| ☐ Poor | ☐ Poor | ☐ Poor | |

Physical SXS/Pain:     ☐ Yes   ☑ No   Comments: none observed or reported

Mental Status Exam: (Check all that apply)

**Appearance:**
☐ clean/well groomed
☐ unkempt/disheveled
☑ fair grooming

appears upbeat at tmes

**Behavior:**
☐ appropriate
☑ semi/uncooperative
☐ demanding/argumentative
☐ suspicious/bizarre

follow prompts by staff

**Speech:**
☐ normal rate/tone/volume
☐ slow/soft
☐ loud/verbose
☐ rapid/pressured

non-verbal with author

**Orientation:**
☐ person/place/time
☐ disoriented/confusion
☐ impaired attention/concentration

alert but nonverbal towards author

**Mood:**
☐ euthymic
☐ depressed
☐ anxious
☐ elevated/euphoric
☐ dysphoric/irritable
☑ labile

**Affect:**
☐ appropriate
☐ inappropriate
☑ restricted/blunted
☐ flat
☐ labile
☐ anxious

shallow depth

**Thought Process:**
☐ linear/goal-directed
☐ tangential/circumstantial
☐ blocking
☐ concrete
☐ flight of ideas
☐ perseveration

n/a -nonverbal

auditory hallucinations: ☐ Yes ☑ No
no signs observed

visual hallucinations: ☐ Yes ☑ No
no signs observed

delusions: ☐ Yes ☑ No
no signs observed

☐ other:

| | | | |
|---|---|---|---|
| **Gait/Station:** | ☑ Normal | ☐ Injured | ☐ Other |
| **Memory:** | ☑ Intact | ☐ Partial | ☑ Impaired |
| **Insight:** | ☐ Intact | ☐ Partial | ☑ Impaired |
| **Judgment:** | ☐ Intact | ☐ Partial | ☑ Impaired |
| **Suicidal Ideation:** | ☑ Denies | ☐ Passive | ☐ Active |
| **Homicidal Ideation:** | ☑ Denies | ☐ Passive | ☐ Active |

How Tested: grossly intact per behavioral change to BIP

Impulse Control: ☐ Intact ☐ Fair ☑ Poor

Comment: per her behavior

Comment: none evident in her behavior

Comment: exhibits unpredictable behavior

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

Page 1 of 2

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000258

## Psychiatric Progress Note

**Contact with collateral sources** (doctor-to doctor, family, case management, etc.):

Staff/treatment team (+) response to BIP
-reviewed consultation from Medical Director
-contacted mother to discussed treat recommendation and plan. Mother verbalized agreement with Trileptal but does not want any pt taking antipsychotic citing "she has the same bad side effect on all of them". Discussed that an antipsychotic will be considered and that pt has had not current side effects of haldol with cogentin and risk of side effects in general vary from among medications and numerous clinical factors. Due to interpreted phone reception conversation was discontinued. Author notified mother that further update will follow next week if antipsychotic will be initiated.

**Assessment:**

Brooke demonstrates variable  progress toward treatment goals regarding  mood lability, with prominent irritability,  aggressive and compulsive/repetitive behavior. EPS resolved and  sleep has improved  better since taking benadryl. She remains and danger to self and others due to mood lability and barriers in communication /adaptive function. Since starting haldol , pt demonstrated a partial response and on a therapeutic dose. Following consultation with Medical Director, will purse anther medication strategy to address pts mood sx.

**Diagnosis:**

| Psychiatric Diagnosis |
|---|
| DMDD,<br>ASD severe<br>h/o OCD<br>h/o PTSD |
| **Medical Diagnosis** |
| Normalized  AST/ALT<br>Total Chol 187<br>h.o of rhabdomyolysis in 4/2018. |
| **Psychosocial and Environmental Stressors** |

| ☐ Health Problems | ☐ Lack of Healthy Supports | ☐ Financial Problems | ☐ Housing Issues |
|---|---|---|---|
| ☑ Other:   temporary ward of DCS | | | |

**Estimated Length of Stay:** 25-30 days

**Circumstances that support continued Inpatient hospitalization:** (Check all that apply)

☐ Change in diagnosis/ Treatment Plan: _____

☑ Medication adjustment in Inpatient setting needed: _____

☑ Continued use of "PRN" medications to regulate mood, thought or behavior

☑ No less restrictive setting appropriate and/or available at this time

☑ Condition can be more efficiently or more rapidly treated as an inpatient

☑ Significant regression anticipated without continuity of care

☑ Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care

☑ Continued disturbance in: mood, thought, behavior rendering patient incapable of self care self regulation

☑ Danger to Self/ other.

☑ Other: remains on 1:1 for sfaety

**Plan:**

1. Decrease haldol 7.5 mg qHS -taper  due to suboptimal response and parental objection
2. Begin trileptal 150mg BID for mood sx
3. Consider latuda for mood sx if clinically appropriate
4. Continue cogentin 1mg BID for EPS prophylaxis (and will taper with haldol)
5. Continue benadryl 50mg qHS for sleep
6. Discontinue clonidine due to unclear benefit
7. Also taking leostrin(missed several days due to expired home med) , colace, omega 3FAs, vitamin D
8. Maintain 1:1 observation for safety and continue behavioral modification
9. Monitor I/O' s to monitor for constipation and pending repeat AST/ALT
10. Consider restarting TCA once mood stabilization is achieved
11. Maintain strict gluten/dairy free diet
12. Recommend early identification and consultation with DDD group home with training staff

Name/Signature: _____ Date: _____    Time: /4u

Krzysztof Mlak, M.D.    9/28/2018

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000259

Exhibit 39

## Psychiatric Progress Note

Date and Time: <u>10/3/2018 @11:02</u>

Reason for Hospitalization: <u>Aggression , mood sx</u>

cc: <u>Follow up</u>

Interim History:

Brook was observed with staff present, chart reviewed, staff provided input and case was discussed during treatment team meeting

Brooke had another period of agitation occurring during visit by mother. She engaged in head banging but was de-escalated after mother head left. She did not require a PRN medication. During the day she has demonstrated redirectable behavior and appears calm. She requires continuous support/assistance to maintain ADLs and structured / consistent behavior planning to minimize degree of repetitive behaviors

Any medication side effects: ☐ Yes  ☑ No    Comments: none observed or reported

Vital signs stable:  ☑ Yes  ☐ No    Comments: T99.9 P109 R16 BP119/78

| ADL's: | Sleep: | Appetite: |
|--------|--------|-----------|
| ☐ Good | ☐ Good | ☐ Good |
| ☑ Fair | ☑ Fair | ☑ Fair |
| ☐ Poor | ☐ Poor | ☐ Poor |

LABS:
-current AST/ALT normalized

Physical SXS/Pain:   ☐ Yes  ☑ No    Comments: none observed or reported

Mental Status Exam: (Check all that apply)

**Appearance:**
☐ clean/well groomed
☐ unkempt/disheveled
☑ fair grooming

**Behavior:**
☐ appropriate
☑ semi/uncooperative
☐ demanding/argumentative
☐ suspicious/bizarre

**Speech:**
☐ normal rate/tone/volume
☐ slow/soft
☐ loud/verbose
☐ rapid/pressured

non-verbal with author

**Orientation:**
☐ person/place/time
☐ disoriented/confusion
☐ impaired attention/concentration

alert but nonverbal towards author

**Mood:**
☐ euthymic
☐ depressed
☐ anxious
☐ elevated/euphoric
☐ dysphoric/irritable
☑ labile

**Affect:**
☐ appropriate
☐ inappropriate
☐ restricted/blunted
☐ flat
☐ labile
☐ anxious

shallow depth

**Thought Process:**
☐ linear/goal-directed
☐ tangential/circumstantial
☐ blocking
☐ concrete
☐ flight of ideas
☐ perseveration

n/a -nonverbal

auditory hallucinations: ☐ Yes ☑ No
no signs observed

visual hallucinations ☐ Yes ☑ No
no signs observed

delusions: ☐ Yes ☑ No
no signs observed

☐ other:

| Gait/Station: | ☑ Normal | ☐ Injured | ☐ Other |
|---------------|----------|-----------|---------|
| Memory: | ☑ Intact | ☐ Partial | ☐ Impaired |
| Insight: | ☐ Intact | ☐ Partial | ☑ Impaired |
| Judgment: | ☐ Intact | ☐ Partial | ☑ Impaired |
| Suicidal Ideation: | ☑ Denies | ☐ Passive | ☐ Active |
| Homicidal Ideation: | ☑ Denies | ☐ Passive | ☐ Active |

How Tested: grossly intact per behavioral change to BIP

Impulse Control:  ☐ Intact  ☐ Fair  ☑ Poor

Comment: per her behavior

Comment: none evident in her behavior

Comment: exhibits unpredictable behavior

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000268

## Psychiatric Progress Note

**Contact with collateral sources (doctor-to doctor, family, case management, etc.):**

Staff/treatment team  discussed CFT and mother continue to request that CPK level be drawn despite no clinical indication.  Pt had another explosive aggressive outburst in parallel to mothers visit. Discussed the need to initiate behavioral training with mother due to her inadvertent perpetuation of pts negative behavioral displays

**Assessment:**

Brooke demonstrates variable  progress toward treatment goals regarding  mood lability, with prominent irritability,  aggressive and compulsive/repetitive behavior. EPS resolved and  sleep has improved  better since taking benadryl. She remains and danger to self and others due to mood lability and barriers in communication /adaptive function. Since starting haldol , pt demonstrated a partial response and on a therapeutic dose. Following consultation with Medical Director, will purse anther medication strategy to address pts mood sx.

**Diagnosis:**

| Psychiatric Diagnosis |
| --- |
| DMDD, ASD severe h/o OCD h/o PTSD |
| **Medical Diagnosis** |
| Normalized  AST/ALT Total Chol 187 h.o of rhabdomyolysis in 4/2018. |

**Psychosocial and Environmental Stressors**

☐ Health Problems    ☐ Lack of Healthy Supports    ☐ Financial Problems    ☐ Housing Issues

☑ Other:  temporary ward of DCS

**Estimated Length of Stay:**  20-25 days

**Circumstances that support continued inpatient hospitalization: (Check all that apply)**

☐ Change in diagnosis/ Treatment Plan _____
☑ Medication adjustment in inpatient setting needed: _____
☑ Continued use of 'PRN' medications to regulate mood, thought or behavior
☑ No less restrictive setting appropriate and/or available at this time
☑ Condition can be more efficiently or more rapidly treated as an inpatient
☑ Significant regression anticipated without continuity of care
☑ Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care
☑ Continued disturbance in: mood, thought, behavior rendering patient incapable of self care self regulation
☑ Danger to Self/ other.
☑ Other  remains on 1:1 for sfaety

**Plan:**

1. Continue  haldol 2 mg qHS -taper  due to suboptimal response and parental objection
2. Continue trileptal 300mg BID for mood sx
3. Continue benadryl 50mg qHS for sleep
4. Continue cogentin 0.5mg qHS for EPS prophylaxis ( taper with haldol)
5. Consider latuda for mood sx if clinically appropriate
6. Consider restarting TCA once mood stabilization is achieved
7. Also taking leostrin(missed several days due to expired home med) , colace, omega 3FAs, vitamin D
8. Maintain 1:1 observation for safety and continue behavioral modification
9. Maintain strict gluten/dairy free diet
10. Recommend early identification and consultation with DDD group home with training staff
11. Consult to IM regarding need to repeat CPK

Name/Signature: Krzysztof Mlak, M.D.    Date: 10/3/2018    Time: ___

Name: Brooke Scianna
MR#: 119188
UNIT: coyote
Patient Label

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000269

Exhibit 40

# Psychiatric Progress Note

**Date and Time:** 10/5/2018 @ 10:42

**Reason for Hospitalization:** Aggression , mood sx

**CC:** Follow up

**Interim History:**
Brook was observed with staff present, chart reviewed, staff provided input  and case was discussed during treatment team meeting

Brooke had another period of agitation occurring during visit by mother. She engaged in head banging and did require a PRN medication. She de-escalated quicker over a 20 minute period .During the day she appeared calm in various settings and during different observational periods but demonstrated marginal frustration tolerance in context of interactions with mother.  She requires continuous support/assistance to maintain ADLs and structured / consistent behavior planning to minimize degree of repetitive behaviors

**Any medication side effects:** ☐ Yes  ☑ No  Comments: none observed or reported

**Vital signs stable:** ☑ Yes  ☐ No  Comments ____

**ADL's:**
☐ Good
☑ Fair
☐ Poor

**Sleep:**
☐ Good
☑ Fair
☐ Poor

**Appetite:**
☐ Good
☑ Fair
☐ Poor

**LABS:**
-current AST/ALT normalized

**Physical SXS/Pain:** ☐ Yes  ☑ No  Comments none observed or reported

**Mental Status Exam: (Check all that apply)**

**Appearance:**
☐ clean/well groomed
☐ unkempt/disheveled
☑ fair grooming

**Behavior:**
☐ appropriate
☑ semi/uncooperative
☐ demanding/argumentative
☐ suspicious/bizarre

**Speech:**
☐ normal rate/tone/volume
☐ slow/soft
☐ loud/verbose
☐ rapid/pressured

non-verbal with author

**Orientation:**
☐ person/place/time
☐ disoriented/confusion
☐ impaired attention/concentration

alert but nonverbal towards author

**Mood:**
☐ euthymic
☐ depressed
☐ anxious
☐ elevated/euphoric
☐ dysphoric/irritable
☑ labile

**Affect:**
☐ appropriate
☐ inappropriate
☐ restricted/blunted
☐ flat
☐ labile
☐ anxious

shallow depth

**Thought Process:**
☐ linear/goal-directed
☐ tangential/circumstantial
☐ blocking
☐ concrete
☐ flight of ideas
☐ perseveration

n/a -nonverbal

auditory hallucinations: ☐ Yes ☑ No
no signs observed

visual hallucinations: ☐ Yes ☑ No
no signs observed

delusions: ☐ Yes ☑ No
no signs observed

☐ other

**Gait/Station:** ☑ Normal ☐ Injured ☐ Other
**Memory:** ☑ Intact ☐ Partial ☐ Impaired
**Insight:** ☐ Intact ☐ Partial ☑ Impaired
**Judgment:** ☐ Intact ☐ Partial ☑ Impaired
**Suicidal Ideation:** ☑ Denies ☐ Passive ☐ Active
**Homicidal Ideation:** ☑ Denies ☐ Passive ☐ Active

How Tested: grossly intact per behavioral change to BIP
**Impulse Control:** ☐ Intact ☐ Fair ☑ Poor
Comment: per her behavior
Comment: none evident in her behavior
Comment: exhibits unpredictable behavior

Name: Brooke Scianna
MR#: 119188
UNIT: coyote
Patient Label

Page 1 of 2

AURORA(SCIANNA) 000272

## Psychiatric Progress Note

**Contact with collateral sources** (doctor-to doctor, family, case management, etc.):

Treatment team discussed needed training with mother to address coercive behavior cycles.

**Assessment:**

Brooke demonstrates variable progress toward treatment goals regarding mood lability, with prominent irritability, aggressive and compulsive/repetitive behavior. EPS resolved and sleep has improved better since taking benadryl. She remains a danger to self and others due to mood lability and barriers in communication /adaptive function. Since starting haldol , pt demonstrated a partial response and on a therapeutic dose. Following consultation with Medical Director, will purse anther medication strategy to address pts mood sx.

**Diagnosis:**

| Psychiatric Diagnosis |
|---|
| DMDD, ASD severe r/o OCD r/o PTSD |
| **Medical Diagnosis** |
| Normalized AST/ALT Total Chol 187 h.o of rhabdomyolysis in 4/2018. |
| **Psychosocial and Environmental Stressors** |

☐ Health Problems   ☐ Lack of Healthy Supports   ☐ Financial Problems   ☐ Housing Issues

☑ Other: temporary ward of DCS

**Estimated Length of Stay:** 20-25 days

**Circumstances that support continued inpatient hospitalization:** (Check all that apply)

☐ Change in diagnosis/ Treatment Plan

☑ Medication adjustment in inpatient setting needed: _____

☑ Continued use of "PRN" medications to regulate mood, thought or behavior

☑ No less restrictive setting appropriate and/or available at this time

☑ Condition can be more efficiently or more rapidly treated as an inpatient

☑ Significant regression anticipated without continuity of care

☑ Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care

☑ Continued disturbance in: mood, thought, behavior rendering patient incapable of self care self regulation

☑ Danger to Self/ other.

