Jeffrey S. Hunter, Esq.
Arizona Bar No. 024426
jhunter@wwhgd.com
docketing-PHX@wwhgd.com
WEINBERG, WHEELER, HUDGINS,
  GUNN & DIAL, LLC
1 North Central Avenue, Suite 900
Phoenix, Arizona 85004
Telephone: (602) 256-3015
Facsimile:  (602) 307-5853

*Counsel for Defendant Aurora Behavioral Healthcare-Tempe, LLC*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>                Plaintiffs,<br><br>v.<br><br>State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Tina Canale, individually and as an employee with the State of Arizona Department of Child Safety; Christie Johnson aka Christi Mehl, individually and as an employee with the State of Arizona Department of Child Safety; Melissa Courtright, individually and as an employee with the State of Arizona Department of Child Safety, and Barry Courtright, her spouse; Nicholas Long, individually and as an employee with the State of Arizona Department of Child Safety; Gregory McKay, as former Director, Arizona Department of Child Safety; Michael Faust, as Director, Arizona Department of Child Safety; Aurora Behavioral Healthcare-Tempe, LLC, an Arizona Corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Krzystztof | Case No.: 2:21-cv-01444-DJH<br><br>**DEFENDANT AURORA BEHAVIORAL HEALTHCARE TEMPE, LLC'S MOTION FOR SUMMARY JUDGMENT**<br><br>***Oral Argument Requested*** |

Mlak, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and Jane Doe Mlak, his spouse; Kattia Luevano, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Luevano, her spouse; Helen Nagle, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Nagle, her spouse; Care and Dignity Services, LLC, an Arizona Corporation, individually and as a services provider for the State of Arizona Department of Child Safety John and Jane Does 2-6; and Black Entities 1-5,

Defendants.

Defendant Aurora Behavioral Healthcare-Tempe, LLC ("Aurora") hereby files this Motion for Summary Judgment pursuant to Rule 56(a), Fed. R. Civ. P. concerning the only claims filed against Aurora, claims 21 for Assault and Battery and 23 for Negligence.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  BACKGROUND

Plaintiff Brooke Scianna ("Brooke") is a non-verbal, severely autistic individual born on July 14, 2001. (Doc. 17, First Am. Compl. at ¶ 24). It is undisputed that her biological parents are Plaintiff Christine Scianna ("Ms. Scianna") and John Scianna. (Doc. 17 at ¶¶ 23, 24). On June 22, 2018, Brooke was removed from the custody of Ms. Scianna and taken into the temporary custody of the Arizona Department of Child Safety ("DCS").

On or around July 2, 2018, the Arizona Juvenile Court issued an order "continuing [Brooke] as a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety" and finding "that the Department of Child Safety has made reasonable efforts to prevent the removal of the child from the home and that continuation in the home would be contrary to the welfare of the child, or that it was reasonable to make no efforts to maintain the child in the home." (See Ex. 1, Preliminary Protective Hearing Order dated July 2, 2018, at AZDCS004129). On August 21, 2018 "the [Juvenile] Court found that temporary custody of the child was clearly necessary to prevent abuse, pending hearing on the dependency petition." (Doc. 17 at ¶ 159). Although Plaintiffs dispute the

Juvenile Court's decisions, which are not relevant to the claims against Aurora beyond the Juvenile Court placing care, custody and control of Brooke with DCS, they admit that the Court ordered that Brooke would remain a temporary ward of the Court with DCS at all times relevant to the claims against Aurora. (Doc. 17 at ¶¶ 159, 140).

Brooke was transported to Defendant Aurora Behavioral Healthcare-Tempe, LLC on August 25, 2018, from a group home because her needs were too great for the group home and hospital staff to meet. (See Ex. 2, Addendum Report to Juvenile Courts at AZDCS004299). Brooke had exhibited "uncontrollable behaviors as she was hitting, biting, and pulling the hair of staff members." *(Id.)*. Prior to her admission to Aurora, Brooke was exhibiting the following behavior at the group home:

> [P]atient will punch staff in the head, punch the two other residents, bangs her head, bites herself and everyone else. Staff is quitting because of patient's behavior. Last week patient ripped a towel hanger off the wall and attempted to attack staff with it. She additionally punched another resident with [sic] seizure disorder in the head and induced a seizure.

