# EXHIBIT 5

CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 2–5

Page 2

```
 1              APPEARANCES
 2  ON BEHALF OF THE PLAINTIFFS:
        THOMAS A. CONNELLY, ESQ.
 3      Tconnelly@millsandwoods.com
        Mills + Woods Law, PLLC
 4      5055 North 12th Street, Suite 101
        Phoenix, Arizona  85014
 5      480.999.4556
 6  ON BEHALF OF KRZYSTZTOF MLAK, M.D.:
        DUSTIN A. CHRISTNER, ESQ.
 7      Dustin.christner@qpwblaw.com
        Quintairos, Prieto, Wood & Boyer, P.A.
 8      8800 E. Raintree Dr., Suite 100
        Scottsdale, Arizona  85260
 9      602.954.5605
10  ON BEHALF OF AURORA BEHAVIORAL HEALTHCARE-TEMPE, LLC:
        JEFFREY S. HUNTER, ESQ.
11      Jhunter@rcdmlaw.com
        Renaud Cook Drury Mesaros, PA
12      One N. Central, Suite 900
        Phoenix, Arizona  85004
13      602.307.9900
14  ON BEHALF OF CARE & DIGNITY SERVICES, LLC:
        CODY M. HALL, ESQ. (PRESENT VIA ZOOM)
15      Cmh@bowwlaw.com
        Broening Oberg Woods & Wilson, P.C.
16      2800 North Central Avenue, 16th Floor
        Phoenix, Arizona  85004
17      602.271.7700
18  ON BEHALF OF STATE OF ARIZONA:
        GEORGIA A. STATON, ESQ. (PRESENT VIA ZOOM)
19      Gstaton@jshfirm.com
        Jones, Skelton & Hochuli, P.L.C.
20      40 N. Central Avenue, Suite 2700
        Phoenix, Arizona  85004
21      602.263.1700
22  ALSO PRESENT:
23  MARISSA DEMONTE, Videographer
24  MARK GONZALEZ, Alliance (Present via Zoom)
```

Page 3

```
 1                  INDEX PAGE
 2  DEPOSITION OF ANDREW CLARK, M.D.
 3  EXAMINATION                                 PAGE
 4  BY MR. CHRISTNER                               5
 5  BY MR. HALL                                   92
 6  BY MR. CONNELLY                               97
 7              EXHIBIT INDEX
 8  EXHIBIT      DESCRIPTION                    PAGE
 9  Exhibit 1   Curriculum vitae                   9
10  Exhibit 2   Retainer agreement                21
11  Exhibit 3   Psychiatric evaluation report     32
12  Exhibit 4   Timeline                          39
13  Exhibit 5   E-mails                           40
14  Exhibit 6   Invoice for forensic consultation 41
                services
15  Exhibit 7   Retainer request                  42
16  Exhibit 8   Handwritten notes, April 13, 2023 43
17  Exhibit 9   Handwritten notes, April 20, 2023 43
18  Exhibit 10  Handwritten notes, November 26, 2023  44
19
20  (Exhibits attached to transcript.)
```

Page 4

1  DEPOSITION OF ANDREW CLARK, M.D.
2       FEBRUARY 19, 2024
3
4       THE VIDEOGRAPHER: This is the videotaped
5  deposition of Andrew B. Clark, M.D., in the matter of
6  Christine Scianna, et al., versus State of Arizona, et
7  al.
8       This matter is being held in the United States
9  District Court for the District of Arizona, Case Number
10 221-cv-01444-DJH.
11      Our location is O'Brien & Levine Court
12 Reporting Solutions, Boston, Massachusetts. The
13 deposition is now beginning at 9:04 a.m. on Monday,
14 February 19th, 2024.
15      Counsel, would you please identify yourself
16 and whom you represent.
17      MR. CONNELLY: Thomas Connelly on behalf of
18 the plaintiffs.
19      MR. CHRISTNER: Dustin Christner on behalf of
20 Dr. Mlak.
21      MR. HUNTER: Jeff Hunter on behalf of Aurora.
22      MS. STATON: Georgia Staton on behalf of the
23 state defendants and the State of Arizona.
24      MR. HALL: And this is Cody Hall on behalf of

Page 5

1  Care and Dignity Services.
2       ANDREW CLARK, M.D., the deponent, having been
3  satisfactorily identified and duly sworn by the Notary
4  Public, was examined and testified as follows:
5       EXAMINATION
6       BY MR. CHRISTNER:
7   Q.  Can you please state your full name for the
8  record?
9   A.  Andrew Clark, C-L-A-R-K.
10  Q.  Is it all right if I call you Andrew --
11  A.  Sure.
12  Q.  -- or Andy?
13  A.  That's fine. Yeah.
14  Q.  Have you had your deposition taken before?
15  A.  I have.
16  Q.  How many times?
17  A.  More than 50.
18  Q.  More than 50.
19      You understand the process, then.
20  A.  I do.
21  Q.  Okay. And you understand that you're under
22 oath here.
23  A.  I do.
24  Q.  And that this transcript may be read to a jury



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 46–49

Page 46

1 asked by attorney DeeAn Gillespie Strub to review
2 records related to the medical and psychiatric treatment
3 of Brooke Scianna during 2018 and, in particular, her
4 admission to Aurora Behavioral Health Systems, Special
5 Needs Unit, Tempe, Arizona, from August 25, 2018,
6 through November 21, 2018." Is that accurate?
7   A. I believe so, yes.
8   Q. Did you review any medical records from any
9 medical provider other than Aurora for any potential
10 violations of standard of care or harm prepared -- or
11 harm caused to Brooke Scianna?
12   A. I'm not sure I understand the question. Are
13 you asking whether that was my intent or motive?
14   Q. Well, did you review any medical record -- did
15 you -- strike that.
16      Did you review any medical records of Brooke
17 Scianna for standard of care violations by any medical
18 provider other than Dr. Mlak?
19   A. No.
20   Q. Why not?
21   A. I wasn't asked to.
22   Q. In reviewing the medical records for Brooke
23 Scianna, did you identify any violations of the standard
24 of care by any psychiatrist that treated Brooke Scianna

Page 47

1 prior to her residency at Aurora in August of 2018?
2   A. No.
3   Q. Did you identify how many medical providers
4 prescribed Brooke Scianna Haldol before she was a
5 resident at Aurora starting on August 25th of 2018?
6   A. No. I did not enumerate those.
7   Q. We're going to go to your December psychiatric
8 evaluation report.
9   A. Okay.
10   Q. Can you turn to page 15?
11   A. (Deponent viewing document.) Okay.
12   Q. 15 -- page 15 includes your opinions as to
13 Dr. Mlak's violation of the standard of care.
14   A. (Deponent viewing document.) Yes.
15   Q. And it's your opinion, according to the report
16 on page 15, that Dr. Mlak's treatment of Brooke during
17 her Aurora hospitalization in August of 2018 fell below
18 the standard of care.
19   A. Yes.
20   Q. And he -- Dr. Mlak fell below the standard of
21 care because, one, he failed to obtain an adequate
22 history around Brooke's prior psychiatric treatment
23 prior to prescribing Haldol.
24   A. Yes.

