# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CHRISTINE SCIANNA, et al., )
)
)
Plaintiffs, )
)
) No. 2:21-cv-01444-DJH
vs. )
)
)
ARIZONA DEPARTMENT OF CHILD )
SAFETY, et al., )
)
)
Defendants. )
)

DEPOSITION OF KRZYSZTOF MLAK

Phoenix, Arizona
June 8, 2023
10:10 a.m.

Prepared by:
MICHAELA H. DAVIS
Registered Professional Reporter
Certified Realtime Reporter
Certified Realtime Captioner
Certified LiveNote Reporter
AZ CR No. #50574
carrie@carriereporting.com

CARRIE REPORTING, LLC
Certified Reporters
2415 E. Camelback Road
Suite 700
Phoenix, AZ 85016
(480) 429-7573

(COPY)

```
                                                    Page 38
 1    A.   Prior to our move.
 2    Q.   And when did you start at Aurora?
 3    A.   Late July 2018.
 4         Let me amend that. So it looks like I
 5  listed August, so it must have been August 1st, 2nd. At
 6  the very beginning of August.
 7    Q.   Just at the very beginning of the month?
 8    A.   Yes.
 9    Q.   And so you came to Aurora as a staff
10  psychiatrist. That's what it says here.
11         Is that right?
12    A.   That's correct.
13    Q.   In the special needs unit?
14    A.   That's correct.
15    Q.   And what kind of patients are seen in the
16  special needs unit?
17    A.   We accept patients that have a developmental
18  disability, autistic disorder being one, intellectual
19  disabilities being most of the remaining patient
20  population.
21    Q.   Intellectual disability like what?
22    A.   Intellectual disability, previously known as
23  mental retardation.
24    Q.   What other kind of patients does Aurora have
25  that are not part of the special needs unit?
```

```
                                                    Page 39
 1    A.   Everybody else.
 2    Q.   Well, okay, but can you give me like some sort
 3  of description about what the rest of population is like?
 4    A.   Certainly. There's adolescent and adult
 5  patients with a variety of mood disorders, substance use
 6  disorders.
 7    Q.   So outside of the special needs unit are
 8  substance disorders, mood disorders.
 9         Mood disorders that don't rise to the level
10  of being autism? Is autism a mood disorder?
11    A.   It's not considered as such.
12    Q.   But can autistic patients have mood disorders?
13    A.   They can.
14    Q.   All right. So you've got substance disorders,
15  mood disorders. Any other disorders that are seen in the
16  general population at Aurora?
17    A.   Psychotic disorders, quite often.
18    Q.   And inside the special needs unit, among the
19  autism and the intellectual disability-type patients, they
20  might also have a substance disorder or a mood disorder or
21  a psychotic disorder; is that true?
22    A.   Very uncommon to see a substance use disorder.
23  In the five years, I have not seen a youth with a
24  substance use disorder on the specialized needs unit, but
25  the other two are.
```

```
                                                    Page 40
 1    Q.   As far as Brooke Scianna goes, she doesn't have
 2  a substance disorder; right?
 3    A.   Are you asking currently or in 2018?
 4    Q.   In 2018.
 5    A.   She did not have a substance use disorder.
 6    Q.   Did she have a mood disorder?
 7    A.   Yes.
 8    Q.   What was the mood disorder?
 9    A.   If I can reference my psychiatric evaluation.
10    Q.   I'll ask the question again when we get there.
11    A.   Sure.
12    Q.   And you agree, though, that she didn't have any
13  psychotic disorders, right, in 2018?
14    A.   I'll have to reference my documentation.
15    Q.   As part of your employment at Aurora, you had
16  entered into a written contract; right?
17    A.   That's correct.
18         MR. CONNELLY: I'm going to mark Exhibit 16.
19         (Deposition Exhibit No. 16 was marked for
20         identification by the reporter.)
21  BY MR. CONNELLY:
22    Q.   Doctor, do you recognize Exhibit 16 as the first
23  contract you entered into prior to being hired at Aurora?
24    A.   I do.
25    Q.   And I said "being hired," but you were not hired
```

```
                                                    Page 41
 1  as an employee at Aurora; is that correct?
 2    A.   That's correct.
 3    Q.   The contract is an independent contractor type
 4  of contract; right?
 5    A.   That's correct.
 6    Q.   And so Aurora doesn't provide you with any
 7  insurance; you've got to provide that yourself. Right?
 8    A.   That's correct.
 9    Q.   And there are performance standards set by
10  Aurora that you're obligated to meet and adhere to; right?
11         MR. HUNTER: Form and foundation.
12         THE WITNESS: That's correct.
13  BY MR. CONNELLY:
14    Q.   And as part of the contract, you'll see on
15  page 3 of the contract, it requires you to carry liability
16  insurance in the amount not less than a million dollars
17  per occurrence and $3 million annual aggregate.
18         Is that right?
19    A.   That's correct.
20    Q.   At the time in 2018 when you joined Aurora, you
21  had that type of insurance in place; right?
22    A.   That's correct.
23    Q.   And you had it in place at the time that you
24  were treating Brooke Scianna, those times that are
25  relevant to this lawsuit; right?
```

Page 42

1  A. That's correct.
2  Q. And it's your insurance company who is providing
3  your defense in this matter for you; is that right?
4  A. That's correct.
5  Q. And how were you compensated as an independent
6  contractor for the work you did at Aurora --
7     MR. HUNTER: Form and foundation.
8  BY MR. CONNELLY:
9  Q. -- in 2018?
10 A. I am reimbursed for the services that I provide.
11 I believe it is the documentation that is being tracked.
12 And I submit a billing for my services while -- that the
13 hospital bills for separately from what I am reimbursed.
14 Q. When you're billing for your services, do you do
15 that -- is it on an hourly basis? What's the basis on
16 which you submit your invoices?
17 A. Based on the documentation, which is, of course,
18 based on the complexity of that encounter and presentation
19 for that day.
20 Q. So what documentation are you referring to?
21 A. My psychiatric notes and evaluation.
22 Q. And so do you have to provide a copy of your
23 psychiatric notes and records to the billing department?
24 A. I do not. The billing department has its own
25 processes. I would defer to the billing department for

