Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>         Plaintiffs,<br><br>   v.<br><br>State of Arizona, et al.,<br><br>         Defendants. | Case No.: 2:21-cv-01444-DJH<br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>(Hon. Diana J. Humetewa)<br><br>ORAL ARGUMENT REQUESTED |

Plaintiffs, by and through undersigned counsel, move for partial summary judgment in their favor against Defendant Krzystztof Mlak, M.D. on their claims of infringement of their constitutional right of association to make important medical decisions (Count 15), negligent treatment (Counts 20 and 23), and battery (Count 21), because he failed to get informed consent from Plaintiffs before administering a major antipsychotic medication to Brooke while she was placed in a mental health facility under the State's custody. This

motion is supported by the following Memorandum of Points and Authorities and the Exhibits attached thereto.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

"[T]he relationship between a physician and his patient is one of trust and confidence which obligates the physician to exercise the utmost good faith." *Hales v. Pittman*, 118 Ariz. 305, 308 (1978). "[It is] the patient, not the physician, [who] makes the decision on whether to undergo the operation." *Id.* The medical provider must ensure that the patient has been informed of the nature and risks of any medical procedure.

As a matter of law, Defendant Krzystztof Mlak, M.D., made the unilateral decision to administer the antipsychotic medication Haldol to Plaintiff Brooke Scianna. Given Brooke's condition as a non-verbal autistic child, Brooke's mother, Christine, had the common law and constitutional right to make these major medical decisions for her daughter. Indeed, Christine was the ***only*** person authorized to make this decision; under clear Arizona law, in a temporary custody situation such as the present matter, the Department of Child Safety did not have the authority to consent to "major" medical decisions – such as the administration of the first-generation antipsychotic drug Haldol, with its significant potential for serious side effects. Dr. Mlak did not seek informed consent from Christine. Indeed, he did not even seek informed consent for such a major decision from the Department (regardless of their legal inability to give such consent). Rather, he delegated his obligation to Aurora staff, who simply called a Department employee whose knowledge of Brooke and her condition were minimal at best, and most likely nonexistent. Thus, for the reasons set forth herein, Plaintiffs respectfully request that this Court grant partial summary judgment against Defendant Mlak on (1) his breach of his duty of care to obtain informed consent, and (2) his breach of Christine's constitutional right to make important medical decisions for her daughter.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

## II.     BACKGROUND

### A.     Brooke

Plaintiff Brooke Scianna is a non-verbal, severely autistic individual. *See* **Exh. 2 – DCS 6/28/2018 Report to Court, at 7.** She was born in July of 2001, *id.* at 1, and is currently 23 years old. At the time of the incidents at issue, she was 17 years of age.

Plaintiff Christine Scianna is Brooke's mother. *Id.* John Scianna is Brooke's father. *Id.* It is undisputed that Christine and John shared custody of Brooke, but Brooke resided primarily with Christine.

It is also not disputed that Christine cared for Brooke throughout Brooke's childhood. Needless to say, such care was often a full-time job for Christine, and required the assistance of countless medical and psychological professionals. *See generally* **Exh. 19, Christine Scianna Deposition, at 38-47.**

### B.     The Department of Child Safety Inserts Itself in Brooke's Life

On April 18, 2018, due to Brooke's behaviors at her school, school administrators arranged for Brooke to be transported by ambulance to Banner Thunderbird Hospital. *See generally* **Exh. 2.**  A school official called Christine, who agreed with this course of action. At Thunderbird, medical providers diagnosed Brooke with Rhabdomyolysis, a serious syndrome which is caused by a direct or indirect muscle injury. **Exh. 6, Records from Banner Thunderbird Medical Center, at 1** ("During this time, she has required 4 to 5-point restraints and developed significant rhabdomyolysis with a CK level at 6,666 with a normal creatinine on labs"). Rhabdomyolysis results from the death of muscle fibers and a release of their contents into the bloodstream. *See* **Exh. 1, Mlak Deposition**, **at 140-41**.  It can lead to serious complications such as renal (kidney) failure. *Id.* In rare cases, Rhabdomyolysis can even cause death. *See generally* **Exh. 20, Cleveland Clinic Summary of Rhadbomyolysis**.

It is undisputed that on April 30, 2018, Brooke was transferred to Aurora Behavioral Healthcare, with Christine's consent and cooperation. She remained there until released to Christine on May 30, 2018.

