# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CHRISTINE SCIANNA, et al.,              )
                                        )
          Plaintiffs,                   )
                                        )
                                        )  No. 2:21-cv-01444-DJH
             vs.                        )
                                        )
ARIZONA DEPARTMENT OF CHILD             )
SAFETY, et al.,                         )
                                        )
          Defendants.                   )
_____         )


DEPOSITION OF KRZYSZTOF MLAK

Phoenix, Arizona
June 8, 2023
10:10 a.m.


Prepared by:                  CARRIE REPORTING, LLC
MICHAELA H. DAVIS             Certified Reporters
Registered Professional Reporter  2415 E. Camelback Road
Certified Realtime Reporter   Suite 700
Certified Realtime Captioner  Phoenix, AZ 85016
Certified LiveNote Reporter   (480) 429-7573
AZ CR No.  #50574
carrie@carriereporting.com

(COPY)

1              DEPOSITION OF KRZYSZTOF MLAK commenced at

2    10:10 a.m. on June 8, 2023, at the law offices of

3    GILLESPIE, SHIELDS, GOLDFARB & TAYLOR, 7319 NORTH 16TH

4    STREET, SUITE 100, PHOENIX, ARIZONA, before MICHAELA

5    HERMAN DAVIS, a Certified Reporter, in and for the County

6    of Maricopa, State of Arizona.

7

8

9                          * * *

10                   A P P E A R A N C E S

11   FOR THE PLAINTIFF:

12           MILLS + WOODS LAW PLLC
             BY: MR. THOMAS A. CONNELLY
13               5055 NORTH 12TH STREET
                 SUITE 101
14               PHOENIX, ARIZONA 85014
                 tconnelly@millsandwoods.com
15

16   FOR DEFENDANT KRZYSTZTOF MLAK, M.D.:

17           QUINTAIROS, PRIETO, WOOD & BOYER, PA
             BY:  MR. DUSTIN A. CHRISTNER
18               8800 EAST RAINTREE DRIVE
                 SUITE 100
19               SCOTTSDALE, ARIZONA 85260
                 dustin.christner@qpwblaw.com
20

21   FOR DEFENDANT DEPARTMENT OF CHILD SAFETY:

22           JONES SKELTON & HOCHULI
             BY:  MS. GEORGIA A. STATON
23               40 NORTH CENTRAL AVENUE
                 SUITE 2700
24               PHOENIX, ARIZONA 85004
                 gstaton@jshfirm.com
25

```
 1  FOR DEFENDANT AURORA BEHAVIORAL HEALTH SYSTEM:

 2          RENAUD COOK DRURY MESAROS, P.A.
            BY:  MR. JEFFREY S. HUNTER
 3               ONE NORTH CENTRAL AVENUE
                 SUITE 900
 4               PHOENIX, ARIZONA 85004-4417
                 JHunter@rcdmlaw.com
 5

 6  FOR DEFENDANT CARE AND DIGNITY:

 7          BROENING, OBERG, WOODS & WILSON, P.C.
            BY:  MR. CODY M. HALL
 8               2800 NORTH CENTRAL AVENUE
                 SUITE 1600
 9               PHOENIX, ARIZONA 85036
                 cmh@bowwlaw.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                    Phoenix, Arizona
                                      June 8, 2023
 2                                    10:10 a.m.

 3

 4            KRZYSZTOF MLAK, called as a witness herein,

 5   having been first duly sworn, was examined and testified

 6   as follows:

 7                            * * *

 8                   E X A M I N A T I O N

 9   BY MR. CONNELLY:

10        Q.   Good morning, Doctor.

11        A.   Good morning.

12        Q.   Sorry for the slight delay of getting started

13   this morning.

14        A.   Sure.

15        Q.   Will you please state your first and last names

16   for the record.  Spell both of them, please.

17        A.   Krzysztof Mlak.  K-R-Z-Y-S-Z-T-O-F, last name

18   M-L-A-K.

19        Q.   And you understand that you're here today for a

20   deposition in a lawsuit filed by Christine Scianna and

21   Brooke Scianna, who was a former patient of yours; right?

22        A.   I do.

23        Q.   And have you been deposed before?

24        A.   No.

25        Q.   Have you ever given trial testimony before?
```

1   molindone.

2        Q.   Any others that you can think of?

3        A.   Thioridazine.  There's a list.

4        Q.   And as far as Haldol is concerned, you agree

5   that is -- is or was, you tell me -- primarily used for

6   treatment of adults with severe mental illness such as

7   schizophrenia?

