# EXHIBIT 5



**DISCHARGE SUMMARY**

**Patient Name:** Scianna, Brooke
**MR No.:** 119188

**PATIENT NAME:** Brooke Scianna

**Date:** 11/21/2018 at 10:37 AM

**I. Admitting Diagnosis (Primary)**

**II. Discharge Diagnosis**

| | |
|---|---|
| Primary: | UNSPECIFIED MOOD AFFECTIVE DISORDER. |
| | AUTISTIC DISORDER, SEVERE, WITH LANGUAGE IMPAIRMENT. |
| | HISTORY OF OBSESSIVE-COMPULSIVE BEHAVIOR. |
| | HISTORY OF POSTTRAUMATIC STRESS DISORDER. |
| Medical: | HYPERLIPIDEMIA. |
| | NORMALIZED AST/ALT. |
| | HISTORY OF RHABDOMYOLYSIS IN APRIL 2018. |
| Psychosocial Stressors: | TEMPORARY WARD OF DCS. |

**III. Reason for Admission and Chief Complaint:** Mood instability, aggression, and self-injury.

**IV. Course of Treatment:** The patient is a 17-year-old female with established autism with language impairment, who presented for hospitalization after she had been severely aggressive in the DDD group home. She presented to the ER with abrasions on her face after having been restrained. DCS was involved due to allegations of abuse and neglect at the DDD group home.

Upon admission, her previously prescribed medications were continued, including Thorazine 25 mg three times a day which was started in the ER and clonidine 0.1 mg twice a day but discontinued Benadryl and clomipramine due to unclear benefit. The patient exhibited emotional dysregulation. She was frequently aggressive towards staff and peers. She required as-needed medication and exhibited stereotyped and repetitive behaviors, including pacing, opening and closing doors repeatedly, and bathing. She had also been defecating in the shower. Throughout the course of hospitalization, the patient continued to exhibit emotional dysregulation and was exhibiting mood lability as her demeanor changed from irritable, crying, and angry to periods of mood elevation, laughing suddenly, and at times appearing fearful and was exhibiting self-injury as a way of self-regulating. She frequently placed her teeth next to her wrist to stimulate sensation. She would engage in self-injury by hitting her head repeatedly or biting herself in addition to hitting staff. She was continued on her birth control which was periodically not given due to not having the home supply. She was also provided Colace, omega-3 fatty acids, and vitamin D. The patient continued on her home medication while behavioral data was collected. She remained on a one-to-one level of observation due to severity of aggression and self-injury. She often times exhibited poor frustration tolerance and could not tolerate delay in response such as when she would hit staff if not immediately comply with her request to open the door or when interrupted from stereotyped behavior. After approximately two weeks of hospitalization, Thorazine was discontinued and Haldol was recommended targeting mood instability, irritability, and explosive aggressive and self-injurious behavior which were not effectively addressed with Thorazine or other atypical antipsychotics or mood stabilizer or combinations of both. DCS who had legal custody provided consent for the medication. The patient began to experience signs of EPS, including stiffness and rigidity and a tremor which resolved with administration of Cogentin. Additionally, Benadryl was started to help regulate sleep. The patient began to gradually exhibit reduced irritability and fewer aggressive and self-injurious behaviors. Her sleep was more consistently regulated but had periodic disruption. The patient's mother who did not have legal rights opposed to use of Haldol and any antipsychotics despite several discussions with author about the risks and cons of use of an antipsychotics. Mother expressed concerns about previous rhabdomyolysis, which occurred in April 2018 but did not exhibit any clinical signs during this hospitalization. Haldol continued to be utilized to complete a therapeutic trial as the patient had demonstrated moderate improvement. A consultation with the medical director occurred due to mother's strong opposition to the use of that medication. Trileptal was added with a plan to taper Haldol due to lack of consistent benefit and strong parental objection which was recommended following consultation with the medical director. Trileptal was titrated and Haldol was discontinued. Cogentin was discontinued, but Benadryl was maintained for sleep. The patient tolerated

