# EXHIBIT 23

```
 1                                          VOLUME - 1
 2                                          PAGES - 1-131
 3                                          EXHIBITS 1-10
 4          IN THE UNITED STATES DISTRICT COURT
 5             FOR THE DISTRICT OF ARIZONA
 6   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
 7   CHRISTINE SCIANNA, an individual;        CERTIFIED
 8   BROOKE SCIANNA, an individual,           TRANSCRIPT
 9   by and through her legal
10   guardian, Christine Scianna,
11          Plaintiffs,
12   v.                         C.A. NO.:  2:21-cv-01444-DJH
13   STATE OF ARIZONA, a government
14   entity, ET AL.,
15          Defendants.
16   ~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
17            DEPOSITION OF ANDREW CLARK, M.D.
18                   Magna Legal Services
19                    68 Commercial Wharf
20                Boston, Massachusetts 02110
21                    February 19, 2024
22                 9:04 a.m. - 12:26 p.m.
23
24      JENNIFER M. VAILLANCOURT, RPR, CSR #154422
```



```
 1                        APPEARANCES

 2   ON BEHALF OF THE PLAINTIFFS:
          THOMAS A. CONNELLY, ESQ.
 3        Tconnelly@millsandwoods.com
          Mills + Woods Law, PLLC
 4        5055 North 12th Street, Suite 101
          Phoenix, Arizona  85014
 5        480.999.4556

 6   ON BEHALF OF KRZYSTZTOF MLAK, M.D.:
          DUSTIN A. CHRISTNER, ESQ.
 7        Dustin.christner@qpwblaw.com
          Quintairos, Prieto, Wood & Boyer, P.A.
 8        8800 E. Raintree Dr., Suite 100
          Scottsdale, Arizona  85260
 9        602.954.5605

10   ON BEHALF OF AURORA BEHAVIORAL HEALTHCARE-TEMPE, LLC:
          JEFFREY S. HUNTER, ESQ.
11        Jhunter@rcdmlaw.com
          Renaud Cook Drury Mesaros, PA
12        One N. Central, Suite 900
          Phoenix, Arizona  85004
13        602.307.9900

14   ON BEHALF OF CARE & DIGNITY SERVICES, LLC:
          CODY M. HALL, ESQ. (PRESENT VIA ZOOM)
15        Cmh@bowwlaw.com
          Broening Oberg Woods & Wilson, P.C.
16        2800 North Central Avenue, 16th Floor
          Phoenix, Arizona  85004
17        602.271.7700

18   ON BEHALF OF STATE OF ARIZONA:
          GEORGIA A. STATON, ESQ. (PRESENT VIA ZOOM)
19        Gstaton@jshfirm.com
          Jones, Skelton & Hochuli, P.L.C.
20        40 N. Central Avenue, Suite 2700
          Phoenix, Arizona  85004
21        602.263.1700

22   ALSO PRESENT:

23   MARISSA DEMONTE, Videographer

24   MARK GONZALEZ, Alliance (Present via Zoom)
```



1            DEPOSITION OF ANDREW CLARK, M.D.

2                      FEBRUARY 19, 2024

3

4            THE VIDEOGRAPHER:  This is the videotaped

5   deposition of Andrew B. Clark, M.D., in the matter of

6   Christine Scianna, et al., versus State of Arizona, et

7   al.

8            This matter is being held in the United States

9   District Court for the District of Arizona, Case Number

10  221-cv-01444-DJH.

11           Our location is O'Brien & Levine Court

12  Reporting Solutions, Boston, Massachusetts.  The

13  deposition is now beginning at 9:04 a.m. on Monday,

14  February 19th, 2024.

15           Counsel, would you please identify yourself

16  and whom you represent.

17           MR. CONNELLY:  Thomas Connelly on behalf of

18  the plaintiffs.

19           MR. CHRISTNER:  Dustin Christner on behalf of

20  Dr. Mlak.

21           MR. HUNTER:  Jeff Hunter on behalf of Aurora.

22           MS. STATON:  Georgia Staton on behalf of the

23  state defendants and the State of Arizona.

24           MR. HALL:  And this is Cody Hall on behalf of



1  Care and Dignity Services.
2         ANDREW CLARK, M.D., the deponent, having been
3  satisfactorily identified and duly sworn by the Notary
4  Public, was examined and testified as follows:
5         EXAMINATION
6         BY MR. CHRISTNER:
7     Q.  Can you please state your full name for the
8  record?
9     A.  Andrew Clark, C-L-A-R-K.
10    Q.  Is it all right if I call you Andrew --
11    A.  Sure.
12    Q.  -- or Andy?
13    A.  That's fine.  Yeah.
14    Q.  Have you had your deposition taken before?
15    A.  I have.
16    Q.  How many times?
17    A.  More than 50.
18    Q.  More than 50.
19        You understand the process, then.
20    A.  I do.
21    Q.  Okay.  And you understand that you're under
22  oath here.
23    A.  I do.
24    Q.  And that this transcript may be read to a jury

```
 1   spectrum disorder, yes.
 2        Q.   Is the use of Haldol with children common?
 3             MR. HUNTER:  Form and foundation.
 4             MR. CHRISTNER:  Form and foundation.
 5        A.   So the use of Haldol with adolescents in
 6   emergency departments is relevantly common.  It's
 7   commonly used as a, sort of, acute treatment in
 8   emergency departments.
 9             I will say that its use as a regular, ongoing
10   medication in children and adolescents is, in my
11   understanding and my experience, quite rare.
12        Q.   (BY MR. CONNELLY) And when Dr. Mlak started
13   prescribing Haldol to Brooke, it wasn't an emergency
14   room situation; right?
15        A.   It was not.  It was on an inpatient unit.
16        Q.   She had already been inpatient for a number of
17   weeks by that time; right?
18        A.   I think for 13 days at that point in time.
19        Q.   And Dr. Mlak was prescribing it on a daily
20   basis as a -- as a daily medication to Brooke; right?
21        A.   Correct, twice a day to be precise.
22        Q.   And did you form an opinion about Dr. Mlak's
23   use of Haldol in Brooke, the manner in which it was
24   prescribed and administrated to her?
```



