Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>    Plaintiffs,<br><br>v.<br><br>State of Arizona, *et al.*,<br><br>    Defendants. | Case No.: 2:21-cv-01444-DJH<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT MLAK'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Plaintiffs respond to Defendant Krzysztof Mlak, M.D.'s motion for summary judgment. As set forth in Plaintiffs' separate motion for partial summary judgment against Dr. Mlak (Doc. 154), Plaintiffs are entitled to summary judgment on the elements of duty and breach of duty with respect to Dr. Mlak's failure to obtain informed consent prior to administering an antipsychotic drug to Brooke Scianna. Plaintiffs incorporate that motion

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014-2555
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

and accompanying exhibits in this Response.[1] Further, as set forth herein, genuine issues of material fact preclude summary judgment on Dr. Mlak's remaining claims.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.   <u>INTRODUCTION</u>

On September 7, 2018, Defendant Krzysztof Mlak, M.D. administered a first-generation antipsychotic medication – Haldol, a drug that is the equivalent of a chemical restraint and fraught with side effect – to his adolescent patient, Brooke Scianna. He did so without reviewing critical medical records that would have shown Brooke's prior negative reactions to Haldol, without consulting with Brooke's lifelong caretaker, her mother Cristine, and without obtaining "informed" consent from either Christine or even the Department of Child Safety ("DCS"), which acknowledged that it simply rubberstamps any recommendation made by a treating physician. As set forth herein, genuine issue of material facts exist as to both Dr. Mlak's negligence in treating Brooke, as well as whether he breached Plaintiffs' constitutional rights to familial association and physical autonomy.

## II.   <u>BACKGROUND</u>

### A.   <u>Brooke and Her Family</u>

Plaintiff Brooke Scianna is a non-verbal, severely autistic individual. *See* **Exh. 2 (DCS 6/28/2018 Report to Court) at 7.** She was born in July of 2001, *id.* at 1, and is currently 23 years old. At the time of the incidents at issue, she was 17 years of age.

Plaintiff Christine Scianna is Brooke's mother. *Id.* John Scianna is Brooke's father. *Id.* At the time of the incidents at issue, Christine was Brooke's legal decisionmaker. Exh. A (**Christine Scianna Decl.**) ¶ 1. Christine had cared for Brooke her entire life and, despite her being non-verbal, Christine understood her non-verbal cues and moods. *Id.*, ¶ 2.

---

[1] Exhibits to Plaintiffs' motion for summary judgment relied on here will be cited by their Exhibit number (i.e., "Exh. 1," "Exh. 2," and so on), rather than their Doc. number (i.e., "Doc. 154-2," "Doc 154-3," and so on). However, a Table of Exhibits with the cross-reference between Exhibit number and Doc. number is provided herewith. New exhibits to this Response will be labeled alphabetically, per the Court's scheduling order (Doc. 28), with a separate Table of Exhibits provided herewith.

Christine cared for Brooke throughout Brooke's childhood. Needless to say, such care was often a full-time job for Christine, and required the assistance of countless medical and psychological professionals. *See generally* **Exh. 19 (Christine Scianna Dep.) at 38-47.**

### B.    Brooke's Exposure to Antipsychotic Medications

The primary issue in this matter is the decision of Defendant Krzysztof Mlak, a psychiatrist at Aurora Behavioral Health, to administer Haldol to Brooke. As such, a brief history of Brooke's exposure to antipsychotic medications is necessary.

### (1)    Early exposure

Brooke was first put on antipsychotic medication when she was approximately 11 years of age. **Exh. 19 (C. Scianna Dep.) at 40-41**. At that time, her problematic behaviors were minimal, but she didn't understand boundaries, she would become agitated at times, and at times she would bite herself and bang her head. **Exh. 22 (Dr. Clark Report) at 2**. Brooke's pediatrician prescribed Risperdal (an antipsychotic medication) for her, and it seemed to help for the first three to six months. *Id*.; *see also* **Exh. 19 (C. Scianna Dep.), at 41**. However, particularly after the dose was raised, Brooke developed a "glassy look" on her face, as if she were not there. She could not focus, no longer expressed joy or happiness, and did not appear to be emotionally invested. **Exh. 22 (Dr. Clark Report) at 2**. In addition, she walked with a stiff gait, her appetite increased greatly, and she gained weight. *Id*. Over time she became much more violent and began to have melt downs. *Id.* She began "violently lashing out." **Exh. 19 (C. Scianna Dep.) at 41**. After the doctor stopped the Risperdal, Brooke "came back to life," and regained her animation and expressiveness. **Exh. 22 (Dr. Clark Report) at 2**.

### (2)    St. Luke's Behavioral Health, March 18, 2016 – March 29, 2016; May 5, 2016 - June 1, 2016; and December 17, 2017 – January 19, 2018

#### a.    March 18, 2016-March 29, 2016

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Brooke was admitted to St. Luke's Behavioral Health from March 18, 2016, through March 29, 2016, due to severe aggression at home. **Exh. 17 (St. Luke Records) at 00002**. She was given Zyprexa in the emergency room, and then Haldol once in the hospital due to severe agitation. *Id.*

But by March 21, 2016, the St. Luke's medication notes indicated that "don't' continue" with respect to continued use of Haldol, and "INDICATION:  Severe psychotic



agitation WARNING FALL RISK TAKE PRECAUTION, PRN SE[V]ERE PSYCHOTIC AGITATION."  **Exh. 17 (St. Luke Records) at 000021**.

### b.   May 5, 2016-June 1, 2016

Brooke was again admitted to St. Luke's Behavioral Health from May 5, 2016, through June 1, 2016, again due to aggressive behaviors at home. **Exh. 22 (Dr. Clark Report) at 8**. Her treating providers avoided a medication regime that included Risperidone, due to a perceived allergy to this drug. *Id.* They tried Geodon, which resulted in increased agitation and extra pyramidal symptoms, danger to self and others, as well as not sleeping for three or four days, then Seroquel up to 400 mg each night. *Id.* She was discharged on Seroquel and Klonopin. *Id.* Notably, at no point during this visit did the providers prescribe Haldol for Brooke.  *Id.*

Brooke was admitted to St. Luke's from December 27, 2017, through January 19, 2018, transferring from the Banner emergency room. *Id.* It was reported that Brooke had not previously responded well to Seroquel, Haldol or Risperdal, and stated that "none of the psychotropic agents really work… ." *Id.*

Ultimately, St. Luke's treated Brooke with Geodon and discharged her. *Id.*

### (3)   Aurora Behavioral Healthcare, January 19, 2018 – March 3, 2018

After release from St. Luke's, Brooke entered Aurora Behavioral Healthcare for a little more than two weeks. **Exh. 22 (Dr. Clark Report) at 9**. In the initial history, Aurora

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

providers noted that Brooke was allergic to Risperdal, and that "THE PATIENT HAS ALLERGIES TO RISPERDAL WHICH CAUSES A VIOLENT REACTION." *Id.*

At intake, Christine advised Aurora that Brooke became violent when treated with the antipsychotic medication Risperdal, and that when treated with Seroquel, she engaged in frequent changing of clothes and showering. Although Brooke had some increase in aggression during her stay, Aurora noted that it coincided with her menstrual cycle and was managed with an increase in her dose of Ability. Ultimately, Brooke was treated with Ability and Zoloft, and discharged on March 3, 2018.

