Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, *et al.*,<br><br>Defendants. | Case No.: 2:21-cv-01444-DJH<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANT AURORA BEHAVIORAL HEALTHCARE-TEMPE'S MOTION FOR SUMMARY JUDGMENT (DOC. 152)**<br><br>(Hon. Diane J. Humetewa) |

Plaintiffs respond to Defendant Aurora Behavioral Healthcare-Tempe's ("Aurora") motion for summary judgment (Doc. 152) as follows. With one exception, Aurora raises the same factual and legal claims as Defendant Mlak, *see* (Doc. 151), and, as such, Plaintiff incorporates his response to Defendant Mlak's motion for summary judgment (Doc. 159) (and Plaintiff's own motion for partial summary judgment as to Defendant Mlak (Doc.

154)). As set forth herein, Plaintiff explains why genuine issues of fact exist as to Aurora's vicarious liability for the conduct of Dr. Mlak and, further, Aurora's independent liability.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     BACKGROUND

#### A.     Dr. Mlak Goes to Work for Aurora

Dr. Mlak started with Aurora Behavioral Healthcare in August of 2018 as a staff psychologist. **Exh. A (Mlak Dep.) at 38**. Aurora provided Dr. Mlak with a written "independent contractor" agreement for his work as a staff psychologist. *Id***. at 40-41**.

Aurora also entered into a second contract with Dr. Mlak to provide administrative services. *Id***. at 50-51**. Under the terms of this contract, Dr. Mlak would provide the following services:

> Supervision and oversight for the staff on the unit, reviewing the many documents for admissions that come to our program prior to their being accepted, and managing the admissions process, which is a time-intensive process.

*Id.* **at 51**. Aurora compensated Dr. Mlak on an hourly basis for his work in this regard. *Id.* **at 53**.

#### B.     Dr. Mlak Treats Brooke

Plaintiff Brooke Scianna was admitted to Aurora in August of 2018, shortly after Dr. Mlak started with Aurora. *See id.* **at 52**. Dr. Mlak does not recall if he was the staff psychologist who approved her admission. *Id*. He was, however, her attending physician upon her admission. **Exh. B (Aurora Medical Records) at 000003**. He conducted a psychological examination of Brooke on August 26, 2018. *Id***. at 000026-29**.

On September 7, 2018, Dr. Mlak decided to administer Haloperidol (Haldol) to Brooke. *Id***. at 000217**. Haldol is an antipsychotic drug. **Exh. C (Dr. Clark Report) at 14.** "Antipsychotic medications are designed to cause a personality change that, 'if unwanted, interferes with a person's self-autonomy, and can impair his or her ability to function in particular contexts.'" *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010)

(quoting *United States v. Williams*, 356 F.3d 1045, 1053 (9th Cir. 2004)). As the Alaska Supreme Court held:

> Given the nature and potentially devastating impact of psychotropic medications—as well as the broad scope of the Alaska Constitution's liberty and privacy guarantees—we now similarly hold that the right to refuse to take psychotropic drugs is fundamental; and we further hold that this right must extend equally to mentally ill persons, ***so that the mentally ill are not treated as persons of lesser status or dignity because of their illness***.

*Myers v. Alaska Psychiatric Inst.*, 138 P.3d 238, 248 (Alaska 2006) (footnotes and quotations omitted; emphasis added).[1]

Dr. Mlak engaged in ***no*** due process for Brooke before administering Haldol. He did nothing but delegate the purported "informed consent" process to the Aurora-employed nurses:

> So I would have made the recommendation and would have attempted to obtain consent directly. If that wasn't documented, then the nurses would have obtained consent, which is our protocol, and they would have documented that, verbal -- written consent.

**Exh. A (Mlak Dep.) at 106**. He testified that it was ***Aurora's policy*** for the nurses to obtain consent:

> Q. And before you administered the Haldol to Brooke, you didn't receive or review any court orders appointing DCS as Brooke's legal guardian; is that true?
>
> A. I was not aware of any new information since the time of admission, and my nurses -- our hospital policy is for the nurses to obtain consent -- would have reviewed any pertinent records and court orders.

*Id.* at 183.

