# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

CHRISTINE SCIANNA, et al.,         )
                                   )
           Plaintiffs,             )
                                   )
                                   ) No. 2:21-cv-01444-DJH
      vs.                          )
                                   )
ARIZONA DEPARTMENT OF CHILD        )
SAFETY, et al.,                    )
                                   )
           Defendants.             )
_____)

**DEPOSITION OF KRZYSZTOF MLAK**

Phoenix, Arizona
June 8, 2023
10:10 a.m.

Prepared by:                              CARRIE REPORTING, LLC
MICHAELA H. DAVIS                         Certified Reporters
Registered Professional Reporter          2415 E. Camelback Road
Certified Realtime Reporter               Suite 700
Certified Realtime Captioner              Phoenix, AZ 85016
Certified LiveNote Reporter               (480) 429-7573
AZ CR No.  #50574
carrie@carriereporting.com

(COPY)

1  DEPOSITION OF KRZYSZTOF MLAK commenced at
2  10:10 a.m. on June 8, 2023, at the law offices of
3  GILLESPIE, SHIELDS, GOLDFARB & TAYLOR, 7319 NORTH 16TH
4  STREET, SUITE 100, PHOENIX, ARIZONA, before MICHAELA
5  HERMAN DAVIS, a Certified Reporter, in and for the County
6  of Maricopa, State of Arizona.

* * *

APPEARANCES

FOR THE PLAINTIFF:

    MILLS + WOODS LAW PLLC
    BY: MR. THOMAS A. CONNELLY
        5055 NORTH 12TH STREET
        SUITE 101
        PHOENIX, ARIZONA 85014
        tconnelly@millsandwoods.com

FOR DEFENDANT KRZYSTZTOF MLAK, M.D.:

    QUINTAIROS, PRIETO, WOOD & BOYER, PA
    BY:  MR. DUSTIN A. CHRISTNER
        8800 EAST RAINTREE DRIVE
        SUITE 100
        SCOTTSDALE, ARIZONA 85260
        dustin.christner@qpwblaw.com

FOR DEFENDANT DEPARTMENT OF CHILD SAFETY:

    JONES SKELTON & HOCHULI
    BY:  MS. GEORGIA A. STATON
        40 NORTH CENTRAL AVENUE
        SUITE 2700
        PHOENIX, ARIZONA 85004
        gstaton@jshfirm.com

1  *A.*   That's correct.

2  *Q.*   Less restrictive than what?

3  *A.*   Than hospital-based level of care.

4  *Q.*   And you mentioned that Aurora Behavioral Health
5  is considered a level 1.  Level 1 what?

6  *A.*   Acute care facility.

7  *Q.*   And what does that mean?

8  *A.*   That is the most restrictive level of care.
9  It's a locked-door facility.

10  *Q.*   It also says on your CV that you were a member
11  of the medical executive committee at Havenwyck.  What did
12  you do in that role?

13  *A.*   Also provide oversight as to the hospital-wide
14  policies, rules, and regulations, including physician
15  function, nursing department function separately from
16  pharmacy and therapeutics.

17  *Q.*   In that role did you draft any policies or
18  procedures?

19  *A.*   Primarily reviewed drafted policies and
20  procedures.

21  *Q.*   So someone else would draft them and you would
22  be part of the committee that would review them?

23  *A.*   And approve, yes.

24  *Q.*   And where is Cedar Creek Hospital?

25  *A.*   In Michigan.

1    Q.    On your CV it says that you were a staff
2 psychiatrist there from April of 2018 to the present.
3          Are you still a staff psychiatrist there?
4    A.    I am.
5    Q.    So how often do you go back to Michigan and
6 practice there?
7    A.    I provide telehealth services.
8    Q.    What is it that you can do as a psychiatrist --
9 strike that.
10         The telehealth services that you provide
11 through Cedar Creek Hospital, is that in relation to child
12 and adolescent psychiatry?
13   A.    That's correct.
14   Q.    And what kind of medical care or psychiatric
15 care do you provide in a telehealth format?
16   A.    Essentially the same that I would in person; the
17 evaluation, diagnosis, and treatment of psychiatric
18 conditions.
19   Q.    So when you're doing a telehealth -- when you're
20 providing telehealth services, who are you speaking with?
21   A.    The patient, the nursing team, my social
22 workers, families.
23   Q.    And are you receiving medical records somehow as
24 part of that?
25   A.    I am.

