# EXHIBIT C

Andrew B. Clark, M.D.
10 Concord Ave
Cambridge, MA 02138
Ph: 801-960-2138
Fax: 617-830-7281

**Psychiatric Evaluation Report**
Date: December 9, 2023

Re:  Brooke Scianna
DOB 7/14/2001

In the Matter of *Scianna v. State of Arizona, et al.*, 2:21-CV-01444-DJH.

**Introduction:**

   Brooke Scianna is a now 22-year-old woman with a diagnosis of Autism Spectrum Disorder and a history of aggressive and self-injurious behaviors. Brooke was removed from her mother's care in June of 2018 by the Arizona Department of Child Safety ("DCS"), before being returned to her mother in November 2018.  Brooke has been hospitalized for behavioral difficulties on several occasions, including once at the Aurora Behavioral Health Systems Special Needs Unit, Tempe, AZ  from August 25, 2018 through November 21, 2018. During this time, Brooke was treated with several different psychiatric medications, including the antipsychotic Haldol at a dose of up to 12.5 mg a day. I was asked by Attorneys Thomas A. Connelly and DeeAnn Gillespie Strub to review medical records, interview Brooke's mother, and write a report in regard to the psychological impact on Brooke of the separation from her mother during this time, as well as the psychiatric care that she received during this hospitalization.

   I am a licensed physician in the Commonwealth of Massachusetts, and am Board Certified in Psychiatry as well as Child and Adolescent Psychiatry and Forensic Psychiatry. My CV is attached. The opinions presented here are offered within a reasonable degree of medical certainty.  The opinions in this report are based on the information available at the time of the evaluation, and are subject to modification in the event that new information is received.

Scianna v State of Arizona

**Sources of Information:**

The following interviews were conducted as part of this evaluation:
1) Remote interviews with Ms. Christine Webster (nee Scianna) on 4/13/2023 for 70 minutes, 4/20/2023 for 95 minutes, and on 11/26/23 for 70 minutes.

The following documents were reviewed as part of this evaluation:
1) Medical records for Brooke from Aurora Behavioral Health.
2) Medical records for Brooke from St. Luke's Behavioral Health.
3) Medical records for Brooke from the Phoenix Children's Hospital.
4) Medical records for Brooke from Banner Health.
5) Deposition of Dr. Krzysztof Mlak, 6/8/2023.
6) Various emails between Ms. Scianna and staff at the Aurora Behavioral Health, 2018.

**Interview with Ms. Scianna:**

Current Living Situation:

Ms. Scianna reported that she lived with her partner Daniel, his two children ages 13 and 14, and Brooke. She and Daniel had been involved for about 8 years, and they moved in together in March of 2020, just at the start of the Covid pandemic. Prior to that time, Ms. Scianna and Brooke lived on their own.

Brooke's Exposure to Antipsychotic Medication:

Ms. Scianna provided the following history in regard to Brooke's exposure to antipsychotic medication prior to and during her Aurora Behavioral Health admission in the fall of 2018:

Brooke was first put on antipsychotic medication when she was 11 years of age (around 2012). At that time, her problematic behaviors were minimal, but she didn't understand boundaries, she would become agitated at times, and at times she would bite herself and bang her head. Brooke's pediatrician prescribed Risperdal for her, and it seemed to help for the first three to six months. However, particularly after the dose was raised, Brooke developed a "glassy look" on her face, as if she were not there. She could not focus, no longer expressed joy or happiness, and did not appear to be emotionally invested. In addition, she walked with a stiff gait, her appetite increased greatly, and she gained weight[1]. Over time she became much more violent and began to have melt downs. After the doctor stopped the Risperdal, Brooke "came back to life", and regained her animation and expressiveness.

---

[1] All of these are common side effects of Risperdal, particularly at higher doses.

2

Once Brooke reached puberty, her aggressive behaviors worsened, said Ms. Scianna. Brooke was brought to the St. Luke's Emergency Department in March of 2016 due to extreme agitation, was hospitalized there, and was placed on the antipsychotic Seroquel at that time. Ms. Scianna noted that she often did not realize when giving informed consent that the medications being discussed were in fact antipsychotics (noting in particular that Abilify was advertised on television for depression). Ms. Scianna reported that Brooke had a greatly increased appetite when on this medication, gained weight, and had a personality change. Brooke was on Seroquel from March 2016 to October 2016, and she gained 40 pounds around that time[2]. Ms. Scianna also reported that Brooke began to walk stiffly and slowly in this time, was up a great deal at night, and had a glassy and vacant look on her face. Her body would shake badly at times, as if she were shivering from the cold. She was stiff and shaky, and food would fall out of her mouth while chewing. The hospital added Cogentin at some point to try to help with these side effects. Brooke appeared to her mother as if she were drugged, and did not seem able to comprehend things[3]. Ms. Scianna noted that the medications did seem to help with Brooke's agitation at first, but then lost their efficacy in that regard over time. When the primary care physician stopped the Seroquel, Brooke "came back to life", and was again able to laugh and express joy.

From October 2016 through December 2017, said Ms. Scianna, Brooke was not on any antipsychotic medication, but rather received medical marijuana with very good results. However, Ms. Scianna had to stop this treatment as she was unable to send the marijuana product with Brooke when Brooke spent weekends at her father's house.

