Vincent J. Montell (Bar No. 014236)
Dustin A. Christner (Bar No. 019707)
QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
8800 E. Raintree Drive, Suite 100
Scottsdale, Arizona 85260
Telephone: (602) 954-5605
Facsimile: (602) 954-5606
vmontell@qpwblaw.com
dustin.christner@qpwblaw.com

*Attorneys for Defendant Krzystztof Mlak, MD*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Tina Canale, individually and as an employee with the State of Arizona Department of Child Safety; Melissa Courtright, individually and as an employee with the State of Arizona Department of Child Safety, and Barry Courtright, her spouse; Nicholas Long, individually and as an employee with the State of Arizona Department of Child Safety; Gregory McKay, as former Director, Arizona Department of Child Safety; Michael Faust, as Director, Arizona Department of Child Safety; Aurora Behavioral Healthcare-Tempe, LLC, an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Krzystztof Mlak, individually and as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and Jane Doe Mlak, his spouse; Kattia Luevano, individually as an employee with | CASE NO. 2:21-cv-01444-DJH<br><br>**DEFENDANT KRZYSTZTOF MLAK, MD'S REPLY IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**<br><br>The Hon. Judge Diane J. Humetewa<br><br>**ORAL ARGUMENT REQUESTED** |

Case 2:21-cv-01444-DJH   Document 162   Filed 08/16/24   Page 2 of 13

| | |
|---|---|
| 1 | Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Luevano, her spouse; Helen Nagle, individually as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and John Doe Nagle, her spouse; Care and Dignity Services, LLC, an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; John and Jane Does 2-6; and Black Entities 1-5. |
| | Defendants. |

Defendant Krzystztof Mlak, M.D. ("Dr. Mlak"), by and through undersigned counsel, files this Reply in Support of his Motion for Summary Judgment on claims Fifteen, Twenty, Twenty-One, and Twenty-Three. This Reply is supported by the following Memorandum of Points and Authorities.

### MEMORANDUM OF POINTS AND AUTHORITIES

**I.  LEGAL ARGUMENT**

**A.  Medical Malpractice – Claims Twenty and Twenty-Three**

**1.  *Plaintiffs Do Not Create a Genuine Issue of Material Fact Regarding Whether Dr. Mlak's Decision to Administer Haldol to Brooke Complied with the Standard of Care (Reply to Part A.1.)***

The Court already determined that claims Twenty and Twenty-Three set out separate statements of medical malpractice but fall under the same cause of action under Arizona's Medical Malpractice Act. [**Doc. 74**, at 7:9–8:8] A medical malpractice action requires proof of the existence of a duty, a breach of that duty, causation, and damages. *Gipson v. Kasey*, 214 Ariz. 141, 143, ¶ 9 (2007) (citing *Ontiveros v. Borak*, 136 Ariz. 500, 504 (1983). *See also Seisinger v. Seigel*, 220 Ariz. 85, 94, ¶ 32 (2009). Expert testimony is required to establish the duty, the breach of that duty, and causation. A.R.S. § 12–563; *Seisinger*, 220 Ariz. at 94, ¶ 32 (the standard of care must be established by expert medical testimony); *Barrett v. Harris*, 207 Ariz. 374, 378, ¶ 12 (Ct. App. 2004) (the "causal connection between an act or omission and the ultimate injury" must be established by expert medical testimony).

Quintairos, Prieto, Wood & Boyer, P.A.                2

Plaintiffs' standard of care expert against Dr. Mlak is Andrew Clark, M.D. [**Ex. 47**, at pp. 1, 13–15] As Plaintiffs correctly identify, Dr. Clark holds the following opinion:

> In sum, it is my opinion that Dr. Mlak's treatment of Brooke during her Aurora hospitalization in the fall of 2018 fell below the standard of care in that he failed to obtain an adequate history around Brooke's prior psychiatric treatment prior to prescribing her Haldol, and failed to take account of Ms. Scianna's experience or concerns in that regard.

