Vincent J. Montell (Bar No. 014236)
Dustin A. Christner (Bar No. 019707)
QUINTAIROS, PRIETO, WOOD & BOYER, P.A.
8800 E. Raintree Drive, Suite 100
Scottsdale, Arizona 85260
Telephone:  (602) 954-5605
Facsimile:  (602) 954-5606
vmontell@qpwblaw.com
dustin.christner@qpwblaw.com

*Attorneys for Defendant Krzysztof Mlak, MD*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Tina Canale, individually and as an employee with the State of Arizona Department of Child Safety; Melissa Courtright, individually and as an employee with the State of Arizona Department of Child Safety, and Barry Courtright, her spouse; Nicholas Long, individually and as an employee with the State of Arizona Department of Child Safety; Gregory McKay, as former Director, Arizona Department of Child Safety; Michael Faust, as Director, Arizona Department of Child Safety; Aurora Behavioral Healthcare-Tempe, LLC, an Arizona corporation, individually and as a services provider for the State of Arizona Department of Child Safety; Krzysztof Mlak, individually and as an employee with Aurora Behavioral Healthcare-Tempe, LLC, and Jane Doe Mlak, his spouse; Kattia Luevano, individually as an employee with | CASE NO. 2:21-cv-01444-DJH<br><br><br>**DEFENDANT KRZYSZTOF MLAK, MD'S RESPONSE TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br><br>**The Hon. Judge Diane J. Humetewa**<br><br><br>**ORAL ARGUMENT REQUESTED** |

1  Aurora Behavioral Healthcare-Tempe, LLC,
2  and John Doe Luevano, her spouse; Helen
   Nagle, individually as an employee with
3  Aurora Behavioral Healthcare-Tempe, LLC,
   and John Doe Nagle, her spouse; Care and
4  Dignity Services, LLC, an Arizona
   corporation, individually and as a services
5  provider for the State of Arizona
6  Department of Child Safety; John and Jane
   Does 2-6; and Black Entities 1-5.
7

8                         Defendants.

9          Defendant Krzysztof Mlak, M.D. ("Dr. Mlak"), by and through undersigned counsel,

10  file this Response to Plaintiffs' Motion for Partial Summary Judgment ("Motion") on claims

11  Fifteen, Twenty, Twenty-One, and Twenty-Three. This Response is supported by the

12  following Memorandum of Points and Authorities.

13                    **MEMORANDUM OF POINTS AND AUTHORITIES**

14  **I.      INTRODUCTION**

15          Dr. Mlak moved for summary judgment on each of Plaintiffs' claims against him.

16  [**Doc. 86**] Plaintiffs then moved for partial summary judgment. [**Doc. 154**] Plaintiffs then

17  filed a response to Dr. Mlak's motion asserting genuine issues of material fact exist on

18  essentially the same issues they raised in their partial motion for summary judgment. [**Doc.**

19  **159**] Plaintiffs' motion and response to Dr. Mlak's motion provide substantially the same

20  arguments, law, and facts, and only divert principally on the relief requested. This has

21  required unnecessarily redundant efforts for the Parties and the Court. To avoid waiver, Dr.

22  Mlak responds to Plaintiffs' motion, and requests the Court deny it for the reasons below and

23  as more fully articulated in Dr. Mlak's own motion and reply in support thereof.

24          Separately, Plaintiffs' motion should be denied because it is simply confusing and

25  unsupported by law or facts. Plaintiffs seek relief on all four of their claims against Dr. Mlak

26  but spend their entire argument conflating entirely distinct legal theories of "consent" and

27  "informed consent," the former of which applies only to claim Twenty-One, and the latter of

28  which is never plead but would conceivably apply only to claims Twenty and Twenty-Three.

Plaintiffs further inject their consent/informed consent theories into their constitutional conspiracy claim brought under claim Fifteen, but not once in their Motion do Plaintiffs even reference a conspiracy, much less identify facts showing one. Their motion should be denied.

