Exhibit 1

Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub
(AZ Bar #009987)
Kristina Reeves (AZ Bar #031171)
**GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Christina Scianna, am individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>Plaintiffs<br><br>v.<br><br>State of Arizona, a government entity; Arizona Department of Child Safety, a governmental entity; Tina Canale, individually and as an employee with the State of Arizona Department of Child Safety; Christie Johnson aka Christi Mehl, individually and as an employee with the State of Arizona Department of Child Safety; Melissa Courtright, individually and as an employee with the State of Arizona Department of Child Safety, and Barry Courtright, her spouse; Nicholas Long, individually and as an employee | Case No.: 2:21-cv-01444-DJH<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL REQUESTED**<br><br>(Assigned to Hon. Diana J. Humetewa) |

1  with the State of Arizona Department of
2  Child Safety; Gregory McKay, as former
   Director, Arizona Department of Child
3  Safety; Michael Faust, as Director, Arizona
4  Department of Child Safety;   Aurora
   Behavioral Healthcare-Tempe, LLC, an
5  Arizona Corporation, individually and as a
6  services provider for the State of Arizona
   Department of Child Safety; Krzystztof
7  Mlak, individually as an employee with
8  Aurora   Behavioral   Healthcare-Tempe,
   LLC, and Jane Doe Mlak, his spouse; Kattia
9  Luevano, individually as an employee with
10 Aurora   Behavioral   Healthcare-Tempe,
   LLC, and John Doe Luevano, her spouse;
11 Helen Nagle, individually as an employee
12 with Aurora Behavioral Healthcare-Tempe,
   LLC, and John Doe Nagle, her spouse; Care
13 and Dignity Services, LLC, an Arizona
14 Corporation, individually and as a services
   provider   for   the   State   of   Arizona
15 Department of Child Safety John and Jane
16 Does 2-6; and Black Entities 1-5,

                    **Defendants.**

17
18      Plaintiffs  Christine Sciartna  and Hhooke TJclanna,  hy  ancL through  their
19 counsel, file this First Amended Complaint against the State of Arizona, Arizona
20 Department Of Child Safety, Tina Canale, Christi Mehl, Melissa Courtright and
21 Barry  Courtright, Nicholas Long, Gregory McKay, Michael Faust, Aurora
22 Behavioral Healthcare-Tempe, LLC, Krzystztof Mlak and his jpouse, Kattia
23 Luevano, and her spouse, Helen Nagle and her spouse, Care and Dignity Services,
24 LLC, John and Jane Does 2-6, and Black Entities 1-5. Plaintiffs state and allege as
25 follows:

                    **JURISDICTION AND VENUE**

26
27      1.      Plaintiffs bring this civil rights lawsuit pursuant to the First, Fourth,
28 Fifth, and Fourteenth Amendments to the United States Constitution, the Civil

                              2

1  Rights Act of 1871, 42 U.S.C. § 1983, the Americans with Disabilities Act, 42 U.S.C.

2  §§ 12101-12213, the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794, A.R.S.

3  § 12-641, and Arizona common law.

4     2.    The amount in controversy exceeds the minimal jurisdictional limits

5  of this Court.

6     3.    This Court has original subject matter jurisdiction over the claims

7  made in this Complaint pursuant to Article 6, Section 14 of the Arizona

8  Constitution.

9     4.    The acts and events giving rise to the causes of action alleged herein

10  occurred in Maricopa County, Arizona, and all Defendants are subject to the

11  personal jurisdiction of this Court in accordance with A.R.S. § 12-123 and as

12  otherwise provided under Arizona law and the Arizona Rules of Civil Procedure.

13     5.    Venue lies in this Court pursuant to A.R.S. § 12-401 in that, among

14  other reasons, the specific acts giving rise to the causes of action alleged herein

15  occurred with primary effect in Maricopa County, Arizona.

16                          **THE PARTIES**

17     6.    Plaintiff Christine Scianna ("Christine") is an individual, a citizen of

18  the United States, and a resident of Maricopa County, Arizona. At all Times

19  relevant to the present Complaint, Christine resided in Maricopa County, Arizona.

20     7.    Defendant State of Arizona is a government entity that acts by and

21  through its officials, employees, and agents, including, without limitation, each of

22  the other Defendants in this action.

23     8.    Defendant the Arizona Department of Child Safety ("DCS") is a

24  governmental entity that acts by and through its officials, employees, and agents,

25  including without limitation, each of the other non-governmental entity

26  Defendants in this action.

27     9.    Defendant Tina Canale ("Canale") is an individual who resided in

28  Maricopa County, Arizona, at all times relevant to this Complaint. Canale was, at

3

all times relevant to the present Complaint, an employee of the State of Arizona through DCS. At all times relevant to this Complaint, Canale was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

**10.** Defendant Christi Mehl (fna Christi Johnson, referred to herein as "Johnson") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Johnson was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Johnson was acting under the color of law as an employee of DCS. She is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

**11.** Defendant Melissa Courtright ("Courtright") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Courtright was, at all times relevant to the present Complaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Courtright was acting under the color of law as an employee of DCS. She is named drereindnirerindividuaimapacityra∧thatterm is used within the jurispradertcenL the Civil Rights Act of 1871, 42 U.S.C. § 1983.

**12.** Defendant Nicholas Long ("Long") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Long was, at all times relevantJo the presenLComplaint, an employee of the State of Arizona through the DCS. At all times relevant to this Complaint, Long was acting under the color of law as an employee of DCS. He is named herein in his individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

**13.** DedendahFGregory McKay ("McKay") is an individual whoJesided in Maricopa County, Arizona, at times relevant to the present Complaint. McKay

4

1  was, at all times relevant to this Complaint, the Director of the DCS. At all times

2  relevant to this complaint, McKay was the official policymaker for the DCS. He is

3  named herein in his official capacity.

4      14.  Defendant Michael Faust ("Faust") is an individual who resided in

5  Maricopa County, Arizona, at times relevant to the present Complaint. Faust was,

6  at all times relevant to this Complaint, the Director of the DCS. At all times relevant

7  to this complaint, Faust was the official policymaker for the DCS. He is named

8  herein in his official capacity.

9      15.  Defendant Aurora Behavioral Healthcare-Tempe, LLC, ("Aurora") is

10  an Arizona corporation that was authorized to, and did, conduct business in the

11  State of Arizona, including providing medical care services to children in the care

12  and/or custody of DCS.

13      16.  Defendant Dr. Krzystztof Mlak ("Mlak") is an individual who resided

14  in Maricopa County, Arizona, at all times relevant to this Complaint. Mlak was, at

15  all times relevant to the present Complaint, an employee of Defendant Aurora. At

16  all times relevant to this Complaint, Mlak provided contract services for the State

17  of Arizona through the DCS. At all times relevant to this Complaint, Mlak was

18  acting under the color of law as a DCS service provider. Hedsmameddrerein in her

19  individual capacity, as that term is used within the jurisprudence of the Civil

20  Rights Act of 1871, 42 U.S.C. § 1983.

21      17.  Defendant Kattie Luevano ("Kattie") is an individual who resided in

22  Maricopa County, Arizona, at all times relevantly this Complaint. Kattie was, at

23  all times relevant to the present Complaint, an employee of Defendant Aurora. At

24  all times relevant to this Alemplaint, Kattie provided contract services for the State

25  of Arizona through the DCS. At all times relevant to this Complaint, Kattie was

26  acting under the color of law as a DCS service provider. She is named herein in his

27  individual capacity, Iis tKaTterm is used^withirTtHe jurisprudence of the Civil

28  Rights Act of 1871, 42 U.S.C. § 1983.

18.     Defendant Herman LNU ("Herman") is an individual who resided in Maricopa County, Arizona, at all times relevant to this Complaint. Herman was, at all times relevant to the present Complaint, an employee of Defendant Aurora. At all times relevant to this Complaint, Herman provided contract services for the State of Arizona through the DCS. At all times relevant to this Complaint, Herman was acting under the color of law as a DCS service provider. He is named herein in her individual capacity, as that term is used within the jurisprudence of the Civil Rights Act of 1871, 42 U.S.C. § 1983.

19.     Defendant Care and Dignity Services, LLC, is an Arizona corporation that was authorized to, and did, conduct business in the State of Arizona, including providing services to children in the care and/or custody of DCS.

20.     John and Janes Does 2-6 and Black Entities 1-5 are persons, agents, services, employees, business entities, partnerships, corporations, and/or unincorporated associations subject to suit in a common name whose true names are unknown to Plaintiffs and who are, therefore, designated by fictitious names. Plaintiffs will ask leave of the Court to substitute the true names of the said parties prior to the entry of Judgement herein.

21.     Whenever in this Complaint reference is made of any act of "Defendants" such allegations shall be deemed to mean all named Defendants, John and Jane Does 1-5, and Black Entities 1-5, or their officers, agents, managers, members, representatives, employees, heirs, assignees, customers, tenants, and that they did or authorized such acts while actively engaged in the operation, management, direction, or control of the affairs of Defendants and while acting within the course and scope of their duties, except as specifically alleged otherwise.

22.     At all times herein mentioned and with respect to the specific matters alleged in this Complaint, Plaintiffs allege, upon information and belief, that each Defendant was and is the agent, employee, principal, employer, co-conspirator, or

any combination thereof of each of the remaining defendants, vice versa, or both. In addition, Plaintiffs allege, upon information and belief, that the Defendants named herein, and each of them, are responsible in some manner for the occurrences herein alleged, and that each of the above Defendants conspired with, directed, ratified, approved, aided, abetted, jointly collaborated, or any combination thereof, each of the remaining Defendants in committing the acts herein alleged or failed to prevent such acts when having the power, duty, or authority to do so with full knowledge of said acts.

## FACTUAL ALLEGATIONS[1]

### I.   BACKGROUND

23.     Christine is the biological mother of Brooke.

24.     Brooke is a non-verbal, severely autistic individual. Brooke's date of birth is July 14, 2001.

25.     John Scianna ("John") is the biological father of Brooke.

26.     At all times relevant to this complaint, Christine and John were not married.

27.     At all times relevant to Ibis coiiiplaintTBrookmvvas a minor.

28.     At all times relevant to this complaint, Christine and John shared custody of Brooke. Brooke lived with Christine for the majority of the time, and John had parenting time with Brooke for approximately two days every other weekend.

29.     Christine has a degree in psychology and education, and a MS Ed. Degree in Education. At the time of the filing of this complaint, Christine has worked as a teacher for approximately 17 years.

_____

TPlamiiffs makethe allegations in this Complaint basedupon personal knowledge as to those matters in which they had personal involvement and upon information and belief as to all other matters.

Milas + Woods Law, PLLO
2055 #c04 12th =treet, Suite M1
Pozanix, AZ 85012>
#80.922=556

30.     At all times relevant to this complaint, Christine worked as an eighth-grade science teacher at Sonoran Heights Junior-High School.

31.     Prior to June 22, 2018, Christine had many services in place to assist Brooke with having a happy and healthy life. In order to appropriately care for Brooke, Christine had services in place from the following organizations:

a.  Mercy Maricopa Integrated Care (MMIC): a program administered by the Arizona Department of Health Services to assist persons within the MMIC service area who are seriously mentally ill;

b.  Division of Developmental Disabilities (DDD): a division of the Arizona Department of Economic Security which provides support and services to individuals with certain developmental disabilities;

c.  Child and Family Support Services (CFSS): a state contracted service provider who assists families in accessing behavioral healthcare services; and

d.  Arizona Children's Association (ACA): a state contracted service provider that provides behavioral health services to families.

32.     Despite Brooke's challenges, overall she was a happy teenager who enjoyed a close and caring relationship with Christine.

33.     Christine was also attentive to Brooke's medical needs and consistently called on the support of numerous doctors who assisted her in meeting Brooke's medical needs.

34.     On or about March 2, 2018, Brooke was released after a brief hospitalization at Aurora. Aurora employees discharged Brooke to the custody and control of Christine.

35.     On or about April 12, 2018, Christine contacted Dr. Michelle Hardenbrook, Brooke's treating psychiatrist via e-mail.

36.     IrTlhe∧maiiPChristiha explained that she was concerned about Brooke because she had observed that Brooke's compulsive behavior was

Mitsch + Woore Law, PLLC
4805 North 12th Street, Suite 121
Phoenix, AZ 85014
480/953-8516

8

1  increasing in severity. Christine asked Dr. Hardenbrook for assistance in helping
2  Brooke.

3      37.    From on or about April 12, 2018 to April 13, 2018, the following email
4  exchange occurred between Christine and Dr. Hardenbrook:

6  Dr. Hardenbrook: Unfortunately we treat OCD with antidepressants which take
7                    3-4 weeks to start to have effect. Is this with 10 mg of Valium in
8                    the morning? I am wondering if for the short term, until we get
9                    the desired effect from the antidepressant, we might want to
10                   consider something that targets hyperactivity and impulsivity.
11                   Has she been on guanfacine (Tenex is brand name)? I don't see
12                   it in her profile here. It comes in an extended formula dosed
13                   once a day in the morning. At minimum, it might provide some
14                   calm while we wait for anafranil to start working.

16 Christine:        I don't believe she ever took that. I think it would be a good
17                   idea to try that, though. She is so hyper that she cannot sit still.
18                   She resetting IhLrAdheWalram inAhe morning (usually 2)y
19                   because the school has been having similar issues with her
20                   compulsively putting things away.

22 Dr. Hardenbrook: I will send RX to the rpharmacy. It is dosed once day in the
23                   morning. It is an extended formula so should last throughout
24                   the day. We have to start at 1 mg but we can increase in
25                   WEEKLY increments. I will send RX to the pharmacy. If one is
26                   not effective you can increase to 2 after 1 week but let me know
27                   so that adjust the RX. This medication can be sedating the first

1    couple of days- though I doubt it will be in her case. Other
2    possible side effect is dizziness.

3    38.    On or about April 17, 2018, Christine and Dr. Hardenbrook
4  exchanged a series of e-mails about how to appropriately adjust Brooke's
5  medications due to Brooke's negative behaviors increasing while Brooke was at
6  school.

7    39.    On or about April 18, 2018, the following email exchange occurred
8  between Christine and Dr. Hardenbrook:

10  Christine:            Mornings have become unbelievably stressful.   She
11                        rushes to get everything put away before she goes in the
12                        morning and wouldn't get on the bus until all was put
13                        away and she's still having problems with school.   Her
14                        compulsive behavior seems to be getting worse, because
15                        Sunday, she tried pulling plugs out of everything and the
16                        water cooler plug doesn't detach and she was going
17                        crazy (my boyfriend managed to bury the cord inside the
It                        cooler. \and ihart finally helpedr SheVscrdriverrthat sheV
19                        beating her wrists up.  I've been looking into GABA and
20                        not sure if that would help.   Her behavior is so out
21                        control.  Meds don't seem to work.   Even the Valium
22                        doesn't sedate her and two henedryl doesn't do much
23                        either.

25  Dr. Hardenbrook:      When morning in particular are bad I always consider
26                        sleep as a probable culprit.

10

| | | |
|---|---|---|
| 1 | Christine: | How can I make sure she's getting sleep?  The melatonin |
| 2 | | doesn't seem to work for her. |
| 3 | | |
| 4 | Dr. Hardenbrook: | Let me look at her regimen. Is the OCD getting worse or |
| 5 | | just not getting better? We may want to increase Anafrail |
| 6 | | but I want to look at what is on board for sleep. |

40.     The week of April 16, 2018 was the week when Christine was required to administer AZ Merits testing to the students at her school. This week is consistently a busy and stressful week for teachers in Arizona, and during this week, due to the restrictive testing schedule, Christine's availability during the day was limited.

