Thomas A. Connelly (AZ Bar #019430)
Robert T. Mills (AZ Bar #018853)
Sean A. Woods (AZ Bar #028930)
**MILLS + WOODS LAW PLLC**
5055 North 12th Street, Suite 101
Phoenix, Arizona 85014
Telephone 480.999.4556
docket@millsandwoods.com

DeeAn Gillespie Strub (AZ Bar #009987)
Jenny D. Jansch (AZ Bar #024431)
**GILLESPIE, SHIELDS & TAYLOR**
7319 North 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Fax: (602) 870-9783
mailroom@gillaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Christine Scianna, an individual; Brooke Scianna, an individual, by and through her legal guardian, Christine Scianna,<br><br>Plaintiffs,<br><br>v.<br><br>State of Arizona, et al.,<br><br>Defendants. | Case No.: 2:21-cv-01444-DJH<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT MLAK** |

The law in the United States is well-established: convicts and institutionalized medical patients all have a right to due process before any antipsychotic medication such as Haldol is administered to them. *See, e.g, Washington v. Harper*, 494 U.S. 210, 221–22 (1990); *Riggins v. Nevada*, 504 U.S. 127, 134–35 (1992). But, according to Dr. Mlak, he was free to administer Haldol to the minor Brooke Scianna simply by delegating his informed consent responsibility to a nurse, who in turn made a call to some unknown bureaucrat with the Department of Child Safety.

Dr. Mlak does not identify any facts in dispute and, in fact, the critical facts are undisputed:

1. At the time that Dr. Mlak administered Haldol to Brooke, she was in the *temporary* custody of the Department of Child Safety, but before Brooke or her parents had had their due process rights determined through a dependency hearing;
2. While Brooke was being treated at Aurora BehavioralHealth-Tempe ("Aurora"), Dr. Mlak decided to administer Haldol to her;
3. He delegated the task to obtain consent to administer this antipsychotic to his nursing staff;
4. The Department of Child Safety let "on duty" staffers make the decision, even if they had no knowledge of the patient or the case.

Whether deemed "major" (the terminology of A.R.S. § 8-531) or "important" (the constitutional terminology for a parent's fundamental right to make medical decisions), the administration of an antipsychotic medication is not something that can be addressed so cavalierly.

Plaintiffs do not contend that Dr. Mlak was a state actor. But the constitutional rights of both Brooke and her mother Christine inform Dr. Mlak's duty of care. *See Avitia v. Crisis Preparation & Recovery Inc.*, 256 Ariz. 198, 200, ¶ 1 (2023) ("We also hold that mental health professionals owe a duty to third parties based … on their special relationship and public policy"). And Dr. Mlak's contention that section 8-531(5)(c) is not applicable here defies common sense; the Arizona legislature clearly did not intend a medical free-for-all for DCS to make any type of medical decision where (1) the Department's custody was clearly intended to be only temporary (i.e., a dependency), and (2) the trial court had not yet even conducted a dependency trial.

The facts are undisputed and the constitutional and statutory parameters clear. Accordingly, Plaintiffs respectfully request summary judgment with respect to Dr. Mlak's failure to obtain consent.

## I. DISCUSSION

### A. Dr. Mlak Cannot Relitigate His Motion to Dismiss.

Dr. Mlak begins by relitigating his motion to dismiss, arguing that Plaintiffs never plead "lack of informed consent." *Resp.* at 9-11. But this Court has already ruled, and rejected, this claim. Arizona law recognizes two "consent" legal theories, negligence and battery. *Duncan v. Scottsdale Med. Imaging, Ltd.*, 205 Ariz. 306, 309–10, ¶ 11 (2003) ("Courts generally recognize two theories of liability for unauthorized medical treatment or therapy rendered by physicians to their patients: a traditional intentional tort claim for battery and a negligence claim for lack of informed consent"). "A lack of informed consent claim concerns the duty of the physician to inform his patient of risks inherent in the surgery or treatment to which he has consented." *Id.*. "[A] health care provider commits a common law battery on a patient if a medical procedure is performed without the patient's consent." *Id.* at 309, ¶ 9.

