**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Christine Scianna, et al., | No. CV-21-01444-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| State of Arizona, et al., | |
| Defendants. | |

Defendants Krzystztof Mlak, M.D. ("Dr. Mlak") and Aurora Behavioral Healthcare-Tempe, LLC ("Aurora") (collectively, "Defendants") have each filed their own Motion for Summary Judgment. (Docs. 151–52).[1] These Motions are fully briefed. (Docs. 159–60, 162, 165). Plaintiffs Christine Scianna ("Mother") and Brooke Scianna ("Daughter") have also filed their own Motion for Partial Summary Judgment. (Doc. 154). This Motion is also fully briefed. (Docs. 163, 173). For the reasons set forth below, the Court grants summary judgment in Defendant Mlak's favor on Plaintiffs' claim for conspiracy to infringe upon their due process rights in violation of 42 U.S.C. § 1983. The Court also declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims and will remand the remainder of this action to the Maricopa County Superior Court for the State of Arizona.

---

[1] The parties have requested oral argument on this matter. (Doc. 151 at 1; Doc. 152 at 1; Doc. 154 at 1). The Court finds that the issues have been fully briefed and oral argument will not aid the Court's decision. Therefore, the Court will deny the request for oral argument. *See* Fed. R. Civ. P. 78(b) (the Court may decide motions without oral hearings); LRCiv 7.2(f) (same).

## I.    Background[2]

Daughter "is a non-verbal, severely autistic individual" who was seventeen at the time of the incidents at issue in this matter.  (Doc. 151 at 2; Doc. 154 at 3).  On June 22, 2018, the Arizona Department of Child Safety ("DCS") took temporary custody of Daughter after an individual reported that she was put in a choke hold by Mother's significant other and that Mother let Daughter wander the street before her bus arrived.  (Doc. 154 at 4; Doc. 151 at 2).  Plaintiffs state that before Daughter was taken into DCS custody, a DCS employee gave Mother an ultimatum that she must allow the placement of Daughter into a group home or DCS would take legal action.  (Doc. 154 at 4).  Plaintiffs alleged in their Complaint that Mother refused, and the DCS investigator "seized" Daughter.  (Doc. 17 at ¶¶ 107, 117, 125).  Daughter was placed in a group home: Care and Dignity, LLC.  (Doc. 151 at 2; Doc. 154 at 4).

On June 27, 2018, DCS filed an out of home dependency[3] petition, which the juvenile court granted.  (Doc. 154 at 4; Doc. 151 at 2).  The juvenile court specifically ordered that Daughter be "made a temporary ward of the Court, committed to the legal care, custody and control of [DCS] and placed in the physical custody of Care and Dignity," and that "in furtherance of A.R.S. § 8–512 and DCS's obligation, if any, to provide medical behavioral health or other services to child in the DCS's legal custody, the DCS is authorized to consent to evaluation and treatment for medical . . . care upon recommendation of a health care provider."  (Doc. 151-1 at 121, 124).

On July 2, 2018,  the Arizona Juvenile Court issued an order "continuing [Daughter] as a temporary ward of the Court, committed to the care, custody and control of [DCS]" and finding "that [DCS] has made reasonable efforts to prevent the removal of the child from the home and that continuation in the home would be contrary to the welfare of the

---

[2] The following facts are undisputed, unless stated otherwise.

[3] Plaintiffs note that "Dependency" refers to "the status of a child who has been determined by a court to need state intervention because the child does not have proper parental care and control."  (Doc. 154 at 4).  Indeed, relevant here, A.R.S. § 8-201(15)(a)(iii) provides that a "Dependent Child" is a child adjudicated to be "[a] child whose home is unfit by reason of abuse, neglect, cruelty or depravity by a parent."

child, or that it was reasonable to make no efforts to maintain the child in the home." (Doc. 152-1 at 5).

A temporary custody hearing was held on August 21, 2018, and the Juvenile Court ordered, among other things:

> (1) "that temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition;"

> (2) "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS];"

> (3) "affirming all contrary to welfare findings;"

> (4) "that there is a comprehensive medical team evaluating the child's needs;"

> (5) "directing [DCS] to make arrangements to facilitate a comprehensive medical evaluation for the child with Dr. Richard Frye at Phoenix Children's Hospital and to include mother's input;" and

> (6) "[DCS] will amend the dependency petition to include an allegation of neglect and based on the child's behaviors as to mother."

(Doc. 151-1 at 152–53).

Daughter's stay at the group home was an "unmitigated disaster" which resulted in her transport to Abrazo Arrowhead Hospital ("Abrazo"). (Doc. 154 at 5; Doc. 151 at 3). She displayed "uncontrollable behaviors" and Abrazo staff ended up calling the police to transfer Daughter. (Doc. 151-1 at 156). Daughter "was combative with the officers and EMTs and sustained facial abrasions while being restrained." (*Id.*) While at Abrazo, Daughter was physically restrained, sedated and given Haloperidol[4] because she was "running around the ER trying to escape and becoming combative." (Doc. 151-2 at 15). Due to this continued behavior, including punching another patient in the head and inducing a seizure in that patient, Daughter was transported to Defendant Aurora's facility on August 25th. (Doc. 151-2 at 34–36). Her admission, care, and medication were authorized by DCS. (*Id.* at 36–38).

---

[4] Haloperidol, which is referred to as "Haldol," is an anti-psychotic medication which Dr. Mlak prescribed Daughter for "mood instability." (Doc. 154 at 7; Doc. 151-2 at 78).

1    Dr. Mlak performed a psychiatric evaluation of Daughter the day after her arrival at

2  Aurora on August 26, 2018.  (Doc. 151-2 at 40). Defendant Aurora states that Dr. Mlak

3  was an independent contractor who provided behavioral health services at Aurora.  (Doc.

4  152 at 3).  Dr. Mlak's August 26 report states that: (a) he attempted to contact Mother and

5  left her messages; (b) Daughter received multiple medications for agitation including

6  Haldol and Ativan throughout her stay in the ER; and (c) she is currently a temporary ward

7  in a foster care system and her DCS worker is Ms. Melissa Courtright.  (*See* Doc. 151 at 4

8  (referencing Doc. 151-2 at 40–42)).  Dr. Mlak recommended that Daughter be admitted for

9  inpatient psychiatric acute care services as coordinated through DCS.  (Doc. 154-15 at 14).

10    DCS sought, and the Juvenile Court approved, a 72-hour admission for Daughter's

11  inpatient assessment at Aurora on August 31, 2018, under A.R.S. § 8–272.  (Doc. 154-

12  16 at 2–3).  The Juvenile Court also ordered that "if, after completion of the inpatient

13  assessment, the psychologist, psychiatrist or physician recommends that [Daughter]

14  receive inpatient psychiatric acute care services . . . [she may] remain in the facility up to

15  seventy-two hours from the filing of the Motion for Inpatient Psychiatric Acute Care

16  Services."  (*Id*. at 3).  An attorney, Angela Ramos, was also appointed under A.R.S. § 8-

17  272(G) to represent Daughter in all future proceedings in this matter."  (*Id*.)