☑ Other: remains on 1:1 for sfaety

**Plan:**

1. Discontinued haldol  due to suboptimal/partial response and parental objection
2. Continue trileptal 300mg BID for mood sx
3. Continue benadryl 50mg qHS for sleep
4. Continued cogentin( taper with haldol)
5. Consider latuda for mood sx if clinically appropriate
6. Consider restarting TCA once mood stabilization is achieved
7. Also taking leostrin(missed several days due to expired home med) , colace, omega 3FAs, vitamin D
8. Maintain 1:1 observation for safety and continue behavioral modification
9. Maintain strict gluten/dalry free diet
10. Recommend early identification and consultation with DDD group home with training staff
11. Reviewed  consultation with IM regarding lack of clinical indication to obtain CPK level

**Name/Signature:** Krzysztof Mlak, M.D.   **Date:** 10/5/2018   **Time:** 1212

Name: Brooke Scianna
MR#: 119188
UNIT: coyote

Patient Label

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000273

Exhibit 41

## Psychiatric Progress Note

Date and Time: 10/8/2016 @ 9:45

Reason for Hospitalization: Aggression , mood sx

CC: Follow up

Interim History:

Brook was observed with staff present, chart reviewed, staff provided input , reviewed covering attending's progress note and case was discussed during treatment team meeting

Brooke had another period of agitation occurring during visit by mother. over the weekend  She did not require a PRN medication  and de-escalated quicker. During the day she appeared calm in various settings and during different observational periods but demonstrated marginal frustration tolerance in context of interactions with mother.  She requires continuous support/assistance to maintain ADLs and structured / consistent behavior planning to minimize degree of repetitive behaviors

Any medication side effects: [ ] Yes   [✓] No    Comments: none observed or reported

Vital signs stable: [✓] Yes   [ ] No    Comments: T99.8 P110 R18 BP131/90 O2sat 100%

| ADL's: | Sleep: | Appetite: | LABS: |
|---|---|---|---|
| [ ] Good | [ ] Good | [ ] Good | -current AST/ALT normalized |
| [✓] Fair | [✓] Fair | [✓] Fair | -other labs WNL |
| [ ] Poor | [ ] Poor | [ ] Poor | |

Physical SX6/Pain: [ ] Yes   [✓] No    Comments: none observed or reported

Mental Status Exam: (Check all that apply)

**Appearance:**
[ ] clean/well groomed
[ ] unkempt/disheveled
[✓] fair grooming

demeanor can change quickly

**Behavior:**
[ ] appropriate
[✓] semi/uncooperative
[ ] demanding/argumentative
[ ] suspicious/bizarre

**Speech:**
[ ] normal rate/tone/volume
[ ] slow/soft
[ ] loud/verbose
[ ] rapid/pressured

non-verbal with author

**Orientation:**
[ ] person/place/time
[ ] disoriented/confusion
[ ] impaired attention/concentration

alert but nonverbal towards author

**Mood:**
[ ] euthymic
[ ] depressed
[ ] anxious
[ ] elevated/euphoric
[ ] dysphoric/irritable
[✓] labile

**Affect:**
[ ] appropriate
[ ] inappropriate
[ ] restricted/blunted
[ ] flat
[ ] labile
[ ] anxious

shallow depth

**Thought Process:**
[ ] linear/goal-directed
[ ] tangential/circumstantial
[ ] blocking
[ ] concrete
[ ] flight of ideas
[ ] perseveration

n/a -nonverbal

auditory hallucinations: [ ] Yes [✓] No
no signs observed

visual hallucinations: [ ] Yes [✓] No
no signs observed

delusions: [ ] Yes [✓] No
no signs observed

[ ] other

| | | | | |
|---|---|---|---|---|
| Gait/Station: | [✓] Normal | [ ] Injured | [ ] Other | |
| Memory: | [✓] Intact | [ ] Partial | [ ] Impaired | How Tested: grossly intact per behavioral change to BIP |
| Insight: | [ ] Intact | [ ] Partial | [✓] Impaired | Impulse Control: [ ] Intact [ ] Fair [✓] Poor |
| Judgment: | [ ] Intact | [ ] Partial | [✓] Impaired | Comment: per her behavior |
| Suicidal Ideation: | [✓] Denies | [ ] Passive | [ ] Active | Comment: none evident in her behavior |
| Homicidal Ideation: | [✓] Denies | [ ] Passive | [ ] Active | Comment: exhibits unpredictable behavior |

Name: Brooke Scianna
MR#: 119186
UNIT: coyote

Patient Label

Page 1 of 2

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000278

## Psychiatric Progress Note

**Contact with collateral sources** (doctor-to doctor, family, case management, etc.):

Treatment team discussed review of progress over the last 2 weeks and emphasized the need to begin training with mother to address coercive behavior cycles.

MISC-consultation with IM revealed lack of clinical indication to obtain CPK level

**Assessment:**

Brooke demonstrates early progress toward treatment goals regarding mood lability, with prominent irritability,  aggressive and compulsive/repetitive behavior. Pt demonstrated most problematic behavior in context of visisit with mother. She remains labile with no functional ability to de-esce\ated himself without staff support and clear consistent  environmental structure and clear expectations, without which she presents a danger to self and others. There is currently no clear indication for TCA as pts repetitive behavior respond to behavioral intervention and are in of on themselves not functionally impairing.

**Diagnosis:**

| Psychiatric Diagnosis |
| --- |
| DMDD, <br> ASD severe with language impairment <br> h/o OCD <br> h/o PTSD |
| **Medical Diagnosis** |
| Normalized  AST/ALT <br> Total Chol 187 <br> h.o of rhabdomyolysis in 4/2018. |

| Psychosocial and Environmental Stressors | | | |
| --- | --- | --- | --- |
| ☐ Health Problems | ☐ Lack of Healthy Supports | ☐ Financial Problems | ☐ Housing Issues |
| ☑ Other    temporary ward of DCS | | | |

**Estimated Length of Stay:**  14-21 days

**Circumstances that support continued inpatient hospitalization:** (Check all that apply)

- ☐ Change in diagnosis/ Treatment Plan: _____
- ☑ Medication adjustment in inpatient setting needed _____
- ☑ Continued use of "PRN' medications to regulate mood, thought or behavior
- ☑ No less restrictive setting appropriate and/or available at this time
- ☑ Condition can be more efficiently or more rapidly treated as an inpatient
- ☑ Significant regression anticipated without continuity of care
- ☑ Severe, multiple psychosocial stressors which would undermine treatment at a lower level of care
- ☑ Continued disturbance in: mood, thought, behavior rendering patient incapable of self care self regulation
- ☑ Danger to Self/ other.
- ☑ Other   remains on 1:1 for sfaety

**Plan:**

1. Continue trileptal 300mg BID for mood sx
2. Continue benadryl 50mg qHS for sleep
3. Also taking leostrin(missed several days due to expired home med) , colace, omega 3-FAs, vitamin D
4 Maintain 1:1 observation for safety and continue behavioral modification
5. Maintain strict gluten/dairy free diet
6. Recommend early identification of DDD group home with training staff

Name/Signature:  _____    Date:           Time: /045

Krzysztof Mlak, M.D.          10/8/2018

Name: Brooke Scianna
MR#: 119188
UNIT: coyote
Patient Label

Page 2 of 2

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000279

Exhibit 42

CHRIS DEROSE, CLERK
BY *C. Camacho* DEP
C. CAMACHO, FILED

18 OCT 17 PM 4:41

1  DeeAn Gillespie Strub, Bar No. 009987
   **GILLESPIE, SHIELDS, DURRANT & GOLDFARB**
2  7319 North 16th Street
3  Phoenix, AZ 85020
   Telephone: (602) 870-9700
4  Fax: (602) 870-9783
5  *Attorneys for Mother, Christine Scianna*

6  *Send All Court Documents to:*
7  mailroom@gillaw.com

8           **IN THE SUPERIOR COURT OF THE STATE OF ARIZONA**

9              **COUNTY OF MARICOPA, JUVENILE DIVISION**
10

11
   In re the Matter of:                    Case No.: JD36034
12
13 BROOKE ANGELINA SCIANNA               **REQUEST FOR EMERGENCY**
      d.o.b. 7/14/2001                   **HEARING**
14
15                                        (Assigned to the Honorable Nicolas
16 Person(s) under 18 years of age        Hoskins)

17

18         Mother, through undersigned counsel, requests an Emergency Hearing be held
19
   to address the minor child's emergent medical needs as well as her upcoming release
20
21 from Aurora Hospital.

22         Brooke has been hospitalized in Aurora for (52) fifty-two days, since August
23
   25, 2018.  This is the longest hospitalization Brooke has ever endured.  The reason
24
25 for Brooke's admittance into Aurora was in an attempt to stabilize her behaviors
26 which were a direct result of the abuse, neglect and resulting physical and emotional
27
28 trauma that she suffered in the DCS group home.

AZDCS004360

GILLESPIE, SHIELDS, DURRANT & GOLDFARB
7319 North 16ᵗʰ Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783

Brooke has a vast complex medical history, including but not limited to behavior, medication management, muscle disorder and contributing factors to Brooke's underlying muscle disorder. It is challenging for providers who have never treated Brooke to understand Brooke's complex history. Brooke, who is profoundly autistic, is verbally non-communicative. Mother is a walking library and the historian of medical information for her daughter. The simple fact that the treating providers at Aurora gleaned their information about Brooke from the Department instead of Mother has been detrimental to Brooke and prolonged her hospitalization. Mother's lifelong history regarding her daughter's condition and medical needs is invaluable to providers as it relates to Brooke's treatment.

Because of DCS involvement, all of the providers at Aurora refuse to listen to Mother as it relates to helping manage Brooke's treatment and her medication in their efforts to stabilize her. Mother has made tireless efforts to relay what does and does not work for her daughter, to no avail. Brooke's prolonged hospitalization is based mostly in part on administering medication to Brooke which historically has proven to be completely ineffective and contraindicative in managing Brooke's behaviors.

Aurora providers put Brooke on Haldol, a medication that has been documented in other hospital records as being ineffective and damaging to Brooke. Mother plead with the providers to recognize this was not a proper medication for Brooke and would not work. Shortly after Brooke was placed on this medication, she started showing signs of muscle stiffness, which the providers then had to place her

AZDCS004361

on another medication to counteract the stiffness and prevent a permanent muscle disorder. Haldol caused Brooke to be expressionless, as though she had a medical lobotomy. Brooke would not do her regular activities that she enjoys, such as puzzles and drawing. She became lethargic. In response, the treating providers continued to raise Brooke's Haldol levels, worsening her condition.

After weeks of watching her daughter suffer, Mother finally contacted Bruce Waldo, CEO of Aurora and requested a new doctor be assigned to Brooke's case. Mr. Waldo consulted with Dr. Ghafoor, and advised Mother they would taper Brooke off of the Haldol. Brooke has been completely off Haldol for approximately a little over a week and a half. She is beginning to smile, laugh and using chalk on the board. It is the first time in over a month Mother has seen Brooke laugh. This tragedy for Brooke could and should have avoided had the Department instruct the treating providers to listen to Mother. Mother could have discussed Brooke's complex medical history with the providers, and critical knowledge and medical history of which the Department does not possess.

The Department has not been candid with the Court. At the Tuesday, August 21, 2018 hearing, the Department failed to disclose to the Court that Brooke had been hospitalized the day before Court, on Monday, August 20, 2018. Mother was finally allowed to visit Brooke on Wednesday, August 22, 2018. Upon Mother's arrival for her regularly scheduled visit, she was advised by the DCS employee at the home that

GILLESPIE, SHIELDS, DURRANT & GOLDFARB
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783

AZDCS004362

Brooke was not there, that she was being taken to the hospital. Mother was not informed of the hospitalization on August 20, 2018.

The Department wrongly removed Brooke from her Mother's care under the notion that the group home was a better environment. It was a disastrous decision for Brooke. She was severely neglected and physically and abhorrently abused. Her long hair was matted at the scalp and there was gum throughout her hair, she had significant scabs covering her face from rug burns and bruises all over her body, down to her feet, much of it in places where she has no history of self-infliction. See Exhibits attached hereto. The Department has still provided no explanation for the neglect and physical and emotional trauma Brooke has suffered under their care.

Further, Brooke has attended (1) one day of school since being taken into the Department's care. Had the Department and/or Brooke's treating providers had discussions with Mother, this lengthy hospitalization could have been avoided and Brooke could be attending school pursuant to her IEP.

The Department has failed to recognize their error with regard to Brooke's treatment. The Department continues to fail Brooke.

It is possible that Brooke will be released following the next CFT. Brooke should be released to Mother's care based on the Department's failure to treat Brooke and recognize the constant errors in their judgment with the treatment of Brooke.

CFSS, one of Brooke's care providers, has noted that they will provide (24) twenty-four hour care for Brooke pending her discharge home. Despite the Court's

GILLESPIE, SHIELDS, DURRANT & GOLDFARB
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783

AZDCS004363

admonition that Brooke would not go to another home without a Court Order, the Department has continued to disregard Mother and their clear intent to put her in another group home upon her release.

During the previous hearing, almost exactly two months ago, the court ordered DCS to produce medical proof from a PhD level therapist or medical doctor that Brooke being stripped from her Mother's care was best for Brooke. Not only has DCS had more than enough time to produce the requested evidence, evidence has shown the polar opposite. In fact, every action DCS has taken has been grossly detrimental to Brooke's physical health and emotional and behavioral wellbeing.

DCS has failed to arrange the anticipated comprehensive medical evaluation arranged by Jim Adams with a doctor at Phoenix Children's Hospital.   The Department has in essence ignored this valuable opportunity to help Brooke.

Undersigned has requested positions from counsel for the Department and the Guardian Ad litem, who are each opposed to this request.  Counsel for Father has not provided a position as of the time of filing.

WHEREFORE, it is requested that the Court Order for the Department to immediately give written instructions to all of Brooke's providers that they are to communicate with Mother and consider her input, as well as upon Brooke's release, she be immediately returned to her Mother and have CFSS provide 24 hour care.

GILLESPIE, SHIELDS, DURRANT & GOLDFARB
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783

AZDCS004364

**DATED** this ⎦⎤ day of October 2018.

GILLESPIE, SHIELDS, DURRANT & GOLDFARB

DeeAn Gillespie Strub
Attorneys for Mother

**ORIGINAL** of the foregoing filed/lodged* this
⎦⎤ day of October, 2018, with:

Clerk of the Court
Maricopa County Superior Court
Juvenile Division/Durango

*The Honorable Nicolas Hoskins
Maricopa County Superior Court – Juvenile Division
botzj@superiorcourt.maricopa.gov

**COPY** of the foregoing e-mailed this
⎦⎤ day of October, 2018, to:

Monica Malhotra
Monica.malhotra@azag.gov
Attorney for the Department

Cynthia Ceasar
ceasarc@mail.maricopa.gov
Counsel for Mom

Sara Smith
sarasmithlaw@gmail.com
Counsel for Father

Thomas Stubbs
stubbst@mail.maricopa.gov
Guardian Ad Litem for Child

GILLESPIE, SHIELDS, DURRANT & GOLDFARB
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax (602) 870-9783

AZDCS004365

Exhibit 43

Chris DeRose, Clerk of Court
\*\*\* Filed \*\*\*
8:00 AM

10·18·18

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                              10/17/2018

JUDGE PRO TEM NICOLAS B. HOSKINS          CLERK OF THE COURT
                                                A. Burd
                                                Deputy

IN THE MATTER OF:

BROOKE ANGELINA SCIANNA          DIANA THEOS
  F1138995
  DOB: 7/14/2001

                                  MONICA MALHOTRA

                                  THOMAS F STUBBS

                                  DEEAN GILLESPIE STRUB

                                  SARA J. SMITH

                                  FOSTER CARE REVIEW BOARD
                                  DCS SPECIALIST - SOUTHWEST
                                  REGION


                          MINUTE ENTRY

        The Court has received a "Request for Emergency Hearing" from Mother, filed October
17, 2018 (the "Request"). The Request contains two separate requests for relief, in addition to
asking for an emergency hearing. The first is to compel the Department to provide written notice
to the Child's providers that they are required to communicate with Mother concerning the
Child's medical care and to consider her input. The second is essentially a Rule 59 Motion
asking for an Order that the Child be returned to Mother upon her discharge from Aurora
Behavioral Health.

        The Court believes there is a benefit to Mother being able to provide input to the Child's
medical providers. Should the Court be incorrect, and Mother's input proves deleterious to the
child's care, the Court anticipates that fact will provide the Court with additional information
useful in the resolution of the factual disputes in the case.


Docket Code ORDENTERED          Form XPJDBlankME                    Page 1

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

JD36034                                                    10/17/2018

The Court has previously ordered that the Child may not be discharged from Aurora without further order of the Court.

There already is a Review of Placement set for October 30, 2018, at 9:00 a.m.

Based on the foregoing,

IT IS ORDERED denying the Request to the extent it seeks an emergency hearing.  The October 30, 2018, hearing is sufficient.

IT IS ORDERED denying the Request to the extent that it purports to be a Rule 59 Motion, without prejudice to Mother filing a properly styled Rule 59 Motion.

IT IS ORDERED reiterating the Court's prior Order that the child shall not be discharged or otherwise removed from Aurora without prior Order of this Court.  The Court has yet to determine whether the child will be returned to congregate care, Mother, or some other placement.

IT IS FURTHER ORDERED that the Department shall promptly give the Child's treatment providers the instruction that they shall make reasonable efforts to obtain information from Mother concerning the Child's medical history, and to consult with Mother concerning the Child's ongoing medical care.  Mother's input should be considered, but shall not be considered determinative of the appropriate course of treatment.

_____10/17/18_____                    _____
DATE                                            JUDGE PRO TEM NICOLAS B. HOSKINS

Docket Code ORDERENTERED          Form XPJDBlankME                    Page 2

AZDCS004376

.

Exhibit 44

1   MARK BRNOVICH
    Attorney General
2

3   MONICA MALHOTRA
    Assistant Attorney General
4   State Bar No. 032784
    CFP/PSS
5   2005 N. Central Ave. C051AG
    Phoenix, Arizona 85004
6   Telephone: (602) 774-9000
    PSSDurango@azag.gov
7

8
    Attorneys for the Department of Child Safety
9

10              IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

11                  IN AND FOR THE COUNTY OF MARICOPA

12   In the Matter of:                No.  JD36034

13   BROOKE ANGELINA SCIANNA          **DCS'S MOTION TO DISMISS**
14      d.o.b. 07/14/2001

15                                    **(UNCONTESTED)**

16   Person under 18 years of age.    (Honorable Nicolas B. Hoskins)
17

18        The  Department  of  Child  Safety  (DCS  or  the  Department),  by  and  through

19   undersigned counsel, hereby requests an order dismissing the dependency petition filed in

20   this matter, releasing the child, BROOKE ANGELINA SCIANNA, from court wardship

21   and relieving DCS, Foster Care Review Board, and all court appointed attorneys and
22
     guardians ad litem from further responsibility in this case.
23

24        The reasons for this motion are REUNIFICATION and as set forth in the attached
25   report to the Court, dated February 5, 2019.     The Department further requests the Court
26
     to vacate all future hearings scheduled in this matter, now set for February 14, 2019 at 1:30
27

28

1

AZDCS004487

CHRIS DEROSE, CLERK
BY
J. Chaidez    DEP
J. CHAIDEZ, FILED

**19 FEB 11  PM 4: 54**

p.m., March 12, 2019 at 1:30 p.m., March 13, 2019 at 1:30 p.m., and May 22, 2019 at 9:30 a.m.

Under Arizona Rules of Procedure for the Juvenile Court, 46(A), all counsel have been notified of this Motion.   Thomas Stubbs, Esq., Guardian ad Litem for the Child, Diana Theos, Esq., Attorney for the Child, DeeAn Gillespie Strub, Esq., Attorney for Mother, and Sara J. Smith, Esq., Attorney for Father,  have no objection to this Motion.

RESPECTFULLY SUBMITTED this ____ day of February, 2019.