(See Ex. 3, Crisis Evaluation/Intervention at AURORA(SCIANNA) 000063, 000067). Beginning on September 1, 2018, and at all relevant times, Defendant Krzystztof Mlak, M.D. was an independent contractor providing inpatient, outpatient, partial hospitalization, intensive outpatient, and chemical dependency behavioral health services at Aurora. (See Ex. 4, Agreement for Provision of Physician Services at AURORA(SCIANNA) 003102). On or around September 20, 2018, after a representative of DCS authorized treatment, Dr. Mlak administered Haldol as part of Brooke's mental health treatment. (Doc. 17 at ¶¶ 221-22). No medical provider documented in Brooke's medical records that she did not respond well to Haldol. (See Ex. 5, Dep. Tr. of Dr. Clark at 91:5-11). Brooke was discharged from Aurora on November 21, 2018. (See Ex. 6, Aurora Discharge Summary at AURORA(SCIANNA) 000004-7).

Aurora anticipates that Plaintiffs will raise irrelevant issues concerning their objections to the Arizona Juvenile Court proceedings, the bases for the Juvenile Court's decisions, and the events leading up to Brooke's removal from her home, none of which are relevant to the claims Plaintiffs brought against Aurora. Not only did Aurora play no

role in the removal of Brooke from her home, but Aurora had no control over the Arizona Juvenile Court proceedings. As outlined above, Aurora's involvement did not begin until Brooke was transferred to Aurora on August 25, 2018, and Plaintiffs' claims arise solely out of the alleged events that occurred while Brooke was admitted to Aurora based on the consent of her court-approved legal guardian, DCS.

## II.  LEGAL STANDARD

Pursuant to Rule 56(a), Fed. R. Civ. P., a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although the evidence is viewed "in the light most favorable to the non-moving party," an issue of material fact is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019). The non-moving party must "go beyond the pleadings" and their own affidavits and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## III.  ARGUMENT

### A.  Plaintiffs' Battery Claim Fails Because Dr. Mlak Had Actual Consent to Administer Haldol

Plaintiffs claim that Dr. Mlak administered Haldol to Brooke without the consent of Brooke's parent or legal guardian and that Dr. Mlak knew or should have known that Ms. Scianna would not consent to the use of Haldol. (Doc. 17 at ¶¶ 438-45). However, it is irrelevant whether Dr. Mlak knew or should have known Ms. Scianna's stance on Haldol because Dr. Mlak and Aurora obtained actual consent from Brooke's legal custodian at the time, DCS. (See Ex. 7, Dep. Tr. of Dr. Mlak at 105:20-106:3).

Under Arizona law, a claim based on a lack of consent involves "the doctor's failure to operate within the limits of the patient's consent" and should be pled in battery. *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 310, 70 P.3d 435, 439 (Ariz. 2003). While "[t]he law is well established that a health care provider commits a common law battery on a patient if a medical procedure is performed without the patient's consent", "[a] battery

claim is defeated, however, when consent is given." *Id.* at 309, 70 P.3d at 438. Such is the case here.

### i. A.R.S. § 8-531 Does Not Apply to Aurora or the Claims in This Case

The central question at issue here is whether Aurora and Dr. Mlak had consent to administer Haldol to Brooke. Plaintiffs have repeatedly relied upon A.R.S. § 8-531 to assert that only Brooke's parents could consent to the Haldol injections provided to Brooke at Aurora. Upon closer examination of the plain language of the statute, statutory interpretation, and the legislative history of this statute and those applicable to healthcare providers like Aurora, Plaintiffs' application of this statute to Aurora is misapplied. Rather, A.R.S. § 36-2272, for the provision of mental health screening or treatment of minors, is applicable here.