Page 48

1   Q. And it was also a violation of the standard of
2 care, in your opinion, because Dr. Mlak failed to take
3 into account Ms. Scianna's experience or concerns in
4 regards to prescribing Haldol.
5   A. Correct.
6   Q. Do you have any other standard of care
7 opinions for Dr. Mlak?
8   A. No.
9   Q. It's your opinion that Dr. Mlak did not take
10 an adequate history regarding Brooke's prior psychiatric
11 treatment because Dr. Mlak did not get a medical history
12 from Ms. Scianna until September 7th of 2018; is that
13 fair?
14   A. No.
15   Q. Tell me why it's not fair.
16   A. I am not aware of Dr. Mlak having gotten a
17 medical history from Ms. Scianna on September 7th of
18 2018.
19      And my understanding is that his first
20 conversation with her was September 12th of 2018. And
21 to the extent that he did obtain information from her,
22 it is my understanding and opinion that he did not give
23 adequate weight to the concerns that she expressed to
24 him.

Page 49

1   Q. Did not give adequate weight to the concerns
2 that Ms. Scianna expressed, what does that mean?
3   A. What it means is that I noticed that -- again,
4 my understanding is -- and I think it's a little bit
5 unclear in the records -- but that he spoke to her on
6 September 12th of 2018 finally.
7      There's no indication in his notes of any
8 conversation with Ms. Scianna until September 28th of
9 2018. I infer from that, that he did not feel that the
10 information that she provided him was important enough
11 to warrant a notation in the medical record and wasn't
12 important enough for him to modify his treatment plan in
13 that regard.
14   Q. Okay.
15   A. I will also, if I may, say that part of what I
16 mean by this paragraph is that he also, apparently, as
17 far as I can tell from both the deposition and the
18 medical record, took no note of Ms. Scianna's assessment
19 of how Brooke was responding to the medication during
20 the period of time that she was on Haldol.
21      There's nowhere in the medical record that he
22 indicates that the mom -- what the mom thought of the
23 Haldol.
24      I take a parent's -- in this case, in



Page 50

1 particular Ms. Scianna's, but a parent's assessment of
2 how their child is doing as being a critically important
3 piece of information for a prescriber.
4     There's no one in the world who knows her
5 better than her mother, and if you're trying a new
6 medication on her, the mother's assessment of how the
7 child is doing is critically important.
8     I don't see that anywhere in his -- I don't
9 see that reflected anywhere in either -- in his medical
10 records or in his deposition.
11     Q. You understand, from your review of the
12 medical records, that Ms. Scianna was opposed to
13 antipsychotic medications for Brooke; correct?
14     A. Yes.
15     Q. And she --
16     A. I'm sorry. If I may just clarify, at a
17 certain point in time, she was opposed to it. She had
18 not always been opposed to it historically, I think.
19     Q. Well before Brooke's administration to Aurora
20 in August of 2018, the medical records show that
21 Ms. Scianna was opposed to antipsychotic medications
22 being prescribed to Brooke.
23     A. Correct.
24     Q. Does Ms. Scianna have any medical training?

Page 51

1     MR. CONNELLY: Form.
2     A. I don't believe so, no.
3     Q. (BY MR. CHRISTNER) She's not a nurse.
4     A. No.
5     Q. She's not a doctor.
6     A. Correct.
7     Q. She's not a psychiatrist.
8     A. Correct.
9     Q. At Aurora, you understand that employees at
10 Aurora are registered nurses.
11     MR. CONNELLY: Form.
12     A. I understand there are some registered nurses
13 who are employed at Aurora. At least I presume that to
14 be the case, yes.
15     Q. (BY MR. CHRISTNER) Certified nursing
16 assistants?
17     A. Yes.
18     Q. Psychiatrists?
19     A. Yes.
20     Q. Perhaps other doctors?
21     A. Yes.
22     Q. All of which have some medical training?
23     A. Yes.
24     Q. And all of which are qualified to do an

Page 52

1 assessment of the patients that are admitted to Aurora.
2     MR. CONNELLY: Form and foundation.
3     MR. HUNTER: Join.
4     THE DEPONENT: I'm sorry.
5     MR. HUNTER: I just joined in the objection.
6     A. I would say that each of them was qualified to
7 do an assessment according to their training, but they
8 have different levels of training.
9     Q. (BY MR. CHRISTNER) You saw in the medical
10 records from Aurora that Dr. Mlak did several
11 assessments of Brooke throughout her stay at Aurora.
12     A. Yes.
13     Q. Is it your opinion that Dr. Mlak should have
14 provided more weight to the assessment of Brooke's
15 condition that was expressed by Ms. Scianna than his own
16 assessment based on his education, training, and
17 experience?
18     MR. CONNELLY: Form and foundation.
19     A. It is my opinion that his own assessment
20 should have integrated the mother's understanding and
21 impressions of how her child was doing.
22     Q. (BY MR. CHRISTNER) And how should that have
23 been integrated?
24     A. In that if a parent says to a psychiatrist, my

Page 53

1 daughter is different; my daughter is off; there's
2 something wrong about her; she's not acting as usual;
3 she's having side effects; she's not doing well; she's
4 not -- I think she's not responding well to this
5 medication, I think that's very meaningful information.
6     It may not be correct, but I think very
7 meaningful information, and then I think the onus is on
8 the doctor to try to make sense of that and to discern
9 to what extent that's correct.
10     I will say that certainly in my experience,
11 both doing pediatrics and child psychiatry, the parent's
12 understanding of how their child is doing is generally
13 considered to be exceptionally important and often very
14 valuable.
15     And I know that in my practice, I take it very
16 seriously when a parent says to me, something is not
17 right with my child. And I don't have any indication
18 that Dr. Mlak took her seriously in that regard.
19     Q. You understand that there are several attempts
20 documented in Aurora records of staff attempting to
21 reach Ms. Scianna.
22     A. I'm aware of three attempts documented in the
23 medical record at the time that she came in.
24     Q. Do you have any reason to believe that those