Page 43

1  that.
2  Q. So when you create your psychiatric records, you
3  just create them in whatever system Aurora has established
4  for recording psychiatric records?
5  A. That's correct.
6  Q. And then when you prepare an invoice, what's on
7  your invoice?
8  A. The patient's identifying information and the
9  billing code.
10 Q. And the billing code relates to?
11 A. The complexity of the encounter.
12 Q. And those are codes that are established by
13 whom?
14 A. Those are CPT codes that I -- by the -- that
15 refer to the International Classification of Diseases and
16 for diagnosis. And then the medical complexity codes,
17 which is a national standard. Or a federal standard, I
18 believe.
19 Q. And were you paid a set amount per visit for
20 psychiatric evaluations?
21 A. That's correct.
22 Q. And what was that amount?
23 A. $90.
24 Q. And would that be for any encounter you had with
25 a patient regardless of how long it took?

Page 44

1  A. That's correct.
2  Q. So an initial evaluation would be one, let's
3  say, billing unit. Okay? And then if you had any
4  subsequent encounters with the patient would be another
5  billing unit?
6  A. One billing unit per day.
7  Q. One billing unit per day per patient?
8  A. That's correct.
9  Q. Would it happen that you might spend time with
10 the same patient two or three times during a day but in
11 different time intervals?
12 A. That's correct.
13 Q. But you'd only be eligible, as far as
14 compensation goes, for the one billing unit for that
15 patient?
16 A. That's correct.
17 Q. And then if you saw the patient the next day,
18 that's a new billing unit?
19 A. That's correct.
20 Q. And how many patients did you have on your
21 caseload in August of 2018?
22    MR. CHRISTNER: Form, foundation.
23    THE WITNESS: Approximately ten to
24 15 patients.
25    ///

Page 45

1  BY MR. CONNELLY:
2  Q. Were you seeing all of your patients every day?
3  A. Weekdays.
4  Q. Weekdays.
5  A. Yes.
6  Q. And so Monday through Friday you would see ten
7  to -- I'm sorry. Did you say ten to 15?
8  A. That's correct.
9  Q. So Monday through Friday you would see ten to
10 15 patients a day?
11 A. That's correct.
12 Q. So you would have ten to 15 billing units per
13 day?
14 A. That's correct.
15 Q. And you didn't work on the weekends?
16 A. Not at Aurora Behavioral Health.
17    MR. CHRISTNER: Keep your voice up. You're
18 trailing off a little bit.
19 BY MR. CONNELLY:
20 Q. And has your license ever been suspended,
21 revoked, restricted, or deemed probationary in Arizona?
22 A. No.
23 Q. What about in Michigan?
24 A. No.
25 Q. Have you ever had any board complaints leveled

### Page 46

1  against you?
2  A. I have.
3  Q. In which state?
4  A. In Michigan.
5  Q. When was that?
6  A. Approximately two weeks ago.
7  Q. Two weeks ago?
8  A. That's right.
9  Q. Is that the first time ever?
10 A. That's correct.
11 Q. And what's the nature of the complaint?
12 A. If I remember the wording correctly, it was that
13 I did not communicate with the family.
14 Q. What kind of -- what was the nature of the
15 child's, I guess, disorder or condition, psychiatric
16 condition?
17      MR. CHRISTNER: Yeah, that --
18 BY MR. CONNELLY:
19 Q. Let me rephrase the question.
20     Was it an autistic child?
21      MR. CHRISTNER: You're getting into --
22      MR. CONNELLY: I'm not getting into any
23 personally identifiable information.
24      MR. CHRISTNER: It's the child of someone
25 who filed a board complaint against the doctor. Seems

### Page 47

1  like that would be pretty easy to figure out, so I don't
2  feel comfortable with him talking about the diagnosis or
3  the medical condition of another patient.
4      MR. CONNELLY: So are you instructing him
5  not to answer?
6      MR. CHRISTNER: Yes.
7  BY MR. CONNELLY:
8  Q. What's the status of the complaint?
9  A. Unsubstantiated.
10 Q. Has it been officially unsubstantiated or --
11 A. Officially and closed. I apologize for
12 interrupting.
13 Q. Just to finish out the question, has it been
14 officially unsubstantiated, or is the complaint still
15 under review?
16 A. Officially unsubstantiated.
17 Q. When did that occur?
18 A. Less than -- approximately one week ago.
19 Q. And that was a complaint to the Michigan Board
20 of -- what's the name of the board?
21 A. Board of Medicine.
22 Q. And if you'll just flip to the last page for me
23 of Exhibit 16 and confirm for me that that's your
24 signature on the physician signature line.
25 A. That's correct.