Sometime in June 2018, an anonymous person reported to the Arizona Department of Child Safety ("Department" or "DCS") that Christine's significant other had supposedly used excessive force to control Brooke and, further, that Christine had let Brooke "wander" the street for ten minutes before her school bus arrived. **Exh. 2, DCS 6-28-2018 Report to the Court, at 1-2.** At an informal family meeting on June 18, 2018, a DCS employee gave Christine an ultimatum that she must allow the placement of Brooke into a group home or DCS would take legal action against Christine. *See* **Exh. 21, Notes of June 18, 2018, Family Meeting, at 7** ("She stated that due to the concern for the safety of Brooke and others around her, the Department may have to become legally involved if the parents would not agree to placing her in a group home on a voluntary foster care agreement.").

Ultimately, on June 22, 2018, the Department took temporary custody of Brooke and, on June 27, filed an out-of-home dependency petition. **Exh. 3, Dependency Petition, at 3.** "Dependency" refers to the status of a child who has been determined by a court to need state intervention because the child does not have proper parental care and control. *See* **A.R.S. § 8-201(15)**. In a dependency case, the court may place the child in foster care or with a relative while services are provided to address the issues that led to the dependency. The goal is typically reunification with the parents. The Department must prove dependency by a preponderance of the evidence. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 489, ¶ 23 (App. 2015). Generally, the hearing on the Department's dependency petition must be conducted within ninety (90) days of service of the dependency petition. **A.R.S. § 8-842(C)**; *Joshua J. v. Arizona Dep't of Econ. Sec.*, 230 Ariz. 417, 421, ¶¶ 1-2 (App. 2012).[1]

---

[1] The trial court initially scheduled the dependency hearing for September 14, 2018. **Exh. 10, 7/13/2018 Minute Entry, at 2**. Eventually, the hearing was continued to February 14, 2019. *See* **Exh. 11 – 11/15/2018 Minute Entry, at 4.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**C.**     **DCS Sends Brooke to a Group Home, Where She was Abused and Which Placement was a Categorical Failure**

Meanwhile, before the Department was put to the test of proving its case, the Department placed Brooke in a group home. Placement in the group home was an unmitigated disaster. On August 22, 2018, paramedics transported Brooke to Abrazo Arrowhead Hospital. The intake physician noted: "[Brooke] apparently at her care facility is now unable to be cared for there, she has been very aggressive with staff and has been performing a lot of self-abuse." **Exh. 7, Abrazo Medical Records, at 000105.** The Crisis Intervention evaluator reported:

> Patient's mother was her primary care giver and administering medical marijuana throughout her life until 6/22/18 when patient was removed from the home and placed in a group home. **This was likely a huge adjustment for patient and she is now having daily violent outbursts**. Today she punched staff in the face and refused to stay in the group home. She has been assaulting the other two residents as well. Group home staff do not feel they can keep patient, staff and other residents safe at this point.

**Exh. 9, Abrazo Crisis Intervention Report, at 00067** (emphasis added).

**D.**     **DCS Moves Brooke from Abrazo Arrowhead to Defendant Aurora Behavioral Healthcare-Tempe**

Following hospitalization at Abrazo Arrowhead, on August 25, 2018, Brooke was moved to Aurora Behavioral Healthcare-Tempe ("Aurora"). On August 30, the Department of Child Safety filed a motion with the juvenile court to approve Brooke's admission to Aurora, simultaneously seeking appointment of an attorney for Brooke. *See* **Exh. 14, 8/30/2018 Motion to Approve Inpatient Treatment**. On August 31, 2018, the trial court granted a 72-hour inpatient evaluation, and appointed Angela Ramos as Brooke's attorney. **Exh. 15, 8/31/2018 Order**. The trial court approved inpatient treatment at Aurora in an order dated September 4, 2018; it did not grant Aurora *carte blanche* to conduct whatever treatment it may so desire. **Exh. 16, 9/4/2018 Order.**

Meanwhile, on August 26, 2018, Defendant Krzysztof Mlak, M.D., examined Brooke. Despite Brooke's extensive medical history, Dr. Mlak reviewed only the following

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

medical records before beginning his treatment of Brooke: Emergency room records from Abrazo Arrowhead Health, the crisis intervention record, and records from two prior admissions at Aurora. **Exh. 1, Mlak Deposition, at 72**.  He did not review records from either Banner Thunderbird Hospital or St. Luke's Behavioral Health, despite Brooke's lengthy hospitalizations at both institutions. **Exh. 1, Mlak Deposition, at 125, 139.**

The St. Luke's records show, among other things, that antipsychotic medications, such as Geodon, Risperidone, Seroquel, and Zyprexa resulted in Brooke's ***increased agitation. Exh. 17, St. Luke's Medical Records, at 00001-2.*** As to Haldol, the St. Luke's records showed that it was not to be administered to Brooke:



*Id.* at 21 (remarking "Don't Continue").