8        A.   Can you restate your question, please?

9        Q.   You agree with me that Haldol was developed in

10  the 1950s as part of the first wave of antipsychotic

11  medications; right?

12       A.   Correct.

13       Q.   And it was used primarily for the treatment of

14  adults with severe mental illness like schizophrenia;

15  right?

16       A.   That's correct.

17       Q.   And then this first generation of antipsychotics

18  was then -- strike that.

19            It's also true that the typical

20  antipsychotics all have some significant side effects.

21            Do you agree?

22            MR. CHRISTNER:  Form.

23            THE WITNESS:  I would state that they have

24  the potential for side effects.

25            ///

BY MR. CONNELLY:

*Q.* Well, I asked you if the age of the patient made a -- is a factor in whether or not Haldol should be prescribed, and you said it wasn't.

Is that a fair summary of what you're saying as far as prescribing Haldol?

*A.* I would say the age is one of the factors that we would consider.

*Q.* And you said that you would consider Haldol for psychotic illness or mood disorders. Anything else that you would consider prescribing Haldol for?

*A.* Certainly for instances in which other medications have been tried and have lacked effectiveness. Severe OCD or Tourette disorder, severe self-injurious behavior and aggression related to a myriad of illnesses.

*Q.* Do you agree that today Haldol is used mainly as an emergency chemical restraint in emergency room settings?

MR. HALL: Foundation.

MR. CHRISTNER: Form, foundation.

THE WITNESS: I can't speak to what is mainly used in emergency room settings.

BY MR. CONNELLY:

*Q.* Well, is it widely used at Aurora Behavioral Health to treat autistic children or adolescents?

```
 1              MR. CHRISTNER:  Join.
 2              THE WITNESS:  I believe both scenarios can
 3    be applicable.
 4    BY MR. CONNELLY:
 5         Q.    And in this case, what was it that you were
 6    prescribing Haldol to Brooke Scianna for?
 7         A.    Primarily to treat her mood disorder.
 8         Q.    Would you agree that the use of Haldol for
 9    treating mood disorders in adolescents is rare in today's
10    world?  "Today" meaning 2018.
11              MR. CHRISTNER:  Form, foundation.
12              THE WITNESS:  Yeah, I can't reflect on the
13    prescribing patterns of tens of thousands of physicians.
14    BY MR. CONNELLY:
15         Q.    Okay.  Well, let's narrow it down to you.
16              Do you use Haldol routinely to treat mood
17    disorders in adolescents, or do you use it rarely to treat
18    mood disorders in adolescents?
19              MR. HALL:  Form.
20              THE WITNESS:  So I use Haldol in instances
21    where other medications have been tried and have not been
22    effective.
23    BY MR. CONNELLY:
24         Q.    Where other antipsychotic medications have been
25    tried and not effective?
```

1      A.    That's correct.

2      Q.    And do you recall what medical records you

3   reviewed at that time?

4      A.    I believe I outlined some of those at the

5   beginning of the morning.

6      Q.    So those would have been the emergency room

7   records from Abrazo Health and the records from the prior

8   admissions at Aurora and the crisis intervention record?

9      A.    That sounds correct.

10     Q.    Okay.  So at that time you did not review

11  records from St. Luke's; is that true?

12     A.    I would have to defer to my documentation if I

13  referenced those records or not.

14     Q.    Okay.  And do you recall whether or not you

15  reviewed any records from Banner?

16     A.    I would have to refer to my documentation to see

17  if I had noted records from Banner Health Hospital.

18     Q.    And what kind of interview or -- as far as

19  Brooke Scianna herself goes, did you conduct or attempt to

20  conduct any kind of interview with her?

21     A.    Yes.

22     Q.    What did you do in that regard before you

23  prescribed any course of medication?

24     A.    My standard practice is to attempt to interact

25  with Brooke, and I would have asked her questions,

1    custody, provided consent for the medication."

2                    Was that a written consent?

3         A.    That would have been written consent, yes.

4         Q.    And this was a written consent that DCS had

5    provided you to administer Haldol?

6                    MR. CHRISTNER:  Form and foundation.

7                    THE WITNESS:  Can you -- I'm not sure what

8    you're asking in that question.

9    BY MR. CONNELLY:

10        Q.    I'm asking if the legal consent that you

11   received from DCS was to change medication from Thorazine

12   to Haldol.

13        A.    So I would have made the recommendation and

14   would have attempted to obtain consent directly.  If that

15   wasn't documented, then the nurses would have obtained

16   consent, which is our protocol, and they would have

17   documented that, verbal -- written consent.