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000004



BEHAVIORAL HEALTH SYSTEM

**Patient Name:** Scianna, Brooke
**MR No.:** 119188

# DISCHARGE SUMMARY

medication changes without any apparent side effects. She continued to exhibit periodic episodes of agitation, self-injury, and aggressive behavior; but the frequency remained relatively low compared to the level seen upon admission. By mid-October, the patient had showed consistent and sustained improvement in emotional dysregulation with reduced aggressive behaviors. Her discharge, however, was delayed due to lack of disposition as mother opposed DCS recommendations and author's recommendations for group home placement, and emergency court hearing was held which then proceeded to the trial in which the patient's disposition was ruled to remain under the legal custody of DCS but to return home to mother's home. At the time of discharge, the patient continued to exhibit emotional dysregulation, irritability, low frustration tolerance, and periodic self-injury. She will continue to need continuous monitoring in home support and respite services for the family.

The following is a discharge summary by Kattia Luevano, SNU therapist: The patient was admitted on 08/25/2018 and was hospitalized at Aurora Behavioral East Specialized Needs Unit for 88 days. Throughout her stay, the patient had many emotional and behavioral cycles. The patient came in dysregulated on her first and took 26 showers to self-regulate. The patient did not engage in any activities and appeared labile, restless, and agitated. Within one week, the patient reduced her showers and baths to less than five a day and replaced her showers with going to the swing. The patient was observed going to the swing for less than five minutes, requested to return to the unit, and then requested to return to the swing again. The patient targeted preferred staff to meet her needs. The patient became very agitated that staff did not fulfill her request immediately as she attempted to hit others, bite herself, and bang her head against the wall. Throughout her stay, the BCBA worked with the patient on tolerance training, increased ability to request, and ignore low-intensity hits and bites, use visual schedules, and use PECS strip to increase communication.

The patient responded well to the interventions implemented by the BCBA but then regressed at the end of October and started demonstrating repetitive behaviors. The patient started to close the patient's rooms, turn off bathroom lights, and remove everything that was on the nurse station's counter. In the beginning of November, the patient began to take all the trash bags on the unit and put them in her room. When the repetitive behaviors started, her number of request for baths increased and her tolerance for waiting for a preferred item decreased.

During her stay, she was in one hold, 09/09/2018 for danger to others and self. There were 13 CFT meetings and four training sessions. CFTs held in September and October were tense as the mother did not agree with medication regimen that Dr. Mlak was providing even though DCS was supporting him. Several times, mother yelled at the DCS case manager and writer to demonstrate that she was upset that Anafranil was discontinued and Haldol was started. Mother claimed that the patient had negative reactions to antipsychotics. DCS case manager and writer welcomed any documentation she had to support her concern. Mother and support team from Arizona Childen's scanned several hospital record and doctor's notes but none indicated that the patient had any negative reactions to antipsychotics. On 09/21/2018, mother filed a complaint against Aurora, stating, "I'm very disappointed in her medical treatment at Aurora at this time." This is when visits from family members and outpatient teams increased which would dysregulate the patient. Aurora suspended visits for three days with the support of DCS and then requested a 24-hour notice for anyone who wanted to visit the patient. This helped staff collect effective data for the FBA. Throughout the CFTs, DCS reminded mother that she could not make any medication changes as DCS continued to be the legal guardian. During this period, writer had to redirect mother and reminder her that everyone is working together for the best of the patient.

Trainings were offered in September and October, but 11/05/2018 was the first training that mother attended. Mother and her boyfriend and two staff members of CFSS attended the two-hour training on FBA with the BCBA on 11/05/2018. Mother and one staff from CFSS attended another two-hour training on the unit with the BCBA on 11/12/2018. Also, six staff members of CFSS attended a two-hour training on FBA with the BCBA on 11/20/2018 and 11/21/2018. All of the trainings with mother and CFSS went well according to Aurora's BCBA.