1            I noted that a -- I believe it was a crisis
2   evaluation that was done in August of 2018, the
3   clinician opined that Brooke's separation from her
4   mother and placement in a group home was likely quite
5   traumatic for her and likely a significant factor in her
6   behavioral deterioration.
7            I think that was an important dimension to
8   what was going on for Brooke that seemed to be
9   overlooked entirely in her -- in her hospitalization.
10           And I think that -- I'm also critical of
11  Dr. Mlak for not having requested a functional
12  behavioral assessment earlier because, although one was
13  done, it was done quite well into the hospitalization.
14  And I think that paying attention to the behavioral
15  aspects of Brooke's management was an important
16  dimension that seemed to have been overlooked.
17           And I will, sort of, further say Haldol in an
18  adolescent carries with it significant risks.  And given
19  Brooke's complicated history and the real risks that she
20  posed, for him to not -- for Dr. Mlak to not have
21  understood what her prior experience with -- with
22  medications had been meant that he was really operating
23  in the dark and employing a very high-risk strategy
24  without really knowing what had gone on with her



```
 1   previously.
 2        Q.   (BY MR. CONNELLY) And is it fair to say that
 3   the doses that he was administering and the rate at
 4   which he increased the dose and the maximum that he
 5   ended up prescribing to her is not commonly seen with
 6   children?
 7             MR. HUNTER:  Form and foundation.
 8             MR. CHRISTNER:  Form and foundation.
 9        A.   Correct, not commonly seen with children.
10   There are individuals, and there are treatment
11   recommendations regarding adults with chronic psychotic
12   disorders that might call for doses of Haldol up to 15
13   milligrams a day.
14             But, typically, for children and adolescents,
15   a lower -- much lower dose is used.  Typically, for the
16   treatment of individuals with autism and aggression, a
17   lower dose is used.
18             Individuals -- adolescents are thought to have
19   a higher propensity to develop side effects, and
20   individuals with autism are thought to have a higher
21   propensity to develop side effects from medications.
22             So at least in my experience and understanding
23   of the use of any antipsychotic to treat aggression in
24   individuals with autism spectrum disorder, you typically
```



1  an adequate use of the medication; right?
2           MR. HUNTER:  Form and foundation.
3           MR. CHRISTNER:  Join.
4       Q.   (BY MR. CONNELLY) It would be a proper use of
5  the medication.
6           MR. HUNTER:  Form and foundation.
7       A.   I agree it would be a proper use of the
8  medication, yes.
9       Q.   (BY MR. CONNELLY) And at the doses and for the
10 purpose it was being administered to Brooke, would you
11 agree that that was a major psychiatric treatment being
12 administered to Brooke?
13          MR. HUNTER:  Form and foundation.
14          MR. CHRISTNER:  Form and foundation.
15      A.   So major may be a term of art in the legal
16 world that I don't understand and can't offer an opinion
17 on.
18          I will say that as a psychiatrist, it's a --
19 it's a significant -- it's a -- it's a medication that
20 carries significant risks and has really been delegated,
21 relegated to third- or fourth-line treatment because of
22 the risks that it involves.
23          So it is, colloquially speaking, a big deal to
24 put an adolescent on Haldol.  It's a big deal to put an



```
 1   adolescent on any antipsychotic medication, but Haldol
 2   even more so because of the risks that it poses.
 3        Q.   (BY MR. CONNELLY) And would it be even more of
 4   a big deal at the doses and the rate at which those
 5   doses were increased in this case?
 6             MR. CHRISTNER:  Form and foundation.
 7             MR. HUNTER:  Join.
 8        A.   Yes.  It's a very high-risk proposition.
 9        Q.   (BY MR. CONNELLY) And so using Haldol the way
10   it was used with Brooke here at Aurora was not a
11   run-of-the-mill use of the medication.
12             MR. CHRISTNER:  Form and foundation.
13             MR. HUNTER:  Form and foundation.
14        A.   No.  Very much in my experience and
15   understanding, it's -- it would be very -- it's very
16   unusual.
17        Q.   (BY MR. CONNELLY) And it's true, isn't it,
18   that in Massachusetts, a court order is necessary to
19   administer Haldol to a minor who's in state care; right?
20             MR. HUNTER:  Form and foundation.
21             MR. CHRISTNER:  Join.
22        A.   Yes.  A court order's necessary for any -- the
23   use of any antipsychotic for a minor in the custody of
24   the state.
```



```
 1                    CERTIFICATION

 2

 3            I, Jennifer M. Vaillancourt, a Certified

 4  Shorthand Reporter, Registered Professional Reporter,

 5  and Notary Public, within and for the State of

 6  Massachusetts, do hereby certify:

 7            That, ANDREW CLARK, M.D., the deponent whose

 8  examination is hereinbefore set forth, was first duly

 9  sworn by me and that this transcript of said testimony

10  is a true record of the testimony given by said

11  deponent.

12            I further certify that I am not related to any

13  of the parties to this action by blood or marriage, and

14  that I am in no way interested in the outcome of this

15  matter.

16

17            IN WITNESS WHEREOF, I have hereunto set my

18  hand this 29th day of February, 2024.

19

20

21            _____

22            Jennifer M. Vaillancourt, Notary Public in

23            and for the Commonwealth of Massachusetts.

24            My Commission Expires June 14, 2030.
```