### (4)   Banner Health, April 23, 2018 – April 30, 2018

On April 20, 2018, Brooke was taken to the emergency department at Banner Health Thunderbird due to agitation and aggressive behavior; although Brooke was at school at the time, Christine agreed with this action. On April 22, 2018, Banner began a regimen of Haldol with Brooke. **Exh. B (Banner) at 000897.** By April 23, her CK[2] levels had risen from 2,000 to 6,666. ***Id.* at 000863** ("CK level obtained yesterday was elevated at 2000 and is now 6666"). Thus, "[i]t was then determined that patient required inpatient admission for rhabdomyolysis." *Id.* Rhabdomyolysis results from the death of muscle fibers and a release of their contents into the bloodstream. *See* **Exh. 1 (Mlak Dep.) at 140-41**. It can lead to serious complications, such as renal (kidney) failure. *Id.* In rare cases, rhabdomyolysis can even cause death. *See generally* **Exh. 20 (Cleveland Clinic Summary of Rhadbomyolysis)**.

Thus, Brooke was admitted to Banner Health inpatient unit from April 23 to April 30, 2018. At that time, she was on Zyprexa (10 mg a day), along with clonidine and clomipramine. On April 30, she was released to the Aurora Behavioral Healthcare facility. **Exh. B (Banner) at 000975.**

---

[2]  CK levels refer to the amount of protein called creatinine kinase in the bloodstream. **Exh. 1 (Mlak Dep.)** at 140. If elevated beyond their normal range, they can cause complications, including kidney damage and the like. *Id.* at 140-141.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

(5)    **Aurora Behavioral Healthcare, April 30, 2018 – May 30, 2018**

Brooke was admitted to Aurora on April 30, 2018, where she stayed for a month, until May 30, 2018. The records in Aurora's possession during that hospitalization are replete with the information that Brooke was allergic to Risperdal, an antipsychotic medication. **Exh. C (Aurora) at 002531, 002539, 002542, 002546, 002551, 002565-67, 002579, 002602, 002607.** She was not treated with any antipsychotic medication, and did well on the unit, utilizing her self-regulation skills. ***Id.* at 002600.** She was discharged on the antidepressant medication Anafranil. ***Id.*** She was given the discharge diagnoses of Disruptive Mood Dysregulation Disorder and Autism Spectrum Disorder, as well as Obsessive Compulsive Disorder and Post Traumatic Stress Disorder by history. ***Id.* at 2599.**

B.    **The Department of Child Safety Inserts Itself in Brooke's Life**

Sometime in June 2018, an anonymous person reported to the Arizona Department of Child Safety ("Department" or "DCS") that Christine's significant other had supposedly used excessive force to control Brooke and, further, that Christine had let Brooke "wander" the street for ten minutes before her school bus arrived. **Exh. 2 (DCS 6-28-2018 Report to the Court) at 1-2.** At an informal family meeting on June 18, 2018, a DCS employee gave Christine an ultimatum that she must allow the placement of Brooke into a group home or DCS would take legal action against Christine. *See* **Exh. 21 (Notes of June 18, 2018 Family Meeting) at 7** ("She stated that due to the concern for the safety of Brooke and others around her, the Department may have to become legally involved if the parents would not agree to placing her in a group home on a voluntary foster care agreement").

Ultimately, on June 22, 2018, the Department took temporary custody of Brooke and, on June 27, 2018, filed an out-of-home dependency petition. **Exh. 3 (Dependency Petition) at 3.** "Dependency" refers to the status of a child who has been determined by a court to need state intervention because the child does not have proper parental care and control. *See* **A.R.S. § 8-201(15).** In a dependency case, the court may place the child in

foster care or with a relative while services are provided to address the issues that led to the dependency. The goal is typically reunification with the parents. The Department must prove dependency by a preponderance of the evidence. *Louis C. v. Dep't of Child Safety*, 237 Ariz. 484, 489, ¶ 23 (App. 2015). Generally, the hearing on the Department's dependency petition must be conducted within ninety (90) days of service of the dependency petition. **A.R.S. § 8-842(C)**; *Joshua J. v. Arizona Dep't of Econ. Sec.*, 230 Ariz. 417, 421, ¶¶ 1-2 (App. 2012).[3]

### C.   DCS Sends Brooke to a Group Home, Where She was Abused and Which Placement was a Categorical Failure

Meanwhile, before the Department was put to the test of proving its case, it placed Brooke in a group home. Placement in the group home was an unmitigated disaster. On August 22, 2018, paramedics transported Brooke to Abrazo Arrowhead Hospital. The intake physician noted: "[Brooke] apparently at her care facility is now unable to be cared for there, she has been very aggressive with staff and has been performing a lot of self-abuse." **Exh. 7 (Abrazo Medical Records) at 000105.** The Crisis Intervention evaluator reported:

> Patient's mother was her primary care giver and administering medical marijuana throughout her life until 6/22/18 when patient was removed from the home and placed in a group home. **This was likely a huge adjustment for patient and she is now having daily violent outbursts**. Today she punched staff in the face and refused to stay in the group home. She has been assaulting the other two residents as well. Group home staff do not feel they can keep patient, staff and other residents safe at this point.

**Exh. 9 (Abrazo Crisis Intervention Report) at 00067** (emphasis added).

---

[3]  The trial court initially scheduled the dependency hearing for September 14, 2018. **Exh. 10 (7/13/2018 Minute Entry) at 2**. Eventually, the hearing was continued to February 14, 2019. *See* **Exh. 11 (11/15/2018 Minute Entry) at 4.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

### D.   DCS Moves Brooke from Abrazo Arrowhead to Defendant Aurora Behavioral Healthcare-Tempe

Following hospitalization at Abrazo Arrowhead, on August 25, 2018, Brooke was moved to Aurora Behavioral Healthcare-Tempe ("Aurora"). On August 30, the Department filed a motion with the juvenile court to approve Brooke's admission to Aurora, simultaneously seeking appointment of an attorney for Brooke. *See* **Exh. 14 (8/30/2018 Motion to Approve Inpatient Treatment)**. On August 31, 2018, the trial court granted a 72-hour inpatient evaluation, and also appointed Angela Ramos as Brooke's attorney. **Exh. 15 (8/31/2018 Order)**. The trial court approved inpatient treatment at Aurora in an order dated September 4, 2018; it did not grant Aurora *carte blanche* to conduct whatever treatment it may so desire. **Exh. 16 (9/4/2018 Order).**

Meanwhile, on August 26, 2018, Defendant Mlak examined Brooke. Despite Brooke's extensive medical history, Dr. Mlak reviewed only the following medical records before beginning his treatment of Brooke: (1) emergency room records from Abrazo Arrowhead Health, (2) the crisis intervention record, and (3) records from two prior admissions at Aurora. **Exh. 1 (Mlak Dep.) at 72**.  He did not review records from either Banner Thunderbird Hospital or St. Luke's Behavioral Health, despite Brooke's lengthy hospitalizations at both institutions. ***Id*. at 125, 139.**

The St. Luke's records show, among other things, that antipsychotic medications, such as Geodon, Risperidone, Seroquel, and Zyprexa resulted in Brooke's ***increased agitation.* Exh. 17 (St. Luke's Medical Records) at 00001-2.** As to Haldol, the St. Luke's records showed that it was not to be administered to Brooke. *Id*. at 21 (referencing Haldol: "Don't Continue").