---

[1] Arizona's constitution likewise has liberty and privacy protections. The Arizona Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law," Ariz. Const. art. 2, § 8, and that "[n]o person shall be deprived of life, liberty, or property without due process of law," Ariz.Const. art. 2, § 4.

3

The Aurora nurses did not obtain a court order, or even ask the Department of Child Safety for one. Brooke's active DCS case manager, Melissa Courtright, testified that she would simply rubberstamp the doctor's recommendation if she had been asked:

> Q. Do you think you have any obligation to understand what the side effects or the risks of any psychotropic medications are before you consent to the administration?
>
> A. No. I didn't go to med school. If it's being recommended by a medical provider for a child to receive a particular medication, I'm not going to withhold that medication from the child if it's the recommendation.

**Exh. D (Courtright Dep.) at 132-33** (objections to form omitted).

And if Ms. Courtright was not available, some random staffer at the Department would be asked to make the decision:

> Q. So if a call comes in after hours and it's for medications or to increase medications, the person taking the call has the authority to give consent?
> A. They do.
> Q. And that's a standard practice at the department?
> A. Yeah. Based on the case and what's going on, yes.

*Id.* **at 146.** The evidence shows that is what happened here, as the Department employee named "Kaloni" at "DCS" approved the Haldol administration on "9/7/18":

[Aurora Behavioral Health System "Informed Consent for Adolescent Medication" form for patient Scianna, Brooke, DOB 07/14/01, Age 17, Doctor Mlak, K. Medication: Haldol, Route: PO, Dose: 1mg/5mg, Frequency: TID, New medication: Yes, How Discussed: Telephone (2 RN verification), Parent/Guardian Initials: Kaloni DCS, Date/Time: 9/7/18, Behavioral Health Professional signature, Date/Time: 9/7/18. Target Symptoms: Mood.]

**Exh. E (9-7-2018 Consent Form) at 000150**.

Not only did Aurora fail to obtain meaningful informed consent (let alone protect Brooke's due process rights), but its staff psychiatrist, Dr. Mlak, negligently decided to administer the medication. As set forth in greater detail in (1) Plaintiff's motion for partial summary judgment against Dr. Mlak (Doc. 154), and (2) Plaintiff's response to Dr. Mlak's motion for summary judgment (Doc. 159) (both of which are incorporated herein), Dr. Mlak neither obtained a history from Brooke's lifelong caretaker, her mother Christine, nor did he review critical records from either Banner Health or St. Luke's Behavioral Health, both of which would have demonstrated significant concerns about administering any antipsychotic medication, and Haldol in particular, to Brooke.

As set forth herein, genuine issues of material fact exist as to whether Aurora bears responsibility for the failure to obtain true informed consent (let alone protect Brooke's and Christine's constitutional rights). Accordingly, Plaintiffs respectfully request that this Court deny Aurora's motion for summary judgment.

## II.   DISCUSSION

### A.   Standard of Review

In reviewing Aurora's motion for summary judgment, this Court must accept all facts – as well as the reasonable inferences that flow from these facts – in the light most favorable to Christine and Brooke Scianna. *Hourani v. Benson Hosp.*, 211 Ariz. 427, 432, ¶ 13 (App. 2005).

### B.   Genuine Issues of Material Fact Exist as to Whether Aurora's Nurses Obtained Consent from Someone Capable of Giving Informed Consent; They Did Not, Which Constitutes a Battery.

A medical provider has a "duty … to inform his patient of risks inherent in the surgery or treatment to which he has consented." *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 310, ¶ 11 (2003) (quoting *Mink v. Univ. of Chicago*, 460 F.Supp. 713, 716 (N.D.Ill.1978). "Courts generally recognize two theories of liability for unauthorized medical treatment or therapy rendered by physicians to their patients: a traditional

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

intentional tort claim for battery and a negligence claim for lack of informed consent." *Id*. Both are implicated here.

"[A] health care provider commits a common law battery on a patient if a medical procedure is performed without the patient's consent." *Id*.; *see also Bailey-Null v. ValueOptions*, 221 Ariz. 63, 70, ¶ 20 (App. 2009) ("A health care provider commits common law battery when a medical procedure is performed on a patient without that patient's consent"). "[T]he central question in a case of medical battery is whether the patient has effectively given his or her consent to the procedure." *Id*.