1     *A.*     Prior to our move.
2     *Q.*     And when did you start at Aurora?
3     *A.*     Late July 2018.
4         Let me amend that. So it looks like I
5 listed August, so it must have been August 1st, 2nd. At
6 the very beginning of August.
7     *Q.*     Just at the very beginning of the month?
8     *A.*     Yes.
9     *Q.*     And so you came to Aurora as a staff
10 psychiatrist. That's what it says here.
11         Is that right?
12     *A.*     That's correct.
13     *Q.*     In the special needs unit?
14     *A.*     That's correct.
15     *Q.*     And what kind of patients are seen in the
16 special needs unit?
17     *A.*     We accept patients that have a developmental
18 disability, autistic disorder being one, intellectual
19 disabilities being most of the remaining patient
20 population.
21     *Q.*     Intellectual disability like what?
22     *A.*     Intellectual disability, previously known as
23 mental retardation.
24     *Q.*     What other kind of patients does Aurora have
25 that are not part of the special needs unit?

1   Q.   As far as Brooke Scianna goes, she doesn't have
2   a substance disorder; right?
3   A.   Are you asking currently or in 2018?
4   Q.   In 2018.
5   A.   She did not have a substance use disorder.
6   Q.   Did she have a mood disorder?
7   A.   Yes.
8   Q.   What was the mood disorder?
9   A.   If I can reference my psychiatric evaluation.
10  Q.   I'll ask the question again when we get there.
11  A.   Sure.
12  Q.   And you agree, though, that she didn't have any
13  psychotic disorders, right, in 2018?
14  A.   I'll have to reference my documentation.
15  Q.   As part of your employment at Aurora, you had
16  entered into a written contract; right?
17  A.   That's correct.
18          MR. CONNELLY:  I'm going to mark Exhibit 16.
19          (Deposition Exhibit No. 16 was marked for
20      identification by the reporter.)
21  BY MR. CONNELLY:
22  Q.   Doctor, do you recognize Exhibit 16 as the first
23  contract you entered into prior to being hired at Aurora?
24  A.   I do.
25  Q.   And I said "being hired," but you were not hired

1   as an employee at Aurora; is that correct?
2       A.   That's correct.
3       Q.   The contract is an independent contractor type
4   of contract; right?
5       A.   That's correct.
6       Q.   And so Aurora doesn't provide you with any
7   insurance; you've got to provide that yourself.  Right?
8       A.   That's correct.
9       Q.   And there are performance standards set by
10  Aurora that you're obligated to meet and adhere to; right?
11              MR. HUNTER:  Form and foundation.
12              THE WITNESS:  That's correct.
13  BY MR. CONNELLY:
14      Q.   And as part of the contract, you'll see on
15  page 3 of the contract, it requires you to carry liability
16  insurance in the amount not less than a million dollars
17  per occurrence and $3 million annual aggregate.
18              Is that right?
19      A.   That's correct.
20      Q.   At the time in 2018 when you joined Aurora, you
21  had that type of insurance in place; right?
22      A.   That's correct.
23      Q.   And you had it in place at the time that you
24  were treating Brooke Scianna, those times that are
25  relevant to this lawsuit; right?