Brooke was hospitalized at Banner in December 2017 after an incident of aggression at her father's house, and was again placed on antipsychotic medication. Ms. Scianna noted that she was opposed to the use of antipsychotic medications in general by this point in time, and that there were times when the father gave informed consent for such medication.[4]

Ms. Scianna reported that Brooke was treated with the antipsychotic Abilify in early 2018, through a Nurse Practitioner at the Arizona Children's Association. She had significant behavioral problems in this time, perhaps associated with her being constipated[5]. The mother reported that Brooke slept poorly, looked miserable, stared off into space, would shake at times, would fly into rages, and would try to bite herself. In addition, Brooke began to bite at her knees and wrists. The Abilify was stopped, and these issues were much improved when Brooke was not on antipsychotics.

---

[2] St. Luke's records indicate that Brooke was also treated with Zyprexa and Geodon during this time. Zyprexa is particularly understood to lead to substantial weight gain.
[3] All of these symptoms are common side effects of antipsychotic medications.
[4] Banner records from December 2017 support this assertion.
[5] Constipation is a known side effect of Abilify and other antipsychotics.

Ms. Scianna reported that when Brooke was hospitalized at Aurora in the spring of 2018, she was on no antipsychotic medication and did quite well; indeed, she was much better off of such medication than on it.

Ms. Scianna reported that during Brooke's Aurora hospitalization in the fall of 2018, she only found out that Brooke was on Haldol after the fact, being informed of this at a weekly CFT meeting. She felt strongly that Brooke should not be on an antipsychotic of any sort, and was concerned about Haldol in particular because Brooke had been stiff and shaking when on it in the past. Ms. Scianna made concerted efforts to inform DCS, Aurora, and Dr. Mlak of her concerns, but to no avail. At the time, said Ms. Scianna, Brooke looked "terrible" – she could barely move, had a shuffling gait and seemed so unhappy. Aurora staff who had worked with Brooke from the prior hospitalization expressed concern over how she was doing at this time, asking 'what is wrong with her?', and saying that this was the worst that they had ever seen her. Brooke's father also visited once or twice a week, and he also thought that she looked miserable and wasn't herself.

When Ms. Scianna visited, Brooke would grab her hand and take her to the door, trying to get Ms. Scianna to leave with her. Ms. Scianna had visits with Brooke two or three times a week during this hospitalization, driving 50 miles each way from her home, but Brooke would often have "meltdowns" when her mother would try to leave. In time, Brooke stopped protesting her mother's departure, and would just sit passively in a chair as if resigned to the situation. The hospital seemed to blame Brooke's behavior on Daniel, Ms. Scianna's partner.

Ms. Scianna noted that when she finally spoke with Dr. Mlak in late September or early October 2018, he did not seem to take her concerns seriously, including her concerns about Haldol. Ms. Scianna noted that she had never met Dr. Mlak in person at any time, as he never attended the CFT meetings.

Brooke has not been on antipsychotic medication since her discharge from Aurora in late 2018.

During the interview of 11/26/2023, Ms. Scianna noted that Brooke had been changed from the medication Anafranil to Zoloft several months before, as she had gained weight on Anafranil, and she seemed to be responding very well to the new medication regimen. Her OCD behaviors were better, and she was better able to tolerate being out in public.

Mother's Reports Regarding Impact of Separation:

Prior to her removal from the mother's care in 2018, said Ms. Scianna, Brooke had never been separated from her for any appreciable lengths of time. She had been hospitalized on a handful of occasions, for no longer than 3.5 weeks at a time, and during those times the mother would typically visit her about three times a week for 90 minutes or so each time. During the fall 2018 Aurora hospitalization, the hospital set a requirement that Ms. Scianna schedule her visits ahead of time; this requirement made it somewhat more difficult for Ms. Scianna to fit such visits into her schedule, and resulted in her visiting

4

Brooke somewhat less frequently than she had during prior hospitalizations. Prior to the separation, Brooke had typically visited with her father about two weekends a month, although she stopped seeing him in 2021.

Ms. Scianna reported that Brooke had been traumatized by having been handcuffed by police in March of 2016 at the Care & Dignity group home, just prior to her Banner hospitalization. Ever since that time, she has been nervous around police officers, and will tend to hide behind her mother when in the presence of one. Ms. Scianna contrasted this with Brooke's reaction to firefighters, for whom she has no apprehension; fire fighters on two occasions have dealt with Brooke by wrapping her in a large blanket rather than by trying to lay hands on her to restrain her. Ms. Scianna did not report any other previous traumas for Brooke.

After Brooke was removed from her mother's care and placed in a Care & Dignity group home, Ms. Scianna had scheduled visits with her in public places or at the group home itself two or three times a week, although the group home often cancelled, purportedly due to Brooke's challenging behaviors.

Prior to the separation, said Ms. Scianna, Brooke had tolerated her mother going out with no difficulties, and was used to having caregivers, so that the mother could even go away for the weekend. After Brooke's return in late 2018, however, Brooke would get very upset when her mother would try to leave the house, which was an entirely new behavior. Upon discovering that her mother had surreptitiously left the house, Brooke would often "freak out", and run around the house hitting and punching walls. Brooke would pay careful attention to the placement of her mother's keys, phone, and purse, and would protest when her mother picked those up. At one point, Ms. Scianna bought a second purse in order to avoid the battle when she picked her own purse up in anticipation of going out. Ms. Scianna has worked closely with a behavioral coach with the goal of helping Brooke tolerate her mother leaving the house, and in August of 2022, Brooke was able to do that for the first time. At the time of the first interview, Brooke was able to tolerate her mother leaving the house for a few hours; by the time of the final interview, Brooke could tolerate her mother being away for a few hours, but would go upstairs to her room if her mother was not there.