[**Doc. 159**, at 16:21–24] As Plaintiffs further correctly identify, Dr. Clark testified in support of his opinion that: (1) "Had Dr. Mlak spoken with the mother, he would have learned a great deal that should, in my opinion, have given him pause before prescribing an antipsychotic medication of any sort;" and (2) "Had Dr. Mlak reviewed records from prior medication trials, he would have learned that Brooke had consistently developed severe side effects from trials of antipsychotic medication, and that she had never had a sustained beneficial response, even after trials with several different antipsychotics." [**Doc. 159**, at 15:7–19]

In their Response, Plaintiffs unnecessarily recite the history of Haldol, its risks and potential side effects, and prescribing guidelines. [**Doc. 159**, 14:3–16:21] This information is entirely untethered to Dr. Clark's opinion that Dr. Mlak breached the standard of care by failing to speak with Christine and by failing to review Brooke's medical records. Dr. Clark never testified that it would have been a breach of the standard of care had Dr. Mlak spoken to Christine and/or reviewed Brooke's medical records and still chose to administer Haldol to Brooke—and when Dr. Clark testified to this opinion, he had the benefit of knowing what Christine would have told Dr. Mlak and what Brooke's medical records contained. [**Ex. 48**, at 55:6–18] Rather, Dr. Clark admitted it was not necessarily below the standard of care for Dr. Mlak to prescribe Haldol to a patient like Brooke, and testified it was <u>not</u> below the standard of care for Dr. Mlak to administer Haldol to Brooke under the circumstances and information available to him. [**Ex. 48**, at 60:18–62:1; 116:5–117:7] Dr. Clark further affirmed that to a reasonable degree of medical certainty, he did not develop a treatment plan for Brooke that would not have included Haldol. [**Ex. 48**, at 73:4–8]

Dr. Clark's only standard of care opinion against Dr. Mlak is his failure to speak to Christine and his failure to review Brooke's medical records. Yet Dr. Mlak identified all his efforts to speak with Christine and obtain Brooke's medical history. [**Doc. 86**, at 23:24–24:10] Because Plaintiffs fail to identify any refuting evidence to create any genuine issue of material fact regarding Dr. Mlak's alleged breach of the standard of care, he is entitled to summary judgment on claims Twenty and Twenty-Three.

### 2. *Plaintiffs Do Not Allege and Do Not Have Facts to Support a Lack of Informed Consent Claim (Reply to Part A.2.a.)*

Arizona recognizes two distinct theories of liability when a physician provides unauthorized medical treatment to a patient: "lack of consent," and "lack of informed consent." *Duncan v. Scottsdale Med. Imaging, LTD*, 205 Ariz. 306, 309–10 (2003). "Lack of consent" claims involve "the doctor's failure to operate within the limits of the patient's consent" and must be brought as battery actions. *Id*. at 310. "Lack of informed consent" claims involve "the doctor's' obligation to provide information" and must be brought as negligence actions. *Id*.

Claims Twenty and Twenty-Three are plead in negligence, so neither is nor can be a "lack of consent" claim. Second, neither claim Twenty nor claim Twenty-Three is premised on allegations of "lack of informed consent:" claim Twenty is devoid of the word "consent" altogether, and claim Twenty-Three is premised in part on failure to obtain consent, not failure to obtain informed consent. [**Doc. 17**, at ¶¶ 432–35, 451–54]

Notwithstanding, Plaintiffs argue Dr. Mlak was required to obtain informed consent from Christine. [**Doc. 159**, at 17:25–18:5] "Lack of informed consent" claims must be established by expert testimony. *Duncan*, 205 Ariz. at 310. The expert must first establish "the precise parameters of the required disclosure . . . in accordance with the applicable standard of care." *Id*. (quoting *Hales v. Pittman*, 118 Ariz. 305, 311 n.4 (1978). Causally, lack of informed consent claims require proof that both "adequate disclosure would have caused the plaintiff to decline the treatment" and "the treatment proximately caused injury

to the plaintiff. *Gorney v. Meaney*, 214 Ariz. 226, 231, ¶ 15 (Ct. App. 2007). Expert testimony is required for the latter element. *Id*. at 231, ¶¶ 14–15 ("'failure of a physician to disclose a known risk does not, standing alone, constitute sufficient grounds for a malpractice action'; occurrence of risk must be harmful to patient since negligence unrelated to injury is nonactionable") (quoting *Hales*, 118 Ariz. at 311).

Here, Plaintiffs do not identify any expert testimony from Dr. Clark establishing that Dr. Mlak failed to disclose a known risk of Haldol, much less that such undisclosed risk occurred and caused injury to Brooke. Rather, Dr. Clark opines Dr. Mlak failed to obtain and heed information about Brooke from Christine, which does not satisfy any element of a lack of informed consent claim.