## II.     FACTUAL BACKGROUND

Christine is the biological mother of Brooke. [**Ex. 1**, ¶ 23] Brooke, born July 14, 2001, is a non-verbal, severely autistic individual. [**Ex. 1**, ¶ 24] On June 22, 2018, Brooke was removed from her home and taken into temporary physical custody of Arizona Department of Child Safety ("DCS"). [**Ex. 2**, p. 3] DCS filed an Out-of-Home Dependency Petition ("Dependency Petition") on June 27, 2018 [**Ex. 2**], along with a DCS Court Report [**Ex. 3**]. The same day, the Juvenile Court ordered that Brooke "is made a temporary ward of the Court, committed to the legal care, custody and control of [DCS] and placed in the physical custody of Care and Dignity," and that "in furtherance of A.R.S. § 8–512 and DCS's obligation, if any, to provide medical behavioral health or other services to child in the DCS's legal custody, the DCS is authorized to consent to evaluation and treatment for medical . . . care upon recommendation of a health care provider . . . ." [**Ex. 4**, pp. 2, 5]

On July 2, 2018, the Juvenile Court found it had "exclusive jurisdiction over the subject matter pursuant to A.R.S. § 8–802" and that "continued temporary custody is clearly necessary to prevent abuse or neglect pursuant to A.R.S. § 8–825" [**Ex. 5**, pp. 3, 6], and ordered "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS]" [**Ex. 6**, p. 4]. On August 16, 2018, the Juvenile Court ordered "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS]." [**Ex. 7**, p. 3] On August 21, 2018, the Juvenile Court ordered, among other things: (a) "that temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition;" (b) "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS];" (c) "affirming all contrary to welfare findings;" (d) "that there is a comprehensive medical team evaluating the child's needs;" (e) "directing [DCS] to make arrangements to facilitate a comprehensive

medical evaluation for the child with Dr. Richard Frye at Phoenix Children's Hospital and to include mother's input;" and (f) "[DCS] will amend the dependency petition to include an allegation of neglect and based on the child's behaviors as to mother." [**Ex. 8**, pp. 3–4]

On August 22, 2018, police and paramedics were called to Care and Dignity when Brooke began "displaying uncontrollable behaviors within the group home. [**Ex. 9, 10, 11**; **Ex. 12**, pp. 3, 10] Upon arrival, Brooke "was combative with the officers and EMTs and sustained facial abrasions while being restrained." [**Ex. 9**] Brooke was transported to the emergency department at Abrazo Arrowhead Campus ("Abrazo") where she was administered 5mg Haldol. [**Ex. 13**, p. 91] Brooke remained at Abrazo until August 25, 2018, and was administered Haldol each day. [**Ex. 14**, pp. 97–98; **Ex. 15**] During her admission Brooke "continued to have uncontrollable behaviors as she was hitting, biting, and pulling the hair of the staff members" and was "throwing and eating feces," and referral was submitted for her to be placed at Aurora Behavioral Healthcare ("Aurora") because "her needs are too great for the group home and hospital staff to meet." [**Ex. 9**; **Ex. 16**, pp. 1, 6]

Brooke was transported to Aurora on August 25, 2018. [**Ex. 17**] Her admission, care, and adolescent medication were authorized by DCS case manager Katy B. [**Ex. 18**; **Ex. 19**] On August 26, 2018, Dr. Mlak performed a psychiatric evaluation of Brooke and documented: (a) "attempts to contact her mother, Ms. Christine Scianna, and left messages;" (b) "she received multiple medications for agitation including Haldol and Ativan throughout her stay in the ER;" and (c) "[s]he is currently a temporary ward in a foster care system and her DCS worker is Ms. Melissa Courtright." [**Ex. 20**, pp. 1–3] Dr. Mlak's recommended treatment plan included pharmacological approach to target "mood instability and explosive aggressive behavior" and "[p]sychiatric rounds to manage medication and coordination with DCS regarding placement." [**Ex. 20**, p. 4] On August 27, 2018, Dr. Mlak documented Brooke's aggressive behavior, regression, and danger to self and others, and further noted he had "left two messages for mother to obtain collateral information." [**Ex. 21**]