41.     For the week of April 16, 2018, Cassandra Tisdale, a High-needs case supervisor with ACA offered to assist Christine with any needs that arose during the day that week.

42.     On or about April 18, 2018, due to Brooke's behaviors while at school, an unknown school official from Brooke's school, ACCEL, contacted the MMIC Crisis Team. An unknown member of the MMIC Crisis Team then contacted Ms. Tisdale, however, this individual mistakenly believed that Ms. Tisdale was Christine. Ms. Tisdale informed the MMIC Crisis Team member that the crisis team could not take Brooke to the hospital. Christine was not made aware of this telephone call until several weeks later.

43.     After the above-described events occurring on or about April 18, 2018, based on Ms. Tisdale's refusal to allow the MMIC Crisis Team to take Brooke to the hospital, an unknown person from MMIC contacted the Arizona Department of Child Safety (DCS) and erroneously informed them that Christine had refused to consent to appropriate medical care for Brooke.

44.     On or about April 18, 2018, after Brooke returned home from school, Christine observed that Brooke had injuries on her knees, wrists and arms and

became concerned. The following email exchange occurred between Christine and Dr. Hardenbrook:

Christine:                Is it possible to re-hospitalize Brooke? She came home crying and agitated and the school is basically housing her in a padded room during the day. Meds are doing no good. They have already suspended her once and are requesting another meeting because they can't handle her behaviors. She's out of control with punching her head, biting her wrists, and has bruises and bites on her knees. The school took pictures.

Dr. Hardenbrook:        Take her to the hospital. I don't know if they will hospitalize her or not, but you can have her evaluated. You can call her CM for directions on the process if needed or you can just take her.

45.     After receiving the above email from Dr. Hardenbrook, Christine then received cm email froirrMsr Tisdale; which stated: "It would her bestiirscheduienrr emergency meeting to discuss concerns and come up with some options for Brooke. To put her back in the hospital would not be the best option. Let me know a good day and time for everyone to meet. We can include the school on these meetings as well tomom&up with some options for Brooke."

46.     After receiving the above email from Ms. Tisdale, Christine chose to wait and see how Brooke did at school the following day rather tharrtaking her to the hospital that evening.

47.     The next morning, on or about April 19, 2018, Christine sent an email tbdETeciaHart fBfodke's DDUcoordinator), Danielle Howell (Brooke's HighmeedsT

1  case manager with ACA), Patrice Munday (Christine's assigned parent-partner

2  with ACA), and Ms. Tisdale.

3      48.    The email stated: "I went to give her a bath to try and relax her and I

4  saw her knees. This is bad. Something has to be done." Ms. Munday responded:

5  "Cassandra wants to stop by to see Brooke tomorrow but you need to let the

6  principal know it is okay to communicate with her. Also Cassandra had already

7  spoken with crisis team.  We need to set up a CFT as soon as possible to get

8  referrals sent. Call me with any questions, Cassandra is having trouble with her

9  phone."

10     49.    On or about April 19, 2018, the following email exchange occurred

11  between Christine and Dr. Hardenbrook:

12

13  Christine:                  OCD is getting worse.  GABA comes over the counter.  It

14                              was suggested I give her that, so I gave her that last night,

15                              but during the morning she was so hyper and OCD, yet

16                              she slept all night. I met with DDD and I'd have to have

17                              her in full meltdown and 911 and her taken to emergency

18                              and I'm so sick from a respiratory infection right

19                              now...that would be a ton of stress.  They did think for a

20                              teen who is 5 foot 8, the dosages were low, because she's

21                              such a big girl. I don't know what to do.  Her agitation in

22                              the morning and compulsion is the worst it's been.

23

24  Dr. Hardenbrooke           So sorry you're sick on top of all this. I was planning to

25                              look at her meds yesterday but last plan was

26                              hospitalization. I will look over her medication this

27                              mommghancTmake some changes. Is thereTany chance

28                              she is constipated? I don't know her bowel regimen but

13

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

|   |   |   |
|---|---|---|
| 1 | | the new medication can be constipating and we should |
| 2 | | consider underlying medical that she might not be able |
| 3 | | to verbalize- sleep too. You can give two of the Intuniv- |
| 4 | | this targets impulsivity and hyperactivity. I don't know |
| 5 | | anything about GABA to comment. I would have to do |
| 6 | | research to give input. I will get back to you soon. |
| 7 | | |
| 8 | Christine: | The topic of constipation did come up and inflammation |
| 9 | | in joints, because she is biting wrists, knees, and areas |
| 10 | | that appear to be joints. She has a neurologist |
| 11 | | appointment a week from tomorrow, so looking into |
| 12 | | that, too. Benefiber was a suggestion if she is constipated. |
| 13 | | The school wants a meeting, because she is so out of |
| 14 | | control at school that they cannot even have her in the |
| 15 | | classroom and that is even on 10 mg of valium. It is as |
| 16 | | though it isiT! even working at all. GABA is just Gamma- |
| 17 | | aminobutyric acid (GABA) is a key neurotransmitter |
| 18 | | Tesponsible for xaiming  lire central nervous system: |
| 19 | | Thank you for your continued effort to help out with |
| 20 | | meds. |
| 21 | | |
| 22 | Dr. Hardenbrook: | Ha, I know what GABA, the neurotransmitter, is. I don't |
| 23 | | know that the research is on supplementation or what |
| 24 | | the actual products contain. I am sorry my appointments |
| 25 | | today are all busy and I am trying to catch up in between. |
| 26 | | I will look over her profile and make some changes |
| 27 | | today. I am wondering xFValiumTshaving a paradoxical |
| 28 | | effect- making her more hyper and disinhibited. This is a |

|   |   |   |
|---|---|---|
| 1 | | possibility and it is definitely not having a positive effect. |
| 2 | | Do you think we can hold the PM dose and see? Actually, |
| 3 | | it is also a possibility with Benadryl though I know she |
| 4 | | has been taking it a while with the intended effect. I will |
| 5 | | get back to you today. |
| 6 | | |
| 7 | Christine: | I was wondering that, too, with the Valium. I didn't give |
| 8 | | it to her in the evening yesterday to see how she's act. In |
| 9 | | some ways she seemed better when DDD was here at 5, |
| 10 | | but then later, she started laughing and 5 minutes later |
| 11 | | was crying. I asked her if she was in pain and she said |
| 12 | | yeah, so I gave her ibuprofen 600 mg. She seemed to feel |
| 13 | | better, but the OCD behavior was so bad that at 8 last |
| 14 | | night she was trying to cram glass containers into the |
| 15 | | dish washer and they didn't fit and one broke. She went |
| 16 | | to bed after that, but the morning was rough and she |
| 17 | | hadn't even had any meds yet and was hyper vigilant |
| 18 | | trying to cram everything shednundrinydaces beforelhe |
| 19 | | bus arrived. She was really overstimulated this morning. |
| 20 | | Crisis was called to the school as behavior went from the |
| 21 | | time she got there to going home. Crisis was going to go |
| 22 | | talk to AZ Children's Assoc. It was hospitalize Jher or |
| 23 | | send her home again. She's coming home, but I don't |
| 24 | | know how much morelhe school and I can take. DDD |
| 25 | | said there was some sort of swab of cheek test that could |
| 26 | | be done to test how she responds to drugs. Do you know |
| 27 | | about it? They said it was some sort of genetic test. |
| 28 | | Thank you for your time. I understand being busy. It's |

been a crazy day.  Waiting to see if they are going to strike.  I voted against it right now.  Not a good time.

50.    On the morning of April 19, 2018, Brooke went to school as usual. During the day, Ms. Tisdale visited Brooke at her school. Ms. Tisdale observed that Brooke was exhibiting severe negative behaviors while at school. Concerned, Ms. Tisdale contacted Christine.

51.    Ms. Tisdale reported to Christine that Brooke's eyes appeared to be fully dilated and that although four school staff members were attempting to physically restrain her, they were not being successful. Christine suggested to Ms. Tisdale that Brooke should be hospitalized, and Ms. Tisdale responded that she would contact Aurora.

52.    On the afternoon of April 19, 2018, Christine received a call from the principal of ACCEL. The principal informed her that the MMIC Crisis Team was at the school and that they recommended that Brooke be taken to Thunderbird Banner Hospital (Thunderbird). Christine gave her approval for Brooke to be taken to Thunderbird.

53.    After speaking with Brooke's school principal, Christine called John. Christine explained to John what was occurring with Brooke. Since Christine was 45-minutes away from Thunderbird, and John was located near Thunderbird, they agreed that John would go to Thunderbird to meet the ambulance transporting Brooke, and Christine would arrive as soon as she could.

54.    After speaking with John, Christine informed her supervisors of the situation, and then left work to go to Thunderbird to be with Brooke.

55.    Brooke was admitted to Thunderbird that day and numerous tests were administered to determine if there were any medical conditions occurring which could explain Brooke's behaviors.

56.    On or about April 20, 2018, an unidentified DCS investigator went to Christine's home. The DCS investigator questioned Christine regarding

16

Christine's alleged refusal to follow the MMIC Crisis Team's recommendation to hospitalize Brooke. Since Christine had never done so, however, she was confused by the questions of the DCS investigator. The DCS investigator would not explain to Christine to what alleged refusal she was referring.

57.     Christine was also confused by the questions of the DCS investigator because, at that time, Brooke was hospitalized at Thunderbird with Christine's consent.

58.     Later that afternoon, Christine went to Thunderbird to visit Brooke. Brooke was in the behavioral ward of Thunderbird and was in restraints.

59.     At Thunderbird, tests determined that Brooke's CK levels were 6,666, which indicated that Brooke had been dangerously close to renal (kidney) failure. This meant that Brooke's kidneys could not remove waste and concentrated urine.

60.     Brooke was diagnosed with Rhabdomyolysis. Rhabdomyolysis is a serious syndrome which is caused by a direct or indirect muscle injury. It results from the death of muscle fibers and a release of their contents into the bloodstream. It can lead to serious complications such as renal (kidney) failure. In rare cases, rhabdomyolysis can even cause death. Thunderbird provided medical treatment to Brooke.

61.     On or about April 30, 2018, with Christine's consent, Brooke was transferred from Thunderbird to Aurora. Christine went to Thunderbird and followed the ambulance transporting Brooke to Aurora and stayed with her at Aurora until Brooke was settled and comfortable. Christine regularly visited with Brooke during her hospital stay.

62.     On or about May 30, 2018, Brooke was released from Aurora into Christine's care and custody.

63.     On or about June 1, 2018, Defendant Canale, a DCS investigator, arrived at Chnstine'sTibme akChristine was preparing to leave to attend a friend's birthday celebration. Christine asked Canale to contact her about meeting at

another time and to contact Ms. Hart, Brooke's DDD Support Coordinator to become informed regarding Brooke.

64.     At the time Canale arrived, Brooke was resting. When Canale asked to see Brooke, Christine explained that disturbing Brooke would upset her.

65.     The exchange between Canale and Christine was witnessed by Ryan Last-Name-Unknown, Brooke's behavior coach.

66.     On or about June 6, 2018, Christine met with representatives of ACCEL and the school district. Christine expressed concerns that a vest the district was using to transport Brooke to school was too tight for Brooke and was causing Brooke pain and may have contributed to Brooke developing rhabdomyolysis. Representatives from the school district discussed that the following Monday, the transportation personnel would bring several vests with them, so that Brooke could try on different vests to find one that may fit better.

67.     In hearing the school district's plan, Christine expressed her concern that trying on different vests may trigger Brooke because Brooke would not be able to understand the reason for putting on different vests. All persons at the meeting discussed alternative methods of keeping Brooke calm during the bus ride to school.

68.     On or about June 10, 2018, Christine broke her foot.

69.     On or about June 11, 2018, Christine received a call from an unknown individual with the school district's transportation division who told Christine that personnel from the school district's transportation division would be arriving early that day to try vests on Brooke. Christine expressed her concern that if personnel attempted to place a vest on Brooke when the bus was not there, Brooke would not understand what was occurring, and could get upset.

70.     Despite Christine's concerns, later that morning, two unknown personnel from The school district transportation office arrived at Christine and

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480-999-4556

Brooke's home. Christine escorted Brooke outside, and the transportation personnel attempted to try different vests on Brooke. Brooke became upset.

71.     Brooke bit one of the persons on the shoulder and hit the other person and pulled her hair.

72.     After being assaulted by Brooke, the transportation personnel ran to the sidewalk and stood near their car. Once there, their view of what occurred in the front of the house was obscured by several stucco pillars.

73.     After the transportation personnel had run to their car, Brooke bit and hit Daniel Quigley ("Daniel"), a friend of Christine's who was present and was trying to assist with having Brooke try on the vests.

74.     Daniel attempted to place Brooke in an appropriate safety restraining hold which he had been taught by qualified persons. This hold involved Daniel placing his hands on Brooke's jaw in order to encourage her to release her bite hold.

75.     Brooke also bit Christine and stepped on Christine's broken foot. This caused Christine to experience severe pain, and Daniel instructed Christine to go into the home so that her broken foot would not be further injured.

76.     Christine reluctantly went inside the home but continued to watch Brooke from the open front door.

77.     Brooke then began to bang her head against the outside stucco of the home. Fearing that Brooke would seriously injure herself, Daniel placed Brooke in aa appropriate safety restraining hold that heJhad been Taught by qualified personnel. The purpose of the hold was to stop Brooke from continuing to bang her head and possibly seriously injuring herself.

78.     When it appeared that Brooke had stopped attempting to bang her head, Daniel released Brooke from the safety restraining hold.

79.     When Daniel released BrobkeTrom theTTold,ThbokeTarTtoward the street. Christine yelled for Brooke to stop.

80. Brooke went to the vehicle of the transportation personnel and began to hit the vehicle with her hand. Daniel ran after Brooke and persuaded her to return to the house.

81. Eventually, Daniel and Christine were able to calm Brooke down and the transportation personnel left.

82. When the school bus arrived, Brooke put on a vest and boarded the bus. Christine then emailed the school district transportation office expressing her displeasure with the manner in which the situation had been handled by the personnel that morning.

83. Christine also emailed John and explained what had occurred. Christine included in the email a photograph of the bite that Brooke had inflicted on her.

84. On or about June 11, 2018, an unknown person called the DCS Hotline regarding the incident with the transportation personnel attempting to get Brooke to try on vests. The report stated that Brooke had become "very aggravated." The report falsely accused Daniel of attempting to choke Brooke. It also falsely accused Christine of leaving Brooke wandering in the street alone for ten minutes.

85. On Tuesday, June 12, 2018, a person from ACCEL contacted Christine. Due to Brooke's recent violent behaviors while at school, the person recommended that Brooke be transferred to another school within the district, ACES. Christine agreed with the recommendation.

86. Christine began to work with the district psychologist on transferring Brooke to ACES.

87. On or about June 13, 2018, Canale contacted Christine about scheduling a meeting with her, John, and Brooke's care providers. Christine was led to believe that the meeting was in regard to the plan to transfer Brooke to ACES. The meeting was scheduled for Monday June 18, 201K

88.     On June 18, 2018, a meeting was held which Christine and John attended. The meeting was also attended by Daniel, Shannon Jones (John's significant other), Canale, and various of Brooke's DDD and behavioral health providers.

89.     Canale relayed to Christine and Daniel what was reported to DCS as allegedly occuring on the morning of June 11, 2018. Christine and Daniel provided Canale a true and accurate account, as outlined above, regarding what had actually occurred.