And that is precisely what this Court held on Dr. Mlak's motions to dismiss. This Court recognized both theories—and that Plaintiffs had alleged both:

> Count Twenty-Three similarly alleges that Mlak had a duty to retrieve Brooke's medical history and parental consent before administering Haldol and, because he did not, "Mlak's negligence" resulted in harm to Brooke…. [T]he Court finds that both Counts Twenty and Twenty-three plead sufficient factual matter to place Mlak on notice of, as Plaintiffs say, this "medical malpractice action." Therefore, the Court finds that Counts Twenty and Twenty-three are medical malpractice claims under Arizona's Medical Malpractice Act…. [¶] Plaintiffs may also bring a "lack of consent" claim in battery. ... Under Rule 8, as said before, these alternative claims are permissible. So, the Court cannot dismiss Count Twenty-one.

*Order on Motion to Dismiss*, Doc. 74 at 7-8 (internal citations omitted).

Here, there are elements to both in Dr. Mlak's conduct. While Dr. Mlak may have delegated the obligation to obtain informed consent to a nurse, who in turn contacted DCS—where he or she either talked to someone who admitted to just "rubberstamping" Dr. Mlak's decisions, or an on-call employee who knew nothing about Brooke or the case.

3

Thus, Dr. Mlak's conduct may be either a complete lack of consent due to communication with someone disinterested or unable to make an "informed" decision, or simply a failure of informed consent. Here, as Plaintiffs noted in their motion, they seek summary judgment on their negligence claim, that Dr. Mlak failed to obtain informed consent as a matter of law considering the undisputed facts set forth above.

> **B.  Arizona Revised Statutes Section 8-531 *and* the Constitutional Right of Familial Association both (1) Inform Dr. Mlak's Duty of Care and (2) For Purposes of Plaintiffs' Motion for Summary Judgment, Dr. Mlak Breached Plaintiffs' Right of Familial Association as a Matter of Law.**

This is the status of Brooke and her mother at the time that Dr. Mlak treated Brooke:

1. The Department of Child Safety had filed a *dependency* petition asserting that Brooke was dependent; the Department was ***not*** seeking severance or ending the relationship between Mother and Brooke;

2. Mother had denied the Department's allegations and a trial on the merits had been set for September 14, 2018, *see 7/13/2018 Minute Entry*, **Exhibit 26**, but not conducted as of Brooke's admission to or treatment at Aurora;

3. The Department had received court approval for Brooke's admission to Aurora;

4. But the Department had not received any juvenile court authority for the administration of antipsychotic drugs such as Haldol.

In short, Mother's parental rights with respect to Brooke had not been taken away from her; indeed, she had not even had a full hearing with respect to the Department's claim of dependency.

Nonetheless, according to Dr. Mlak, there is neither Arizona law (statutory or common law), or federal constitutional law limiting his discretion in treating Brooke. And this defies common sense.

1. **Under Arizona Revised Statutes section 8-531, in this pre-dependency adjudication matter, Dr. Mlak had *not* been given the right to make "major" medical decisions for Brooke.**

At the time of Brooke's admission to Aurora, she ***had not been adjudicated to be dependent as to Mother.*** Rather, the Department had filed a dependency petition, and the juvenile court conducted an initial preliminary dependency hearing, concluding on August 21, 2018, that "temporary custody of the child is clearly necessary to prevent abuse **pending the hearing on the dependency petition**." *See 9/5/2018 Minute Entry*, **Exhibit 27** at 3 (emphasis added).[1]

At that hearing, the trial court also ordered a comprehensive medical evaluation of Brooke, which was to "include mother's input." *Id.* On August 30, 2018, the Department moved for approval of Brooke's inpatient admission at Aurora (together with an emergency motion for a 72-hour admission). *See* **Exhibits 28 and 29**. The trial court granted these motions before obtaining Mother's position on the issue.[2]

Thus, at the time that Dr. Mlak administered Haldol to Brooke, Brooke had not been adjudicated dependent. Neither Brooke nor Mother had yet had their full due process rights with respect to the Department's temporary custody due to dependency.