18    On September 4, 2018, the Juvenile Court held a hearing to determine whether

19  Daughter would remain at Aurora for inpatient psychiatric acute care services.  (Doc. 151-

20  2 at 65).  It approved inpatient care at Aurora for Daughter through October 30, 2018, and

21  scheduled a review hearing for that day.  (Doc. 154-17 at 3).  While at Aurora from

22  September through November of 2018, Dr. Mlak assessed Daughter and prepared daily

23  progress notes and documented several failed attempts to establish contact with Mother.

24  (*See e.g.*, Doc. 151-2 at 75, 78).

25    On September 7, 2018, Dr. Mlak began Daughter's Haldol treatment  and increased

26  her dosage on September 10th.  On September 11th he noted that Daughter had "muscle

27  rigidity"  and  prescribed  her  Cogentin  for  extrapyramidal  symptoms  ("EPS").

28  (Doc. 151 at 4–5). On September 12th, Dr. Mlak noted that Daughter's EPS was resolving

- 4 -

and  he was able to speak with Mother for the first time.  (*Id.* at 5).  On September 13, 2018, Dr. Mlak decreased Daughter's Haldol prescription, and the next day he noted that the Haldol's side effects were resolving and he "attempted to contact mother and left message to report resolution of side effect and improving sleep." (Doc. 151-3 at 6).

On September 21, 2018, Dr, Mlak and Mother spoke about Daughter's progress. He noted that Daughter's emotional dysregulation and violent outbursts persisted.  Mother expressed her concerns that Daughter would again develop rhabdomyolysis and demanded that she be taken off Haldol.  (*Id.* at 5).  Dr. Mlak notes that he explained that Daughter had no symptoms of rhabdomyolysis and Mother noted that she was going to file a complaint. (*Id.*)  Mother indeed emailed Aurora stating

> I'd like the name of the director of Aurora The doctor is completely ignoring me and refuses to take her off the Haldol. Her one on one told me she's not the same Brooke and that she's voiced her opinion and has been ignored, as well. When I have patients at that hospital telling me Brooke's attacking staff and hitting her head twice in one day, that doesn't show the medication side effects being resolved as the doctor put it. Staff told me as well and Brooke doesn't show any signs of cough or runny nose or illness and yet, even though it's associated with her condition, he still is ignoring me as a parent with proof.
>
> My daughter has been in almost a month and will end up with a longer tone [sic] in patient than any other stay, because the doctor chose to change all her meds after being abused and neglected in a home and wasn't even getting taken to appointments and neglected to bring her to emergency medical appointment at Arizona Children's Association, as well. ACA has it notated she has bad reactions to antipsychotics, but this doctor still refuses to listen to anything I say. The doctor she had last April was so much better and she didn't show these behaviors at Aurora on that doctor's regimen.
>
> I'm very disappointed in her medical treatment at Aurora this time.

(Doc. 154-9 at 2).

On October 17, 2018, Mother filed a request for an emergency hearing with the Juvenile Court and sought an Order that Daughter's providers communicate with Mother and consider her input.  (Doc. 151-3 at 23).  The Juvenile Court granted this request but noted that Daughter "shall not be discharged." (*Id.* at 31).

1

2

3

4

5

6

7

8

On October 31, 2018, Mother filed a Motion for Change of Physical Custody with the Juvenile Court to return Daughter to Mother's custody. (Doc. 154-5 at 2). The Juvenile Court granted the motion, subject to confirmation that Mother participate in specified training. (Doc. 154-12 at 5). In November of 2018, Daughter was discharged from Aurora and placed with her Mother. (Doc. 151 at 6; Doc. 159 at 13). In February 2019, DCS filed an Uncontested Motion to Dismiss, seeking to terminate the dependency proceedings after observing that Daughter had been doing well while with Mother. (Doc. 151-3 at 33). The Juvenile Court granted the Motion and dismissed all proceedings. (*Id.* at 36).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

Plaintiffs originally filed this action in Maricopa County Superior Court in July 2021. (Doc. 1-4). [5] Defendants removed the matter to this Court based on federal question jurisdiction. (Doc. 1). Plaintiffs then filed an Amended Complaint against the different Defendants alleged to be involved in Daughter's removal and treatment. (Doc. 17). Several Defendants have since been dismissed and the only remaining Defendants are Dr. Mlak and Aurora. The Amended Complaint brings the following claims against these Defendants: (1) conspiracy to violate Plaintiffs' due process rights in violation of 42 U.S.C. § 1983 against Dr. Mlak (Count XV) (Doc. 17 at ¶¶ 381–90); (2) medical malpractice against Dr. Mlak (Count XX) (*Id.* at ¶¶ 432–35); (3) assault and battery against both Defendants (Count XXI) (*Id.* at ¶¶ 436–46); and (4) negligence against both Defendants (Count XXIII) (*Id.* at ¶¶ 451–54). Defendants have each separately moved for summary judgment on all the claims against them (Docs. 151–52) and Plaintiffs have moved for summary judgment on the issues of informed consent, Mother's due process right to make medical decisions for Daughter, and that the administration of Haldol was a "major" medical decision. (Doc. 154).

24

25

26

27

28

---

[5] Plaintiffs initially brought this case against the State of Arizona; DCS; Tina Canale, Christie Johnson, Melissa Courtright, Nicholas Long, Gregory McKay, and Michael Faust individually and as employees of DCS; Aurora Behavioral Healthcare, Dr, Mlak, Kattia Lnu, an employee of Aurora, Care and Dignity Services, LLC; and several John and Jane Does as well as "Black Entities." (Doc. 1-4 at 2–3). Plaintiffs later added Kattia Luevano and Helen Nagle, both of whom were employees of Aurora. (Doc. 17 at 2). All the Defendants in this matter except Dr. Mlak and Aurora have been dismissed. (Doc. 172 (dismissing the State Defendants and Care and Dignity); Doc. 116 (dismissing Defendant Faust); Doc. 74 (dismissing Defendants Luevano and Nagle)).

## II.    Legal Standard

A court will grant summary judgment if the movant shows there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is "material" if it might affect the outcome of a suit, as determined by the governing substantive law. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" when a reasonable jury could return a verdict for the nonmoving party.  *Id*.  Courts do not weigh evidence to discern the truth of the matter; they only determine whether there is a genuine issue for trial.  *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).  This standard "mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict."  *Anderson*, 477 U.S. at 250.  "If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed."  *Id*. at 250–51 (citing *Wilkerson v. McCarthy*, 336 U.S. 53, 62 (1949)).

The moving party bears the initial burden of identifying portions of the record, including pleadings, depositions, answers to interrogatories, admissions, and affidavits, that show there is no genuine factual dispute.  *Celotex*, 477 U.S. at 323.  Once shown, the burden shifts to the non-moving party, which must sufficiently establish the existence of a genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986).  Where the moving party will have the burden of proof on an issue at trial, the movant must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail "merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  *Id.* (citing *Celotex Corp.*, 477 U.S. at 323).

If the moving party meets its initial burden, the nonmoving party must set forth, by

1    affidavit or otherwise as provided in Rule 56, "specific facts showing that there is a genuine

2    issue for trial." *Anderson*, 477 U.S. at 250; Fed. R. Civ. P. 56(e).  The non-moving party

3    must make an affirmative showing on all matters placed in issue by the motion as to which

4    it has the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  The summary-judgment stage

5    is the " 'put up or shut up' moment in a lawsuit, when the nonmoving party must show

6    what evidence it has that would convince a trier of fact to accept its version of events."