MARK BRNOVICH
Attorney General

MONICA MALHOTRA
Assistant Attorney General

2

AZDCS004488

Exhibit 45

CHRIS DEROSE, CLERK
BY _____ DEP
A. PROVENCIO, FILED

19 FEB 12 PM 12: 11

1  MARK BRNOVICH
   Attorney General
2
3  MONICA MALHOTRA
   Assistant Attorney General
4  State Bar No. 032784
   CFP/PSS
5  2005 N. Central Ave. C051AG
6  Phoenix, Arizona 85004
   Telephone: (602) 774-9000
7  PSSDurango@azag.gov
8
   Attorneys for the Department of Child Safety
9
10          IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
11              IN AND FOR THE COUNTY OF MARICOPA
12  In the Matter of:                    No. JD36034
13                                        **ORDER TO DISMISS**
    BROOKE ANGELINA SCIANNA
14  d.o.b. 07/14/2001                     **(UNCONTESTED)**
15
16  Person under 18 years of age.        (Honorable Nicolas B. Hoskins)
17       Upon motion of the Department of Child Safety (DCS or the Department), and good
18  cause appearing,
19
20       IT IS ORDERED dismissing the dependency petition filed in this matter, releasing
21  the child, BROOKE ANGELINA SCIANNA, from the wardship of the Court, and
22  relieving DCS of further responsibility of the child for the reason of REUNIFICATION.
23       IT IS FURTHER ORDERED relieving the Foster Care Review Board and all court
24  appointed attorneys and guardians ad litem of further responsibility in this case.
25
26       THIS COURT HEREBY NOTIFIES the child that, pursuant to A.R.S. § 8-543, you
27  are authorized to participate in the sibling information exchange program to facilitate
28  contact between former dependent children and any siblings.  You can obtain more

1   information on this program by contacting the Arizona Supreme Court at

2   www.supreme.state.az.us/CIP/.

3
        IT IS FURTHER ORDERED relieving all parents from the obligation to pay a

4
5   parental assessment from the date of the order forward.

6       · IT IS FURTHER ORDERED vacating the Dependency Adjudication set for

7   February 14, 2019, March 12, 2019, and March 13, 2019 before Commissioner Hoskins.

8
        IT IS FURTHER ORDERED vacating the Permanency Planning Hearing set for

9
10  May 22, 2019 at 9:30 a.m.

11      DATED: _____ 2/11 _____, 2019.

12
13
14                                  JUDGE OF THE SUPERIOR COURT

15
16                                  Commissioner Nicolas B. Hoskins

17
18
19
20
21
22
23
24
25
26
27
28

                                    2

Exhibit 46

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

CHRISTINE SCIANNA, et al., )
                          )
                          )
Plaintiffs,               )
                          )No. 2:21-cv-01444-DJH
vs.                       )
                          )
                          )
ARIZONA DEPARTMENT OF CHILD )
SAFETY, et al.,           )
                          )
                          )
Defendants.               )
_____ )

DEPOSITION OF KRZYSZTOF MLAK

Phoenix, Arizona
June 8, 2023
10:10 a.m.

Prepared by:            CARRIE REPORTING, LLC
MICHAELA H. DAVIS        Certified Reporters
Registered Professional Reporter   2415 E. Camelback Road
Certified Realtime Reporter   Suite 700
Certified Realtime Captioner   Phoenix, AZ 85016
Certified LiveNote Reporter   (480) 429-7573
AZ CR No. #50574
carrie@carriereporting.com

(COPY)

---

Page 2

INDEX
WITNESS                              PAGE
KRZYSZTOF MLAK
   BY MR. CONNELLY                     6
   BY MR. HUNTER                     228
   BY MR. CHRISTNER                  237
   BY MR. CONNELLY                   252

* * *

EXHIBITS
EXHIBIT;    DESCRIPTION               PAGE
15  Curriculum Vitae of Krzysztof Mlak,    12
    M.D.;
    Bates Nos. AZDCS004467 - 4469
16  Agreement for Provision of Physician   40
    Services;
    Bates Nos. AURORA(SCIANNA) 003102 -
    3110
17  Amendment to the Provision of Physician  48
    Services Agreement;
    Bates No. AURORA(SCIANNA) 003111
18  Administrative Services Agreement for    50
    Service Director;
    Bates Nos. AURORA(SCIANNA) 003112 -
    3122
19  Article entitled Treatment              69
    Recommendations for the Use of
    Antipsychotics for Aggressive Youth
    (TRAAY) Part II
20  Portions of a medical record beginning   91
    Bates Nos. AURORA(SCIANNA) 000004
    CONFIDENTIAL
21  Arizona Revised Statute 8-531         109
22  Banner Thunderbird records labeled     139
    BS-BANNER 000850
23  Psychiatric Evaluation                 152
    CONFIDENTIAL

(Continued.)

---

Page 3

EXHIBITS
EXHIBIT;    DESCRIPTION               PAGE
24  Series of e-mails;                    187
    Bates Nos. PLTFS-000109 - 117
25  Series of e-mails;                    196
    Bates Nos. PLTFS-000121 - 123
26  Series of e-mails;                    197
    Bates Nos. PLTFS-000124 - 125
27  Portions of Arizona's Children        202
    Association records beginning
    Bates Nos. ACA-SDT-000265
28  Letter;                               209
    Bates No. AZDCS004463
29  Letter dated 10/30/2018;              214
    Bates No. AZDCS004465
30  Affidavit of Andrew B. Clark, M.D.;   218
    Bates Nos. PLTFS-001146 abc - 1148 abc

* * *

---

Page 4

DEPOSITION OF KRZYSZTOF MLAK commenced at
10:10 a.m. on June 8, 2023, at the law offices of
GILLESPIE, SHIELDS, GOLDFARB & TAYLOR, 7319 NORTH 16TH
STREET, SUITE 100, PHOENIX, ARIZONA, before MICHAELA
HERMAN DAVIS, a Certified Reporter, in and for the County
of Maricopa, State of Arizona.

* * *

A P P E A R A N C E S

FOR THE PLAINTIFF:
    MILLS + WOODS LAW PLLC
    BY: MR. THOMAS A. CONNELLY
    5055 NORTH 12TH STREET
    SUITE 101
    PHOENIX, ARIZONA 85014
    tconnelly@millsandwoods.com

FOR DEFENDANT KRZYSZTOF MLAK, M.D.:
    QUINTAIROS, PRIETO, WOOD & BOYER, PA
    BY: MR. DUSTIN A. CHRISTNER
    8800 EAST RAINTREE DRIVE
    SUITE 100
    SCOTTSDALE, ARIZONA 85260
    dustin.christner@qpwblaw.com

FOR DEFENDANT DEPARTMENT OF CHILD SAFETY:
    JONES SKELTON & HOCHULI
    BY: MS. GEORGIA A. STATON
    40 NORTH CENTRAL AVENUE
    SUITE 2700
    PHOENIX, ARIZONA 85004
    gstaton@jshfirm.com

Page 105

1  A.  That my summary of the treatments rendered up to
2  that period of time, based on the past medication trials,
3  even prior to her coming to our hospital, which included
4  other atypical antipsychotics, combinations of medicines
5  in addition to when I tried Thorazine, was not effective.
6  Q.  Okay.  So what you're saying here is that the
7  Thorazine after two weeks wasn't working to your
8  professional determination; right?
9  A.  That's correct.
10  Q.  And you're not saying that you tried other
11  atypical antipsychotics or mood stabilizers or
12  combinations of both before you put her on the Haldol?
13  A.  That's correct.
14  Q.  You're saying that based on your review of the
15  three sets of medical records we've talked about today
16  that you identified in those records, that other atypical
17  antipsychotics or mood stabilizers or combinations of both
18  had been tried and were ineffective?
19  A.  That was my determination, yes.
20  Q.  Okay.  And then in the next sentence you say:
21  "DCS, who had legal custody, provided consent for the
22  medication."
23      And my question to you is:  Where did you
24  get the notion -- or excuse me.
25      Okay.  You say: "DCS, who had legal

Page 106

1  custody, provided consent for the medication."
2      Was that a written consent?
3  A.  That would have been written consent, yes.
4  Q.  And this was a written consent that DCS had
5  provided you to administer Haldol?
6      MR. CHRISTNER:  Form and foundation.
7      THE WITNESS:  Can you -- I'm not sure what
8  you're asking in that question.
9  BY MR. CONNELLY:
10  Q.  I'm asking if the legal consent that you
11  received from DCS was to change medication from Thorazine
12  to Haldol.
13  A.  So I would have made the recommendation and
14  would have attempted to obtain consent directly.  If that
15  wasn't documented, then the nurses would have obtained
16  consent, which is our protocol, and they would have
17  documented that, verbal -- written consent.
18  Q.  And what's your understanding of DCS's ability
19  to provide consent to the administration of atypical
20  antipsychotic when they have legal custody as opposed to
21  legal guardianship of a child?
22      MS. STATON:  Object to the form, foundation.
23      THE WITNESS:  My understanding at the time
24  was they had the authority to provide consent for
25  treatment, hospitalization, and inherently any medication

Page 107

1  and services as a part of that hospitalization.
2  BY MR. CONNELLY:
3  Q.  Okay.  And where does that understanding come
4  from?
5  A.  The arrangement that I understood to be for
6  Brooke that she was under DCS custody.
7  Q.  Okay.  And I'm assuming that it's your
8  understanding that whenever DCS has legal custody of a
9  child, that they can consent to any medical or psychiatric
10  treatments.
11      Is that what your understanding is?
12      MR. CHRISTNER:  Form and foundation.
13      THE WITNESS:  In a general sense, yes.
14  BY MR. CONNELLY:
15  Q.  And so my question is:  Where do you get that
16  general-sense understanding from?
17  A.  Based on the review of the information that she
18  was, in fact, under their guardianship and they had to
19  sign consent for treatment.
20  Q.  And I don't mean just specifically regarding
21  Brooke Scianna.  I just mean, in general, is it your
22  understanding that whenever DCS has -- first of all, do
23  you understand that there's a difference between legal
24  custody and legal guardianship?
25      MR. HUNTER:  Form and foundation.

Page 108

1      MS. STATON:  Join.
2      THE WITNESS:  I do understand that there are
3  differences in that arrangement, yeah.  I think I am using
4  those terms interchangeably and not specifically, though.
5  BY MR. CONNELLY:
6  Q.  So are you using "legal custody" here to mean
7  legal guardianship?
8  A.  I believe that would be more specific, yes.
9  Q.  So what makes you believe that DCS had legal
10  guardianship of Brooke Scianna in August of 2018?
11  A.  Because they had signed the vol- -- the
12  admission forms, the consent for treatment.
13  Q.  So because they signed a form consenting to her
14  being admitted to Aurora, you understood that to mean that
15  they were the legal guardian of Brooke Scianna?
16      MR. CHRISTNER:  Form and foundation.
17      MS. STATON:  Join.
18      THE WITNESS:  That was my understanding,
19  yes.
20  BY MR. CONNELLY:
21  Q.  As part of your medical training or perhaps in
22  any of the continuing medical education that you undergo,
23  do you ever review state laws that are applicable to
24  providing medical services to children?
25      MR. CHRISTNER:  Form, foundation.

Page 249

```
1      Q.   Didn't go to law school?
2      A.   No.
3      Q.   You wouldn't have the basis to know whether the
4   court's order was a legally valid court order; right?
5      A.   Correct.
6      Q.   You didn't have any reason to question a
7   statement that DCS was able to consent to the care and
8   treatment of Brooke Scianna at any time; right?
9      A.   That's correct.
10     Q.   The first time that you became aware of
11  Brooke Scianna was on or about August 25th of 2018?
12     A.   That's correct.
13     Q.   Before August 25, 2018, you didn't have any
14  contact with any representatives of DCS regarding Brooke;
15  correct?
16     A.   Correct.
17     Q.   When a patient comes -- when a patient is
18  admitted to Aurora, are there administrative personnel or
19  nursing staff that process the admission?
20     A.   Yes.
21          MR. CONNELLY:  Form and foundation.
22          MR. HUNTER:  Join.
23  BY MR. CHRISTNER:
24     Q.   And there's staff that obtain the written
25  consent for medications?
```

Page 250

```
1          MR. CONNELLY:  Form and foundation.
2          THE WITNESS:  Yes.
3          MR. HUNTER:  Join.
4   BY MR. CHRISTNER:
5      Q.   In this case were you the one who obtained
6   written consent for the medications for Brooke Scianna?
7      A.   No.
8      Q.   Were you ever made aware while Brooke was still
9   at Aurora that there was any dispute as to who could
10  legally consent to the care and treatment of Brooke?
11     A.   No.
12     Q.   You personally had no meetings, conversations,
13  understandings, or agreements with Melissa Courtright from
14  DCS regarding Christine Scianna's ability to make medical
15  decisions for Brooke?
16          MR. CONNELLY:  Form and foundation.
17          THE WITNESS:  Correct.
18  BY MR. CHRISTNER:
19     Q.   You personally had no meetings, conversations,
20  understanding, or agreements with Nicholas Long from DCS
21  regarding Christine Scianna's ability to make medical
22  decisions for Brooke Scianna?
23          MR. CONNELLY:  Form and foundation.
24          THE WITNESS:  Correct.
25          ///
```

Page 251

```
1   BY MR. CHRISTNER:
2      Q.   You personally had no meetings, conversations,
3   understandings, or agreements with anyone from DCS
4   regarding Christine Scianna's ability to make medical
5   decisions for Brooke Scianna?
6          MR. CONNELLY:  Form and foundation.
7          THE WITNESS:  Correct.
8   BY MR. CHRISTNER:
9      Q.   You would disagree with any assertion by
10  plaintiff or their experts in this case that you conspired
11  with Ms. Courtright or Mr. Long to violate Christine
12  Scianna's right to make medical decisions for Brooke?
13     A.   Correct.
14     Q.   Your decisions in the care and treatment for
15  Brooke were always made for the best interest of Brooke,
16  in your opinion?
17          MR. CONNELLY:  Form and foundation.
18          THE WITNESS:  Correct.
19  BY MR. CHRISTNER:
20     Q.   And you made those care and treatment decisions
21  based on your education, training, and experience?
22     A.   That's correct.
23          MR. CHRISTNER:  That's all I have.
24          MR. CONNELLY:  Just a couple followups,
25  Doctor.
```

Page 252

```
1             E X A M I N A T I O N
2   BY MR. CONNELLY:
3      Q.   Brooke was already on a medication to reduce
4   her -- the risk of harm to herself and others when she was
5   admitted to Aurora; right?
6      A.   That's correct.
7      Q.   And you could have continued her on that
8   medication until you had gathered whatever other -- some
9   of the other documents we talked about and saw today;
10  right?
11     A.   Not at the risk of jeopardizing her safety and
12  the safety of others.
13     Q.   Well, she was already on a medication to reduce
14  the risk of jeopardizing her safety and the safety of
15  others; right?
16     A.   She was on a medication that was showing to not
17  be effective.
18     Q.   Okay.  Isn't it true that Christine Scianna
19  returned calls to you and wasn't able to reach you in
20  doing so?
21     A.   I don't know.  I don't have the answer to that.
22     Q.   Did you ever have any voice messages from
23  Christine Scianna -- first of all, do you have voicemail
24  at your office phone?
25     A.   I instruct the families to call the nurses or
```

Page 253

1  the social worker and then they provide the messages to
2  me.
3      Q.   And did they ever provide messages that
4  Christine Scianna had tried to reach you?
5      A.   I don't recall specifically.
6      Q.   And then when you administered the Haldol to
7  Brooke Scianna in this case, she experienced EPS as a
8  result of the Haldol; right?
9      A.   That's correct.
10     Q.   And when we see that Haldol is being
11 administered through an injection, does that always occur
12 in an emergency room?
13     A.   Rephrasing that to mean do we sometimes use
14 injections --
15     Q.   Oh, okay.  Do you sometimes use injections in
16 the clinical setting as a form of --
17     A.   In the hospital, you're saying.  Yes.
18     Q.   And do you agree with me that the duty or the
19 responsibility to take a history from a patient or a
20 patient's family and make collateral contacts at the time
21 of an admission belongs to the admitting doctor and not to
22 the collateral contacts?
23          MR. HUNTER:  Form and foundation.
24          MR. CHRISTNER:  Form and foundation.
25          MS. STATON:  Join.

Page 254

1          THE WITNESS:  I'm unclear as to the
2  question.
3  BY MR. CONNELLY:
4      Q.   Mr. Hunter asked you questions about did this
5  doctor call you or did that doctor call you or did
6  Ms. Scianna or Mr. Quigley call you at the time that
7  Brooke was admitted to Aurora in regards to taking a
8  medical history.
9          As the admitting physician and a prospective
10 treating physician, it's your responsibility to take a
11 complete and accurate medical history; right?
12     A.   It is.  The caveat being that it works both
13 ways.  I receive calls from outpatient providers.  More
14 oftentimes I'm the one that initiates the calls.
15     Q.   And that's because the obligation to you -- is
16 yours in the provision of medical treatment and care that
17 meets the standard of care of your profession is that
18 you're responsible for collecting the medical history;
19 right?
20          MR. CHRISTNER:  Form and foundation.
21          THE WITNESS:  I make every effort to reach
22 out and gain the collateral information.
23 BY MR. CONNELLY:
24     Q.   And you do that because that's part of your
25 obligation under the standard of care that's applicable to

Page 255

1  your profession; right?
2          MR. CHRISTNER:  Form and foundation.
3          THE WITNESS:  That's correct.
4  BY MR. CONNELLY:
5      Q.   And then, you know, there's been a lot of
6  discussion or mention about the crisis intervention
7  record.  And I'm not sure that I exactly know what record
8  that is.
9          Is that the record that's related to the --
10 what I'll call the van incident, which was the
11 precipitating incident for DCS getting involved in this
12 case?
13     A.   I'd have to review the record to be clear on the
14 van incident.
15     Q.   Are there any details that you recall about the
16 crisis -- that the intervention record relates to?
17     A.   I think we'll have to look at that document.
18     Q.   So your answer is, no, you don't recall --
19     A.   I simply don't recall the specifics of the
20 crisis intervention.
21          MR. CONNELLY:  Thank you, Doctor.
22          MR. CHRISTNER:  Anybody else?
23          He'll read and sign.
24
25          (WHEREUPON, this deposition concluded at

Page 256

1  5:20 p.m.)
2
3
4
5
6          KRZYSZTOF MLAK
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Exhibit 47

Andrew B. Clark, M.D.
10 Concord Ave
Cambridge, MA 02138
Ph: 801-960-2138
Fax: 617-830-7281

### Psychiatric Evaluation Report
Date: December 9, 2023

Re: Brooke Scianna
DOB 7/14/2001

In the Matter of *Scianna v. State of Arizona, et al.*, 2:21-CV-01444-DJH.