Arizona courts have acknowledged that their "primary goal in interpreting a statute is to give effect to legislative intent, looking to the plain language as the best indicator of that intent." *Baker v. Univ. Physicians Healthcare*, 231 Ariz. 379, 383, 296 P.3d 42, 46 (Ariz. 2013). Plaintiffs seek to incorrectly apply the definitions of legal custodian and legal guardians outlined in A.R.S. § 8-531, which are organized under Title 8 – Child Safety, Chapter 4 for the Department of Child Safety, and Article 5 for Termination of Parent-Child Relationship. The statute expressly states that the definitions and language on which Plaintiffs rely are for "this article," in other words, for application in the context of Article 5 for the termination of the parent-child relationship. A.R.S. § 8-531. In 1970, the Arizona Legislature amended Title 8, Chapter 5 by adding Article 2, § 8-531 through § 8-544. Laws 1970, Ch. 153, Sec. 2. The stated purpose of those sections, including A.R.S. § 8-531, was stated in Chapter 153, Section 1 as follows:

> The purpose of this act is to provide for voluntary and involuntary severance of the parent-child relationship and for substitution of parental care and supervision by judicial process which will safeguard the rights and interests of all parties concerned and promote their welfare and that of the state. Implicit in this act is the philosophy that, wherever possible, family life should be strengthened and preserved and that the issue of severing the parent-child relationship is of such vital importance as to require a judicial determination in place of attempts at severance by contractual arrangements, express or implied, for the surrender or relinquishment of children. This

>judicial action is intended primarily for those situations where other judicial remedies appear inappropriate.

Matter of Appeal in Pima Cty., Juv. Act. No. S-111, 25 Ariz. App. 380, 386, 543 P.2d 809, 815 (Ariz. Ct. App. 1975). Despite Plaintiffs' argument, the plain language and legislative history of A.R.S. § 8-531 establishes that the statute's application is limited to the severance of the parent-child relationship, which is not at issue in Plaintiffs' battery and medical negligence claims against Aurora.

>In contrast, A.R.S. § 36-2272 provides, in relevant part:
>Except as otherwise provided by law or a court order, no person, corporation, association, organization or state-supported institution, or any individual employed by any of these entities, may procure, solicit to perform, arrange for the performance of or perform mental health screening in a nonclinical setting or mental health treatment on a minor without first obtaining the written or oral consent of a parent *or a legal custodian of the minor child*. If the parental consent is given through telehealth, the health professional must verify the parent's identity at the site where the consent is given.

A.R.S. § 36-2272(A) (emphasis added). The statute is organized under Title 36 – Public Health and Safety, Chapter 22 for Protection of Minors, and Article 1 for "In General." A.R.S. § 36-2272 was originally introduced in the Arizona Forty-Ninth Legislature, Second Regular Session in January 2010. By March 22, 2010, the Arizona Legislature had amended Senate Bill No. 1309 to include the language "without first obtaining the written consent of a parent *or a legal custodian* of the minor child." S.B. 1309, 49th Leg., 2d Reg. Sess. (Ariz. 2010) (emphasis added). The purpose of the statute adopted via Senate Bill No. 1309 was described as follows: "Prohibits a person from performing mental health screening or treatment of a minor except under certain circumstances." Arizona Fact Sheet, 2010 Regular Session, Senate Bill 1309. The Arizona Legislature further explained that the statute concerning mental health screening or treatment (1) prohibits a person, corporation, association, organization or state-supported institution, or an employee of those entities from procuring, soliciting to perform, arranging for the performance of or performing a mental health screening in a nonclinical setting or mental health treatment on a minor without first obtaining the written or oral consent of a parent or legal custodian of the child; (2) specifies the requirement does not apply when an emergency exists to prevent

serious injury to or save the life of a minor child, and classifies a violation of this requirement as a class 1 misdemeanor. *Id.*

### ii. The Distinction Between "Adequate" and "Major" Medical Treatment is Irrelevant Because A.R.S. § 8-531 Does Not Apply

Plaintiffs have argued that DCS did not have the authority to consent to the administration of Haldol to Brooke, arguing that DCS was Brooke's custodian, not guardian, and such treatment was "major medical" and psychiatric treatment, requiring parental or guardian consent. Plaintiffs have relied upon A.R.S. § 8-531(8)(a), which states that "'[g]uardianship of the person' with respect to a minor means the duty and authority to make important decisions in matters affecting the minor including but not necessarily limited either in number or kind to: (a) . . . major medical, psychiatric and surgical treatment . . ." A.R.S. § 8-531(5) states that a "[c]ustodian means a person, other than a parent or legal guardian, who stands in loco parentis to the child or a person to whom legal custody of the child has been given by order of a court of competent jurisdiction." As explained above, while that may be the definition of custodian within the context of terminating the parent-child relationship, such definition did not govern a health care provider like Aurora's duty to obtain consent for mental health treatment administered to Brooke.