Page 54

1 are false or made up?
2   A.  No, but -- I'm sorry. A fuller answer, I know
3 that Ms. Scianna, in her deposition, said that she did
4 not receive messages from Dr. Mlak on the second -- I
5 think August 26th, so I don't know in this case who
6 to -- who to believe, but I know it's documented in the
7 record that he tried to call her twice on that day.
8   Q.  In Dr. Mlak's deposition and in your report on
9 page 12, you state, "In regards to the information
10 Ms. Scianna relayed to him about Brooke's past reactions
11 to medication, Dr. Mlak testified he did not consider it
12 to be clinically accurate." Do you see that, bottom of
13 page 12?
14   A.  (Deponent viewing document.) I do see it, yes.
15   Q.  So in your report, you recognize that, one,
16 Dr. Mlak had a conversation with Ms. Scianna regarding
17 Brooke's past reactions to medications; right?
18   A.  Yes.
19   Q.  And he did not consider it to be clinically
20 accurate.
21   A.  Correct.
22   Q.  Did you conduct an investigation regarding
23 Ms. Scianna's interpretation of Brooke's past reactions
24 to medications and determine whether they were accurate

Page 55

1 or not?
2       MR. CONNELLY:  Form and foundation.
3   A.  So, yes, I'd say my report includes my
4 investigation of Ms. Scianna's understanding of -- and
5 reporting of Brooke's response to medication.
6   Q.  (BY MR. CHRISTNER) And was Ms. Scianna's
7 reporting of Ms. -- or of Brooke's reactions to
8 medications in the past accurate?
9   A.  Well, I would say that -- two things.  One is
10 I think that, as I testified to earlier this morning,
11 there were at least two occasions in which I think she
12 was just wrong in her assessment.
13       But in terms of the big picture and with the
14 benefit of 20/20 hindsight, I think she was absolutely
15 right, that antipsychotics in every single instance
16 either were counterproductive in causing Brooke to
17 become more agitated and/or caused significant side
18 effects.
19       And we see that Brooke does -- did better
20 historically -- I'm just going on here -- did better
21 historically when she was off medication. Big picture
22 I think Ms. Scianna actually got it right more than the
23 doctors did.
24   Q.  I believe you just testified that each and

Page 56

1 every time that Brooke was prescribed antipsychotic
2 medication, it was not effective and oftentimes
3 increased her aggressive behavior.
4   A.  In short, yes. On at least two occasions, it
5 was thought to have increased her aggressive behavior.
6 On every single occasion, it was thought, at least over
7 the course of a few months, to be either
8 counterproductive or to cause side effects.
9       I will say that there were at least a few
10 occasions where it was thought to be temporarily helpful
11 for her, but none of the antipsychotic medications were
12 ever sustained by the clinicians who were treating her.
13 They were all dropped at different points in time.
14   Q.  Can you show me anywhere in any of the records
15 from St. Luke's, from Abruzzo, from Banner Health,
16 anywhere that a medical provider indicated that the --
17 prescribing Haldol to Brooke was counterproductive?
18   A.  I don't believe there is any such thing. At
19 least I have not seen it.
20   Q.  No medical provider detailed any side effects
21 from the use of Haldol on Brooke.
22   A.  That's correct.
23   Q.  And when Haldol was used on Brooke at the
24 various medical facilities, including St. Luke's and

Page 57

1 Banner, the Haldol reduced her aggression at that time.
2   A.  I know that that -- I'm actually not sure the
3 answer to that question.  I know there were certain
4 times that was the case.  It was used in emergency
5 departments with her at various points and times.  I
6 actually don't have a sense of how effective it was.
7       I also know that it was given to her on the
8 inpatient unit at, I believe, St. Luke's and then not
9 continued.  And I don't know why that is or what her
10 response to it was.  I don't -- I could not find that in
11 the records.
12   Q.  In review of the medical records at Aurora
13 from the August 2018 stay by Brooke, would you agree
14 with me that there's documentation that Brooke had
15 increased aggression, which led Dr. Mlak to prescribe
16 Haldol on September 7th, 2018?
17   A.  I'm not sure the baseline upon which you say
18 her aggression was increased.
19   Q.  Did you -- you reviewed the records; right?
20   A.  Yes.
21   Q.  Is there any documentation in the records that
22 her aggression increased near 9-7 of 2018 when Dr. Mlak
23 prescribed Haldol?
24   A.  There is.



Page 58

1  Q.  Do you have any reason to doubt that her
2  aggression increased?
3      MR. CONNELLY:  Form and foundation.
4  A.  No.  I'm just -- just raising the point that
5  I'm not sure what -- what they are comparing it to, but
6  there is documentation in the records that around
7  September 7th, 2018, they saw increased aggression.
8  Q.  (BY MR. CHRISTNER) And what type of increased
9  aggression?
10 A.  I don't recall specifically.
11 Q.  Did you make any notes on what type of
12 increased aggression?
13 A.  Unless it's in my report, I don't -- I don't
14 recall.  I know that she was at times --
15     MR. CONNELLY:  If you want to show him the
16 record, why don't you show him the record, and you can
17 really get into it.
18     MR. CHRISTNER:  Was that an objection to form
19 or foundation?
20     MR. CONNELLY:  That's a suggestion.
21     MR. CHRISTNER:  All right.
22 Q.  (BY MR. CHRISTNER) In your report, do you
23 include any recitation of the medical records from
24 Aurora regarding Brooke's aggressive behavior on or

Page 59

1  about September 7, 2018?
2  A.  I don't recall what I said about it.
3  Q.  Would you agree with me that when Brooke was
4  admitted to Aurora on -- in August of 2018, she had a
5  history of being a risk of harm to herself and others?
6  A.  Yes.
7  Q.  Tell me a little bit about the types of harm
8  she was at risk for causing herself and others prior to
9  her admission to Aurora.
10     MR. CONNELLY:  Form and foundation.
11 Q.  (BY MR. CHRISTNER) What's your understanding?
12     MR. CONNELLY:  Form and foundation.
13 A.  My understanding is that she could become
14 quite physically aggressive at times; that she would
15 strike out; that other people considered her a potential
16 danger, and reasonably so; that she would bang her head
17 at times, I believe and engaged in self-injurious
18 behavior at times; and she was -- that her behavior
19 was -- was very problematic at different points in time.
20 She had had multiple prior hospitalizations, mostly for
21 aggressive and agitated behavior, and I believe had
22 suffered injuries as a result.
23 Q.  (BY MR. CHRISTNER) Is there a history of
24 her -- of biting herself?