### Page 48

1  Q. And the tax ID is an ID number that you
2  established for Krzysztof Mlak, M.D., P.C.
3  A. That's correct.
4      MS. STATON: Because you're going to a new
5  exhibit, and we've been going for an hour, can we --
6      MR. CONNELLY: Sure. Let's go ahead and
7  take a break.
8      (WHEREUPON, a brief recess was taken from
9  11:17 a.m. to 11:25 a.m.)
10 BY MR. CONNELLY:
11 Q. The first contract you had was only a one-year
12 term; right? If you remember.
13 A. I don't recall.
14 Q. Just to refresh your recollection real quick --
15 A. Sure.
16 Q. -- if you look at page 4 of the contract,
17 Section III, number 1, term for a period of one year.
18     Do you see that?
19 A. I do, yes.
20      MR. CONNELLY: Okay. And then we'll mark
21 Exhibit 17.
22      (Deposition Exhibit No. 17 was marked for
23      identification by the reporter.)
24 BY MR. CONNELLY:
25 Q. In or around September 1st of 2019, you extended

### Page 49

1  your contract for another year; right?
2  A. That's correct.
3  Q. And that's what we see in Exhibit 17; right?
4  A. That's correct.
5  Q. And that's your signature underneath where it
6  says "Physician" at the bottom?
7  A. That's correct.
8  Q. And it looks like the only thing that was really
9  changed was the compensation provision was revised to
10 include some language there about not receiving payments
11 for patients who qualify under the facility's policy for
12 charity; is that right?
13 A. That's correct.
14 Q. Did you have any patients that qualified for
15 that exemption?
16 A. I do not recall.
17 Q. And this doesn't give us a term. The amendment
18 doesn't say it's extending the contract for another year
19 or anything like that. But your contract, the original
20 one, says that it would automatically renew at the end of
21 the first year and each subsequent year unless terminated
22 by you or the hospital for reasons that are discussed in
23 paragraph 2 of Section III; right?
24 A. That's correct.
25 Q. And at no time since 2018, neither you or Aurora

Page 62

1  A.  There's patient factors, predisposing health
2  factors.
3  Q.  Does the age of a patient have any influence on
4  the potential side effects?
5  A.  It can.
6  Q.  Do you agree with me that Haldol fell out of
7  favor or out of widespread use after the introduction of
8  the atypical antipsychotics?
9  A.  It depends on the condition that it was being
10 used to treat.
11 Q.  In your view, what are the conditions that
12 Haldol is effective in treating today?  Or in 2019 or
13 2018.
14 A.  Sure.  Certainly antipsychotic illnesses, mood
15 disorders.
16 Q.  For what kind of patients?  And by that I mean
17 adults versus children.
18 A.  For both.
19 Q.  So it makes no difference, in your mind, whether
20 a patient is an adult or a child or an adolescent.  Haldol
21 might still be the drug of choice for you to prescribe to
22 them for a psychotic illness or mood disorders?
23      MR. CHRISTNER:  Form and foundation.
24      THE WITNESS:  Yeah.  Can you narrow down
25 that question, please?

Page 63

1  BY MR. CONNELLY:
2  Q.  Well, I asked you if the age of the patient made
3  a -- is a factor in whether or not Haldol should be
4  prescribed, and you said it wasn't.
5      Is that a fair summary of what you're saying
6  as far as prescribing Haldol?
7  A.  I would say the age is one of the factors that
8  we would consider.
9  Q.  And you said that you would consider Haldol for
10 psychotic illness or mood disorders.  Anything else that
11 you would consider prescribing Haldol for?
12 A.  Certainly for instances in which other
13 medications have been tried and have lacked effectiveness.
14 Severe OCD or Tourette disorder, severe self-injurious
15 behavior and aggression related to a myriad of illnesses.
16 Q.  Do you agree that today Haldol is used mainly as
17 an emergency chemical restraint in emergency room
18 settings?
19      MR. HALL:  Foundation.
20      MR. CHRISTNER:  Form, foundation.
21      THE WITNESS:  I can't speak to what is
22 mainly used in emergency room settings.
23 BY MR. CONNELLY:
24 Q.  Well, is it widely used at Aurora Behavioral
25 Health to treat autistic children or adolescents?

Page 64

1      MR. HUNTER:  Form, foundation.
2      MR. HALL:  Form.
3      THE WITNESS:  I can't answer that across the
4  hospital.  I can really only speak to my practice on the
5  specialized needs unit.
6  BY MR. CONNELLY:
7  Q.  Do you find it to be an effective chemical
8  restraint for a patient who is displaying aggressive
9  behaviors?
10 A.  I don't prescribe it as a chemical restraint.
11 Q.  You said one of the things you would prescribe
12 it for would be for severe aggression; right?
13 A.  Related to an underlying mood disorder or a
14 myriad of illnesses.
15 Q.  And would the severe aggression need to be
16 something that was a chronic condition, one that persists
17 over long periods of time?
18 A.  It can.
19 Q.  That wasn't my question.  My question wasn't
20 whether it can.
21     My question is:  When you're going to
22 prescribe Haldol to treat severe aggression, is it severe
23 aggression that's perhaps only temporary, or is it severe
24 aggression that a patient has persistently and ongoing?
25     MR. HALL:  Form, foundation.

Page 65

1      MR. CHRISTNER:  Join.
2      THE WITNESS:  I believe both scenarios can
3  be applicable.
4  BY MR. CONNELLY:
5  Q.  And in this case, what was it that you were
6  prescribing Haldol to Brooke Scianna for?
7  A.  Primarily to treat her mood disorder.
8  Q.  Would you agree that the use of Haldol for
9  treating mood disorders in adolescents is rare in today's
10 world?  "Today" meaning 2018.
11     MR. CHRISTNER:  Form, foundation.
12     THE WITNESS:  Yeah.  I can't reflect on the
13 prescribing patterns of tens of thousands of physicians.
14 BY MR. CONNELLY:
15 Q.  Okay.  Well, let's narrow it down to you.
16     Do you use Haldol routinely to treat mood
17 disorders in adolescents, or do you use it rarely to treat
18 mood disorders in adolescents?
19     MR. HALL:  Form.
20     THE WITNESS:  So I use Haldol in instances
21 where other medications have been tried and have not been
22 effective.
23 BY MR. CONNELLY:
24 Q.  Where other antipsychotic medications have been
25 tried and not effective?