In sum, at the time of Brooke's admission to Aurora, she was a 17-years-old, severely autistic individual since birth. Brooke was raised by her mother, Christine, since birth. Thus, there would be no better historian of Brooke's medical history than Christine. Yet, Dr. Mlak made little effort to contact Christine about Brooke's medical or medication history. He testified that he attempted to contact Christine on August 26th. **Exh. 1, Mlak Deposition, at 143.**

### E.      Dr. Mlak Administers Haldol to Brooke

Meanwhile, without the benefit of Christine's history regarding Brooke or adequate medical records, on September 7, 2018, Dr. Mlak decided to administer Haloperidol (better known as Haldol) to Brooke for her mood disorder. *See* **Exh. 1, Mlak Deposition, at 65, 101-02**; **Exh. 18, 9/7/2018 Consent Form**.

Haldol (full name, Haloperidol) was discovered in 1958 by the Belgian company Janssen Pharmaceuticals, the pharmaceutical manufacturer that also developed Imodium

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and Fentanyl. Haldol is a "first generation" psychotropic medication. **Exh. 1, Mlak Deposition, at 60.** Dr. Mlak testified:

> Q.     You agree with me that Haldol was developed in the 1950s as part of the first wave of antipsychotic medications; right?
>
> A.     Correct.
>
> Q.     And it was used primarily for the treatment of adults with severe mental illness like schizophrenia; right?
>
> A.     That's correct.

*Id*.

Haldol has the potential for severe and serious side effects, as Dr. Mlak acknowledged:

> Q.     Do you agree with me that Haldol is a typical antipsychotic that has some severe side effects, potentially severe side effects? Right?
>
> A.     Yes.

*Id*. at 113.  Dr. Mlak outlined some of the side effects of Haldol:

> Q.     Now, what are some of the side effects that you're aware of for Haldol?
>
> A.     The common side effects can include drowsiness, dizziness, muscle stiffness, muscle contractions, to name a few.
>
> Q.     And it can include -- is it tarditis[sic] dyskinesia? Is that right or...
>
> A.     Tardive.
>
> Q.     Tardive dyskinesia. And that is a -- and what is tardive dyskinesia?
>
> A.     It is a permanent and involuntary movement disorder that occurs with antipsychotic medications.
>
> Q.     And that's a potential side effect of Haldol; right?
>
> A.     That's correct.
>
> Q.     And what is EPS?
>
> A.     EPS is another type of movement disorder that is transient and reversible.
>
> Q.     Tardive dyskinesia is not reversible; right?

1    A.    That's correct.

2    Q.    And it can result from the administration of typical antipsychotics;
          right?

3

4    A.    That's one of the -- one set of medications that can result in tardive
          dyskinesia, yes. And atypical antipsychotics as well.

5    **Exh. 1, Mlak Deposition, at 121-22**.

6    Haldol is particularly dangerous for adolescents, as Dr. Andrew Clark explained:

7

8        So the use of Haldol with adolescents in emergency
          departments is relevantly common. It's commonly used as a,
          sort of, acute treatment in emergency departments.

9

10       I will say that its use as a regular, ongoing medication in
          children and adolescents is, in my understanding and my
          experience, quite rare.

11

12   **Exh. 23, Clark Deposition**, at 107. There is a reason for this:

13       And I will, sort of, further say Haldol in an adolescent carries
          with it significant risks. And given Brooke's complicated
          history and the real risks that she posed, for him to not – for
          Dr. Mlak to not have understood what her prior experience
          with – with medications had been meant that he was really
          operating in the dark and employing a very high-risk strategy
          without really knowing what had gone on with her previously.

14

15

16

17   **Exh. 23, Clark Deposition**, **at 109-110**; *see also* **Exh. 1, Mlak Deposition**, at 63

18   (acknowledging that age was a factor to be considered). Dr. Clark continued:

19

20       I will say that as a psychiatrist, it's a – it's a significant – it's a
          – it's a medication that carries significant risks and has really
          been delegated, relegated to third- or fourth-line treatment
          because of the risks that it involves.