18        Q.    And what's your understanding of DCS's ability

19   to provide consent to the administration of atypical

20   antipsychotic when they have legal custody as opposed to

21   legal guardianship of a child?

22                    MS. STATON:  Object to the form, foundation.

23                    THE WITNESS:  My understanding at the time

24   was they had the authority to provide consent for

25   treatment, hospitalization, and inherently any medication

1    BY MR. CONNELLY:
2        Q.    Okay.  And so do you then -- I mean, I don't
3    want to keep going over the same ground, but I'm just
4    trying to address your -- when you say you don't
5    understand the custodian part, but it seems that you do.
6                  You understand who a custodian is; right?
7                  MR. CHRISTNER:  Form and foundation.
8                  MS. STATON:  Form.
9                  THE WITNESS:  Maybe I can help by specifying
10   that it is my understanding that the DCS entity was the
11   legal guardian --
12   BY MR. CONNELLY:
13       Q.    Okay.
14       A.    -- of Brooke Scianna.
15       Q.    And if you had understood that DCS was the
16   custodian and not the guardian of the child, then you
17   agree that consent to administer the Haldol would have had
18   to come from the parents or guardian; right?
19                  MR. HALL:  Form and foundation.
20                  MS. STATON:  Join.
21                  THE WITNESS:  I understand that, yes.
22   BY MR. CONNELLY:
23       Q.    Now, what are some of the side effects that
24   you're aware of for Haldol?
25       A.    The common side effects can include drowsiness,

1   dizziness, muscle stiffness, muscle contractions, to name

2   a few.

3       Q.    And it can include -- is it tarditis[sic]

4   dyskinesia?  Is that right or...

5       A.    Tardive.

6       Q.    Tardive dyskinesia.

7             And that is a -- and what is tardive

8   dyskinesia?

9       A.    It is a permanent and involuntary movement

10  disorder that occurs with antipsychotic medications.

11      Q.    And that's a potential side effect of Haldol;

12  right?

13      A.    That's correct.

14      Q.    And what is EPS?

15      A.    EPS is another type of movement disorder that is

16  transient and reversible.

17      Q.    Tardive dyskinesia is not reversible; right?

18      A.    That's correct.

19      Q.    And it can result from the administration of

20  typical antipsychotics; right?

21      A.    That's one of the -- one set of medications that

22  can result in tardive dyskinesia, yes.  And atypical

23  antipsychotics as well.

24      Q.    And what is -- I'm going to not pronounce this

25  correctly, but it's spelled -- let me do it that way --

1    BY MR. CONNELLY:

2        *Q.*    Dr. Mlak, have you ever seen these St. Luke's

3    records?

4        *A.*    I don't recall seeing them before.

5        *Q.*    Do you remember admissions at St. -- do you

6    recall whether her admissions at St. Luke's were referred

7    to in the records that you reviewed upon her admission to

8    Aurora?

9        *A.*    I don't recall specific references to

10   St. Luke's.

11       *Q.*    Isn't it true that the Aurora records of her

12   past hospitalizations included references to her

13   St. Luke's hospitalization?

14               MR. CHRISTNER:  Form.

15               THE WITNESS:  I would have to refer to those

16    specific documents to say with certainty.

17   BY MR. CONNELLY:

18       *Q.*    Well, let's take a look at the St. Luke's

19   records for a second.

20               If you look at the page that's labeled

21   ending in 2, so the second page, and the Reason For

22   Admission section, you see that about two-thirds of the

23   way down, there's a reference that at the emergency room

24   the patient was given Zyprexa.

25               That's an atypical antipsychotic; is that

1          MS. STATON:  Join.

2          THE WITNESS:  That's a very difficult

3  speculative statement that I'm not comfortable making.

4  BY MR. CONNELLY:

5      Q.    Really?  Do you think that the DCS caseworker

6  had -- who -- do you agree with me that the mother, as the

7  person who has reared the child and brought her up for

8  17 years and has been involved in her life for 17 years

9  and not for a couple of months, is going to be a person

10  who has far more relevant and important information as to

11  her medical and medication history?

12          MR. CHRISTNER:  Form and foundation.

13          THE WITNESS:  I agree that that is a general

14  statement.  Brooke's mom would have been able to offer

15  much more important information about her history and the

16  development, yes.

17  BY MR. CONNELLY:

18      Q.    In the St. Luke's records, it also shows that

19  when Brooke was on the antipsychotics, and I'm on page 6

20  of Exhibit 2, that she was changing her clothes multiple

21  times a day, more than 20 to 30 times a day; she was

22  taking multiple showers at varying frequency, anywhere

23  between 16 to over 38 showers a day.