The patient's discharge had to be postponed three different times due to no placement. Finally, a trial was scheduled on 11/15/2018. The patient's original discharge date was on 10/23/2018 and was rescheduled to 10/31/2018 and since court was scheduled for 10/30/2018 to discuss placement. On 10/30/2018, the judge requested more clarification from the physician's involved regarding the recommendation on where the patient should be discharged. A trial was

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

**AURORA(SCIANNA) 000005**



**Patient Name:** Scianna, Brooke
**MR No.:** 119188

# DISCHARGE SUMMARY

scheduled for 11/15/2018 to determine placement. Dr. Mlak and Aurora's BCBA ~~were~~ *testified* J. As a result, the judge ordered the patient to return home with wraparound services. However, DCS will continue to be the legal guardian.

A dependency hearing is scheduled in February 2019. DCS approved mother to switch behavioral health agency from Aurora Children's Association to Child and Family Support Services.

Mother had an intake with CFSS on 11/21/2018 at 09:00 a.m. and a medication management appointment with CFSS on 11/21/2018 at 03:00 p.m. CFSS is providing the patient wraparound services.

**V. Laboratory and Imaging:** Throughout the hospitalization, the patient's AST was elevated in addition to total cholesterol. AST peaked at 78 but trended and returned to normal limits. Total cholesterol was 187. A medical consultant was involved in the patient's medical decision-making.

## VI. Mental Status Examination

**Appearance:** Limited self-care. Attitude was calm.
**Behavior:** Calm.
**Eye Contact:**
**Speech:** Characterized by vocalization.
**Orientation:** She was alert.
**Attention:** Attention span was sustained as observed by the patient's ability to sustain attention during tasks.
**Motor:** No disturbance
**Thought Process:** Unable to be assessed due to lack of language.
**Thought Content:** Unable to be assessed due to lack of language.
**Perception:** No hallucinations.
**Mood:** Euthymic but easily frustrated.
**Affect:** Shallow in depth.
**Insight:** Poor per her behavior.
**Judgment:** Poor per her behavior.
**Recent Memory:** Not able to be formally assed due to lack of language.
**Remote Memory:** Not able to be formally assed due to lack of language.
**Abstract Reasoning:** Not able to be formally assed due to lack of language.
**Intelligence:** Below average.

**Check one of the following:**

_____ Two or more antipsychotic medications prescribed at discharge.
       *If selected, please indicate justification for the patient being discharged on two or more antipsychotic medications.*
_____ History of at least three failed multiple trials of monotherapy.
_____ Plan to taper to monotherapy due to previous use of multiple antipsychotic medication or cross-taper in progress at time of discharge.
_____ Augmentation of Clozapine.

Others:

Discharge Risk Factors: Severity of developmental disability, aggression, and impulsivity.

**VII. Functional Status** Clinically Stable for Discharge

**Physical Functioning:** The patient will need continuous observation and support to maintain safety and ADLs.
**Social Functioning:** Requires continuous monitoring J

**VIII. Condition at Time of Discharge**

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000006



**DISCHARGE SUMMARY**

Patient Name: **Scianna, Brooke**
MR No.: **119188**

**Status on day of discharge:** Psychiatrically, the patient continued to exhibit symptoms of irritability and impulsivity but had significantly improved throughout hospitalization. Physical: She had significant restrictions and was medically stable. She had sustained an injury to her fingers after grabbing the door resulting in cuts to her fingers but no significant injury occurred.

**Anticipated Problems after discharge and suggested means for intervention:** The patient will continue to need intensive in-home behavioral services and family support but no anticipated problems with the appropriate services in place.

**IX. Aftercare Plans**

Please refer to social work assessment and discharge appointments.

Discharge Medications: Trileptal 600 mg twice a day, Benadryl 50 mg at bedtime, Loestrin, Colace, omega-3 fatty acids, and vitamin D.

**Completed by**

Printed Name/Stamp & Signature: _____Krzysztof Mlak, M.D._____   12\14\2018   Date   140   Time

Dictated by: Krzysztof Mlak, M.D.

DR:        KM:avt/mai
DD:        11/29/2018 05:26
DT:        11/29/2018 21:53
Job #:     49970000047

Page 4 of 4

CONFIDENTIAL DOCUMENTS - SUBJECT TO CONFIDENTIALITY AGREEMENT
AND PROTECTIVE ORDER DATED DECEMBER 16, 2021

AURORA(SCIANNA) 000007