The Banner records showed that when the emergency department administered Haldol, Brooke's CK levels increased from 2,000 to 6,666, and she was formally diagnosed with the potentially injurious or fatal condition of Rhabdomyolysis. **Exh. B. (Banner) at 000863**; **Exh. 6 (Banner) at 000850.**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

In sum, at the time of Brooke's admission to Aurora, she was a 17-years-old, severely autistic individual since birth. Brooke was raised by her mother, Christine, since birth. Thus, there would be no better historian of Brooke's medical history than Christine. Yet, Dr. Mlak made little effort to contact Christine about Brooke's medical or medication history. He testified that he attempted to contact Christine once on August 26th. **Exh. 1 (Mlak Dep.) at 143.**

E.   **Dr. Mlak Administers Haldol to Brooke**

Meanwhile, without the benefit of Christine's history regarding Brooke or adequate medical records, on September 7, 2018, Dr. Mlak decided to administer Haloperidol (better known as Haldol) to Brooke for her mood disorder. *See* **Exh. 1 (Mlak Dep.) at 65, 101-02**; **Exh. 18 (9/7/2018 Consent Form)**.

Haldol (full name, Haloperidol) was discovered in 1958 by the Belgian company Janssen Pharmaceuticals, the pharmaceutical manufacturer that also developed Imodium and Fentanyl. Haldol is a "first generation" psychotropic medication. **Exh. 1 (Mlak Dep.) at 60.** Haldol has the potential for severe and serious side effects, as Dr. Mlak acknowledged:

> Q.   Do you agree with me that Haldol is a typical antipsychotic that has some severe side effects, potentially severe side effects? Right?
>
> A.   Yes.

*Id*. at 113.  Haldol is particularly dangerous for adolescents, as Dr. Clark explained:

> So the use of Haldol with adolescents in emergency departments is relevantly common. It's commonly used as a, sort of, acute treatment in emergency departments.
>
> I will say that its use as a regular, ongoing medication in children and adolescents is, in my understanding and my experience, quite rare.

**Exh. 23 (Dr. Clark Dep.)** at 107. There is a reason for this:

> And I will, sort of, further say Haldol in an adolescent carries with it significant risks. And given Brooke's complicated

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

> history and the real risks that she posed, for him to not – for Dr. Mlak to not have understood what her prior experience with – with medications had been meant that he was really operating in the dark and employing a very high-risk strategy without really knowing what had gone on with her previously.

*Id*. at 109-110; *see also* **Exh. 1 (Mlak Dep.) at 63** (acknowledging that age was a factor to be considered). Dr. Clark continued:

> I will say that as a psychiatrist, it's a – it's a significant – it's a – it's a medication that carries significant risks and has really been delegated, relegated to third- or fourth-line treatment because of the risks that it involves.

> So it is, colloquially speaking, a big deal to put an adolescent on Haldol. It's a big deal to put an adolescent on any antipsychotic medication, but Haldol even more so because of the risks that it poses.

**Exh. 23 (Dr. Clark Dep.) at 123-24**.

Further, one of the side effects is Rhabdomyolysis, as Dr. Mlak confirmed:

> Q.    … R-H-A-B-D-O-M-Y-O-L-Y-S-I-S?

> A.    Rhabdomyolysis.

> Q.    And what is that?

> A.    That is a muscular condition that results in the muscle breakdown.

> Q.    And Haldol can cause that condition; right?

> A.    It can.

> Q.    Would you agree with me that rhabdomyolysis –

> A.    Correct.

> Q.    -- and tardive dyskinesia are severe potential side effects from the administration of Haldol?

> A.    Yes, I would.

**Exh. 1 (Mlak Dep.) at 123** (objection to form omitted). In short, one of the side effects is the very condition Brooke developed while at Banner Thunderbird Hospital, where she was given Haldol – but contained in a medical record that Dr. Mlak did not review, nor had he spoken with Christine.

      **F.**    **Dr. Mlak Does Not Obtain Informed Consent to Prescribe Haldol to Brooke**

Although Haldol is a major antipsychotic medication, Dr. Mlak did not obtain informed consent for its administration to Brooke. He did not seek to obtain consent from Christine, let alone informed consent. He did not even seek to obtain informed consent from DCS. Rather, he delegated the responsibility for obtaining "consent" (albeit not informed) from DCS to Defendant Aurora's nursing staff. **Exh. 1 (Mlak Dep.) at 106**. He personally spoke with ***neither*** Christine nor DCS staff. *Id*. at 182. Rather, he testified that "it must have been my nursing team secured consent for the medication." *Id.*

Melissa Courtright was the DCS case manager assigned to the case. However, Ms. Courtright testified that she did nothing more than simply defer to what the doctor recommends:

    Q.    Do you think you have any obligation to understand what the side effects or the risks of any psychotropic medications are before you consent to the administration?

    A.    No. I didn't go to med school. If it's being recommended by a medical provider for a child to receive a particular medication, I'm not going to withhold that medication from the child if it's the recommendation.

    Q.    So if a medical provider that the department has somehow put in place or engaged in its provision of care to a child it's taken into its custody says the child needs this psychotropic medication -- Haldol, for instance -- is it your position, then, that that constitutes adequate medical care because a doctor is saying this is what's needed and you don't need to make a distinction between adequate versus major?

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

A.   There's going to be a reason as to why this was a recommendation of the provider to implement this particular drug to the child. So I'm going to ensure that the child is receiving the appropriate medication that is being prescribed to them. So, yes, I believe that's adequate.

**Exh. 24 (Courtright Dep.) at 132-33** (objections to form omitted).

But here, it does not appear that even Ms. Courtright was involved with the "consent" to administer Haldol:

Q.   So if a call comes in after hours and it's for medications or to increase medications, the person taking the call has the authority to give consent?

A.   They do.

Q.   And that's a standard practice at the department?

A.   Yeah. Based on the case and what's going on, yes.

*Id.* at 146.

Defendant Aurora's consent form relating to Dr. Mlak's administration of Haldol indicates that the "consent" conversation was between Aurora nurses and some unknown person at DCS. **Exh. 18 (9-7-2018 Consent Form) at 000150**.

Further, although the Department sought the appointment of an attorney for Brooke at the same time it sought permission for Brooke's inpatient treatment at Aurora, Aurora's records do not indicate that any effort was made to reach Brooke's attorney, Angela Ramos, or her mother, Christine, to obtain consent for the administration of the major antipsychotic medication Haldol. **Exh. D (Connelly Decl.) ¶¶ 2-3**.

In short, for the administration of as significant an antipsychotic medication as Haldol, one with a host of potential life-altering side effects, Dr. Mlak did not obtain informed consent from Brooke's mother, even though there had never been a dependency finding as to mother, or her court-appointed attorney; nor was there a court order authorizing the administration of Haldol. In fact, Dr. Mlak completely delegated the informed consent process to others – Aurora nurses sought consent from government

workers who had no knowledge of this case or Brooke. In short, there was not an actual, meaningful, informed consent process in this case before Dr. Mlak administered the antipsychotic drug Haldol.

### G. The Juvenile Court Returns Brooke to Christine, and the Department Eventually Dismisses the Dependency Proceeding Against Her.

On October 31, 2018, while Brooke was still a patient at Aurora, Christine filed a motion with the juvenile court, pursuant to Arizona Rule of Juvenile Court Procedure 59, to return Brooke to her custody. *See* **Exh. 4 (Mot. for Change of Physical Custody Pursuant to Rule 59)**. The trial court granted the motion, subject to confirmation that Christine participate in specified training. **Exh. 11 (11/15/2018 Minute Entry) at 4**.