Further, consent must be obtained from someone who actually has an interest in the best interests of the patient. "At common law, minors generally were considered to lack the legal capacity to give valid consent to medical treatment or services, and consequently a parent, guardian, or other legally authorized person generally was required to provide the requisite consent." *Am. Acad. of Pediatrics v. Lungren*, 16 Cal. 4th 307, 314–15, 940 P.2d 797, 800 (1997). "[T]he purpose of the general common law rule regarding medical care was ***to protect the health and welfare of minors, safeguarding them from the potential overreaching of third parties*** or the improvidence of their own immature decisionmaking, and ***leaving decisions concerning the minor's medical care in the hands of his or her parents, who were presumed to be in the best position to protect the health of their child***." *Id*. (emphasis added). In short, consent is intended to be a meaningful, rather than prophylactic, process, particularly when vulnerable minors are concerned.[2]

---

[2] A battery occurs when a medical provider does not obtain consent from someone authorized to give consent. For example, in *In re Est. of Allen*, 848 N.E.2d 202 (Ill.App. 2006), a doctor ordered forcible blood and urine samples from an incapacitated patient, without obtaining other consent. In a subsequent suit against the doctor, the doctor asserted the "emergency" exception to consent. But the Illinois Court of Appeals noted that the medical provider "[d]efendants have not established that there is no genuine issue of material fact as ***to the impossibility or impracticality of obtaining consent from someone authorized to consent to the drug screen procedure on Allen's behalf***…. [D]efendants have failed to provide testimony to explain why obtaining consent from someone empowered to consent for Allen, possibly including her sister Denise Moriarity, before Allen was treated was impossible or impractical." *Id*. at 217.

6

Here, Aurora delegated the responsibility to obtain consent for new medications to its nurses. **Exh. A (Mlak Dep.) at 183** ("Our hospital policy is for the nurses to obtain consent"); *see also id.* at 106 ("… then the nurses would have obtained consent, which is our protocol, and they would have documented that, verbal -- written consent"). Here, the informed consent was sought for administration of an antipsychotic drug – a medication with such risks and potential side effects (including significant psychological effects) that its unwanted administration typically requires due process, such as a court order after weighing the various reasons for the medication and alternatives. Thus, even assuming it was not Aurora's role to seek the court order, informed consent certainly required Aurora to provide sufficient information to a *qualified* person at the Department of Child Safety who could seek such an order.

Instead, the facts and their reasonable inferences show that the delegated Aurora nurse simply spoke with a random employee at the Department of Child Safety, one of its 2,784 employees as of September 2018.[3]

With something as significant as the administration of Haldol, a telephone call from an Aurora nurse to a random DCS employee does not constitute "consent" required to administer this antipsychotic medication. Since the nurses were indisputably employees of Aurora, it is Aurora who is responsible for this conduct under the doctrine of *respondeat superior*. *Laurence v. Salt River Project Agric. Improvement & Power Dist.*, 255 Ariz. 95, 105, ¶ 41 (2023). Genuine issues of fact exist as to if Aurora committed battery on Brooke by obtaining consent from someone who could not authorize a medical procedure such as administration of an antipsychotic medication, including Haldol.

### C. **Genuine Issues of Material Facts Exist as to Whether Aurora Failed to Obtain "Informed" Consent, also Precluding Summary Judgment.**

"'[L]ack of informed consent' [occurs] where the provider does not adequately disclose the risks and alternative treatments prior to performing the procedure." *Gorney v.*

---

[3] This number is derived from the September 2018 monthly report prepared by DCS, which can be found here: Monthly Operational and Outcome Report_Sep 2018.

7

*Meaney*, 214 Ariz. 226, 228, n. 1 (App. 2007). Here, Dr. Mlak indicated that the nurses' obtaining of informed consent would be "documented." **Exh. A (Mlak Dep.) at 106.** The "documentation" here is nothing more than a phone call from a nurse to an unknown DCS employee. **Exh. E (9-7-2018 Consent Form) at 000150**. There is no notation about what risks or alternative treatments were provided. Indeed, the reasonable inference under these circumstances – to which Plaintiffs are entitled – is that the conversation was minimal, *i.e.,* "is it okay if Aurora administers Haldol?" or words to that effect.