1  that.
2      Q.    So when you create your psychiatric records, you
3  just create them in whatever system Aurora has established
4  for recording psychiatric records?
5      A.    That's correct.
6      Q.    And then when you prepare an invoice, what's on
7  your invoice?
8      A.    The patient's identifying information and the
9  billing code.
10     Q.    And the billing code relates to?
11     A.    The complexity of the encounter.
12     Q.    And those are codes that are established by
13 whom?
14     A.    Those are CPT codes that I -- by the -- that
15 refer to the International Classification of Diseases and
16 for diagnosis.  And then the medical complexity codes,
17 which is a national standard.  Or a federal standard, I
18 believe.
19     Q.    And were you paid a set amount per visit for
20 psychiatric evaluations?
21     A.    That's correct.
22     Q.    And what was that amount?
23     A.    $90.
24     Q.    And would that be for any encounter you had with
25 a patient regardless of how long it took?

1  has terminated your contract; correct?
2      A.    That's correct.
3      Q.    And just so the record is clear, when we're
4  referring to Aurora, can we have the agreement that
5  we're referring to Aurora Behavioral Health Tempe?
6      A.    That's correct.
7      Q.    There was a time when you entered into another
8  agreement with Aurora; right?
9      A.    I don't recall.
10              (Deposition Exhibit No. 18 was marked for
11          identification by the reporter.)
12 BY MR. CONNELLY:
13     Q.    You've seen Exhibit 18 before?
14     A.    Yes.
15     Q.    And if you look at the last page of Exhibit 18,
16 that's your signature on the signature line for the
17 physician?
18     A.    That is correct.
19     Q.    And it's countersigned by Bruce Waldo.
20              He's the CEO at Aurora?
21     A.    That's correct.
22     Q.    And what was the purpose of this contract?
23     A.    To recognize the additional tasks and
24 administrative services that I was providing for the
25 specialized needs unit, and also for the purpose of

1  compensation for those additional tasks and services.
2      Q.   What additional tasks and services were you
3  providing?
4      A.   Supervision and oversight for the staff on the
5  unit, reviewing the many documents for admissions that
6  come to our program prior to their being accepted, and
7  managing the admissions process, which is a time-intensive
8  process.
9      Q.   Okay.  So managing the -- managing the
10 admissions process for incoming patients?
11     A.   For potentially incoming patients.
12     Q.   Okay.  And as part of that duty, were you part
13 of a committee or a group that would make admission
14 decisions?
15     A.   So in a general sense, when we refer -- when we
16 are receiving a referral for an application for admission,
17 I review the admission information to ensure that the
18 person has a developmental disability, and then I approve
19 based on that confirmation.
20     Q.   And are you the sole reviewer and approver, or
21 are there other people involved in that process?
22     A.   I am the sole reviewer to make that
23 determination, but there are other individuals in the
24 review process.
25     Q.   And when did you assume the mantle of being the

1  sole approver?
2       A.    In 2018, upon my entry with the unit.
3       Q.    So when you first started in 2018, you came in
4  as a staff psychiatrist, but you were also performing
5  these administrative functions?
6       A.    That's correct.
7       Q.    So did you review and approve Brooke Scianna for
8  admission?
9       A.    I'm not -- I don't recall, essentially.  And if
10 I can specify.  So sometimes we review and approve an
11 admission, but that person may not arrive to our program
12 for weeks or months, depending on our waiting list.
13            So Brooke's referral packet may have come in
14 at some time.  I simply don't recall whether I had
15 reviewed and approved hers.
16      Q.    So if I understand what you're saying is you may
17 have reviewed and approved her admission in August of
18 2018, but it also may be the case that she had been
19 submitted, reviewed, and approved by someone else before
20 you started in August of 2018?
21      A.    That's correct.
22      Q.    And as you're sitting here today, you don't have
23 a present recollection of whether or not you reviewed and
24 approved Brooke Scianna for admission in August of 2018?
25      A.    That's correct.