Ms. Scianna noted that after Brooke returned home from the hospital in November 2018, Brooke developed a new behavior of coming into her mother's bedroom to check on her several times a night, especially in the first month or two after her return. Ms. Scianna reported that prior to the separation, Brooke had had some intermittent sleep difficulties, but they became much more pronounced and common following the separation. Brooke now insists on falling asleep with the lights on, will get up every night to check on the dog, and will often sleep fitfully throughout the night.

Ms. Scianna noted that Brooke's OCD (Obsessive Compulsive Disorder) was much worse than her baseline after her Aurora hospitalization. She would need to line things up (such as sauces in the kitchen placed in alphabetical order, or in color groups), and she

would need to put things away in a very particular manner prior to them leaving the house (so that it might take them 15 minutes to get out the door).

Asked about triggers for Brooke, Ms. Scianna recounted that on one occasion in 2020, Brooke had a doctor's appointment, and was quite stressed about it ahead of time. The doctor talked with the mother, in front of Brooke, about the possibility of placing her in a group home, and this made Brooke clearly stressed. Brooke had melt downs every night for a week after this incident. Similarly, at a later psychiatry virtual visit, the issue of group homes was brought up and Brooke "flipped out" for days afterward.

Ms. Scianna noted that when Brooke was in the Care & Dignity group home, she had visits with her twice a week, typically at the Arrowhead Mall, which was near the group home. Now, Brooke becomes upset when they drive by the mall. Similarly, Ms. Scianna has a friend who lives in a house that resembles the house the Care & Dignity group home Brooke occupied; during the first year following her return, when they went to visit the friend, Brooke would refuse to get out of the car and go into the home, appearing very stressed in the process.

Prior to the separation, said Ms. Scianna, she and Brooke would go on 'field trips' once or twice a week, to places such as Caregiver's Park, the pool in the summer, or to a fast food place to get French fries. After her return, however, Brooke would melt down when she tried to take her on field trips, and so they stopped doing so. By November of 2023, Brooke was better able to tolerate such trips. Brooke continues to have a difficult time when they visit a hospital for any reason.

Before the removal, said Ms. Scianna, Brooke had always looked to water to soother her, and she would typically take a bath in the morning and another in the evening, but no more than two or three a day. For the first six months after her return, however, she would take a bath or a shower at least 10 times a day, and often closer to 16 times a day, and for a year and a half after the separation, she showered around eight or ten times a day.

Brooke seemed to be more emotionally on edge after the separation. Previously, Ms. Scianna and Brooke's dad could argue in front of her, and Brooke would not be bothered by it, but following the separation, Brooke would become upset if there was arguing in the house. Ms. Scianna also noted that Brooke was more angry with her after the separation, and the mother was a constant target of Brooke's anger in a way that she had not been before.

Ms. Scianna reported that she had seen an increase in Brooke's reactivity and startle following the separation, so that Brooke would jump and startle in response to a loud noise, such as a door slamming. In addition, Brooke would tend to panic in new situations, such as when a new OT person would start with them. On such occasions, Brooke would panic, and then engage in more obsessive behaviors.

Following the separation, said Ms. Scianna, Brooke, who had always liked food, developed a compulsion around eating, at times eating so much that she would then vomit. The mother would have to hide food from her, which at times resulted in Brooke becoming aggressive with her. Similarly, Brooke began to horde food in her room, which she had never done before; this behavior persisted for up to two years after the separation. By November of 2023, and especially since starting on Zoloft, Brooke no longer eats compulsively. Similarly, Brooke began to drink water compulsively, and the mother would need to work to keep her away from water. At the time of this interview, the compulsive water drinking was better, as they had worked with a behavioral specialist around that behavior.

Ms. Scianna described Brooke as often angry following the reunification, with frequent meltdowns. She took a large number of showers, bit herself often, and engaged in a number of self-soothing behaviors. She was more easily frustrated, and became covered with scars due to her biting herself.

Ms. Scianna noted that Brooke had lost a number of skills during the separation, such as cutting along a dotted line, or using a computer mouse. She lost some ability to use signs or gestures, which she had been doing prior to the separation, and was less verbal, so that overall she was much more difficult to communicate with.

Ever since the separation, said Ms. Scianna, Brooke has engaged in a number of somewhat odd behaviors. These include throwing towels onto the floor, throwing rolls of toilet paper into the garbage, and putting on dirty clothes. She has also become more clingy with her mother, and will often insist on her mother being the one to help her.

Recent Developments:

Following the Aurora hospitalization, Brooke began seeing Dr. Fryer, a developmental pediatric neurologist, and receiving her care at the Autism Center at Phoenix Children's Hospital. Brooke has been treated with the medications memantine and propranolol, which have been helpful for her, particularly for her anxiety.

==At the November 2023 interview, Ms. Scianna reported that Brooke was doing better in terms of communication. She continues to become upset and have behavior difficulties if someone mentions Aurora or mentions the court case, and she gets upset when they drive to the CFSS office near where the Aurora unit used to be.==

In regard to her current services, Ms. Scianna noted that Brooke receives behavioral coaching two days a week for 2 hours at a time (recently reduced from three days a week for 3 or 4 hours at a time). She also gets Occupational Therapy and Speech Therapy for one hour each week. She sees a primary care physician, a pediatric gynecologist, and a gastrointestinal doctor.