Plaintiffs also argue Dr. Mlak failed to obtain informed consent from DCS because he "delegated this 'chore' to the nursing staff." [**Doc. 159**, at 18:1–5] Plaintiffs cite no legal authority to support this argument that a physician cannot delegate the informed consent process to other qualified healthcare professionals. Even if supported, this argument changes nothing, because it concedes that DCS still consented. Altogether, Plaintiffs' "lack of informed consent" argument is inapplicable and misplaced. Plaintiffs never plead a lack of informed consent claim and have no expert testimony to even support such a claim, and the Court should disregard this red herring.

### 3. *Plaintiffs Do Not Create a Genuine Issue of Material Fact Regarding Causation (Reply to Part C.)*

To establish causation, an expert must opine to a "causal connection between an act or omission and the ultimate injury." *Barrett*, 207 Ariz. at 378, ¶ 12. Plaintiffs argue "there is considerable evidence that Dr. Mlak's wrongful acts caused damage to both Christine and Brooke." [**Doc. 159**, at 31:24–25] However, even if Plaintiffs could prove a breach, which they cannot, they have failed to establish that such breach caused any injury to Brooke.

Dr. Clark's only standard of care opinion is that Dr. Mlak failed to speak to Christine and failed to review Brooke's medical records. [**Ex. 48**, at 107:22–108:13; 111:3–12] Dr.

Clark's only causation opinion is that "[a]s a result of Brooke's being unsuccessfully treated with Haldol over the course of approximately four weeks in September and October of 2018, she was unnecessarily exposed to a range of side effects and risks and her hospital course was unnecessarily prolonged for several weeks." [**Ex. 47**, at p. 15]

First, because Dr. Clark opines that *as a result of* Brooke being "unsuccessfully treated with Haldol" she was "unnecessarily exposed to a range of side effects and risks and her hospital course was unnecessarily prolonged for several weeks," Dr. Clark must necessarily establish that Dr. Mlak's alleged breach of the standard of care by failing to speak with Christine and failing to review Brooke's medical history *caused* Brooke's unsuccessful treatment. However, Dr. Clark never links this standard of care opinion to this causation opinion, and instead admitted he has no standard of care opinions about Dr. Mlak's prescribing and administering Haldol to Brooke, *i.e.*, treatment. [**Ex. 48**, at 107:22–108:13, 111:3–12] Therefore, Plaintiffs have no expert testimony establishing how Dr. Mlak's alleged failure to speak to Christine and failure to review Brooke's medical records exposed Brooke to side effects and risks of Haldol and prolonged her hospital stay.

Second, even if Plaintiffs could establish a breach of the standard of care and causation through expert testimony, Plaintiffs have no facts establishing any injury to Brooke. [**Doc. 86**, at 26:16–28] Exposure to side effects and risks of Haldol does not equate to injury without a manifestation or occurrence of such side effects and risks, and Dr. Clark admitted that to a reasonable degree of medical certainty, Brooke did not experience any permanent injuries or harm from the Haldol administered to her at Aurora. [**Ex. 48**, at 70:24–73:22] Dr. Clark also admitted he could not opine to a reasonable degree of medical certainty that had Brooke been treated with a different medication that Haldol, then her hospitalization would have been shorter. [**Ex. 48**, 70:24–73:22]

Plaintiffs identify no evidence to refute Dr. Clark's concessions. Instead, they identify observations wholly unrelated to Dr. Clark's causation opinion. For example, Plaintiffs point out that Christine told Dr. Clark in November 2023 that Brooke becomes "upset and have

behavior difficulties if someone mentions Aurora or mentions the court case" and "gets upset when they drive . . . near where the Aurora unit use to be." [**Doc. 159**, at 31:26–28] But Christine is not a medical expert, and Plaintiffs cite no expert testimony establishing that these observations were the result of being administered Haldol at Aurora. As another example, Plaintiffs point out Christine's own observations and beliefs about Brooke. [**Doc. 159**, at 32:15–28] But again, Christine is not a medical expert, and Plaintiffs cite no expert testimony that these observations were the result of being administered Haldol at Aurora. Instead, Plaintiffs gloss over Dr. Clark's testimony where he affirmed "to a reasonable degree of medical certainty, [he] cannot say that there was any harm or injury to Brooke from her being prescribed Haldol while at Aurora." [**Ex. 48**, at 71:24–72:9] Plaintiffs have failed to create any genuine issue of material fact regarding causation, entitling Dr. Mlak to summary judgment on claims Twenty and Twenty-Three.