On August 30, 2018, DCS filed an emergency motion for approval of seventy-two-

hour admission for inpatient assessment pursuant to A.R.S. § 8–272(A) [**Ex. 22**], and a motion for approval of inpatient psychiatric acute care services pursuant to A.R.S. § 8–272(F) [**Ex. 23**], attaching Dr. Mlak's psychiatric evaluation report and recommendation and a written statement of Aurora's medical director that Aurora's services are appropriate to meet Brooke's mental health needs [**Ex. 20, 24**]. On August 31, the Juvenile Court granted DCS's emergency motion and set a hearing for approval of inpatient psychiatric acute care services. [**Ex. 25, 26**] The Juvenile Court held the hearing on September 4, 2018, and after holding discussion and reviewing supporting evidence, approved Brooke's admission for inpatient psychiatric acute care services. [**Ex. 27**] The Juvenile Court found, "based upon clear and convincing evidence, that Brooke . . . is suffering from a mental disorder or is a danger to self or others, and requires inpatient psychiatric acute care services; and [a]vailable alternatives to inpatient psychiatric acute care services were considered, but inpatient psychiatric acute care services are the least restrictive available alternative." [**Ex. 27**]

Brooke remained an inpatient at Aurora until November 21, 2018. [**Ex. 28**, p. 1] Each day Dr. Mlak assessed Brooke and prepared daily progress notes. On September 6, 2018, Dr. Mlak documented that "mother has not responded to author attempts to establish contact." [**Ex. 29**, p. 2] On September 7, 2018, Dr. Mlak again documented that "mother has not responded to author attempts to establish contact." [**Ex. 30**, p. 2] The same day he recommended Haldol for mood instability after Brooke had not responded to first- and second-line treatment [**Ex. 30**, p. 2], and obtained consent to administer Haldol from DCS, [**Ex. 31**]. On September 10, 2018, Dr. Mlak again documented that "mother has not responded to author attempts to establish contact." [**Ex. 32**, p. 2] The same day Dr. Mlak increased Brooke's Haldol dose. [**Ex. 32**, p. 2] On each of these days Dr. Mlak noted Brooke's continued agitation, aggression, striking of staff, injurious behavior, and danger to self. [**Ex. 29**, **30**, **32**]

On September 11, 2018, Dr. Mlak documented medication side effects of "[t]remor/muscle rigidity" and recommended Cogentin for extrapyramidal symptoms

("EPS"). [**Ex. 33**, pp. 1–2] On September 12, 2018, Dr. Mlak noted the medication side effects were resolving. [**Ex. 34**, p. 1] The same day he spoke with Christine for the first time, addressed her questions and concerns about Haldol, and discussed Brooke's treatment plan that included continuing Haldol. [**Ex. 34**, p. 2] On September 13, 2018, Dr. Mlak decreased Brooke's Haldol for mood instability. [**Ex. 35**] On September 14, 2018, Dr. Mlak documented Brooke's medication side effects were resolving and he "attempted to contact mother and left message to report resolution of side effect and improving sleep." [**Ex. 36**, p. 2]

On September 21, 2018, Dr. Mlak documented Brooke's continued emotional dysregulation, aggression, striking of staff, injurious behavior, and danger to self. [**Ex. 37**, p. 1] The same day he spoke with Christine and documented he "attempted to discuss medication plan but mother insisted that patient is having side effect of Haldol and demands for the medication to be discontinued;" "attempt[ed] to address her concern about 'muscle breakdown' as patient experienced rhabdomyolysis in 4/2018, and to discuss that patient has no signs of this condition in current time frame;" and that "mother indicated she will file a complaint and hung up the phone." [**Ex. 37**, p. 2] On September 28, 2018, Dr. Mlak again spoke with Christine to discuss Brooke's treatment recommendation and plan and documented Brooke was not experiencing current side effects of Haldol with Cogentin as claimed by Christine. [**Ex. 38**, p. 2] Dr. Mlak further documented he would decrease Haldol "due to suboptimal response and parental objection." [**Ex. 38**, p. 2]