90.     Brooke's DDD and behavioral health providers all spoke favorably of Christine and her care of Brooke.

91.     At some point during the meeting, Ms. Tisdale arrived. Ms. Tisdale informed Canale that it was she who had refused to have Brooke taken to the hospital on April 18, 2018 and not Christine. This is the first time Christine learned of that incident.

92.     Arizona law, specifically A.R.S. § 8-456(C)(1) requires that "after receiving a DCS report from the centralized intake hotline," a DCS investigator, "shall":

          Make a prompt and thorough investigation. An investigation Trust evaluate and determine the nature, extent and cause of any condition created by the parents, guardian or custodian or an adult member of the victim's household that would tend to support or refute the allegaiiorLthat the child is a victim of abuse or neglect and determine the name, age and condition of other children in the home.

98.     Despite being informed of the falsity of the initial allegations, and her obligation to make a prompt and thorough investigation, including evaluating evidence that would tend to support an allegation of neglect or abuse, Canale refused to investigate the allegations.

21

94.    Despite the favorable reports from Brooke's DDD and behavioral health providers who knew Brooke and Christine and had worked with them for a significant period of time, during the meeting, Canale informed Christine that it was her intention to place Brooke in a group home and that if Christine did not consent to that plan, then she would just take action to remove Christine's parental rights.

95.    Despite Canale's threat to remove her parental rights, Christine did not agree to allow Canale to place Brooke in a group home.

## II.    THE UNCONSTITUTIONAL SEIZURE OF BROOKE.

96.    On or about June 19, 2018, Canale emailed Christine and informed her that Christine must agree to tour a possible group home for Brooke, and that if she did not, Canale would deem her to be not cooperating with her and would remove her parental rights.

97.    Christine was frightened and distressed by Canale's threat to remove her parental rights.

98.    Due to Canale's threat, Christine agreed to tour a possible group home for Brooke.

99.    On June 21, 2018, Christine and John toured a group home that Canale had selected as a possible placement for Brooke.

100.    During the tour, Canale once again informed Christine that she would be placing Brooke in a group home and that if Christine did not agree with her actions, then she would remove her parental rights.

101.    Canale also informed Christine that she was preparing the paperwork to remove Christine's parental rights for at least six months.

102.    Canale then unlawfully ordered Christine to bring Brooke to the group home that evening at 4:30 p.m. and surrender custody of her child to the state, and threatened that if Christine did not do so, then the paperwork to remove her parental rights would be filed with the court.

103.   When Christine returned home, she contacted an attorney. Based on what the attorney told her, Christine believed that the company who managed the group home Canale had selected did not have a good reputation and that Christine was not under any legal obligation to take Brooke to the group home and surrender her custody rights to the state.

104.   According to the progress report filed by DCS on June 28, 2018, while Canale was at the group home, she "explained" to Christine "how the Department will be taking custody but would like to facilitate an easy transition to the group home for the child's sake."

105.   The report does not discuss in any way what possible legal authority or lawful basis Canale had for seizing Brooke.

106.   Christine did not bring her child to the group home at 4:30 p.m. on June 21, 2018.

107.   After Christine did not bring Brooke to the group home at 4:30 p.m. on June 21, 2018, Canale did not take any steps to obtain a warrant to seize Brooke.

108.   On June 22, 2018, Canale arrived at Christine's home at approximately 1:10 p.m. and began to pound on her door and scream threats at Christine. Chrrstmexlid nohopen the door.

109.   Christine could hear Canale yelling through her front door. Canale was yelling that she was there to seize Brooke.

110.   When Christine refused to allow Canale to unlawfully enter her home and seize her child, Canale called the police. Later, unidentified police officers arrived at Christine's home.

111.   When the police officers arrived at her home, Christine became even more fearful and telephoned an attorney.

112.   Christine went to the door and, through the door, asked Canale to Telephone her attorney, ancTprovidecTCanale the name and telephone number of her attorney.

113.   One of the police officers called the attorney at the telephone number Christine provided, and, in response to the request from the attorney, one of the police officers called the MMIC Crisis Team.

114.   While waiting for the MMIC Crisis Team to arrive, Christine fed Brooke her lunch.

115.   The MMIC Crisis Team arrived approximately 90 minutes after being called.

116.   Once the MMIC Crisis Team arrived, Christine allowed Canale, the police officers, and the members of the Crisis Team to enter her home.

117.   At approximately 1:10 p.m. on June 22, 2018, Canale seized Brooke from Christine.

118.   Canale did not have a warrant for seizing Brooke.

119.   In the time period between when Christine did not arrive at the group home with Brooke at 4:30 p.m. on June 21, 2018 until the time when Canale seized Brooke, Canale did not take any action to obtain a warrant to seize Brooke or obtain court authorization for her to seize Brooke.

120.   At the time Canale seized Brooke, "Arizona law recognize[d] that juvenile courts can issue same-day motions for pickup" *MTmrrreru. Terfersorir SSO* F. 3d 1066, 1076 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa*, 228 Ariz. 150, 151 (App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at imminent risk of abuse and/or neglect due to Mother's substance abuse'"); *Tyren T. v. Dep't of Child Safety*, No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct. App. Aug. 25, 2016); *Michael C. v. Ariz. Dep't of Econ. Sec.*, No. 1 CA-JV 12-0005, 2012 WL 1964581, at *1 (Ariz. Ct. App. May 31, 2012); *Magdaline L. v. Ariz. Dept. of Econ. Sec.*, No. 1 CA-JV 08-0076, 2008 WL 5403657, at *1 (Ariz. Ct. App. Dec. 07, 2008).

121.   In the time period between when Christine did not arrive at the group home with Brooke at 4:30 p.m. on June 21, 2018 until the time when Canale seized Brooke, Canale had sufficient time to obtain a warrant or other court authorization to seize Brooke.

**122**.   In seizing Brooke, Canale provided Christine with a temporary custody notice (TCN) signed by herself and Defendant Johnson as the approving supervisor.

123.   According to a DCS press release in 2018, removal decisions do not and never have "rested solely with the child welfare investigator." "All child removals have always, and still require, a thorough case review and approval by the investigator's supervisor prior to DCS making a removal decision." DCS website, https://dcs.az.gov/news/november-29-2018-statement-dcs-regarding-removal-children (last visited October 31, 2019).

124.   The TCN form lists several circumstances which purportedly justify an unwarranted seizure; the person completing the TCN is required to check the box next to whatever circumstance applies. On the TCN Canale used for seizing Brooke, no box was checked. The form did not in any way indicate what circumstance was alleged to exist which purportedly justifiechthemnwarranted seizure.

125.   After seizing Brooke, Canale placed Brooke into a different group home than the one toured by Christine and John.

126.   Xanale refusedha inform Christine of the identity or Locationnf the group home where Canale had taken Brooke.

—127.   Canale simply took Christine's child and then unnecessarily and cruelly forced Christine to undergo the trauma of not knowing where her child was.

III.    AGENTS OF DCS CONTINUE TO VIOLATE THE LAW.

128.    In the days following Canale's seizure of Brooke, Christine attempted to contact Canale numerous times to learn the status of her child, where she was, and if she was ok.

129.    Canale did not respond to any of Christine's calls. Instead, Canale unnecessarily and cruelly forced Christine to undergo the trauma of not knowing where her child was or if her child was okay.

130.    Canale also inexcusably forced Brooke to undergo the trauma of suddenly and inexplicably being separated from her mother.

131.    After seizing Brooke from the custody of her loving parents, Canale placed Brooke in a group home operated by Defendant Care and Dignity Services, LLC ("C&D group home").

132.    Under A.R.S. § 1-602 (A): "All parental rights are reserved to a parent of a minor child without obstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including:

1. The right to direct the education of the minor child.

2. All rights of parents identified in title 45, including the right to access and review all records relating to the minor child.

3. The right to direct the upbringing of the minor child.

4. The right to direct the moral or religious training of the minor child.

5. The right to make health care decisions for the minor child, including rights pursuant to §§ 15-873, 36-2271 and 36-2272, unless otherwise prohibited by law.

133.    Under A.R.S. § 1-602 (B): "Unless those rights have been legally waived or legally terminated, parents have inalienable rights that are more comprehensive than those listed in this section. This chapter does not prescribe all

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 2J
Phoenix, AZ 85014
480.999.4556

1   rights of parents. Unless otherwise required by law, the rights of parents of minor

2   children shall not be limited or denied."

3        134.   After seizing Brooke, Canale did not take any steps to obtain court

4   approval for her seizure.

5        135.   On or about June 27, 2018, six days after seizing Brooke, DCS filed a

6   dependency petition, alleging that Brooke was dependent as to Christine and John.

7        136.   The dependency petition was signed, under penalty of perjury, and

8   verified as being true and accurate by Johnson.

9        137.   In the dependency petition, Johnson made numerous statements

10  which she knew to be false and/or which exhibited a reckless disregard for the

11  truth, including, but not limited to the following statements:

12       a. "On or about June 11, 2018, after placing the child in an inappropriate

13       choke hold during a behavioral episode, Christine went into the house and

14       left the child unattended for about ten minutes while the child wandered in

15       the street."

16       b. "[Christine] expected the school's transport staff to supervise the child."

17       c. "Christine frequently could not be reached when the school called her for

18       emergency pickups."

19       d. "Christine stated that she sleeps upstairs on the opposite side of the house

20       from the child and did not hear when the child once answered the door and

21       allowed a stranger into the home."

22       e. "Christine reports that when the child's behaviors escalate, she will

23       frequently hide in the bathroom from the child."

24       f. "…several providers report that Christine's home has been observed as

25       dirty and always kept dark."

26       g. "Christine's behavior is erratic…"

27       h. "Christine blames the school for the child's behavioral issues and states

28       the child does not have the issues in her home; however, the

communications between Christine and the school indicate that Christine has the same issues in her home."

i. "Christine changed the child's medications at least five times within a span of 20 days."

j. "On or about June 11, 2018, Christine and her significant other were observed

placing the child, Brooke, in an inappropriate hold to contain her behaviors."

k. Christine held Brooke "against the wall by her neck."

l. "Brooke had a red mark and scratch on her neck after this incident."

m. "Father did not attend the child's medical appointments or stay up to date on what medications she was on."

n. "Father did not allow the child's DDD supports in his home to work with the child."

o. "Father had concerns about what may be occurring in Christine's home but did not take any actions to protect his child."

p. "Father stated he does not have a home that the child can reside in with **him** at this time."

138.   On or about June 28, 2018, DCS filed with the court a progress report, signed by Canale and Johnson.

139.   In the progress report, Canale and Johnson made numerous statements which they knew to be false and/or which exhibited a reckless disregard for the truth, including, but not limited to the following statements:

a. "Mother stated that she had 'almost' called crisis the night prior due to behaviors in her presence."

b. "A higher level of care was recommended to Mother"

c. "Mother agreed that she would take the child to a hospital after school."

28

d. "Grandmother was contacted and told the principal that Mother had decided not to take Brooke in the night before because she did not feel well and did not want to sit in the lobby and wait."

e. "Mother stated that she could not come" to Thunderbird Hospital on April 20, 2018, "and Father could handle it."

f. "Brooke was last hospitalized at the beginning of March and there was "no change" when she returned to school."

g. On or around Jun 11, 2018, "Brooke was going towards mother and the boyfriend when they put their hands on her. Mother and the boyfriend each put a hand on the front of Brookes neck and pushed her against the wall. Mother and the boyfriend held Brooke against the wall by her neck for a few minutes. It is unknown if Brooke had any difficulty breathing. Later the boyfriend was seen stopping himself from hitting Brooke several times. The boyfriend would start to swing and stop instantly. At one point Brooke stepped on mother's toe and mother went inside bawling. Brooke was left outside wandering out in the street for about 19 minutes before she went back into the yard. Brooke had become upset over a safety vest she is supposed to wearurrthe rideTo schoot"

140.    On July 2, 2018, based on the false allegations contained in the dependency petition and the false statements contained in the June 28, 2018 progress report, the Arizona juvenile court ordered:

"IT IS ORDEREDhpermitting the Christine to have visits with the child through approved safety monitors."

"IT IS ORDERED permitting Christine to have supervisedhvisits with the child by the hospital stabilization representative through CFSS throughout the community or in the group home, if allowed."

"IT IS ORDERED continuing the child as a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety."

141. Soon after the July 2, 2018 hearing, Canale turned management of Brooke's case over to Defendant Courtright, a DCS Case Manager.

142. From on or before August 6, 2018 until the dependency proceedings in this matter were dismissed, Courtright's supervisor at DCS was Defendant Long.

143. As Courtright's supervisor, Long was aware of and approved of each action taken by Courtright. Without Long's knowledge and approval, Courtright would not have taken any action regarding Brooke and her parents.

144. Long participated substantially in every action taken by Courtright.

145. On July 12, 2018, in response to Christine's objection regarding Courtright's failure to allow Christine to visit Brooke on her birthday, the court ordered that Courtright arrange for Christine to visit Brooke on Brooke's birthday.

146. On or about July 16, 2018, Christine received an email from a doctor's office regarding an appointment for Brooke made with that office. This appointment had been made without Christine's knowledge or consent.

147. On or about July 16, 2018, in an email to Christine, Courtright stated: "I have staffed with my supervisor as well and any information in regard to Brooke and medical information will come directly through DCS, this goes for all other services as well."

148. On or about August 3, 2018, in an email to Christine, Courtright informed Christine that she would be scheduling medical appointments for Brooke and that these appointments would be scheduled without Christine's knowledge, input, or consent. The email further stated: "Please note that appointments will not be rescheduled or changed if you are not able to belh attendance."

149. On August 6, 2018, Courtright emailed Christine and informed her that she, without Christine's consent or authorization, had scheduled numerous appointments for Brooke regarding Brooke's education and medical care, including appointments regarding Brooke's mental health treatment. In the email, Courtright informed Christine that Christine could attend the appointments if she chose, but that the appointments would not be rescheduled if Christine was unable to attend.

150. Under Arizona law, specifically, A.R.S. § 36-2272:

A. Except as otherwise provided by law or a court order, no person, corporation, association, organization or state-supported institution, or any individual employed by any of these entities, may procure, solicit to perform, arrange for the performance of or perform mental health screening in a nonclinical setting or mental health treatment on a minor without first obtaining the written or oral consent of a parent or a legal custodian of the minor child. If the parental consent is given through telemedicine, the health professional must verify the parent's identity at the site where the consent is given.

B. This section does not apply when an emergency exists that requires a person to perform mental health screening or provide mental health treatment to prevent serious injury to or save the life of a minor child.

C. A person who violates this section is guilty of a class 1 misdemeanor.

D. For the purposes of this section, "parent" means the parent or legal guardian of a minor child.

151. On or about August 6, 2018, Brooke was taken to a medical appointment by unknown DCS agents or employees. Christine was never informed of this appointment and Avasthi is notable to be present for it.

152.   In 2014, the Arizona Supreme Court made clear that, even when a child is found dependent, under Arizona law, DCS "does not serve as a 'guardian.'" *Alexander M. v. Abrams*, 235 Ariz. 104, 106 (2014). Rather, once "legal custody of the child has been given by order of the juvenile court," to DCS, DCS is legally the child's "custodian."

153.   As an agent of DCS, Courtright knew, or reasonably should have known, that DCS was not Brooke's guardian.

154.   At the time Courtright acted to procure, solicit to perform, arrange for the performance of, or perform mental health screening in a nonclinical setting or mental health treatment on Brooke, she was acting in violation of Arizona law.