In *Diana H. v. Rubin*, 217 Ariz. 131 (App. 2007), the Arizona Court of Appeals explained the relationship between a custodian (such as the Department of Child Safety) and a parent prior to any termination of parental rights. As noted in Plaintiffs' motion, section 8-531 provides in pertinent part that:

> 5. "Custody" or "legal custody" means a status embodying all of the following rights and responsibilities:…
>
> (c) The responsibility to provide the child with adequate food, clothing, shelter, education and medical care, provided that such rights and responsibilities shall be exercised subject to the powers, rights, duties and responsibilities of the guardian

---

[1] In this minute entry, the dependency adjudication hearing was set for November 15 and 20, 2018. *Id.* at 4.
[2] At a September 4, 2018, hearing, Mother indicated that she did not object to Brooke's admission to Aurora. **Exhibit 30.**

5

of the person and *subject to the residual parental rights and responsibilities if they have not been terminated by judicial decree*.

\* \* \*

8. "Guardianship of the person" with respect to a minor means the duty and authority to make important decisions in matters affecting the minor including but not necessarily limited either in number or kind to:

(a) *The authority to consent* to marriage, to enlistment in the armed forces of the United States and *to major medical, psychiatric and surgical treatment*, to represent the minor in legal actions and to make other decisions concerning the child of substantial legal significance….

A.R.S. § 8-531(5)(c), (9)(a) (emphasis added).

In *Diana H.*, the Court of Appeals explained that section 8-531 "articulat[es] the comparative rights of the state and parent upon an adjudication of dependency"—a due process protection *that had not yet been given to Mother*.³ The court noted that the Legislature's use of the term "residual" refers to "that which remains." *Diana H.*, 217 Ariz. at 135, ¶ 17 (citing WEBSTER'S THIRD NEW INT'L DICTIONARY 1931 (1971) (defining "residual" as that which is "remaining after a part is taken")). **As used in § 8–531(5), the term suggests the legislature intended that parents would retain those rights not expressly acquired by ADES upon an adjudication of dependency**. *Id.*

Turning to the specific issue at hand, the court in *Diana H.* considered whether a mother, whose child *had been declared dependent*, retained the right to withhold consent for a childhood vaccination on religious grounds. "This case," the court noted, "requires us to address the conflict between the state's particular interest in immunizing children to promote their health and welfare, and Diana's constitutional and statutory right to direct the religious upbringing of her child." *Id.* at 135, ¶ 19. Ultimately, the Court of Appeals concluded:

---

³ Ultimately, shortly before the scheduled dependency adjudication trial, the Department moved to dismiss the dependency petition, which the juvenile court granted. *See Order Dismissing Dependency*, **Exhibit 31.**

> [W]e can find no language whatever in Arizona's dependency or immunization statutes suggesting that the few residual rights of a parent whose child has been adjudged dependent should carry any less weight than those of other parents.[5] Instead, through the language it chose to use in § 8–531(5), our legislature has preserved Diana's continuing right to determine Cheyenne's religious upbringing notwithstanding the adjudication of dependency. As discussed, the statute provides that, even in dependency proceedings, ADES's right and duty to provide the child medical care is "subject to" the few remaining rights of the parent. § 8–531(5)(c).

*Id.* at 137, ¶ 27.

The court in *Diana H.* held that a parent retains her "residual" rights with respect to "adequate medical care." Further, in construing a statute,

> [this court has] a duty to interpret them in a way that promotes consistency, harmony, and function. If possible, each word or phrase must be given meaning so that no part is rendered void, superfluous, contradictory or insignificant. The primary purpose is to determine and give effect to the legislative intent behind the statute, considering among other things the context of the statute, the language used and the spirit and purpose of the law.