7    *Arguedas v. Carson*, 2024 WL 253644, at \*2 (S.D. Cal. Jan. 22, 2024) (citation omitted).

8    In fact, the non-moving party "must come forth with evidence from which a jury could

9    reasonably render a verdict in [its] favor."  *In re Oracle Corp. Sec. Litig*., 627 F.3d 376,

10   387 (9th Cir. 2010) (citation omitted).  In judging evidence at the summary judgment stage,

11   the court does not make credibility determinations or weigh conflicting evidence.  Rather,

12   it draws all inferences in the light most favorable to the nonmoving party.  *See T.W. Electric*

13   *Service, Inc. v. Pacific Electric Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).

14   **III.    Discussion**

15           The Motions here relate to the same four claims: (1) conspiracy to violate Plaintiffs'

16   due process rights under Section 1983 against Defendant Mlak; (2) failure to provide the

17   minimum accepted standard of care to Daughter (medical malpractice) against Defendant

18   Mlak; (3) assault and battery against both Defendants; and (4) negligence against both

19   Defendants.

20           Defendant Mlak argues that Plaintiffs cannot support any of their claims against him

21   and that their claims are barred by the statute of limitations.  (Doc. 151 at 8, 22).  Defendant

22   Aurora argues that Plaintiffs' medical malpractice, assault and battery claims fail because

23   Dr. Mlak had actual consent to administer Haldol; because Aurora cannot be vicariously

24   liable for the acts of an independent contractor like Dr. Mlak; and because Plaintiffs' have

25   generally failed to prove up the elements of a negligence claim, including damages.

26   (Doc. 152 at 4, 10–12).  Plaintiffs, on the other hand, seek partial summary judgment

27   against Defendant Mlak for "(1) his breach of his common law duty to obtain informed

28   consent before administering Haldol, and (2) his breach of Mother's constitutional right to

1    make important, major medical decisions for her daughter." (Doc. 154 at 20–21). The

2    Court first addresses Dr. Mlak's Motion (Doc. 151).

3        Dr. Mlak argues he is entitled to summary judgment on all of Plaintiffs' claims. He

4    first argues that all of Plaintiffs' claims are time barred. He says even if they are timely,

5    his Section 1983 conspiracy claim fails as a matter of law because he was not a state actor,

6    he did not deprive Plaintiffs of their constitutional rights, and because A.R.S. § 8–531, the

7    Arizona statute defining "custody" and "guardianship of the person" does not apply to this

8    matter. (Doc. 151 at 8–9, 11, 15). He finally argues that summary judgment in his favor

9    is justified because Plaintiffs have not provided sufficient evidence to support their other

10   claims against him. (*Id*. at 22–26). The Court will begin with Dr. Mlak's timeliness

11   argument.

12       **A.    The Timeliness of Plaintiffs' Claims**

13       Defendant Mlak argues that Mother's Section 1983 Conspiracy claim was filed too

14   late under Arizona law, A.R.S. § 12-542, and must be dismissed. (Doc. 151 at 8). Plaintiffs

15   argue that Dr. Mlak waived this defense. (Doc. 159 at 21). The Court finds that Dr. Mlak

16   indeed waived this defense by not raising it until the summary judgment stage.

17       A defendant can waive its right to assert an affirmative defense. *See, e.g., Day v.*

18   *McDonough*, 547 U.S. 198, 207-08 (2006) (waiver of statute of limitations defense). A

19   "waiver" is the "intentional relinquishment or abandonment of a known right." *Wood v.*

20   *Milyard*, 566 U.S. 463, 474 (2012) (citations and internal quotation marks omitted).

21   Generally, an affirmative defense that is not asserted in an answer to the complaint is

22   waived or forfeited by the defendant. *John R. Sand & Gravel Co. v. United States*, 552

23   U.S. 130, 133 (2008) (citing Fed. R. Civ. P. 8(c)(1), 12(b), 15(a)). Though, affirmative

24   defenses like the statute of limitations may "be raised in motions to dismiss filed before

25   the first responsive pleading." *Cedars-Sinai Med. Ctr. v. Shalala*, 177 F.3d 1126, 1129

26   (9th Cir. 1999) (citing *Bacon v. City of Los Angeles*, 843 F.2d 372 (9th Cir. 1988).

27       Federal Rule of Civil Procedure 7(a) defines "pleadings" as "a complaint and

28   answer; a reply to a counterclaim; an answer to a cross-claim; and a third party complaint

1   and answer. Anything else is a motion or paper." *Morrison v. Mahoney*, 399 F.3d 1042,

2   1046 (9th Cir. 2005). "The requirement in Rule 8(c) that a party set forth the affirmative

3   defenses listed in that rule applies only to responsive 'pleadings,' not to motions." *Id*.

4   "Federal Rules of Civil Procedure 8(c) and 12(b) *require* that the [defendant] raise the

5   statute of limitations in its first responsive pleading to avoid waiving the defense." *Id*.

6   (citation omitted) (emphasis added). "In the absence of a showing of prejudice, however,

7   affirmative defenses may be raised for the first time at summary judgment." *Camarillo v.*

8   *McCarthy*, 998 F.2d 638, 639 (9th Cir. 1993).

### 1.    Dr. Mlak did not Give Plaintiffs Fair Notice of his Statute of Limitations Defense

Defendant Mlak did not specifically raise a statute of limitations defense in his
Answer or in his Motion to Dismiss. (*See* Docs. 75 & 88). Defendant argues that he did,
however, reserve "all affirmative defenses under Fed. R. Civ. P. 8(c) in his Answer."
(Doc. 162 at 12). In his Answer, Dr. Mlak states that "[i]n order to avoid waiver, Defendant
asserts the following defenses should discovery reveal these defenses are appropriate,
specifically, the affirmative defenses set forth in Rule 8(c) and 12 Fed. R. Civ. P."
(Doc. 75 at ¶ 482). Rule 8(c) includes eighteen affirmative defenses, including the statute
of limitations defense. *See* Fed. R. Civ. P 8(c)(1).

"An affirmative defense, under the meaning of Federal Rule of Civil Procedure 8(c),
is a defense that does not negate the elements of the plaintiff's claim, but instead precludes
liability even if all of the elements of the plaintiff's claims are proven." *Barnes v. AT & T*
*Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1173-74 (N.D. Cal
2010) (citations omitted). Rule 8(b) requires defendants to "state in short and plain terms"
their defenses to each claim. Fed. R. Civ. P. 8(b)(1)(A). However, Rule 8(c) requires that,
in responding to a pleading, a party "must *affirmatively* state any avoidance or affirmative
defense." Fed. R. Civ. P 8(c)(1).

There is a split within this Circuit as to whether a defendant must plead their
affirmative defenses under the plausibility standard set out in *Iqbal* and *Twombly* or simply
provide the plaintiff with fair notice under *Conley*. *Compare Hukman v. Terrible Herbst*

- 10 -

*Inc.*, 2024 WL 365290, at *2 (D. Nev. Jan. 31, 2024) *with Nippon Sigmax Co., Ltd v. Kranos Corp.*, 2021 WL 2634823, at *5 (C.D. Cal. June 25, 2021).  Some district courts have recently found that "in determining 'insufficient defenses,' *Iqbal* and *Twombly* govern Rule 8(b)(1)(A) defenses while *Conley* governs Rule 8(c) affirmative defenses." *Hukman*, 2024 WL 365290, at *2.