### Introduction:

Brooke Scianna is a now 22-year-old woman with a diagnosis of Autism Spectrum Disorder and a history of aggressive and self-injurious behaviors. Brooke was removed from her mother's care in June of 2018 by the Arizona Department of Child Safety ("DCS"), before being returned to her mother in November 2018. Brooke has been hospitalized for behavioral difficulties on several occasions, including once at the Aurora Behavioral Health Systems Special Needs Unit, Tempe, AZ from August 25, 2018 through November 21, 2018. During this time, Brooke was treated with several different psychiatric medications, including the antipsychotic Haldol at a dose of up to 12.5 mg a day. I was asked by Attorneys Thomas A. Connelly and DeeAnn Gillespie Strub to review medical records, interview Brooke's mother, and write a report in regard to the psychological impact on Brooke of the separation from her mother during this time, as well as the psychiatric care that she received during this hospitalization.

I am a licensed physician in the Commonwealth of Massachusetts, and am Board Certified in Psychiatry as well as Child and Adolescent Psychiatry and Forensic Psychiatry. My CV is attached. The opinions presented here are offered within a reasonable degree of medical certainty. The opinions in this report are based on the information available at the time of the evaluation, and are subject to modification in the event that new information is received.

Scianna v State of Arizona

## Sources of Information:

The following interviews were conducted as part of this evaluation:
1) Remote interviews with Ms. Christine Webster (nee Scianna) on 4/13/2023 for 70 minutes, 4/20/2023 for 95 minutes, and on 11/26/23 for 70 minutes.


The following documents were reviewed as part of this evaluation:
1) Medical records for Brooke from Aurora Behavioral Health.
2) Medical records for Brooke from St. Luke's Behavioral Health.
3) Medical records for Brooke from the Phoenix Children's Hospital.
4) Medical records for Brooke from Banner Health.
5) Deposition of Dr. Krzysztof Mlak, 6/8/2023.
6) Various emails between Ms. Scianna and staff at the Aurora Behavioral Health, 2018.


## Interview with Ms. Scianna:

### Current Living Situation:

  Ms. Scianna reported that she lived with her partner Daniel, his two children ages 13 and 14, and Brooke. She and Daniel had been involved for about 8 years, and they moved in together in March of 2020, just at the start of the Covid pandemic. Prior to that time, Ms. Scianna and Brooke lived on their own.

### Brooke's Exposure to Antipsychotic Medication:

Ms. Scianna provided the following history in regard to Brooke's exposure to antipsychotic medication prior to and during her Aurora Behavioral Health admission in the fall of 2018:

  Brooke was first put on antipsychotic medication when she was 11 years of age (around 2012). At that time, her problematic behaviors were minimal, but she didn't understand boundaries, she would become agitated at times, and at times she would bite herself and bang her head. Brooke's pediatrician prescribed Risperdal for her, and it seemed to help for the first three to six months. However, particularly after the dose was raised, Brooke developed a "glassy look" on her face, as if she were not there. She could not focus, no longer expressed joy or happiness, and did not appear to be emotionally invested. In addition, she walked with a stiff gait, her appetite increased greatly, and she gained weight[1]. Over time she became much more violent and began to have melt downs. After the doctor stopped the Risperdal, Brooke "came back to life", and regained her animation and expressiveness.

---

[1] All of these are common side effects of Risperdal, particularly at higher doses.

2

Scianna v State of Arizona

Once Brooke reached puberty, her aggressive behaviors worsened, said Ms. Scianna. Brooke was brought to the St. Luke's Emergency Department in March of 2016 due to extreme agitation, was hospitalized there, and was placed on the antipsychotic Seroquel at that time. Ms. Scianna noted that she often did not realize when giving informed consent that the medications being discussed were in fact antipsychotics (noting in particular that Abilify was advertised on television for depression). Ms. Scianna reported that Brooke had a greatly increased appetite when on this medication, gained weight, and had a personality change. Brooke was on Seroquel from March 2016 to October 2016, and she gained 40 pounds around that time[2]. Ms. Scianna also reported that Brooke began to walk stiffly and slowly in this time, was up a great deal at night, and had a glassy and vacant look on her face. Her body would shake badly at times, as if she were shivering from the cold. She was stiff and shaky, and food would fall out of her mouth while chewing. The hospital added Cogentin at some point to try to help with these side effects. Brooke appeared to her mother as if she were drugged, and did not seem able to comprehend things[3]. Ms. Scianna noted that the medications did seem to help with Brooke's agitation at first, but then lost their efficacy in that regard over time. When the primary care physician stopped the Seroquel, Brooke "came back to life", and was again able to laugh and express joy.

From October 2016 through December 2017, said Ms. Scianna, Brooke was not on any antipsychotic medication, but rather received medical marijuana with very good results. However, Ms. Scianna had to stop this treatment as she was unable to send the marijuana product with Brooke when Brooke spent weekends at her father's house.

Brooke was hospitalized at Banner in December 2017 after an incident of aggression at her father's house, and was again placed on antipsychotic medication. Ms. Scianna noted that she was opposed to the use of antipsychotic medications in general by this point in time, and that there were times when the father gave informed consent for such medication.[4]

Ms. Scianna reported that Brooke was treated with the antipsychotic Abilify in early 2018, through a Nurse Practitioner at the Arizona Children's Association. She had significant behavioral problems in this time, perhaps associated with her being constipated[5]. The mother reported that Brooke slept poorly, looked miserable, stared off into space, would shake at times, would fly into rages, and would try to bite herself. In addition, Brooke began to bite at her knees and wrists. The Abilify was stopped, and these issues were much improved when Brooke was not on antipsychotics.

---

[2] St. Luke's records indicate that Brooke was also treated with Zyprexa and Geodon during this time. Zyprexa is particularly understood to lead to substantial weight gain.
[3] All of these symptoms are common side effects of antipsychotic medications.
[4] Banner records from December 2017 support this assertion.
[5] Constipation is a known side effect of Abilify and other antipsychotics.

3

Scianna v State of Arizona

Ms. Scianna reported that when Brooke was hospitalized at Aurora in the spring of 2018, she was on no antipsychotic medication and did quite well; indeed, she was much better off of such medication than on it.

Ms. Scianna reported that during Brooke's Aurora hospitalization in the fall of 2018, she only found out that Brooke was on Haldol after the fact, being informed of this at a weekly CFT meeting. She felt strongly that Brooke should not be on an antipsychotic of any sort, and was concerned about Haldol in particular because Brooke had been stiff and shaking when on it in the past. Ms. Scianna made concerted efforts to inform DCS, Aurora, and Dr. Mlak of her concerns, but to no avail. At the time, said Ms. Scianna, Brooke looked "terrible" – she could barely move, had a shuffling gait and seemed so unhappy. Aurora staff who had worked with Brooke from the prior hospitalization expressed concern over how she was doing at this time, asking 'what is wrong with her?', and saying that this was the worst that they had ever seen her. Brooke's father also visited once or twice a week, and he also thought that she looked miserable and wasn't herself.

When Ms. Scianna visited, Brooke would grab her hand and take her to the door, trying to get Ms. Scianna to leave with her. Ms. Scianna had visits with Brooke two or three times a week during this hospitalization, driving 50 miles each way from her home, but Brooke would often have "meltdowns" when her mother would try to leave. In time, Brooke stopped protesting her mother's departure, and would just sit passively in a chair as if resigned to the situation. The hospital seemed to blame Brooke's behavior on Daniel, Ms. Scianna's partner.

Ms. Scianna noted that when she finally spoke with Dr. Mlak in late September or early October 2018, he did not seem to take her concerns seriously, including her concerns about Haldol. Ms. Scianna noted that she had never met Dr. Mlak in person at any time, as he never attended the CFT meetings.

Brooke has not been on antipsychotic medication since her discharge from Aurora in late 2018.

During the interview of 11/26/2023, Ms. Scianna noted that Brooke had been changed from the medication Anafranil to Zoloft several months before, as she had gained weight on Anafranil, and she seemed to be responding very well to the new medication regimen. Her OCD behaviors were better, and she was better able to tolerate being out in public.

<u>Mother's Reports Regarding Impact of Separation:</u>

Prior to her removal from the mother's care in 2018, said Ms. Scianna, Brooke had never been separated from her for any appreciable lengths of time. She had been hospitalized on a handful of occasions, for no longer than 3.5 weeks at a time, and during those times the mother would typically visit her about three times a week for 90 minutes or so each time. During the fall 2018 Aurora hospitalization, the hospital set a requirement that Ms. Scianna schedule her visits ahead of time; this requirement made it somewhat more difficult for Ms. Scianna to fit such visits into her schedule, and resulted in her visiting

4

Brooke somewhat less frequently than she had during prior hospitalizations. Prior to the separation, Brooke had typically visited with her father about two weekends a month, although she stopped seeing him in 2021.

Ms. Scianna reported that Brooke had been traumatized by having been handcuffed by police in March of 2016 at the Care & Dignity group home, just prior to her Banner hospitalization. Ever since that time, she has been nervous around police officers, and will tend to hide behind her mother when in the presence of one. Ms. Scianna contrasted this with Brooke's reaction to firefighters, for whom she has no apprehension; fire fighters on two occasions have dealt with Brooke by wrapping her in a large blanket rather than by trying to lay hands on her to restrain her. Ms. Scianna did not report any other previous traumas for Brooke.

After Brooke was removed from her mother's care and placed in a Care & Dignity group home, Ms. Scianna had scheduled visits with her in public places or at the group home itself two or three times a week, although the group home often cancelled, purportedly due to Brooke's challenging behaviors.

Prior to the separation, said Ms. Scianna, Brooke had tolerated her mother going out with no difficulties, and was used to having caregivers, so that the mother could even go away for the weekend. After Brooke's return in late 2018, however, Brooke would get very upset when her mother would try to leave the house, which was an entirely new behavior. Upon discovering that her mother had surreptitiously left the house, Brooke would often "freak out", and run around the house hitting and punching walls. Brooke would pay careful attention to the placement of her mother's keys, phone, and purse, and would protest when her mother picked those up. At one point, Ms. Scianna bought a second purse in order to avoid the battle when she picked her own purse up in anticipation of going out. Ms. Scianna has worked closely with a behavioral coach with the goal of helping Brooke tolerate her mother leaving the house, and in August of 2022, Brooke was able to do that for the first time. At the time of the first interview, Brooke was able to tolerate her mother leaving the house for a few hours; by the time of the final interview, Brooke could tolerate her mother being away for a few hours, but would go upstairs to her room if her mother was not there.

Ms. Scianna noted that after Brooke returned home from the hospital in November 2018, Brooke developed a new behavior of coming into her mother's bedroom to check on her several times a night, especially in the first month or two after her return. Ms. Scianna reported that prior to the separation, Brooke had had some intermittent sleep difficulties, but they became much more pronounced and common following the separation. Brooke now insists on falling asleep with the lights on, will get up every night to check on the dog, and will often sleep fitfully throughout the night.

Ms. Scianna noted that Brooke's OCD (Obsessive Compulsive Disorder) was much worse than her baseline after her Aurora hospitalization. She would need to line things up (such as sauces in the kitchen placed in alphabetical order, or in color groups), and she

5

Scianna v State of Arizona

would need to put things away in a very particular manner prior to them leaving the house (so that it might take them 15 minutes to get out the door).

Asked about triggers for Brooke, Ms. Scianna recounted that on one occasion in 2020, Brooke had a doctor's appointment, and was quite stressed about it ahead of time. The doctor talked with the mother, in front of Brooke, about the possibility of placing her in a group home, and this made Brooke clearly stressed. Brooke had melt downs every night for a week after this incident. Similarly, at a later psychiatry virtual visit, the issue of group homes was brought up and Brooke "flipped out" for days afterward.

Ms. Scianna noted that when Brooke was in the Care & Dignity group home, she had visits with her twice a week, typically at the Arrowhead Mall, which was near the group home. Now, Brooke becomes upset when they drive by the mall. Similarly, Ms. Scianna has a friend who lives in a house that resembles the house the Care & Dignity group home Brooke occupied; during the first year following her return, when they went to visit the friend, Brooke would refuse to get out of the car and go into the home, appearing very stressed in the process.

Prior to the separation, said Ms. Scianna, she and Brooke would go on 'field trips' once or twice a week, to places such as Caregiver's Park, the pool in the summer, or to a fast food place to get French fries. After her return, however, Brooke would melt down when she tried to take her on field trips, and so they stopped doing so. By November of 2023, Brooke was better able to tolerate such trips. Brooke continues to have a difficult time when they visit a hospital for any reason.

Before the removal, said Ms. Scianna, Brooke had always looked to water to soother her, and she would typically take a bath in the morning and another in the evening, but no more than two or three a day. For the first six months after her return, however, she would take a bath or a shower at least 10 times a day, and often closer to 16 times a day, and for a year and a half after the separation, she showered around eight or ten times a day.

Brooke seemed to be more emotionally on edge after the separation. Previously, Ms. Scianna and Brooke's dad could argue in front of her, and Brooke would not be bothered by it, but following the separation, Brooke would become upset if there was arguing in the house. Ms. Scianna also noted that Brooke was more angry with her after the separation, and the mother was a constant target of Brooke's anger in a way that she had not been before.

Ms. Scianna reported that she had seen an increase in Brooke's reactivity and startle following the separation, so that Brooke would jump and startle in response to a loud noise, such as a door slamming. In addition, Brooke would tend to panic in new situations, such as when a new OT person would start with them. On such occasions, Brooke would panic, and then engage in more obsessive behaviors.

6

Scianna v State of Arizona

Following the separation, said Ms. Scianna, Brooke, who had always liked food, developed a compulsion around eating, at times eating so much that she would then vomit. The mother would have to hide food from her, which at times resulted in Brooke becoming aggressive with her. Similarly, Brooke began to horde food in her room, which she had never done before; this behavior persisted for up to two years after the separation. By November of 2023, and especially since starting on Zoloft, Brooke no longer eats compulsively. Similarly, Brooke began to drink water compulsively, and the mother would need to work to keep her away from water. At the time of this interview, the compulsive water drinking was better, as they had worked with a behavioral specialist around that behavior.

Ms. Scianna described Brooke as often angry following the reunification, with frequent meltdowns. She took a large number of showers, bit herself often, and engaged in a number of self-soothing behaviors. She was more easily frustrated, and became covered with scars due to her biting herself.

Ms. Scianna noted that Brooke had lost a number of skills during the separation, such as cutting along a dotted line, or using a computer mouse. She lost some ability to use signs or gestures, which she had been doing prior to the separation, and was less verbal, so that overall she was much more difficult to communicate with.

Ever since the separation, said Ms. Scianna, Brooke has engaged in a number of somewhat odd behaviors. These include throwing towels onto the floor, throwing rolls of toilet paper into the garbage, and putting on dirty clothes. She has also become more clingy with her mother, and will often insist on her mother being the one to help her.

<u>Recent Developments:</u>

Following the Aurora hospitalization, Brooke began seeing Dr. Fryer, a developmental pediatric neurologist, and receiving her care at the Autism Center at Phoenix Children's Hospital. Brooke has been treated with the medications memantine and propranolol, which have been helpful for her, particularly for her anxiety.

At the November 2023 interview, Ms. Scianna reported that Brooke was doing better in terms of communication. She continues to become upset and have behavior difficulties if someone mentions Aurora or mentions the court case, and she gets upset when they drive to the CFSS office near where the Aurora unit used to be.

In regard to her current services, Ms. Scianna noted that Brooke receives behavioral coaching two days a week for 2 hours at a time (recently reduced from three days a week for 3 or 4 hours at a time). She also gets Occupational Therapy and Speech Therapy for one hour each week. She sees a primary care physician, a pediatric gynecologist, and a gastrointestinal doctor.

7

Scianna v State of Arizona

**Review of Records:**

St. Luke's Behavioral Health:

  Brooke was admitted to St. Luke's Behavioral Health from 3/18/2016 through 3/29/2016 due to severe aggression at home. She was given Zyprexa in the emergency room, and then Haldol once in the hospital due to severe agitation. She was started on Zyprexa 15 mg daily, but was noted to remain agitated nevertheless, although she eventually calmed with the addition of Zoloft. She was said to smile when told she would be going home. She was discharged on Zyprexa 15 mg daily along with Zoloft. She was given a discharge diagnosis of Disruptive Mood Dysregulation Disorder, as well as Autism Spectrum Disorder.

Brooke was admitted to St. Luke's Behavioral Health from 5/5/2016 through 6/1/2016, with a presentation similar to what she had had in March of that year. Her medications from her previous St. Luke's admission had been continued on an outpatient basis. The clinicians determined that Zyprexa had not been effective. She was said to be 'allergic' to Risperidone as it led to increased agitation. Multiple medication trials were employed, including the antipsychotic Geodon (which resulted in increased agitation and extra pyramidal symptoms, danger to self and others, as well as not sleeping for three or four days), then Seroquel up to 400 mg each night. She was discharged on Seroquel and Klonopin. She was given a discharge diagnosis of Disruptive Mood Dysregulation Disorder, as well as Autism Spectrum Disorder.

 Brooke was admitted to St. Luke's from 12/27/2017 through 1/19/2018. At the initial psychiatric evaluation of 12/28/2017 it was noted that she had transferred from the Banner emergency room where she had presented on 12/22/2017. The mother provided the report that Brooke had not previously responded well to Seroquel, Haldol or Risperdal, and was reported to state that "none of the psychotropic agents really work...". The father was noted to report that Brooke had been decompensating without psychotropic agents. Brooke was treated with Geodon 80 mg twice a day.

Banner Health:

  Brooke was seen at the Banner Health Emergency Department on 3/9/2016 due to increased agitation. She was given Haldol and subsequently fell asleep.

Brooke was seen at Banner Health Emergency Department on 8/28/2017 due to increased agitation. She was said to have been in the ED twice before in the preceding two days. Brooke was taking only cannabis and oral contraceptives at this time. She was subsequently discharged to home. The intake note states, "Mother reiterated that pt. does not do well on psychotropic medications....". She was discharged home with her mother.