Even assuming A.R.S. § 8-531 applies, which Aurora denies, <u>there is no evidence to support that the administration of Haldol was a major medical or psychiatric treatment</u> requiring a guardian's authority. Plaintiffs' expert, Dr. Clark, testified under oath that he could not offer an opinion on whether the administration of Haldol to Brooke was "major" because he was "not sure what you mean by the word 'major'" and "major may be a term of art in the legal world that I don't understand and can't offer an opinion on." (See Ex. 5, Dep. Tr. of Dr. Clark at 120:11-17, 123:9-124:2). Dr. Mlak similarly did not agree that the administration of Haldol was a "major" medical or psychiatric treatment. (See Ex. 7, Dep. Tr. of Dr. Mlak at 113:21-115:25). Instead, the administration of Haldol was an appropriate response to Brooke's uncontrollable behaviors and in the best interest of Brooke.

Plaintiffs' argument further ignores DCS' status as custodian by order of the Arizona Juvenile Court. As custodian, DCS had a responsibility to provide Brooke with "adequate food, clothing, shelter, education and *medical care* . . ." A.R.S. § 8-531(a)(5) (emphasis added). This obligation to ensure that children receive adequate medical care substantially outweighs what is simply a definition of "guardianship of the person." DCS' duty is further emphasized in A.R.S. § 8-451(B) and (B)(4) which state that DCS' primary purpose is to protect children and that DCS shall "[w]ithout compromising child safety . . . provide prevention, intervention and treatment services pursuant to this chapter."

### iii. Dr. Mlak Obtained Actual Consent to Administer Haldol, Defeating Plaintiffs' Medical Battery Claim

In accordance with A.R.S. § 36-2272(A), Plaintiffs admit that on August 21, 2018, "the Court found that temporary custody of [Brooke] was clearly necessary to prevent abuse, pending hearing on the dependency petition." (Doc. 17 at ¶ 159). Plaintiffs also cite *Alexander M. v. Abrams*, 235 Ariz. 104, 106 (2014) for the proposition that "once 'legal custody of the child has been given by order of the juvenile court' to DCS, DCS is legally the child's 'custodian.'" (Doc. 17 at ¶ 152). Plaintiffs further admit that, while DCS was Brooke's legal custodian, a DCS representative authorized Dr. Mlak, as Brooke's treating physician, to administer Haldol as part of her mental health treatment. (Doc. 17 at ¶ 221). Dr. Mlak confirmed under oath that he obtained actual, written consent from DCS to administer Haldol. (See Ex. 7, Dep. Tr. of Dr. Mlak at 105:20-106:3). Such consent from Brooke's legal custodian was all that was required of Aurora and Dr. Mlak to administer such treatment. Given that Aurora and Dr. Mlak had actual consent from Brooke's legal guardian, Plaintiffs' battery claim, which is predicated on a lack of consent, is defeated and Aurora is entitled to summary judgment.

It bears noting that although DCS had the authority to consent and provided actual consent to the administration of Haldol, defeating Plaintiffs' battery claim, such consent was likely unnecessary under the statute's exception for emergency mental health treatment to prevent serious injury to a minor. A.R.S. § 36-2272(B) states, "This section does not apply when an emergency exists that requires a person to perform mental health screening

or provide mental health treatment to prevent serious injury to or save the life of a minor child." Here, the severity of Brooke's condition and behavior prior to admission to Aurora is undisputed. She was exhibiting uncontrollable behavior, violent outbursts, and presented a danger to herself and others. It bears repeating that Brooke was transferred to Aurora because the prior group home could not meet her needs. As of August 22, 2018, three days before Brooke was transferred to Aurora, her records note that "[g]roup home staff do not feel they can keep patient, staff and other residents safe at this point." (See Ex. 1, Crisis Evaluation/Intervention at AURORA(SCIANNA) 000067). She was noted to have "violent outbursts making her a danger to self/others" and to bang her head, bite herself, sustain a rug burn on her face from being restrained, and pick the rug burn, sustaining large red abrasions on her face. (See Ex. 1, Crisis Evaluation/Intervention at AURORA(SCIANNA) 000063-64). Transferring Brooke to Aurora for mental health treatment to prevent her from seriously injuring herself was akin to an emergency and satisfies the exception to consent under A.R.S. § 36-2272.