Page 60

1  A.  Yes.
2  Q.  History of her biting others?
3  A.  Yes.
4  Q.  There's documentation of her attacking
5  security staff at the hospital.
6  A.  I don't recall specifically, but that would
7  not surprise me at all.
8  Q.  Do you recall documentation that Brooke had to
9  be physically restrained at the hospital on multiple
10 occasions?
11 A.  Yes.
12     MR. CONNELLY:  Form and foundation.
13 Q.  (BY MR. CHRISTNER) There was -- there was a
14 time that it's documented that Brooke knocked down her
15 grandfather, and as a result, he broke his hip.
16     MR. CONNELLY:  Form and foundation.
17 A.  I actually don't recall that.
18 Q.  (BY MR. CHRISTNER) Is it within the standard
19 of care if you have a patient like Brooke going through
20 one of these aggressive outbursts to prescribe Haldol to
21 reduce the aggressiveness of Brooke?
22     MR. CONNELLY:  Form and foundation.
23 A.  I would say that it is not necessarily below
24 the standard of care to prescribe Haldol to a patient

Page 61

1  like Brooke.
2  Q.  (BY MR. CHRISTNER) And you have no opinion as
3  to any other medical provider that prescribed Haldol to
4  Brooke that they fell below the standard of care.
5  A.  Correct.
6  Q.  Would you --
7      MR. CONNELLY:  A late objection, form and
8  foundation on that, please.
9  Q.  (BY MR. CHRISTNER) Would you agree with me
10 that a reasonable psychiatrist, if presented with a
11 patient such as Brooke who is going through one of her
12 aggressive outbursts, that the standard of care requires
13 the doctor to take some action to reduce the
14 aggressiveness of Brooke?
15     MR. CONNELLY:  Form and foundation.
16 A.  Yes.  I would say requires the doctor to take
17 some action in an effort to reduce the aggressiveness,
18 yes.
19 Q.  (BY MR. CHRISTNER) Understood.
20     And that is because a doctor has a duty to
21 protect a patient from harming themselves.
22 A.  Yes.
23 Q.  A doctor has a duty to protect a patient from
24 harming others.



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024
Pages 62–65

Page 62

1   A. Yes.
2   Q. And if a psychiatrist does not take reasonable
3 steps to protect a patient from harming themselves or
4 others, that may open them up to liability.
5     MR. CONNELLY: Form and foundation.
6   Q. (BY MR. CHRISTNER) Correct?
7     MR. CONNELLY: Form and foundation.
8   A. Correct.
9   Q. (BY MR. CHRISTNER) In review of your medical
10 records, when Brooke had these aggressive outbursts,
11 were there -- was there a risk that she could cause
12 permanent injury to herself?
13     MR. CONNELLY: Form and foundation.
14   A. Yes.
15   Q. (BY MR. CHRISTNER) Obviously, if you're
16 slamming your head into the wall, you have a risk of
17 serious brain injury.
18   A. Yes.
19     MR. CONNELLY: Form and foundation.
20   Q. (BY MR. CHRISTNER) And in your review of the
21 medical records, it would be fair to say that when
22 Brooke is going through one of these aggressive
23 outbursts, there is a significant risk of her causing
24 permanent injury to others.

Page 63

1     MR. CONNELLY: Form and foundation.
2   A. Yes.
3   Q. (BY MR. CHRISTNER) When Brooke was prescribed
4 Haldol at Aurora in August of 2018, September of 2018,
5 October of 2018, is there documentation that her
6 aggressive behavior was reduced at times?
7   A. I'm -- so I'll just -- just to take a second,
8 I don't think she was prescribed Haldol in August of
9 2018.
10   Q. All right.
11   A. And during September and October of 2018, at
12 times, there was some indication that her aggression was
13 better.
14   Q. The Haldol, however, was not effective in
15 completely eliminating her aggressive behavior; fair?
16   A. I don't think the Haldol was effective in even
17 helping overall her aggressive behavior.
18   Q. You would agree with me that other medical
19 providers had prescribed Haldol because of her
20 aggressive behaviors; right?
21   A. Yes.
22     MR. CONNELLY: Form and foundation.
23   Q. (BY MR. CHRISTNER) Any reason to believe that
24 they did not find that the Haldol reduced Brooke's

Page 64

1 aggressive behaviors?
2     MR. CONNELLY: Form and foundation.
3   A. I just don't know what they found, so in
4 answer to your question, no, I have no reason to believe
5 that they did not.
6   Q. (BY MR. CHRISTNER) Right.
7   A. I think I understand the double negative.
8   Q. I understand.
9     You didn't see anything in the medical records
10 of any medical provider indicating that they believe
11 that Haldol did nothing to reduce Brooke's aggressive
12 behavior.
13   A. Correct.
14     MR. CONNELLY: Form and foundation.
15   Q. (BY MR. CHRISTNER) When Brooke was prescribed
16 Haldol by Dr. Mlak on September 7th of 2018, were there
17 any documented side effects from this drug?
18   A. I'm sorry. Prior to that time or?
19   Q. No.
20   A. Since that time.
21   Q. Since that time.
22   A. Yes.
23   Q. What were they?
24   A. She developed, what I noticed, extrapyramidal

Page 65

1 symptoms, I believe fairly shortly after, which included
2 stiffness and rigidity. I don't recall if there were
3 other symptoms.
4   Q. The EPS that she --
5   A. I apologize. Can I -- I have a little more
6 answer to the question.
7   Q. Uh-huh.
8   A. She also, according to the records, had
9 developed difficulty sleeping and was often sleeping
10 during the day and not sleeping well at night.
11   Q. Anything else?
12   A. I believe that's it.
13   Q. So when she developed EPS, that is a known
14 side effect of Haldol.
15   A. Yes.
16   Q. And that is something that can be treated with
17 Cogentin.
18   A. Cogentin.
19   Q. Cogentin. Thank you.
20     Correct?
21   A. Yeah, typically, yes.
22   Q. And that's common in the industry.
23     MR. CONNELLY: Form and foundation.
24   A. Yes.