Page 102

```
 1   medication rather than a chronological timeline that makes
 2   the review a little tricky. So my assumption was that
 3   prior to the start of Haldol, prior to September 10th is
 4   when she had been taking Thorazine.
 5        And I'm not seeing Thorazine or
 6   chlorpromazine on this formulary sheet, so this is
 7   incomplete.
 8   Q.   But if you were -- if you were administering the
 9   Thorazine to her, there should be some pages of these --
10   what did you call it? A formulary?
11   A.   It's technically a medication administration
12   record.
13   Q.   Okay. And the Thorazine will be identified as
14   either Thorazine or --
15   A.   Chlorpromazine.
16   Q.   Okay. So back to the first page, that sentence
17   we read, during those two weeks when you had her on the
18   Thorazine, did you have her on any atypical
19   antipsychotics?
20   A.   Not on a scheduled basis. She may have received
21   emergency medications that would have fallen under that
22   category of atypical antipsychotics.
23   Q.   But it wasn't part of your prescribed
24   medication, regularly prescribed medications?
25   A.   That's correct.
```

Page 103

```
 1   Q.   Because in this sentence you say that after
 2   two weeks, you started the Haldol because the Thorazine or
 3   other atypical antipsychotics or mood stabilizer or
 4   combinations of both were not effectively addressing her
 5   irritability and aggressive and self-injurious behavior.
 6        So I'm wondering, what did you try other
 7   than the Thorazine before you went to the Haldol?
 8   A.   Based on my review of the record, I determined
 9   that Haldol was the next most appropriate course of
10   action.
11   Q.   So you didn't try any other atypical
12   antipsychotics or mood stabilizers or combinations of both
13   before you moved her from the Thorazine to the Haldol; is
14   that right?
15   A.   That is correct.
16   Q.   So what are you referring to when you say that
17   you went to the Haldol because these behaviors that you
18   identify were not effectively addressed with Thorazine or
19   other atypical antipsychotics or mood stabilizers or
20   combinations of both?
21   A.   Can you just specify that, please?
22   Q.   This is your writing; right?
23   A.   Correct.
24   Q.   You wrote the sentence that we're looking at;
25   right?
```

Page 104

```
 1   A.   Correct.
 2   Q.   Okay. And when we read this sentence, what it
 3   seems to say is that she was on Thorazine and after
 4   two weeks you say: "Thorazine was discontinued and Haldol
 5   was recommended," targeting all these behaviors, "which
 6   were not effectively addressed with Thorazine or other
 7   atypical antipsychotics or mood stabilizer or combinations
 8   of both."
 9        So it seems -- you seem to be saying that
10   you moved her from Thorazine to the Haldol because the
11   Thorazine or other atypical antipsychotics or mood
12   stabilizers or combinations or both were not effective, as
13   if you had tried other atypical antipsychotics or mood
14   stabilizers or combinations of both.
15        Am I misunderstanding what you've written
16   here?
17        MR. CHRISTNER: Form and foundation.
18        THE WITNESS: I don't hear the specific
19   question embedded to that. I think you're circling around
20   an idea, but you're not asking a specific question.
21   BY MR. CONNELLY:
22   Q.   No, I asked a specific question. Let me ask a
23   different specific question.
24        Why don't you tell me in your own words here
25   today what you mean by the sentence that we're looking at.
```

Page 105

```
 1   A.   That my summary of the treatments rendered up to
 2   that period of time, based on the past medication trials,
 3   even prior to her coming to our hospital, which included
 4   other atypical antipsychotics, combinations of medicines
 5   in addition to when I tried Thorazine, was not effective.
 6   Q.   Okay. So what you're saying here is that the
 7   Thorazine after two weeks wasn't working to your
 8   professional determination; right?
 9   A.   That's correct.
10   Q.   And you're not saying that you tried other
11   atypical antipsychotics or mood stabilizers or
12   combinations of both before you put her on the Haldol?
13   A.   That's correct.
14   Q.   You're saying that based on your review of the
15   three sets of medical records we've talked about today
16   that you identified in those records, that other atypical
17   antipsychotics or mood stabilizers or combinations of both
18   had been tried and were ineffective?
19   A.   That was my determination, yes.
20   Q.   Okay. And then in the next sentence you say:
21   "DCS, who had legal custody, provided consent for the
22   medication."
23        And my question to you is: Where did you
24   get the notion -- or excuse me.
25        Okay. You say: "DCS, who had legal
```

### Page 106

1  custody, provided consent for the medication."
2  Was that a written consent?
3  A. That would have been written consent, yes.
4  Q. And this was a written consent that DCS had
5  provided you to administer Haldol?
6  MR. CHRISTNER: Form and foundation.
7  THE WITNESS: Can you -- I'm not sure what
8  you're asking in that question.
9  BY MR. CONNELLY:
10 Q. I'm asking if the legal consent that you
11 received from DCS was to change medication from Thorazine
12 to Haldol.
13 A. So I would have made the recommendation and
14 would have attempted to obtain consent directly. If that
15 wasn't documented, then the nurses would have obtained
16 consent, which is our protocol, and they would have
17 documented that, verbal -- written consent.
18 Q. And what's your understanding of DCS's ability
19 to provide consent to the administration of atypical
20 antipsychotic when they have legal custody as opposed to
21 legal guardianship of a child?
22 MS. STATON: Object to the form, foundation.
23 THE WITNESS: My understanding at the time
24 was they had the authority to provide consent for
25 treatment, hospitalization, and inherently any medication

### Page 107

1  and services as a part of that hospitalization.
2  BY MR. CONNELLY:
3  Q. Okay. And where does that understanding come
4  from?
5  A. The arrangement that I understood to be for
6  Brooke that she was under DCS custody.
7  Q. Okay. And I'm assuming that it's your
8  understanding that whenever DCS has legal custody of a
9  child, that they can consent to any medical or psychiatric
10 treatments.
11 Is that what your understanding is?
12 MR. CHRISTNER: Form and foundation.
13 THE WITNESS: In a general sense, yes.
14 BY MR. CONNELLY:
15 Q. And so my question is: Where do you get that
16 general-sense understanding from?
17 A. Based on the review of the information that she
18 was, in fact, under their guardianship and they had to
19 sign consent for treatment.
20 Q. And I don't mean just specifically regarding
21 Brooke Scianna. I just mean, in general, is it your
22 understanding that whenever DCS has -- first of all, do
23 you understand that there's a difference between legal
24 custody and legal guardianship?
25 MR. HUNTER: Form and foundation.