21

22       So it is, colloquially speaking, a big deal to put an adolescent
          on Haldol. It's a big deal to put an adolescent on any
          antipsychotic medication, but Haldol even more so because of
          the risks that it poses.

23

24

25   **Exh. 23, Clark Deposition, at 123-24**.

26   Further, one of the side effects is Rhabdomyolysis, as Dr. Mlak confirmed:

27   Q.    … R-H-A-B-D-O-M-Y-O-L-Y-S-I-S?

28   A.    Rhabdomyolysis.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Q.    And what is that?

A.    That is a muscular condition that results in the muscle breakdown.

Q.    And Haldol can cause that condition; right?

A.    It can.

Q.    Would you agree with me that rhabdomyolysis –

A.    Correct.

Q.    -- and tardive dyskinesia are severe potential side effects from the administration of Haldol?

A.    Yes, I would.

**Exh. 1, Mlak Deposition, at 123** (objection to form omitted). In short, one of the side effects is the very condition Brooke developed while at Banner Thunderbird Hospital, where she was given Haldol – which information is contained in a medical record that Dr. Mlak did not review, nor had she spoken with Christine.

### F.    <u>Dr. Mlak Does Not Obtain Informed Consent to Prescribe Haldol to Brooke.</u>

Although Haldol, as shown herein, is a major antipsychotic medication, Dr. Mlak did not obtain informed consent for its administration. He did not seek to obtain consent from Christine, let alone informed consent. He did not even seek to obtain informed consent from the Department of Child Safety. Rather, he delegated the responsibility for obtaining "consent" (albeit not informed) from DCS to Defendant Aurora's nursing staff:

Q.    I'm asking if the legal consent that you received from DCS was to change medication from Thorazine to Haldol.

A.    So I would have made the recommendation and would have attempted to obtain consent directly. If that wasn't documented, then the nurses would have obtained consent, which is our protocol, and they would have documented that, verbal – written consent.

**Exh. 1, Mlak Deposition, at 106.**

Q.    And there's nothing in Exhibit 23, is there, that shows you having a conversation with DCS in the nature of gathering and providing informed consent?

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

9

> MR. CHRISTNER: Are you talking about him personally getting consent from DCS?
>
> MR. CONNELLY: I'm meaning him as the medical provider having a conversation with DCS in the context of informing them of what he wanted to do secondary to getting consent to do what he wanted to do.
>
> THE WITNESS:      So it does – my documentation doesn't reflect that. So it must have been my nursing team secured consent for the medication.

*Id.* at 182.

Melissa Courtright was the DCS case manager assigned to the case. However, Ms. Courtright testified that she did nothing more than simply defer to what the doctor recommends:

> Q.   Do you think you have any obligation to understand what the side effects or the risks of any psychotropic medications are before you consent to the administration?
>
> A.   No. I didn't go to med school. If it's being recommended by a medical provider for a child to receive a particular medication, I'm not going to withhold that medication from the child if it's the recommendation.
>
> Q.   So if a medical provider that the department has somehow put in place or engaged in its provision of care to a child it's taken into its custody says the child needs this psychotropic medication -- Haldol, for instance -- is it your position, then, that that constitutes adequate medical care because a doctor is saying this is what's needed and you don't need to make a distinction between adequate versus major?
>
> A.   There's going to be a reason as to why this was a recommendation of the provider to implement this particular drug to the child. So I'm going to ensure that the child is receiving the appropriate medication that is being prescribed to them. So, yes, I believe that's adequate.

**Exh. 24, Courtright Deposition, at 132-33** (objections to form omitted).

But here, it does not appear that even Ms. Courtright was involved with the "consent" to administer Haldol:

> Q.   So if a call comes in after hours and it's for medications or to increase medications, the person taking the call has the authority to give consent?
>
> A.   They do.
>
> Q.   And that's a standard practice at the department?

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

10

1       A.    Yeah. Based on the case and what's going on, yes.

2   *Id.* at 146.

3       Defendant Aurora's consent form relating to Dr. Mlak's administration of Haldol

4   indicates that the "consent" conversation was between Aurora nurses and some unknown

5   person "Kaloni" at the Department of Child Safety:



17  **Exh. 18, 9-7-2018 Consent Form,** at 000150.

18      Further, although the Department sought the appointment of an attorney for Brooke

19  at the same time it sought permission for Brooke's inpatient treatment at Aurora, Aurora's

20  records do not indicate that any effort was made to reach Brooke's attorney, Angela Ramos,

21  or her mother, Christine, to obtain consent for the major administration of Haldol.