24          Do you see that?

25      A.    I see that, yes.

```
 1  BY MR. CONNELLY:
 2      Q.   Maybe we can get you the records and take a look
 3  and see.
 4              MR. CONNELLY:  These are Banner Thunderbird
 5  records labeled BS-BANNER 000850.
 6              And, again, I'm going to tell you all that
 7  these are -- that the records' Bates labels jump around,
 8  and they are mostly demonstrating when she was
 9  administered the Haldol at Banner and some of the
10  behaviors that were observed.
11              (Deposition Exhibit No. 22 was marked for
12          identification by the reporter.)
13  BY MR. CONNELLY:
14      Q.   And so, Doctor, at the time that Brooke was
15  admitted to Aurora in August of 2018 or at any time before
16  you began the administration of Haldol, did you review any
17  records from Banner Health?
18              MR. HALL:  Form.
19              MR. CHRISTNER:  Join.
20              THE WITNESS:  I don't believe that's what my
21  document -- my evaluation reflected.
22  BY MR. CONNELLY:
23      Q.   And I'll tell you that these are records related
24  to an emergency room visit in April of 2018, so a few
25  months before she was admitted for the third time at
```

DEPOSITION OF KRZYSZTOF MLAK, 06/08/2023

1   Aurora.

2           On the first page that we have here, the one

3   ending in 850, up at the top near the end of that first

4   carried-over paragraph, it says that during this time, she

5   was required four-to-five-point restraints and developed

6   significant rhabdomyolysis, if I got it right, with a CK

7   level at 6,666.

8           The first question is that rhabdomyolysis is

9   the permanent -- or is the condition that we talked about

10  a little earlier; right?

11          MR. HALL:  Form.

12  BY MR. CONNELLY:

13      Q.    Do you remember?

14      A.    We talked about rhabdomyolysis previously, yes.

15      Q.    And what is that again?

16      A.    It's a muscle breakdown.

17      Q.    What does it mean that her CK level was at

18  6,666?

19          MR. HALL:  Form.

20  BY MR. CONNELLY:

21      Q.    If you know.

22      A.    I understand that to mean that the protein

23  circulating in the bloodstream, a protein called

24  creatinine kinase, are elevated significantly beyond their

25  normal range and that can cause complications, kidney

 1    damage, so forth.

 2        Q.    And that can be a result of being restrained and

 3    on an antipsychotic medication?

 4                    MR. CHRISTNER:   Form and foundation.

 5                    MR. HUNTER:   Join.

 6                    MR. HALL:   Join.

 7                    MS. STATON:   Join.

 8                    THE WITNESS:   Both scenarios are true

 9    together and separately.

10    BY MR. CONNELLY:

11        Q.    Okay.   So the antipsychotic medication, the

12    administration of that on its own, can cause a dangerous

13    rise in CK level?

14        A.    It's in the realm of possibility, yes.

15        Q.    As you see throughout here as you're flipping

16    through that there are a number of orders for Haldol

17    throughout the -- throughout the day.

18                    Would you -- the administration of the

19    antipsychotic is intended to reduce conditions of

20    agitation; right?

21        A.    That's correct.

22        Q.    It's not intended to -- and so if you're

23    administering the antipsychotic, you shouldn't -- you

24    should be seeing agitation reducing and not increasing or

25    remaining.

1    I don't recall reviewing these records.

2    BY MR. CONNELLY:

3        Q.    And did you -- did you take a medical history

4    from the mother at the time of administration -- or

5    admission where she told you about the child's prior

6    admission to Banner?

7                MR. CHRISTNER:  Form and foundation.

8                MR. HALL:  Foundation.

9                MS. STATON:  Join.

10               THE WITNESS:  So I was not able to secure

11   contact with mother at the time of admission.

12   BY MR. CONNELLY:

13       Q.    And how was it that you tried to contact her?

14       A.    I called her by telephone.

15       Q.    When was the first time you tried to contact her

16   by telephone?

17       A.    The date that the evaluation was initiated.  Was

18   it the 26th of August?  Is that accurate?

19       Q.    The what?

20       A.    Was it August 26th when she was admitted?  The

21   date of the admission.