On November 21, 2018, Aurora released Brooke to Christine's custody. *See* **Exh. 5 (Aurora Discharge Summary).**

On February 11, 2019, prior to the scheduled dependency trial, the Department moved to dismiss the dependency petition, noting that Brooke had been reunified with Christine. **Exh. 12 (2/11/2019 Mot. to Dismiss).** The trial court granted the motion the next day. **Exh. 13 (2/12/2019 Order Dismissing Petition)**.

## III. DISCUSSION

Although Dr. Mlak's motion began his legal discussion with the constitutional issues and then addressed the common law negligence claims, Plaintiffs address these in reverse order, as the constitutional claims flow from Dr. Mlak's initial negligence.

### A. Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Negligence Claims against Dr. Mlak.

Plaintiffs' negligence claim stems from two separate but related wrongful acts or omissions by Dr. Mlak: (1) his decision to administer Haldol to Brooke, an adolescent; and (2) his failure to obtain informed consent for the administration of Haldol. Each is discussed in turn.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1.   **Genuine issues of material fact preclude summary judgment on Plaintiffs' negligence claims against Dr. Mlak.**

Haldol, or haloperidol, is classified as a first-generation antipsychotic that was developed in the late 1950s, and primarily used for the treatment of adults with severe mental illness, such as schizophrenia. **Exh. 22 (Dr. Clark Report) at 14**. This class of medications, sometimes referred to as "typical" or "first generation" antipsychotics, were largely superseded by what are known as the "second generation" antipsychotics, newer medications that are believed to have a more favorable (i.e., less dangerous) side effect profile. *Id*.

These first-generation antipsychotic medications, such as Haldol, carry risks and side effects that are more widespread and dangerous than any other class of medications typically used in child psychiatry. *Id***. at 15**.

> For Haldol in particular, the risks and side effects include but are not limited to extra-pyramidal symptoms (movement disorders such as parkinsonism, akathisia and dystonia), tardive dyskinesia (permanent, disfiguring motor dyscontrol manifesting as writhing contortions of the face and trunk), cognitive dulling and sedation, neuroleptic malignant syndrome (potentially fatal), cardiac conduction abnormalities, and sexual dysfunction.

*Id*. In addition, at medium to high doses, medications such as Haldol can leave an individual in a drugged state, too stuporous to make use of behavioral or psychosocial interventions, and with their personality largely suppressed. *Id*.

Further, "[t]he overuse of antipsychotic medication for children in foster care has been of great concern to both clinicians and policy makers for several years." *Id***. at 15**. "This is due in part to a concern that these medications are being used simply as 'chemical restraints' – an easy way to suppress behaviors that would be more effectively managed by behavioral and psychosocial interventions." *Id*

Against this backdrop, Dr. Mlak chose to administer Haldol to Brooke, notwithstanding:

1.   She was an adolescent;

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

2.    There not an emergent need for the medication;

3.    He had not obtained informed consent for the administration;

4.    He had not spoken with Brooke's lifelong caretaker and guardian; and

5.    He had not reviewed critical records of Brooke's prior hospitalizations and experiences with Haldol.

Nonetheless, Dr. Mlak chose to administer Haldol to Brooke.

Dr. Clark explained how this decision breached his duty of care to Brooke. "One of the primary responsibilities of the attending physician in caring for a patient on an inpatient psychiatric unit is developing an effective medication regimen." **Exh. 22 (Dr. Clark Report) at 13**. "Typically, this involves gathering a comprehensive history of the presenting complaint, as well as of any prior medication trials and their effects." *Id*. Given Brooke's complexity, this duty involved *either* or *both* communicating with Christine and reviewing her medical history. *Id*. "Had Dr. Mlak spoken with the mother, he would have learned a great dealt that should, in my opinion, have given him pause before prescribing an antipsychotic medication of any sort." *Id*. In addition, "[h]ad Dr. Mlak reviewed records from prior medication trials, he would have learned that Brooke had consistently developed severe side effects from trials of antipsychotic medication, and that she had never had a sustained beneficial response, even after trials with several different antipsychotics." *Id*. at **14**.

> This information from the mother and from the medication records, in my opinion, should have raised serious questions as to the advisability of yet another trial of antipsychotics, as well as serious concerns around the risks and side-effects that Brooke would likely be subjected to. At the time of Brooke's hospitalization in the fall of 2018 there were many other medication options available for her treatment besides antipsychotics, and besides Haldol in particular.

*Id*.

Further, Dr. Mlak's use of Haldol was particularly contra-indicated because of Brooke's age. *Id*. Dr. Clark noted that the American Academy of Child and Adolescent

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

Psychiatry prescribed guidelines for the use of antipsychotic medications in aggressive youth, four of which were relevant to the present matter as follows:

> Recommendation 1: For all new cases, clinicians should conduct (or review the results of) comprehensive psychiatric diagnostic interviews with patients and parents/guardians before prescribing, changing or discontinuing medication.
>
> Recommendation 4: Use appropriate treatment for primary disorders as a first line treatment. In this instance, the recommendations suggest using a mood stabilizer rather than an antipsychotic to address mood instability.
>
> Recommendation 5: Use an Atypical Antipsychotic First Rather than a Typical Antipsychotic to Treat Aggression. The recommendation explains that the atypical antipsychotics have a safer acute side effect profile than the traditional antipsychotics, with a lower risk of tardive dyskinesia, neuroleptic malignant syndrome, and extrapyramidal symptoms.
>
> Recommendation 6: Use a conservative dosing strategy. The recommendation states that physicians should "start low, go slow, taper slow."

*Id.* at 14-15 (citing to American Academy of Child and Adolescent Psychiatry, "Treatment Recommendations for the Use of Antipsychotics in Aggressive Youth"). "In my opinion, Dr. Mlak violated all four of these precepts in his treatment of Brooke during the fall of 2018." *Id.* at 15.

> In sum, it is my opinion that Dr. Mlak's treatment of Brooke during her Aurora hospitalization in the fall of 2018 fell below the standard of care in that he failed to obtain an adequate history around Brooke's prior psychiatric treatment prior to prescribing her Haldol, and failed to take account of Ms. Scianna's experience or concerns in that regard.

*Id.*

Genuine issues of material fact preclude summary judgment on Dr. Mlak's breach of his duty of care to Brooke.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

2. **As set forth in Plaintiffs' separate motion for partial summary judgment, Plaintiffs are entitled to summary judgment on Plaintiffs' claims regarding lack of informed consent; at the very least genuine issues of material fact preclude summary judgment for Dr. Mlak.**

Plaintiffs requested summary judgment against Dr. Mlak for his failure to obtain informed consent, *see* (Doc. 154), and believe the facts on this issue are clear and undisputed. However, at the very least, genuine issues of material fact preclude summary judgment for Dr. Mlak.

a. **Genuine issues of material fact exist as to whether Dr. Mlak adequately obtained "informed" consent for the provision of the antipsychotic medication to Brook.**

"The gravamen of an informed consent claim ... is a healthcare provider's duty to communicate information to enable a patient to make an intelligent and informed choice, after full and frank disclosure of material risk information and the benefit of data regarding a proposed course of medical treatment." *Dowling v. A.R.T. Inst. of Washington, Inc.*, 372 F. Supp. 3d 274, 286 (D. Md. 2019) (quoting *McQuitty v. Spangler*, 976 A.2d 1020 (Md. 2009)). The foundation of the informed consent doctrine is the relationship of trust between a physician and patient: "[T]he relationship between a physician and his patient is one of trust and confidence which obligates the physician to exercise the utmost good faith." *Hales v. Pittman*, 118 Ariz. 305, 308 (1978). Ultimately, the decision as to whether to undergo a medical treatment or not rests with the ***patient, not the physician***. "[It is] the patient, not the physician, [who] makes the decision on whether to undergo the operation." *Id*.