But administration of Haldol is a "major" medical decision,[4] or an "important" medical decision.[5] Psychiatrist Andrew B. Clark, M.D., Plaintiffs' medical expert, noted:

> In … non-emergent situations, … the informed consent process with parents and guardian is typically a complex discussion, as the risks involved are so serious and manifold. No parent, in my experience, makes the decision to start their child on antipsychotic medication without a great deal of trepidation and concern.

**Exh. C (Dr. Clark Report) at 16**. Thus, the informed process in the present matter should have included a "complex discussion" involving the "serious and manifold" risks, to a person capable of considering and weighing these risks. ***Nothing*** in the record suggests that anything of this nature ever occurred. Dr. Mlak did not know. And the only documentation indicates that a call was made by a nurse to an unknown DCS employee. **Exh. E (9-7-2018 Consent Form) at 000150**.

Moreover, it was not possible for true informed consent to have been made in this matter. A true informed decision would have required consideration of Brooke's medical

---

[4] To use the terminology of Arizona Revised Statutes section 8-531(5).

[5] To use the terminology of a parent's and child's constitutional right to familial association. *See Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000) (right of familial association "includes the right of parents to make ***important medical decisions*** for their children, and of children to have those decisions made by their parents rather than the state") (emphasis added). Although Defendant Aurora is not named as a defendant for Plaintiffs' constitutional claims, the constitutional requirement informs Aurora's duty of care. *Cf. Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 565, ¶ 15 (2018) ("Public policy creating a duty is based on our state and federal statutes and the common law").

history and prior reactions from antipsychotic medications. However, as set forth in detail in Plaintiffs' motion for summary judgment against Dr. Mlak (Doc. 154) and their response to his motion (Doc. 159), neither Aurora nor Dr. Mlak had the medical records that would have provided the information for meaningful informed consent. Dr. Clark stated:

> One of the primary responsibilities of the attending physician in caring for a patient on an inpatient psychiatric unit is developing an effective medication regimen. Typically, this involves gathering a comprehensive history of the presenting complaint, as well as of any prior medication trials and their effects.

**Exh. C (Dr. Clark Report) at 13.**

> Had Dr. Mlak spoken with the mother, he would have learned a great dealt that should, in my opinion, have given him pause before prescribing an antipsychotic medication of any sort. … [¶] Had Dr. Mlak reviewed records from prior medication trials, he would have learned that Brooke had consistently developed severe side effects from trials of antipsychotic medication, and that she had never had a sustained beneficial response, even after trials with several different antipsychotics.

*Id.* at 13-14.

> This information from the mother and from the medication records, in my opinion, should have raised serious questions as to the advisability of yet another trial of antipsychotics, as well as serious concerns around the risks and side-effects that Brooke would likely be subjected to. At the time of Brooke's hospitalization in the fall of 2018 there were many other medication options available for her treatment besides antipsychotics, and besides Haldol in particular.

*Id.* at 14.

Aurora argues that it had "actual consent." While that is not true, *see* Section C, above, it also did not have "informed consent." Genuine issues of material fact preclude summary judgment on the issue of consent.[6]

---

[6] As with Dr. Mlak, Aurora also argues that the "major" and "adequate" distinctions of Arizona statutory law do not apply. *See* Aurora MSJ at 5-8. Plaintiffs incorporate their discussion of this issue from their own motion for summary judgment (Doc. 154) at 14-20, and in response to Defendant Mlak's motion for summary judgment (Doc. 159) at 18-20.

**D.   Genuine Issues of Material Fact Exist As To Whether Dr. Mlak Was One of Aurora's Employees Rather Than An Independent Contractor.**

Aurora maintains that it is entitled to summary judgment because Dr. Mlak was an independent contractor rather than an employee and, as such, there is no vicarious liability. However, issues of fact preclude summary judgment on this issue.

The Arizona Supreme Court has noted that several criteria must be evaluated in determining whether an employer-employee relationship exists, including the factors set forth in the RESTATEMENT (SECOND) OF AGENCY § 220 (1958):

1. The extent of control exercised by the master over details of the work and the degree of supervision;
2. The distinct nature of the worker's business;
3. Specialization or skilled occupation;
4. Materials and place of work;
5. Duration of employment;
6. Method of payment;
7. Relationship of work done to the regular business of the employer;
8. Belief of the parties.