1    Q.   And the services that you provide under this
2  administrative services agreement are compensated on an
3  hourly basis; is that right?
4    A.   No.  I'm compensated based on a fee-for-service
5  arrangement.
6             And let me retract that.  You're referring
7  to the current agreement?
8    Q.   I'm referring to Exhibit 18, the administrative
9  services agreement.
10   A.   I apologize.  That is an hourly, that's correct.
11   Q.   And what's the hourly rate on that?
12   A.   $150 an hour.
13   Q.   And that's a maximum of 20 hours a month; right?
14   A.   I believe that's correct.
15   Q.   Yeah, it's on page 4, Section 2, 2(a).
16   A.   Thank you.  Correct.
17   Q.   And as far as the $90 per unit in the agreement
18 for your services -- physician services, is it still $90,
19 or has that been increased?
20   A.   It's still $90.
21   Q.   On page 2 of the second agreement, the
22 administrative services agreement, in subparagraph (f)
23 there --
24            MR. CHRISTNER:  You're talking about
25 Exhibit 17; right?

```
 1  custody, provided consent for the medication."
 2                   Was that a written consent?
 3       A.    That would have been written consent, yes.
 4       Q.    And this was a written consent that DCS had
 5  provided you to administer Haldol?
 6              MR. CHRISTNER:  Form and foundation.
 7              THE WITNESS:  Can you -- I'm not sure what
 8  you're asking in that question.
 9  BY MR. CONNELLY:
10       Q.    I'm asking if the legal consent that you
11  received from DCS was to change medication from Thorazine
12  to Haldol.
13       A.    So I would have made the recommendation and
14  would have attempted to obtain consent directly.  If that
15  wasn't documented, then the nurses would have obtained
16  consent, which is our protocol, and they would have
17  documented that, verbal -- written consent.
18       Q.    And what's your understanding of DCS's ability
19  to provide consent to the administration of atypical
20  antipsychotic when they have legal custody as opposed to
21  legal guardianship of a child?
22              MS. STATON:  Object to the form, foundation.
23              THE WITNESS:  My understanding at the time
24  was they had the authority to provide consent for
25  treatment, hospitalization, and inherently any medication
```

1     *Q.*    Other than any phone conversations with
2 Christine, did you have any other type of communications
3 in any other form with Christine, the mother?
4     *A.*    No.
5     *Q.*    Did you attend any of the CFTs that were held in
6 this case?
7     *A.*    No.
8     *Q.*    Did you have conversations with the DCS
9 caseworker in this case?
10    *A.*    Not that I recall.
11    *Q.*    And if you had had such conversations, would
12 they be reflected in Exhibit 23?
13    *A.*    Very likely, yes.  That's my general practice,
14 yes.
15    ==*Q.*    And before you administered the Haldol to==
16 ==Brooke, you didn't receive or review any court orders==
17 ==appointing DCS as Brooke's legal guardian; is that true?==
18    ==*A.*    I was not aware of any new information since the==
19 ==time of admission, and my nurses -- our hospital policy is==
20 ==for the nurses to obtain consent -- would have reviewed==
21 ==any pertinent records and court orders.==
22    *Q.*    I appreciate that, but, again, the direct
23 question is:  You yourself did not review any court orders
24 appointing DCS as Brooke's legal guardian; right?
25    *A.*    I do not recall having court orders at my

1  administration of Haldol?
2          MR. CHRISTNER: Form and foundation.
3          THE WITNESS: No, I don't recall.
4  BY MR. CONNELLY:
5      Q. Let's look through a couple of e-mails real
6  quick.
7          (Deposition Exhibit No. 24 was marked for
8          identification by the reporter.)
9  BY MR. CONNELLY:
10     Q. You know who Helen Nagle is; right?
11     A. Yes, I recall Helen Nagle.
12     Q. She was the director of the specialized needs
13 program; right?
14     A. At that time, yes.
15     Q. In that role, was she -- if there's a reference
16 to "medical director" in your notes, would that be a
17 reference to Helen Nagle?
18     A. No, she's not the medical director.
19     Q. Who would that be a reference to?
20     A. Dr. Ghafoor.
21     Q. Okay. And Dr. Ghafoor had treated Brooke on
22 prior admissions; right?
23     A. That's my understanding, yes.
24     Q. So as far as Helen Nagle being the director of
25 the specialized needs program, where does that put her in