**Review of Records:**

St. Luke's Behavioral Health:

Brooke was admitted to St. Luke's Behavioral Health from 3/18/2016 through 3/29/2016 due to severe aggression at home. She was given Zyprexa in the emergency room, and then Haldol once in the hospital due to severe agitation. She was started on Zyprexa 15 mg daily, but was noted to remain agitated nevertheless, although she eventually calmed with the addition of Zoloft. She was said to smile when told she would be going home. She was discharged on Zyprexa 15 mg daily along with Zoloft. She was given a discharge diagnosis of Disruptive Mood Dysregulation Disorder, as well as Autism Spectrum Disorder.

Brooke was admitted to St. Luke's Behavioral Health from 5/5/2016 through 6/1/2016, with a presentation similar to what she had had in March of that year. Her medications from her previous St. Luke's admission had been continued on an outpatient basis. The clinicians determined that Zyprexa had not been effective. She was said to be 'allergic' to Risperidone as it led to increased agitation. Multiple medication trials were employed, including the antipsychotic Geodon (which resulted in increased agitation and extra pyramidal symptoms, danger to self and others, as well as not sleeping for three or four days), then Seroquel up to 400 mg each night. She was discharged on Seroquel and Klonopin. She was given a discharge diagnosis of Disruptive Mood Dysregulation Disorder, as well as Autism Spectrum Disorder.

Brooke was admitted to St. Luke's from 12/27/2017 through 1/19/2018. At the initial psychiatric evaluation of 12/28/2017 it was noted that she had transferred from the Banner emergency room where she had presented on 12/22/2017. The mother provided the report that Brooke had not previously responded well to Seroquel, Haldol or Risperdal, and was reported to state that "none of the psychotropic agents really work…". The father was noted to report that Brooke had been decompensating without psychotropic agents. Brooke was treated with Geodon 80 mg twice a day.

Banner Health:

Brooke was seen at the Banner Health Emergency Department on 3/9/2016 due to increased agitation. She was given Haldol and subsequently fell asleep.

Brooke was seen at Banner Health Emergency Department on 8/28/2017 due to increased agitation. She was said to have been in the ED twice before in the preceding two days. Brooke was taking only cannabis and oral contraceptives at this time. She was subsequently discharged to home. The intake note states, "Mother reiterated that pt. does not do well on psychotropic medications….". She was discharged home with her mother.

Brooke was seen at Banner Health on 12/22/2017 for increased agitation. She was described as agitated in the emergency room as well. The note says, "Mother would like

to see pt. get stabilized on psychiatric medication but reported pt. does not respond well to Seroquel, Haldol or Risperdal." The clinician obtained consent from the father for Geodon.

Brooke had been admitted to Banner Health inpatient unit from 4/23/2018 through 4/30/2018. She had been initially brought to the emergency department on 4/20/2108 for agitation and aggressive behavior. She was moved to the behavioral health unit, required restraints, and subsequently her CPK levels rose to 6666; it was determined that she required inpatient admission for rhabdomyolysis. At that time she was on Zyprexa 10 mg a day, along with clonidine and clomipramine.

Brooke was seen at Banner Health on 3/26/2019 for a fracture of her humerus that occurred after an altercation with staff at school. She was given ketamine by EMS due to aggressive behavior.


Aurora Behavioral Health:

   Records indicated that Brooke had been inpatient at Aurora Behavioral Health from 1/19/2018 through 3/3/2018. She had recently been inpatient at St. Luke's Behavioral Health, but had significant difficulty there including aggression toward others and biting herself. She had been started on the anti-psychotic Geodon, but was noted to be drooling, sticking out her tongue, and unable to communicate; the staff worried that she was having a reaction. It was noted in the initial history and physical consultation with Dr. Soni, in capital letters, "THE PATIENT HAS ALLERGIES TO RISPERDAL WHICH CAUSES A VIOLENT REACTION." The initial psychiatric evaluation by Dr. Ghafoor noted the worsening self-harm and aggression. Brooke had been taking Geodon 40 mg twice a day, which was continued at first.

The Behavioral Interview conducted with the mother at the time of her admission on 1/19/2018 included the mother's report that Brooke had become violent when treated with Risperdal, and that when treated with Seroquel, she engaged in frequent changing of clothes and showering. Dr. Ghafoor noted on 1/25/2018 that he had learned from the mother that Brooke had been experiencing tremors and drooling since starting Geodon at St. Luke's; they agreed that Geodon would be stopped and a trial of Abilify begun. On 1/26/2018, Brooke was started on Abilify 5 mg a day, along with 50 mg of Zoloft. On 2/14/2018, the dose of Abilify was increased to 10 mg a day due to increased mood lability, aggression toward staff, and self-injurious behavior. Brooke was thought to be ready for discharge by 2/14/2018, but her discharge was extended in order to give the mother time to arrange outpatient services. Brooke was discharged on Abilify 5 mg twice a day, Zoloft 50 mg a day, and several other medications. She had been noted to exhibit an increase in aggression, which was thought to be due to hormonal changes during her menstrual cycle, and which was managed by a temporary increase in her dose of Abilify. She was given the discharge diagnoses of Disruptive Mood Dysregulation Disorder and Autism Spectrum Disorder.

Brooke was admitted to the Aurora Behavioral Health inpatient unit from 4/30/2018 to 5/30/2018 due to increased agitation and self-injurious behavior. She had come from Banner Thunderbird, where she had spent 7 days on a medical ward due to rhabdomyolysis. She was said to demonstrate both OCD and sexualized behaviors. The Inpatient Admit Order noted under Allergies and Reaction: Risperdal- Extreme Agitation, and the doctor's order sheets listed Risperdal as an allergy throughout her stay there. She was not treated with any antipsychotic medication, and did well on the unit, utilizing her self-regulation skills. She was discharged on the antidepressant medication Anafranil. She was given the discharge diagnoses of Disruptive Mood Dysregulation Disorder and Autism Spectrum Disorder, as well as Obsessive Compulsive Disorder and Post Traumatic Stress Disorder by history. A functional behavioral assessment was conducted, dated 5/30/2018.