**B.     Medical Battery – Claim Twenty-One (Reply to Part A.2.b.)**

The Court already determined that claim Twenty-One is a lack of consent claim brought as a battery action. [**Doc. 74**, at 8:9–18] "Lack of consent" claims involve "the doctor's failure to operate within the limits of the patient's consent" and must be brought as battery actions. *Duncan*, 205 Ariz. at 310. But "[a] battery claim is defeated, however, when consent is given." *Id*. at 309.

As extensively briefed in Dr. Mlak's Motion, it is undisputed the Juvenile Court: (1) made Brooke a temporary ward of the court; (2) committed Brooke to the legal care, custody, and control of DCS; (3) ordered DCS to provide medical and behavioral health or other services to Brooke in DCS's legal custody; and (4) authorized DCS to consent to evaluation and treatment for medical care upon recommendation of a health care provider. [**Doc. 86**, at 12:9–13:7] It is undisputed the Juvenile Court later granted DCS's motion for Dr. Mlak to provide Brooke inpatient psychiatric acute care services, which included chronic mental illness and medication stabilization. [**Doc. 86**, at 13:8–14:24] While Brooke remained inpatient at Aurora, Dr. Mlak recommended Haldol for mood instability, and DCS consented

to its administration. [**Ex. 30**, at p. 2; **Ex. 31**] Dr. Mlak testified under oath that DCS provided written consent to administer Haldol. [**Ex. 46**, at 105:20–106:17] Plaintiffs do not identify any facts refuting this evidence.

Nonetheless, Plaintiffs contend DCS "was not permitted to unilaterally make such major decisions as the administration of Haldol." [**Doc. 159**, at 18:14–18] Plaintiffs then detail several Arizona statutes to support their claim that only Christine could make such decisions. [**Doc. 159**, at 18:19–21] After doing so, Plaintiffs pronounce Dr. Mlak "erred as a matter of law in delegating his informed consent duty to the nursing staff." [**Doc. 159**, 20:22–25] First, Plaintiffs cite no legal authority to support their argument that Dr. Mlak could not rely on his qualified nursing staff to obtain it. Second, this argument is illogical; it is entirely unclear how Dr. Mlak's delegation of the informed consent process relates to whether DCS or Christine had the authority to consent.

Further, Plaintiffs' argument is framed as who has the authority to give consent, not that consent was not given. Still further, Plaintiffs' argument is framed as DCS's lack of authority for unilaterally making Brooke's medical decisions, not that Dr. Mlak unilaterally made such decisions.[1] And still further, Plaintiffs identify no evidence showing DCS did not give consent. Whether DCS was legally authorized or not, it has no bearing on whether Dr. Mlak "operate[d] within the limits of [DCS's] consent," *see Duncan*, 205 Ariz. at 310, which Dr. Mlak undisputedly did, and which Plaintiffs would need to disprove to establish a lack of consent claim. They have not.

As for the legal authority buttressing Plaintiffs' argument, A.R.S. §§ 8–531 and 8–809.01, each statute is unavailing, and Plaintiffs offer no meaningful counterargument to why section 8–531 is inapplicable. [**Doc. 86**, at 15:17–22:7] First, Plaintiffs correctly state that under section 8–531, an individual or authorized agency is responsible for providing a child "adequate" medical care, and only a "guardianship of the person" has the authority to

---

[1] Elsewhere, Plaintiffs claim Dr. Mlak unlawfully "made major medical decisions unilaterally." [**Doc. 159**, at 30:27–31:7] This is one of many examples where Plaintiffs assert illogical, confusing, and contradictory arguments.

consent to "major" psychiatric treatment. [**Doc. 159**, at 18:19–19:2] But Plaintiffs fail to refute Dr. Mlak's argument that Christine was neither the individual nor authorized agency responsible for providing Brooke adequate medical care, or Brooke's guardianship of the person with authority to consent to major psychiatric treatment, as those terms are used in section 8–531. [**Doc. 86**, at 13:17–22:7]