On October 3, 2018, Dr. Mlak documented Brooke "had another period of agitation occurring during visit by mother" and "engaged in head banging but was de-escalated after mother had left." [**Ex. 39**, p. 1] Dr. Mlak further documented that Christine "continues to request that CPK level be drawn despite no clinical indication." [**Ex. 39**, p. 2] Dr. Mlak documented that Brooke had another period of agitation when Christine visited on October 5, 2018, and October 8, 2018. [**Ex. 40**, p. 1; **Ex. 41**, p. 1]

Christine filed a request for emergency hearing with the Juvenile Court on October

17, 2018. [**Ex. 42**] Among other things, Christine sought relief in the form of a court order for DCS "to immediately give written instructions to all of Brooke's providers that they are to communicate with Mother and consider her input." [**Ex. 42**, p. 5] The Juvenile Court addressed the motion the same day and ordered that DCS "shall promptly give the Child's treatment providers the instruction that they shall make reasonable efforts to obtain information from Mother concerning the Child's medical history, and to consult with Mother concerning the Child's ongoing medical care." [**Ex. 43**, p. 2] Importantly, the order stated: "Mother's input should be considered, but shall not be considered determinative of the appropriate course of treatment." [**Ex. 43**, p. 2]

Brooke was discharged from Aurora on November 21, 2018. [**Ex. 28**, p. 1] On February 11, 2019, DCS moved to dismiss the Dependency Petition [**Ex. 44**], which the Juvenile Court granted on February 19, 2019 [**Ex. 45**].

## III.   LEGAL ARGUMENT

Plaintiffs' Motion is difficult to comprehend. First, it states Plaintiffs are entitled to partial summary judgment on all four of their claims because Dr. Mlak "failed to get informed consent from Plaintiffs before administering a major antipsychotic medication to Brooke while she was placed in a mental health facility under the State's custody." [**Doc. 154**, at 1:22–27] Next, it states Plaintiffs are entitled to partial summary judgment on: (1) "his breach of his duty of care to obtain informed consent," and (2) "his breach of Christine's constitutional right to make important medical decisions for her daughter." [**Doc. 154**, at 2:24–27] Plaintiffs then lay out four unpersuasive arguments in their discussion section without specifying which of their four claims each applies to.

The first argument is titled: "The Responsibility for Obtaining Informed Consent Rests on the Treating Provider, Dr. Mlak." [**Doc. 154**, at 13:6–7] Without explaining which of their four claims this applies to, Plaintiffs conclude Dr. Mlak breached his "fiduciary relationship with Brooke" because he himself did not speak with DCS, but rather his nursing staff spoke to DCS. [**Doc. 154**, at 13:8–27] Plaintiffs provide no legal authority or expert

testimony to support their argument that Dr. Mlak cannot rely on his qualified nursing staff to have the informed consent conversation with DCS. Plaintiffs fail to set forth the elements of a lack of informed consent claim. Plaintiffs fail to identify any facts to support a lack of informed consent claim.  Moreover, Plaintiffs have never plead a lack of informed consent claim.

The second argument is titled: "Under Arizona Law, the Department of Child Safety Did Not Have Authority to Give Consent to Such a Major Medical Decision as Administration of Antipsychotic Medications Like Haldol." [**Doc. 154**, at 14:1–3] Plaintiffs try to make their case that under Arizona statutes, DCS was not authorized to make such decisions, and instead Christine "retained her constitutional right of association to make important medical decisions for Brooke." [**Doc. 154**, at 14:3–16:8] In the last paragraph, Plaintiffs mention Dr. Mlak for the first time, and conclude Dr. Mlak "erred as a matter of law in delegating his informed consent duty to the nursing staff, to in turn do nothing more than reach out to call-line employees of [DCS]." [**Doc. 154**, at 16:9–12] This entire argument is disjointed and confusing, mixing issues of who between Christine and DCS had authority to consent, constitutional rights of association, informed consent, and the informed consent process between Dr. Mlak's nursing staff and DCS.