155.   In a series of emails beginning on August 8, 2018, Courtright informed Christine that, without Christine's consent or authorization, Courtright had determined to move Brooke to a new school, ACES. Courtright informed Christine that a meeting with personnel at the school had been scheduled to discuss Brooke's transition to the school. Although Christine objected to the meeting being held when she could not attend, Courtright refused to reschedule the meeting.

156.   In an email to Christine, dated August 10, 2018, Courtright stated: "I also want to be sure that you are aware that the school will mot prrovxdcryou information, make appointments, or change appointments *as DCS is guardian*…Also please note this will be the same on all medical appointments." (Emphasis added).

157.   Courtright's statement that DCS was Brooke's guardian was false and/or showed a reckless disregard for the truth and was made for the purpose of infringing on Christine and Brook's fundamental, constitutional rights.

158.   Although Courtright knew, or reasonably should have known, that DCS was not Brooke's legal guardian and had no legal right to take any action to

1    stop Brooke's school from providing information to Christine, making

2    appointments with Christine, or allowing Christine to change appointments, she

3    nonetheless did so.

4        159.    On August 21, 2018, the court held a temporary custody hearing.

5    Based on the false allegations in the dependency petition and in the filed progress

6    report, the court found that temporary custody of the child was clearly necessary

7    to prevent abuse, pending the hearing on the dependency petition. It therefore

8    ordered that Brooke would remain a temporary ward of the Court, committed to

9    the care, custody and control of DCS.

10        160.    In all incident reports from the C&D Group Home, in which Brooke

11    had been placed, the form used lists DCS as Brooke's "guardian." Neither

12    Courtright nor any other person from DCS took any steps to correct this error.

13        161.    Neither Courtright nor any other person from DCS took steps to

14    ensure that Christine was notified of the incidents at the C&D Group Home,

15    although, as Brooke's parent and legal guardian, she had a legal right to be

16    immediately notified of any incident.                                                CAAi

17        162.    The Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§

18    12101-12213 (2018), is a federal law that requires public entities six make reasonable

19    accommodations for qualified individuals with disabilities.

20        163.    The ADA prohibits a public entity from discriminating against a

21    qualified individual with disabilities in the provision or operation of public

22    services, programs, nr activities. *Tennessee v. Lane,* 541 U.S. 509, 517 (2004).

23        164.    Section 504 of the Rehabilitation Act applies the same requirement to

24    entities that receive federal financial assistance. *See In re* H.Cr, 487 A.3d 1254, 1265

25    (D.C. 2018).

26        165.    Under the ADA, a qualified person with a disability shall not, "solely

27    by reason of her or herchsability, be excluded from the participation uTHbebenied

28

MILLS + WOODS LAW, PLLC
5055 No. 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

166. The ADA imposes an affirmative duty on public entities to make reasonable accommodations for qualified individuals with disabilities. 28 C.F.R. § 35.130(b)(7) (2018).

167. DCS is a public entity.

168. Brooke is a qualified individual with a disability, as that term is used in 42 U.S.C. §§ 12101-12213.

169. The services that DCS offered to Brooke are public services.

170. DCS is an entity that receives federal financial assistance.

171. Despite being well aware of Brooke's disability and that requirement of federal law that DCS offer her services that were reasonably accommodated to her disability, no agent of DCS complied with federal law by offering Brooke services that were reasonably accommodated to her disability.

IV. **AFTER UNLAWFULLY SEIZING BROOKE, DCS AGENTS PLACED HER IN C&D GROUP HOME, WHERE SHE WAS NEGLECTED AND/OR ABUSED.**

172. After seizing Brooke from her loving and caring parents, Canale and Johnson placed Brooke in the C&D Group Home.

173. On or about July 9, 2018, an unidentified employee of the C&D Group Home notified Canale that Brooke had sustained injuries from allegedly biting her hand and breaking the glass on a picture. Canale took no action.

174. On or about July 16, 2018, an unidentified employee of the C&D Group Home notified Courtright that Brooke had sustained injuries from allegedly "pounding" her forehead into the wall and from repeatedly hitting her wrist on the wall. Courtright took no action.

175. On or about July 19, 2018, a "CFT" was held which Christine attended. During the UCFT, ah e ttempfecF tcTcontact the C&D Group Home manager, Shawnee LNU, but was unable to reach her.

176.   For the majority of "CFT's" held regarding the care of Brooke, no person, employee, and/or agent from the C&D Group Home attended. Courtright took no action in response to the group home's failure to attend these meetings intended to ensure that Brooke was receiving the appropriate care, in large part from the C&D Group Home.

177.   At the "CFT" held on or about July 19, 2018, Christine informed Courtright that employees of C&D Group Home had failed to take Brooke to her yearly medical exam, although they had been aware of the appointment. The appointment was rescheduled for July 25, 2018. Christine went to the rescheduled appointment, however, employees from the C&D Group Home again failed to bring Brooke for her appointment. Courtright took no action.

178.   On or about July 23, 2018, an unidentified employee of the C&D Group Home notified Courtright that Brooke had allegedly sustained injuries from hitting a light switch, biting her hands, and hitting her head on the wall. The police were called, and Brooke was placed in handcuffs.

179.   When the police arrived, Brooke was strapped to a gurney and taken to Arrowhead Hospital (Arrowhead). This was done without Christine's knowledge or consent. Arrowhead would not admit Brooke, so she was returned to the C&D Group Home. Courtright took no action.

180.   On or about July 26, 2018, Christine had a visitation with Brooke. Christine brought Brooke **strawberries,** mini-tomatoes, and plums which are some of Brooke's favorite snacks. Christine observed that Brooke appeared to be starving.

181.   Brooke quickly ate all the food Christine had brought. Brooke's CFSS Behavior coach Grace LNU also attended this visitation. Christine notified Courtright of her concerns about Brooke, but Courtright took no action.

182.   Or for about July 15, 2018 employees of the C&D Group Home failed to bring Brooke for a scheduled visit with Christine. Christine notified Courtright

35

of the failure of employees of the C&D Group Home to provide a visitation which the court had determined was in Brooke's best interest, but Courtright took no action.

183.   On or about July 30, 2018, Christine had a visitation with Brooke. Christine brought Brooke strawberries, cherry tomatoes and plums for Brooke. Christine observed that once again Brooke appeared to be starving.

184.   Brooke quickly ate all the food Christine had brought.

185.   Brooke's shirt and shorts were on backward.

186.   Brooke's hair was also unkempt.

187.   Christine notified Courtright of her concerns about Brooke, but Courtright took no action.

188.   On or about August 3, 2018, Christine had a visitation with Brooke. Christine brought Brooke strawberries, cherry tomatoes, plums, and vegetable chips for Brooke. Christine observed that once again Brooke appeared to be starving.

489.   Brooke quickly ate all the food Christine Asad brought. Christine notified Courtright of her concerns about Brooke, but Courtright took no action.

190.   Due to the problems the employees of the C&D Group Homm were experiencing with Brooke's behavior, an emergency medical check was scheduled for Brooke, for on or about August 6, 2018. The employees of C&D Group Home, however, neglected to bring Brooke for this medical appointment. Courtright took no action.

191.   On or about August 7, 2018, an unidentified employee of the C&D Group Home notified Courtright that Brooke had sustained injuries from allegedly biting her knee and then had licked the blood from the injury. Courtright took no action.

192.   On or about August 18, 2018 employees of ThtTC&D Group Home arrived one-hour late for a scheduled visitation with Christine.

193.   When Brooke arrived for the visit, Christine noticed a concerning bruise on the back of Brooke's shoulder, and Christine documented the bruise by taking a photograph. Later that day, Christine informed Courtright of the bruise and provided her with the photograph. Courtright took no action.

194.   On or about August 22, 2018 Brooke was taken by ambulance from the C&D Group Home to Arrowhead.

195.   On or about August 22, 2018, Christine had a visitation scheduled for 4:30-6:30 p.m.

196.   When Christine arrived at the C&D Group Home for her scheduled visitation, there were two unknown DCS employees present. One of the unknown DCS employees informed Christine that Brooke had been taken to a hospital.

197.   In response to Christine's request to know to which hospital her child had been taken, the unknown DCS employee contacted the employee's supervisor. The unknown DCS employee informed Christine that Christine would not be informed as to which hospital her child had been taken until Brooke was deemed "stable."

198.   After learning that Brooke had been taken to the hospital, Christine repeatedly requested that Courtright inform her of the hospital to which her child had been taken. Courtright, however, refused to provide Christine with this information.

199.   Christine was not informed of the name of the hospital to which her child had been taken until *two days later,* on or about August 24, 2018.

200.   On August 24, 2018, Christine was finally told that Brooke was at Arrowhead and was finally able to see her. Christine immediately went to Arrowhead to be with her child.

201.   After arriving at Arrowhead, Christine observed that Brooke had extensive and concerning burns and abrasions on her face that appeared as though someone had dragged Brooke across a rug or carpeting.

202. An unidentified nurse at Arrowhead informed Christine that unidentified employees of the C&D Group Home had informed hospital personnel that while at the C&D Group Home, Brooke had been eating her own feces. Brooke had never before exhibited this behavior.

203. An unidentified medical professional at Arrowhead told Christine that Brooke's facial injuries appeared to be the result of someone purposefully dragging Brooke across a carpeting so harshly that Brooke's face was burned and injured.

204. Christine also observed that it appeared that Brooke had not bathed for an extended period of time.

205. Brook had large segments of dried gum in her hair and her hair was severely matted.

206. Brooke's fingernails had been removed to below the nail bed.

207. Brooke had traces of dried feces and blood on her hands and under her fingernails.

208. On or about August 27, 2018, a "CFT" was held which Christine attended. At that meeting, Long informed Christine that a criminal investigation into the abuse and/or neglect inflicted upon Brooke by personnel at the C&D Group Home had been opened.

209. On August 30, 2018, DCS filed a motion with the court asking it to approve of Brooke's hospitalization. The next day, the court granted the motion and scheduled a hearing for September 4, 2018.

210. On September 4, 2018, the court held a hearing regarding Brooke's hospitalization. Due to concerns regarding the C&D Group Home, where agents of DCS had placed and kept Brooke, the court ordered that Brooke was not to be removed from the hospital and placed anywhere without court approval.

211. Although the court approved of the hospitalization of Brooke, nothing in the court's order authorized any person from DCS to authorize any

38

1  aspect of Brooke's mental health treatment under A.R.S. § 36-2272 as Brooke's

2  parent or legal guardian.

3  **V.   BROOKE'S HOSPITALIZATION** AND **ULTIMATE END TO THE**

   **HORRIFIC   ORDEAL   INFLICTED   ON   PLAINTIFFS   BY   DCS**

4  **EMPLOYEES.**

5       212.   On or about August 22, 2018, Arrowhead staff notified Courtright that

6  a bed for Brooke had become available at Aurora and that they recommended that

7  Brooke be moved to Aurora.

8       213.   While at Arrowhead, Brooke was unable to shower because the

9  hospital did not have the necessary facilities. Neither was Arrowhead equipped to

10 provide Brooke with the level of care she needed.

11      214.   Despite the fact that Brooke was not receiving the treatment needed

12 at Arrowhead and the medical recommendation that Brooke be moved to Aurora,

13 Courtright did not inform Christine of the recommendation so that Christine could

14 take the steps necessary to have Brooke moved to Aurora.

15      215.   Courtright failed to take any appropriate action to facilitate the

16 transfer, and as a result of Courtright's failure, Brooke was not moved to Aurora

17 until three days later, on or about August 25, 2018.

18      216.   On or about August 25, AOLSr Courtright wentdo Arrowhead and,

19 without consulting Christine or John or obtaining any parental consent, and

20 although Courtright was neither Brooke's guardian nor her parent, Courtright

21 took action to have Brooke admitted to Aurora for mental health treatment and,

22 although she had no legal authority to dcLso, Courtright purported to authorize

23 Aurora to provide mental health treatment for Brooke.

24      217.   On the evening of on or about August 25, 2018, Brooke was

25 transported by ambulance from Arrowhead to Aurora. Christine was at

26 Arrowhead when Brooke was transferred and followed the ambulance from

27 Arrowhead to Aurora!

28

218.   Upon arriving at Aurora, Brooke immediately went to the bathroom and prepared to take a shower. Before Brooke was able to shower, however, an Aurora employee informed Christine that Courtright had not completed the necessary paperwork correctly and that Brooke would have to be taken to the lobby until the error was corrected.

219.   When Brooke was taken to the lobby, she became confused and responded by banging her head repeatedly into the wall of the lobby until Christine and Afirora staff were able to restrain Brooke.

220.   Brooke was forced to spend approximately two hours in the lobby while Christine completed the necessary paperwork that Courtright had failed to earlier provide to Christine so that Christine could complete it.

221.   On or about September 20, 2018, although she had no legal authority to do so, Courtright purported to authorize Defendant Mlak, Brooke's treating physician, to administer Haldol to Brooke as part of her mental health treatment. At the time she did so, Courtright was aware that Christine did not consent to Brooke being given Haldol because Brooke had previously had a negative reaction to it. Courtright was also aware that John had also not consented to Brooke being given Haldol.

222.   On or about September 20, 2018, although he had not obtained any lawful authority to do so, Mlak administered Haldol to Brooke. At the time Mlak did so, he was aware that neither Christine, John, nor any legal guardian for Brooke had consented to Brooke being given the medication.

223.   On or about September 26, 2018, Courtright informed Christine that although she had no legal authorise do so, Courtright had purported to authorize Mlak to increase Brooke's dose of Haldol, and Mlak had done so based on Courtright's fraudulent authorization.

224.   At the time Courtright purported to authorize Mlak to increase *Brooke's dose of Haldol, she was aware that Christine objected to Brooke's dose*

40

of Haldol being increased. Courtright also was aware that she did not have John's consent to agree to the increase in Brooke's dose of Haldol.

225. Although she had no legal authority to do so, Courtright continued to purport to authorize Aurora personnel to provide Brooke with Haldol as part of Brooke's mental health treatment, until November 16, 2018, when Brooke was finally discharged.

226. The period of August 27, 2018 until November 16, 2018—81 days— was the longest period of hospitalization that Brooke had ever experienced.

227. On November 15, 2018, after a hearing, the court granted Christine's motion that Brooke be placed with her once Brooke was discharged from Aurora. It also ordered that Brooke would remain a temporary ward of the Court, committed to the care, custody and control of DCS. The court did not appoint DCS as Brooke's legal guardian.

228. On or about November 16, 2018, Brooke was discharged from the hospital and placed with Christine.

229. On or about February 11, 2019, DCS filed a motion to dismiss all dependency proceedings. DCS attached to its motion, a progress report to the court dated February 5, 2019. This report was signed H by A5 ourtright arrckfcong:

230. In this report, it stated that "[s]ince being back in Christine's care Brooke has overall been doing well."

231. The report also noted that Christine's psychological evaluation did not yieldjffly recommendations for services and that DCS was not providing any services to the family.

232. The report also noted that Brooke's needs were being met by Christine with assistance of CFSS and DDD. These were the same circumstance as before DCS's interference with this family.

2331 Christine had been meeting Brooke's needs with the assistance of *CFSS and DDD prior to DCS's intervention in their family.*

234.   On February 2, 2019, the court dismissed all proceedings.

235.   No finding of dependency as to Christine or John was ever found by any court.  Nor was legal guardianship over Brooke ever granted to DCS.