*Welch-Doden v. Roberts*, 202 Ariz. 201, 206, § 22 (App. 2002). To that end, section 8-531 (a statute already deemed to apply to the dependency situation) describes the role of guardian, as opposed to a custodian:

> 8. "Guardianship of the person" with respect to a minor means the duty and authority to make important decisions in matters affecting the minor including but not necessarily limited either in number or kind to:
>
> (a) The authority to consent to marriage, to enlistment in the armed forces of the United States and to major medical, psychiatric and surgical treatment….

**A.R.S. § 8-531(8)(a).** Construing the two provisions of this statute together, one "residual right" that a parent retains in a dependency proceeding is that to make "major medical and

psychiatric" decisions, until such time as a guardian is appointed (or parental rights are terminated).

### 2. A key source of a parent's "residual rights" is the parent's (and child's) constitutional right to make important medical decisions for her child.

A key—if not "the" key—source of a parent's "residual rights" is her constitutional right to parental association. *See Benavidez v. County of San Diego*, 993 F.3d 1134, 1149 (9th Cir. 2021). In *Benavidez*, the Ninth Circuit held:

> Parents and children have a well-elaborated constitutional right to live together without governmental interference that includes the right of parents ***to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state***. … [Parents have] the right … to notice and consent or judicial authorization in advance of medical examinations of their children, unless a reasonable concern that material physical evidence might dissipate or an urgent medical problem exists.

*Id*. (quotation omitted).

> Where the County [the CPS agency in California] fails to notify parents about the examinations and performs the examination] without obtaining either the parents' consent or judicial authorization, the County violates the constitutional rights of children and parents. First, the County violates parents' Fourteenth Amendment substantive due process rights. Second, the County violates the children's Fourth Amendment right to "be secure in their persons ... against unreasonable searches and seizures."

*Id*. (quotations omitted). Specifically, the Constitution requires that a state child protective agency: "(1) notify the parents of a medical examination of their children; (2) obtain parental consent or a court order in advance of the medical examination; and (3) permit the parent to be present at the examination." *Id*. at 1150; *see also Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *Mann v. County of San Diego*, 907 F.3d 1154, 1161 (9th Cir. 2018).

Further, in *Benevidez*, the juvenile court had issued orders authorizing the medical examinations at issue. *Id*. at 1150. But these orders, standing alone, did not obviate the

parents' right to notice and presence at the examinations. *Id.* "The district court correctly rejected the County's argument that the Orders were all that was necessary to make the medical examinations constitutional." *Id.*

The importance of this fundamental constitutional right of **both** Christine Scianna and Brooke Scianna is two-fold: *first*, Dr. Mlak breached this fundamental right as a matter of law, and *second*, this right informs both the construction of section 8-531 *and* Dr. Mlak's duty of care. Beginning with the second, in construing statutes, Arizona courts "avoid interpretations that unnecessarily implicate constitutional concerns." *State v. Brearcliffe*, 254 Ariz. 579, 585, ¶ 23 (2023). Plaintiffs' construction of section 8-531, and not that of Dr. Mlak, best fits the constitutional paradigm, ensuring that the State and guardians have their necessary powers, but *without* intruding on a parent's and child's constitutional rights.

Similarly, the constitutional right informs Dr. Mlak's duty of care. A duty of care in Arizona is founded upon such considerations as public policy and special relationships. *See Quiroz v. ALCOA Inc.*, 243 Ariz. 560, 567, ¶¶ 17-22 (2018). Dr. Mlak does not dispute his special relationship with Brooke. But this special relationship came with a caveat—she had been separated from her ***primary*** lifetime caretaker, her mother, Christine. Further, although the Department of Child Safety had *temporary* custody, even that had not been resolved through a dependency trial. It is the public policy of our nation to protect the fundamental right of familial association. *Benevidez, supra*. And, in furtherance of this constitutional right, it is the public policy of Arizona, even in cases giving rise to State interference, to restore the family. *See, e.g.,* **A.R.S. § 8-845(C)** ("In reviewing the status of the child, the court, insofar as possible, shall seek to reunite the family"); *see also Diana H.*, 217 Ariz. at 138, ¶ 31 (App. 2007) (outlining Arizona's public policy of reunification).