The Ninth Circuit recently used the fair notice standard when analyzing whether the affirmative defense of "equivalent facilitation" under the Americans with Disabilities Act Accessibility Guidelines was sufficiently pled.  There, the Circuit court stated that  "[t]he 'fair notice' required by the pleading standards only requires describing the defense in 'general terms.' " *Snow Covered Capital, LLC v. Fonfa*, 2023 WL 5726259, *1 (D. Nev. March 6, 2023) (citing *Kohler v. Flava Enters.*, 779 F.3d 1016, 1019 (9th Cir. 2015).  Under this approach, fair notice means that "a pleader must only present what the 'claim is and the grounds upon which it rests.' " *Nippon*, 2021 WL 2634823, at *5 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, (1957), *abrogated by Bell Atl. Corp. v. Twombly*, 550 U.S. 544, (2007)).

Without deciding which approach is appropriate, the Court will utilize the fair notice standard as Defendant Mlak failed under this lower standard to put Plaintiffs on notice of the defenses he wished to assert.  See *Nippon*, 2021 WL 2634823, at *5.  In his Answer, Dr. Mlak states that: "In order to avoid waiver, Defendant asserts the following defenses should discovery reveal these defenses are appropriate, specifically, the affirmative defenses set forth in Rule 8(c) and 12 Fed. R. Civ. P."  (Doc. 75 at ¶ 482).  This assertion of "the affirmative defenses set forth in Rule 8(c) and 12 Fed. R. Civ. P." is insufficient as the pleader must, at the very least, present what the claim is and the grounds upon which it rests.  *Nippon*, 2021 WL 2634823, at *5.  "Fair notice requires a defendant to describe an affirmative defense in 'general terms.' " *Sims v. Peak Legal Advocates*, 2018 WL 8731538 (C.D. Cal. Nov. 16, 2018).  Therse general terms include "the nature and grounds for the affirmative defense." *Id*. (quoting *Kohler v. Islands Restaurants, LP*, 280 F.R.D. 560, 564 (S.D. Cal. 2012)).  Defendant did not state which of the eighteen defenses in Rule 8(c) it

wished to assert or why it wished to assert them. (Doc. 75 at ¶ 482). Even under the low fair notice standard, this is insufficient.

### 2. Raising the Statute of Limitations Defense at this Stage Prejudices Plaintiffs

A finding that Dr. Mlak did not give Plaintiffs fair notice of his affirmative defense does not end the Court's inquiry as affirmative defenses may be raised for the first time at summary judgment if there is not prejudice to the plaintiff. *Camarillo*, 998 F.2d at 639.

Plaintiffs argue that they have suffered prejudice in many ways, including:

- Defendant specifically asserted a "plethora" of other affirmative defenses such as "Plaintiffs' preliminary expert opinion affidavit is lacking pursuant to A.R.S. 12-2603 and A.R.S. § 12-2604." (Doc. 75 at ¶ 457).

- Dr. Mlak demonstrated his intent to litigate this case on the merits by taking depositions of Mother, John Scianna, Daniel Quigley, and Dr. Clark, appeared at and participated in six fact witness depositions noticed by Plaintiffs, appeared for and defended his own deposition, and propounded and responded to written discovery under Rules 33, 34, and 36. (Doc. 159 at 22).

- "Plaintiffs did not pursue any discovery with respect to any equitable tolling or discovery of Dr. Mlak's wrongful conduct, as Dr. Mlak had clearly abandoned the defense, and Plaintiffs used her limited discovery to advance her own case and respond to the twenty-six other defenses that Dr. Mlak did posit." (*Id.* at 23).

- "Plaintiffs incurred great expense in defending and taking the eleven (11) depositions noticed in this case, including one requiring travel to Massachusetts. Plaintiffs did not establish precisely when [Mother] learned of the feeble informed consent efforts that Dr. Mlak made (his deposition was taken in June of 2023), or when she learned precisely who the ultimate decisionmaker was with respect to the administration of Haldol." (*Id.*)

In the context of a late affirmative defense, prejudice relates largely to discovery. *See Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) ("[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice."). The Court's Scheduling Order was amended several times throughout the course of this matter. Relevant here, the parties' fact discovery deadline

was extended to September 22, 2023.  (Doc. 108 at 1).  Defendant Mlak's Motion, in which he first asserts the statute of limitations defense, was filed on July 3, 2024—ten months *after* the close of discovery.  (Doc. 151).  If Plaintiffs wanted to conduct discovery into equitable tolling of the statute of limitations, as they argue they would have, the Court's Scheduling Order would have precluded such attempts.  (Doc. 108 at 1). Defendants' belated statute of limitation defense has resulted in prejudice to the Plaintiffs by preventing her from requesting potentially necessary, useful, written discovery to counter the assertion.  *See Camarillo*, 998 F.2d at 639; *Control Laser Corp.*, 705 F. Supp. 3d at 1017; *see also Lockheed Martin*, 194 F.3d at 986 (stating that "[a] need to reopen discovery and therefore delay the proceedings supports a district court's finding of prejudice.").

Additionally, "[t]here is no prejudice to a plaintiff where an 'affirmative defense would have been dispositive' if asserted 'when the action was filed.' " *Garcia v. Salvation Army*, 918 F.3d 997, 1008 (9th Cir. 2019) (quoting *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001)).  While the statute of limitation defense can be dispositive in many cases, it is not dispositive here, by itself, because Defendants admitted that *Mother's* claim "accrued no later than November 2018," therefore, she "had until November 2020 to file her complaint before the statute of limitations ran."  (Doc. 151 at 8 ("Christine's § 1983 Claim is Barred by the Statute of Limitations")).  Daughter may still have very well been able to bring her claims against Dr. Mlak if he had properly raised his affirmative defense.  So, raising this late defense is prejudicial.  *Cf. Garcia v. Salvation Army*, 918 F.3d at 1008.

In sum, Defendant Mlak has waived his statute of limitations affirmative defense. The Court will proceed to Dr. Mlak's assertion that Plaintiff's 1983 claim fails because he was not a state actor and that no Constitutional derivation occurred.  (Doc. 151 at 9).

## B.    Section 1983 Conspiracy

The Civil Rights Act, codified at 42 U.S.C. § 1983, provides in relevant part:

> Every person who, under color of [state law]. . . subjects, or causes to be subjected, any citizen of the United States. . . to the deprivation of any rights, privileges, or immunities secured by the Constitution. . . shall be liable to the

party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.' " *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

To prevail in a Section 1983 action, a plaintiff must show that: (1) the acts of the defendants (2) under color of state law (3) deprived her of federal rights, privileges, or immunities and (4) caused her damage. *Thornton v. City of St. Helens*, 425 F.3d 1158, 1163-64 (9th Cir. 2005). The "color of law" or "state actor" requirement is "a jurisdictional requisite for a § 1983 action." *West v. Atkins*, 487 U.S. 42, 46 (1988). Furthermore, "[t]o establish liability for a conspiracy in a § 1983 case, a plaintiff must 'demonstrate the existence of an agreement or meeting of the minds' to violate constitutional rights." *Kirwin*, 2023 WL 4747396, at *3 (*quoting Crowe v. Cnty. of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010)). "Such an agreement need not be overt and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Id.* (citation omitted). "A 'common objective' is insufficient; the common objective must also intend a violation of constitutional rights." *Id.* (quoting *Crowe*, 608 F.3d at 440–41).