Brooke was seen at Banner Health on 12/22/2017 for increased agitation. She was described as agitated in the emergency room as well. The note says, "Mother would like

8

Scianna v State of Arizona

to see pt. get stabilized on psychiatric medication but reported pt. does not respond well to Seroquel, Haldol or Risperdal." The clinician obtained consent from the father for Geodon.

Brooke had been admitted to Banner Health inpatient unit from 4/23/2018 through 4/30/2018. She had been initially brought to the emergency department on 4/20/2108 for agitation and aggressive behavior. She was moved to the behavioral health unit, required restraints, and subsequently her CPK levels rose to 6666; it was determined that she required inpatient admission for rhabdomyolysis. At that time she was on Zyprexa 10 mg a day, along with clonidine and clomipramine.

Brooke was seen at Banner Health on 3/26/2019 for a fracture of her humerus that occurred after an altercation with staff at school. She was given ketamine by EMS due to aggressive behavior.


Aurora Behavioral Health:

    Records indicated that Brooke had been inpatient at Aurora Behavioral Health from 1/19/2018 through 3/3/2018. She had recently been inpatient at St. Luke's Behavioral Health, but had significant difficulty there including aggression toward others and biting herself. She had been started on the anti-psychotic Geodon, but was noted to be drooling, sticking out her tongue, and unable to communicate; the staff worried that she was having a reaction. It was noted in the initial history and physical consultation with Dr. Soni, in capital letters, "THE PATIENT HAS ALLERGIES TO RISPERDAL WHICH CAUSES A VIOLENT REACTION." The initial psychiatric evaluation by Dr. Ghafoor noted the worsening self-harm and aggression. Brooke had been taking Geodon 40 mg twice a day, which was continued at first.

The Behavioral Interview conducted with the mother at the time of her admission on 1/19/2018 included the mother's report that Brooke had become violent when treated with Risperdal, and that when treated with Seroquel, she engaged in frequent changing of clothes and showering. Dr. Ghafoor noted on 1/25/2018 that he had learned from the mother that Brooke had been experiencing tremors and drooling since starting Geodon at St. Luke's; they agreed that Geodon would be stopped and a trial of Abilify begun. On 1/26/2018, Brooke was started on Abilify 5 mg a day, along with 50 mg of Zoloft. On 2/14/2018, the dose of Abilify was increased to 10 mg a day due to increased mood lability, aggression toward staff, and self-injurious behavior. Brooke was thought to be ready for discharge by 2/14/2018, but her discharge was extended in order to give the mother time to arrange outpatient services. Brooke was discharged on Abilify 5 mg twice a day, Zoloft 50 mg a day, and several other medications. She had been noted to exhibit an increase in aggression, which was thought to be due to hormonal changes during her menstrual cycle, and which was managed by a temporary increase in her dose of Abilify. She was given the discharge diagnoses of Disruptive Mood Dysregulation Disorder and Autism Spectrum Disorder.

9

Scianna v State of Arizona

Brooke was admitted to the Aurora Behavioral Health inpatient unit from 4/30/2018 to 5/30/2018 due to increased agitation and self-injurious behavior. She had come from Banner Thunderbird, where she had spent 7 days on a medical ward due to rhabdomyolysis. She was said to demonstrate both OCD and sexualized behaviors. The Inpatient Admit Order noted under Allergies and Reaction: Risperdal- Extreme Agitation, and the doctor's order sheets listed Risperdal as an allergy throughout her stay there. She was not treated with any antipsychotic medication, and did well on the unit, utilizing her self-regulation skills. She was discharged on the antidepressant medication Anafranil. She was given the discharge diagnoses of Disruptive Mood Dysregulation Disorder and Autism Spectrum Disorder, as well as Obsessive Compulsive Disorder and Post Traumatic Stress Disorder by history. A functional behavioral assessment was conducted, dated 5/30/2018.

A Crisis Evaluation dated 8/22/2018 indicated that Brooke's behavior in the Care & Dignity group home had been exceptionally challenging, and that she had been seen at Banner Thunderbird three times in the preceding month. The clinician wrote, "Per CPR records, patient was off psychiatric medication for a few years and did well on medical marijuana". The clinician also noted that Brooke had recently been removed from her mother's care; "this was likely a huge adjustment for patient and she is now having daily violent outbursts". Brooke had been removed from her mother's care on 6/22/2018, and was in the custody of DCS. She was not being prescribed any antipsychotic medication at this time.

Brooke was admitted to the Aurora Behavioral Health Inpatient unit on 8/25/2018. She was on a low dose of Thorazine, 25 mg three times a day upon admission, which was continued for a time while inpatient. Dr. Mlak's Psychiatric Evaluation of 8/26/2018 notes that the doctor had tried to contact Ms. Scianna without success[6], and had obtained other information from "staff" and "chart review". A hand written insertion noted the two prior Aurora admissions earlier that year, and "prior medication multiple antipsychotics". He noted that the patient had earlier experienced rhabdomyolysis "attributed to excessive physical restraint". Dr. Mlak's note of 8/27/2018 indicated that he had left two messages for the mother to obtain collateral information, with a note that the plan included an effort to "Clarify current maternal rights and DCS disposition regarding placement". On 8/28/2018, Dr. Mlak's note indicated that "Staff report CFT occurred today and revealed that DCS is likely placing pt back into mother's care following hospitalization."

On 9/7/2018, Dr. Mlak recommended stopping the Thorazine and initiating Haldol 1 mg three times a day for mood instability, as well as a trial of Lithium[7]. Three days later, on 9/10/2018, he doubled the dose of Haldol to 2 mg three times a day. That evening, Brooke was noted to have had severe agitation, poor sleep, tremor and muscle rigidity, so Cogentin was added. On 9/13/2018, the psychiatric progress note indicated that Broke appeared tired and was not engaging in activities as she was sleeping most of the

---

[6] Ms. Scianna denies that she ever received a message from Dr. Mlak in this time.
[7] Lithium was apparently never prescribed.

Scianna v State of Arizona

morning. Haldol was raised again to 2.5 mg in the morning and 5 mg at night. On
9/15/2018, Brooke was noted to be sleeping late into the morning. On 9/18/2018, Dr.
Mlak indicated that Brooke remained labile and dysregulated. On 9/21/2018, Brooke was
noted to have required a prn dose of Zyprexa due to aggression. On 9/24/2018, Brooke
was noted to remain emotionally dysregulated and the Haldol dose was raised to 10 mg
total daily. On 9/26/2018, the dose of Haldol was raised yet again to 12.5 mg daily. On
9/27/2018, Dr. Mlak wrote that Brooke had shown "variable progress" and was now at a
"therapeutic dose".

    Dr. Mlak's Psychiatric Progress Note of 9/28/2018 provides the first documentation of
any contact between him and Brooke's mother. Ms. Scianna was reported to have
expressed objections to antipsychotic medication, pointing to bad side effects on all of
them. At this point, Dr. Mlak had consulted with the medical director and assessed
Brooke's response to Haldol as "sub-optimal', and began to wean down the dose. The
dose of Haldol was weaned fairly rapidly from that point forward, and Brooke was then
treated with the mood stabilizer Trileptal.

    Several of the Psychiatric Progress notes during this hospitalization took note of
Brooke's agitation when her mother would visit. The doctor wrote on 10/3/2018 that
"Discussed need to initiate behavioral training with mother due to her inadvertent
perpetuation of pts negative behavioral displays". Dr. Mlak also noted that he would not
have a CPK level drawn in spite of the mother's request that he do so. Brooke was
entirely off of Haldol by 10/5/2018. Brooke's behavior was described as significantly
improved by 10/10/2018, and she continued to show improvement in the subsequent
days, especially after she was taken off one to one observation.

    A Functional Behavioral Assessment dated 10/18/2018 by Brian Kociszewski noted that
at that time Brooke was on Trileptal but not antipsychotics. The staff had removed one to
one support (presumably around October 12), which "significantly decreased engagement
in repetitive/stereotypical behavior".

    Dr. Chafoor conducted a Second Opinion Psychiatric Consultation on Brooke on
9/27/18 and 9/28/2018. The doctor noted the mother's perspective that antipsychotics had
consistently increased agitation and psychosis in the past, and that Brooke had previously
been tried on Risperdal, Haldol and Seroquel. The doctor concluded, "there is no clear
evidence of her current medication regimen being effective. Given the lack of clear
therapeutic benefit, having to add another rx for se (EPS), and above all strong parental
objection to her being treated with Haldol, I'd suggest that she be taken off of this rx…"

Emails Between Ms. Scianna and Aurora Staff, 8/2019-11/2019:

On 9/13/2023, Ms. Scianna wrote, "I do not understand how Brooke was put on Haldol
when it is in her records she had a reaction to this medication at St. Luke's….Brooke has
a medical doctor at Aurora who clearly does not know her background and until
yesterday, I'd never even spoken to him." On 9/14/2023, Ms. Scianna wrote, "It was part

11

PLTFS-003765

of her records that she not be given Haldol. That's why I'm upset. She should never have been given that drug." Helen Nagle responded, "I will forward your thoughts to Dr. Mlak to add to your conversation with him." On 9/21/2013, Ms. Scianna wrote to complain that Brooke's doctor was ignoring her, and "refuses to take her off Haldol"; she expressed an intent to file a complaint. She wrote on that same day that she had learned at a CFT that Brooke was still on Haldol. On 9/24/2023, Ms. Scianna wrote, "If there is anything else I can do please tell me. I'm desperate to stop the Haldol and he's only increasing it. That is the worst drug out there...." On 10/1/2023, the mother wrote to ask that Brooke's CK levels be checked.

Phoenix Children's Medical Group:

A physician's consultation note by Dr. Mohan Belthur of Phoenix Children's Hospital on 3/28/2019 noted the mother as reporting that "patient has had paradoxical reactions with antipsychotics and tardive dyskinesia with Haldol". The doctor's assessment was that "One significant challenge in this patient is her severe intolerance to all antipsychotic medications"

At a Neurology Clinic visit on 5/22/2022, the doctor noted the history that Brooke had been "crazy" on Zyprexa, and was "eating everything", in addition to the assertion that antipsychotics had resulted in tardive dyskinesia and rabdo. The doctor's diagnostic impressions included, "averse [sic] reaction to anti-psychiatric [sic] medication".

Deposition of Dr. Mlak, 6/8/2023:

Dr. Mlak testified that during the time he treated Brooke at the Aurora inpatient unit in the second half of 2018, he was prescribing Haldol primarily to treat her mood disorder. He noted that the records he would have reviewed as part of his initial assessment would have been emergency room records from Abruzzo Health, as well as prior Aurora admission and crisis intervention records. He noted that he typically attempts to interview the family as a part of his admission protocol, and he believed that in this case he had left a message for Ms. Scianna; he did not recall whether he had ever received a message that she had attempted to reach him. Dr. Mlak further testified that he had not requested a functional behavioral assessment of Brooke at the time of her admission to Aurora, as her behaviors were so severe that such an assessment would not have been reliable or successful. He testified that he did not recall whether he had gathered information from prior treaters, and he did not recall any specific conversations with workers from DCS. It was his understanding, he testified, that DCS had the authority to consent to medication for Brooke. He testified that his first conversation with Ms. Scianna would have been on September 12, 2018, about two and a half weeks after Brooke had been admitted to the unit. He testified that the impetus for his reaching out to Ms. Scianna at that time was a series of emails that he had been informed of between Ms. Scianna and Ms. Helen Nagle. In regard to the information Ms. Scianna relayed to him about Brooke's past reactions to medication, Dr. Mlak testified that he did not consider it to be clinically accurate.

Scianna v State of Arizona

**Conclusions and Opinions:**

Opinions In Regard to Brooke's Psychiatric Treatment at Aurora Behavioral Health:

When Brooke Scianna was admitted to the Aurora Behavioral Health inpatient unit on 8/25/2018, she was known to be a young woman with Autism Spectrum Disorder, developmental delay, and a long history of agitated and aggressive behaviors. She had done particularly poorly in the Care & Dignity group home where she had been placed after being removed from her mother's care.

One of the primary responsibilities of the attending physician in caring for a patient on an inpatient psychiatric unit is developing an effective medication regimen. Typically, this involves gathering a comprehensive history of the presenting complaint, as well as of any prior medication trials and their effects. This may be a relatively simple task for some patients with minimal past history, but a much more complex one in patients with a history as lengthy as Brooke's. In this case as well, Brooke's inability to provide a history herself rendered the other sources of information, such as past medical records and the mother's report, especially valuable. Clinicians who work with small children or individuals with developmental delay appreciate that observations by the primary caregiver can be exceptionally valuable, as they are the individuals who know the patient best. In addition, such individuals can help fill in the gaps in the available medical record, providing nuance and detail that is often of critical importance. It is striking, therefore, that Dr. Mlak apparently made minimal or no effort to interview Ms. Scianna as part of the admission process; in failing to do so, the history he gathered was deeply impoverished and inadequate. Further, it is not at all clear what prior medical records Dr. Mlak reviewed, if any, as part of the admission, and there is no indication in the records from this admission that he made any efforts to seek information from other facilities or providers.

In selecting the choice of psychiatric medication to prescribe for an individual, and even whether or not to prescribe any medication, the past history of psychiatric medication is an essential component of adequate information gathering. Given the high degree of individual variability in response to medication, the past history is typically the single most important source of information available to a psychiatrist. It is essential, in my opinion, to learn which medications have been tried in the past, at what doses, in what combinations, for what duration, and with what results.

Had Dr. Mlak spoken with the mother, he would have learned a great dealt that should, in my opinion, have given him pause before prescribing an antipsychotic medication of any sort. Ms. Scianna reported that while antipsychotic medication often provided some short term benefit in regard to decreased agitation, the side effects that Brooke suffered from them were substantial and disabling- including substantial weight gain, tremors, gait

Scianna v State of Arizona

disturbance, sedation, cognitive dulling, and loss of emotional responsiveness. In addition, the benefits of the medications were short lived, and the medications may have contributed to her aggression at times. Dr. Mlak also would have learned that Brooke did well overall for a sustained period of time as on outpatient on no psychiatric medication but just cannabis, and had done very well without antipsychotics while inpatient on that same unit earlier in the year.

Had Dr. Mlak reviewed records from prior medication trials, he would have learned that Brooke had consistently developed severe side effects from trials of antipsychotic medication, and that she had never had a sustained beneficial response, even after trials with several different antipsychotics. This information from the mother and from the medication records, in my opinion, should have raised serious questions as to the advisability of yet another trial of antipsychotics, as well as serious concerns around the risks and side-effects that Brooke would likely be subjected to. At the time of Brooke's hospitalization in the fall of 2018 there were many other medication options available for her treatment besides antipsychotics, and besides Haldol in particular.

Haldol, or haloperidol, is classified as a first generation antipsychotic that was developed in the late 1950s, and primarily used for the treatment of adults with severe mental illness, such as schizophrenia. That entire class of medications, sometimes referred to as 'typical' or 'first generation' antipsychotics, were largely superseded by what are known as the 'second generation' antipsychotics, that were thought to have a more favorable side effect profile. Haldol remains in active use as a form of emergency chemical restraint, primarily in emergency room settings, and it is still used as a regular medication for a small number of individuals with chronic psychotic illness. It's routine use in adolescents is quite rare.

One relevant and authoritative document in regard to this matter is the American Academy of Child and Adolescent Psychiatry "Treatment Recommendations for the Use of Antipsychotics in Aggressive Youth". Among the recommendations, the Guidelines offer the following:

1) Recommendation 1: *For all new cases, clinicians should conduct (or review the results of) comprehensive psychiatric diagnostic interviews with patients and parents/guardians before prescribing, changing or discontinuing medication.*
2) Recommendation 4: *Use appropriate treatment for primary disorders as a first line treatment.* In this instance, the recommendations suggest using a mood stabilizer rather than an antipsychotic to address mood instability.[8]
3) Recommendation 5: *Use an Atypical Antipsychotic First Rather than a Typical Antipsychotic to Treat Aggression.* The recommendation explains that the atypical antipsychotics have a safer acute side effect profile than the traditional antipsychotics, with a lower risk of tardive dyskinesia, neuroleptic malignant syndrome, and extrapyramidal symptoms.

---

[8] After Brooke was taken off of Haldol, she was placed on the mood stabilizer Trileptal, and apparently did quite well.

14

Scianna v State of Arizona

4) Recommendation 6: *Use a conservative dosing strategy*. The recommendation states that physicians should "start low, go slow, taper slow". Of note, the influential document "Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health (6th edition), suggests an FDA approved maximum Haldol dose for children and adolescents of 6 mg a day for severely disturbed children, and 0.075 mg/kg/day for severe behavioral problems (approximately 4 mg for Brooke). Dr. Mlak had Brook taking 6 mg a day within 3 days of starting the medication, and then at 12.5 mg a day three weeks later.

In my opinion, Dr. Mlak violated all four of these precepts in his treatment of Brooke during the fall of 2018.

In sum, it is my opinion that Dr. Mlak's treatment of Brooke during her Aurora hospitalization the fall of 2018 fell below the standard of care in that he failed to obtain an adequate history around Brooke's prior psychiatric treatment prior to prescribing her Haldol, and failed to take account of Ms. Scianna's experience or concerns in that regard.

As a result of Brooke being unsuccessfully treated with Haldol over the course of approximately four weeks in September and October of 2023, she was unnecessarily exposed to a range of side effects and risks, and her hospital course was unnecessarily prolonged for several weeks. While her five prior hospitalizations had ranged in duration from two to six weeks, this hospitalization lasted around 12 weeks.

Considerations in Regard to Adequate vs. Major Medical Treatment:

The overuse of antipsychotic medication for children in foster care has been of great concern to both clinicians and policy makers for several years. This is due in part to a concern that these medications are being used simply as 'chemical restraints' – an easy way to suppress behaviors that would be more effectively managed by behavioral and psychosocial interventions. In addition, however, these medications carry risks and side effects that are more widespread and dangerous than any other class of medications typically used in child psychiatry. For Haldol in particular, the risks and side effects include but are not limited to extra-pyramidal symptoms (movement disorders such as parkinsonism, akathisia and dystonia), tardive dyskinesia (permanent, disfiguring motor dyscontrol manifesting as writhing contortions of the face and trunk), cognitive dulling and sedation, neuroleptic malignant syndrome (potentially fatal), cardiac conduction abnormalities, and sexual dysfunction. In addition, at medium to high doses, medications like Haldol and other antipsychotics can leave an individual in a drugged state, too stuporous to make use of behavioral or psychosocial interventions, and with their personality largely suppressed. In some states, such as Massachusetts, antipsychotics are accorded special status, and prescribing antipsychotic medications to youths in foster care is considered "extraordinary treatment", which requires a judicial hearing and court order. This is in part due to the fact that the informed consent process for children in state custody is often somewhat cursory.