### B. Plaintiffs' Claims Based on Vicarious Liability Fail Because Dr. Mlak Was An Independent Contractor

Plaintiffs allege that Dr. Mlak was an Aurora employee and that Aurora is liable to them for medical negligence. (Doc. 17 at ¶¶ 16, 451-54). Under Arizona law, an employer is not generally vicariously liable for the negligence of an independent contractor resulting in injury, unless the employer of the contractor has been independently negligent. *Ft. Lowell-NSS, Ltd. P'ship v. Kelly*, 166 Ariz. 96, 101, 800 P.2d 962, 967 (Ariz. 1990). Further, "[t]he distinction between an employee and an independent contractor usually rests on the extent of control the employer may exercise over the details of the work." *Cent. Mgmt. Co. v. Indus. Comm'n*, 162 Ariz. 187, 187, 781 P.2d 1374, 1376 (Ariz. Ct. App. 1989).

Aurora and Dr. Mlak entered into an Agreement for Provision of Physician Services ("Agreement") for a one-year term beginning on September 1, 2018, which would automatically renew unless terminated pursuant to the terms of the Agreement. (See Ex. 4, Agreement for Provision of Physician Services at AURORA(SCIANNA) 003105; See

Ex. 7, Dep. Tr. of Dr. Mlak at 40:15-24). The Agreement defines "Physician" as Dr. Mlak and Dr. Mlak confirmed he signed the Agreement. (See Exhibit 4, Agreement for Provision of Physician Services at AURORA(SCIANNA) 003102*;* See Ex. 7, Dep. Tr. of Dr. Mlak at 47:22-25). Among other terms, Section V, Subsection 1 of the Agreement states, "It is expressly acknowledged and understood by the parties that Physician is an 'independent contractor', and that nothing in this Agreement is intended to or shall be construed to, create an employee/employer relationship. . . provided always that the performance of services hereunder shall at all times be in accordance with the law and with the terms and conditions of this Agreement." (See Ex. 4, Agreement for Provision of Physician Services at AURORA(SCIANNA) 003107).

In addition, Dr. Mlak testified under oath that that he was not hired as an employee of Aurora. (See Ex. 7, Dep. Tr. of Dr. Mlak at 40:25-41:5). Dr. Mlak confirmed that he entered into "an independent contractor type of contract" with Aurora. (See Ex. 7, Dep. Tr. of Dr. Mlak at 41:3-5). Under the Agreement, Dr. Mlak submitted an invoice for his services to be compensated for his independent contractor work. (See Ex. 7, Dep. Tr. of Dr. Mlak at 42:5-43:1). Although the Agreement provides performance standards for Dr. Mlak, he used his own independent judgment on how best to care and treat Brooke and <u>his decision making as to how to treat Brooke was not controlled or dictated by Aurora in any manner</u>. (See Ex. 7, Dep. Tr. of Dr. Mlak at 41:9-12, 228:6-16). Given that Aurora did not exercise control over the manner in which Dr. Mlak's work was to be performed, he was an independent contractor and Plaintiffs' claims must fail to the extent they are predicated on Aurora's alleged vicarious liability for Dr. Mlak's alleged actions. In the alternative, to the extent Plaintiffs' claims are based on a lack of consent, for the reasons stated above, Plaintiffs' claims must be dismissed.

    **C.    Plaintiffs' Medical Negligence Claim Fails Because They Failed to Establish Negligence and the Standard of Care**

Plaintiffs have alleged that Aurora and Dr. Mlak are liable for medical negligence for failing to collect a complete medical history on Brooke, failing to obtain parental consent before administering any medications, and failing to administer appropriate

medications to Brooke, which the defendants deny. (Doc. 17 at ¶ 452). To establish a prima facie case for medical negligence, or malpractice, a plaintiff must prove the existence of a duty, a breach of that duty, the breach was the proximate cause of the plaintiff's injury, and damages. A.R.S. § 12-563. A healthcare provider breaches his or her duty to act in accordance with the standard of care he or she fails to exercise the degree of care, skill, and learning expected of a reasonable, prudent health care provider in the profession or class to which he or she belongs within the state acting in the same or similar circumstances. A.R.S. § 12-563. The plaintiff in a medical malpractice action <u>must</u> establish the standard of care with expert testimony. *See, e.g.*, *Riedisser v. Nelson*, 111 Ariz. 542, 544, 534 P.2d 1052, 1054 (1975). Negligence on the part of a physician must be established by expert medical testimony unless it is "so grossly apparent that a layman would have no difficulty in recognizing it." *Id.*