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024 — Pages 66–69

Page 66

1  Q. (BY MR. CHRISTNER) And that Cogentin was
2  effective for Brooke in relieving her symptoms of EPS.
3  A. It seemed to be, yes.
4  Q. Okay.
5  A. I'm sorry. Perhaps I gave a fuller answer.
6  The records would indicate that it was indeed helpful
7  for her. The mother reported that she remained
8  shuffling, which is a sign of EPS, and so to the extent
9  that's the case, then the Cogentin was not fully
10 effective.
11  Q. When -- when did Ms. Scianna state that she
12 witnessed Brooke shuffling?
13  A. I'd have to turn to my report, but she
14 reported to me that she saw Brooke -- and I believe that
15 she saw Brooke shuffling, and I believe that in her
16 e-mails she also indicates she was concerned about
17 Brooke's -- yeah, Brooke's shuffling.
18  Q. And was that shuffling that Ms. Brooke
19 allegedly witnessed, was that before or after Cogentin
20 was prescribed for the EPS?
21  A. I believe that it was after.
22  MR. CONNELLY: And just to -- you misspoke and
23 said Ms. Brooke. You meant Ms. Scianna; right?
24  MR. CHRISTNER: I apologize. I did.

Page 67

1  MR. CONNELLY: Okay.
2  THE VIDEOGRAPHER: There are five minutes
3  remaining on media.
4  Q. (BY MR. CHRISTNER) After -- in your review of
5  the medical records of Aurora, was there any
6  documentation that the Cogentin was not -- or did not
7  successfully alleviate Brooke's EPS?
8  A. No.
9  Q. There's no documentation that after Brooke
10 received Cogentin that she continued to shuffle or have
11 symptoms of EPS.
12  A. No. And it's -- just to say it's Cogentin.
13  Q. Cogentin.
14  A. I don't mean to be a know-it-all.
15  Q. That's all right.
16  But what I said was correct except for the
17 pronunciation.
18  A. That's correct. Yeah.
19  Q. Thank you.
20  We're running out of tape on the videotape, so
21 we're going to take a break.
22  A. Great.
23  THE VIDEOGRAPHER: The time is 10:59 a.m.
24 This concludes Media Unit Number 1. We're off the

Page 68

1  record.
2  (Brief break from 10:59 a.m. to 11:05 a.m.)
3  THE VIDEOGRAPHER: The time is 11:05 a.m.
4  This is the beginning of Media Unit Number 2. We're
5  back on the record.
6  Q. (BY MR. CHRISTNER) Doctor, we're back on the
7  record after taking a brief break to change tapes in the
8  video.
9  We were talking about your opinions regarding
10 Dr. Mlak. And on page 15 of your December psychiatric
11 evaluation report, you indicate one of your opinions is,
12 "As a result of Brooke's being unsuccessfully treated
13 with Haldol over the course of approximately four weeks
14 in September and October of 2023, (as said) she was
15 unnecessarily exposed to a range of side effects and
16 risk and her hospital course was unnecessarily prolonged
17 for several weeks."
18  A. Correct.
19  Q. Do you see that?
20  A. Yeah.
21  Q. Is that still your opinion?
22  A. It is.
23  Q. Did we talk about the side effects of the
24 Haldol that she experienced?

Page 69

1  A. Did we talk about the side effects?
2  Q. Yes.
3  A. We did.
4  Q. She was not -- other than the EPS, she did not
5  experience any side effect -- any other side effects of
6  Haldol; right?
7  MR. CONNELLY: Form and foundation.
8  A. I disagree.
9  Q. (BY MR. CHRISTNER) Okay.
10  A. It is my understanding and opinion that she
11 experienced significant sedation and likely cognitive
12 impairment. And I base that on three things; one is the
13 medical records that I indicated indicated -- showed
14 that she was often sleeping during the day.
15  A second is that my understanding is that
16 Haldol, and especially at the doses that were used for
17 much of this time, typically and predictably causes
18 significant sedation and cognitive impairment.
19  And my third is that the mother's report was
20 that Brooke seemed to be -- to have vacant stare and
21 just wasn't there, wasn't engaged, wasn't aware in the
22 way that she normally was.
23  Q. So you believe that one of the side effects
24 that Brooke experienced from the Haldol was she was



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024
Pages 70–73

Page 70

1 sleeping more.
2    A. Yes.
3    Q. Okay.
4    A. Well, actually, just to clarify, she was
5 sleeping poorly at night and then sleeping more during
6 the day. I don't know whether her overall 24 sleep was
7 increased. I would think it likely that it would be.
8    Q. And it's your belief that the Haldol was
9 causing her unusual sleep patterns.
10    A. I think that's the likely explanation, yes.
11    Q. The cognitive impairment, the basis for that
12 is the fact that she was sleeping more.
13    A. The fact that typically and predictably Haldol
14 will cause cognitive impairment, especially --
15 specifically -- especially at these doses, and that the
16 mother reported her to be -- to have a vacant stare and
17 just not being as engaged and responsive as she normally
18 was.
19    Q. Did you find any evidence of cognitive
20 impairment for Brooke in the records from Aurora?
21    A. Aside from what I referred to about Brooke
22 being -- sleeping -- very sleepy during the day, the
23 answer is no.
24    Q. Did Brooke experience any permanent injuries

Page 71

1 or harm once she was taken off the Haldol?
2    MR. CONNELLY: Form and foundation.
3    A. The only harm that she may have experienced --
4 I'm not -- and that I'm not able to say that she didn't
5 was an increased risk of tardive dyskinesia, which is a
6 disabling side effect, permanent, that is the risk --
7 the risk of which is increased according to the exposure
8 to medications, to antipsychotic medications in
9 particular.
10    So Brooke being exposed to a high dose of
11 Haldol for several weeks puts her at a somewhat
12 increased risk down the road of developing tardive
13 dyskinesia, but at this point in time, as I understand
14 it, she's not manifesting any symptoms of such.
15    Q. (BY MR. CHRISTNER) To a reasonable degree of
16 medical certainty, the Haldol that was prescribed to
17 Brooke while she was at Aurora did not cause any
18 permanent injury or harm to her.
19    MR. CONNELLY: Form and foundation.
20    A. With the proviso as to what I just testified
21 to, the answer is correct, did not cause any permanent
22 harm or injury.
23    Q. (BY MR. CHRISTNER) Right.
24    I understand that you believe that there was

Page 72

1 an increased risk of harm or injury to Brooke from
2 taking the Haldol, but to a reasonable degree of medical
3 certainty, you cannot say that there was any harm or
4 injury to Brooke from her being prescribed Haldol while
5 at Aurora; is that fair?
6    MR. CONNELLY: Form and foundation.
7 Misconstrues or misstates his testimony.
8    Go ahead.
9    A. I think it is, yes.
10    Q. (BY MR. CHRISTNER) Am I misstating your
11 testimony in any way that you can tell me?
12    A. I don't --
13    MR. CONNELLY: I'll tell you what I --
14    MR. CHRISTNER: I don't care what you think,
15 and I don't want you to instruct the witness on what you
16 think.
17    MR. CONNELLY: I'm not instructing him on what
18 I think.
19    MR. CHRISTNER: So your objection is form or
20 on foundation and then stop talking.
21    MR. CONNELLY: Well --
22    MR. HUNTER: I think the question's actually
23 for the doctor, not you, unless I misunderstood.
24    MR. CHRISTNER: Right.