### Page 108

1  MS. STATON: Join.
2  THE WITNESS: I do understand that there are
3  differences in that arrangement, yeah. I think I am using
4  those terms interchangeably and not specifically, though.
5  BY MR. CONNELLY:
6  Q. So are you using "legal custody" here to mean
7  legal guardianship?
8  A. I believe that would be more specific, yes.
9  Q. So what makes you believe that DCS had legal
10 guardianship of Brooke Scianna in August of 2018?
11 A. Because they had signed the vol- -- the
12 admission forms, the consent for treatment.
13 Q. So because they signed a form consenting to her
14 being admitted to Aurora, you understood that to mean that
15 they were the legal guardian of Brooke Scianna?
16 MR. CHRISTNER: Form and foundation.
17 MS. STATON: Join.
18 THE WITNESS: That was my understanding,
19 yes.
20 BY MR. CONNELLY:
21 Q. As part of your medical training or perhaps in
22 any of the continuing medical education that you undergo,
23 do you ever review state laws that are applicable to
24 providing medical services to children?
25 MR. CHRISTNER: Form, foundation.

### Page 109

1  THE WITNESS: I'm not sure if I understand
2  the question.
3  BY MR. CONNELLY:
4  Q. Let me ask a different question.
5  Have you ever -- are you aware of the laws
6  in Arizona regarding who can consent to medical and
7  psychiatric care of children?
8  A. Yes, I do.
9  MR. CONNELLY: I'll show you what we'll mark
10 as Exhibit 21.
11 (Deposition Exhibit No. 21 was marked for
12 identification by the reporter.)
13 BY MR. CONNELLY:
14 Q. Exhibit 21 is Arizona Revised Statute 8-531.
15 Have you ever had the occasion to review
16 this statute and become familiar with the definition of
17 terms in it?
18 A. I have, yes.
19 Q. You see that it defines custodian to be a
20 person, other than a parent or a legal guardian, who
21 stands in loco parentis to the child or a person to whom
22 legal custody of the child has been given by order of a
23 court of competent jurisdiction.
24 Did I read that correctly?
25 A. Yes.

Page 110

1  Q. So if you're a custodian, you're not necessarily
2  a parent or a legal guardian; right?
3       MR. HUNTER: Form and foundation.
4       MS. STATON: Join.
5       MR. CHRISTNER: Join.
6       THE WITNESS: It appears to state that, yes.
7  BY MR. CONNELLY:
8  Q. And in number 5, when someone is a custodian and
9  they have custody or legal custody, according to this
10 statute, that means that they have three sets of rights
11 and responsibilities in relation to the child.
12      Do you see that?
13 A. I do.
14 Q. And the first right is the right to have
15 physical possession of the child.
16      The second one is the right and duty to
17 protect, train, and discipline the child.
18      And then the third, 5(c), is the
19 responsibility to provide the child with adequate food,
20 clothing, shelter, education, and medical care, provided
21 that those rights and responsibilities shall be exercised
22 subject to the powers, rights, duties, and
23 responsibilities of the guardian of the person and subject
24 to the residual parental rights and responsibilities if
25 they have not been terminated by judicial decree.

Page 111

1       Do you see that paragraph?
2  A. I do.
3  Q. Okay. And do you agree with me that when you
4  put the definition of "custodian" and "custody" together,
5  it means that the person who has legal custody or the
6  agency that has legal custody has a responsibility to
7  provide the child with adequate food, clothing, shelter,
8  education, and medical care, as long as those rights don't
9  interfere with the powers and the rights and duties of the
10 legal guardian or parent of that person? Do you agree
11 with that?
12      MR. HUNTER: Form and foundation.
13      MS. STATON: Join.
14      THE WITNESS: I understand that that's what
15 that portion of the document says, yes.
16 BY MR. CONNELLY:
17 Q. And you understand that that means that the
18 parents retain the right to consent and be responsible for
19 medical care that is other than what can be described as
20 adequate medical care?
21      MR. CHRISTNER: Form and foundation.
22      MS. STATON: Join.
23 BY MR. CONNELLY:
24 Q. Right?
25 A. That's what I see written, yes.

Page 112

1  Q. And if you look down at number 8, Guardianship
2  of the Person, when a person has guardianship of another
3  person, and in this case we're meaning a child, they have
4  the right and the duty and authority to make important
5  decisions in matters affecting the minor, including, but
6  not necessarily limited either in number or kind to: The
7  authority to have -- now I'm on (a). I'm going to skip
8  over the marriage stuff. The authority to consent to
9  major medical, psychiatric, and surgical treatment.
10      Do you see that?
11 A. I do.
12 Q. So do you agree with me that under this statute,
13 the guardian, a legal guardian, or a parent, a parent
14 whose rights have not been terminated, maintain the
15 authority to consent to major medical, psychiatric, and
16 surgical treatment even if they are -- even if someone
17 else is a legal custodian?
18      MR. CHRISTNER: Form and foundation.
19      MS. STATON: Join.
20      THE WITNESS: I understand that's what that
21 portion says, yes.
22 BY MR. CONNELLY:
23 Q. And would you agree with me that the
24 administration of Haldol to a child is a major psychiatric
25 treatment?