22      In short, for the administration of as significant an antipsychotic medication as

23  Haldol, one with a host of potential life-altering side effects, Dr. Mlak did not obtain

24  informed consent from Brooke's mother, even though there had never been a dependency

25  finding as to mother, or her court-appointed attorney; nor was there a court order

26  authorizing the administration of Haldol. In fact, Dr. Mlak completely delegated the

27  informed consent process to others; Aurora nurses sought consent from government

28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

workers who had no knowledge of this case or Brooke. In short, there was not an actual, meaningful, informed consent process in this case before Dr. Mlak administered the antipsychotic drug Haldol.

### G. Christine Formally Complains to Aurora about Dr. Mlak's Refusal to Listen to Her.

On September 21, 2018, Christine expressed her frustration with the lack of communication and consideration by Dr. Mlak, particularly with the use of Haldol. She stated:

> ***The doctor is completely ignoring me and refuses to take her off the Haldol***. Her one on one told me that she's [Brooke] not the same Brooke and that she's [the one-on-one facilitator] voiced her opinion and has been ignored, as well. When I have patients at that hospital telling me Brooke's attacking staff and hitting her head twice in one day, that ***doesn't show the medication side effects being resolved as the doctor put it***. …
>
> My daughter has been in [Aurora] almost a month and will end up with a longer [time] in patient than any other stay, because ***the doctor chose to change all her meds*** after being abused and neglected in a [group] home and wasn't even getting taken to [doctor] appointments….ACA [Arizona Children's Association] has notated she has bad reactions to antipsychotics, but ***this doctor still refuses to listen to anything I say***. The doctor she had last April was so much better and she didn't show these behaviors at Aurora on that doctor's regimen.

**Exh. 8, Christine's 9-21-2018 Email to Aurora** (emphasis added)**.**

### H. The Juvenile Court Returns Brooke to Christine, and the Department Eventually Dismisses the Dependency Proceeding Against Her.

On October 31, 2018, while Brooke was still a patient at Aurora, Christine filed a motion with the juvenile court, pursuant to Arizona Rule of Juvenile Court Procedure 59, to return Brooke to Mother's custody. *See* **Exh. 4, Motion for Change of Physical Custody Pursuant to Rule 59**. The trial court granted the motion, subject to confirmation that Christine participate in specified training. **Exh. 11,** 11/15/2018 Minute Entry, at 4.

On November 21, 2018, Aurora released Brooke to Christine's custody. *See* **Exh. 5, Aurora Discharge Summary.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

On February 11, 2019, prior to the scheduled dependency trial, the Department moved to dismiss the dependency petition, noting that Brooke had been reunified with Christine. **Exh. 12, 2/11/2019 Motion to Dismiss.** The trial court granted the motion the next day. **Exh. 13, 2/12/2019 Order Dismissing Petition**.

## III.  DISCUSSION

### A.  The Responsibility for Obtaining Informed Consent Rests on the Treating Provider, Dr. Mlak.

"The gravamen of an informed consent claim ... is a healthcare provider's duty to communicate information to enable a patient to make an intelligent and informed choice, after full and frank disclosure of material risk information and the benefit of data regarding a proposed course of medical treatment." *Dowling v. A.R.T. Inst. of Washington, Inc.*, 372 F. Supp. 3d 274, 286 (D. Md. 2019) (quoting *McQuitty v. Spangler*, 976 A.2d 1020 (Md. 2009)). The foundation of the informed consent doctrine is the relationship of trust between a physician and patient: "[T]he relationship between a physician and his patient is one of trust and confidence which obligates the physician to exercise the utmost good faith." *Hales v. Pittman*, 118 Ariz. 305, 308 (1978). Ultimately, the decision as to whether to undergo a medical treatment or not rests with the ***patient, not the physician***. "[It is] the patient, not the physician, [who] makes the decision on whether to undergo the operation." *Id.*

"[I]nformed consent is a process, not a document." *Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112, 121 (Ky. 2021) (quotation omitted).