22       Q.    Where did you get mother's telephone number?

23       A.    In the physical chart.

24       Q.    And so if mother had told you that Brooke had

25   been admitted to Banner four months earlier, what would

 1 | BY MR. CONNELLY:
 2 |     Q.    It was so important that you basically just
 3 | ignored it; right?
 4 |              MR. CHRISTNER:  Form.
 5 |              MR. HALL:  Form.
 6 |              MS. STATON:  Join.
 7 |              THE WITNESS:  That's incorrect.
 8 | BY MR. CONNELLY:
 9 |     Q.    Isn't it true that you didn't change your
10 | position on the administration of Haldol until after the
11 | medical director got involved and put pressure on you to
12 | change -- to take Brooke off the Haldol?
13 |              MR. HALL:  Form and foundation.
14 |              MS. STATON:  Join.
15 |              MR. CHRISTNER:  Join.
16 |              THE WITNESS:  So that's not an accurate
17 | statement.  Would you like to rephrase your question?
18 | BY MR. CONNELLY:
19 |     Q.    No.
20 |     A.    I can't answer a question that doesn't have a
21 | true statement.  I didn't have pressure placed on me.  I
22 | did not ignore mother's concerns.
23 |     Q.    Well, when mother said, "I don't really want her
24 | on Haldol," you left her on Haldol; right?
25 |     A.    That's correct.

```
 1              MR. HALL:  Form.
 2   BY MR. CONNELLY:
 3       Q.    And you didn't take her off Haldol for several
 4   weeks; right?
 5       A.    That's correct.
 6       Q.    And, in fact, after mother told you she didn't
 7   want her on Haldol, ultimately you increased the levels of
 8   Haldol that were being administered; right?
 9              MR. CHRISTNER:  Form and foundation.
10              THE WITNESS:  Yes.  I believe she was still
11   undergoing a titration to establish a therapeutic trial,
12   yes.
13   BY MR. CONNELLY:
14       Q.    So, again, how important and what weight did you
15   give mother's opposition to Haldol?
16              MR. CHRISTNER:  Form and foundation.
17              MS. STATON:  Join.
18              MR. CHRISTNER:  Asked and answered.
19              THE WITNESS:  It's important information
20   coming from the parent.  Whether it's clinically accurate
21   is a different matter.
22   BY MR. CONNELLY:
23       Q.    And so would it be fair to say that you didn't
24   view the information coming from Christine as clinically
25   accurate?
```

1    the social worker and then they provide the messages to
2    me.
3        Q.    And did they ever provide messages that
4    Christine Scianna had tried to reach you?
5        A.    I don't recall specifically.
6        Q.    And then when you administered the Haldol to
7    Brooke Scianna in this case, she experienced EPS as a
8    result of the Haldol; right?
9        A.    That's correct.
10       Q.    And when we see that Haldol is being
11   administered through an injection, does that always occur
12   in an emergency room?
13       A.    Rephrasing that to mean do we sometimes use
14   injections --
15       Q.    Oh, okay.  Do you sometimes use injections in
16   the clinical setting as a form of --
17       A.    In the hospital, you're saying.  Yes.
18       Q.    And do you agree with me that the duty or the
19   responsibility to take a history from a patient or a
20   patient's family and make collateral contacts at the time
21   of an admission belongs to the admitting doctor and not to
22   the collateral contacts?
23              MR. HUNTER:  Form and foundation.
24              MR. CHRISTNER:  Form and foundation.
25              MS. STATON:  Join.

1   STATE OF ARIZONA      )
                          )  ss.
2   COUNTY OF MARICOPA    )

3

4          BE IT KNOWN that the foregoing proceedings were
    taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
5   in and for the County of Maricopa, State of Arizona; that
    the witness before testifying was duly sworn to testify to
6   the whole truth; that the questions propounded to the
    witness and the answers of the witness thereto were taken
7   down by me in shorthand and thereafter reduced to
    typewriting under my direction; that the foregoing pages
8   are a true and correct transcript of all proceedings had,
    all done to the best of my skill and ability.

9
           I CERTIFY that I am in no way related to any of
10  the parties hereto, nor am I in any way interested in the
    outcome hereof.

11
                   [X] Review and signature was requested.
12                 [ ] Review and signature was not requested.
                   [ ] Review and signature was waived.

13

14         I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and
15  ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona,
    this 27th day of June, 2023.

16

17

18                        

19  _____
              Michaela H. Davis, RPR, CRR, CRC, CLR
20                   Arizona CR No. 50574

21

22         I CERTIFY that Carrie Reporting, LLC, has
    complied with the ethical obligations set forth in
23  ACJA 7-206.  Dated at Phoenix, Arizona, this _____ day of
    _____, 2023.

24

25  _____
                     Carrie Reporting, LLC
                     Arizona RRF No. R1064