"[I]nformed consent is a process, not a document." *Univ. Med. Ctr., Inc. v. Shwab*, 628 S.W.3d 112, 121 (Ky. 2021) (quotation omitted).

Here, Dr. Mlak had a relationship of trust and utmost good faith with Brooke. As Brooke was both a minor and a non-verbal autistic individual, this relationship extended to Brooke's parent and legal custodian, Christine Scianna. This relationship required that Dr. Mlak ensure that he provided informed consent to the individual or entity who had the legal

17

right and responsibility to make informed decisions for Brooke. He did not obtain informed consent from Christine, Brooke's mother. Further, Dr. Mlak did not obtain "informed" consent from DCS either; rather, he delegated this "chore" to the nursing staff, who in turn contacted DCS employees who had no knowledge of Brooke's case or issues, and admitted they simply rubberstamped what the doctor recommended.

Genuine issues of material fact exist as to whether Dr. Mlak breached this obligation. Despite the critical importance of informed consent, he delegated this decision to Aurora nurses, who then spoke to persons at DCS unqualified to make any major health decisions for Brooke, which was a breach of Dr. Mlak's fiduciary relationship with Brooke.

      b.    **<u>Under Arizona law, the Department of Child Safety did not have authority to give consent to such a major medical decision as administration of antipsychotic medications like Haldol and, as such, Dr. Mlak had no right to administer Haldol.</u>**

At the time of the treatment at issue in this matter, Brooke was in the ***temporary custody*** of the Department of Child Safety, the legal gray area following the filing of a dependency petition but before the required hearing on the allegations in the petition. Under Arizona law, the Department was ***not*** permitted to unilaterally make such major decisions as the administration of Haldol.

As shown in Plaintiffs' separate motion for summary judgment, the juvenile code defines "custody" or "legal custody" as "[t]he responsibility to provide the child with **adequate** food, clothing, shelter, education and ***medical care***, provided that such rights and responsibilities shall be exercised subject to the powers, rights, duties and responsibilities of the guardian of the person ***and subject to the residual parental rights and responsibilities if they have not been terminated by judicial decree***." **[A.R.S. § 8-531(5)](#)** (emphasis added). In contrast, a person must be a "guardian" to make ***major*** decisions for a child: "'Guardianship of the person' with respect to a minor means the duty and authority to make important decisions in matters affecting the minor including but not

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

necessarily limited either in number or kind to … **[t]he authority to consent to** … **major medical, psychiatric and surgical treatment** …." **A.R.S. § 8-531(8)** (emphasis added).

In construing a statute, this Court must "seek to harmonize related statutes and 'aim to achieve consistency among them' within the context of the overall statutory scheme." *State v. Fell*, 203 Ariz. 186, 188, ¶ 6 (App. 2002) (quoting *Bills v. Arizona Property & Cas. Ins. Guar. Fund*, 194 Ariz. 488, 495, ¶ 18 (App.1999)). But most importantly, "if possible this court construes statutes to avoid rendering them unconstitutional. Second, if possible we construe statutes to avoid unnecessary resolution of constitutional issues." *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 272–73 (1994) (quotation omitted).

Dr. Mlak contends that the definitions and mandates of section 8-531 do not apply to this matter, relying on the introductory sentence of the statutory section, which introduces the definitions as follows: "In this article, unless the context otherwise requires…," and the "article" at issue is Article 5, "Termination of Parent-Child Relationship." *See Mlak MSJ* at 15-22 (quoting **A.R.S. § 8-531**).

"Context," in this situation, clearly requires reading section 8-531 to include the division of "major" versus "adequate" medical decisions to extend **beyond** simply the termination context. By Dr. Mlak's reasoning, when the situation is the "extreme" measure of ending the parent-child relationship, which can only occur with "the most serious instances of parental abuse, neglect, or incapacity," *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17–18, ¶ 27 (App. 2019) (quotation omitted), only a guardian can make "major" medical decisions, but where the Department's custody is only temporary, and the grounds for the out-of-home seizure has not even been litigated, Dr. Mlak reasons that the Department can make healthcare decisions for the child, major or minor, as section 8-531 does not apply. By Dr. Mlak's reasoning, once the Department has "temporary," pre-dependency determination custody, it has the authority to consent to all medical procedures, from risky surgeries to transplants to perhaps even gender changes.

There is no statute defining the division of responsibilities for medical decisions in the context of the Department's pre-dependency hearing temporary custody. This Court

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

must seek to harmonize related statutes. In that regard, A.R.S. § 8-809.01 guarantees a parent going through the dependency process the right "[t]o be consulted about the child's medical care, education and grooming." **A.R.S. § 8-809.01(C)(9).** "Consult" means "to seek advice or information from; ask guidance from." Given the context of "consult" in such areas as "education" and "grooming" – *i.e.,* the Department must seek guidance from parents on hair styles – the obligation to "consult" the parent is broad and encompasses *far more* than just major medical decisions, but *all* medical decisions, which certainly did not happen in this case. Certainly, a parent has the sole authority to make informed decisions as to *major* medical decisions, as section 8-531 mandates.

Here, the Department had only *temporary custody*, and Christine's parental rights had not been "terminated by judicial decree." Indeed, at the stage of the treatment at issue, Brooke had not yet even been found dependent as to Christine (which never happened). Thus, Christine retained her constitutional right of association to make important medical decisions for Brooke, an important factor in a *custodian's* right to make decisions for a child.[4] Further, section 8-531(5) provides that a custodian – as opposed to a guardian – can make "adequate" medical decisions for the child, as opposed to "major" decisions that are to be made solely by a guardian.

Providing antipsychotic medication to Brooke was, in fact, a major and important medical decision, one with potentially long-lasting impact on Brooke. Section 8-531(5) did not permit the Department, as a temporary custodian, to make this type of medical decision. Rather, this medical decision was reserved to Mother – Christine – and not the Department.

Under Dr. Mlak's relationship of trust and utmost good faith, he erred as a matter of law in delegating his informed consent duty to the nursing staff, to in turn do nothing more than reach out to call-line employees of the Department (including employees with no first-hand knowledge of the case and likely no medical training).

---

[4]  This constitutional right is examined in the next section, below.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**B.**   **Genuine Issues of Material Fact Preclude Summary Judgment on Plaintiffs' Constitutional Claims against Dr. Mlak**.