*Santorii v. MartinezRusso, LLC*, 240 Ariz. 454, 458, ¶ 17 (App. 2016) (quoting *Santiago v. Phx. Newspapers, Inc.*, 164 Ariz. 505, 509 (1990)). "It is well established that the chief characteristic distinguishing an independent contractor from an employee is his *right*, independent of his employer, to control the manner and means of accomplishing the particular job." *DeMontiney v. Desert Manor Convalescent Ctr.*, 144 Ariz. 21, 26 (App. 1984), *vacated in part on other grounds*, 144 Ariz. 6 (1985).

Each of the factors suggest that Dr. Mlak should be deemed an employee of Aurora.

*First*, the record shows that Aurora provided significant supervision over Dr. Mlak. Aurora had a medical director, Tariq Ghafoor, M.D. **Exh. A (Mlak Dep.) at 187.** The records demonstrate that Dr. Ghafoor directly supervised and directed Dr. Mlak's work. There is an October 31, 2018, memorandum regarding Dr. Mlak's assignment;

> I, Tariq Ghafoor, MD, as the Medical Director of Aurora Behavioral Health, Tempe, assign Krzysztof Mlak, MD, as my designee for matters related to patients being treated on the hospital's Special Needs (Coyote) Unit.

**Exh. B (Aurora Medical Records) at 000621.**[7] Also, Aurora's medical director, Dr. Ghafoor, was instrumental in reversing Dr. Mlak's decision to administer Haldol to Brooke:

> A consultation with the medical director occurred due to mother's strong opposition to the use of that medication. Trileptal was added with a plan to taper Haldol due to lack of consistent benefit and strong parental objection which was recommended following consultation with the medical director. Trileptal was titrated and Haldol was discontinued

*Id.* **at 000004**. In a progress note on September 25, 2018, Dr. Mlak noted, as item 9 in his plan: "Requested consultation with medical director for treatment recommendations." *Id.* **at 000253**.

When Dr. Mlak learned about Mother's concerns about the use of Haldol on Brooke, he consulted with Dr. Ghafoor as to how best to proceed:

> Q. And that's a reference to a consultation with Dr. Ghafoor [referencing note in medical record]?
>
> A. That's correct.
>
> Q. And what did you want to consult with him about regarding treatment recommendations?
>
> A. Exactly as that states. Based on the parental objection and to treat -- to my treatment plan. And I believe some of those e-mails just referenced mom requesting a second opinion, if I scanned that information accurately. So that would have been a response to mom's request as well for a second-opinion consultation.

**Exh. A (Mlak Dep.) at 190-91.**

---

[7] It appears that DCS requested such a designation. **Exh. B (Aurora Medical Records) at 000615**.

11

Further, as noted above, Dr. Mlak was more than simply a doctor working at the Aurora facility. He independently oversaw many administrative aspects of the facility, including its intake process and decisions. ***Id.* at 50-51**.

*Second*, Aurora is a mental health institution. Providing mental health care is its reason for existing. And Dr. Mlak acknowledged that his role was in providing such care as a "staff psychiatrist."

> Q. And so you came to Aurora as a staff psychiatrist. That's what it says here. Is that right?
>
> A. That's correct.
>
> Q. In the special needs unit?
>
> A. That's correct.

***Id.* at 38.** Dr. Mlak performs tasks within the core purpose of Aurora's existence, and he does so not only as a treating doctor, but also as an administrator.

*Third,* Dr. Mlak is a specialized doctor, in psychiatry. But as a mental health institution, that falls within the very nature of Aurora's purpose.

*Fourth*, Dr. Mlak works at Aurora's facility in Tempe, where he utilizes Aurora's staff and facilities. He was a "staff psychiatrist," not having his own separate practice elsewhere and not providing his own materials at the Aurora facility.[8]

*Fifth*, Dr. Mlak began work in early August of 2018, and remained employed with Aurora through the date of his deposition in June of 2023, nearly four full years at the time. ***Id.* at 38**.

*Sixth*, Dr. Mlak received two types of payments from Aurora, $90 per psychiatric evaluation, and $150 per hour for his administration work. ***Id.* at 43, 53**.