1 I don't see the actual document of that consultation
2 before or after that in this particular printout.
3     Q.   Look at your record for 9/25, 252 and 253.  You
4 see that on 253 at the top you say:  "Consult with
5 collateral sources, doctor to doctor, family case
6 manager," et cetera?  Do you know what that's a reference
7 to?
8     A.   Can you point me --
9     Q.   253, the very first line at the top.
10     A.   Oh, that statement is a template for that
11 particular document.
12     Q.   Okay. I'm sorry.  That's for the text that
13 comes below.
14     A.   Correct.
15     Q.   And then down at the bottom, though, in your
16 plan, number 9:  "Requested consultation with medical
17 director for treatment recommendations."
18         Do you see that?
19     A.   I do.
20     Q.   And that's a reference to a consultation with
21 Dr. Ghafoor?
22     A.   That's correct.
23     Q.   And what did you want to consult with him about
24 regarding treatment recommendations?
25     A.   Exactly as that states.  Based on the parental

1  objection and to treat -- to my treatment plan.  And I
2  believe some of those e-mails just referenced mom
3  requesting a second opinion, if I scanned that information
4  accurately.  So that would have been a response to mom's
5  request as well for a second-opinion consultation.
6      Q.    And then on your next record for 9/26 on the
7  second page, in item number 9 as part of your plan, it
8  says:  "Pending consultation with medical director for
9  treatment recommendations."
10         What does that mean, "Pending consultation"?
11     A.    We were waiting for Dr. Ghafoor to have the
12 chance to complete his evaluation and consultation.
13     Q.    Okay.  So you had been -- between the 25th and
14 the 26th, you had reached out to Dr. Ghafoor and asked him
15 to consult with you on a treatment recommendation; right?
16     A.    That's correct.
17     Q.    And if I understand, what you said in response
18 to what the pending consultation means was that
19 Dr. Ghafoor was going to examine Brooke and the medical
20 records and then consult with you?  Is that what you're
21 conveying?
22     A.    That's correct.
23     Q.    And do you know what medical records Dr. Ghafoor
24 would be consulting?
25     A.    I don't know specifically what he reviewed.

```
 1  STATE OF ARIZONA    )
                        ) ss.
 2  COUNTY OF MARICOPA  )

 3

 4          BE IT KNOWN that the foregoing proceedings were
    taken by me, MICHAELA HERMAN DAVIS, a Certified Reporter,
 5  in and for the County of Maricopa, State of Arizona; that
    the witness before testifying was duly sworn to testify to
 6  the whole truth; that the questions propounded to the
    witness and the answers of the witness thereto were taken
 7  down by me in shorthand and thereafter reduced to
    typewriting under my direction; that the foregoing pages
 8  are a true and correct transcript of all proceedings had,
    all done to the best of my skill and ability.
 9
            I CERTIFY that I am in no way related to any of
10  the parties hereto, nor am I in any way interested in the
    outcome hereof.
11
            [X] Review and signature was requested.
12          [ ] Review and signature was not requested.
            [ ] Review and signature was waived.
13

14          I FURTHER CERTIFY that I have complied with the
    ethical obligations set forth in ACJA 7-206(F)(3) and
15  ACJA 7-206(J)(1)(g)(1) and (2). Dated at Phoenix, Arizona,
    this 27th day of June, 2023.
16
```



```
19          Michaela H. Davis, RPR, CRR, CRC, CLR
                     Arizona CR No. 50574
20

21
            I CERTIFY that Carrie Reporting, LLC, has
22  complied with the ethical obligations set forth in
    ACJA 7-206.  Dated at Phoenix, Arizona, this _____ day of
23  _____, 2023.

24
    _____
25                Carrie Reporting, LLC
                  Arizona RRF No. R1064
```

CARRIE REPORTING, LLC - Certified Reporters
(480) 429-7573    carrie@carriereporting.com