A Crisis Evaluation dated 8/22/2018 indicated that Brooke's behavior in the Care & Dignity group home had been exceptionally challenging, and that she had been seen at Banner Thunderbird three times in the preceding month. The clinician wrote, "Per CPR records, patient was off psychiatric medication for a few years and did well on medical marijuana". The clinician also noted that Brooke had recently been removed from her mother's care; "this was likely a huge adjustment for patient and she is now having daily violent outbursts". Brooke had been removed from her mother's care on 6/22/2018, and was in the custody of DCS. She was not being prescribed any antipsychotic medication at this time.

Brooke was admitted to the Aurora Behavioral Health Inpatient unit on 8/25/2018. She was on a low dose of Thorazine, 25 mg three times a day upon admission, which was continued for a time while inpatient. Dr. Mlak's Psychiatric Evaluation of 8/26/2018 notes that the doctor had tried to contact Ms. Scianna without success[6], and had obtained other information from "staff" and "chart review". A hand written insertion noted the two prior Aurora admissions earlier that year, and "prior medication multiple antipsychotics". He noted that the patient had earlier experienced rhabdomyolysis "attributed to excessive physical restraint". Dr. Mlak's note of 8/27/2018 indicated that he had left two messages for the mother to obtain collateral information, with a note that the plan included an effort to "Clarify current maternal rights and DCS disposition regarding placement". On 8/28/2018, Dr. Mlak's note indicated that "Staff report CFT occurred today and revealed that DCS is likely placing pt back into mother's care following hospitalization."

On 9/7/2018, Dr. Mlak recommended stopping the Thorazine and initiating Haldol 1 mg three times a day for mood instability, as well as a trial of Lithium[7]. Three days later, on 9/10/2018, he doubled the dose of Haldol to 2 mg three times a day. That evening, Brooke was noted to have had severe agitation, poor sleep, tremor and muscle rigidity, so Cogentin was added. On 9/13/2018, the psychiatric progress note indicated that Broke appeared tired and was not engaging in activities as she was sleeping most of the

---

[6] Ms. Scianna denies that she ever received a message from Dr. Mlak in this time.
[7] Lithium was apparently never prescribed.

morning. Haldol was raised again to 2.5 mg in the morning and 5 mg at night. On 9/15/2018, Brooke was noted to be sleeping late into the morning. On 9/18/2018, Dr. Mlak indicated that Brooke remained labile and dysregulated. On 9/21/2018, Brooke was noted to have required a prn dose of Zyprexa due to aggression. On 9/24/2018, Brooke was noted to remain emotionally dysregulated and the Haldol dose was raised to 10 mg total daily. On 9/26/2018, the dose of Haldol was raised yet again to 12.5 mg daily. On 9/27/2018, Dr. Mlak wrote that Brooke had shown "variable progress" and was now at a "therapeutic dose".

Dr. Mlak's Psychiatric Progress Note of 9/28/2018 provides the first documentation of any contact between him and Brooke's mother. Ms. Scianna was reported to have expressed objections to antipsychotic medication, pointing to bad side effects on all of them. At this point, Dr. Mlak had consulted with the medical director and assessed Brooke's response to Haldol as "sub-optimal', and began to wean down the dose. The dose of Haldol was weaned fairly rapidly from that point forward, and Brooke was then treated with the mood stabilizer Trileptal.

Several of the Psychiatric Progress notes during this hospitalization took note of Brooke's agitation when her mother would visit. The doctor wrote on 10/3/2018 that "Discussed need to initiate behavioral training with mother due to her inadvertent perpetuation of pts negative behavioral displays". Dr. Mlak also noted that he would not have a CPK level drawn in spite of the mother's request that he do so. Brooke was entirely off of Haldol by 10/5/2018. Brooke's behavior was described as significantly improved by 10/10/2018, and she continued to show improvement in the subsequent days, especially after she was taken off one to one observation.

A Functional Behavioral Assessment dated 10/18/2018 by Brian Kociszewski noted that at that time Brooke was on Trileptal but not antipsychotics. The staff had removed one to one support (presumably around October 12), which "significantly decreased engagement in repetitive/stereotypical behavior".

Dr. Chafoor conducted a Second Opinion Psychiatric Consultation on Brooke on 9/27/18 and 9/28/2018. The doctor noted the mother's perspective that antipsychotics had consistently increased agitation and psychosis in the past, and that Brooke had previously been tried on Risperdal, Haldol and Seroquel. The doctor concluded, "there is no clear evidence of her current medication regimen being effective. Given the lack of clear therapeutic benefit, having to add another rx for se (EPS), and above all strong parental objection to her being treated with Haldol, I'd suggest that she be taken off of this rx…"

Emails Between Ms. Scianna and Aurora Staff, 8/2019-11/2019:

On 9/13/2023, Ms. Scianna wrote, "I do not understand how Brooke was put on Haldol when it is in her records she had a reaction to this medication at St. Luke's….Brooke has a medical doctor at Aurora who clearly does not know her background and until yesterday, I'd never even spoken to him." On 9/14/2023, Ms. Scianna wrote, "It was part

11

of her records that she not be given Haldol. That's why I'm upset. She should never have been given that drug." Helen Nagle responded, "I will forward your thoughts to Dr. Mlak to add to your conversation with him." On 9/21/2013, Ms. Scianna wrote to complain that Brooke's doctor was ignoring her, and "refuses to take her off Haldol"; she expressed an intent to file a complaint.  She wrote on that same day that she had learned at a CFT that Brooke was still on Haldol. On 9/24/2023, Ms. Scianna wrote, "If there is anything else I can do please tell me. I'm desperate to stop the Haldol and he's only increasing it. That is the worst drug out there…." On 10/1/2023, the mother wrote to ask that Brooke's CK levels be checked.