Second, Plaintiffs state: "By Dr. Mlak's reasoning, . . . where the Department's custody is only temporary, and the grounds for the out-of-home seizure has not even been litigated, . . . the Department can make healthcare decisions for the child, major or minor, as section 8–531 does not apply." [**Doc. 159**, 19:17–24] But Plaintiffs misconstrue Dr. Mlak's argument, which is that while a child is in DCS's temporary custody and before proceedings that would invoke section 8–531 are initiated, special statutes require DCS to obtain court authorization for certain medical services deemed sufficiently "major"—inpatient psychiatric acute care services. [**Doc. 86**, at 20:3–23]

Third, Plaintiffs correctly state that section 8–809.01 requires DCS during the dependency process to "consult" a parent whose child is in DCS's temporary custody about that child's medical care. [**Doc. 159**, at 19:27–20:9] After acknowledging that "consult" means "to seek advice or information from; ask guidance from," Plaintiffs conclude Christine still retains sole authority to make "major" medical decision because of section 8–531. [**Doc. 159**, at 19:27–20:9] But the right to be consulted under section 8–809.01 cannot be harmonized with the authority to consent under section 8–531, which is why each applies to separate proceedings under Title 8 where the rights of parents are explicitly different. [**Doc. 86**, at 13:17–22:7] Moreover, section 8–809.01 was enacted in 2024, meaning Christine had no right to be consulted in 2018, much less the right to veto lawfully court-approved inpatient psychiatric acute care services under section 5–272.

C.   **Section 1983 Conspiracy – Claim Fifteen**

1.   ***Plaintiffs Were Not Deprived of Constitutional Rights (Reply to Part B.2.)***

Plaintiffs wholly fail to refute Dr. Mlak's argument that the Juvenile Court lawfully

intruded on Plaintiffs' rights to familial association and direct Brooke's medical care, [**Ex. 86**, at 11:22–15:16] and instead cite numerous cases that are inapplicable to this case.

*Wallis v. Spencer* involved two minor children who were subjected to invasive medical examinations without prior judicial authorization and without their parents being notified. 202 F.3d 1126, 1131 (9th Cir. 2000). Here, Plaintiffs concede DCS obtained judicial authorization for inpatient psychiatric acute care services for Brooke, but without any meaningful analysis or citation to relevant legal authority, conclude Christine still retained the right to make Brooke's medical decisions regarding antipsychotic medications. [**Doc. 159**, at 24:11–25:2] However, Christine did not retain this right because the Juvenile Court's order authorized Dr. Mlak to administer antipsychotic medications as part of the inpatient psychiatric acute care services he was to provide Brooke. [**Doc. 86**, at 11:22–15:16]

*Washington v. Harper* involved the forcible administration of antipsychotic medication to a prison inmate, not a minor child in the state's custody pursuant to a dependency petition. 494 U.S. 210 (1990). The Court held that inmates had a constitutional right to refuse antipsychotic drugs, but that the due process clause "permits the State to treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest," and that the state's procedures for making these determinations were procedurally sound *Id*. at 220–22, 227–36. Here, Plaintiffs do not challenge that DCS obtained a court order for Brooke's inpatient psychiatric acute care services. [**Doc. 159**, at 24:20–21] And notably in that order, the Juvenile Court found "by clear and convincing evidence" that Brooke "is suffering from a mental disorder or is a danger to self or others, and requires inpatient psychiatric acute care services." [**Ex. 27**]

*Kiva O. v. Dep't of Health & Soc. Servs.* involved a challenged to the superior court's granting the office of child services' request for authority to medicate a minor child over the parent's objection. 408 P.3d 1181, 1183 (Alaska 2018). Here, Plaintiffs do not challenge the Juvenile Court's decisions, which Dr. Mlak was undisputedly not involved with.