The third argument is titled: "Plaintiff Christine Scianna, as Brooke's Mother, Retained Her Constitutional Right to Make Major Medical (and Psychiatric) Decisions for Brooke." [**Doc. 154**, at 16:13–14] Plaintiffs begin by briefly setting out some legal principles for a parent's constitutional right to make important medical decisions for their children. [**Doc. 154**, at 16:15–17:5] Plaintiffs then state they do not dispute that DCS obtained court authorization for Brooke's inpatient psychiatric acute care services. [**Doc. 154**, at 17:6–7] Nevertheless, Plaintiffs conclude Dr. Mlak did not have "a constitutional free-for-all in terms of treatment of Brooke," and Christine retained her right to decide whether Brooke should be medicated with antipsychotic medication. [**Doc. 154**, at 17:7–12]

Other than simply saying so, Plaintiffs never explain why Christine retained this right despite the court's order, and do not identify one fact showing how Dr. Mlak conspired with DCS to deprive her of it.

The fourth and final argument is titled: "Administration of Haldol was a "Major" or "Important" Medical and/or Psychiatric Decision." [**Doc. 154**, at 17:13–14] Plaintiffs cite testimony of Andrew Clark, M.D., their standard of care expert against Dr. Mlak, and cite various cases in support of their argument that Haldol is a "major" medication. [**Doc. 154**, at 17:15–20:14] Plaintiffs conclude that consent for administration of Haldol must be provided from a parent, legal guardian, or court order, but instead, Dr. Mlak unilaterally chose to administer Haldol to Brooke and delegated the informed consent process to his nursing staff. [**Doc. 154**, at 20:15–24] However, the expert testimony cited by Plaintiffs is irrelevant, and the cases cited by Plaintiffs are inapposite. Moreover, their conclusion is nothing more than an illogical and confusing mashup of their three previous arguments involving consent, lack of informed consent, and constitutional rights that does not prove any of their four claims against Dr. Mlak.

Whatever may logically be construed in Plaintiffs' Motion, it should be denied.

### A.     Lack of Informed Consent is a Red Herring and Plaintiffs Are Not Entitled to Summary Judgment on Any Claim Under This Theory

Arizona recognizes two distinct theories of liability when a physician provides unauthorized medical treatment to a patient: "lack of consent," and "lack of informed consent." *Duncan v. Scottsdale Med. Imaging, LTD*, 205 Ariz. 306, 309–10 (2003). Lack of consent claims involve "the doctor's failure to operate within the limits of the patient's consent" and must be brought as battery actions. *Id*. Lack of informed consent claims involve "the doctor's obligation to provide information" and must be brought as negligence actions. *Id*. Lack of informed consent claims must be established by expert testimony. *Id*. at 310. The expert must first establish "the precise parameters of the required disclosure . . . in accordance with the applicable standard of care." *Id*. (quoting *Hales v. Pittman*, 118 Ariz.

305, 311 n.4 (1978). To prove causation, there must be proof that both "adequate disclosure would have caused the plaintiff to decline the treatment" and "the treatment proximately caused injury to the plaintiff." *Gorney v. Meaney*, 214 Ariz. 226, 231, ¶ 15 (Ct. App. 2007). The latter element requires expert testimony. *Id*. at 231, ¶¶ 14–15 ("'failure of a physician to disclose a known risk does not, standing alone, constitute sufficient grounds for a malpractice action'; occurrence of risk must be harmful to patient since negligence unrelated to injury is nonactionable") (quoting *Hales*, 118 Ariz. at 311).

The Court already determined that claim Twenty-One is a lack of consent claim brought as a battery action. [**Doc. 74**, at 8:9–18] Therefore, lack of informed consent does not apply to claim Twenty-One.

The Court also already determined that claims Twenty and Twenty-Three set out separate statements of medical malpractice but fall under the same cause of action under Arizona's Medical Malpractice Act. [**Doc. 74**, at 7:9–8:8] Although plead in negligence, neither claim Twenty nor claim Twenty-Three is premised on allegations of "lack of informed consent:" claim Twenty is devoid of the word "consent" altogether, and claim Twenty-Three is premised in part on failure to obtain consent, not failure to obtain informed consent. [**Doc. 17**, at ¶¶ 432–35, 451–54] Therefore, lack of informed consent is a legal theory Plaintiffs never plead, never alleged, and never pursued, so it does not apply to claims Twenty and Twenty-Three. Even if Plaintiffs had done so, they have not identified any expert testimony from Dr. Clark establishing that Dr. Mlak failed to disclose a known risk of Haldol, much less that such undisclosed risk occurred and caused injury to Brooke. To the contrary, Dr. Clark testified *not only* that to a reasonable degree of medical certainty, Brooke did not experience any permanent injuries or harm from being administered Haldol at Aurora, *but also* that to a reasonable degree of medical certainty, he "cannot say that there was any harm or injury to Brooke from being prescribed Haldol while at Aurora." [**Ex. 46**, at 70:24–73:22]