## CLAIMS

### CLAIM ONE:

**(The State of Arizona is liable for violating Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (ADA), and § 504 of the Rehabilitation Act (Rehabilitation Act), 29 U.S.C. § 794.)**

236.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

237.   The Arizona Department of Child Safety (DCS) is a public entity and a government agency of the State of Arizona.

238.   Employees of the DCS are employees of the State of Arizona.

239.   The State of Arizona is vicariously liable for the acts of its employees which violate the ADA and the Rehabilitation Act.

240.   Brooke is a qualified individual with a disability under The ADA and the Rehabilitation Act because she has a mental impairment that substantially limits oht of more major life activities.

241.   Brooke was excluded from participation in and/or denied the benefits of the services, programs, and/or activities of DCS, and/or otherwise discriminated against by DCS, and this exclusion, denial of benefits, and/or discrimination was by reason of her disability.

242.   Brooke was excluded from participation in and/or denied the benefits of the services, programs, and/or activities of the DCS, and/or otherwise discriminated against by DCS when employees of DCS failed to offer her services that were reasonably accommodated to her disability.

243.   Brooke was untitled to receive the benefit of services provided by DCS.

244. Brooke was denied these benefits solely by reason of her disability.

245. The services that DCS offers are programs and/or activities that receive federal financial assistance.

246. DCS employees intentionally and/or with deliberate indifference failed to provide Brooke with meaningful access to services and/or make reasonable accommodations in its provision of services.

247. DCS employees were aware from the inception of its involvement in this family that Brooke has a mental disability.

248. Once DCS employees became aware of Brooke's disability, they had a duty to investigate options for providing a reasonable accommodation by gathering "information from [both the disabled individual and] qualified experts as needed to determine what accommodations are necessary to enable" the individual to meet relevant standards. *Mantolete v. Bolger*, 767 F.2d 1416, 1423 (9th Cir. 1985). No DCS employee did so.

249. Despite her cognitive disability, and the applicable federal guidance, DCS employees repeatedly failed to provide Brooke with services that reasonably accommodated her disability.

250. The failure of DCS employees to offer Brooke meaningful access to services was due solely to her disability.

251. If not for her disability, DCS would have provided Brooke with services that did not result in her being hospitalized from August 27, 2018 until November 16, 2018, a period of approximately 81 days.

252. If not for the discriminatory acts of DCS employees and their repeated failure to offer Brooke services that were reasonably accommodated to her disability, there is a reasonable probability that she would not have suffered injuries and/or conditions that required her to be hospitalized from August 27, 2018 until November 16, 2018, a period of approximately 81 days

43

intrusion cannot be longer than necessary to avert the injury. *Wallis*, 202 F.3d at 1138-1141.

262. At the time Canale seized Brooke, "Arizona law recognize[d] that juvenile courts can issue same-day 'motions for pickup.'" *Demaree v. Pederson*, 880 F. 3d 1066, 1076 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of Maricopa*, 228 Ariz. 150, 151 (App. 2011) (noting that the department filed a dependency petition and, "[o]n the same day, the juvenile court granted a motion for pickup of the Child based on [the department's] assertion that the 'child is at

1  order unless they have "information at the time of the seizure that establishes
2  reasonable cause to believe that the child is in imminent danger of serious bodily
3  injury." *Rogers v. County of San Joaquin,* 487 F. 3d 1288, 1294 (9th Cir. 2007).

4      261.    At the time Canale and Johnson seized Brooke, it was well established
5  that a state official "cannot seize children suspected of being abused or neglected
6  unless reasonable avenues of investigation are first pursued," the "scope of the
7  intrusion" must be "reasonably necessary to avert" a specific injury, and the
8  intrusion cannot be longer than necessary to avert the injury. *Wallis,* 202 F.3d at
9  1138-1141.

10     262.    At the time Canale seized Brooke, "Arizona law recognize[d] that
11 juvenile courts can issue same-day 'motions for pickup.'" *Demaree v. Pederson,* 880
12 F. 3d 1066, 1076 (9th Cir. 2018) (citing *Ariz. Dep't of Econ. Sec. v. Lee ex rel. Cty. of
13 Maricopa,* 228 Ariz. 150, 151 (App. 2011) (noting that the department filed a
14 dependency petition and, "[o]n the same day, the juvenile court granted a motion
15 for pickup of the Child based on [the department's] assertion that the 'child is at
16 imminent risk of abuse and/or neglect due to Mother's substance abuse'"); *Tyren
17 T. v. Dep't of Child Safety,* No. 1 CA-JC 16-0091, 2016 WL 4474154, at *1 (Ariz. Ct.
18 ALppr Augr25, 2016); *MichaeDC: v. ArizrALep'trof Rcam Secr,AAcr.* 1 CA-JV LM0005,
19 2012 WL 1964581, at *1 (Ariz. Ct. App. May 31, 2012); *Magdaline L. v. Ariz. Dept. of
20 Econ. Sec.,* No. 1 CA-JV 08-0076, 2008 WL 5403657, at *1 (Ariz. Ct. App. Dec. 30,
21 2008).

22     263.    At the time Canale and Johnson seized Brooke, they dkLnot have
23 information that established reasonable cause to believe that Brooke was in
24 imminent danger of serious bodily injury.

25     264.    Prior to seizing Brooke, Canale and/or Johnson did not first pursue
26 reasonable avenues of investigation.

27
28

265.   When Canale and Johnson seized Brooke, the scope of the intrusion was not reasonably necessary to avert any specific injury, and, even if it were, the intrusion was longer than necessary to avert the injury.

266.   At the time Canale and Johnson seized Brooke, there were no exigent circumstances that justified the seizure.

267.   At the time Canale and Johnson seized Brooke, no reasonable person in their position would have believed that Brooke would be harmed in the time it would take for Canale and/or Johnson to obtain a warrant or other court authorization authorizing the seizure of Brooke.

268.   Canale and Johnson, and each of them, acted under the color of law when they seized Brooke.

269.   Canale's and Johnson's seizure of Brooke violated Christine's constitutional rights.

270.   As a direct and proximate result of the violation of her constitutional rights, Christine suffered irreparable harm and will continue to suffer general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM THREE:

**(Under 42 U.S.C. § 1983, Defendants Canale and Johnson are liable for violating Brooke's Right to Be from Unlawful Seizure under the Fourth Amendment and Fourteenth Amendment to the U.S. Constitution.)**

271.   Plainthis re-allege and incorporate by reference each allegation set forth in the paragraphs above.

272.   At the time Canale and Johnson seized Brooke from her parents, it was well established that children have a Fourth Amendment right, incorporated to the States through the Fourteenth Amendment, to not be unlawfully seized from their parents. *Wallis*, 202 F.3d at 1138-1141.

273.    At the time Canale and Johnson seized Brooke, no reasonable person in their position would have believed that they had the lawful right to seize Brooke from her parents.

274.    Canale and Johnson, and each of them, acted under the color of law when they violated Brooke's constitutional rights.

275.    As a direct and proximate result of the violation of her constitutional rights, Brooke suffered irreparable harm and will continue to suffer, general and special damages, in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM FOUR:
**(Under 42 U.S.C. § 1983, Defendant Arizona Department of Child Safety is liable for the unconstitutional seizure of Brooke by Defendants Canale and Johnson.)**

276.    Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

277.    It is well-established that a government entity is liable for the constitutional violations of its employees when its employees commit a constitutional violation and, at the time of the constitutional violation, the government entity had a policy which amounted to a deliberate indifference of the relevant constitutional right and the policy was the moving force behind the constitutional violation. *Lee v. City of Los Angeles,* 250 F. 3d 668, 685 (9th Cir. 2001).

278.    The Arizona Court of Appeals has found that until July 1, 2018, "DCS assumed temporary custody over a child using a DCS-issued 'temporary custody notice' that involved no advanced court review or approval." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma,* 247 Ariz. 108, 112, (App. 2019) (citing *Kimu P. v. Ariz. Dep't of Econ. Sec.,* 218 Ariz. 39, 41, ¶ 5 (App. 2008); *Michael J., Jr. v. Michael J., Sr.,* 198 Ariz. 154, 155, ¶ 4, (App. 2000).)

279.   "In 2017 and 2018, in response to litigation in federal court concerning the constitutionality of removing a child from a parent's care without judicial authorization, *see Rogers v. Cty. of San Joaquin,* 487 F.3d 1288, 1294-96 (9th Cir. 2007) (collecting cases), the legislature amended A.R.S. § 8-821(A) to abolish this practice, see 2018 Ariz. Sess. Laws, ch. 191, § 1 (2d Reg. Sess.); 2017 Ariz. Sess. Laws, ch. 282, § 3 (1st Reg. Sess.)." *Dep't of Child Safety v. Stocking-Tate in & for Cty. of Yuma,* 247 Ariz. 108, 112, (App. 2019).  The Arizona Supreme Court "adopted Rule 47.3, effective July 1, 2018, to implement those amendments." *Id.*

280.   At the time that Canale and Johnson violated Christine's and Brooke's constitutional rights by unlawfully seizing Brooke, DCS had a policy which allowed its employees to seize children from their parents using a TCN and did not require its employees to seek prior judicial approval before seizing children, even in the absence of exigent circumstances.

281.   DCS's policy amounted to a deliberate indifference to the constitutional rights of Christine and Brooke.

282.   DCS's policy was the moving force behind the constitutional rights violations perpetuated by Canale and Johnson.

283.   DCS either didrTroirrreatm clearmndr constitutionally permissible policies and procedures for DCS employees to follow when those employees removed a child from the custody of the child's parents, and/or it failed to train DCS employees on clear and constitutionally permissible policies and procedures for DCS employees to follow when those employeesuremoved a child from the custody of the child's parents.

284.   It was obvious that the policy instituted and/or maintained by DCS would lead to a constitutional violation like the violation suffered by Christine and Brooke, and DCS was deliberately indifferent to the consequent constitutional violations that would inevitably occuras ahJirect resultTaf the policy.

285.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

<u>CLAIM FIVE</u>
**(Under 42 U.S.C. § 1983, Defendant Johnson is liable for violating Christine's and Brooke's right to Due Process under the Fourth and Fourteenth Amendments for making misrepresentations and/or omissions to the court which were deliberate falsehoods and/or which demonstrated a reckless disregard for the truth.)**

286.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

287.   It is well established that liability for a § 1983 claim will lie for judicial deception. *Liston v. County of Riverside*, 120 F.3d 965, 972 (9th Cir. 1997).

288.   Although, the Ninth Circuit has "recognized absolute immunity for social workers ... for the discretionary, quasi-prosecutorial decisions to institute court dependency proceedings to take custody away from parents," the "scope of absolute immunity for social workers is extremely narrow." *Miller v. Gammie*, 335 F.3d 889, 989 (9th Cir. 2003). Absolute immunity does not extend to the fabrication of false evidence or perjury. *Hardwick v. County of Orange*, 844 F. 3d 1112 (9th Cir. 2017).

289.   At all relevant times, "the constitutional right to be free from the knowing presentation of false or perjured evidence" was clearly established. *Hardwick v. County of Orange*, 844 F. 3d 1112 (9th Cir. 2017); *see also Devereaux v. Perez*, 218 F.3d 1045 (9th Cir.2000); *Whitaker v. Garcetti*, 486 F.3d 572, 582 (2007) (concluding that "the contours of the Fourth Amendment right against judicial deception" were clearly established by 1996).

290.   In the dependency petition, Johnson made numerous statements which were false and/or demonstrated a reckless disregard for the truth,

49

1  including, but not limited to the false statements discussed in paragraph 139

2  above.

3  291.  When committing her acts of judicial deception, Johnson was acting

4  under color of law.

5  292.  As a direct and proximate result of the violations of their

6  constitutional rights, Plaintiffs suffered irreparable harm and will continue to

7  suffer general and special damages in an amount not yet ascertained but which

8  shall be shown according to proof at trial.

9  **CLAIM SIX**

10  **(Under 42 U.S.C. § 1983, Defendants Canale and Johnson are liable**

11  **for violating Christine's and Brooke's right to Due Process under**

12  **the   Fourth   and   Fourteenth   Amendments   for   making**

13  **misrepresentations and/or omissions to the court which were**
**deliberate falsehoods and/or which demonstrated a reckless**

14  **disregard for the truth.)**

15  293.  Plaintiffs re-allege and incorporate by reference each allegation set
forth in the paragraphs above.

16  294.  In a progress report submitted to the court, Canale and Johnson made

17  numerous statements which were false and/or demonstrated a reckless disregard

18  for the truth, including, but not limited to the false statements discussed in

19  paragraph 141 above.

20  295.  When committing their acts of judicial deception, Canale and Johnson

21  were acting under color of law.

22  296.  As a direct and proximate result of the violations of their

23  constitutional rights, Plaintiffs suffered irreparable harm and will continue to

24  suffer general and special damages in an amount not yet ascertained but which

25  shall be shown according to proof at trial.

26  **CLAIM SEVEN**

27  **(Under 42 U.S.C. § 1983, Defendants Canale, Johnson, Courtright,**
**and Long are liable for violating Christine's and Brooke's right to**

28

Due **Process under the Fourth and Fourteenth Amendments for** failing **to make reasonable efforts to preserve the family relationship.)**

297.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

298.   At all relevant times, it was "well established that the State…has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.*, 193 Ariz. 1.85, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id.* at 192, ¶ 32.  A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id.*

299.   At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed to improve the parent's ability to care for the child." *Id.* at ¶ 37.

300.   At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 24 ∧ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period." *Id.* at 23, ¶ 49. At the "very least," reasonable efforts require "DCS to identify the conditions causing the child's out- of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Id.* at 20, ¶ 50.

301.   At all relevant times, it was well-established that in determining whether DCS has complied with the law and made reasonable efforts to reunite a

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480-————-0.4556

parent with their children, a juvenile court must view the "totality of the circumstances" and review DCS' actions during the entirety of time the child has been in DCS' care. *Donald W.*, 247 Ariz. at 19, ¶ 49. "[A]bsent reasonable modifications to…rehabilitative services offered to a disabled parent, a department has failed to perform its duty under the ADA to reasonably accommodate a disability and, in turn, its obligation to make reasonable efforts to rehabilitate the parent." *People in Interest of S.K.*, 440 P. 3d 1240, 1249 (Co. App. 2019).

302.    Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Christine's and Brooke's right to the State's reasonable efforts to reunite them by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

303.    Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Christine's and Brooke's right to the State's reasonable efforts to reunite her with her child by failing to conduct a continuing, and appropriate investigation into the circumstances justifying out of home care throughout the entire period of out of home care.

304.    Defendants Canale, Johnson, Courtright, deeding, and Long, and each of them, violated Christine's and Brooke's right to the State's reasonable efforts to reunite them by failing to at any time appropriately identify to Christine the conditions causing Brooke's out-of-home placement.

305.    Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Christine's and Brooke's right to the State's reasonable efforts to reunite them by:

a.   Failing to ensure that scheduled visitations between Christine and Brooke occurred at all and by failing to ensure that scheduled visitations occurred at the scheduled time;

b.   Failing to inform Christine about scheduled CFT meeting and by otherwise failing to take appropriate steps so that Christine could attend these meetings; and or,

c.   Authorizing Brooke's visitation with Christine to be withheld as a punishment for Brooke's undesired behavior.

306.   Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Brooke's right to the State's reasonable efforts to reunite her with her parents by failing to inform John about scheduled CFT meeting and by otherwise failing to take appropriate steps so that John could attend these meetings.

307.   When they violated Christine's right to the State's reasonable efforts to reunite them, Defendants Canale, Johnson, Courtright, and Long, and each of them, were acting under color of law.