Dr. Mlak also breached his constitutional obligation to Brooke and Christine.[4] He administered an antipsychotic medication to Brooke, a major medical decision, and did so

---

[4] Obviously, for Dr. Mlak to have breached the Plaintiffs' constitutional rights, actionable under 42 U.S.C. § 1983, Dr. Mlak had to engage in some type of state action. As noted in response to Dr. Mlak's motion for summary judgment, Dr. Mlak's role as a state actor or involvement in state action is a question of fact for the jury.

9

by excluding both Brooke's family and the courts. As in *Benevidez,* the juvenile court's order approving inpatient care at Aurora did not create a *carte blance* permission for Dr. Mlak to engage in whatever course of treatment he desired, without involvement of the parents. Thus, he breached both his common law duty of care as well as Christine's and Brooke's constitutional rights with respect to familial association.[5]

## II.    CONCLUSION

Dr. Mlak seeks to create a constitutional black hole—a child in a pre-dependency adjudication status has essentially no common law or constitutional rights governing the use of antipsychotic medications, and he had the authority to administer antipsychotic medications with, at best, the barest of "consent" by persons either ready to rubberstamp his decisions or without any knowledge of Brooke or the case whatsoever.

A case squarely on point is *Kiva O. v. State Dep't of Health & Soc. Servs.*, 408 P.3d 1181 (Alaska 2018). Contrary to Dr. Mlak's contention, *Kiva O.* directly addressed the situation at issue here, closing the black hole that Dr. Mlak seeks to create. Specifically, when either a child protection agency or its medical providers seek to administer an

---

[5] Dr. Mlak claims that his medical records indicates that he reached out to Christine several times without response. Christine disputes this assertion. She testified that she spoke to Kattia at Aurora on August 26, who advised Christine that the people at Aurora could not talk to her due to the ongoing juvenile matter. *Christine Scianna Deposition* (**Exhibit 32**) at 60 ("Kattia said, due to DCS being involved, like I just said, they couldn't have contact with me"). Christine denied receiving any messages from Dr. Mlak:

> Q.   So if Dr. Mlak's records indicate that he attempted to contact you on 8/26, 8/27, and multiple times after 8/27, that would be incorrect?
> A.   Incorrect.
> Q.   Okay. Did you make any calls to Aurora attempting to talk to Dr. Mlak?
> A.   I was told I wasn't able to do that.

*Id.* at 61. Indeed, on October 17, 2018, Mother filed a motion in the juvenile court asking the trial court to order communication with Brooke's medical providers. The juvenile court held that "[t]he Court believes there is a benefit to Mother being able to provide input to the Child's medical providers…." *10/18/2018 Minute Entry* (**Exhibit 33**) at 2.  Resolution of this factual dispute, however, is not relevant to Mother's motion for partial summary judgment.

antipsychotic drug over the objections of a parent, they ***must*** seek judicial approval. *Id*. at 1189. Dr. Mlak sought neither parental consent nor judicial approval. He breached his common law obligations and Plaintiffs' constitutional rights.

Thus, for the reasons set forth in Plaintiffs' motion and the present reply, Plaintiffs' respectfully request that this Court grant summary judgment on the following issues: (1) that Dr. Mlak breached his common law duty to obtain informed consent before administering Haldol, and (2) he breached Plaintiffs' constitutional rights for Mother to make major medical decisions for Brooke, including whether antipsychotic medications should be administered.

RESPECTFULLY SUBMITTED this 17th day of September 2024.

**MILLS + WOODS LAW PLLC**

By   */s/ Thomas A. Connelly*
   Thomas A. Connelly
   Robert T. Mills
   Sean A. Woods
   5055 North 12th Street, Suite 101
   Phoenix, AZ 85014

**GILLESPIE, SHIELDS & TAYLOR**
   DeeAn Gillespie Strub
   Jenny D. Jansch
   7319 North 16th Street
   Phoenix, AZ 85020

   *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 17, 2024, I electronically transmitted the foregoing document to be filed electronically with the Clerk's Office through the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to be served on all counsel of record via the Court's CM/ECF system.

    /s/ Thomas A. Connelly