On the merits, Defendant Mlak argues that (1) he was not a state actor; (2) Plaintiffs suffered not constitutional deprivation; and (3) that A.R.S. § 8–531 does not apply to this case. The Court will address each argument.

### 1.    Whether Dr. Mlak was a State Actor

#### a.    Legal Standard

A Section 1983 claim is actionable only against state actors. *See e.g., Lyndon v. United States*, 2020 WL 3405530, at *5 (D. Haw. June 19, 2020). The determination of "whether a nominally private person or corporation acts under color of state law is a matter of normative judgment, and the criteria lack rigid simplicity." *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (citations and internal quotations

omitted).  Indeed, "[no] one fact can function as a necessary condition across the board . . . nor is any set of circumstances absolutely sufficient."  *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002) (citation omitted). Rather, courts must engage in "sifting facts and weighing circumstances" to answer what is "necessarily a fact-bound inquiry.*"  Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 939 (1982).

The Ninth Circuit explains the first part of the state actor inquiry requires identifying the "specific conduct of which the plaintiff complains" in order to evaluate whether the entity was acting under color of state law at the time of its conduct towards the plaintiff. *Rawson*, 975 F.3d at 747.  To evaluate whether the defendant's conduct constitutes state action, the Ninth Circuit has recognized four different "general tests that may aid [courts] in identifying state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus."  *Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020) (quoting *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (citation omitted)).

Under the public-function test, "when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations."  *Solomon v. Las Vegas Metro. Police Dep't*, 441 F. Supp. 3d 1090, 1097 (D. Nev. 2020) (quoting *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002)).  "The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.' " *Kirtley*, 326 F.3d at 1093 (quoting *Lee*, 276 F.3d at 555).  Under the second test, "[t]o be engaged in joint action, a private party must be a 'willful participant' with the State or its agents in an activity which deprives others of constitutional rights."  *Solomon*, 441 F. Supp. 3d at 1097 (quoting *Brunette v. Humane Soc'y of Ventura Cty.*, 294 F.3d 1205, 1211 (9th Cir. 2002)).  "To satisfy the test, the plaintiff must show that the private party's actions are substantially and 'inextricably intertwined' with those of the government,' or that a conspiracy to violate his constitutional rights exists."  *Id.*  The government compulsion or coercion test considers "whether the coercive influence or 'significant encouragement' of

the state effectively converts a private action into a government action." *Douglass v. HonorHealth*, 2024 WL 4475093, at *4 (D. Ariz. Oct. 11, 2024) (quoting *Kirtley*, 326 F.3d at 1094). This test "requires more than 'the mere fact that the government compelled a result. Rather, it requires instances akin to private parties being 'left with no choice of [their] own.' " *Id.* (quoting *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 838 (9th Cir. 1999)). "The final test—the nexus test—looks to whether 'there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.' " *Id.* (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 US. 288, 295 (2001) (quotations and citation omitted).

"Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Id.* The relevant inquiry as to whether a defendant's actions constituted state action thus hinges on the specific alleged conduct and role of the defendant, and requires a fact-intensive, totality of the circumstances approach. *See id.* at 747. Regardless of the test applied, "[a]t bottom, the inquiry is always whether the defendant has 'exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Id.* at 748 (quoting *West*, 487 U.S. at 49).

"Generally, private doctors and hospitals are not considered to be state actors." *Morrison v. Clinic*, 703 F. Supp. 3d 1245, 1251 (D. Mont. 2023) (citing *Briley v. State of Cal.*, 564 F.2d 849, 855-56 (9th Cir. 1977) (noting that "private hospitals and physicians have consistently been dismissed from § 1983 actions for failing to come within the color of state law requirement of this section")). However, "[i]t is 'the physician's function within the state system,' not his private-contractor status, that determine[s] whether his conduct could 'fairly be attributed to the State.' " *Voage v. Shpaner*, 2021 WL 5417147, at *4 (S.D. Cal. Nov. 19, 2021) (quoting *West*, 487 U.S. at 55–56)). Determining whether a private party, such as Dr. Mlak, is a state actor for purposes of § 1983 is thus a "fact-bound inquiry." *Wright v. S. Arizona Children's Advoc. Ctr.*, 2024 WL 4349422, at *6 (D. Ariz. Sept. 30, 2024) (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

1

**b.    Analysis**

2          Plaintiffs argue that when DCS was awarded temporary custody of Daughter, it

3    delegated the right to make any medical decision to Dr. Mlak. (Doc. 159 at 28).  In doing

4    so, Plaintiffs argue that Dr. Mlak was serving a public function that was "traditionally and

5    exclusively governmental."    (*Id*.) Plaintiffs also analogize *Rawson v. Recovery*

6    *Innovations, Inc.*, where the Ninth Circuit found a private behavioral health facility was a

7    state actor for purposes of a person's involuntary mental health commitment.  (*Id*. at 30

8    citing *Rawson*, 975 F.3d at 757).

9          Applying the Ninth Circuit's test, the Court will first examine the "specific conduct

10   of which the plaintiff complains."   *Rawson*, 975 F.3d at 747.   Plaintiffs allege that

11   Defendant Mlak "conspired with [other Defendants] to violate [Mother's] right to make

12   medical decisions for [Daughter] and [Daughter's] right to have [Mother] make medical

13   decisions for her when Mlak provided medical treatment to [Daughter] from August 2018

14   to November 2018 without [Mother's] knowledge and/or consent."  (Doc. 17 at ¶ 388).

15   Plaintiffs say that Dr. Mlak "knew that [Daughter] was in the 'legal custody of [DCS], but

16   made major medical decisions unilaterally, nonetheless."  (Doc. 159 at 31).  Plaintiffs

17   essentially argue that DCS rubber stamped Dr. Mlak's decision to administer Haldol to

18   Daughter. (*See id*.) In this context, the Court must examine Dr. Mlak's relationship

19   with DCS.

20         The record currently reflects that DCS sought the juvenile court's approval to

21   commit Daughter to inpatient services based, in part, on the psychiatric evaluation Dr.

22   Mlak performed. (Doc. 154-15 at 7).  Specifically, DCS represented to the court that Dr.

23   Mlak had assessed Daughter and found that she was "suffering from a mental disorder or

24   is a danger to self or others and is in need of inpatient psychiatric acute care services."

25   (*Id*. at 1).  On August 25, 2018, Dr. Mlak also recommended to DCS that Daughter remain

26   inpatient due to the risks she presented.  (*Id*. at 14).  DCS attached Dr. Mlak's psychiatric

27   evaluation and medical screening evaluation of Daughter to its Motion for the juvenile

28   court's review.   (*Id*. at 7–10).   Based in part on Dr. Mlak's evaluation, DCS also

recommended that Daughter remain a ward of the court and be committed to the care, custody and control of DCS.  (*Id*. at 6).  Ultimately, the Juvenile Court, in part relying on the "written assessment recommending inpatient psychiatric acute care services," found that Daughter required impatient services and approved her admission to Aurora. (Doc. 154-17 at 2–3).