15

Scianna v State of Arizona

Antipsychotics such as Haldol are commonly used and considered effective in emergency situations when safety is a paramount concern. In addition, low doses of second generation antipsychotics are sometimes used in adolescents with mood difficulties and agitation, and sometimes used in individuals with developmental delay and aggressive or self-injurious behavior. In those non-emergent situations, however, the informed consent process with parents and guardian is typically a complex discussion, as the risks involved are so serious and manifold. No parent, in my experience, makes the decision to start their child on antipsychotic medication without a great deal of trepidation and concern. In this particular situation regarding Brooke Scianna, the use of very aggressive doses of a 'first generation' antipsychotic in a non-verbal adolescent raises the degree of risk involved quite substantially.

In sum, the decision to use a medication such as Haldol for Brooke Scianna in September 2018, at the doses it was prescribed, carried with it substantial risks for a wide range of possible serious side effects. Although all medications carry some risk, this particular treatment stands out, in my opinion, for exposing an adolescent to a greater risk than almost any other medication choice available.[9] Furthermore, the decision to administer Haldol to Brooke Scianna was not made under urgent circumstances but was taken only after she had been hospitalized for almost two weeks.

<u>Considerations In Regard to Mother's Interactions with Brooke:</u>

Aurora Behavioral Health inpatient records offer several notations regarding Brooke's distress when her mother or mother's partner visited, and directly indict the mother for encouraging Brooke's maladaptive behavior, although there is no indication in the records that the mother's behavior was in any way inappropriate. It is striking to me that the Aurora staff apparently never considered the possibility that Brooke missed her mother, and was simply upset when her mother left her at the end of the visits. Had this been a pediatric inpatient unit, and the patient a four year old who became distraught when their parent left them alone, it is hard to imagine that clinicians would blame the parent for their child's upset. In this case, it would seem, Aurora staff apparently did not consider Brooke capable of forming a strong human attachment, or capable of feeling bereft when left alone.

<u>Considerations and Opinions in Regard to Care & Dignity Group Home Placement:</u>

Brooke Scianna was placed into a Care & Dignity group home upon removal from her mother's care in June of 2018, remaining there until her hospitalization at Aurora in August of that year. Records from her stay there were not available at the time of this report. Given Brooke's underlying disability and diagnoses, her ongoing behavioral

---

[9] The only medication used in psychiatry with a higher degree of risk, in my opinion, would be Clozaril, an antipsychotic which is tightly regulated through use of a national registry and mandatory monitoring.

16

Scianna v State of Arizona

difficulties, and the likely emotional upset associated with her removal from her mother's care, Brooke likely posed a significant challenge to the group home in regard to her management and care.

In my opinion, the minimal qualifications for a group home caring for a child such as Brooke at that time would include:
   1) Capacity for around the clock close supervision.
   2) Staffing numbers adequate to provide one to one, or several to one coverage of Brooke when necessary.
   3) Staff well trained in working with individuals with Autism and Intellectual Disability.
   4) A comprehensive and individualized behavioral plan for Brooke, developed by a professional with expertise in Applied Behavioral Analysis, and modified as necessary on an ongoing basis.
   5) Professional oversight and management of Brooke's medical and psychiatric needs, including taking her to routine appointments, as well as administering medication on site.


Opinions in Regard to the Impact of Separation On Brooke Scianna:

Brooke Scianna was removed from her mother's care on June 22, 2018, and was returned on November 21, 2018. During this time, her mother had only limited contact with her, and we do not know what Brooke herself understood about the situation. In this context, Brooke's behavior appears to have deteriorated significantly, with one clinician at the crisis center writing in August of that year that Brooke's removal from her mother's care was "likely a huge adjustment for patient and she is now having daily violent outbursts".

There is no reason to think, in my opinion, that children with Autism Spectrum Disorder or Intellectual Disability are not capable of forming strong attachments by virtue of their disability. Indeed, their limited ability to communicate, self-advocate, or manage their emotions may well leave many such children at an even greater risk of behavioral decompensation in the setting of separation from primary attachment figures. It seems quite possible, if not likely, that a child such as Brooke would find such a prolonged separation to be psychologically traumatic and possibly terrifying, and would have a very difficult time understanding or coping with those circumstances.

Ms. Scianna's reports of Brooke's behaviors following their reunification in late 2018 reflect, in my opinion, a child who had been severely traumatized and emotionally damaged by the experience. Brooke, for example, had a very difficult time in tolerating separation from her mother after the reunification, and would protest when her mother would attempt to leave the house, and would check in on her several times each night. She began to engage in a number of behaviors associated with severe stress, such as hoarding food, compulsively eating and drinking, engaging in obsessive compulsive behaviors, and showering multiple times a day. She was also more emotionally fragile

17

Scianna v State of Arizona

following the separation, often melting down, becoming angry or self-injurious. She showed signs of regression (commonly seen in children under severe stress or trauma), such as losing communication and fine motor capabilities. Although it is not possible to make an explicit diagnosis of Posttraumatic Stress Disorder in an individual with such limited abilities to communicate their internal states, Brooke exhibited clear Posttraumatic Symptoms of distress in response to reminders of the separation (such as driving near former visitation sites, or hearing a doctor raise the question of group home placement), as well as an increased startle response. Although some of these symptoms have abated or resolved in the intervening five years since the separation, many still remain to this day.

As a result of this experience, in my opinion, Brooke currently meets criteria for the diagnosis of Other Specified Trauma and Stressor-related Disorder, in addition to her long standing diagnosis of Autism Spectrum Disorder.

Functionally, the psychological impact of Brooke's separation from the mother has been twofold. For one, it significantly impacted, and continues to impact, her functioning on a day to day basis, limiting her abilities and constricting her opportunities. Secondly, it leaves Brooke much more vulnerable to subsequent traumatic experiences, and particularly to future experiences of separation from her mother. She has lost a significant degree of resilience in this process, and will likely be less able to manage future stressors.

Opinions and Considerations in Regard to Future Needs:

Brooke's needs going forward include ongoing regular behavioral management (to work both with Brooke and her caregivers), specialty services, such as ongoing occupational therapy and speech therapy, and ongoing medical care. She will need some sort of structured day program for socialization and skill development. Most importantly, Brooke requires around the clock supervision and support; although her mother is currently providing that for her, there may come a time when she is not capable of doing so, and at that time, Brooke will need dedicated, skilled, reliable and caring individuals who can provide for her in that way.

Andrew Clark, M. D.
Board Certified, Child and Adolescent Psychiatry

Exhibit 48

1                                        VOLUME - 1

2                                     PAGES - 1-131

3                                   EXHIBITS 1-10

4          IN THE UNITED STATES DISTRICT COURT

5              FOR THE DISTRICT OF ARIZONA

6    ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

7    CHRISTINE SCIANNA, an individual;        **CERTIFIED**

8    BROOKE SCIANNA, an individual,           **TRANSCRIPT**

9    by and through her legal

10   guardian, Christine Scianna,

11            Plaintiffs,

12   v.                          C.A. NO.:  2:21-cv-01444-DJH

13   STATE OF ARIZONA, a government

14   entity, ET AL.,

15            Defendants.

16   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

17            DEPOSITION OF ANDREW CLARK, M.D.

18                 Magna Legal Services

19                 68 Commercial Wharf

20            Boston, Massachusetts 02110

21                 February 19, 2024

22                 9:04 a.m. - 12:26 p.m.

23

24       JENNIFER M. VAILLANCOURT, RPR, CSR #154422



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 42–45

Page 42

1  not.  And I'll note that I did have an interview with
2  her on November 26, '23, and so I surmise that this is a
3  typo.  I should have put in November 26, '23.
4      Q.  I see.  I see.
5          Is there any time that you spent reviewing
6  records or writing the report that you did not include
7  on your invoice for some reason?
8      A.  I don't think so, no.
9          (Exhibit-7, Retainer request, marked for
10  identification.)
11      Q.  (BY MR. CHRISTNER) Exhibit 7 is a request for
12  retainer dated February 5, 2024.
13      A.  (Deponent viewing document.) Correct.
14      Q.  I take it, you had used up your prior retainer
15  as of February 5th, 2024.
16      A.  Actually, there had been a surplus of $500 at
17  that point in time.
18      Q.  After February 5th of 2024, did you incur any
19  additional hours reviewing records or preparing for your
20  deposition?
21      A.  I -- after February 5th, 2024, I spent one
22  hour in -- reviewing the expert report of Dr. Khan and
23  speaking with Attorney Connelly.  And I spent more than
24  an hour preparing for the deposition, which had been

Page 43

1  included as a part of my request for a retainer for this
2  deposition.
3          (Exhibit-8, Handwritten notes, April 13, 2023,
4  marked for identification.)
5      Q.  (BY MR. CHRISTNER) We marked a document as
6  Exhibit 8, which, I believe, is your handwritten notes
7  from your April 13, 2023, interview with Ms. Scianna.
8      A.  (Deponent viewing document.) Correct.
9      Q.  And Exhibit 8 includes all of the notes that
10  you took of that interview.
11      A.  Yes.
12      Q.  Did anybody else attend the interview with
13  Ms. Scianna?
14      A.  No.
15          (Exhibit-9, Handwritten notes, April 20, 2023,
16  marked for identification.)
17      Q.  (BY MR. CHRISTNER) Exhibit 9, I believe, are
18  your handwritten notes from your April 20, '23,
19  interview with Ms. Scianna.
20      A.  (Deponent viewing document.) Correct.
21      Q.  And is this a complete copy of your notes?
22      A.  (Deponent viewing document.) It is.
23      Q.  And did anyone else attend this interview with
24  Ms. Scianna?

Page 44

1      A.  No.
2      Q.  And no recordings, audio or video, were made
3  of this interview.
4      A.  That's correct.
5          (Exhibit-10, Handwritten notes, November 26,
6  2023, marked for identification.)
7      Q.  (BY MR. CHRISTNER) Exhibit 10 that's in front
8  of you now is, I believe, your handwritten notes from
9  November 23 of '23.
10      A.  (Deponent viewing document.) I think it's 26,
11  as I recall.  Yes.  It's November 26th.
12      Q.  And are these the complete notes from that
13  interview?
14      A.  Yes.
15      Q.  And did you record, audio -- by audio or video
16  this interview?
17      A.  No.
18      Q.  Looking at this -- your notes from
19  November 26, '23, do you -- can you tell me whether you
20  had, prior to the interview, prepared a list of
21  questions that you wanted to ask Ms. Scianna for this
22  last interview?
23      A.  I don't recall whether I had written out any
24  particular topics.  I know that I did not prepare a

Page 45

1  specific set of questions.
2      Q.  For the November 26, 2023, interview, can you
3  tell me why you felt the need to conduct a third
4  interview?
5          MR. CONNELLY:  Form.
6      A.  Two reasons come to mind.  One is, it just had
7  been a while.  It had been several months since I had
8  talked with her, and so it wasn't as fresh in my mind.
9          And a second is that I'm sure that there were
10  areas that I felt I had not covered very -- thoroughly
11  enough in speaking to her.
12      Q.  (BY MR. CHRISTNER) I'm going to give you back
13  your original notes, so stick those in your folder.
14      A.  Great.  Thanks.
15      Q.  And set those aside so we don't lose them.
16          As we sit here today, do you have -- do you
17  anticipate doing any additional research in this case?
18          MR. CONNELLY:  Form.
19      A.  No.
20      Q.  (BY MR. CHRISTNER) I had asked you about your
21  affidavit of January 27th of 2023.  That's your original
22  affidavit.
23      A.  Yes.
24      Q.  In your original affidavit, you state, "I was



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 46–49

Page 46

1  asked by attorney DeeAn Gillespie Strub to review
2  records related to the medical and psychiatric treatment
3  of Brooke Scianna during 2018 and, in particular, her
4  admission to Aurora Behavioral Health Systems, Special
5  Needs Unit, Tempe, Arizona, from August 25, 2018,
6  through November 21, 2018." Is that accurate?
7      A.  I believe so, yes.
8      Q.  Did you review any medical records from any
9  medical provider other than Aurora for any potential
10  violations of standard of care or harm prepared -- or
11  harm caused to Brooke Scianna?
12      A.  I'm not sure I understand the question.  Are
13  you asking whether that was my intent or motive?
14      Q.  Well, did you review any medical record -- did
15  you -- strike that.
16          Did you review any medical records of Brooke
17  Scianna for standard of care violations by any medical
18  provider other than Dr. Mlak?
19      A.  No.
20      Q.  Why not?
21      A.  I wasn't asked to.
22      Q.  In reviewing the medical records for Brooke
23  Scianna, did you identify any violations of the standard
24  of care by any psychiatrist that treated Brooke Scianna

Page 47

1  prior to her residency at Aurora in August of 2018?
2      A.  No.
3      Q.  Did you identify how many medical providers
4  prescribed Brooke Scianna Haldol before she was a
5  resident at Aurora starting on August 25th of 2018?
6      A.  No.  I did not enumerate those.
7      Q.  We're going to go to your December psychiatric
8  evaluation report.
9      A.  Okay.
10      Q.  Can you turn to page 15?
11      A.  (Deponent viewing document.) Okay.
12      Q.  15 -- page 15 includes your opinions as to
13  Dr. Mlak's violation of the standard of care.
14      A.  (Deponent viewing document.) Yes.
15      Q.  And it's your opinion, according to the report
16  on page 15, that Dr. Mlak's treatment of Brooke during
17  her Aurora hospitalization in August of 2018 fell below
18  the standard of care.
19      A.  Yes.
20      Q.  And he -- Dr. Mlak fell below the standard of
21  care because, one, he failed to obtain an adequate
22  history around Brooke's prior psychiatric treatment
23  prior to prescribing Haldol.
24      A.  Yes.

Page 48

1      Q.  And it was also a violation of the standard of
2  care, in your opinion, because Dr. Mlak failed to take
3  into account Ms. Scianna's experience or concerns in
4  regards to prescribing Haldol.
5      A.  Correct.
6      Q.  Do you have any other standard of care
7  opinions for Dr. Mlak?
8      A.  No.
9      Q.  It's your opinion that Dr. Mlak did not take
10  an adequate history regarding Brooke's prior psychiatric
11  treatment because Dr. Mlak did not get a medical history
12  from Ms. Scianna until September 7th of 2018; is that
13  fair?
14      A.  No.
15      Q.  Tell me why it's not fair.
16      A.  I am not aware of Dr. Mlak having gotten a
17  medical history from Ms. Scianna on September 7th of
18  2018.
19          And my understanding is that his first
20  conversation with her was September 12th of 2018.  And
21  to the extent that he did obtain information from her,
22  it is my understanding and opinion that he did not give
23  adequate weight to the concerns that she expressed to
24  him.

Page 49

1      Q.  Did not give adequate weight to the concerns
2  that Ms. Scianna expressed, what does that mean?
3      A.  What it means is that I noticed that -- again,
4  my understanding is -- and I think it's a little bit
5  unclear in the records -- but that he spoke to her on
6  September 12th of 2018 finally.
7          There's no indication in his notes of any
8  conversation with Ms. Scianna until September 28th of
9  2018.  I infer from that, that he did not feel that the
10  information that she provided him was important enough
11  to warrant a notation in the medical record and wasn't
12  important enough for him to modify his treatment plan in
13  that regard.
14      Q.  Okay.
15      A.  I will also, if I may, say that part of what I
16  mean by this paragraph is that he also, apparently, as
17  far as I can tell from both the deposition and the
18  medical record, took no note of Ms. Scianna's assessment
19  of how Brooke was responding to the medication during
20  the period of time that she was on Haldol.
21          There's nowhere in the medical record that he
22  indicates that the mom -- what the mom thought of the
23  Haldol.
24          I take a parent's -- in this case, in



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 50–53

Page 50

1 particular Ms. Scianna's, but a parent's assessment of
2 how their child is doing as being a critically important
3 piece of information for a prescriber.
4        There's no one in the world who knows her
5 better than her mother, and if you're trying a new
6 medication on her, the mother's assessment of how the
7 child is doing is critically important.
8        I don't see that anywhere in his -- I don't
9 see that reflected anywhere in either -- in his medical
10 records or in his deposition.
11     Q.   You understand, from your review of the
12 medical records, that Ms. Scianna was opposed to
13 antipsychotic medications for Brooke; correct?
14     A.   Yes.
15     Q.   And she --
16     A.   I'm sorry.  If I may just clarify, at a
17 certain point in time, she was opposed to it.  She had
18 not always been opposed to it historically, I think.
19     Q.   Well before Brooke's administration to Aurora
20 in August of 2018, the medical records show that
21 Ms. Scianna was opposed to antipsychotic medications
22 being prescribed to Brooke.
23     A.   Correct.
24     Q.   Does Ms. Scianna have any medical training?