As an initial matter, Plaintiffs cannot prove medical negligence against Aurora based on Dr. Mlak's alleged conduct because, as stated above, Dr. Mlak was an independent contractor whose actions cannot be the basis of liability for Aurora. Even assuming Dr. Mlak was not an independent contractor, which he was, Plaintiffs have failed to prove the standard of care or breach of that standard through the requisite expert medical testimony. Plaintiffs disclosed Dr. Andrew Clark as their psychiatry standard of care expert. (See Ex. 8. Andrew B. Clark, M.D.'s Psychiatric Evaluation Report at pp. PLTFS-003767-003769). While Dr. Clark claims that Dr. Mlak fell below the standard of care by failing "to obtain an adequate history around Brooke's psychiatric treatment prior to prescribing her Haldol and failed to take account of Ms. Scianna's experience or concerns in that regard," Dr. Clark admitted under oath "that it is not necessarily below the standard of care to prescribe Haldol to a patient like Brooke." (See Ex. 8, at PLTFS-003769; See Ex. 5, Dep. Tr. of Dr. Clark at 60:18-61:1, 116:5-117:7). He agreed that a doctor has a duty to protect a patient from harming him or herself or others and that the standard of care requires a reasonable psychiatrist "to take some action in an effort to reduce the aggressiveness" when presented with a patient like Brooke going through an aggressive outburst. (See Ex. 5, Dep. Tr. of Dr. Clark at 61:9-62:8). Dr. Clark further conceded that

Dr. Mlak spoke with Ms. Scianna several times after prescribing Haldol to Brooke. (See Ex. 5, Dep. Tr. of Dr. Clark at 48:19-19:13, 54:8-21).

Plaintiffs have otherwise neither alleged that other employees of Aurora were negligent nor provided other medical experts or expert medical opinions concerning Brooke's care or treatment at Aurora. In fact, Dr. Clark acknowledged that Aurora's employees are registered nurses and others with medical training. (See Ex. 5, Dep. Tr. of Dr. Clark at 51:9-52:8). However, Dr. Clark has not and cannot render standard of care opinions about these other employees, including registered nurses, to the extent Dr. Clark does not practice or instruct students in an accredited health professional school or accredited residency or clinical research program in the same profession as Aurora's employees or otherwise meet the requirements of A.R.S. § 12-2604. *See Baker v. Univ. Physicians Healthcare*, 296 P.3d 42, 50, ¶ 31, (Ariz. 2013); *Rasor v. Nw. Hosp., LLC*, 419 P.3d 956, 960 (Ariz. Ct. App. 2018) (noting that § 12-2604 "'precludes a witness who is otherwise qualified under Rule 702 from testifying [to the standard of care] in a medical malpractice case unless he or she meets the additional criteria set forth in the statute'"). It is undisputed that Dr. Clark is not and has never been a registered nurse. (See Ex. 9, Dr. Clark Curriculum Vitae).

D. **Both of Plaintiffs' Claims Against Aurora Must Fail Because They Have Failed to Prove Damages**

Under claims 21 and 23, Plaintiffs have generally alleged that "Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial." (Doc. 17 at ¶¶ 446, 454). However, Plaintiffs have failed to prove the requisite proximate cause or damages to support their claims against Aurora. Rather, the evidence shows that Brooke did not sustain Brooke sustained any injury, harm, or damages as a result of Dr. Mlak's administration of Haldol to her.