Page 73

1    A. I don't -- I do not believe you are misstating
2 my testimony.
3    Q. (BY MR. CHRISTNER) Thank you.
4    To a reasonable degree of medical certainty,
5 did you develop a treatment plan for Brooke that you
6 believe would have met the standard of care that did not
7 include her being prescribed Haldol?
8    A. No.
9    Q. Medication -- all medications have a range of
10 side effects and potential risk from their use; is that
11 fair?
12    A. Yes.
13    Q. And those potential side effects and those
14 risks can vary from patient to patient.
15    A. Yes.
16    Q. And you cannot tell me to a reasonable degree
17 of medical certainty if a different medication from
18 Haldol would have been used on Brooke while she was at
19 Aurora that her hospitalization would have been
20 shortened.
21    MR. CONNELLY: Form and foundation.
22    A. I think that's correct.
23    Q. (BY MR. CHRISTNER) It was your opinion that
24 Brooke was better off after her residency at Aurora with



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024                             Pages 114–117

Page 114

1 question either, but you know what I was asking.
2     A.  I know what you're asking.
3         MR. CHRISTNER:  Form and foundation.
4     Q.  (BY MR. CONNELLY)  Is the fact that Christine
5 is not a doctor or a nurse or a psychiatrist make her
6 views and concerns any less valuable or meaningless
7 to -- to a psychiatrist, a clinical psychiatrist like
8 yourself or Dr. Mlak?
9         MR. HUNTER:  Form and foundation.
10        MR. CHRISTNER:  Join.
11    A.  So, I mean, there is a -- there's a relevance
12 to the fact that she's not a doctor.  If she were a
13 physician, she would bring a clinical lens to it.
14        As I say, there are times, I think, that she's
15 just wrong about things, particularly around neuroleptic
16 malignant syndrome with Haldol at whatever -- I think at
17 Banner.
18        But that said, I think her -- it's my
19 understanding that she knows Brooke better than anybody
20 in the world, so that her impressions and understanding
21 of how Brooke is doing is enormously meaningful.
22    Q.  (BY MR. CONNELLY)  And you have no reason to
23 think that she would misreport or exaggerate any of
24 Brooke's reactions or side effects to medications.

Page 115

1         MR. HUNTER:  Form and foundation.
2         MR. CHRISTNER:  Form and foundation.
3     A.  So, you know, I try to take every informant
4 with a grain of salt, or sometimes two grains of salt.
5 I think it's possible that Ms. Scianna got an idea in
6 her head that antipsychotics don't work and got a little
7 rigid about it.
8         And so then the question is, well, on what
9 basis, Ms. Scianna, do you believe that?  And as she
10 describes all the various reasons that -- that she has
11 for these opinions and all that's happened to Brooke,
12 they are completely consistent with what you would
13 expect to see from the use of these medications.
14        She's not describing things that are odd or
15 unusual.  Cognitive dulling, drooling, sedation, weight
16 gain, the dulling -- there's a dullness of the
17 personality, those are very common, and, to some extent,
18 expectable.
19    Q.  (BY MR. CONNELLY)  And some of what she is
20 saying is verified by the -- the records in this case.
21        MR. CHRISTNER:  Form and foundation.
22        MR. HUNTER:  Form and foundation.
23    A.  Some of it is.  A lot of it isn't.  A lot of
24 it is that it's not -- it's the mom's report about these

Page 116

1 things that doesn't have a lot of independent
2 corroboration in the medical records.  But, again, it's
3 absolutely what you would expect to see when you treat a
4 child like this with those doses of medications.
5     Q.  (BY MR. CONNELLY)  You testified earlier to a
6 question by Mr. Christner that it was not necessarily
7 below the standard of care to prescribe Haldol to a
8 patient like Brooke.  What did you mean by the limiting
9 phrase "not necessarily below the standard of care"?
10    A.  So what I meant was that, the -- you know,
11 Haldol has been used for the treatment of aggression in
12 individuals with autism spectrum disorder.  Back in the
13 1970s and 1980s, it was probably the most commonly used
14 medication for that indication.
15        My understanding is that at this point in
16 time, that the second-generation antipsychotics are
17 considered to be first-line treatments because they have
18 a better side effect profile than Haldol does, and they
19 tend to be more effective.
20        However, that said, under the circumstances in
21 which a physician had done a careful history, understood
22 that there were various reasons why the trial of another
23 second-generation antipsychotic didn't make sense, was
24 aware of the risks involved, and was willing to pay

Page 117

1 careful attention, that a careful trial of haloperidol
2 in a case like Brooke's might have been reasonable thing
3 to do.
4         My own feeling -- my own clinical opinion is
5 that it probably didn't make a lot of sense, but I'm not
6 saying that that would have fallen below the standard of
7 care had it been done carefully and thoughtfully.
8     Q.  (BY MR. CONNELLY)  And, Doctor, you were asked
9 questions about a doctor has a duty to protect patients
10 from harming themselves and others and a couple of other
11 duties.  A doctor also has a duty not to overprescribe a
12 medication; right?
13    A.  Correct.
14    Q.  And a doctor has a duty to not misuse a
15 medication --
16        MR. CHRISTNER:  Form.
17    Q.  (BY MR. CONNELLY) -- in prescribing it to
18 patients; right?
19        MR. CHRISTNER:  Form and foundation.
20    A.  I'm not quite sure I understand what you mean.
21    Q.  (BY MR. CONNELLY)  Well, there are certain
22 off -- what's called off-label uses of medications;
23 right?
24        But would you agree that there are -- there