Page 113

1       MR. CHRISTNER: Form and foundation.
2       MS. STATON: Join.
3       THE WITNESS: Any psychiatric medication
4  is --
5       MS. STATON: I'm sorry. I didn't hear that.
6       THE WITNESS: I was just reflecting that any
7  psychiatric medication is a -- constitutes a psychiatric
8  treatment. I'm not sure what is really meant by "major."
9  BY MR. CONNELLY:
10 Q. Okay. Do you agree with me that Haldol is a
11 typical antipsychotic that has some severe side effects,
12 potentially severe side effects? Right?
13 A. Yes.
14      MR. HUNTER: Form, foundation.
15 BY MR. CONNELLY:
16 Q. Would you agree that that makes the
17 administration of Haldol a major psychiatric treatment?
18      MR. CHRISTNER: Form, foundation.
19      THE WITNESS: I don't.
20 BY MR. CONNELLY:
21 Q. Do you think that the way you administered
22 Haldol to Brooke over several weeks or couple of months of
23 time constitutes a major psychiatric treatment?
24      MR. CHRISTNER: Form and foundation.
25      MS. STATON: Form and foundation.

Page 114

1  THE WITNESS: Again, I have to better
2  understand what is meant by "major" compared to "minor."
3  I'm not sure I understand the distinction.
4  BY MR. CONNELLY:
5  Q. I think the difference in the statute is between
6  major and adequate, but I don't even know. Let me
7  rephrase it.
8      Do you agree with me that -- let's take a
9  for-instance -- the administration of Haldol in an
10 emergency room might be adequate medical treatment in that
11 emergent situation?
12     MR. HALL: Form, foundation.
13     MS. STATON: Join.
14     MR. CHRISTNER: Join.
15     THE WITNESS: I still don't understand what
16 makes it a major.
17 BY MR. CONNELLY:
18 Q. That's what I'm trying to get it.
19     Would you agree that there could be a
20 distinction between adequate and major in a situation
21 where administering Haldol to a child in an emergency room
22 situation might be adequate under those emergency
23 circumstances, but then becomes a major psychiatric
24 treatment in the case outside of the emergency room where
25 you're administering it on a daily basis at high levels

Page 115

1  for an extended period of time?
2      MS. STATON: Object to the form and
3  foundation.
4      MR. CHRISTNER: Join.
5      THE WITNESS: I simply don't -- I'm not
6  following the line of thought to distinguish it from a
7  major or minor. I don't know what that means, a minor
8  treatment.
9  BY MR. CONNELLY:
10 Q. When you read the statute, major psychiatric
11 treatment, what do you constitute is a major psychiatric
12 treatment?
13     MR. HALL: Form, foundation.
14     MS. STATON: Join.
15     MR. CHRISTNER: Join.
16     THE WITNESS: Perhaps the use of
17 electroconvulsive therapy.
18 BY MR. CONNELLY:
19 Q. Anything else?
20     MR. HALL: Same objections.
21     MR. CHRISTNER: Join.
22     THE WITNESS: From a medication management
23 perspective, I think all of it falls under a similar level
24 of potential for treatment risks and the need to balance
25 the potential for benefit.

Page 116

1  BY MR. CONNELLY:
2  Q. Are you aware of any states that have statutory
3  schemes in place that require parental consent before
4  administering any antipsychotic medications?
5      MR. HUNTER: Form, foundation.
6      THE WITNESS: It is my understanding that
7  that -- every state has that.
8  BY MR. CONNELLY:
9  Q. Is it your understanding that Arizona has a
10 statute that requires parental consent before
11 administering antipsychotic medications?
12     MR. CHRISTNER: Form and foundation.
13     THE WITNESS: And I would extend that to all
14 psychiatric or psychotropic medications, yes.
15 BY MR. CONNELLY:
16 Q. Do you know which Arizona law that is?
17 A. I do not know specifically the statute.
18 Q. Did Michigan have a law that specifically
19 requires doctors to get parental consent before
20 administering a drug like Haldol to a child?
21 A. Michigan has a law requiring that a parent or
22 guardian provides consent for any psychotropic medication.
23 Q. Were you aware that, for instance, like
24 Massachusetts has a law that requires -- specifically
25 requires parental consent before the administration of

Page 117

1  antipsychotic medications to a child?
2      MR. HUNTER: Form, foundation.
3      MR. CHRISTNER: Join.
4      THE WITNESS: I understood every state to
5  have that law.
6  BY MR. CONNELLY:
7  Q. So it's your understanding that Arizona law --
8  Arizona has a law that requires parental consent before
9  the administration of any psychotropic medication such as
10 Haldol?
11     MR. HUNTER: Form, foundation.
12     MS. STATON: Join.
13     THE WITNESS: Parental, slash, guardian
14 consent, yes.
15 BY MR. CONNELLY:
16 Q. Okay. And so in your understanding of the law,
17 a custodian cannot consent to the administration of
18 psychotropic medications; it has to be a parent or a
19 guardian?
20     MS. STATON: Form, foundation.
21     THE WITNESS: So unfortunately, I think I
22 did not use that term with legal implications in a
23 specific way when I said "legal custody."
24 BY MR. CONNELLY:
25 Q. Yeah, that's okay. I'm not talking about that

Page 162

1  yes.
2  Q. And if you would have made a request to obtain
3  those records, would there be a record of you making that
4  request?
5  MR. CHRISTNER: Form and foundation.
6  THE WITNESS: Not necessarily.
7  BY MR. CONNELLY:
8  Q. And why not?
9  A. Because these are oftentimes verbal requests
10 that my team takes and helps me with in terms of
11 submitting a release of information and submitting a fax
12 to the hospitals involved.
13 Q. And so in order to get the records from
14 St. Luke's or Banner, you would have had to obtain a HIPAA
15 release for those records; right?
16 MR. HALL: Form and foundation.
17 THE WITNESS: My understanding is yes.
18 BY MR. CONNELLY:
19 Q. And that's a written document; right? Or an
20 electronic document; right?
21 A. Yes.
22 Q. And so --
23 MR. HALL: Is that a yes?
24 THE WITNESS: Yes.
25 ///