Here, Dr. Mlak had a relationship of trust and utmost good faith with Brooke. Thus, this relationship required that Dr Mlak ensure that he provided informed consent to the individual or entity who had the legal right and responsibility to make informed decisions for Brooke. His decision to delegate this decision to Aurora nurses, who then spoke to persons at DCS unqualified to make any major health decisions for Brooke, was a breach of Dr. Mlak's fiduciary relationship with Brooke.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**B.** **Under Arizona Law, the Department of Child Safety Did Not Have Authority to Give Consent to Such a Major Medical Decisions as Administration of Antipsychotic Medications Like Haldol.**

At the time of the treatment at issue in this matter, Brooke was in the ***temporary custody*** of the Department of Child Safety, the legal gray area following the filing of a dependency petition but before the required hearing on the allegations in the petition.

Arizona juvenile law directly addresses this situation. The juvenile code defines "custody" or "legal custody" as follows:

> "Custody" or "legal custody" means a status embodying all of the following rights and responsibilities:
>
> (a)     The right to have physical possession of the child.
>
> (b)     The right and the duty to protect, train and discipline the child.
>
> (c)     The responsibility to provide the child with **adequate** food, clothing, shelter, education and ***medical care***, provided that such rights and responsibilities shall be exercised subject to the powers, rights, duties and responsibilities of the guardian of the person ***and subject to the residual parental rights and responsibilities if they have not been terminated by judicial decree***.

**A.R.S. § 8-531(5)** (emphasis added).

In contrast, a person must be a "guardian" to make ***major*** decisions for a child:

> "Guardianship of the person" with respect to a minor means the duty and authority to make important decisions in matters affecting the minor including but not necessarily limited either in number or kind to:
>
> (a)     ***The authority to consent to*** marriage, to enlistment in the armed forces of the United States and to ***major medical, psychiatric and surgical treatment,*** to represent the minor in legal actions and to make other decisions concerning the child of substantial legal significance.

**A.R.S. § 8-531(8)** (emphasis added).

The best indicator of a statute's meaning is "the plain language of the statute." *State v. Fell*, 203 Ariz. 186, 188, ¶ 6 (App. 2002). Further, this Court must "seek to harmonize related statutes and 'aim to achieve consistency among them' within the context of the

overall statutory scheme." *Id.* (quoting *Bills v. Arizona Property & Cas. Ins. Guar. Fund*, 194 Ariz. 488, 495, ¶ 18 (App.1999)).

Finally, under Arizona law,

> if possible this court construes statutes to avoid rendering them unconstitutional. Second, if possible we construe statutes to avoid unnecessary resolution of constitutional issues.

*Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272–73 (1994) (quotation omitted).

A case squarely on point is *Kiva O. v. State Dep't of Health & Soc. Servs.*, 408 P.3d 1181 (Alaska 2018). Alaska utilizes the same basic definitions of "custodian" and "guardian" as Arizona. *See* **A.S. § 47.10.084(a), (b),** also attached as **Exh. 25**. In *Kiva O.*, the parent of a child in the custody of the Office of Children's Services challenged OCS's decision to administer an antidepressant and mood stabilizer to the child. The Alaska Supreme Court noted that the term "major medical treatment" had to be considered in light of a parent's fundamental constitutional rights:

> In this case we conclude … that because the parent is asserting a fundamental constitutional right in the context of medical treatment for her child, *Myers* [*v. Alaska Psychiatric Services*, 138 P.3d 228 (Alaska 2006),] provides the appropriate analytical framework. Our review of AS 47.10.084 convinces us that its express recognition of the parent's residual right "to consent to major medical treatment" does not signal a weakening of the fundamental constitutional right…. [¶] [A]s we explained in *Myers*, ***treatment with psychotropic drugs is "truly intrusive" and "literally intended to alter the mind."***

*Kiva O.*, 408 P.3d at 1188 (emphasis added; citations omitted).[2]

Here, the Department had only ***temporary custody***, and Christine's parental rights had <u>not</u> been "terminated by judicial decree." Indeed, at the stage of the treatment at issue, Brooke had not yet even been found dependent as to Christine. Thus, Christine retained her constitutional right of association to make important medical decisions for Brooke, an

---

[2] Similarly, according to Dr. Clark, "[i]n some states, such as Massachusetts, antipsychotics are accorded special status, and prescribing antipsychotic medications to youths in foster care is considered 'extraordinary treatment', which requires a judicial hearing and court order." **Exh. 22, Dr. Clark expert report, at 15**.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

important factor in a ***custodian's*** right to make decisions for a child.[3] Further, A.R.S. 8-531(5) provides that a custodian – as opposed to a guardian – can make "adequate" medical decisions for the child, but not "major" decisions that are to be made solely by a guardian.