**1.**   **Christine's constitutional claims are timely.**

As a threshold matter, Dr. Mlak maintains that Christine's constitutional claims are time-barred under the two-year statute of limitations governing civil rights actions in Arizona. *See Mlak MSJ* at 8; *see also Marks v. Parra*, 785 F.2d 1419, 1420 (9th Cir. 1986) (holding that Arizona's two-year personal injury statute of limitations applies to section 1983 actions arising within the State).[5]

In Plaintiffs' complaint, Christine was very clear about the operative dates at issue in this matter. She alleged that Dr. Mlak's administration of Haldol occurred between September and November of 2019. *See First Amended Complaint* (Doc. 17), ¶¶ 221-225. She further alleged that the Brooke's dependency was fully dismissed in February of 2019. *Id.*, ¶ 229-234. And, as Dr. Mlak acknowledges, Plaintiffs filed their initial complaint in state court on July 14, 2021. *See Mlak MSJ* at 6; *see also* (Doc. 1-4) (removal documents).

Dr. Mlak answered Plaintiffs' First Amended Complaint on June 3, 2022. *See* (Doc. 75). In that Answer, Dr. Mlak asserted **twenty-six (26)** separate affirmative defenses. *Answer to First Amended Complaint*, ¶¶ 456-481.Yet, despite Plaintiffs' clear allegation of all relevant dates in their complaint and First Amended Complaint, not one of these affirmative defenses included the statute of limitations.

As a general rule, "[e]xpiration of the statute of limitations is an affirmative defense that is generally required to be included in a responsive pleading under Rule 8 of the Federal Rules of Civil Procedure." *Heyrend v. Badger Med., P.A.*, No. 4:21-CV-00137-CWD, 2022 WL 1522569, *slip op.* at 4 (D. Idaho May 13, 2022). Further, waiver occurs when "a party intentionally relinquishes a right" or "when that party's acts are so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished." *See Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d

---

[5]  Defendant Mlak does not challenge the timeliness of Brooke's claims. Brooke's claims are unquestionably timely as she was both a minor and incompetent at the time of the incidents at issue.

1551, 1559 (9th Cir. 1991); *see also Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 938 (9th Cir. 2017) (same); *Tennenbaum v. Arizona City Sanitary Dist.*, No. CV-10-2137-PHX-GMS, 2012 WL 3245975 * 3 (D. Ariz. 2012) ("Waiver is either the express, voluntary, intentional relinquishment of a known right or such conduct as warrants an inference of such an intentional relinquishment."); *Jones v. Cochise County*, 218 Ariz. 372, 379, 380, ¶¶ 23, 26, 187 P.3d 97, 104 (App. 2008) (waiver by conduct is established by showing "acts inconsistent with an intent to assert the right", and exists where a party "has taken substantial action to litigate the merits of the claim that would not have been necessary had the [party] promptly raised the defense"); *see also, e.g., Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1296-97 (7th Cir. 1993) (waiver of personal jurisdiction where party raised defense in answer but "fully participated in litigation of the merits for over two-and-a-half years without actively contesting personal jurisdiction"). Here, Dr. Mlak did not raise the defense in his motion to dismiss before this Court. He did not raise the issue in his Answer, despite raising a plethora of other affirmative defenses. And he did so despite the fact that ***every single date*** Dr. Mlak now invokes to support his motion for summary judgment was contained in Plaintiffs' original and First Amended Complaint. Moreover, during the three years this matter has been pending, Dr. Mlak noticed and took the depositions of Christine, John Scianna, Daniel Quigley, and Dr. Clark; appeared at and participated in six (6) fact witness depositions noticed by Plaintiffs; appeared for and defended his own deposition; and propounded and responded to written discovery under Rules 33, 34, and 36. **Exh. D (Connelly Decl.) ¶¶ 4-8**. Dr. Mlak demonstrated his intent to litigate this case on the merits, rather than seeking a partial dismissal on statute of limitations grounds; he has thus waived the defense.

Despite the express language of Rule 8 and unlike other circuits, the Ninth Circuit has allowed a defendant to raise the statute of limitations as an affirmative defense for the first time in a motion for summary judgment absent a showing of prejudice to the plaintiff. *Brewster v. City of Los Angeles*, 672 F. Supp. 3d 872, 915 (C.D. Cal. 2023) (citing *Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984)). But here, there is unquestionable prejudice

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

to Plaintiffs. *First*, the right to familial association is a reciprocal right, not held by just Brooke and/or Christine, but by both. *See Hardwick v. County of Orange*, 980 F.3d 733, 740–41 (9th Cir. 2020) ("The companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal and the distinction between the parent-child and the child-parent relationships does not justify constitutional protection for one but not the other"). *Second*, just as Dr. Mlak deemed his autistic, non-verbal patient as deserving fewer rights than even convicted felons when he administered Haldol in a non-emergent situation to Brooke, the apparent goal here is to have the sole plaintiff to obtain recovery being a non-verbal, autistic individual who is unable to testify about the extreme anxiety and dysregulation she felt while under the influence of this antipsychotic medication. *Third*, Plaintiffs did not pursue any discovery with respect to any equitable tolling or discovery of Dr. Mlak's wrongful conduct, as Dr. Mlak had clearly abandoned the defense, and Plaintiffs used her limited discovery to advance her own case and respond to the twenty-six other defenses that Dr. Mlak did posit. And *fourth*, Plaintiffs incurred great expense in defending and taking the eleven (11) depositions noticed in this case, including one requiring travel to Massachusetts. Plaintiffs did not establish precisely when Christine learned of the feeble informed consent efforts that Dr. Mlak made (his deposition was taken in June of 2023), or when she learned precisely who the ultimate decisionmaker was with respect to the administration of Haldol. She did not need to. As such, the prejudice from Dr. Mlak's decision to not raise the statute of limitations defense is clear. *See Chung v. Intellectsoft Grp. Corp.*, No. 21-CV-03074-JST, 2024 WL 813445, at *slip op.* at 5 (N.D. Cal. Feb. 12, 2024) ("And Intellectsoft's failure to raise these statute of limitations defenses until after the close of discovery only exacerbates the prejudice to Plaintiffs, who now cannot conduct discovery into these defenses. Intellectsoft's delay in asserting a statute of limitations defense has deprived Plaintiffs of the opportunity to fully litigate the issue").

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

**2.**   **Dr. Mlak violated both Christine's and Brooke's right to familial association and right to direct a child's medical care.**

"Parents and children have a well-elaborated constitutional right to live together without governmental interference." *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (collecting Supreme Court cases). "The Supreme Court has called parents' care, custody, and control of their children ... perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency." *Wallis*, 202 F.3d at 1136.

This right "includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Id.* at 1141. Thus, the Ninth Circuit in *Wallis* recognized the right of parents to notice and consent or judicial authorization in advance of medical examinations of their children, unless a "reasonable concern that material physical evidence might dissipate" or an "urgent medical problem" exists. *Id.* (citations omitted). "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state." *Mann v. County of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018) (quoting *Wallis*).[6]

The Department obtained a court order for inpatient treatment at Aurora, and Christine does not challenge this decision. But inpatient treatment did not give the providers there, including Dr. Mlak, a constitutional free-for-all in terms of treatment of Brooke. As a matter of both state law, as set forth above, and constitutional law, Christine retained the right to make informed decisions as to whether her daughter should be

---

[6]   The Ninth Circuit has recognized that a parent's rights give way in an emergency situation. *See Mueller v. Auker*, 700 F.3d 1180, 1187 (9th Cir. 2012) (the rights of parents "step aside" … "[i]n an emergency situation ... when the children are subject to immediate or apparent danger or harm") (quoting *Caldwell v. LeFaver*, 928 F.2d 331, 333 (9th Cir.1991)). In emergency situations, the medical treatment needed to stabilize the emergency would presumably be "adequate" in that instance. An emergency did not exist here.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

medicated with an antipsychotic medication, a medication with the potential for major and permanent side effects.