*Seventh,* as already noted above, Dr. Mlak's work as a staff psychiatrist in a mental health institution is directly related to the core of Aurora's mission and purpose.

---

[8] Dr. Mlak did some telehealth psychiatry for his prior employer, Cedar Creek Hospital, a Michigan hospital. **Exh. A (Mlak Dep.) at 35-36.**

*Finally,* Dr. Mlak testified that he was an independent contractor. But that was far from clear to Christine Scianna; there is no evidence showing that she knew Dr. Mlak was not employed by Aurora. He was, as his title indicated, a "staff psychiatrist" at the facility. As a member of the Aurora "staff," Christine sought out the assistance of Dr. Mlak's "supervisor," Dr. Ghafoor, when she became dissatisfied with Dr. Mlak's decision and unwillingness to work with her. *See* **Exh. B (Aurora Medical Records) at 000664** (email from Christine Scianna seeking contact information for the Aurora director to discuss Dr. Mlak).

These factors all support a finding that Dr. Mlak was Aurora's employee, not simply an independent contractor. The resolution of this issue should be given to the jury. And if the jury finds Dr. Mlak to be an employee, Aurora would not only be directly responsible for its wrongful conduct, but vicariously liable for Dr. Mlak's wrongful conduct, as well.

**C.   Genuine Issues of Material Fact Preclude Summary Judgment on the Causation Issue.**

As with Dr. Mlak, Aurora claims that it is entitled to summary judgment on causation grounds. Plaintiffs thoroughly briefed this issue in response to Dr. Mlak's summary judgment motion and incorporates that response here. *See* (Doc. 159) at 31-33.

When there are disputed material facts on causation, causation is a jury issue. *Gipson v. Kasey*, 214 Ariz. 141, 143-44, ¶¶ 9, 17 (2007). "The jury is given the most deference in weighing evidence, drawing inferences, and reaching conclusions on questions of negligence, causation, and damages." *Orme School v. Reeves*, 166 Ariz. 301, 310 (1990). "It is not how little or how large a cause is that makes it a legal cause, for a proximate cause is any cause which in a natural and continuous sequence produces the injury and without which the result would not have occurred." *McDowell v. Davis*, 104 Ariz. 69, 71-72 (1968).

Here, there is considerable evidence that Dr. Mlak's wrongful acts caused damage to both Christine and Brooke. Dr. Clark observed:

> At the November 2023 interview, Ms. Scianna reported that Brooke was doing better in terms of communication. She continues to become upset and have behavior difficulties if someone mentions Aurora or mentions the court case, and she gets upset when they drive to the CFSS office near where the Aurora unit used to be. … [¶]
>
> As a result of Brooke being unsuccessfully treated with Haldol over the course of approximately four weeks in September and October of 2023, she was unnecessarily exposed to a range of side effects and risks, and her hospital course was unnecessarily prolonged for several weeks. While her five prior hospitalizations had ranged in duration from two to six weeks, this hospitalization lasted around 12 weeks.

**Exh. C (Dr. Clark Report) at 7, 15**.

Christine explains the harms to Brooke and, by extension, to herself:

> While on Haldol, I observed her being confused, and experiencing spasms, loss of bladder control, muscle stiffness, blank or upset facial expressions, swelling, and noticeable shuffling.

**Exh. F (Christine Scianna Decl.**), ¶ 9; *see also id.*, ¶¶ **10-12, 15, 17-18, 20-22** (other harms to Brooke while at Aurora in August – November 2018 and since discharge).

### III. <u>CONCLUSION</u>

For the reasons set forth herein, Plaintiffs re-urge their own motion for summary judgment on liability issues (Doc. 154), and further respectfully request that this Court deny Defendant Aurora's motion for summary judgment (Doc. 152).

RESPECTFULLY SUBMITTED this 11th day of August 2024.

**MILLS + WOODS LAW PLLC**

By    */s/ Thomas A. Connelly*
      Thomas A. Connelly
      Robert T. Mills
      Sean A. Woods
      5055 North 12th Street, Suite 101
      Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
DeeAn Gillespie Strub
Jenny D. Jansch
7319 North 16th Street
Phoenix, AZ 85020

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 11, 2024, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system.

　　*/s/ Thomas A. Connelly*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556