Phoenix Children's Medical Group:

A physician's consultation note by Dr. Mohan Belthur of Phoenix Children's Hospital on 3/28/2019 noted the mother as reporting that "patient has had paradoxical reactions with antipsychotics and tardive dyskinesia with Haldol". The doctor's assessment was that "One significant challenge in this patient is her severe intolerance to all antipsychotic medications"

 At a Neurology Clinic visit on 5/22/2022, the doctor noted the history that Brooke had been "crazy" on Zyprexa, and was "eating everything", in addition to the assertion that antipsychotics had resulted in tardive dyskinesia and rabdo. The doctor's diagnostic impressions included, "averse [sic] reaction to anti-psychiatric [sic] medication".

Deposition of Dr. Mlak, 6/8/2023:

  Dr. Mlak testified that during the time he treated Brooke at the Aurora inpatient unit in the second half of 2018, he was prescribing Haldol primarily to treat her mood disorder. He noted that the records he would have reviewed as part of his initial assessment would have been emergency room records from Abruzzo Health, as well as prior Aurora admission and crisis intervention records. He noted that he typically attempts to interview the family as a part of his admission protocol, and he believed that in this case he had left a message for Ms. Scianna; he did not recall whether he had ever received a message that she had attempted to reach him. Dr. Mlak further testified that he had not requested a functional behavioral assessment of Brooke at the time of her admission to Aurora, as her behaviors were so severe that such an assessment would not have been reliable or successful. He testified that he did not recall whether he had gathered information from prior treaters, and he did not recall any specific conversations with workers from DCS. It was his understanding, he testified, that DCS had the authority to consent to medication for Brooke. He testified that his first conversation with Ms. Scianna would have been on September 12, 2018, about two and a half weeks after Brooke had been admitted to the unit. He testified that the impetus for his reaching out to Ms. Scianna at that time was a series of emails that he had been informed of between Ms. Scianna and Ms. Helen Nagle. In regard to the information Ms. Scianna relayed to him about Brooke's past reactions to medication, Dr. Mlak testified that he did not consider it to be clinically accurate.

**Conclusions and Opinions:**

Opinions In Regard to Brooke's Psychiatric Treatment at Aurora Behavioral Health:

When Brooke Scianna was admitted to the Aurora Behavioral Health inpatient unit on 8/25/2018, she was known to be a young woman with Autism Spectrum Disorder, developmental delay, and a long history of agitated and aggressive behaviors. She had done particularly poorly in the Care & Dignity group home where she had been placed after being removed from her mother's care.

One of the primary responsibilities of the attending physician in caring for a patient on an inpatient psychiatric unit is developing an effective medication regimen. Typically, this involves gathering a comprehensive history of the presenting complaint, as well as of any prior medication trials and their effects. This may be a relatively simple task for some patients with minimal past history, but a much more complex one in patients with a history as lengthy as Brooke's. In this case as well, Brooke's inability to provide a history herself rendered the other sources of information, such as past medical records and the mother's report, especially valuable. Clinicians who work with small children or individuals with developmental delay appreciate that observations by the primary caregiver can be exceptionally valuable, as they are the individuals who know the patient best. In addition, such individuals can help fill in the gaps in the available medical record, providing nuance and detail that is often of critical importance. It is striking, therefore, that Dr. Mlak apparently made minimal or no effort to interview Ms. Scianna as part of the admission process; in failing to do so, the history he gathered was deeply impoverished and inadequate. Further, it is not at all clear what prior medical records Dr. Mlak reviewed, if any, as part of the admission, and there is no indication in the records from this admission that he made any efforts to seek information from other facilities or providers.

In selecting the choice of psychiatric medication to prescribe for an individual, and even whether or not to prescribe any medication, the past history of psychiatric medication is an essential component of adequate information gathering. Given the high degree of individual variability in response to medication, the past history is typically the single most important source of information available to a psychiatrist. It is essential, in my opinion, to learn which medications have been tried in the past, at what doses, in what combinations, for what duration, and with what results.

Had Dr. Mlak spoken with the mother, he would have learned a great dealt that should, in my opinion, have given him pause before prescribing an antipsychotic medication of any sort. Ms. Scianna reported that while antipsychotic medication often provided some short term benefit in regard to decreased agitation, the side effects that Brooke suffered from them were substantial and disabling- including substantial weight gain, tremors, gait

13

disturbance, sedation, cognitive dulling, and loss of emotional responsiveness. In addition, the benefits of the medications were short lived, and the medications may have contributed to her aggression at times. Dr. Mlak also would have learned that Brooke did well overall for a sustained period of time as on outpatient on no psychiatric medication but just cannabis, and had done very well without antipsychotics while inpatient on that same unit earlier in the year.