### 2. *Plaintiffs Do Not Create a Genuine Issue of Material Fact Regarding State Action (Reply to Part B.3.)*

Plaintiffs allege Dr. Mlak and DCS engaged in a conspiracy under 42 U.S.C. § 1983 to violate their constitutional right involving Brooke's medical decisions. [**Doc. 17**, at ¶¶ 381–90] To prove conspiracy, Plaintiffs "must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Mendocino Envtl. Ctr. V. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999). Plaintiffs must also show the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48–49 (1988). It is undisputed Dr. Mlak is a private actor, and a private actor's actions may amount to state action only if there is "significant" state involvement in the action. *Franklin v. Fox*, 312 F.3d 423, 444–45 (9th Cir. 2002). Plaintiffs only allege a joint action theory to show Dr. Mlak's actions amount to state action. [Doc. 17, ¶ 381–83] To prevail on this theory, Plaintiffs must show Dr. Mlak was a "willful participant" with DCS in depriving them of their constitutional rights, *see Dennis v. Sparks*, 449 U.S. 24, 27 (1980), Dr. Mlak's actions were "inextricably intertwined" with those of DCS, *see Brunette v. Humane Society of Ventura Cnty.*, 294 F.3d 1205, 1211 (9th Cir. 2002), and "substantial cooperation" between Dr. Mlak and DCS, *see Mathis v. Pac. Gas & Elec. Co.*, 75 F.3d 498, 503 (9th Cir. 1996). Plaintiffs have not created a genuine issue of material fact on this issue.

Plaintiffs conclude that Dr. Mlak "acted under color of law" because DCS delegated him its responsibility "to exercise its own independent judgment as to what medical care was in Brooke's best interest" after it had "purportedly (but wrongfully) stripped Christine of her medical decision-making authority." [**Doc. 159**, at 30:9–13] By this argument, Christine's constitutional right to make Brooke's medical decisions was apparently violated because DCS should have made Brooke's medical decisions, not Dr. Mlak. And in support of this argument, Plaintiffs identify testimony from Ms. Courtright and Dr. Mlak showing nothing more than the consent process between Dr. Mlak and DCS. [**Doc. 159**, at 28:11–30:13] None of it shows Dr. Mlak agreed with DCS to deprive Christine of her right to make Brooke's medical decisions, willfully participated and substantially cooperated with DCS in such

deprivation, or that his actions were inextricably intertwined with those of DCS.

Relying on *Rawson v. Recovery Innovations, Inc.*, 975 F.2d 742 (9th Cir. 2020), Plaintiffs also argue they were not afforded procedural due process protections before Brooke was administered Haldol. [**Doc. 159**, at 30:14–31:7] Plaintiffs argue DCS "delegated this decision solely to Dr. Mlak, without any oversight or consultation with Brooke's parents;" that Dr. Mlak knew DCS had legal custody of Brooke; and yet Dr. Mlak "made major medical decisions unilaterally, nonetheless." [**Doc. 159**, at 30:14–31:7] None of this, even if true, shows an agreement or meeting of the minds between Dr. Mlak and DCS to deprive Christine of her right to make Brooke's medical decisions.

### 3. *Dr. Mlak Did Not Waive His Statute of Limitations Defense (Reply to Part B.1.)*

Dr. Mlak reserved all affirmative defenses under Fed. R. Civ. P. 8(c) in his Answer to Plaintiffs' First Amended Complaint. [**Doc. 75**, ¶ 482] Even if he had failed to, Plaintiffs are not prejudiced. *See Rivera v. Anaya*, 726 F.2d 564, 566 (9th Cir. 1984).

## II. CONCLUSION

For the reasons asserted above and in Dr. Mlak's Motion, Plaintiffs have not identified or set forth any evidence to create a genuine issue of material fact as to whether Dr. Mlak agreed with DCS to deprive Plaintiffs of their constitutional rights, breached the standard of care causing Brooke injury, or committed a battery upon Brooke. Accordingly, Dr. Mlak is entitled to summary judgment on Claims Fifteen, Twenty, Twenty-One, and Twenty-Three.

**RESPECTFULLY SUBMITTED** this 16th day of August 2024.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By: /s/ Vincent J. Montell
　　　Vincent J. Montell
　　　Dustin A. Christner
　　　*Attorneys for Defendant Krzystztof Mlak, MD*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of August 2024, I electronically transmitted the foregoing with the Clerk of the Court using the CM/ECF system for filing, and copies were mailed to all counsel of record at the following addresses:

Thomas A. Connolly
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub
GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street
Phoenix, AZ 85020
*Attorneys for Plaintiffs*

Jeffrey S. Hunter
ERNAUD COOK DRURY MESAROS, PA
One N. Central, Suite 900
Phoenix, Arizona 85004
*Attorneys for Defendant Aurora Behavioral Healthcare-Tempe, LLC*

By:  /s/ Julie Irby