Claim Fifteen is a 42 U.S.C. § 1983 civil conspiracy claim involving Plaintiffs' due process rights under the Fourteenth Amendment to make medical decisions. The allegations

of this claim are that Dr. Mlak conspired with DCS "to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when [Dr.] Mlak provided medical treatment to Brooke from August 2018 to November 2018 without Christine's knowledge and/or consent." [**Doc. 17**, at ¶ 384]. To prove this conspiracy claim, Plaintiffs "must demonstrate the existence of an agreement or meeting of the minds" between Dr. Mlak and DCS to make Brooke's medical decisions without Christine's consent. *See Mendocino Envtl. Ctr. V. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999). At best, claim Fifteen is premised on lack of consent, but it is certainly not based on lack of informed consent. Even if it were, Plaintiffs would need to identify facts establishing, in part, that Dr. Mlak and DCS agreed to conspire to withhold a known risk of Haldol from Christine, and in fact did so. No such facts exist.

**B.    DCS Had Authority to Consent to the Administration of Haldol, and Whether Administration of Haldol Is Considered "Major" Medical and/or Psychiatric Treatment is Irrelevant Because A.R.S. § 8–531 Does Not Apply – Response to Part III.B. and III.D.**

Plaintiffs want the Court to declare that A.R.S. § 8–531 made it unlawful for DCS to consent to Brooke's administration of Haldol, and that only Christine had the authority to do so. For the reasons fully briefed in Dr. Mlak's motion for summary judgment, section 531 was never operative at the time Dr. Mlak administered Haldol to Brooke. [**Doc. 86**, at 15:16–22:7] Section 531 applies only to child-termination proceedings, which were never initiated, not dependency proceedings, which were. [**Doc. 86**, at 15:16–22:7] Even if section 531 were operative, Christine, as Brooke's biological parent, could not have possessed the "status embodying . . . [t]he responsibility to provide [Brooke] with adequate . . . medical care," § 8–531(5), or have been the "guardianship of the person" of Brooke possessing "[t]he authority to consent to . . . major medical, psychiatric and surgical treatment," § 8–531(8). [**Doc. 86**, at 18:17–19:13] Because section 531 is inapplicable, it is irrelevant whether administration of Haldol is considered "major" medical and/or psychiatric treatment within the meaning of section 531, and efforts to do so have and continue to unnecessarily plague

this litigation.

Rather, the statutes that were operative authorized DCS to provide "comprehensive medical and dental care" for a child "[i]n the custody of [DCS] in an out-of-home placement, § 8–512, and authorized inpatient psychiatric acute care services be provided for a child "in the temporary custody of [DCS]," §§ 8–271, 272. [**Doc. 86**, at 11:21–22:7] Plaintiffs do not dispute that Brooke was in DCS's temporary custody, [**Doc. 154**, at 15:21–23], and the Juvenile Court explicitly authorized Brooke's inpatient psychiatric acute care services, [**Doc. 154**, at 17:6–7].

Last, Plaintiffs' reliance on *Kiva O. v. Dep't of Health & Soc. Servs.* does not help their argument. In *Kiva*, a minor child in the custody of Alaska's office of children's services ("OCS") was diagnosed with major depressive disorder by a psychiatrist who then recommended psychiatric medication for treatment. 408 P.3d 1181, 1183 (Alaska 2018). Mother objected, and OCS sought judicial authorization to consent to psychiatric medication. *Id*. at 1184. The lower court held an evidentiary hearing where the psychiatrist testified to his diagnosis and recommendation, and the lower court issued an order granting OCS authority to consent to the administration of psychiatric medication. *Id*. at 1185. Mother appealed, "arguing that the superior court failed to apply the correct standard for determining whether her fundamental constitutional rights as a parent could be overridden." *Id*. at 1183.