308.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in art amount not yet ascertained But whicTTshalLheTshdwhTiccording toproof attriaL

## CLAIM EIGHT:
**(Under 42 U.S.C. § 1983, Canale, Tohnson, Courtright and/or Long are liable for violating Brooke's right to Due Process under the Fourteenth Amendment for placing Brooke in a group home in which they knew, or reasonably should have known, she would be neglected and/or abused.)**

309.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

310.   At all relevant times, it was well established that the Due Process Clause of the Fourteenth Amendment bars States from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Clause "guarantees more than fair process." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion) (internal quotation marks omitted). It "also includes a

MILLS + WOODS LAW, P.L.C.
5055 No.5 12th Street, Suite 101
Phoenix, AZ 85014
1▲999.4456

substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." *Id.* (internal quotation marks omitted).

311.   At all relevant times, it was clearly established that "when a custodial relationship exists between the plaintiff and the State such that the State assumes some responsibility for the plaintiffs safety and well-being" or when "the state affirmatively places the plaintiff in danger by acting with 'deliberate indifference' to a 'known and obvious danger/'" "a state's omission or failure to protect may give rise to a § 1983 claim." *Henry v. Willden*, 678 F.3d 991, 998 (9th Cir. 2012). The Ninth Circuit has held that it is "clearly established that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* (internal quotation marks omitted). "When the State asserts this type of custody over a person and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by ... the Due Process clause." *Ibid.* (internal quotation marks omitted)

312.   At all relevant times, "it has been clearly established since at least 1996 that foster children have a federal constitutional right to state protection while they remain in the care of the State." *Henry v. Willden*, 678 F.3d 991, 998 (2012) (internal quotation marks omitted). The liberty interest of a child in the care of the State encompasses a child's right to state supervision and protection immJᵢarm inflicted while in the care of the State. *Id.*

313.   Canale, Johnson, Courtright, and/or Long placed Brooke in the CD Group Home, where she was neglected and abused.

314.   At the time Brooke was neglected and/or abused in the CD Group Home, there existed a custodial relationship between Brooke and the State such that the State had assumed some responsibility for her safety and/or well-being.

GALLAGHER + WOODS LAW, PLLC
2046 North 12th Street, Suite 101
Phoenix, AZ 85011
480.999.4556

315. Despite their duty to protect Brooke from harm, Canale, Johnson, Courtright, and/or Long, and each of them, affirmatively placed Brooke in danger when they, either individually or conspiring with each other, placed her in a group home in which they knew, or reasonably should have known, that she would be abused and/or neglected, or when they placed Brooke in the group home, they acted with deliberate indifference to the danger that Brooke would be abused and/or neglected while in the group home.

316. Canale, Johnson, Courtright, and/or Long, and each of them, affirmatively placed Brooke in danger when they, either individually or conspiring together, kept Brooke in the group home after they knew, or reasonably should have known, that she was being or would be abused and/or neglected, or when they kept Brooke in the group home, they acted with deliberate indifference to the danger that Brooke was being or would be abused and/or neglected while in the group home.

317. Based on the numerous reports that Canale, Johnson, Courtright, and/or Long, and each of them, had received from the group home and from Christine, and the need for Brooke to be taken to the hospital while in the care of the group home, Canale, Johnson, Courtright, and/nr Long, and each of them, either collectively or separately, knew, or reasonably should have known, that there was a substantial risk of harm to Brooke yet Canale, Johnson, Courtright, and/or Long, and each of them failed to take the necessary and appropriate action to protect Brooke.

318. In placing Brooke in the group home, and/or continuing to keep her there, Canale, Johnson, Courtright, and/or Long, and each of them acted under color of law.

319. At the time Canale, Johnson, Courtright, and/or Long, and each of them placeiTBrooke mthdgroup home, or continued to keepTier there, they, either collectively or separately, were aware of facts from which an inference could be

1   drawn that a substantial risk of harm existed and Canale, Johnson, Courtright,

2   and/or Long, and each of them, either collectively or individually, drew that

3   inference or a reasonable official in their position would have been compelled to

4   draw that inference.

5       320.   As a direct and proximate result of the violations of her constitutional

6   rights, Brooke suffered irreparable harm and will continue to suffer general and

7   special damages in an amount not yet ascertained but which shall be shown

8   according to proof at trial.

9                          **CLAIM NINE:**

10  **(Under 42 U.S.C. § 1983, Defendants Canale, Johnson, Courtright,**
    **Reeding, and Long are liable for violating Christine's Due Process**

11  **under the Fourteenth Amendment to the U.S. Constitution to make**
    **medical decisions for Brooke and Brooke's Due Process Right**

12  **under the Fourth and Fourteenth Amendments to the U.S.**

13  **Constitution to have medical decisions for her made by her**
    **parents.)**

14

15      321.   Plaintiffs re-allege and incorporate by reference each allegation set

16  forth in the paragraphs above.                     AoE?/!      I  1/1

17      322.   At all relevant times, it was well established that the constitutional

18  due process *right to a family association* includes tha *right of parents to make*

19  important medical decisions for their children, and of children to have those

20  decisions made by their parents rather than the state." *Wallis, 202* F.3d at 1141

21  (citing *Parham u. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of

22  both parents and children that parents have ultimate authority to make medical

23  decisions for their children unless a "neutral fact finder" determines, through due

24  process hearing, that parent is not acting in child's best interests)).

25      323.   At all relevant times, it was well established that: "All parental rights

26  are reserved to a parent of a minor child without obstruction or interference from

27  this state, any political subdivision of this state, any other governmental entity or

28  any other institution, including: The right to make health care decisions for the

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 21
Phoenix, AZ 85013
480.999.4567

1  minor child, including rights pursuant to §§ 15-873, 36-2271 and 36-2272, unless
2  otherwise prohibited by law." A.R.S. § 1-602(A)(5).

3      324.  At all relevant times, it was well established that until there is a
4  finding of dependency by a court, which legally entitles DCS "to temporarily
5  invade" a parent's rights to "legal custody" of their child, that the state has no legal
6  right to invade the constitutional and legal rights of a parent to make medical
7  decisions for their child. *Diana H. v. Rubin*, 217 Ariz. 131, 134 ⨍ 13 (2007).

8      325.  At all relevant times, it was well established that "the requirement
9  that [the state child welfare organization] provide parental notice and obtain
10 consent" before a child in its care and/or custody is provided medical treatment
11 is not "inconsistent with [the state child welfare organization's] obligation to
12 provide routine or emergency medical care to children in its custody." *Mann v.*
13 *Cty. of San Diego*, 907 F.3d 1154, 1163 (9th Cir. 2018).

14     326.  Defendants Canale, Johnson, Courtright, and Long, and each of them,
15 violated Christine's right to make medical decisions for Brooke by, prior to any
16 finding of dependency:

17   a.  Scheduling medical appointments for Brooke without Christine's or
18      John's knowledge and/or consent and refusing to reschedule those
        appointments so that Christine could attend;
19   b.  Taking steps to prohibit Christine from receiving medical information
20      regarding Brooke from medical providers;
21   c.  Taking steps to prohibit Christine from providing medical information
        regarding Brooke to medical providers;
22   d.  Failing to notify Christine or John when Brooke was taken to Arrowhead
        Hospital on or about July 23, 2018;
23   e.  Failing to immediately notify Christine and/or John when Brooke was
24      taken to Arrowhead Hospital on or about August 22, 2018;
25   f.  Purporting to consent to Brooke's admission to Aurora on or about
        August 22, 2018;
26   g.  Purporting to consent to Brooke's medication regime while Brooke was
27      at Aurora from on or about August 22, 2018 until on or about November
        16, 2018; and/or,
28

h. Purporting to consent to Brooke receiving a flu vaccination injection while Brooke was in the care of the State. This consent was provided without Christine's knowledge or consent.

327. When they violated Christine's and Brooke's rights regarding Brooke's medical care, Defendants Canale, Johnson, Courtright, and Long, and each of them, were acting under color of law.

328. As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

### CLAIM TEN:

**(Under 42 U.S.C. § 1983, Defendants Courtright and Long are liable for violating Christine's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to be with Brooke during medical treatment and Brooke's Due Process Right under the Fourth and Fourteenth Amendments to the U.S. Constitution to have Christine with her during medical treatments.)**

329. Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

330. At all relevant times, it was well established that the "Constitution assures parents that, in the absence of parental consent, [medical treatment] of their child may not be undertaken ... at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an [treatment] exist and that the administration of the procedure is reasonable under all the circumstances." *Wallis*, 202 F.3d at 1141 (9th Cir. 2000). "Moreover, parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted)." *Id.*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

331.   At all relevant times, it was well established that "[c]hildren removed from their parents' custody have a legitimate expectation of privacy in not being subjected to medical examinations without their parents' notice and consent." *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1165 (9th Cir. 2018). While a child welfare organization's "custodial responsibility and authority over the children diminishes their privacy interests somewhat, *Parham*, 442 U.S. at 603, 99 S.Ct. 2493, the children nonetheless maintain a legitimate expectation of privacy." *Id*.

332.   Defendants Canale, Johnson, Courtright, and Long violated Christine's right to be with Brooke during medical treatments by:

    a. Scheduling medical appointments for Brooke without Christine's knowledge and/or consent, and refusing to reschedule those appointments so that Christine could attend;

    b. Failing to take adequate steps to ensure that Christine could attend all of Brooke's medical appointments;

    c. Failing to notify Christine when Brooke was taken to Arrowhead Hospital on or about July 23, 2018;

    TL ikaKng tmntmmediateiy notify Christine wherr Brooke was Aakerrto Arrowhead on or about August 22, 2018.Scheduling medical appointments for Brooke without Christine's knowledge and/or consent, and refusing to reschedule those appointments so that Christine could attend;

    e. Taking steps to prohibit Christine from receiving medical information regarding Brooke from medical providers; and/or,

    f. Taking steps to prohibit Christine from providing medical information regarding Brooke to medical providers.

333. When they violated Christine's right to be with Brooke during medical treatments, Defendants Canale, Johnson, Courtright, and Long, and each of them, were acting under color of law.

334. As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM ELEVEN:

**(Under 42 U.S.C. § 1983, Defendants Canale, Johnson, Courtright and Long are liable for violating Brooke's right to Due Process under the Fourteenth Amendment for failing to ensure that Brooke was provided with proper medical care while Brooke was in the custody of the State.)**

335. Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

336. At all relevant times, it was well established that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon him a corresponding duty to assume some responsibility for his safety and general well-being." *Henry A v. WUiden*, 678 F.3d 991, 998 (2012) (internal quotation marks umiLted) r "When the SlciLe asserts Lids type of custody over a person and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by ... the Due Process clause." *Ibid.* (internal quotation marks omitted).

337. Canale, Johnson, Courtright, and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to ensure that Brooke attended her scheduled medical appointments.

338. Courtright and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to

60

take appropriate action to ensure that the paperwork necessary for Brooke's transfer from Arrowhead to Aurora was completed properly and in an appropriate amount of time.

339. Each time Brooke was hospitalized while in the custody of the state, Courtright and/or Long, and each of them, failed to medical personnel that Brooke was only to be provided food that was gluten free and dairy free.

340. Canale, Johnson, Courtright and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to inform medical personnel at the medical facilities where Brooke was being treated that Brooke was only to be provided food that was gluten free and dairy free.

341. While in the custody of the state, Canale, Johnson, Courtright and/or Long, and each of them, failed to ensure that Brooke was to be provided her prescribed birth control treatment, which was necessary to prevent Brooke from menstruating since Brooke lacks the mental capacity to understand menstruation or care for herself while menstruating.

342. Canale, Johnson, Courtright and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to ensure that Brooke was to be provided her prescribed birth control treatment.

343. While in the custody of the state, Canale, Johnson, Courtright and/or Long, and each of them, failed to ensure that Brooke was to be provided her prescribed anti-depressant treatment, causing Brooke to suffer effects from the unnecessary withdraw of the medication.

344. Canale, Johnson, Courtright and/or Long, and each of them, violated Brooke's right to receive appropriate medical care while in the care of the State when they failed to ensure that Brooke was to be provided her prescribed anti-depressant treatment,

345.   When violating Brooke's right to receive appropriate medical care while in the custody of the state, Canale, Johnson, Courtright and/or Long, and each of them, were acting under the color of law.

346.   As a direct and proximate result of the violations of her constitutional rights, Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM TWELVE:

**(Under 42 U.S.C. § 1983, Canale, Johnson, Courtright and/or Long are liable for violating Christine's Due Process under the Fourteenth Amendment to the U.S. Constitution to make educational decisions for Brooke and Brooke's Due Process Right under the Fourteenth Amendment to the U.S. Constitution to have educational decisions for her made by Christine)**

347.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

348.   At all relevant times, it was well established that parents have the right to make educational decisions for their children. In *Troxel v. Granville*, 530 U.S. 57, 66 (2000), a plurality of the court held: "it cannot now be doubted that the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). This interest also includes the right of parents to "direct the upbringing and education of [their] children." *Id.; see also Meyer v. Nebraska*, 262 U.S. 390 (1923) (upholding constitutional right of parents to make educational decisions for their children); *Pierce v. Society of Sisters*, 268 U.S. 510 (1925)/same).

349.   At all relevant times, it was well established that: "All parental rights are reserved to a parent of a minor child withouLobstruction or interference from this state, any political subdivision of this state, any other governmental entity or any other institution, including: The right direct the education of the minor child." AiCS. §TL602(A)(5).

350.   At all relevant times, it was well established that until there is a finding of dependency by a court, which legally entitles DCS "to temporarily invade" a parent's rights to "legal custody" of their child, that the state has no legal right to invade the constitutional and legal rights of a parent to make educational decisions for their child. *Diana H. v. Rubin,* 217 Ariz. 131, 134 ∧ 13 (2007).

351.   In an email to Christine dated July 17, 2018, Courtright stated: "Brooke will be attending the ACES. She was unable to get into school for their summer session and will begin in August, when school resumes for the year. It was determined not to send Brooke back to her previous school as she would only be attending for about another week, and it was felt it would be best to minimize the amount of transitions for her."

352.   Courtright did not have Christine's or John's consent to change Brooke's school. Courtright changed Brook's school without Christine's knowledge.

353.   In August 2018, Courtright scheduled a meeting with persons from Brooke's school regarding Brooke's education. Courtright scheduled this meeting without Christine's knowledge or consent.

354.   After learning of the meeting with persons from JBrooke% School regarding Brooke's education, Christine informed Courtright that she could not attend because the meeting was scheduled during her workday. In an email to Christine dated August 3, 2018, Courtright stated: "As I had expressed before we wilL demur best to schedule meetings at times that you may be able to he present. I explained that you would and will be invited to all meetings for Brooke, if you are unable to attend meetings they will not be rescheduled duetto a conflict with your schedule. I apologize that this meeting is not in-line with your schedule however, at the CFTI will be more than happy to discuss what occurred."

355.   In an email to Christine dated August 10, 2018, Courtright stated: "I also want to be sure that you are aware that the school will not provide you information, make appointments, or change appointments as DCS is guardian."

356.   Defendants Canale, Johnson, Courtright, and/or Long, and each of them, violated Christine's right to make educational decisions for Brooke, and Brooke's right to have educational decisions for her made by her parent, by, prior to any finding of dependency:

a. Scheduling educational appointments for Brooke without Christine's knowledge and/or consent, and refusing to reschedule those appointments so that Christine could attend;

b. Making educational decisions for Brooke without Christine's knowledge and/or consent;

d. Failing to take adequate steps to ensure that Christine could attend all of Brooke's educational appointments;

e. Taking steps to prohibit Christine from receiving educational information regarding Brooke from education providers; and/or,

e. Taking steps to prohibit Christine from providing educational information regarding Brooke to educational providers.