DCS's delegation of Daughter's treatment to Dr. Mlak along with his involvement in her commitment to DCS custody shows Dr. Mlak had "a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself."  *See Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (noting that challenged action may constitute state activity "when a private actor operates as a willful participant in joint activity with the State or its agents") (citation and internal quotations omitted).  Indeed, when Daughter's DCS case manager, Melissa Courtright, was asked whether she has "any obligation to understand what the side effects or the risks of any psychotropic medications are before [she] consent[s] to the[ir] administration" she stated that she did not go to medical school and that if a drug is being recommended by a provider (like Dr. Mlak), she will not withhold it.  (Doc. 154-25 at 4). *See Jensen v. Lane Cnty*., 222 F.3d 570, 574 (9th Cir. 2000) (holding contract services provided by licensed private physicians to municipal governments in the detention and examination of persons brought into treatment facilities by police officers as possible mental patients constituted state action).

In *Rawson*, which Plaintiffs rely heavily upon, the Ninth Circuit concluded that private medical professionals who had treated an involuntarily committed plaintiff were state actors.  975 F.3d at 757.  There, the plaintiff was involuntarily committed at the private defendant's mental health facility after making comments to a bank teller about mass murder.  *Id*. at 745.    Relevant here, the Ninth Circuit in *Rawson* concluded that the defendants were engaged in state action for several reasons: (1) "Defendants were 'clothed with the authority of state law' when they detained and forcibly treated Rawson beyond the initial 72-hour emergency evaluation period[;]" (2) "the State has a Fourteenth

Amendment obligation toward those whom it has ordered involuntarily committed" and its duties "toward persons involuntarily committed weighs toward a finding of state action[;]" (3) the defendants cooperation "with the executive arm of the State to further the State's interest in protecting both the public and the patient[;] and (4) "much of the challenged activity received clear state imprimatur" such as the State's forcible detainment and treatment of the patient showed the state's "authorization and approval" of the defendant's actions.  *Rawson*, 975 F.3d at 752–755.  The Circuit also specifically concluded that "any deprivation effected by Defendants here was in some sense caused by the State's exercise of its right, pursuant to both its police powers and *parens patriae* powers, to deprive [plaintiff] of his liberty for an extended period of involuntary civil commitment."  975 F.3d at 752.

Here, the State had a Fourteenth Amendment obligation toward Daughter, whom it ordered involuntarily committed at Dr. Mlak's direction.  *See Addington*, 441 U.S. at 425 ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.").  Dr. Mlak worked closely with DCS when DCS was seeking to obtain custody over Daughter and commit her to Aurora's care (Doc. 154-17).  *See Rawson*, 975 F.3d at 755 (concluding that "the role of state authorization and approval weighs in favor of a finding of state action" where "the challenged activity received clear state imprimatur."); *see also imprimatur*, Black's Law Dictionary (12th ed. 2024) (defining imprimatur as "[a] general grant of approval").  The record also demonstrates that Dr. Mlak cooperated with DCS and that this cooperation was necessary for DCS to make its custody decision over Daughter, and her necessary care while in DCs' care.  *See Rawson*, 975 F.3d at 749 (discussing "the necessity of the physician cooperating with prison management" as a factor which weighs towards a finding of state action); *see also West* 487 U.S. at 57 (finding that a private contract physician rendering treatment services to prisoners at a state prison acted under color of law because any deprivation effected by the physician would necessarily be caused by the State).

The record sufficiently shows that DCS has "undertaken a complex and deeply intertwined process of evaluating and detaining [children] who are believed to be mentally ill and a danger to themselves or others," which it has involved Dr. Mlak in—who recommended Daughter be treated inpatient.  *See Jensen*, 222 F.3d at 575 (finding that defendant physicians were state actors where they were responsible for making the medical determinations relevant to the duration of the plaintiff's emergency detention); *see also id*. ("The record is clear that [the defendant physicians] and the County through its employees have undertaken a complex and deeply intertwined process of evaluating and detaining individuals who are believed to be mentally ill and a danger to themselves or others."). Finally, as Plaintiffs argue, DCS approved Dr. Mlak's actions. (Doc. 154-25 at 4).  *See Rawson*, 975 F.3d at 755 ("the role of state authorization and approval weighs in favor of a finding of state action").  In sum, the facts and evidence sufficiently show that Dr. Mlak was a state actor.

## 2.    Constitutional Deprivation

Dr. Mlak next argues that Plaintiffs did not suffer a constitutional deprivation. (Doc. 151 at 11).  Plaintiffs argue that Dr. Mlak violated both Mother and Daughter's right to familial association and Mother's right to direct her child's medical care. (Doc. 159 at 24).

The Supreme Court has stated that "the interest of the parents in the care, custody and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court."  *Troxel v. Granville*, 530 U.S. 57, 65 (2000).  "The right to family association includes the right of parents to make important medical decisions for their children, and of children to have those decisions made by their parents rather than the state."  *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000).  As a result, "barring a reasonable concern that material physical evidence might dissipate . . . or that some urgent medical problem exists requiring immediate medical attention, the state is required to notify parents and to obtain judicial approval before children are subjected to investigatory physical examinations."  *Id*.; *see also Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1162

("A parent's due process right to notice and consent is not dependent on the particular procedures involved in the examination [of the child], or the environment in which the examinations occurs, or whether the procedure is invasive . . . [A] parent's right to notice and consent is an essential protection of the child and the parent.").

A plaintiff may bring a claim of interference with the parent-child relationship in violation of the Fourteenth Amendment as either a procedural due process claim or a substantive due process claim. *See Smith v. City of Fontana*, 818 F.2d 1411, 1419-20 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc). "Whether State interference with a liberty interest implicates a procedural due process or a substantive due process right depends on whether the interference was for the purpose of furthering a legitimate governmental interest (procedural) or was 'for the purpose of oppression.' " *Ovando v. City of Los Angeles*, 92 F. Supp. 2d 1011, 1017 (C.D. Cal. 2000) (quoting *Smith v. City of Fontana*, 818 F.2d 1411, 1419 (9th Cir. 1987)). A procedural due process claim typically arises when a state official removes a child from a parent's care. For such claims, "[t]he Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies." *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1294 (9th Cir. 2007) (quoting *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107 (9th Cir. 2001)).

Removing a child from a parent's custody violates the Fourteenth Amendment unless the removal (1) is authorized by a court order, i.e., a warrant; or (2) is supported by "reasonable cause to believe that the child is in imminent danger of serious bodily injury," and the scope of intrusion does not extend beyond that which is reasonably necessary. *Id.* (quoting *Mabe*, 237 F.3d at 1106). "While the right is a fundamental liberty interest, officials may interfere with the right if they 'provide the parents with fundamentally fair procedures.' " *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018) (citing *Santosky v. Kramer*, 455 U.S. 745, 753–54 (1982)).

Like many constitutional rights, the right to family association is not "absolute."