Page 51

1        MR. CONNELLY:  Form.
2     A.   I don't believe so, no.
3     Q.   (BY MR. CHRISTNER) She's not a nurse.
4     A.   No.
5     Q.   She's not a doctor.
6     A.   Correct.
7     Q.   She's not a psychiatrist.
8     A.   Correct.
9     Q.   At Aurora, you understand that employees at
10 Aurora are registered nurses.
11        MR. CONNELLY:  Form.
12     A.   I understand there are some registered nurses
13 who are employed at Aurora.  At least I presume that to
14 be the case, yes.
15     Q.   (BY MR. CHRISTNER) Certified nursing
16 assistants?
17     A.   Yes.
18     Q.   Psychiatrists?
19     A.   Yes.
20     Q.   Perhaps other doctors?
21     A.   Yes.
22     Q.   All of which have some medical training?
23     A.   Yes.
24     Q.   And all of which are qualified to do an

Page 52

1 assessment of the patients that are admitted to Aurora.
2        MR. CONNELLY:  Form and foundation.
3        MR. HUNTER:  Join.
4        THE DEPONENT:  I'm sorry.
5        MR. HUNTER:  I just joined in the objection.
6     A.   I would say that each of them was qualified to
7 do an assessment according to their training, but they
8 have different levels of training.
9     Q.   (BY MR. CHRISTNER) You saw in the medical
10 records from Aurora that Dr. Mlak did several
11 assessments of Brooke throughout her stay at Aurora.
12     A.   Yes.
13     Q.   Is it your opinion that Dr. Mlak should have
14 provided more weight to the assessment of Brooke's
15 condition that was expressed by Ms. Scianna than his own
16 assessment based on his education, training, and
17 experience?
18        MR. CONNELLY:  Form and foundation.
19     A.   It is my opinion that his own assessment
20 should have integrated the mother's understanding and
21 impressions of how her child was doing.
22     Q.   (BY MR. CHRISTNER) And how should that have
23 been integrated?
24     A.   In that if a parent says to a psychiatrist, my

Page 53

1 daughter is different; my daughter is off; there's
2 something wrong about her; she's not acting as usual;
3 she's having side effects; she's not doing well; she's
4 not -- I think she's not responding well to this
5 medication, I think that's very meaningful information.
6        It may not be correct, but I think very
7 meaningful information, and then I think the onus is on
8 the doctor to try to make sense of that and to discern
9 to what extent that's correct.
10        I will say that certainly in my experience,
11 both doing pediatrics and child psychiatry, the parent's
12 understanding of how their child is doing is generally
13 considered to be exceptionally important and often very
14 valuable.
15        And I know that in my practice, I take it very
16 seriously when a parent says to me, something is not
17 right with my child.  And I don't have any indication
18 that Dr. Mlak took her seriously in that regard.
19     Q.   You understand that there are several attempts
20 documented in Aurora records of staff attempting to
21 reach Ms. Scianna.
22     A.   I'm aware of three attempts documented in the
23 medical record at the time that she came in.
24     Q.   Do you have any reason to believe that those



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 54–57

**Page 54**

1 are false or made up?
2      A.   No, but -- I'm sorry.  A fuller answer, I know
3 that Ms. Scianna, in her deposition, said that she did
4 not receive messages from Dr. Mlak on the second -- I
5 think August 26th, so I don't know in this case who
6 to -- who to believe, but I know it's documented in the
7 record that he tried to call her twice on that day.
8      Q.   In Dr. Mlak's deposition and in your report on
9 page 12, you state, "In regards to the information
10 Ms. Scianna relayed to him about Brooke's past reactions
11 to medication, Dr. Mlak testified he did not consider it
12 to be clinically accurate."  Do you see that, bottom of
13 page 12?
14      A.   (Deponent viewing document.) I do see it, yes.
15      Q.   So in your report, you recognize that, one,
16 Dr. Mlak had a conversation with Ms. Scianna regarding
17 Brooke's past reactions to medications; right?
18      A.   Yes.
19      Q.   And he did not consider it to be clinically
20 accurate.
21      A.   Correct.
22      Q.   Did you conduct an investigation regarding
23 Ms. Scianna's interpretation of Brooke's past reactions
24 to medications and determine whether they were accurate

**Page 55**

1 or not?
2          MR. CONNELLY:  Form and foundation.
3      A.   So, yes, I'd say my report includes my
4 investigation of Ms. Scianna's understanding of -- and
5 reporting of Brooke's response to medication.
6      Q.   (BY MR. CHRISTNER) And was Ms. Scianna's
7 reporting of Ms. -- or of Brooke's reactions to
8 medications in the past accurate?
9      A.   Well, I would say that -- two things.  One is
10 I think that, as I testified to earlier this morning,
11 there were at least two occasions in which I think she
12 was just wrong in her assessment.
13          But in terms of the big picture and with the
14 benefit of 20/20 hindsight, I think she was absolutely
15 right, that antipsychotics in every single instance
16 either were counterproductive in causing Brooke to
17 become more agitated and/or caused significant side
18 effects.
19          And we see that Brooke does -- did better
20 historically -- I'm just going on here -- did better
21 historically when she was off medication.  Big picture
22 I think Ms. Scianna actually got it right more than the
23 doctors did.
24      Q.   I believe you just testified that each and

**Page 56**

1 every time that Brooke was prescribed antipsychotic
2 medication, it was not effective and oftentimes
3 increased her aggressive behavior.
4      A.   In short, yes.  On at least two occasions, it
5 was thought to have increased her aggressive behavior.
6 On every single occasion, it was thought, at least over
7 the course of a few months, to be either
8 counterproductive or to cause side effects.
9          I will say that there were at least a few
10 occasions where it was thought to be temporarily helpful
11 for her, but none of the antipsychotic medications were
12 ever sustained by the clinicians who were treating her.
13 They were all dropped at different points in time.
14      Q.   Can you show me anywhere in any of the records
15 from St. Luke's, from Abruzzo, from Banner Health,
16 anywhere that a medical provider indicated that the --
17 prescribing Haldol to Brooke was counterproductive?
18      A.   I don't believe there is any such thing.  At
19 least I have not seen it.
20      Q.   No medical provider detailed any side effects
21 from the use of Haldol on Brooke.
22      A.   That's correct.
23      Q.   And when Haldol was used on Brooke at the
24 various medical facilities, including St. Luke's and

**Page 57**

1 Banner, the Haldol reduced her aggression at that time.
2      A.   I know that that -- I'm actually not sure the
3 answer to that question.  I know there were certain
4 times that was the case.  It was used in emergency
5 departments with her at various points and times.  I
6 actually don't have a sense of how effective it was.
7          I also know that it was given to her on the
8 inpatient unit at, I believe, St. Luke's and then not
9 continued.  And I don't know why that is or what her
10 response to it was.  I don't -- I could not find that in
11 the records.
12      Q.   In review of the medical records at Aurora
13 from the August 2018 stay by Brooke, would you agree
14 with me that there's documentation that Brooke had
15 increased aggression, which led Dr. Mlak to prescribe
16 Haldol on September 7th, 2018?
17      A.   I'm not sure the baseline upon which you say
18 her aggression was increased.
19      Q.   Did you -- you reviewed the records; right?
20      A.   Yes.
21      Q.   Is there any documentation in the records that
22 her aggression increased near 9-7 of 2018 when Dr. Mlak
23 prescribed Haldol?
24      A.   There is.



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 58–61

Page 58

1    Q.  Do you have any reason to doubt that her
2 aggression increased?
3        MR. CONNELLY:  Form and foundation.
4    A.  No.  I'm just -- just raising the point that
5 I'm not sure what -- what they are comparing it to, but
6 there is documentation in the records that around
7 September 7th, 2018, they saw increased aggression.
8    Q.  (BY MR. CHRISTNER) And what type of increased
9 aggression?
10   A.  I don't recall specifically.
11   Q.  Did you make any notes on what type of
12 increased aggression?
13   A.  Unless it's in my report, I don't -- I don't
14 recall.  I know that she was at times --
15       MR. CONNELLY:  If you want to show him the
16 record, why don't you show him the record, and you can
17 really get into it.
18       MR. CHRISTNER:  Was that an objection to form
19 or foundation?
20       MR. CONNELLY:  That's a suggestion.
21       MR. CHRISTNER:  All right.
22   Q.  (BY MR. CHRISTNER) In your report, do you
23 include any recitation of the medical records from
24 Aurora regarding Brooke's aggressive behavior on or

Page 59

1 about September 7, 2018?
2    A.  I don't recall what I said about it.
3    Q.  Would you agree with me that when Brooke was
4 admitted to Aurora on -- in August of 2018, she had a
5 history of being a risk of harm to herself and others?
6    A.  Yes.
7    Q.  Tell me a little bit about the types of harm
8 she was at risk for causing herself and others prior to
9 her admission to Aurora.
10       MR. CONNELLY:  Form and foundation.
11   Q.  (BY MR. CHRISTNER) What's your understanding?
12       MR. CONNELLY:  Form and foundation.
13   A.  My understanding is that she could become
14 quite physically aggressive at times; that she would
15 strike out; that other people considered her a potential
16 danger, and reasonably so; that she would bang her head
17 at times, I believe and engaged in self-injurious
18 behavior at times; and she was -- that her behavior
19 was -- was very problematic at different points in time.
20 She had had multiple prior hospitalizations, mostly for
21 aggressive and agitated behavior, and I believe had
22 suffered injuries as a result.
23   Q.  (BY MR. CHRISTNER) Is there a history of
24 her -- of biting herself?

Page 60

1    A.  Yes.
2    Q.  History of her biting others?
3    A.  Yes.
4    Q.  There's documentation of her attacking
5 security staff at the hospital.
6    A.  I don't recall specifically, but that would
7 not surprise me at all.
8    Q.  Do you recall documentation that Brooke had to
9 be physically restrained at the hospital on multiple
10 occasions?
11   A.  Yes.
12       MR. CONNELLY:  Form and foundation.
13   Q.  (BY MR. CHRISTNER) There was -- there was a
14 time that it's documented that Brooke knocked down her
15 grandfather, and as a result, he broke his hip.
16       MR. CONNELLY:  Form and foundation.
17   A.  I actually don't recall that.
18   Q.  (BY MR. CHRISTNER) Is it within the standard
19 of care if you have a patient like Brooke going through
20 one of these aggressive outbursts to prescribe Haldol to
21 reduce the aggressiveness of Brooke?
22       MR. CONNELLY:  Form and foundation.
23   A.  I would say that it is not necessarily below
24 the standard of care to prescribe Haldol to a patient

Page 61

1 like Brooke.
2    Q.  (BY MR. CHRISTNER) And you have no opinion as
3 to any other medical provider that prescribed Haldol to
4 Brooke that they fell below the standard of care.
5    A.  Correct.
6    Q.  Would you --
7        MR. CONNELLY:  A late objection, form and
8 foundation on that, please.
9    Q.  (BY MR. CHRISTNER) Would you agree with me
10 that a reasonable psychiatrist, if presented with a
11 patient such as Brooke who is going through one of her
12 aggressive outbursts, that the standard of care requires
13 the doctor to take some action to reduce the
14 aggressiveness of Brooke?
15       MR. CONNELLY:  Form and foundation.
16   A.  Yes.  I would say requires the doctor to take
17 some action in an effort to reduce the aggressiveness,
18 yes.
19   Q.  (BY MR. CHRISTNER) Understood.
20       And that is because a doctor has a duty to
21 protect a patient from harming themselves.
22   A.  Yes.
23   Q.  A doctor has a duty to protect a patient from
24 harming others.



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 62–65

Page 62

1    A.   Yes.
2       Q.   And if a psychiatrist does not take reasonable
3   steps to protect a patient from harming themselves or
4   others, that may open them up to liability.
5       MR. CONNELLY:  Form and foundation.
6       Q.   (BY MR. CHRISTNER) Correct?
7       MR. CONNELLY:  Form and foundation.
8    A.   Correct.
9       Q.   (BY MR. CHRISTNER) In review of your medical
10   records, when Brooke had these aggressive outbursts,
11   were there -- was there a risk that she could cause
12   permanent injury to herself?
13       MR. CONNELLY:  Form and foundation.
14    A.   Yes.
15       Q.   (BY MR. CHRISTNER) Obviously, if you're
16   slamming your head into the wall, you have a risk of
17   serious brain injury.
18    A.   Yes.
19       MR. CONNELLY:  Form and foundation.
20       Q.   (BY MR. CHRISTNER) And in your review of the
21   medical records, it would be fair to say that when
22   Brooke is going through one of these aggressive
23   outbursts, there is a significant risk of her causing
24   permanent injury to others.

Page 63

1       MR. CONNELLY:  Form and foundation.
2    A.   Yes.
3       Q.   (BY MR. CHRISTNER) When Brooke was prescribed
4   Haldol at Aurora in August of 2018, September of 2018,
5   October of 2018, is there documentation that her
6   aggressive behavior was reduced at times?
7    A.   I'm -- so I'll just -- just to take a second,
8   I don't think she was prescribed Haldol in August of
9   2018.
10       Q.   All right.
11    A.   And during September and October of 2018, at
12   times, there was some indication that her aggression was
13   better.
14       Q.   The Haldol, however, was not effective in
15   completely eliminating her aggressive behavior; fair?
16    A.   I don't think the Haldol was effective in even
17   helping overall her aggressive behavior.
18       Q.   You would agree with me that other medical
19   providers had prescribed Haldol because of her
20   aggressive behaviors; right?
21    A.   Yes.
22       MR. CONNELLY:  Form and foundation.
23       Q.   (BY MR. CHRISTNER) Any reason to believe that
24   they did not find that the Haldol reduced Brooke's

Page 64

1   aggressive behaviors?
2       MR. CONNELLY:  Form and foundation.
3    A.   I just don't know what they found, so in
4   answer to your question, no, I have no reason to believe
5   that they did not.
6       Q.   (BY MR. CHRISTNER) Right.
7    A.   I think I understand the double negative.
8       Q.   I understand.
9       You didn't see anything in the medical records
10   of any medical provider indicating that they believe
11   that Haldol did nothing to reduce Brooke's aggressive
12   behavior.
13    A.   Correct.
14       MR. CONNELLY:  Form and foundation.
15       Q.   (BY MR. CHRISTNER) When Brooke was prescribed
16   Haldol by Dr. Mlak on September 7th of 2018, were there
17   any documented side effects from this drug?
18    A.   I'm sorry.  Prior to that time or?
19       Q.   No.
20    A.   Since that time.
21       Q.   Since that time.
22    A.   Yes.
23       Q.   What were they?
24    A.   She developed, what I noticed, extrapyramidal

Page 65

1   symptoms, I believe fairly shortly after, which included
2   stiffness and rigidity.  I don't recall if there were
3   other symptoms.
4       Q.   The EPS that she --
5    A.   I apologize.  Can I -- I have a little more
6   answer to the question.
7       Q.   Uh-huh.
8    A.   She also, according to the records, had
9   developed difficulty sleeping and was often sleeping
10   during the day and not sleeping well at night.
11       Q.   Anything else?
12    A.   I believe that's it.
13       Q.   So when she developed EPS, that is a known
14   side effect of Haldol.
15    A.   Yes.
16       Q.   And that is something that can be treated with
17   Cogentin.
18    A.   Cogentin.
19       Q.   Cogentin.  Thank you.
20       Correct?
21    A.   Yeah, typically, yes.
22       Q.   And that's common in the industry.
23       MR. CONNELLY:  Form and foundation.
24    A.   Yes.



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 86–89

Page 86

1    A.   I'll say that -- that's an interesting
2 question.  In my work at Boston Medical Center, we had a
3 policy against doing it.  I'm not convinced that, on
4 balance, it's the best thing for most patients.
5 Although, I do recognize more and more that some
6 patients find real benefit from it.
7    Q.   I'm from Arizona.  Out here in Massachusetts,
8 is medical marijuana available to the public?
9    A.   It's -- medical marijuana's available with a
10 prescription.
11    Q.   With a prescription?
12    A.   And marijuana is available through
13 state-sponsored or regulated dispensaries here.
14    Q.   On page 4 of your report, second paragraph
15 down, you include in your report, "Ms. Scianna reported
16 that during Brooke's Aurora hospitalization in the fall
17 of 2008, she only found out that Brooke was on Haldol
18 after the fact being informed of this at a weekly CFT
19 meeting.  She felt strongly that Brooke should not be on
20 antipsychotic of any sort and was concerned Haldol in
21 particular because Brooke had stiff" -- "had been stiff
22 and shaking when on it in the past."  Do you see that?
23    A.   (Deponent viewing document.) I do.
24    Q.   Did you find any medical record that indicated

Page 87

1 that Brooke was prescribed Haldol and documented that
2 Brooke was -- appeared to be stiff and shaking due to
3 the Haldol?
4    A.   No.
5    Q.   On page 8 of your report, under "Review of
6 records," it says, "St. Luke's Behavioral Health."  Do
7 you see that?
8    A.   (Deponent viewing document.) I do.
9    Q.   Third paragraph down you're talking about
10 Brooke was admitted to St. Luke's from December 27th,
11 2017 through January 19th, 2018.  Do you see that?
12    A.   (Deponent viewing document.) I do.
13    Q.   You recorded that, "The mother provided the
14 report that Brooke had not previously responded well to
15 Seroquel, Haldol, or Risperdal and was reported to state
16 that, quote, none of the psychotropic agents really
17 worked, end quote."  Do you see that?
18    A.   (Deponent viewing document.) I do.
19    Q.   Do you understand that St. Luke's recorded in
20 their records that Ms. Scianna told them that Brooke had
21 not previously responded well to Seroquel, Haldol, or
22 Risperdal?
23    A.   Yes.
24    Q.   You did not find any medical records that

Page 88

1 indicated that Brooke did not respond well to Seroquel;
2 correct?
3    A.   Aside from the mother's report which showed up
4 --
5    Q.   Correct.
6    A.   -- in the medical records.
7    Q.   Right.
8       No medical provider indicated in any medical
9 records that you saw that Brooke did not respond well to
10 Seroquel.
11    A.   Again, aside from quoting the mother.
12    Q.   Right.
13       You didn't find any evidence in any of the
14 medical records that any medical provider documented
15 that Brooke did not respond well to Haldol.
16    A.   Well, I did find in that -- I did find that in
17 that the medical providers documented the mother's
18 report that Brooke did not respond well to Haldol.  I
19 consider that to be evidence that then shows up in the
20 medical record.
21    Q.   You didn't find any evidence that a medical
22 provider made a medical decision that Brooke does not
23 respond well to Seroquel, Haldol, or Risperdal; is that
24 fair?