It is undisputed that Dr. Mlak prescribed Haldol to Brooke. (See Ex. 7, Dep. Tr. of Dr. Mlak at 65:5-7, 228:17-19; Doc. 17 at ¶¶ 221-22). This occurred only after Dr. Mlak concluded that Brooke's prior treatments rendered up to that period of time were not

effective. (See Ex. 7, Dep. Tr. of Dr. Mlak at 104:2-105:5). Dr. Mlak's course of treatment was based on "[t]he severity of her clinical presentation as defined by the chronic behaviors, the chronic mood symptoms, the extent of the aggression and self-harm, [and] the multiple past medication trials." **(**See Ex. 7, Dep. Tr. of Dr. Mlak at 164:12-165:2). In sum, Dr. Mlak believed the administration of Haldol to Brooke was in her best interest. (See Ex. 7, Dep. Tr. of Dr. Mlak at 228:20-22). Although the Haldol caused Brooke to experience a transient, reversible side effect called EPS, Dr. Mlak prescribed a medication called Cogentin, which resolved the EPS. (See Ex. 7, Dep. Tr. of Dr. Mlak at 229:1-9). Even Plaintiffs' expert, Dr. Clark, concedes that the Cogentin relieved Brooke's symptoms of EPS. (See Ex. 5, Dep. Tr. of Dr. Clark at 67:4-12). Dr. Mlak and Dr. Clark agree that the prescription of Haldol and Cogentin together in response to side effects of EPS is not unusual and is in fact, common in the industry. (See Ex. 7, Dep. Tr. of Dr. Mlak at 229:21-230:4; See Ex. 5, Dep. Tr. of Dr. Clark at 65:13-24). Notably, Dr. Mlak and Dr. Clark agree that <u>the EPS did not cause any permanent harm or injury to Brooke</u> to a reasonable degree of medical certainty. (See Ex. 7, Dep. Tr. of Dr. Mlak at 230:5-7; See Ex. 5, Dep. Tr. of Dr. Clark at 71:15-73:2). In addition, Dr. Mlak's expert, board certified psychiatrist Jahanzeb Ali Khan, M.D., also determined that the use of Haldol "did not cause Brooke any long-term harm and was necessary to address her aggression and self-harming behavior." (See Ex. 10, Jahanzeb Ali Khan report at p. 5).

Based on the above, Plaintiffs have failed to prove proximate cause or damages for their claims. Rather, Plaintiffs' own expert concedes that the administration of Haldol and Cogentin did not result in any permanent harm or injury to Brooke. In the absence of these necessary elements of their claims, Plaintiffs' claims against Aurora must be dismissed.

### IV.   CONCLUSION

For the reasons stated above, Defendant Aurora Behavioral Healthcare Tempe, LLC moves for summary judgment on claims 21 and 23 of the First Amended Complaint.

Respectfully submitted this 11th day of July, 2024.

>WEINBERG, WHEELER, HUDGINS,
>    GUNN & DIAL, LLC
>
>By */s/ Jeffrey S. Hunter*
>   Jeffrey S. Hunter, Esq.
>   1 North Central Avenue, Suite 900
>   Phoenix, Arizona 85004
>   *Counsel for Defendant Aurora Behavioral Healthcare-Tempe, LLC*

# CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmitted a Notice of Electronic Filing to the following CM/ECF participants:

Thomas A. Connelly
Robert T. Mills
Sean A. Woods
MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
docket@millsandwoods.com

-and-

DeeAn Gillespie Strub
Jenny DeAnn Jansch
GILLESPIE, SHIELDS & TAYLOR
7319 North 16th Street
Phoenix, Arizona 85020
mailroom@gillaw.com
*Attorneys for Plaintiffs*

Georgia A, Staton, Esq.
Ravi V. Patel, Esq.
JONES, SKELTON & HOCHULI P.L.C,
40 N. Central Avenue, Suite 2700
Phoenix, Arizona 85004
*Attorneys for Defendants State of Arizona,*
*Arizona Department of Child Safety,*
*Tina Canale, Christie Johnson (Christi Mehl),*
*Melissa Courtright, Barry Courtright*
*Nicholas Long, and Gregory McKay*

Cody M. Hall
BROENING OBERG WOODS & WILSON, P.C.
2800 N. Central Ave., 16th Fl.
Phoenix, Arizona 85004
cmh@bowwlaw.com
cjg@bowwlaw.com
*Attorneys for Defendant Care & Dignity Services, LLC*

Dustin A. Christner
Vincent J. Montell
Quintairos, Prieto, Wood & Boyer, P.A.
8800 East Raintree Drive, Suite 100, Scottsdale, Arizona 85260
*Attorneys for Defendant Krzystztof Mlak*

By *s/ Connie Traslavina*