Page 90

1 is that I think for any medical provider in this
2 circumstance, the mother's report of how the child did
3 carries a great deal of weight, and that's considered to
4 be medical evidence, and so their conclusions are likely
5 to incorporate that information.
6    If a parent comes in and says, my child was
7 vomiting bright red blood last night, the fact that the
8 provider doesn't himself or herself see it, doesn't mean
9 it's not useful information and doesn't mean it's not
10 important information.
11    And so -- so the whole idea of a medical
12 provider having an independent assessment without the
13 mother's report just doesn't quite compute for me.
14    Q.  (BY MR. CHRISTNER) Let's try it a different
15 way then.  A medical provider prescribed Seroquel to
16 Brooke; right?
17    A.  Correct.
18    Q.  And we have records of a medical provider
19 prescribing Seroquel to Brooke; right?
20    A.  Yes, we do.
21    Q.  And you reviewed those records.
22    A.  Yes.
23    Q.  Anywhere in the records did a medical
24 provider, a doctor, psychiatrist indicate that Brooke

Page 91

1 did not respond well to Seroquel?
2    MR. CONNELLY:  Form and foundation.
3    A.  Only in the instances in which they were
4 reporting the mother's report.
5    Q.  (BY MR. CHRISTNER) I see.
6    No medical provider documented in the medical
7 records that they made a medical decision that Haldol --
8 or that Brooke did not respond well to Haldol; is that
9 true?
10    MR. CONNELLY:  Form and foundation.
11    A.  I think that's true.
12    Q.  (BY MR. CHRISTNER) Did you see in any of the
13 medical records that a medical provider documented that
14 none of the psychotropic agents really worked for
15 Brooke?
16    MR. CONNELLY:  Form and foundation.
17    A.  No.
18    Q.  (BY MR. CHRISTNER) Doctor, did I give you an
19 opportunity to respond fully and completely to my
20 questions?
21    A.  I believe so, yes.
22    Q.  At this point, do you feel the need to clarify
23 or expand on any of your answers you've given?
24    A.  No.

Page 92

1    MR. CHRISTNER:  Doctor, I think I'm going pass
2 you off to another attorney.  Thank you very much for
3 your time.
4    THE DEPONENT:  Thank you.
5    MR. HUNTER:  I have nothing for you.
6    MR. CONNELLY:  Georgia, any questions?
7    MS. STATON:  No questions here on behalf of
8 the state.  Thank you.
9    MR. CONNELLY:  Cody?
10    EXAMINATION
11 BY MR. HALL:
12    Q.  Yeah.  This is Cody Hall.  I've got a few
13 questions for you, Dr. Clark.  Can you hear me okay?
14    A.  I can, yes.  Thanks.
15    Q.  Thank you.
16    I represent Care and Dignity.  And I just have
17 a couple of questions about some comments in your report
18 as well.  I'm going to start with, though I understood
19 from your earlier testimony that you did not interview
20 Brooke at any point in time; correct?
21    A.  That is correct.
22    Q.  Did you ask to interview Brooke at any point
23 in time?
24    A.  No.

Page 93

1    Q.  Was Brooke ever present in the room while you
2 were doing the Zoom phone call with the mother that you
3 could tell?
4    A.  No.
5    Q.  And that's a bad lawyer question.
6    Do you know she wasn't in the room, or you
7 just simply could not tell if she was in the room?
8    A.  I could not tell if she was in the room.  I
9 saw no indication that she was in the room, period.
10    Q.  Thank you.
11    So page 16 of your report, Doctor, you
12 indicated, I believe, that records of Brooke's stay at
13 Care and Dignity were not available at the time of the
14 report.  Did you mean to indicate that you had not seen
15 any records from Care and Dignity as of December of
16 2023?
17    A.  I did.  They were not available to me.
18    Q.  And you have not seen any records since the
19 time you authored that report; correct?
20    A.  That is correct.
21    Q.  From Care and Dignity?
22    A.  That is correct.
23    Q.  On page 5 of your report, Doctor, you have a
24 note that says, "Mrs. Scianna reported that Brooke had



Page 118

1  are situations in which it just makes no sense to use a
2  medication that -- that on the label might be okay for a
3  particular symptom that you're trying to treat, but that
4  -- but there will be other situations where it would be
5  a misuse of the medication?
6       MR. HUNTER:  Form and foundation.
7       MR. CHRISTNER:  Form and foundation.
8       You want to continue with that one.
9       MR. CONNELLY:  Let me see if I can -- let me
10  see if I can fix that.
11      MR. HUNTER:  That will take us an hour to
12  grammatically diagram that.
13      MR. CONNELLY:  Yeah.  That's a -- that's a --
14  let's get out the Venn diagram on that one.  Well, I'm
15  going to just move off of that one.  I'll strike that
16  last question.
17   Q.  (BY MR. CONNELLY) Now, you were also asked
18  about any permanent harm that Brooke suffered as a
19  result of the aggressive prescribing of Haldol while she
20  was at Aurora.  You had given an answer prior to that
21  one where you said that she may develop tarkides
22  dyskinesia.
23   A.  Tardive dyskinesia.
24   Q.  Tardive dyskinesia.  You can't, as you're

Page 119

1  sitting here today, rule out that she might develop
2  tardive dyskinesia in the future; right?
3       MR. CHRISTNER:  Form and foundation.
4       MR. HUNTER:  Form and foundation.
5   A.  I cannot.
6   Q.  (BY MR. CONNELLY) And through your review of
7  the medical records, you understand that it was Brooke's
8  mother, Christine, who was the one who had her
9  hospitalized in the past due to her aggressive
10  behaviors; right?
11      MR. CHRISTNER:  Form and foundation.
12      MR. HUNTER:  Form and foundation.
13   A.  I think in general, yes.  I believe the
14  December 2017 hospitalization may have been initiated by
15  the father.
16   Q.  (BY MR. CONNELLY) But setting aside the
17  hospitalizations that occurred when Brooke was in the
18  state's care, which is the -- the hospitalization out --
19  which came out of Care and Dignity, and then before she
20  went into Aurora, you understand that when Brooke was
21  admitted to St. Luke's, for instance, that it was her
22  mother who brought her to St. Luke's; right?
23      MR. CHRISTNER:  Form and foundation.
24   A.  Yes.