Page 163

1  BY MR. CONNELLY:
2  Q. And so if that request had been made, there
3  would be a record of it somewhere in the Aurora medical
4  records for Brooke; right?
5  MR. CHRISTNER: Form and foundation.
6  THE WITNESS: Yes.
7  BY MR. CONNELLY:
8  Q. And if we don't find a request -- a release form
9  directed to those hospitals, we can assume that a request
10 for those records was not made; right?
11 MR. CHRISTNER: Form and foundation.
12 MR. HUNT: Form and foundation.
13 MR. HALL: Form and foundation.
14 MS. STATON: Form and foundation.
15 THE WITNESS: No, we can't assume that.
16 BY MR. CONNELLY:
17 Q. And why not?
18 MR. HALL: Form.
19 THE WITNESS: Because -- simply because
20 that's out of my immediate control. I can't follow, you
21 know, that chain of events down to the conclusion in every
22 instance.
23 BY MR. CONNELLY:
24 Q. Okay. But you agree with me that you can't
25 obtain the records -- "you" being Aurora. You can't

Page 164

1  obtain the records from St. Luke's or from Banner without
2  providing those hospitals with a signed release?
3  MR. HALL: Form and foundation.
4  MR. CHRISTNER: Form and foundation.
5  THE WITNESS: It is my understanding that
6  that is required by HIPAA for the release of information.
7  MR. CONNELLY: I had asked you to mark a
8  question before. Can you go back and tell me what that
9  was?
10 (The following requested portion of the
11 record was read back by the reporter:
12 "QUESTION: Then tell me, what was it in the
13 clinical history of Brooke Scianna that led you to believe
14 that prescribing Haldol was the thing to do?")
15 BY MR. CONNELLY:
16 Q. There you go, Doctor. Please answer that
17 question.
18 A. So based on the severity of her clinical
19 presentation, the timeline, and how long she's been
20 struggling emotionally --
21 MS. STATON: I'm going to ask you to speak
22 up, sir.
23 THE WITNESS: The severity of her clinical
24 presentation as defined by the chronic behaviors, the
25 chronic mood symptoms, the extent of the aggression and

Page 165

1  self-harm, the multiple past medication trials, and -- in
2  summary is why I made the recommendation.
3  BY MR. CONNELLY:
4  Q. And, in summary, the information or conditions
5  that you outlined are all things that you're summarizing
6  and gleaning from the Arrowhead Abrazo records, the prior
7  Aurora admission records, and the crisis intervention
8  record; right?
9  A. In addition to my direct evaluation of the
10 patient, yes.
11 Q. And there was no -- as you're here sitting today
12 and looking at your records, there is no other set of
13 records that you looked at to make that determination;
14 correct?
15 MR. HALL: Form.
16 MR. CHRISTNER: Foundation.
17 THE WITNESS: That's the way it's
18 documented, yes.
19 BY MR. CONNELLY:
20 Q. You've identified September 12th as the first
21 time that you had a conversation with mother; is that
22 right?
23 A. That was my first documented record of a
24 conversation with the mother.
25 Q. Would you have had a conversation with her that

### Page 226

1  MR. HALL: Form.
2  MR. CHRISTNER: Form and foundation.
3  THE WITNESS: All of that information would
4  have been important data to consider in her function, yes.
5  BY MR. CONNELLY:
6  Q. Okay. But it wasn't important enough to you
7  that you reached out to Care and Dignity to speak to
8  anyone about her experience there; right?
9  MS. STATON: Object to the form.
10  MR. CHRISTNER: Form and foundation.
11  THE WITNESS: My team was -- my team was
12  coordinating with any of their providers as clinically
13  appropriate.
14  BY MR. CONNELLY:
15  Q. There were some notations in the Aurora records
16  that Brooke was displaying some distress or dysregulated
17  behaviors when her mother or Mr. Quigley visited.
18  Do you or -- do you attribute those
19  behaviors to the fact that the mother was visiting the
20  child?
21  MR. CHRISTNER: Form and foundation.
22  THE WITNESS: I think that's an incomplete
23  statement or data that -- I wouldn't draw that conclusion
24  just based on something of that sort.
25  ///

### Page 227

1  BY MR. CONNELLY:
2  Q. Does it make sense that Brooke missed her mother
3  and was upset when her mother left at the end of visits
4  which would cause the dysregulated behavior?
5  MR. CHRISTNER: Form and foundation.
6  MS. STATON: Form and foundation.
7  MR. HALL: Form, foundation.
8  MR. HUNTER: Form, foundation.
9  THE WITNESS: I'm not sure about "does it
10  make sense," what you mean --
11  BY MR. CONNELLY:
12  Q. Well, isn't it more likely than not -- well, let
13  me ask a different question first.
14  Do you agree that Brooke is capable of
15  forming strong human attachments?
16  A. Children across the autism spectrum do form
17  attachments, yes.
18  Q. And so she's capable of feeling bereft when
19  she's left alone with a parent or sibling that she's
20  attached to; right?
21  A. Certainly.
22  Q. And that might be displayed -- if she's in an
23  inpatient setting, that might be displayed through
24  dysregulated behavior following a visit; right?
25  A. It's plausible, yes.