Providing antipsychotic medication to Brooke – medication recognized as "truly intrusive" and "literally intended to alter the mind" – was, in fact, a major and important medical decision, one with potentially long-lasting impact on Brooke. Section 8-531(5) did not permit the Department, as a temporary custodian, to make this type of medical decision. Rather, this medical decision was reserved to Mother, Christine, and not the Department.

Under Dr. Mlak's relationship of trust and utmost good faith, he erred as a matter of law in delegating his informed consent duty to the nursing staff, to in turn do nothing more than reach out to call-line employees of the Department of Child Safety (including employees with no first-hand knowledge of the case and likely no medical training).

**C.**   **Plaintiff Christine Scianna, as Brooke's Mother, Retained Her Constitutional Right to Make Major Medical (and Psychiatric) Decisions for Brooke.**

"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (collecting Supreme Court cases). "The Supreme Court has called parents' care, custody, and control of their children ... perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Wallis*, 202 F.3d at 1136.

This right "includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* at 1141. Thus, the Ninth Circuit in *Wallis* recognized the right of parents to notice and consent or judicial authorization in advance of medical examinations of their

---

[3]   This constitutional right is examined in section "C", below.

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

children, unless a "reasonable concern that material physical evidence might dissipate" or an "urgent medical problem" exists. *Id.* (citations omitted). "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Mann v. County of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (quoting *Wallis*).[4]

The Department obtained a court order for inpatient treatment at Aurora, and Christine does not challenge this decision. But inpatient treatment did not provide the providers there, including Dr. Mlak, a constitutional free-for-all in terms of treatment of Brooke. As a matter of both state law, as set forth above, and constitutional law, Christine retained the right to make informed decisions as to whether her daughter should be medicated with an antipsychotic medication, a medication with the potential for major and permanent side effects.

> ### D.   Administration of Haldol was a "Major" or "Important" Medical and/or Psychiatric Decision.

The administration of an antipsychotic medication, particularly Haldol, is a major and important medical (or psychiatric) decision that ***cannot*** be made without adequate informed consent. Dr. Mlak conceded Haldol's significant risk of side effects, including Rhabdomyolysis, a condition that Brooke briefly contracted at Banner Thunderbird after administration of Haldol.

Dr. Clark further explained Haldol's elevated risk when administered to children and adolescents. He noted that "[o]ne relevant and authoritative document in regard to this matter is the American Academy of Child and Adolescent Psychiatry 'Treatment Recommendations for the Use of Antipsychotics in Aggressive Youth.'" **Exh. 22, Dr. Clark expert report, at 14**. Dr. Clark outlined the relevant recommendations as follows:

---

[4]      The Ninth Circuit has recognized that a parent's rights give way in emergency situations. *See Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012) (the rights of parents "step aside" … "[i]n an emergency situation ... when the children are subject to immediate or apparent danger or harm") (quoting *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir.1991)). In emergency situations, the medical treatment needed to stabilize the emergency would presumably be "adequate" in that instance.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

> Recommendation 1: *For all new cases, clinicians should conduct (or review the results of) comprehensive psychiatric diagnostic interviews with patients and parents/guardians before prescribing, changing or discontinuing medication.*
>
> Recommendation 4: *Use appropriate treatment for primary disorders as a first line treatment.* In this instance, the recommendations suggest using a mood stabilizer rather than an antipsychotic to address mood instability.
>
> Recommendation 5: *Use an Atypical Antipsychotic First Rather than a Typical Antipsychotic to Treat Aggression.* The recommendation explains that the atypical antipsychotics have a safer acute side effect profile than the traditional antipsychotics, with a lower risk of tardive dyskinesia, neuroleptic malignant syndrome, and extrapyramidal symptoms.

**Exh. 22, Dr. Clark expert report, at 14** (italics in original). He also notes that antipsychotic drugs like Haldol "are accorded special status" as "extraordinary treatment" in some states, like Massachusetts, the administration of which "requires a judicial hearing and court order." **Exh. 22, Dr. Clark expert report, at 15**.

Courts, too, have long recognized the significance of the administration of antipsychotic medications.