The United States Supreme Court has recognized that individuals "possess[] a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment." *Washington v. Harper*, 494 U.S. 210, 221–22 (1990). "The forcible injection of medication into a nonconsenting person's body, represents a substantial interference with that person's liberty." *Id*. at 229. In the case of antipsychotic drugs, that interference is particularly severe: "***The purpose of the drugs is to alter the chemical balance in a patient's brain***, leading to changes, intended to be beneficial, in his or her cognitive processes. While the therapeutic benefits of antipsychotic drugs are well documented, it is also true that ***the drugs can have serious, even fatal, side effects***." *Id*. at 229–230 (citations omitted); *see also Riggins v. Nevada*, 504 U.S. 127, 134–35 (1992) (confirming the right of persons to reject antipsychotic medication absent a compelling state interest).

A case squarely on point is *Kiva O. v. State Dep't of Health & Soc. Servs.*, 408 P.3d 1181 (Alaska 2018). Alaska utilizes the same basic definitions of "custodian" and "guardian" as Arizona. *See* **A.S. § 47.10.084(a), (b)**. In *Kiva O.*, the parent of a child in the custody of the Office of Children's Services ("OCS") objected to OCS's administration of an antidepressant and mood stabilizer to the child. The Alaska Supreme Court noted that the term "major medical treatment" had to be considered in light of a parent's fundamental constitutional rights:

> In this case we conclude … that because the parent is asserting a fundamental constitutional right in the context of medical treatment for her child, *Myers* [*v. Alaska Psychiatric Services*, 138 P.3d 228 (Alaska 2006),] provides the appropriate analytical framework. Our review of AS 47.10.084 convinces us that its express recognition of the parent's residual right "to consent to major medical treatment" does not signal a weakening of the fundamental constitutional right…. [¶] [A]s we explained in *Myers*, **treatment with psychotropic drugs is "truly intrusive" and "literally intended to alter the mind."**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

*Kiva O.*, 408 P.3d at 1188 (emphasis added; citations omitted).

The Alaska Supreme Court recognized that, in the context of a child custody case, neither the parent nor child have rights lesser than that of incarcerated inmates. Rather, before ***antipsychotic medication*** could be administered to a child in the custody of the state's child protective services, the state must seek judicial approval, in which the juvenile court must consider, among other relevant factors:

> (A)     an explanation of the patient's diagnosis and prognosis, or their predominant symptoms, with and without the medication;
>
> (B)     information about the proposed medication, its purpose, the method of its administration, the recommended ranges of dosages, possible side effects and benefits, ways to treat side effects, and risks of other conditions, such as tardive dyskinesia;
>
> (C)     a review of the patient's history, including medication history and previous side effects from medication;
>
> (D)     an explanation of interactions with other drugs, including over-the-counter drugs, street drugs, and alcohol; and
>
> (E)     information about alternative treatments and their risks, side effects, and benefits, including the risks of nontreatment.

*Kiva O.*, 408 P.3d at 1189 (quoting *Myers*, 138 P.3d at 252)).

And this right to familial association and physical autonomy is as applicable to Brooke as it is to Mother. In *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018), the Ninth Circuit observed that "[i]n sum, our case law clearly establishes that the rights of parents and children to familial association under the Fourteenth, First, and Fourth Amendments are violated if a state official removes children from their parents without their consent…." *Id.* at 1237; *see also Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) ("Parents and children have a well-elaborated constitutional right to live together without governmental interference").

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

26

> That right is an essential liberty interest protected by the Fourteenth Amendment's guarantee that parents and children will not be separated by the state without due process of law except in an emergency…. [¶] The constitutional interest in familial companionship and society logically extends to protect children from unwarranted state interference with their relationships with their parents. The companionship and nurturing interests of parent and child in maintaining a tight familial bond are reciprocal and the distinction between the parent-child and the child-parent relationships does not justify constitutional protection for one but not the other. There is no reason to accord less constitutional value to the child-parent relationship than to the parent-child relationship. Therefore, a child's interest in her relationship with a parent is sufficiently weighty by itself to constitute a cognizable liberty interest.

*Hardwick v. County of Orange*, 980 F.3d 733, 740–41 (9th Cir. 2020) (citations and quotations omitted).

### 3.   A jury must decide whether Dr. Mlak was a state actor.

Dr. Mlak contends that he was not acting under color of law for purposes of his role in violating Mother's – and Brooke's[7] – constitutional rights as a matter of law. *Mlak MSJ* at 9-15.[8] However, genuine issues of material fact preclude summary judgment on this issue.

There are four scenarios in which an otherwise private actor can be deemed to be acting "under color of law" for purposes of the Civil Rights Act of 1871, 42 U.S.C. § 1983: "(1) the private actor performs a public function; (2) the private actor engages in joint

---

[7]  Both Christine and Brooke have related constitutional rights, that of the right to make medical decisions and that of physical autonomy. As the Supreme Court noted in *Parham v. J. R.*, 442 U.S. 584 (1979), "[i]t is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment and that the state's involvement in the commitment decision constitutes state action under the Fourteenth Amendment." *Id.* at 600. "However, since this interest is inextricably linked with the parents' interest in and obligation for the welfare and health of the child, the private interest at stake is a combination of the child's and parents' concerns." *Id.* at 600.

[8]  Section 1983 provides in pertinent part that **"[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory** or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" **42 U.S.C. § 1983.** In short, a person must be acting "under color of law" to be liable under the statute.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

activity with a state actor; (3) the private actor is subject to governmental compulsion or coercion; or (4) there is a governmental nexus with the private actor." *George v. Sonoma County Sheriff's Dep't*, 732 F. Supp. 2d 922, 933 (N.D. Cal. 2010); *see also Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (same).

Under the public-function test, "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Lee v. Katz*, 276 F.3d 550, 554-55 (9th Cir. 2002) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). "To satisfy the public-function test, the function at issue must be both traditionally and exclusively governmental." *Id*. at 555.

Here, the juvenile court awarded temporary custody of Brooke *to the Department of Child Safety*, *not* to any private person or entity. The Department of Child Safety is an agency of the State of Arizona, created by the Arizona legislature. *See* **A.R.S. § 8-451(A)** ("The department of child safety is established"). The Department (wrongfully) took custody of Brooke as part of its established purpose "to protect children." **A.R.S. § 8-451(B)**. And the juvenile court granted the "legal care, custody and control" to the Department in its July 27, 2018, Preliminary Protective Order:

> IT IS ORDERED that the child(ren) remain(s) a ward of the court in the legal care, custody and control of the Department of Child Safety," identifying Brooke Scianna as the protected child.

**Exh. E (July 27, 2018, Preliminary Protective Order) at 3**.

And the Department's case manager, Melissa Courtright, testified that she delegated the right to make any medical decision to the treating physician, Dr. Mlak:

> Q.   Do you think you have any obligation to understand what the side effects or the risks of any psychotropic medications are before you consent to the administration?
>
> A.   No. I didn't go to med school. If it's being recommended by a medical provider for a child to receive a particular

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

medication, I'm not going to withhold that medication from the child if it's the recommendation.