Had Dr. Mlak reviewed records from prior medication trials, he would have learned that Brooke had consistently developed severe side effects from trials of antipsychotic medication, and that she had never had a sustained beneficial response, even after trials with several different antipsychotics. This information from the mother and from the medication records, in my opinion, should have raised serious questions as to the advisability of yet another trial of antipsychotics, as well as serious concerns around the risks and side-effects that Brooke would likely be subjected to. At the time of Brooke's hospitalization in the fall of 2018 there were many other medication options available for her treatment besides antipsychotics, and besides Haldol in particular.

Haldol, or haloperidol, is classified as a first generation antipsychotic that was developed in the late 1950s, and primarily used for the treatment of adults with severe mental illness, such as schizophrenia. That entire class of medications, sometimes referred to as 'typical' or 'first generation' antipsychotics, were largely superseded by what are known as the 'second generation' antipsychotics, that were thought to have a more favorable side effect profile. Haldol remains in active use as a form of emergency chemical restraint, primarily in emergency room settings, and it is still used as a regular medication for a small number of individuals with chronic psychotic illness. It's routine use in adolescents is quite rare.

One relevant and authoritative document in regard to this matter is the American Academy of Child and Adolescent Psychiatry "Treatment Recommendations for the Use of Antipsychotics in Aggressive Youth". Among the recommendations, the Guidelines offer the following:

1) Recommendation 1: *For all new cases, clinicians should conduct (or review the results of) comprehensive psychiatric diagnostic interviews with patients and parents/guardians before prescribing, changing or discontinuing medication.*
2) Recommendation 4: *Use appropriate treatment for primary disorders as a first line treatment.* In this instance, the recommendations suggest using a mood stabilizer rather than an antipsychotic to address mood instability.[8]
3) Recommendation 5: *Use an Atypical Antipsychotic First Rather than a Typical Antipsychotic to Treat Aggression*. The recommendation explains that the atypical antipsychotics have a safer acute side effect profile than the traditional antipsychotics, with a lower risk of tardive dyskinesia, neuroleptic malignant syndrome, and extrapyramidal symptoms.

---

[8] After Brooke was taken off of Haldol, she was placed on the mood stabilizer Trileptal, and apparently did quite well.

14

4) Recommendation 6: *Use a conservative dosing strategy*. The recommendation states that physicians should "start low, go slow, taper slow". Of note, the influential document "Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health (6th edition), suggests an FDA approved maximum Haldol dose for children and adolescents of 6 mg a day for severely disturbed children, and 0.075 mg/kg/day for severe behavioral problems (approximately 4 mg for Brooke). Dr. Mlak had Brook taking 6 mg a day within 3 days of starting the medication, and then at 12.5 mg a day three weeks later.

In my opinion, Dr. Mlak violated all four of these precepts in his treatment of Brooke during the fall of 2018.

In sum, it is my opinion that Dr. Mlak's treatment of Brooke during her Aurora hospitalization the fall of 2018 fell below the standard of care in that he failed to obtain an adequate history around Brooke's prior psychiatric treatment prior to prescribing her Haldol, and failed to take account of Ms. Scianna's experience or concerns in that regard.

As a result of Brooke being unsuccessfully treated with Haldol over the course of approximately four weeks in September and October of 2023, she was unnecessarily exposed to a range of side effects and risks, and her hospital course was unnecessarily prolonged for several weeks. While her five prior hospitalizations had ranged in duration from two to six weeks, this hospitalization lasted around 12 weeks.

Considerations in Regard to Adequate vs. Major Medical Treatment:

The overuse of antipsychotic medication for children in foster care has been of great concern to both clinicians and policy makers for several years. This is due in part to a concern that these medications are being used simply as 'chemical restraints' – an easy way to suppress behaviors that would be more effectively managed by behavioral and psychosocial interventions. In addition, however, these medications carry risks and side effects that are more widespread and dangerous than any other class of medications typically used in child psychiatry. For Haldol in particular, the risks and side effects include but are not limited to extra-pyramidal symptoms (movement disorders such as parkinsonism, akathisia and dystonia), tardive dyskinesia (permanent, disfiguring motor dyscontrol manifesting as writhing contortions of the face and trunk), cognitive dulling and sedation, neuroleptic malignant syndrome (potentially fatal), cardiac conduction abnormalities, and sexual dysfunction. In addition, at medium to high doses, medications like Haldol and other antipsychotics can leave an individual in a drugged state, too stuporous to make use of behavioral or psychosocial interventions, and with their personality largely suppressed. In some states, such as Massachusetts, antipsychotics are accorded special status, and prescribing antipsychotic medications to youths in foster care is considered "extraordinary treatment", which requires a judicial hearing and court order. This is in part due to the fact that the informed consent process for children in state custody is often somewhat cursory.

Antipsychotics such as Haldol are commonly used and considered effective in emergency situations when safety is a paramount concern. In addition, low doses of second generation antipsychotics are sometimes used in adolescents with mood difficulties and agitation, and sometimes used in individuals with developmental delay and aggressive or self-injurious behavior. In those non-emergent situations, however, the informed consent process with parents and guardian is typically a complex discussion, as the risks involved are so serious and manifold. No parent, in my experience, makes the decision to start their child on antipsychotic medication without a great deal of trepidation and concern. In this particular situation regarding Brooke Scianna, the use of very aggressive doses of a 'first generation' antipsychotic in a non-verbal adolescent raises the degree of risk involved quite substantially.