The *Kiva* court first determined that a parent's "residual right 'to consent to major medical treatment'" recognized by a specific Alaska statute was a fundamental constitutional right under the broad scope of the Alaska Constitution's liberty and privacy guarantees. *Id*. at 1186–88. The *Kiva* court next determined that OCS had a compelling interest in providing necessary medical care for children in its custody. *Id*. at 1188–89. The *Kiva* court then held the superior court did not err in finding that psychiatric medication was in the best interests of the minor child. *Id*. at 1189–92.

Plaintiffs cite *Kiva* only for the first determination. The Alaska statute central to *Kiva*

explicitly states: "When there has been transfer of legal custody or appointment of a guardian and parental rights have not been terminated by court decree, the parents shall have residual rights and responsibilities." Alaska Stat. § 47.10.084(c). It then describes the residual rights and responsibilities of the parent to include "consent to major medical treatment," and describes "major medical treatment" to include "the administration of medication used to treat a mental health disorder." *Id*. Plaintiffs want the Court to engraft section 531 with similar language, but the Arizona legislature chose not to. An Alaska statute that operates within the unique framework of its statutory code cannot be analogized to section 531 that operates within the unique framework of Title 8. *Kiva* is not applicable or persuasive.

### C. Christine, as Brooke's Mother, Did Not Retain Her Constitutional Right to Make Major Medical (and Psychiatric) Decisions for Brooke – Response to Part III.C.

Under the Fourteenth Amendment, parents have the right to make important medical decisions for their children, and children have the right to have those decisions made by their parents rather than the state. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000). However, this right is not absolute. *Mueller v. Auker*, 700 F.3d 1180, 1186–87 (9th Cir. 2012). Plaintiffs' argument to the contrary starts and stops with their express recognition that DCS obtained a court order for Brooke's inpatient psychiatric acute care services at Aurora, which they expressly do not challenge. [**Doc. 154**, at 17:6–7] For the reasons fully briefed in Dr. Mlak's motion for summary judgment, the Juvenile Court lawfully intruded upon Plaintiffs' constitutional rights when it ordered Brooke be placed in DCS's temporary legal care, custody, and control; granted DCS the authority to provide and consent for Brooke's medical care; and approved Brooke's admission for inpatient psychiatric acute care services. [**Doc. 86**, at 11:22–14:16] Plaintiffs neither challenge the jurisdiction of the Juvenile Court nor challenge the constitutionality of the statutes under which the Juvenile Court made its findings and issued it orders. Plaintiffs' argument is unavailing.

**IV.    CONCLUSION**

For the reasons asserted above, Plaintiffs are not entitled to summary judgment on claims Fifteen, Twenty, Twenty-One, and Twenty-Three; are not entitled to summary judgment because Dr. Mlak purportedly failed to obtain informed consent; and are not entitled to summary judgment for any other new, novel, or nonsensical basis that can be gleaned from their Motion.

**RESPECTFULLY SUBMITTED** this 16th day of August 2024.

QUINTAIROS, PRIETO, WOOD & BOYER, P.A.

By:  /s/  Vincent J. Montell
   Vincent J. Montell
   Dustin A. Christner
   *Attorneys for Defendant Krzysztof Mlak, MD*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of August 2024, I electronically transmitted the

foregoing with the Clerk of the Court using the CM/ECF system for filing, and copies were

mailed to all counsel of record at the following addresses:

Thomas A. Connolly
MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
*Attorneys for Plaintiffs*

DeeAn Gillespie Strub
GILLESPIE, SHIELDS, GOLDFARB & TAYLOR
7319 North 16th Street
Phoenix, AZ 85020
*Attorneys for Plaintiffs*

Jeffrey S. Hunter
ERNAUD COOK DRURY MESAROS, PA
One N. Central, Suite 900
Phoenix, Arizona 85004
*Attorneys for Defendant Aurora*
*Behavioral Healthcare-Tempe, LLC*

By: ____/s/ Julie Irby_____