357.   When they violated Christine's right to make educational decisions for Brooke and Brooke's right to have educational decisions for her made by her parents, Defendants Canale, Johnson, Courtright, and Breeding, and each of them, were acting under color of law.

358.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

CLAIM THIRTEEN:
[Under **42 U.S.C. § 1983, Canale, Johnson, Courtright, and/or Long are liable for violating Brooke's right to Due Process under the**

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
(480) 999-4556

**Fourteenth Amendment for failing to ensure that Brooke was provided with an appropriate education while Brooke was in the custody of the State.)**

359.    Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

360.    At all relevant times, it was well established children in the care of the state have a special relationship with the state and thus a federal constitutional right to state protection. *Tamas v. Dep't of Soc. & Health Sews.*, 630 F.3d 833, 846-47 (9th Cir. 2010). This protection requires the state to provide "reasonable safety and minimally adequate care and treatment appropriate to the age and circumstances of the child." *Lipscomb v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992).

361.    At all times while Brooke was in the care of the state, Brooke had an Individual Education Plan (IEP) which required that she attend school throughout the calendar year.

362.    From June 2018 until December 2018, while Brooke was in the care of the state, Brooke only attended one day of school. This was a violation of Brooke's IEP

363.    Canale, Johnson, Courtright, and/or Long, and each of them, violated Brooke's right to adequate care and treatment appropriate To her age and circumstances when they failed to follow Brooke's IEP and did not take appropriate steps to ensure that Brooke was provided the education outlined in her IEP while in the care of the state.

364.    When violating Brooke's constitutional jights regarding Brooke's to adequate care and treatment appropriate to her age and circumstances, Canale, Johnson, Courtright, and/oriLong, and each of them were acting under color of law.

365.    As a direct and proximate result of the violations of her constitutional rights, Brooke suffered irreparableIharm ancLwill continue to suffer general and

special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM FOURTEEN:

**(Under 42 U.S.C. § 1983, Defendants Courtright and Long are liable for violating Christine's Due Process Right under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be represented by counsel at all juvenile proceedings.)**

366.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

367.   At all relevant times, it was well established that, under Arizona statutory law, when a child is seized by the State, a parent is entitled to be represented by counsel at all related proceedings. *See* A.R.S. § 8–225(B), and A.R.S. § 8–221(B) (Supp.2002).

368.   At all relevant times, it was well established that "the denial of the right to effective participation of counsel" during parental rights proceedings "constitutes a denial of due process of law..." *Daniel Y. v. Arizona Dept. ofEcon. Sec.*, 206 Ariz. 257, 260 ¶ 12 (App. 2003) (quoting *Ariz. State Dep't of Pub. Welfare v. EarBw, SO* Arizr.249 £ 253 (T956)).

369.   At all relevant times, it was well established that the right to counsel under the fifth amendment is a protection of the privilege against self-incrimination. *United States v. Gouveia,* 467 U.S. 180, 188 n. 5 (1984).

370.   The Fifth Amendment, made applicable to the states through the Fourteenth Amendment, commands that "[n]o person ... shall be compelled in any criminal case to be a witness against himself."

371.   "The Court has held that the availability of the Fifth Amendment privilege does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Estelle v. Smith,* 451 U.S. 454, 462 (1981) (internal quotation marks ancTBrackets omitted).

372.   The privilege protects a person from being compelled to provide evidence of a "testimonial or communicative nature." *Schmerber v. Cal.*, 384 U.S. 757, 761 (1966)); *see also Doe v. United States*, 487 U.S. 201, 210 (1988) (a testimonial communication is one which explicitly or implicitly relates a factual assertion or discloses information.)

373.   Throughout the underlying juvenile proceedings, Courtright and Long held "CFT" meetings, at which Christine, service providers, and DCS employees discussed issues related to DCS's seizure and continued removal of Brooke, and at which Christine was compelled, under threat of losing her child, to provide evidence of a testimonial or communicative nature.

374.   At every CFT meeting, Christine wanted to be represented by counsel.

375.   In an email dated July 16, 2018, Courtright informed Christine that if Christine was represented by counsel at a scheduled CFT, then the CFT would be cancelled.

376.   In an email dated August 24, 2018, from Tisdale to numerous parties, including Courtright, Tisdale stated: "There is no place for any attorneys at a CFT unless its GAL for Brooke. If there is any attorneys present besides GAL the CFT will be stopped." Courtright took no action to correct this violation of Christine's right to be represented by counsel at the CFT.

377.   In an email dated August 27, 2018, from Courtright to numerous parties, including Christine, Courtright stated: "The CFT will be held at the DCS Peoria office today at 4pm. Anne Ronan is not permitted to be in presence as she is an attorney from mother's council. We will not hold a CFT if she is in presence as the focus of the meeting is to be directly related to services and supports to the child and not the case. As no other parties will have council present we cannot hold a CFT should any attorney other than the GAL be present."'

378.   By taking action including, but not limited to, threatening to take action that would harm Christine's efforts to reunite with her child, to prevent Christine from being represented by counsel at CFT meetings, Defendants Courtright, and/or Long violated Christine's Due Process Rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be represented by counsel at all juvenile proceedings.

379.   When they violated Due Process Rights under the Fourth, Fifth, and Fourteenth Amendments to the U.S. Constitution to be represented by counsel at all juvenile proceedings, Defendants Courtright and Long, and each of them, were acting under color of law.

380.   As a direct and proximate result of the violations of her constitutional rights, Christine suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM FIFTEEN:

**(Under 42 U.S.C. § 1983, Courtright, Long, Mlak, Luevano and Nagle are liable for conspiring to violate Christine's Due Process Rigid under the Fourteenth Amendment to the U.S. Constitution to makeTnedicardecisibhsToFBrbbke ancTBrooke'sDue Process Rijpit under the Fourteenth Amendment to the U.S. Constitution to have medical decisions for her made by Christine.)**

381.   Plaintiffs re-allege and incorporate by reference each and every allegation set forth in the paragraphs above.

382.   At all relevant times, it was well established that liability for a conspiracy in a § 1983 case will lie when there exists an "agreement or meeting of the minds" to violate constitutional rights. *Crowe v. Cty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010). Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.*

383.   At all relevant times, it was also well established: "A private individual may be liable under §1983 if she conspired or entered joint action with a state actor." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir.2002).

384.   Mlak conspired with Courtright and/or Long to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when Mlak provided medical treatment to Brooke from August 2018 to November 2018 without Christine's knowledge and/or consent or the consent of John.

385.   At all relevant times, Kattia Luevano was an employee and/or agent of Aurora. Throughout Brooke's treatment at Aurora from August 2018 to November 2018, although there was no court order in place authorizing her conduct, Kattia refused to provide information regarding Brooke's medical treatments to Christine, her parent and legal guardian, and would provide information regarding Brooke's medical treatments to Courtright, who was neither Brooke's parent nor her legal guardian.

386.   Kattia conspired with Defendants Courtright and/or Long to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when throughout Brooke's treatment at Aurora from August 2018 to November 2018, Kattia refused to provide information regarding Brooke's medical treatments to Christine.

387.   At all relevant times, Helen Nagle was an employee and/or agent of Aurora. On or about August 25, 2018, Nagle informed Christine, over her objection, that Brook would be administered a test for tuberculosis. Brooke was then administered this test without Christine's consent.

388.   Nagle conspired with Defendants Courtright and/or Long to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her when, on or about August 25, 2018,

Nagle informed Christine, over her objection, that Brook would be administered a test for tuberculosis and then took steps to have that test administered to Brooke.

389.   When conspiring to violate Christine's right to make medical decisions for Brooke and Brooke's right to have Christine make medical decisions for her, Courtright, Long, Mlak, Lattia, and Nagle, and each of them, were acting under color of law.

390.   As a direct and proximate result of the violations of their constitutional rights, Christine and Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SIXTEEN
**(Under established** Arizona **law, Defendants Canale, Johnson, Courtright, and Long are liable to Christine and Brooke for exercising Gross Negligence in carrying out their duty to protect the legal rights of children and families.)**

391.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

**392.**   Under AcJLSI § 8-802 (D)(1), "[a]ll child safety workers shall be trained and demonstrate competency in [their] duty to protect the legal rights of children and families from the time of the initial contact through treatment."

393.   "A statute or regulation typically gives rise to a tort duty premised on public policy only if it is designed to protect the class of persons, in which the Plaintiffs is included, against the risk of the type o f harm which has in fact occurred as a result of its violation." *Lorenz v. State,* 238 Ariz. 556, 558 (App. 2015).

394.   Canale and Johnson acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they failed to properly investigate whether DCS should remove Brooke from her parent's care before removing Brooke from her parent's care.

MILLS + WOODS LAW PELLO
5055 NORTH 12TH Street, Suite 101
Phoenix, AZ 85014
Phone 480.999.4356

395.   Canale, Johnson, Courtright, and Long, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke by failing to complete a prompt and thorough investigation, as required by A.R.S. § 8-456(C)(1).

396.   Canale, Johnson, Courtright, and Long, and each of them, exercised Gross Negligence in carrying out their duty to protect the legal rights of Brooke by failing to comply with the ADA by failing to offer Brooke services that were reasonably accommodated to her disability.

397.   Canale and Johnson acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they made representations to the court that were false and/or demonstrated a reckless disregard for the truth.

398.   398.   Canale, Johnson, Courtright, and Long, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they refused to return Brooke to her Christine even though there was no probable cause to believe Christine had abused onneglected Brooke.

399.   Canale, Johnson, Long, and/or Courtright, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine when they took action to prevent Christine from being represented by counsel at the CFT.

400.   Canale, Johnson, Courtright and/or Long, and each of them, acted with gross negligence and breached their duty to protect the legal rights of Christine and Brooke when they took steps to purport to authorize medical providers to provide medical care to Brooke although they knew, or reasonably should have known, that they had a legal and constitutional obligation to obtain Christine and/orjohn's consent before Brooke was provided any medical care while in the care and/or custody of DCS.

401.   As a direct and proximate result of Canale's; Johnson's, Courtright's and/or Long' breach of their duty, Christine and Brooke suffered irreparable harm and will continue to suffer, general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM SEVENTEEN
**(Under established Arizona law, Defendants Canale, Johnson, Courtright, and Long, are liable are to Christine and Brooke for exercising Gross Negligence in carrying out their duty to make reasonable and/or diligent efforts to preserve the family relationship.)**

402.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

403.   At all relevant times, it was "well established that the State...has an affirmative duty to make all reasonable efforts to preserve the family relationship." *Mary Ellen C. v. Arizona Dep't of Econ. Sec.,* 193 Ariz. 185, 186, ¶ 1 (App. 1999). This duty is "defined [] on constitutional grounds." *Id.* at 192, ¶¶32.   A "reasonable effort" requires the State "to undertake measures with a reasonable prospect of success." *Id.*

404.   At all relevant times, it was well established that DCS agents are "obligated to undertake measures with a reasonable probability of success." *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.,* 193 Ariz. 185, 192, ¶ 34 (App. 1999). DCS agents "must provide a parent with the time and opportunity to participate in programs designed do improve the parenTs ability to care for the child." *Id.* at ∧ 37.

405.   At all relevant times, it was well established that "DCS has a constitutional obligation to attempt to unite" a parent with her children. *Donald W. v. Dep't of Child Safety,* 247 Ariz. 9, 24 ¶ 46 (App. 2019). "DCS is obliged to work with the parent toward a shared goal of reunification throughout the statutory period."Tci. at 237∧ 49. At the ∧very least," reasonable efforts require "DCS to identify the conditions causing the child's out-of-home placement, provide

72

1  services that have a reasonable prospect of success to remedy the circumstances as
2  they arise throughout the time-in-care period, maintain consistent contact with the
3  parent, and make reasonable efforts to assist the parent in areas where compliance
4  proves difficult." *Id.* at 20, ¶ 50.

5  406.   A.R.S. § 8-533(B)(8) requires DCS agents to make a diligent effort to
6  provide appropriate reunification services.

7  407.   At all relevant times, it was well-established that in determining
8  whether DCS has complied with the law and made reasonable efforts to reunite a
9  parent with their children, a juvenile court must view the "totality of the
10  circumstances" and review DCS's actions during the entirety of time the child has
11  been in DCS' care. *Donald W.,* 247 Ariz. at 19, ¶ 49.

12  408.   Canale, Johnson, Courtright, Reeding, and Long, and each of them,
13  acted with gross negligence and breached their duty to make reasonable and/or
14  diligent efforts to preserve the family relationship by failing to complete a prompt
15  and thorough investigation, as required by A.R.S. § 8-456(C)(1).

16  409.   Canale, Johnson, Courtright, and Long, and each of them, exercised
17  Gross Negligence in carrying out their duty to make reasonable and/or diligent
18  efforts to preserve the family relationship by failing to conduct urccmtinuingrand
19  appropriate investigation into the circumstances justifying out of home care
20  throughout the entire period of out of home care.

21  410.   Canale, Johnson, Courtright, and Long, and each of them, exercised
22  Gross Negligence in carryingout them dutyAocmake reasonable and/or diligent
23  efforts to preserve the family relationship by failing to at any time appropriately
24  identify to Christine-fche conditions causing Brooke's out-of-home placement.

25  411.   Canale, Johnson, Courtright, and Long, and each of them, violated
26  Christine's and Brooke's right to the State's reasonable efforts to reunite them by:

27

28

a. Failing to ensure that scheduled visitations between Christine and Brooke occurred at all and by failing to ensure that scheduled visitations occurred at the scheduled time;

b. Failing to inform Christine about scheduled CFT meeting and by otherwise failing to take appropriate steps so that Christine could attend these meetings; and/or,

c. Authorizing Brooke's visitation with Christine to be withheld as a punishment for Brooke's undesired behavior.

412. Defendants Canale, Johnson, Courtright, and Long, and each of them, violated Brooke's right to the State's reasonable efforts to reunite her with her parents by failing to inform John about scheduled CFT meeting and by otherwise failing to take appropriate steps so that John could attend these meetings.

413. As a direct and proximate result of Canale's, Johnson's, Courtright's and/or Long' breach of their duty, Christine and Brooke suffered irreparable harm, including but not limited to, the permanent loss of her parental rights, and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM EIGHTEEN
**(Under established Arizona law, McKay and/or Faust are liable to Christine and Brooke for the Gross Negligence exercised by Defendant employees of DCS in carrying out their duties.)**

414. Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

415. McKay and/or Faust owed a duty to Christine and Brooke to ensure that the employees, officers, and/opagents of DCS were qualified to serve in their respective roles before hiring and assigning employees to act as investigators and/or case managers for DCS.

416. Defendants McKay & Faust operated with gross negligence and breached the duties described herein by failing to ensure that employees, officers,

1  and/or agents of DCS were properly qualified before hiring and assigning
2  employees to act as investigators and/or case managers for DCS.

3      417.   Defendants McKay and/or Faust also owed a duty to Christine and
4  Brooke to ensure that the employees, officers, and/or agents of DCS were properly
5  trained and possessed the skill and knowledge to perform their assigned job tasks
6  in a competent manner.

7      418.   Defendants McKay and/or Faust operated with gross negligence and
8  breached the duties described herein by failing to ensure that the employees,
9  officers, and/or agents of DCS were properly trained and possessed the skill and
10  knowledge to perform their assigned job tasks in a competent manner

11     419.   Under Arizona law, specifically A.R.S. § 8-456(A)(2), DCS is required
12  to ensure that all DCS investigators were properly trained on their "duty to protect
13  the legal and due process rights of children and families from the time of the initial
14  contact through case closure."