*Mueller v. Auker*, 700 F.3d 1180, 1186 (9th Cir. 2012); *see also Parham v. J.R.*, 442 U.S. 584, 602 (1979) (holding that it is in the interest of both parents and children that parents have ultimate authority to make medical decisions for their children unless "neutral fact finder" determines, through due process hearing, that parent is not acting in child's best interests). "Under certain circumstances, these rights must bow to other countervailing interests and rights, such as the basic independent life and liberty rights of the child and of the State acting as *parens patriae*." *Id.*

There are two recognized circumstances in which the constitutional rights of parents to make medical decisions "step aside." *Pope v. Cnty. of San Diego*, 719 F. Supp. 3d 1076, 1087 (S.D. Cal. 2024) (quoting *Mueller*, 700 F.3d at 1187). "First, these rights may be extinguished where, after a formal hearing in which 'all available sources' were considered and the parents were afforded due process, a neutral adjudicator concludes that the parents neglected or abused their child." *Id.* (quoting *Parham*, 442 U.S. at 606). "Second, without such a 'due process' hearing, the state can only override parental rights to make medical decisions in 'emergency situation[s,]' 'when the children are subject to immediate or apparent danger or harm.' " *Id.* (quoting *Mueller*, 700 F.3d at 1187)). "Examples of such situations include circumstances where a parent refuses necessary medical care for a child, where a child requires immediate emergency medical care, or where parents pose an imminent threat to their child's health and wellbeing." *Id.* (citing *Pickup v. Brown*, 740 F.3d 1208, 1235 (9th Cir. 2014); *see also Lamorie v. Davis*, 485 F. Supp. 3d 1065, 1070 (D. Ariz. 2020) ("a parent's right to be heard about a child's medical procedures is not violated when the state actor has reasonable cause to believe that serious bodily harm will befall the child or that the parent is unfit.")).

In sum, when the State "wishes to provide medical attention to a child in temporary protective custody, it ***must***: '(1) notify the parents;' '(2) obtain either parental consent or a court order in advance;' and '(3) permit the parent to be present at [or nearby] the [medical event]' and that failure to do so absent exigent circumstances amounts to a violation of the parents' Fourteenth Amendment substantive due process rights." *Pope*, 719 F. Supp. 3d at

1087 (quoting *Benavidez v. County of San Diego*, 993 F.3d 1150 (9th Cir. 2021)).

Defendant Mlak notes, and Plaintiff does not contest, that "[w]hen a dependency petition is filed, the Juvenile Court has authority to issue an order authorizing DCS 'to take temporary custody of a child on finding that probable cause exists to believe that temporary custody is clearly necessary to protect the child from suffering abuse or neglect and it is contrary to the child's welfare to remain in the home.' " (Doc. 151 at 12 (citing A.R.S. § 8–821(B)). Plaintiffs note, however, that "[g]enerally, the hearing on the Department's dependency petition must be conducted within ninety (90) days of service of the dependency petition." (Doc. 159 at 7 (citing A.R.S. § 8-842(C)).

Indeed, as Defendant Mlak points out, if the Juvenile Court authorizes DCS to take temporary custody, it must hold a hearing to decide "whether there is probable cause to believe that continued temporary custody is clearly necessary to prevent abuse or neglect pending the hearing on the dependency petition." (Doc. 151 at 12 (citing A.R.S. § 8–824(F))). "On the filing of such a petition, the Arizona court may issue 'temporary orders necessary to provide for the safety and welfare of the child,' A.R.S. § 8-841(G), and assumes continuing jurisdiction 'over all matters affecting dependent children,' " *B.K. by next friend Tinsley v. Snyder*, 922 F.3d 957, 963 (9th Cir. 2019) ("*Tinsley*") (quoting *In re Appeal in Maricopa Cty. Juvenile Action No. JD-6236*, 874 P.2d 1006, 1008 (Ariz. Ct. App. 1994)). If the child is found to be "dependent," the Juvenile Court "will typically place the child in DCS's legal custody, triggering [its] legal obligations to the child." *Id.* (citing *Oscar F. v. Dep't of Child Safety*, 330 P.3d 1023, 1025 (Ariz. Ct. App. 2014) ("Since the day after the dependency petition was filed, the children have been temporary wards of the Court, committed to the legal care, custody and control of DCS")).

Here, Plaintiffs allege that Dr. Mlak conspired with DCS employees Melissa Courtright and Nicholas Long to violate Mother's right to make medical decisions for Daughter and Daughter's right to have Mother make medical decisions for her when Dr. Mlak "provided medical treatment to [Daughter] from August 2018 to November 2018 without [Mother's] knowledge and/or consent." (Doc. 17 at ¶ 384). Dr. Mlak essentially

argues that DCS' removal of Daughter was a fundamentally fair process, so, no Constitutional deprivation can be said to have occurred. (Doc. 151 at 15). Plaintiffs argue that, while DCS obtained a court order for inpatient treatment at Aurora, this inpatient treatment "did not give the providers there, including Dr. Mlak, a constitutional free-for-all in terms of treatment of [Daughter]." (Doc. 159 at 24). Plaintiffs specifically argue that Mother "retained the right to make informed decisions as to whether her daughter should be medicated with an antipsychotic medication, a medication with the potential for major and permanent side effects." (*Id*. at 24–25).

After taking temporary custody of Daughter, DCS filed an out of home dependency petition on June 27, 2018, which the juvenile court granted. (Doc. 154 at 4; Doc. 151 at 2). The juvenile court specifically ordered that Daughter be "made a temporary ward of the Court, committed to the legal care, custody and control of [DCS]" and that it is now "DCS's obligation, if any, to *provide medical behavioral health or other services to child*." (Doc. 151-1 at 121, 124) (emphasis added). Furthermore, on August 21, 2018, the Juvenile Court ordered "that temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition," and that "continuing the child as a temporary ward of the Court, committed to the care, custody and control of [DCS]." (Doc. 151-1 at 152–53).

On August 31st, the Juvenile Court extended DCS temporary custody over Daughter and approved a 72-hour admission for Daughter's inpatient assessment. (Doc. 154-16 at 2–3). It found that Daughter was "a dependent child in the care custody and control of" DCS. (*Id*. at 2). This finding "triggered" DCS' obligations to Daughter—including its obligation to care for her. *See Snyder*, 922 F.3d at 963; *see also Diana H. v. Rubin*, 171 P.3d 200, 212 (Ariz. Ct. App. 2007) (noting that the State has "a statutory duty to provide [dependent children] with comprehensive medical care.") (citing A.R.S. §§ 8–512, 8–531(4)).

Dr. Mlak performed an inpatient psychiatric evaluation of Daughter and provided the assessment to DCS with recommendations that she be admitted for inpatient psychiatric acute care services as coordinated through DCS. (Doc. 154-15 at 14). Dr. Mlak testified

that he attempted to call Mother's telephone on August 26, 2018, at the number that was in Daughter's physical chart.  (Doc. 154-2 at 18).  Then, based in part on Dr. Mlak's assessment and recommendation, the Juvenile Court found that Daughter "is suffering from a mental disorder or is a danger to self or others, and requires inpatient psychiatric acute care services."  (Doc. 154-17 at 2).  The Juvenile Court approved inpatient psychiatric acute care services through October 30, 2018, and scheduled a review hearing for October 30th.  (*Id.* at 3).  Under A.R.S. § 8-271(8), psychiatric acute care services can mean any of the following:

> (a) Emergency or crisis behavioral health services.

> (b) Psychiatric and psychological assessments and short-term intensive behavioral health counseling and treatment for acute episodes or mental disorders.

> (c) ***Medication stabilization*** and twenty-four hour a day nursing care for a child who suffers from acute psychiatric or mental disorders or who needs to have a chronic mental illness stabilized.

A.R.S. § 8-271(8) (emphasis added).