Page 89

1       MR. CONNELLY:  Form and foundation.
2    A.   I'm not sure I -- I'm not sure I fully
3 understand the question.  I'm sorry.
4    Q.   (BY MR. CHRISTNER) Well, Ms. Scianna is
5 telling medical providers that Brooke does not respond
6 well to Seroquel, Haldol, and Risperdal.
7    A.   Correct.
8    Q.   You understand that.  Okay.
9       She's -- before this time, Brooke was seen by
10 a number of medical providers; right?
11    A.   Correct.
12    Q.   Those medical providers prescribed Haldol,
13 Seroquel, and supposedly Risperdal; correct?
14    A.   Some of them had at some points in time, yes.
15    Q.   None of those medical providers that
16 prescribed Seroquel or Haldol or Risperdal included a
17 medical assessment and determination that Brooke did not
18 respond well to Seroquel, Haldol, and Risperdal.
19       MR. CONNELLY:  Form and foundation.
20    A.   So I did not see any -- in any instances when
21 medical providers documented in the medical record that
22 they had done an independent assessment.
23       And I'm -- I'm sorry if I'm struggling with
24 this question.  I'll just say the reason I'm struggling


Alliance
REPORTING SOLUTIONS

Alliance Reporting Solutions
www.AllReportingSolutions.com

(602) 230-8448
20239021

CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 90–93

Page 90

1 is that I think for any medical provider in this
2 circumstance, the mother's report of how the child did
3 carries a great deal of weight, and that's considered to
4 be medical evidence, and so their conclusions are likely
5 to incorporate that information.
6     If a parent comes in and says, my child was
7 vomiting bright red blood last night, the fact that the
8 provider doesn't himself or herself see it, doesn't mean
9 it's not useful information and doesn't mean it's not
10 important information.
11     And so -- so the whole idea of a medical
12 provider having an independent assessment without the
13 mother's report just doesn't quite compute for me.
14     Q.   (BY MR. CHRISTNER) Let's try it a different
15 way then.  A medical provider prescribed Seroquel to
16 Brooke; right?
17     A.   Correct.
18     Q.   And we have records of a medical provider
19 prescribing Seroquel to Brooke; right?
20     A.   Yes, we do.
21     Q.   And you reviewed those records.
22     A.   Yes.
23     Q.   Anywhere in the records did a medical
24 provider, a doctor, psychiatrist indicate that Brooke

Page 91

1 did not respond well to Seroquel?
2     MR. CONNELLY:  Form and foundation.
3     A.   Only in the instances in which they were
4 reporting the mother's report.
5     Q.   (BY MR. CHRISTNER) I see.
6     No medical provider documented in the medical
7 records that they made a medical decision that Haldol --
8 or that Brooke did not respond well to Haldol; is that
9 true?
10     MR. CONNELLY:  Form and foundation.
11     A.   I think that's true.
12     Q.   (BY MR. CHRISTNER) Did you see in any of the
13 medical records that a medical provider documented that
14 none of the psychotropic agents really worked for
15 Brooke?
16     MR. CONNELLY:  Form and foundation.
17     A.   No.
18     Q.   (BY MR. CHRISTNER) Doctor, did I give you an
19 opportunity to respond fully and completely to my
20 questions?
21     A.   I believe so, yes.
22     Q.   At this point, do you feel the need to clarify
23 or expand on any of your answers you've given?
24     A.   No.

Page 92

1     MR. CHRISTNER:  Doctor, I think I'm going pass
2 you off to another attorney.  Thank you very much for
3 your time.
4     THE DEPONENT:  Thank you.
5     MR. HUNTER:  I have nothing for you.
6     MR. CONNELLY:  Georgia, any questions?
7     MS. STATON:  No questions here on behalf of
8 the state.  Thank you.
9     MR. CONNELLY:  Cody?
10     EXAMINATION
11     BY MR. HALL:
12     Q.   Yeah.  This is Cody Hall.  I've got a few
13 questions for you, Dr. Clark.  Can you hear me okay?
14     A.   I can, yes.  Thanks.
15     Q.   Thank you.
16     I represent Care and Dignity.  And I just have
17 a couple of questions about some comments in your report
18 as well.  I'm going to start with, though I understood
19 from your earlier testimony that you did not interview
20 Brooke at any point in time; correct?
21     A.   That is correct.
22     Q.   Did you ask to interview Brooke at any point
23 in time?
24     A.   No.

Page 93

1     Q.   Was Brooke ever present in the room while you
2 were doing the Zoom phone call with the mother that you
3 could tell?
4     A.   No.
5     Q.   And that's a bad lawyer question.
6     Do you know she wasn't in the room, or you
7 just simply could not tell if she was in the room?
8     A.   I could not tell if she was in the room.  I
9 saw no indication that she was in the room, period.
10     Q.   Thank you.
11     So page 16 of your report, Doctor, you
12 indicated, I believe, that records of Brooke's stay at
13 Care and Dignity were not available at the time of the
14 report.  Did you mean to indicate that you had not seen
15 any records from Care and Dignity as of December of
16 2023?
17     A.   I did.  They were not available to me.
18     Q.   And you have not seen any records since the
19 time you authored that report; correct?
20     A.   That is correct.
21     Q.   From Care and Dignity?
22     A.   That is correct.
23     Q.   On page 5 of your report, Doctor, you have a
24 note that says, "Mrs. Scianna reported that Brooke had



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 106–109

**Page 106**

1 working with adolescents and children.
2    Q.   And so --
3    A.   This was during my training from 1994 to 1996.
4    Q.   So when you were talking about prescribing
5 antipsychotics more than 40 times to inpatient, those
6 were all -- those were children.
7    A.   In those instances, they were children.  And
8 from 1991 to 1994, I worked -- I was an adult resident.
9 I worked in some adult inpatient units, and those would
10 have been to adults.
11    Q.   Okay.
12    A.   But I prescribed antipsychotics to both
13 populations.
14    Q.   So the more than 40 times includes children
15 and adults.
16    A.   Yes.  I can't -- actually, I can't remember
17 what specific question I was responding to in that case,
18 but I've -- in my work on inpatient units, I prescribed
19 antipsychotics more than 40 times to both adults and to
20 children.
21    Q.   And did any of the children -- were they
22 autistic?
23    A.   Some of them -- again, I can't remember
24 specifically.  I'm sure that some of them had autism

**Page 107**

1 spectrum disorder, yes.
2    Q.   Is the use of Haldol with children common?
3    MR. HUNTER:  Form and foundation.
4    MR. CHRISTNER:  Form and foundation.
5    A.   So the use of Haldol with adolescents in
6 emergency departments is relevantly common.  It's
7 commonly used as a, sort of, acute treatment in
8 emergency departments.
9    I will say that its use as a regular, ongoing
10 medication in children and adolescents is, in my
11 understanding and my experience, quite rare.
12    Q.   (BY MR. CONNELLY) And when Dr. Mlak started
13 prescribing Haldol to Brooke, it wasn't an emergency
14 room situation; right?
15    A.   It was not.  It was on an inpatient unit.
16    Q.   She had already been inpatient for a number of
17 weeks by that time; right?
18    A.   I think for 13 days at that point in time.
19    Q.   And Dr. Mlak was prescribing it on a daily
20 basis as a -- as a daily medication to Brooke; right?
21    A.   Correct, twice a day to be precise.
22    Q.   And did you form an opinion about Dr. Mlak's
23 use of Haldol in Brooke, the manner in which it was
24 prescribed and administrated to her?

**Page 108**

1    MR. CHRISTNER:  Form and foundation.
2    MR. HUNTER:  Form and foundation.
3    A.   I did.
4    Q.   (BY MR. CONNELLY) And what's your opinion on
5 that?
6    MR. CHRISTNER:  Form and foundation.
7    A.   So my opinion, as I testified to, is that
8 is that his treatment of her fell below the standard of
9 care by virtue of him not having obtained a history from
10 the mother in particular and not taking account of her
11 ongoing assessments or observations of how Brooke was
12 doing, so that's my opinion in terms of the standard of
13 care.
14    I also thought that he prescribed Brooke
15 medication -- Haldol at doses that were quite aggressive
16 in terms of both how rapidly he went up on them and in
17 terms of how -- in terms of the ultimate maximum dose
18 that -- that she was given.
19    I think that -- I -- I -- I'm critical of
20 Dr. Mlak's treatment of her in another way, which is
21 that he did not seem to have taken account of the fact
22 that Brooke had been separated from her mother and the
23 likelihood that that was emotionally quite traumatic for
24 her.

**Page 109**

1    I noted that a -- I believe it was a crisis
2 evaluation that was done in August of 2018, the
3 clinician opined that Brooke's separation from her
4 mother and placement in a group home was likely quite
5 traumatic for her and likely a significant factor in her
6 behavioral deterioration.
7    I think that was an important dimension to
8 what was going on for Brooke that seemed to be
9 overlooked entirely in her -- in her hospitalization.
10    And I think that -- I'm also critical of
11 Dr. Mlak for not having requested a functional
12 behavioral assessment earlier because, although one was
13 done, it was done quite well into the hospitalization.
14 And I think that paying attention to the behavioral
15 aspects of Brooke's management was an important
16 dimension that seemed to have been overlooked.
17    And I will, sort of, further say Haldol in an
18 adolescent carries with it significant risks.  And given
19 Brooke's complicated history and the real risks that she
20 posed, for him to not -- for Dr. Mlak to not have
21 understood what her prior experience with -- with
22 medications had been meant that he was really operating
23 in the dark and employing a very high-risk strategy
24 without really knowing what had gone on with her



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 114–117

Page 114

1 question either, but you know what I was asking.
2    A.  I know what you're asking.
3       MR. CHRISTNER:  Form and foundation.
4    Q.  (BY MR. CONNELLY) Is the fact that Christine
5 is not a doctor or a nurse or a psychiatrist make her
6 views and concerns any less valuable or meaningless
7 to -- to a psychiatrist, a clinical psychiatrist like
8 yourself or Dr. Mlak?
9       MR. HUNTER:  Form and foundation.
10      MR. CHRISTNER:  Join.
11   A.  So, I mean, there is a -- there's a relevance
12 to the fact that she's not a doctor.  If she were a
13 physician, she would bring a clinical lens to it.
14      As I say, there are times, I think, that she's
15 just wrong about things, particularly around neuroleptic
16 malignant syndrome with Haldol at whatever -- I think at
17 Banner.
18      But that said, I think her -- it's my
19 understanding that she knows Brooke better than anybody
20 in the world, so that her impressions and understanding
21 of how Brooke is doing is enormously meaningful.
22   Q.  (BY MR. CONNELLY) And you have no reason to
23 think that she would misreport or exaggerate any of
24 Brooke's reactions or side effects to medications.

Page 115

1       MR. HUNTER:  Form and foundation.
2       MR. CHRISTNER:  Form and foundation.
3    A.  So, you know, I try to take every informant
4 with a grain of salt, or sometimes two grains of salt.
5 I think it's possible that Ms. Scianna got an idea in
6 her head that antipsychotics don't work and got a little
7 rigid about it.
8       And so then the question is, well, on what
9 basis, Ms. Scianna, do you believe that?  And as she
10 describes all the various reasons that -- that she has
11 for these opinions and all that's happened to Brooke,
12 they are completely consistent with what you would
13 expect to see from the use of these medications.
14      She's not describing things that are odd or
15 unusual.  Cognitive dulling, drooling, sedation, weight
16 gain, the dulling -- there's a dullness of the
17 personality, those are very common, and, to some extent,
18 expectable.
19   Q.  (BY MR. CONNELLY) And some of what she is
20 saying is verified by the -- the records in this case.
21      MR. CHRISTNER:  Form and foundation.
22      MR. HUNTER:  Form and foundation.
23   A.  Some of it is.  A lot of it isn't.  A lot of
24 it is that it's not -- it's the mom's report about these

Page 116

1 things that doesn't have a lot of independent
2 corroboration in the medical records.  But, again, it's
3 absolutely what you would expect to see when you treat a
4 child like this with those doses of medications.
5    Q.  (BY MR. CONNELLY) You testified earlier to a
6 question by Mr. Christner that it was not necessarily
7 below the standard of care to prescribe Haldol to a
8 patient like Brooke.  What did you mean by the limiting
9 phrase "not necessarily below the standard of care"?
10   A.  So what I meant was that, the -- you know,
11 Haldol has been used for the treatment of aggression in
12 individuals with autism spectrum disorder.  Back in the
13 1970s and 1980s, it was probably the most commonly used
14 medication for that indication.
15      My understanding is that at this point in
16 time, that the second-generation antipsychotics are
17 considered to be first-line treatments because they have
18 a better side effect profile than Haldol does, and they
19 tend to be more effective.
20      However, that said, under the circumstances in
21 which a physician had done a careful history, understood
22 that there were various reasons why the trial of another
23 second-generation antipsychotic didn't make sense, was
24 aware of the risks involved, and was willing to pay

Page 117

1 careful attention, that a careful trial of haloperidol
2 in a case like Brooke's might have been reasonable thing
3 to do.
4       My own feeling -- my own clinical opinion is
5 that it probably didn't make a lot of sense, but I'm not
6 saying that that would have fallen below the standard of
7 care had it been done carefully and thoughtfully.
8    Q.  (BY MR. CONNELLY) And, Doctor, you were asked
9 questions about a doctor has a duty to protect patients
10 from harming themselves and others and a couple of other
11 duties.  A doctor also has a duty not to overprescribe a
12 medication; right?
13   A.  Correct.
14   Q.  And a doctor has a duty to not misuse a
15 medication --
16      MR. CHRISTNER:  Form.
17   Q.  (BY MR. CONNELLY) -- in prescribing it to
18 patients; right?
19      MR. CHRISTNER:  Form and foundation.
20   A.  I'm not quite sure I understand what you mean.
21   Q.  (BY MR. CONNELLY) Well, there are certain
22 off -- what's called off-label uses of medications;
23 right?
24      But would you agree that there are -- there



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 126–129

Page 126

1    A.   Yes.

2    **Q.   But based on what you've seen and read so far,**

3 **do you have any initial views about Dr. Khan's report?**

4    A.   I do.

5         MR. HUNTER:  Form and foundation.

6    **Q.   (BY MR. CONNELLY) What are your initial**

7 **impressions about Dr. Khan's report?**

8         MR. HUNTER:  Form and foundation.

9    A.   My initial impressions -- and, again, these

10 are initial.

11   **Q.   (BY MR. CONNELLY) Right.**

12   A.   One is that it appears that Dr. Khan is not a

13 child and adolescent psychiatrist.  And I do not know

14 what experience he's had treating children and

15 adolescents.  And so I have concerns about his training

16 and experience in that regard.

17       I never -- I have probably two small and one

18 large concerns.  A second -- well, a second concern is

19 that Dr. Khan wrote in his report that Haldol does not

20 cause elevated prolactin levels.

21       And I -- I both was rather sure that's not the

22 case, and then I did some -- some literature review, and

23 my understanding is Haldol very much raises prolactin

24 levels.

Page 127

1         Risperdal is the antipsychotic most likely to

2 raise prolactin levels, but Haldol can do it as well and

3 does it -- does it quite commonly.

4         And that can result in side effects such as

5 the expression of breast milk, the growth of breast

6 tissue in males, and a cessation of menses in females,

7 and so that's one of the many side effects that Haldol

8 poses.

9         My initial impression was that Dr. Khan seemed

10 to think that Dr. Mlak's efforts to reach Ms. Scianna

11 were adequate by virtue of him having made phone calls.

12 And I disagree with that.  I think that he should have

13 tried harder.

14        One big issue that I have is that after I read

15 Dr. Khan's report, I did a little bit of searching on

16 the internet and just reading about children and Haldol

17 and found a blog post that had been -- that was on the

18 internet.

19        And I read a -- the post, and I realized that

20 Dr. Khan had lifted verbiage, an entire paragraph from

21 that report, and had put it into his.  And I did a

22 little more looking around and found another paragraph

23 of an additional paper that Dr. Khan had lifted in its

24 entirety and put it into his report.

Page 128

1    **Q.   (BY MR. CONNELLY) And in his report, he**

2 **doesn't cite to either of those sources.**

3    A.   He does not.

4         MR. CONNELLY:  I don't think I'm going to have

5 any more questions.

6         MR. CHRISTNER:  I have no further questions.

7         MR. HUNTER:  None here.

8         MR. CONNELLY:  Anybody?

9         Georgia?  Cody?

10        MS. STATON:  Nothing here.

11        MR. HALL:  Nothing more for me.  Thank you.

12        MR. CONNELLY:  Okay.  Thanks, Doctor.

13        THE VIDEOGRAPHER:  The time is 12:26 p.m.

14 This concludes the deposition.  We're off the record.

15        THE COURT REPORTER:  Attorney Hall, do you

16 want a copy of this?

17        MR. HALL:  Yes, yes, please.  I'll take a

18 copy.

19        MR. HUNTER:  In Arizona, he has to put on the

20 record whether he's going to read and sign.

21        THE COURT REPORTER:  Do you want to go back on

22 the video record too?

23        MR. CONNELLY:  It doesn't need to be on video.

24 Yeah.  He's going to read and sign.

Page 129

1         MS. STATON:  I'll take a copy on behalf of the

2 state.

3         (Deposition of ANDREW CLARK, M.D. concluded at

4 12:26 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 130–131

Page 130

1                   C E R T I F I C A T E
2           I, ANDREW CLARK, M.D., hereby certify under
3   the pains and penalties of perjury that I have read the
4   foregoing transcript of my testimony and further certify
5   that said transcript is a true and accurate record of my
6   testimony (with the exceptions of the corrections noted
7   below.)
8   PAGE   LINE            CORRECTIONS
9   ____   ____   _____
10  ____   ____   _____
11  ____   ____   _____
12  ____   ____   _____
13  ____   ____   _____
14  ____   ____   _____
15  ____   ____   _____
16  ____   ____   _____
17  ____   ____   _____
18  ____   ____   _____
19  ____   ____   _____
20  ____   ____   _____
21          Signed under the pains and penalties of
22  perjury this ____ day of _____ 20__.
23
24          _____
25                   ANDREW CLARK, M.D.

Page 131

1                   CERTIFICATION
2
3           I, Jennifer M. Vaillancourt, a Certified
4   Shorthand Reporter, Registered Professional Reporter,
5   and Notary Public, within and for the State of
6   Massachusetts, do hereby certify:
7           That, ANDREW CLARK, M.D., the deponent whose
8   examination is hereinbefore set forth, was first duly
9   sworn by me and that this transcript of said testimony
10  is a true record of the testimony given by said
11  deponent.
12          I further certify that I am not related to any
13  of the parties to this action by blood or marriage, and
14  that I am in no way interested in the outcome of this
15  matter.
16
17          IN WITNESS WHEREOF, I have hereunto set my
18  hand this 29th day of February, 2024.
19
20
21          _____
22          Jennifer M. Vaillancourt, Notary Public in
23          and for the Commonwealth of Massachusetts.
24          My Commission Expires June 14, 2030.