Page 120

1   Q.  (BY MR. CONNELLY) Did you get the impression
2  from Christine when you were talking to her that if her
3  daughter needs to be hospitalized because she's a danger
4  to herself or others, that her mother would not take
5  that step?
6       MR. CHRISTNER:  Form and foundation.
7       MR. HUNTER:  Form and foundation.
8   A.  I can't really answer that.  It's just nothing
9  that really came up in particular in my discussion with
10  her.
11   Q.  (BY MR. CONNELLY) All right.  Now, the
12  administration of Haldol is nearly universally a major
13  psychiatric treatment.  Would you agree with that?
14      MR. CHRISTNER:  Form and function.
15      MR. HUNTER:  Form and foundation.
16   A.  I'm not sure what you mean by the word
17  "major."
18   Q.  (BY MR. CONNELLY) Well, as far as psychiatry
19  goes, you don't -- it's not used on a run-of-the-mill
20  basis; is it?
21      MR. CHRISTNER:  Form and foundation.
22      MR. HUNTER:  Form and foundation.
23   A.  So --
24   Q.  (BY MR. CONNELLY) Let me -- let me -- let me

Page 121

1  try it a different way.
2       Haldol -- the main use for Haldol is to
3  control very aggressive behaviors in -- in a patient;
4  right?
5       MR. CHRISTNER:  Form and foundation.
6   A.  I'm going to disagree -- well, I'm going to
7  partly agree and disagree.
8   Q.  (BY MR. CONNELLY) Okay.
9   A.  Maybe I'll say I think in -- Haldol's
10  frequently used, to this day, in emergency room settings
11  where it does indeed help control agitation and
12  aggression, so intramuscular Haldol, in particular, I
13  think is a very common -- very commonly used, and it's
14  been used for -- throughout the entirety of my career.
15      In addition, as I understand it, there are a
16  dwindling number of patients who remain on Haldol on a
17  regular basis for treatment of their psychotic illness.
18      And I think most commonly, these are
19  individuals who somehow got onto Haldol and had a good
20  response and had been maintained on it, and no one has
21  thought there was a particular reason to take them off
22  it.  Again, I think those folks are kind of -- probably
23  dying out to some extent.
24      Since the advent of the second-generation



CHRISTINE SCIANNA, et al. v. STATE OF ARIZONA
ANDREW CLARK, M.D. - February 19, 2024

Pages 122–125

Page 122

1 antipsychotics in the early 1980s, they really have
2 become first-line treatment for just about everybody
3 with the exception of the emergency room setting.
4  Q. And so in an emergency room setting when
5 someone comes in and they're -- or, you know,
6 paramedics, say, show up at some location where
7 somebody's just out of control with aggressive
8 behaviors, it would be common -- maybe I shouldn't use
9 the word common -- but it wouldn't be unusual for Haldol
10 to be used in that situation.
11  A. So not --
12   MR. HUNTER: Form and foundation.
13   MR. CHRISTNER: Join.
14  A. Not by paramedics in the field, but in
15 psychiatric emergency rooms, intramuscular Haldol, I
16 think, is very commonly used.
17  Q. (BY MR. CONNELLY) And you said in psychiatric
18 --
19  A. Emergency room.
20  Q. -- emergency room; right?
21  A. Emergency rooms.
22  Q. Okay. All right. And in that case, the use
23 of Haldol to control the aggressive behavior in an
24 emergency room and in an exigent circumstance would be

Page 123

1 an adequate use of the medication; right?
2   MR. HUNTER: Form and foundation.
3   MR. CHRISTNER: Join.
4  Q. (BY MR. CONNELLY) It would be a proper use of
5 the medication.
6   MR. HUNTER: Form and foundation.
7  A. I agree it would be a proper use of the
8 medication, yes.
9  Q. (BY MR. CONNELLY) And at the doses and for the
10 purpose it was being administered to Brooke, would you
11 agree that that was a major psychiatric treatment being
12 administered to Brooke?
13   MR. HUNTER: Form and foundation.
14   MR. CHRISTNER: Form and foundation.
15  A. So major may be a term of art in the legal
16 world that I don't understand and can't offer an opinion
17 on.
18    I will say that as a psychiatrist, it's a --
19 it's a significant -- it's a -- it's a medication that
20 carries significant risks and has really been delegated,
21 relegated to third- or fourth-line treatment because of
22 the risks that it involves.
23    So it is, colloquially speaking, a big deal to
24 put an adolescent on Haldol. It's a big deal to put an

Page 124

1 adolescent on any antipsychotic medication, but Haldol
2 even more so because of the risks that it poses.
3  Q. (BY MR. CONNELLY) And would it be even more of
4 a big deal at the doses and the rate at which those
5 doses were increased in this case?
6   MR. CHRISTNER: Form and foundation.
7   MR. HUNTER: Join.
8  A. Yes. It's a very high-risk proposition.
9  Q. (BY MR. CONNELLY) And so using Haldol the way
10 it was used with Brooke here at Aurora was not a
11 run-of-the-mill use of the medication.
12   MR. CHRISTNER: Form and foundation.
13   MR. HUNTER: Form and foundation.
14  A. No. Very much in my experience and
15 understanding, it's -- it would be very -- it's very
16 unusual.
17  Q. (BY MR. CONNELLY) And it's true, isn't it,
18 that in Massachusetts, a court order is necessary to
19 administer Haldol to a minor who's in state care; right?
20   MR. HUNTER: Form and foundation.
21   MR. CHRISTNER: Join.
22  A. Yes. A court order's necessary for any -- the
23 use of any antipsychotic for a minor in the custody of
24 the state.

Page 125

1  Q. (BY MR. CONNELLY) And so if the -- whatever
2 the department of child protection is called here in
3 Massachusetts, took custody of a child, a representative
4 of that organization would not be able to consent to the
5 administration of Haldol to a minor; is that right?
6   MR. CHRISTNER: Form and foundation.
7   MR. HUNTER: Form and foundation.
8  A. That is correct.
9  Q. (BY MR. CONNELLY) It would have to be a court
10 order.
11  A. That is correct.
12   MR. HUNTER: Form and foundation.
13   MR. CHRISTNER: Join.
14  Q. (BY MR. CONNELLY) You mention the -- briefly
15 mention the expert report prepared by Dr. Mlak's expert.
16 I can't think of his name right now.
17   MR. HUNTER: Khan.
18  Q. (BY MR. CONNELLY) Khan, yeah, you've seen
19 Dr. Khan's report; right?
20  A. I have, yes.
21  Q. And you read through it.
22  A. Yes.
23  Q. And we've asked you to do a rebuttal report;
24 right?