### Page 228

1  MR. CONNELLY: Thank you for being so
2  patient with me, Doctor. I don't think I have any other
3  questions. Some of these other lawyers might.
4  EXAMINATION
5  BY MR. HUNTER:
6  Q. Doctor, I have some questions for you.
7  The care and treatment that you provided to
8  Brooke when she was admitted to Aurora, you formulated
9  your own independent judgment on how best to care and
10  treat her; correct?
11  A. That's correct.
12  Q. Your decisionmaking as to how to treat Brooke,
13  what medications to give, what medications not to give,
14  et cetera, were not controlled or dictated to you by
15  Aurora in any manner; is that correct?
16  A. That's correct.
17  Q. Sitting here for seven hours or so and listening
18  to your testimony, you ordered Haldol for Brooke; correct?
19  A. That's correct.
20  Q. And you thought that was in her best interest;
21  correct?
22  A. Correct.
23  Q. And you've given us the reasons earlier for
24  ordering that medication; correct?
25  A. Correct.

### Page 229

1  Q. All right. Now, as I understand it, your
2  testimony has been that the Haldol caused a side effect
3  called EPS?
4  A. That's correct.
5  Q. All right. In response to the EPS, you
6  prescribed a medication called Cogentin?
7  A. Correct.
8  Q. And did the Cogentin resolve the EPS?
9  A. It did.
10  Q. And did it resolve the EPS while Brooke
11  continued to be on the Haldol?
12  A. That's correct.
13  Q. Okay. Is it common when giving Haldol and
14  there's a side effect of EPS, while continuing to give
15  Haldol you give Cogentin?
16  MR. CONNELLY: Form and foundation.
17  THE WITNESS: Can you just rephrase the
18  question?
19  BY MR. HUNTER:
20  Q. Sure.
21  If you've given someone Haldol and it has a
22  side effect of EPS, is it common to give Cogentin to make
23  the side effects go away while continuing to give Haldol?
24  A. That's correct.
25  MR. CONNELLY: Form and Foundation.

Page 230

1  BY MR. HUNTER:
2   Q.  So giving those two medications together is not
3  necessarily unusual if you have an EPS side effect?
4   A.  That's correct.
5   Q.  And, in your opinion, did the EPS that she
6  experienced cause any permanent injury to her?
7   A.  It did not.
8       MR. CONNELLY:  I'm going to object to that
9  last question.
10 BY MR. HUNTER:
11  Q.  You were shown some medical records in this
12 case.  Specifically you were being shown some medical
13 records from St. Luke's which is Exhibit 2.  And during
14 that admission Brooke was given Geodon.
15      Do you remember that?
16  A.  Exhibit 2?
17  Q.  Yes.  My question to you is:  While she was
18 admitted to St. Luke's, she was given Geodon; correct?
19  A.  I recall seeing that.  I'm not exactly on the
20 same page as you are, though.
21      MR. CONNELLY:  It's on page 6.
22 BY MR. HUNTER:
23  Q.  Is Geodon an atypical psychotropic?
24  A.  It is.
25  Q.  And when Brooke was put on the Geodon, she

Page 231

1  demonstrated some EPS symptoms, per the records?
2   A.  That's correct.
3   Q.  And how are those symptoms treated?
4   A.  Looks like Cogentin was started.
5   Q.  Okay.  Based on these records which is in
6  Exhibit 2, the EPS symptomatology was related to the
7  Geodon; correct?
8   A.  That's what the records indicate.
9   Q.  And there's nothing in these records to indicate
10 that the Haldol that she received caused EPS symptoms;
11 correct?
12  A.  Can you just point me back to when she was given
13 Haldol in relation to this?
14  Q.  Looks like on March 21st, if you look, there's a
15 discharge medication reconciliation report.
16      MR. CHRISTNER:  It's on page 21 of
17 Exhibit 2.
18      THE WITNESS:  Okay.  Thank you.
19      And can you just repeat the question?
20 BY MR. HUNTER:
21  Q.  Sure.
22      There's nothing in these records presented
23 to you from St. Luke's that reflect that the Haldol caused
24 her to have EPS symptoms; correct?
25  A.  I would say that's correct.

Page 232

1   Q.  In looking at the discharge medication
2  reconciliation report down at the Haldol entry, I have
3  some questions about the internal comments.
4       Do you see where I'm looking?
5   A.  Yes, I do.
6   Q.  Next to Internal Comments, it says:
7  "Indications:  Severe psychotic agitation."
8       When you see that documented, "Indications:
9  Severe psychotic agitation," what does that mean to you?
10  A.  That that's a rationale for the use of the
11 medication.
12  Q.  And then next it says:  "Warning:  Fall risk."
13      When you say that in the record, what does
14 that mean to you?
15  A.  That the patient may present a fall risk.
16  Q.  While she's on the medication Haldol?
17  A.  Yes.
18      MR. CONNELLY:  Form and foundation.
19 BY MR. HUNTER:
20  Q.  And then next to that it says:  "Take precaution
21 PRN."  I'm going to assume it was meant to say "severe
22 psychotic agitation."
23      When you see that in the record, what does
24 that mean to you?
25  A.  Quite frankly, I'm not accustomed to seeing that

Page 233

1  verbiage.
2   Q.  Okay.  You were also shown some medical records
3  from Banner Thunderbird Medical Center which is
4  Exhibit 22; correct?
5   A.  That's correct.
6   Q.  Now, look through there.  You will see some
7  orders for Haldol to be given, and then on the MAR it
8  shows that Haldol was given.
9       Do you see where I'm looking?
10  A.  Can you refer me to the page?
11      MR. CONNELLY:  Where are you looking?
12 What's the Bates label?
13 BY MR. HUNTER:
14  Q.  The orders and the MAR are Bates stamped
15 starting at page 987, 902, 908, 984, 985, 986, 999, 1000.
16  A.  I see, yes.
17  Q.  Okay.  Now, during this admission, based on the
18 discharge summary, Brooke was kept in four-to-five-point
19 restraints; correct?
20  A.  That is what we read, yes.
21  Q.  Bates stamp 1308 in this exhibit, are you there?
22  A.  I am.
23  Q.  Do you see where it says "Plan"?
24  A.  Yes.
25  Q.  It's got the number 1?