> Antipsychotic drugs, also known as "major tranquilizers" and "neuroleptics", are psychotropic drugs widely used in the treatment of mental illness, especially schizophrenia. Although they do not cure psychotic illness, their medical usefulness stems from their ability to influence thought patterns so as to eliminate psychotic symptoms. ***Numerous side effects are associated with their usage, including extrapyramidal symptoms, akathesia, Parkisonisms, dystonic reactions, akinesia and dyskinesia. The most potentially devastating side effect is tardive dyskinesia, an irreversible neurological disorder characterized by involuntary, rhythmic and grotesque movements of the face, mouth, tongue, jaw and extremities.*** Although this condition is fairly widespread, it is impossible to predict who will be a victim.

*Rivers v. Katz*, 67 N.Y.2d 485, 490, n.1, 495 N.E.2d 337, 339 n.1 (1986) (emphasis added; citations omitted).[5]

---

[5]    For a comprehensive list of the side effects of antipsychotic medications such as Haldol, a first generation medication (also called "typical", in contrast to second generation

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

The United States Supreme Court has recognized that individuals "possess[] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). "The forcible injection of medication into a nonconsenting person's body, represents a *substantial* interference with that person's liberty." *Id*. at 229 (italics added). In the case of antipsychotic drugs, that interference is particularly severe:

> ***The purpose of the drugs is to alter the chemical balance in a patient's brain***, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that ***the drugs can have serious, even fatal, side effects***. One such side effect identified by the trial court is acute dystonia, a severe involuntary spasm of the upper body, tongue, throat, or eyes. The trial court found that it may be treated and reversed within a few minutes through use of the medication Cogentin. Other side effects include akathesia (motor restlessness, often characterized by an inability to sit still); neuroleptic malignant syndrome (a relatively rare condition which can lead to death from cardiac dysfunction); and tardive dyskinesia, perhaps the most discussed side effect of antipsychotic drugs. Tardive dyskinesia is a neurological disorder, irreversible in some cases, that is characterized by involuntary, uncontrollable movements of various muscles, especially around the face.... [T]he proportion of patients treated with antipsychotic drugs who exhibit the symptoms of tardive dyskinesia ranges from 10% to 25%. According to the American Psychiatric Association, studies of the condition indicate that 60% of tardive dyskinesia is mild or minimal in effect, and about 10% may be characterized as severe."

*Id*. at 229–230 (citations omitted, emphasis added); *see also Riggins v. Nevada*, 504 U.S. 127, 134–35 (1992) (confirming the right of persons to reject antipsychotic medication absent a compelling state interest).

In *Kiva O.*, the Alaska Supreme Court recognized that, in the context of a child custody case, neither the parent nor child have rights lesser than that of incarcerated inmates. Rather, before ***antipsychotic medication*** could be administered to a child in the

---

antipsychotics, which are sometimes called "atypical"), *see Davis v. Hubbard*, 506 F. Supp. 915, 928 (N.D. Ohio 1980).

custody of the state's child protective services, the state must seek judicial approval, in which the juvenile court must consider, among other relevant factors:

> (A)   an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;

> (B)   information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;

> (C)   a review of the patient's history, including medication history and previous side effects from medication;

> (D)   an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and

> (E)   information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment.

*Kiva O.*, 408 P.3d at 1189 (quoting *Myers*, 138 P.3d at 252)).

It should be axiomatic at this point that the administration of a drug that alters the chemical balance of a patient's brain, alters their cognitive processes, and carries a significant risk of permanent, life-altering side effects is a major medical and/or psychiatric intervention. As such, consent for administration of that drug can only come from a parent, legal guardian, or court order. Here, none of this occurred. Rather, Dr. Mlak unilaterally decided to administer the antipsychotic medication Haldol on a ***non-emergency basis*** to Brooke, bypassing both Brooke's parents and the courts, and delegating any type of informed consent to nurses, who would then obtain some type of consent (whether "informed" in any manner is not shown by the record) from some Department employee at the other end of the call-line with no actual connection to the case.

## IV.   <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs respectfully request that this Court grant partial summary judgment to them as against Defendant Mlak for (1) his breach of his common law duty to obtain informed consent before administering Haldol, and (2) his

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

breach of Mother's constitutional right to make important, major medical decisions for her daughter.

RESPECTFULLY SUBMITTED this 12th day of July 2024.

**MILLS + WOODS LAW PLLC**

By      /s/ Thomas A. Connelly
        Thomas A. Connelly
        Robert T. Mills
        Sean A. Woods
        5055 North 12th Street, Suite 101
        Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
        DeeAn Gillespie Strub
        Jenny D. Jansch
        7319 North 16th Street
        Phoenix, AZ 85020

        *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 12, 2024, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system.

        /s/ Thomas A. Connelly

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556