Q.   So if a medical provider that the department has somehow put in place or engaged in its provision of care to a child it's taken into its custody says the child needs this psychotropic medication -- Haldol, for instance -- is it your position, then, that that constitutes adequate medical care because a doctor is saying this is what's needed and you don't need to make a distinction between adequate versus major?

A.   There's going to be a reason as to why this was a recommendation of the provider to implement this particular drug to the child. So I'm going to ensure that the child is receiving the appropriate medication that is being prescribed to them. So, yes, I believe that's adequate.

**Exh. 24 (Courtright Dep.) at 132-33** (objections to form omitted).

And more often than not, the "informed consent" was made by a Department employee with no knowledge of the case, let alone the child's medical condition:

Q.   So if a call comes in after hours and it's for medications or to increase medications, the person taking the call has the authority to give consent?

A.   They do.

Q.   And that's a standard practice at the department?

A.   Yeah. Based on the case and what's going on, yes.

***Id*. at 146.**

Dr. Mlak's testimony indicated that he was aware of the "rubber stamp" nature of consent from the Department of Child Safety:

Q.   I'm asking if the legal consent that you received from DCS was to change medication from Thorazine to Haldol.

A.   So I would have made the recommendation and would have attempted to obtain consent directly. If that wasn't documented, then the nurses would have obtained

consent, which is our protocol, and they would have documented that, verbal -- written consent.

**Exh. 1 (Mlak Dep.) at 106**.

> Q.    Did you have a discussion with DCS informing them of what you wanted to do as part of seeking consent?
>
> A.    I don't recall specifically. And my documentation suggests that it would have been nursing staff that obtained consent.

*Id*. at 182.

Having purportedly (but wrongfully) stripped Christine of her medical decision-making authority, the burden then fell upon the Department to exercise its own independent judgment as to what medical care was in Brooke's best interests. But it chose not to exercise that function, but to delegate it exclusively to Dr. Mlak. At that point, he acted under color of law for purposes of section 1983.

Likewise, in *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020), the Ninth Circuit considered whether a private behavioral health facility could be considered a state actor for purposes of a person's involuntary mental health commitment. A county employee sought an initial 72-hour hold on the plaintiff, and the plaintiff was placed in the Recovery Innovations facility. There, subsequent in-patient treatment decisions were recommended and made by Recovery Innovations personnel.

The Ninth Circuit held that the Recovery Innovations personnel were state actors in the subsequent wrongful commitment proceedings. "[T]he role of state authorization and approval weighs in favor of a finding of state action in this case." *Id.* at 755.

> [T]he State here has undertaken a complex and deeply intertwined process with private actors of evaluating and detaining individuals for long-term commitments, and therefore, the state has so deeply insinuated itself into this process that the private actors' conduct constituted state action.

*Id.* at 757 (quotations and citation omitted).

Here, as in *Rawson*, an adolescent child was placed on an antipsychotic medication. The United States Supreme Court has repeatedly held that such a procedure required

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

adequate due process protections before commencement, even for incarcerated inmates. But rather than any procedural due process protections, the Department delegated this decision **solely** to Dr. Mlak, without any oversight or consultation with Brooke's parents. Dr. Mlak knew that Brooke was in the "legal custody" of the Department, *see* **Exh. 1**(**Mlak Dep.) at 105-07**, but made major medical decisions unilaterally, nonetheless. Issues of fact preclude summary judgment as to whether there was a governmental nexus between the Department and Dr. Mlak.

C.     **The Evidence Shows that Dr. Mlak's Negligence and Breach of Plaintiffs' Constitutional Rights Caused Damage to Brooke and Christine**.

When there are disputed material facts on causation, causation is a jury issue. *Gipson v. Kasey*, 214 Ariz. 141, 143-44, ¶¶ 9, 17 (2007). "The jury is given the most deference in weighing evidence, drawing inferences, and reaching conclusions on questions of negligence, causation, and damages." *Orme School v. Reeves*, 166 Ariz. 301, 310 (1990). "It is not how little or how large a cause is that makes it a legal cause, for a proximate cause is any cause which in a natural and continuous sequence produces the injury and without which the result would not have occurred." *McDowell v. Davis*, 104 Ariz. 69, 71-72 (1968).

A defendant's "act or omission need not be a 'large' or 'abundant' cause of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Robertson v. Sixpence Inns of America, Inc.*, 163 Ariz. 539, 546 (1990) (quoting *Ontiveros v. Borak*, 136 Ariz. 500, 505 (1983)).

Here, there is considerable evidence that Dr. Mlak's wrongful acts caused damage to both Christine and Brooke. Dr. Clark observed:

> At the November 2023 interview, Ms. Scianna reported that Brooke was doing better in terms of communication. She continues to become upset and have behavior difficulties if someone mentions Aurora or mentions the court case, and she gets upset when they drive to the CFSS office near where the Aurora unit used to be. ... [¶]

31

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

> As a result of Brooke being unsuccessfully treated with Haldol over the course of approximately four weeks in September and October of 2023, she was unnecessarily exposed to a range of side effects and risks, and her hospital course was unnecessarily prolonged for several weeks. While her five prior hospitalizations had ranged in duration from two to six weeks, this hospitalization lasted around 12 weeks.

**Exh. 22 (Dr. Clark Report)** at 7, 15.

Christine explains the harms to Brooke and, by extension, to herself:

> While on Haldol, I observed her being confused, and experiencing spasms, loss of bladder control, muscle stiffness, blank or upset facial expressions, swelling, and noticeable shuffling.

**Exh. A (Christine Decl.) ¶ 9**. Christine discussed the physical abuse Brooke endured while chemically restrained at Aurora – as the only girl in her unit, and nonverbal at that, she was physically abused, including having her hand slammed into a door, and the Department refused to permit her to obtain treatment for the injured hand. **Id., ¶¶ 10-14**.

The harm to Brooke, and the emotional pain and added caretaking tasks for Christine, was also outlined by Christine:

> Even after discharge, I could see the impact of her being placed on a psychotropic medication, Haldol. … [¶]

> Brooke now has a very noticeable tremor in her hands, which has continued from the time Dr. Mlak administered Haldol to the present. In addition, Brooke also has involuntary movements such as grimacing and closing one eye…. [¶]

> Brooke's doctor indicated in a visit earlier this month that there is nothing that could be done about Brooke's tremors.

> Brooke now also has problems with her balance at times, and sometimes loses her footing just walking.

> Haldol caused urinary issues while at Aurora, and they have continued. Brooke now has accidents at night and must wear adult diapers at night.

**Id., ¶¶ 15, 18, 20-22**.

Further, "[s]ince being released from Aurora, Brooke is no longer treated with any type of antipsychotic. And for over a year now, without any of this type of invasive medication, she has not had a single meltdown or violent episode." *Id.*, ¶ **23**.

Genuine issues of material fact exist as to the harm caused by Dr. Mlak's wrongful administration of Haldol.

## IV.   <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs re-urge their own motion for summary judgment on liability issues, and further respectfully request that this Court deny Defendant Mlak's motion for summary judgment.

**RESPECTFULLY SUBMITTED** this 9th day of August 2024.

MILLS + WOODS LAW PLLC

By      /s/ Thomas A. Connelly
Thomas A. Connelly
Robert T. Mills
Sean A. Woods
5055 North 12th Street, Suite 101
Phoenix, AZ 85014

GILLESPIE, SHIELDS & TAYLOR
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on August 9, 2024, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system.

      /s/ Thomas A. Connelly

MILLS + WOODS LAW PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556