In sum, the decision to use a medication such as Haldol for Brooke Scianna in September 2018, at the doses it was prescribed, carried with it substantial risks for a wide range of possible serious side effects. Although all medications carry some risk, this particular treatment stands out, in my opinion, for exposing an adolescent to a greater risk than almost any other medication choice available.[9] Furthermore, the decision to administer Haldol to Brooke Scianna was not made under urgent circumstances but was taken only after she had been hospitalized for almost two weeks.

Considerations In Regard to Mother's Interactions with Brooke:

Aurora Behavioral Health inpatient records offer several notations regarding Brooke's distress when her mother or mother's partner visited, and directly indict the mother for encouraging Brooke's maladaptive behavior, although there is no indication in the records that the mother's behavior was in any way inappropriate. It is striking to me that the Aurora staff apparently never considered the possibility that Brooke missed her mother, and was simply upset when her mother left her at the end of the visits. Had this been a pediatric inpatient unit, and the patient a four year old who became distraught when their parent left them alone, it is hard to imagine that clinicians would blame the parent for their child's upset. In this case, it would seem, Aurora staff apparently did not consider Brooke capable of forming a strong human attachment, or capable of feeling bereft when left alone.

Considerations and Opinions in Regard to Care & Dignity Group Home Placement:

Brooke Scianna was placed into a Care & Dignity group home upon removal from her mother's care in June of 2018, remaining there until her hospitalization at Aurora in August of that year. Records from her stay there were not available at the time of this report. Given Brooke's underlying disability and diagnoses, her ongoing behavioral

---

[9] The only medication used in psychiatry with a higher degree of risk, in my opinion, would be Clozaril, an antipsychotic which is tightly regulated through use of a national registry and mandatory monitoring.

difficulties, and the likely emotional upset associated with her removal from her mother's care, Brooke likely posed a significant challenge to the group home in regard to her management and care.

In my opinion, the minimal qualifications for a group home caring for a child such as Brooke at that time would include:
1) Capacity for around the clock close supervision.
2) Staffing numbers adequate to provide one to one, or several to one coverage of Brooke when necessary.
3) Staff well trained in working with individuals with Autism and Intellectual Disability.
4) A comprehensive and individualized behavioral plan for Brooke, developed by a professional with expertise in Applied Behavioral Analysis, and modified as necessary on an ongoing basis.
5) Professional oversight and management of Brooke's medical and psychiatric needs, including taking her to routine appointments, as well as administering medication on site.

Opinions in Regard to the Impact of Separation On Brooke Scianna:

Brooke Scianna was removed from her mother's care on June 22, 2018, and was returned on November 21, 2018. During this time, her mother had only limited contact with her, and we do not know what Brooke herself understood about the situation. In this context, Brooke's behavior appears to have deteriorated significantly, with one clinician at the crisis center writing in August of that year that Brooke's removal from her mother's care was "likely a huge adjustment for patient and she is now having daily violent outbursts".

There is no reason to think, in my opinion, that children with Autism Spectrum Disorder or Intellectual Disability are not capable of forming strong attachments by virtue of their disability. Indeed, their limited ability to communicate, self-advocate, or manage their emotions may well leave many such children at an even greater risk of behavioral decompensation in the setting of separation from primary attachment figures. It seems quite possible, if not likely, that a child such as Brooke would find such a prolonged separation to be psychologically traumatic and possibly terrifying, and would have a very difficult time understanding or coping with those circumstances.

Ms. Scianna's reports of Brooke's behaviors following their reunification in late 2018 reflect, in my opinion, a child who had been severely traumatized and emotionally damaged by the experience. Brooke, for example, had a very difficult time in tolerating separation from her mother after the reunification, and would protest when her mother would attempt to leave the house, and would check in on her several times each night. She began to engage in a number of behaviors associated with severe stress, such as hoarding food, compulsively eating and drinking, engaging in obsessive compulsive behaviors, and showering multiple times a day. She was also more emotionally fragile

following the separation, often melting down, becoming angry or self-injurious. She showed signs of regression (commonly seen in children under severe stress or trauma), such as losing communication and fine motor capabilities. Although it is not possible to make an explicit diagnosis of Posttraumatic Stress Disorder in an individual with such limited abilities to communicate their internal states, Brooke exhibited clear Posttraumatic Symptoms of distress in response to reminders of the separation (such as driving near former visitation sites, or hearing a doctor raise the question of group home placement), as well as an increased startle response. Although some of these symptoms have abated or resolved in the intervening five years since the separation, many still remain to this day.

   As a result of this experience, in my opinion, Brooke currently meets criteria for the diagnosis of Other Specified Trauma and Stressor-related Disorder, in addition to her long standing diagnosis of Autism Spectrum Disorder.

   Functionally, the psychological impact of Brooke's separation from the mother has been twofold. For one, it significantly impacted, and continues to impact, her functioning on a day to day basis, limiting her abilities and constricting her opportunities. Secondly, it leaves Brooke much more vulnerable to subsequent traumatic experiences, and particularly to future experiences of separation from her mother. She has lost a significant degree of resilience in this process, and will likely be less able to manage future stressors.

Opinions and Considerations in Regard to Future Needs:

   Brooke's needs going forward include ongoing regular behavioral management (to work both with Brooke and her caregivers), specialty services, such as ongoing occupational therapy and speech therapy, and ongoing medical care. She will need some sort of structured day program for socialization and skill development. Most importantly, Brooke requires around the clock supervision and support; although her mother is currently providing that for her, there may come a time when she is not capable of doing so, and at that time, Brooke will need dedicated, skilled, reliable and caring individuals who can provide for her in that way.

Andrew Clark, M. D.
Board Certified, Child and Adolescent Psychiatry