15     420.   Defendants McKay and/or Faust operated with gross negligence and
16  breached the duties described herein by failing to ensure that all DCS investigators
17  were properly trained on their duty to protect the legal and due process rights of
18  children and families from the time of the initial contact through case closure.

19     421.   As a direct and proximate result of McKay's and/or Faust's breaches
20  of these duties, Christine and Brooke were damaged in that they, among other
21  things, were denied their constitutionally protected individual and familial rights
22  thereby suffering damages from the loss of familial relationships for a significant
23  period of time, and Christine and Brooke will continue to suffer such damages into
24  the future, all in an amount that will be demonstrated at trial.

25
26                          **CLAIM NINETEEN:**
   **(Under 42 U.S.C. § 1983, the Arizona Department of Child Safety is**
27  **liable for the unconstitutional acts of its employees which were**
   **committed pursuant to a policy and/or practice of DCS.)**
28

422.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

423.   Defendant Arizona Department of Child Safety is a "person" within the meaning of 42 U.S.C. § 1983 and subject to *Monell* liability. *Monell v. Dept. of Social Services*, 436 U.S. 658 (1978).

424.   DCS, and those individual defendants in their official capacity who had supervisory and/or policy making authority, had a duty to Christine and Brooke to establish, implement, and/or follow policies, procedures, customs and/or practices which confirm and provide the protections guaranteed Christine and Brooke under the United States Constitution, including under the First and Fourteenth Amendments. This includes, without limitation, the protection of the right to familial relations; the right to privacy; and the rights to substantive and procedural due process.

425.   DCS established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Christine's and Brooke's constitutional rights, including those under the First and Fourteenth Amendment of Thsr Unfted States Constitiorr; These policies, included, but are not limited to:

a. the policy of using trickery, duress, fabrications and/or false testimony and/or evidence, and in failing to disclose exculpatory evidence, in pieparing and presenting reports and court documents to the juvenile court, causing an interference with parents' rights, including those as to familial relations;

b. the policy of inadequate training and/or supervision, and/or by failing to train and/or supervise its officers, agent, employees, and state actors, in providihgThe Constitutional protections guaranteed toAndlviduals arid families, including those under the Fourteenth Amendment, when

performing actions related to child abuse and dependency-type proceedings;

c. the policy of setting forth allegations in juvenile dependency petitions against parents claiming child abuse and/or neglect and/or other unsubstantiated allegations regardless of whether or not reasonable and articulable evidence exists at the time to support the claims set out in the petition under penalty of perjury;

d. the policy, practice, or custom of making knowingly false allegations of child abuse and/or neglect in juvenile dependency petitions signed under penalty of perjury, motions, or other documents filed with the juvenile court as a means of intimidating parents, whether or not true, or forcing a parent to adjudicate a matter knowing that the courts most often sustain allegations, whether justified by extant evidence or not;

e. the policy of fraudulently charging parents with child abuse and/or neglect where none exist;

f. the policy of unilaterally determining not to carry out judicial orders regarding visitation of children with their parents;

g. the policy of failing do take appropriate action do ensure that scheduled visitation occurs as ordered by a court;

h. the policy of failing to take appropriate action to ensure that appropriate and meaningful visitation occurs;

i. the policy of making medical decisions for children who have been removed by DCS, although there has been no judicial finding of dependency which would allow DCS agents to lawfully make medical decisions for children;

j. the policy of preventing parents of children who have been removed by DCS frmhdBeingdvitFrtheSTchildren when their children are receiving medical care, although there has been no judicial order which would allow

DCS agents to lawfully prevent parents from being with their children while their children are receiving medical treatment; and/or,

k. the policy of making educational decisions for children who have been removed by DCS, although there has been no judicial finding of dependency which would allow DCS agents to lawfully make educational decisions for children rather than their parent.

426.   The customs, policies, and/or practices listed herein are not exhaustive due to the pending nature of discovery and the privileged and protected records of investigative and juvenile dependency type proceedings. Plaintiff reserves their right to amend this pleading as more information becomes available.

427.   It was obvious that the policies described herein that were instituted and/or maintained by DCS would lead to constitutional violations like the violations suffered by Christine and Brooke, and DCS was deliberately indifferent to the consequent constitutional violations that would inevitably occur as a direct resnltroHts paHciesjr                    ITT     iL

428.   DCS was indifferent to the consequences that would established and/or followed policies, procedures, customs, and/or practices (hereinafter collectively referred to as "policy" or "policies"), which policies were the moving force behind the violation of Christine and Brooke's constitutional rights, including those under the First and Fourteenth Amendment of the United States Constitution.

429.   DCS, breached its duties and obligations to Christine and Brooke including but not limited to, failing to establish, implement, and follow the correct and proper Constitutional policies, procedures, customs, and practices; by failing to properly select, supervise, train, control, and review its agents and employees as to their compliance with Constitutional safeguards; ancTby permitting the DCS employees to engage in the unlawful and unconstitutional conduct alleged herein.

430.   DCS, knew, or should have known, that by breaching the above-mentioned duties and obligations that it was reasonably foreseeable that DCS employees would, and did, cause Christine and Brooke to be injured and damaged by DCS's wrongful policies, or deliberate lack thereof, or deliberate indifference to the need for such policies and/or training, and other acts as alleged herein, and that such breaches occurred in the contravention of public policy and their legal duties and obligations to Plaintiff; and that such policies subjected them to injunctive relief which Plaintiff asserts herein.

431.   These actions, and/or inactions, of DCS are the moving force behind, and direct and proximate cause of Christine and Brooke's injuries, as alleged herein; and as a result, Christine and Brooke has sustained general and specific damages to an extent and in an amount to be proven at trial. Christine and Brooke has incurred and will continue to incur, attorneys' fees, costs, and expenses, including those authorized by 42 U.S.C. § 1983, to an extent and in an amount subject to proof at trial.

## CLAIM TWENTY:

**(Under established Arizona law, Mlak is liable to Brooke for failing to proldde ⁄ê⁄ mimuiiiracceptecCstanaarcroCcareTnrlus cartTof Brooke.)**

432.   Plaintiffs re-allege and incorporate by reference each allegation set forth in the paragraphs above.

433.   Mlak had a duty to provide the minimum accepted standard of care in his treatment of Brooke.

434.   As discussed above, Mlak breached his duty and failed to provide the minimum accepted standard of care in his treatment of Brooke.

435.   As a direct and proximate result of Mlak's failure to satisfy the minimum accepted standard of care, Brooke suffered irreparable harnuandr will

1   continue to suffer general and special damages in an amount not yet ascertained

2   but which shall be shown according to proof at trial.

## CLAIM TWENTY-ONE:

3

4   **(Under established Arizona law, Aurora and Mlak are liable to Brooke for the assault and battery committed upon her person.)**

5       436.   Plaintiffs re-allege and incorporate by reference each allegation set

6   forth in the paragraphs above.

7       437.   It is well established under Arizona law that: "An actor is subject to

8   liability to another for battery if the actor intentionally engages in an act that

9   results in harmful or offensive contact with the person of another." *Duncan v.*

10  *Scottsdale Medical Imaging Ltd.*, 205 Ariz. 306, 309, ꟷ 9 (2003) (citing Restatement

11  (Second) of Torts §§ 13, 18 (1965). "The law is well established that a health care

12  provider commits a common law battery on a patient if a medical procedure is

13  performed without the patient's consent." *Id.* (citing *Hales v. Pittman*, 118 Ariz. 305,

14  310 (1978).

15      438.   At the time Brooke was treated at Aurora by Mlak, Brooke was a

16  minor.

17      43a.   AUhe time Brooke was treated at Aurora by MlakbBrookewaslegallv

18  incapable of granting consent for any treatment, procedure, and/or medication.

19      440.   At the time Brooke was treated at Aurora by Mlak, before any

20  treatment, procedure, and/or medication was provided to Brooke, the consent of

21  Brooke's parent or legal guardian for any treatment, procedure, and/or

22  medication was legally required.

23      441.   At the time Brooke was treated at Aurora by Mlak, neither Brooke's

24  parent nor legal guardian had consented for Brooke to be administered Haldol.

25      442.   At the time Mlak administered Haldol, and/or caused Haldol to be

26  administered to Brooke, Mlak knew, or reasonably should have known that

27

28

1  neither a parent nor legal guardian for Brooke had consented for Brooke to be
2  administered Haldol.

3      443.   At the time Mlak administered Haldol, and/or caused Haldol to be
4  administered to Brooke, Mlak knew, or reasonably should have known, that
5  Christine objected to Brooke being administered Haldol.

6      444.   By administering Haldol to Brooke, and/or causing Haldol to be
7  administered to Brooke, Aurora and/or Mlak performed a medical procedure on
8  Brooke's person without lawful consent.

9      445.   By administering Haldol to Brooke, and/or causing Haldol to be
10  administered to Brooke, Aurora and/or Mlak committed a battery upon Brooke.

11      446.   As a direct and proximate result of the battery committed upon her
12  person, Brooke suffered irreparable harm and will continue to suffer general and
13  special damages in an amount not yet ascertained but which shall be shown
14  according to proof at trial.

15                    CLAIM TWENTY-TWO
16      (Under established Arizona law, C&D Group Home is liable to Brooke
      for exercising Negligence in carrying out its duty To prnterF antfrarefor
17                              **Brooke.**)

18      4477   Idaih Hffkl/\allege aikTihcbfpbfate by reference eachTdlegafiorTseF
19  forth in the paragraphs above.

20      448.   As the party entrusted with Brooke's care, C&D Group Home had a
21  duty to protect and care for Brook.

22      449.   C&D Group Home breached its duties to Brooke in numerous ways,
23  including but not limited to:

24        a.  Failing to properly treat Brooke's injuries sustained at C&D Group
25            Home;

26        b.  Failing to prevent Brooke from injuring herself;

27        r.  Failing to takp Brooke tn her yearly medical exam;

28        d.  Failing to take Brooke to her rescheduled yearly medical exam;

MILD + WOODS LAW, PLLO
5655 North 12th Street, Suite 101
Phoenix, AZ 35014
480.999.4556

e. Failing to ensure Brooke was eating properly;

f. Failing to ensure Brooke's clothes were on properly;

g. Failing to maintain and wash Brooke's hair, resulting in severe matting;

h. Failing to ensure Brooke was regularly bathed;

i. Failing to bring Brooke to a scheduled visitation with Christine;

j. Failing to properly supervise Brooke;

k. Allowing Brooke to eat her own feces; and/or,

l. Failing to clean blood and feces from Brooke

450. As a direct and proximate result of C&D Group Home's negligence, Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## CLAIM TWENTY-THREE
**(Under established Arizona law, Aurora and Mlak are liable to Brooke for exercising Negligence in carrying out their duty to provide appropriate medical and/or mental health service to Brooke.)**

451. Plaintiffs re-allege and incorporate by reference each allegation set fdfthlnthe paragraphs above!

452. As the parties entrusted with Brooke's medical and mental health care, Aurora and Mlak each had a duty to (i) collect a full and complete medical and medication history from Christine or John regarding Brooke, (ii) seek and receive parental consent before administering any medications, including Haldol, to Brooke, and (iii) administer only appropriate medications to Brooke.

453. Aurora and Mlak breached their duties to Brooke in numerous ways, including but not limited to:

a. Failing to collect a full and complete medical and medication history from Christine or John regarding Brooke;

    b. Failing to heed information that Haldol is contraindicated for Brooke;

    c. Failing to seek or receive parental consent from Christine or John before administering medications, including Haldol, to Brooke;

    d. Administering Haldol to Brooke when it was a contraindicated medication for Brooke.

454.   As a direct and proximate result of Aurora's and Mlak's negligence, Brooke suffered irreparable harm and will continue to suffer general and special damages in an amount not yet ascertained but which shall be shown according to proof at trial.

## PRAYER **FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

A.   General damages and special damages according to proof, but in no event less than $5,000,000.00, including, but not limited to economic losses, medical costs, hedonic damages, psychological trauma, and emotional distress;

B.   For injunctive relief in the form of DCS agreeing to provide training to all DCS case workers regarding:

    1. When exigent circumstances exist that justify the unwarranted seizure of a child;

    2. The psychological trauma and Jiarm suffered by children and family that occurs when DCS removes a child from the custody of his or her parent;

    3. That prior to removing a child from the custody of his or her parent, DCS has a legal and constitutional obligation to conduct a thorough investigation into Gmy allegations justifying removal including

investigating facts, witnesses, and evidence that refutes the allegations;

4. That when a parent is disabled the services that DCS offers the parent must be reasonably accommodated to the parent's disability such that the parent is offered a reasonable prospect of success at reunifying with their child if they successfully complete all services offered;

5. That unless and until a court has specifically determined otherwise after a hearing and an opportunity for a parent to be heard, that the parent retains the sole legal right to make all medical decisions for their child;

6. That unless and until a court has specifically determined otherwise after a hearing and an opportunity for a parent to be heard, that the parent retains the sole legal right to make all educational decisions for their child;

7. That it is a violation of the Constitutional rights of children and parents to make misrepresentations or omissions to the court which are false and/or which demonstrate a reckless disregard for the truth; and;

8. That facilitating regular contact between parent and child through visitation is perhaps the most basic and essential of the services prffflded by the State and thus all reasonable efforts mustJbe expended to ensure that a visitation occurs regularly and as scheduled.

C.   The training described in (B) above must be provided, at a minimum, annually to all DCS case workers and must be included in the training provided to /iersons upon their becoming a DCS case worker;

D.   For taxable costs and pre- and post-judgment interest to the extent

Mills + Woods Law, PLLC
5055 North 12th Street, Suite 101
Phoenix, AZ 85014
480.999.4556

1   permitted by law;

2      E.      For punitive and/or exemplary damages to the extent permitted by

3   law and in an amount appropriate to punish the wrongful conduct alleged herein

4   and to deter such conduct in the future;

5      F.      For attorney's fees, costs, and expenses pursuant to 42 U.S.C. § 1988

6   and state law, as applicable; and,

7      G.      For such other relief as the Court deems just and proper under the

8   circumstances.

9   ///

10   ///

11   ///

12   ///

13

14      RESPECTFULLY SUBMITTED this 22nd day of September 2021.

15                                    **MILLS + WOODS LAW PLLC**

16

17                                    By   */s/ Thomas A. Connelly*
                                         Thomas A. Connelly
18                                       Robert T. Mills
                                         Sean A. Woods
19                                       5055 North 12th Street, Suite 101
                                         Phoenix, AZ 85014
20
                                      **GILLESPIE, SHIELDS, GOLDFARB & TAYLOR**
21                                       DeeAn Gillespie Strub
                                         Kristina Reeves
22                                       7319 North 16th Street
                                         Phoenix, AZ 85020
23
                                      *Attorneys for Plaintiff*
24

25

26                                    **CERTIFICATE OF SERVICE**

27      I hereby certify that on September 22, 2021, I electronically transmitted the

28   foregoing document to be filed electronically with the Clerk's Office through the CM/ECF

System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system, as well as counsel for the defendants who have not yet appeared in this matter, as follows:

Jeffrey S. Hunter
Renaud Cook Drury Mesaros, pa
One N. Central Ave., Ste. 900
Phoenix, Arizona 85004-4417
jhunter@rcdmlaw.com
docket@rcdmlaw.com
*Attorneys for Defendant Aurora Behavioral HealthCare-Tempe, LLC*

/s/ Thomas A. Connelly