The Juvenile Court also noted that "[a]vailable alternatives to inpatient psychiatric acute care services were considered, but inpatient psychiatric acute care services are the least restrictive available alternative."  (*Id.*)  Plaintiffs note that this Order did not "grant Aurora *carte blanche* to conduct whatever treatment it may so desire."  (Doc. 159 at 8).  However, Dr. Mlak and Aurora received consent from DCS to give Daughter Haldol via Aurora's "Informed Consent for Adolescent Medication" form.[6]  (Doc. 154-19 at 2).  In fact, it was not until October 17, 2018, that Juvenile Court ordered Daughter's providers communicate with Mother and consider her input.  (Doc. 151-3 at 30).

Dr. Mlak began Daughter's Haldol treatment after the Juvenile Court's September 4th Order without talking to Mother on September 7, 2018, and increased her dosage on September 10th.  On September 11th he noted that Daughter had "muscle rigidity" and prescribed her Cogentin for her EPS.  (Doc. 151 at 4–5; *see also* Doc. 151-2 at 78 ("mother

---

[6] Mother did not sign the informed consent form.  (Doc. 154-19 at 2).

has not responded to author attempts to establish contact")).  The next day, Dr. Mlak noted that the EPS was resolving and he was able to speak with Mother for the first time.  (*Id.* at 5).  From September 7th through the 12th, Dr. Mlak was unable to reach Mother—although he notes that he tried to.  (*See id.*)

While Plaintiffs' rights to familial association and to refuse medical treatment are fundamental rights, *Mueller*, 700 F.3d at 1186, these rights must bend when authorized by a court order or where a parent refuses necessary medical care for a child.  *See Lamorie*, 485 F. Supp. 3d at 1070.  The Juvenile Court affirmatively found that Daughter was "a danger to self or others, and requires inpatient psychiatric acute care services." (Doc. 151-2 at 65).  It had found that she was a "dependent child in the care custody and control of DCS." (Doc. 154-16 at 2).  In this instance, Arizona law specifically allows for health care providers to administer medication stabilization to children admitted for inpatient psychiatric acute care services.  A.R.S. § 8-271(8), 8-727(J).

The facts of this case involve  circumstances where Plaintiffs' asserted rights must "step aside."  *Pope*, 719 F. Supp. 3d at 1087.  The Juvenile Court affirmatively found that Daughter was a danger to herself or others and that "temporary custody of the child is clearly necessary to prevent abuse pending the hearing on the dependency petition." (*See e.g.*, Doc. 154-17 at 2; Doc. 151-1 at 152).  The Juvenile Court also held a temporary custody hearing on August 21, 2018, where Mother was afforded a process in which to object to DCS' custody over Daughter. (Doc. 151-1 at 150).  The Juvenile Court ultimately found that Daughter should remain "a temporary ward of the Court, committed to the care, custody and control of the Department of Child Safety." (*Id.* at 152).  So, this was a situation where the State lawfully interfered with Plaintiffs' right to familial association.  *See Pope*, 719 F. Supp. 3d 1087.

Furthermore, in providing medical attention to Daughter, Dr. Mlak attempted to notify Mother, obtained a court order in advance of treatment, and Mother was allowed to visit Daughter.  *Pope*, 719 F. Supp. 3d at 1087.  Plaintiffs do not argue that Dr. Mlak or Aurora prevented Mother from being "nearby the medical event"—only that Mother

"retained the right to make informed decisions as to whether her daughter should be medicated with an antipsychotic medication." (Doc. 159 at 24–25). Based on the record before it, the Court finds that DCS provided Plaintiffs' with fundamentally fair procedures. So, because Plaintiffs cannot substantiate their argument that a constitutional deprivation occurred here, the Court will grant summary judgment in favor of Defendant Mlak on the Section 1983 claim. *Keates*, 883 F.3d at 1236.

There being no genuine dispute of material fact as to whether Plaintiffs suffered a constitutional deprivation, the Court finds that Defendant Mlak is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp.*, 477 U.S. at 322–23.

## IV. The Court Will Remand Plaintiffs' Remaining State Law Claims

The Court declines to exercise supplemental jurisdiction of Plaintiff's remaining state law claims. Generally, when all federal claims have been resolved before trial, and only state law claims remain to be tried, a federal court should decline to exercise supplemental jurisdiction. *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010); *Avelar v. Youth and Family Enrichment Servs.*, 364 F. App'x 358, 359 (9th Cir. 2010) ("We have frequently recognized that when federal claims are dismissed before trial, supplemental state claims should ordinarily also be dismissed). A district court has the discretion to decline to exercise supplemental jurisdiction if:

> i. the claim raises a novel or complex issue of State law,
>
> ii. the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> iii. **the district court has dismissed all claims over which it has original jurisdiction**, or
>
> iv. in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c) (emphasis added). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–*

*Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988), *superseded on other grounds by statute as recognized in Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 557 (10th Cir. 2000). *See also United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966) (explaining that justification for supplemental jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants"); *San Pedro Hotel Co. v. City of Los Angeles*, 159 F.3d 470, 478 (9th Cir. 1998) (holding that the district court must "articulate why the circumstances of [the] case are exceptional" under the fourth provision, but "any similar explanation" is not required under the first three provisions) (citations omitted).

This matter came to the Court via the State Defendants' removal from Arizona state court.  (Doc. 1).  Now, after granting summary judgment on Defendant Mlak's Section 1983 claim related to their due process rights, the only remaining claims are state law causes of action for: (1) medical malpractice against Dr. Mlak (Count XX) (Doc. 17 at ¶¶ 432–35); (2) assault and battery against both Defendants (Count XXI) (*id*. at ¶¶ 436–46); and (3) negligence against both Defendants (Count XXIII) (*id*. at ¶¶ 451–54).  Having considered the relevant factors, the Court finds that their balance does not tip in favor of this Court retaining the state-law claims, and will therefore remand them to the state court with the Summary Judgment Motions still pending.  *See* 28 U.S.C. § 1367(c)(3).  Notably, Defendant Aurora's Motions ask the Court to examine the applicability of A.R.S. § 8–531 and whether "only" Daughter's parents could consent to the Haldol treatment under her assault and battery claim—an examination that is better suited for the State Court as it is a complex, and perhaps novel, issue of Arizona state law.  (Docs. 151 at 15 & 152 at 5); *see also*  28 U.S.C. § 1367(c)(i).

Accordingly,

**IT IS ORDERED** that Defendant Mlak's Motion for Summary Judgment (Doc. 151) is **GRANTED in part** and **DENIED in part**.  The Court will enter summary judgment for Defendant Mlak on Plaintiffs' Claim XV for conspiracy to violate Plaintiffs' due process rights in violation of 42 U.S.C. § 1983.  The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims, however, and will remand the

rest of this action to the Maricopa County Superior Court.

**IT IS FURTHER ORDERED** that Defendant Aurora's Motion for Summary Judgment (Doc. 152) and Plaintiffs' Motion for Partial Summary Judgment (Doc. 154) are **DISMISSED, without prejudice** to refile in the state court action.

**IT IS FINALLY ORDERED** that the remainder of this matter shall be **REMANDED** to the Maricopa County Superior Court of Arizona.

Dated this 31st day of March, 2025.

Honorable Diane J. Humetewa
United States District Judge